UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

-----------------------------------------------------------------X

MARK J. PATANE, JULIE HARDING,
HEATHER HARRIGAN, STEPHEN S.
SHAPIRO, CATHERINE PORTER,
ERICA RUSSELL, TINA MORETTI,
BRIDGET KOPET, JENNIFER S. COLE,
BENJAMIN A. FLETCHER and
DIANE BOGDAN, Individually and
on Behalf of All Others Similarly Situated,

                        Plaintiffs,

         -v-

NESTLE WATERS NORTH AMERICA, INC.

                     Defendant.

-----------------------------------------------------------------X

Case

Hon.

ECF Case

CLASS ACTION

**COMPLAINT**

DEMAND FOR JURY TRIAL

AUGUST 15, 2017

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................1

SUMMARY OF PLAINTIFFS' FACTUAL ALLEGATIONS ....................................9

PARTIES ..........................................................................................................13

JURISDICTION AND VENUE ............................................................................20

GOVERNING FDA BOTTLED WATER REGULATIONS ....................................20

FACTUAL ALLEGATIONS ................................................................................35

    I.    Defendant Obtained its Spring Water Permits in Maine
          Improperly Without Meeting the FDA's Identity Standard..................36

    II.   Defendant's False and Deceptive Product Labels ..................................39

    III.  Fundamental Concepts of Hydrogeology ..............................................43

    IV.   Commercial Wells and Well-Related Hydrology ..................................54

    V.    The Maine Geological Survey ..............................................................58

    VI.   Defendant's Eight Groundwater Collection Sites Do Not
          Contain Real Springs, and Its Wells Do Not Produce Genuine
          "Spring Water" that Meets the FDA's Identity Standard ......................62

          A.   The "Poland Spring" Is Not a Source of Water Used in Defendant's
               Poland Spring Water Products, and the Water Collected by Wells at
               Defendant's Poland Spring, Maine Site Is Not Spring Water ..................62

          B.   Water Collected at Defendant's "Clear Spring" Site in Hollis
               Is Not Spring Water Because the Clear Spring Is Man-Made ................105

          C.   Water Collected at Defendant's "Garden Spring" Site in Poland Is
               Not Spring Water, and the Garden Spring Is Not a Genuine Spring .......141

          D.   Water Collected at Defendant's "Evergreen Spring" Site in
               Fryeburg Is Not Spring Water, and the Evergreen Spring
               Is Not a Genuine Spring..........................................................................170

          E.   Water Collected at Defendant's "Cold Spring" Site in Denmark
               Is Not Spring Water, and No Genuine Spring Exists at that Site ............192

        F.      Water Collected at Defendant's "White Cedar Spring"
Site in Dallas Plantation Is Not Spring Water, and the
White Cedar Spring Does Not Naturally Exist ..........................................220

        G.      Water Collected at Defendant's "Spruce Spring"
Site in Pierce Pond Is Not Spring Water, and the
Spruce Spring Does Not Genuinely Exist.................................................240

        H.      Water Collected at Defendant's "Bradbury Spring"
Site in Kingfield Is Not Spring Water, and the
Bradbury Spring Is Not a Genuine Spring ................................................259

    VII.   Maine's Compromised Spring Water Regulatory Process .................................277

    VIII.  All Statutes of Limitations are Tolled...................................................................280

CLASS ALLEGATIONS ...............................................................................................282

CLAIMS BROUGHT ON BEHALF OF THE NATIONWIDE CLASS....................................287

    Count I – Fraud ........................................................................................................287

    Count II – Breach of Contract ...................................................................................289

CLAIMS BROUGHT ON BEHALF OF THE STATE SUB-CLASSES ..................................290

    Count III – Violations of the New Jersey Consumer Fraud Act......................................290

    Count IV – Violations of New York General Business Law § 349...................................292

    Count V – Violations of New York General Business Law § 350 ....................................293

    Count VI – Violations of the Connecticut Unfair Trade Practices Act ...........................295

    Count VII – Violations of the Massachusetts Consumer Protection Act........................297

    Count VIII – Violations of the Rhode Island Consumer Protection Act .........................302

    Count IX – Violations of the Vermont Consumer Fraud Act..........................................306

    Count X – Violations of the New Hampshire Consumer Protection Act .......................310

    Count XI – Violations of the Maine Unfair Trade Practices Act
and the Maine Uniform Deceptive Trade Practices Act .................................................315

PRAYER FOR RELIEF and DEMAND FOR JURY TRIAL ...................................................319

Plaintiffs Mark J. Patane, Julie Harding, Heather Harrigan, Stephen S. Shapiro, Catherine Porter, Erica Russell, Tina Moretti, Bridget Kopet, Jennifer S. Cole, Benjamin A. Fletcher and Diane Bogdan, each individually and as class representatives on behalf of all similarly situated persons or entities (collectively, "Plaintiffs"), on knowledge as to their own status and actions and otherwise upon information and belief based on their counsels' investigation, allege for their complaint against Nestle Waters North America, Inc. ("Nestle Waters" or "Defendant") as follows (pages 1 to 13 summarize Plaintiffs' claims and factual allegations; pages 14 to 321 particularize them and state Plaintiffs' causes of action):

## INTRODUCTION

1.      Companies doing business in the United States are legally compelled to tell the truth about the nature of the goods they sell to American consumers.  Mislabeling or otherwise misrepresenting a product as being something it is not, and thereby deceiving and misleading consumers into purchasing that product or paying more for it than they would if the product was accurately labeled, is unlawful.  Defendant Nestle Waters, a unit of the giant Swiss food and beverage conglomerate Nestle, S.A., has long violated this fundamental principle with respect to its Poland Spring® brand "100% Natural Spring Water" product line (hereafter, "Poland Spring Water").  As to that product line, breaching and exploiting its customers' trust to reap massive undue sales and profits is Defendant's entire business model.

2.      For more than twenty years, Nestle Waters' marketing and sales of Poland Spring Water has been a colossal fraud perpetrated against American consumers.  To consumers, "spring water" from a naturally occurring spring signifies purity and high quality and commands a premium price compared to Defendant's non-spring drinking water products or filtered tap water.  To illicitly capture that premium, Defendant, since it began selling the Poland Spring

brand in 1993, has bottled common groundwater and illegally mislabeled it as "100% Natural Spring Water."

3.      Not one drop of Poland Spring Water emanates from a water source that complies with the Food and Drug Administration ("FDA") definition of "spring water."  Each year Defendant misidentifies hundreds of millions of gallons of Poland Spring Water as "spring water," and for many years it has misrepresented on every Poland Spring Water label that the water in the bottle came from one or more of eight purported "natural springs" in Maine.

4.      Rather than being "100% Natural Spring Water" as Defendant's labels advertise, and rather than being collected from pristine mountain or forest springs as the images on those labels depict, Poland Spring Water products all contain ordinary groundwater that Defendant collects from wells it drilled in saturated plains or valleys where the water table is within a few feet of the earth's surface.  The vast bulk of that groundwater is collected from Maine's most populous counties in southwestern Maine, only a short distance from the New Hampshire border.

5.      FDA regulations require all bottled spring water to be collected either at the source of a naturally occurring spring or from a well that extracts water that could otherwise exit the earth's surface from a natural spring if not drawn from the well.  In hydrogeological parlance, all such well water must be "hydraulically connected" to a genuine spring.  All such well water also must have "the same" physical and chemical characteristics as the water emerging from the spring.  Not one ounce of Defendant's Poland Spring Water complies with the law's mandates.

6.      None of Defendant's eight purported "natural spring" sites contains a genuine spring under FDA rules.  Defendant produces *nearly one billion gallons* of alleged "spring water" a year.  To produce that much water naturally, Defendant's eight alleged springs *each* would have to flow at an average rate of 245 gallons per minute, or more forcefully than a 2-inch

2

diameter fire hose at 40 pounds per square inch.  Such a spring would be plainly visible – more like a geyser than a spring – and undoubtedly well known.  Yet there is *no* photographic proof that even one such spring – much less eight – exists on or near Defendant's sites in Maine.  Nor is there *any* historical evidence for six of Defendant's alleged springs, and two are former springs that no longer exist.  The famous Poland Spring in Poland Spring, Maine, which Defendant's labels claim is a source of Poland Spring Water, ran dry nearly 50 years ago, decades before Defendant bought the Poland Spring brand name.  The "spring" Defendant now claims exists in Poland Spring is at the bottom of a lake.  It has never been proven to exist, and the evidence that Defendant itself filed with Maine regulators shows it does not exist.  Because the Poland Spring is not a source of its products, Defendant's use of the "Poland Spring" brand name is unlawful.

7.     To feign compliance with FDA regulations, Defendant has gone so far as to build or maintain phony, man-made "springs" at *all seven* of its other sites.  Defendant has created artificial springs (i) by causing well water to flow artificially through pipes or plastic tubes into wetlands that contain no genuine springs; (ii) by inserting small wells into the ground to tap the water table and artificially force groundwater to the surface; and (iii) by maintaining excavated pits in the ground that intercept the water table to form man-made pools.  (*See* paragraphs 351-359, 467-486, 568-574, 634-635, 703-704, 717-719, 759-765, 775, 820-827 below.)  At its eighth site, Defendant uses a machine to sustain the defunct Poland Spring.  (*See* paragraph 213.)

8.     Artificial man-made "springs" do not satisfy FDA standards.  Genuine springs must have a "natural orifice" through which water "flows naturally" to the surface, *without* human assistance.  By faking the existence of springs, Defendant is defrauding its consumers.

9.     Many wells at Defendant's purported "spring" sites, furthermore, are close enough to swamps, bogs, streams, lakes, ponds or other bodies of surface water to induce water

from them into the wells if they are pumped at sufficient rates.  Under FDA rules, groundwater mixed with surface water is not "spring water."  And in certain circumstances it may not be lawfully used in any bottled drinking water products at all.

10.    Unknown to the general public, one or more wells at each of Defendant's six largest volume groundwater collection sites in Maine – which in recent years have collectively supplied up to 99% of the water in Poland Spring Water products – are near a present or former human waste dump, refuse pit, landfill, ash pile, salt mound, farm where pesticides were previously used, fish hatchery or toxic petroleum dump site.  Such areas are near all four of Defendant's most productive well sites – those in Poland Spring, Hollis, Poland and Fryeburg, from which Defendant collectively pumps 80% of its Poland Spring Water.

11.    In Poland Spring, all of Defendant's wells are near standing bodies of water, including a lake with a nearby recreational beach and a kettle pond next to a now-buried refuse pit, which had served as a nearby resort's garbage dump for nearly 200 years.  Several wells are also directly downhill from the resort's former "spray irrigation" field, a wooded area that was long-used as the resort's septic system, into which it sprayed its guests' human excrements.

12.    While Poland Spring Water products are not frequently contaminated because Defendant disinfects – and in some cases has purified – the groundwater it collects, Poland Spring Water labels are misleading under FDA rules because, in addition to falsely advertising that the bottles contain "100% Natural Spring Water" purportedly sourced from natural springs, the labels depict pristine scenes of water flowing down a verdant hillside or a forest pond to convey an image of natural purity when, in fact, the vast bulk of the water is drawn from wells in low-lying populated areas near potential sources of contamination.  The labels are also deceptive to the extent Defendant purifies the water.  If consumers knew where Defendant's wells were

actually located, rather than being misled by Defendant's falsely reassuring labels depicting pristine scenes, and knew the extent to which Defendant treated or purified the water, they would not buy, or would not pay premium prices for, Poland Spring Water products.

13.     At all of its well sites, Defendant conceals the fact that it is collecting ordinary groundwater rather than natural spring water.  Defendant shields all of its source wells and purported "springs" from public view, behind trees or shrubs and locked fences and gates marked with "No Trespassing," "Private Property" or other warning signs to fend off scrutiny. Although four of Defendant's pumping stations for loading water tankers are visible from the street, there are no signs at or near Defendant's well sites or pumping stations notifying the public that Poland Spring brand purported "spring water" is being collected there or that Poland Spring Water wells are in the area.

14.     Through its more than two decades-long pattern of deception, Defendant has built its Poland Spring Water brand into the country's largest bottled spring water brand.  Poland Spring Water's market share exceeds 50% in its primary marketing region, the northeastern United States.  Poland Spring Water sales in the U.S. were approximately $400 million in 2007 and have been between $300 million and $900 million annually for each of the past nine years. Currently, at least 13 million consumers nationwide buy Poland Spring Water under false and deceptive circumstances every year.

15.     Defendant's consumer fraud-based business model for Poland Spring Water has enabled it to unduly penetrate and profit from the bottled spring water market in three ways. First, by falsely labeling its bottled groundwater as "100% Natural Spring Water," Defendant captures consumers of premium water who are willing to pay premium prices, taking market share from bottlers of genuine spring water.  Through economies of scale, in fact, Defendant

5

captures an extraordinarily large share of that market because it can produce massive volumes of its groundwater products – now about a billion gallons per year – that most bottlers of genuine spring water cannot match due to geophysical and hydrogeological limitations on the volume of water that feeds most natural springs.  These economies of scale enable Defendant to charge lower, but still premium, prices that genuine spring water purveyors also cannot match.

16.    Second, by charging a lower premium, Defendant also captures consumers of other premium water products, such as mineral water or artesian well water, who switch to Poland Spring Water because it is priced more attractively than their current premium water.

17.    Third, Defendant lures consumers of lower cost purified water or other bottled drinking water products, as well as filtered tap water consumers, who are willing to pay more to buy supposedly premium "spring water" at what they think is a favorable price.

18.    Defendant's deceptive business strategy is becoming ever more successful. Pallets of Poland Spring Water have become ubiquitous on the floors of grocery store chains, wholesale discount clubs and convenience stores in many areas in the northeast.  Even some gas station convenience stores are selling many cases of Defendant's Poland Spring Water a day and carry comparatively small supplies of competing premium or purified water products.  Defendant recently lowered its premium to compete more directly with bottlers of private label (store brand) spring water and purified water, enabling retailers to charge only a few dollars more per case for supposedly premium Poland Spring Water than for these other bottled drinking water products. Defendant then raised its prices after capturing additional market share.

19.    In short, Defendant's fraudulent sale of ordinary groundwater as "spring water" has enabled its Poland Spring Water to become the dominant brand in a market in which it does not even belong – the bottled spring water market.  Poland Spring Water is ordinary well water

6

or purified water that legally should be labeled as such.  If Defendant's product were lawfully labeled, it would compete in the bottled drinking water or purified water market, not the bottled spring water market.  Defendant's fraudulent presence in the latter market not only misleads its consumers, it distorts the entire spring water marketplace and deprives legitimate spring water sellers of their rightful shares of 50% of that market in the Northeast United States.

20.    Defendant's Poland Spring Water is sold to two categories of consumers:  the "PET" or "retail" market, which refers primarily to the polyethylene terephthalate plastic bottles (ranging from eight ounces to 2.5 gallons) that are sold to consumers in supermarkets, food stores, other retail stores, and vending machines, and the "Home & Office" market, consisting of the five-gallon or other returnable containers that are delivered to customers directly and used primarily in water coolers.  Five-gallon jugs are now also sold in the PET market.

21.    To end Nestle Waters' long-running fraud and deceptive business practices, Plaintiffs bring this proposed class action on behalf of all consumers of Poland Spring Water nationwide who have purchased Poland Spring Water since November 5, 2003 (the "Class Period"), excluding Defendant's own personnel and agents (the "Class"), as well as on behalf of a sub-class of Home & Office consumers and eight sub-classes of PET market consumers in the brand's primary marketing territory consisting of the northeastern states of New Jersey, New York, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire and Maine (collectively, the "Sub-Classes").

22.    Plaintiffs seek monetary and injunctive relief based on Defendant's violations of those states' false advertising and consumer protection laws and based on Defendant's nationwide breaches of contract and fraud arising from Defendant's false and deceptive labeling and sale of Poland Spring Water as "100% Natural Spring Water."

7

23.     Defendant's false and misleading labels have caused Plaintiffs and members of the Class to overpay for Poland Spring Water in both the PET and Home & Office markets. Poland Spring Water historically has cost materially more per bottle and per gallon than Defendant's own alternative non-spring water product – Nestle Pure Life® brand purified water, some of which is drawn from the same aquifers and bottled in the same plants as Poland Spring Water – and more than what consumers would have paid if Defendant had properly labeled it instead of falsely calling it spring water.  Plaintiffs and the Class have overpaid for Poland Spring Water and are entitled as damages to refunds of the unjustified premiums they have paid or, alternatively, to minimum statutory penalties under state false advertising laws.

24.     The premiums paid by Poland Spring Water purchasers recently have been $0.65 per gallon or more in the retail PET market and $0.20 per gallon in the Home & Office market.

25.     Plaintiffs and the Class are also entitled to permanent injunctive relief compelling Defendant to remove its unlawfully labeled Poland Spring Water products from retail store shelves.  Defendant should also be precluded on all future product labels from referring to "100% Natural Spring Water," from using the "Poland Spring" brand name, and from depicting misleading pristine mountain or forest spring scenes.  (Defendant's misleading labels appear at paragraph 125 below.)  Plaintiffs and the Class are exposed to future harm from Defendant's unlawful activities because, among other reasons, many smaller retailers, such as doughnut shops, delicatessens and pizzerias, sell no bottled water products other than Poland Spring Water, either by choice or because they have exclusive contracts with Defendant.  Plaintiffs and Class members who shop at those stores and want or need to buy bottled water have no option but to buy, and to overpay for, Defendant's mislabeled product.  Permanent injunctive relief, therefore, is both appropriate and necessary.

## SUMMARY OF PLAINTIFFS' FACTUAL ALLEGATIONS

26.     As described in detail below, Defendant Nestle Water's Poland Spring Water products are falsely advertised and sold fraudulently to consumers because they do not comply with the FDA's "standard of identity" for spring water, which defines genuine spring water and specifies the manner in which spring water must be "collected" (or extracted) from the earth.

27.     Poland Spring Water does not meet the FDA's three-part definition of spring water, and it is not collected in conformity with the agency's requirements for extracting spring water from the earth.  Specifically, (i) none of Defendant's groundwater collection wells in Maine is hydraulically connected to water that flows from the natural orifice of a genuine spring; (ii) none of Defendant's Poland Spring Water contains water that is collected from the same underground stratum that feeds a natural spring; and (iii) none of Defendant's Poland Spring Water products contains water that is has the same physical, chemical and quality characteristics as water that flows from the natural orifice of a genuine spring.

28.     Defendant's Poland Spring Water, therefore, does not qualify as "spring water" and cannot be lawfully labeled or sold as "spring water," much less as "100% Natural Spring Water."  Those products instead must be labeled and sold as "bottled water," "drinking water," "well water," or, perhaps, as "purified water" or a particular type of purified water.

29.     Some of Defendant's groundwater sources cannot be used in *any* bottled drinking water products at all under FDA regulations because they are "under the direct influence of surface water" such as swamps, bogs, lakes, ponds, rivers and streams.

30.     Defendant's Poland Spring Water labels are also false and misleading because they do not disclose, as the FDA requires, that some of the water in Poland Spring Water is sourced from a municipal water system that supplies tap water in Fryeburg, Maine.

9

31.     Defendant's Poland Spring Water labels are also false and deceptive because most of the labels misleadingly depict a pristine stream flowing down a verdant hillside or a forest pond, which deceives consumers into believing that Poland Spring Water is produced from naturally pure sources far from potential pollutants when, in fact, the vast bulk of the groundwater used in Poland Spring Water comes from densely populated areas that are potentially susceptible to contamination from human waste, dump sites, chemical fertilizers, salts and other pollutants.

32.     None of Defendant's eight commercial well sites in Maine from which Defendant sources its Poland Spring Water qualifies as a legitimate spring water source under FDA rules, and none of the eight produces water that meets the FDA's standard of identity for spring water.

33.     Defendant's "Poland Spring" site in Poland Spring, Maine fails the FDA's spring water standard of identity because (i) its eight wells there are not hydraulically connected to a genuine natural spring – Defendant asserts that those wells are connected to "subaqueous springs" in the middle of a lake, but it has never proven by valid scientific means that such springs exist; (ii) the water collected by its wells is not from the same underground strata as the groundwater that discharges into its alleged lake-bottom springs; (iii) the water collected by its wells does not have the same chemical and physical composition as the water discharging into the alleged springs; (iv) most or all of its eight wells draw in surface water, which cannot legally be called spring water; and (v) Defendant has in the past demineralized some of its wells' water via purification processes and may still do so, disqualifying it from being called spring water. (*See* paragraphs 189-344 below.)

34.     Defendant's "Clear Spring" site in Hollis, Maine fails the FDA's spring water standard of identity because (i) its six wells there are not hydraulically connected to a genuine

10

natural spring – Defendant has created artificial "springs" there using small wells and plastic tubing to induce groundwater to flow into a wetland area that contains no genuine springs; (ii) the water collected by its wells is not from the same underground strata as the groundwater that discharges into its alleged springs; (iii) the water collected by its wells does not have the same chemical and physical composition as the water discharging into the alleged springs; and (iv) Defendant has in the past demineralized at least one Hollis well's water via purification processes and may still do so, disqualifying it from being called spring water.  (*See* paragraphs 345-458 below.)

35.     Defendant's "Garden Spring" site in Poland, Maine fails the FDA's spring water standard of identity because (i) its two wells there are not hydraulically connected to a genuine natural spring – Defendant's alleged "springs" there are man-made, created when someone digging a gravel pit struck the water table; (ii) there is no evidence that the water collected by its wells is from the same underground strata as the groundwater that discharges into its alleged springs; (iii) the water collected by its wells does not have the same chemical and physical composition as the water discharging into the alleged springs; and (iv) one or both wells draw in surface water, which cannot legally be called spring water.  (*See* paragraphs 459-548 below.)

36.     Defendant's "Evergreen Spring" site in Fryeburg, Maine fails the FDA's spring water standard of identity because (i) its well there is not hydraulically connected to a genuine natural spring – Defendant's alleged "spring" there is a man-made pond that intersects the water table and is fed by a small well or pipe; (ii) the water collected by its well is not from the same underground strata as the groundwater that discharges into its alleged spring; (iii) the water collected by its wells does not have the same chemical and physical composition as the water discharging into the alleged springs; (iv) its well draws in surface water, which cannot legally be

11

called spring water; and (v) Defendant leases its well and purchases its water from a public utility that supplies Fryeburg's tap water, yet Defendant fails to disclose on its Poland Spring Water labels that the water is sourced in part from a "municipal source," as FDA rules require. (*See* paragraphs 548-619 below.)

37.     Defendant's "Cold Spring" site in Denmark, Maine fails the FDA's spring water standard of identity because (i) its two wells there are not hydraulically connected to a genuine natural spring – Defendant has created artificial "springs" there using small wells to induce groundwater to flow into a wetland area that contains no genuine springs; (ii) the water collected by its wells is not from the same underground strata as the groundwater that discharges into its alleged springs; and (iii) the water collected by its wells does not have the same chemical and physical composition as the water discharging into the alleged "springs." (*See* paragraphs 620-689 below.)

38.     Defendant's "White Cedar Spring" site in Dallas Plantation, Maine fails the FDA's spring water standard of identity because (i) its two wells there are not hydraulically connected to a genuine natural spring – Defendant has created artificial "springs" there using small wells to induce groundwater to flow into a man-made pond, which was formed when a railroad berm was built through a wetland that contains no genuine springs; (ii) the water collected by its wells does not have the same chemical and physical composition as the water discharging into the alleged springs; and (iii) one or both wells appear to draw in surface water, which cannot legally be called spring water. (*See* paragraphs 690-743 below.)

39.     Defendant's "Spruce Spring" site in Pierce Pond Township, Maine fails the FDA's spring water standard of identity because (i) its two wells there are not hydraulically connected to a genuine natural spring – Defendant has created artificial "springs" there using

12

small wells to induce groundwater to flow along a stream bed that contains no genuine springs near the wells; and (ii) there is no evidence that the water collected by its wells has the same chemical and physical composition as the water discharging into the alleged springs.  (*See* paragraphs 744-791 below.)

40.     Defendant's "Bradbury Spring" site in Kingfield, Maine fails the FDA's spring water standard of identity because (i) its five wells there are not hydraulically connected to a genuine natural spring – there, Defendant calls seasonal streams "springs" and has created in at least one such stream an artificial "spring" by piping water from a nearby well into the stream; (ii) the water collected by its wells does not have the same chemical and physical composition as the water discharging into the alleged springs; and (iii) several of the five wells appear to draw in surface water, which cannot legally be called spring water.  (*See* paragraphs 792-849 below.)

41.     Because none of Defendant's eight alleged spring water collection sites in Maine produces genuine spring water under FDA rules, Defendant's labels claiming its Poland Spring Water products contain "100% Natural Spring Water" are false and misleading.

## PARTIES

42.     The Plaintiffs and proposed Class Representatives are:

a.      Mark J. Patane, a resident of Vermont who has since November 5, 2003 purchased hundreds of dollars of Poland Spring Water at retail prices in the PET market. Between 2003 and 2009, he bought one or two 2.5- or 5-gallon  jugs a month from local grocery stores for use in his in-home water cooler.  Afterwards, he typically purchased a case at a time from Hannaford's supermarket and other locations.  He bought Poland Spring Water because he believed based on its "100% Natural Spring Water" labels that it was pure, natural and healthy and was, therefore, willing to pay more for it.  Had he

known that Poland Spring Water was ordinary groundwater rather than "100% Natural Spring Water" he would not have purchased Poland Spring Water and would have consumed lower cost bottled water products or filtered tap water, or he would have paid less for Poland Spring Water had it been properly labeled as groundwater, well water, purified water or drinking water.  Sometimes he has had no choice but to buy Poland Spring Water because it is the only available option.

       b.      Julie Harding, a resident of New York who has purchased thousands of dollars of Poland Spring Water since November 5, 2003.  She purchased three to five 5-gallon jugs per month in the Home & Office market through September 2007 (paying as much as $9.50 per bottle).  In the PET market, she bought Poland Spring Water at her local food store, Met Foods (now Key Foods), including: 2.5-gallon bottles (most recently for $4.59 each); one-gallon bottles ( $1.99 each); one-liter bottles ( $1.29 each); and, twice a year, two to three 12-packs of 8-ounce bottles ($2.99 per package).  She has also purchased Poland spring Water many times at her local delicatessen, either the 700-milliliter "sport" bottle (for about $2.00) or the half-liter bottle (for about $1.00).  She bought Poland Spring Water because she believed based on its "100% Natural Spring Water" labels that it was pure, natural and healthy and was, therefore, willing to pay more for it.  Had she known that Poland Spring Water was ordinary groundwater rather than "100% Natural Spring Water" she would not have purchased Poland Spring Water and would have consumed lower cost bottled water products or filtered tap water, or she would have paid less for Poland Spring Water had it been properly labeled as groundwater, well water, purified water or drinking water.  Sometimes she has no choice but to buy Poland Spring Water in the PET market because it is the only available option.

14

c.      Heather Harrigan, a resident of New York and a former resident of New Jersey.  Since November 5, 2003, she has purchased hundreds of dollars of Poland Spring Water at retail prices in the PET market at various retail stores and, recently, from the home delivery service Fresh Direct, which did not sell competing spring water products. Over the past few years, she has purchased at least one bottle per week for herself or her children, including the "sport" bottle and the one-gallon bottle.  When she lived in New Jersey in and around 2010, she bought one or more 5-gallon jugs per month in the Home & Office market.  She bought Poland Spring Water because she believed based on its "100% Natural Spring Water" labels that it was pure, natural and healthy and was, therefore, willing to pay more for it.  Had she known that Poland Spring Water was ordinary groundwater rather than "100% Natural Spring Water" she would not have purchased Poland Spring Water and would have consumed lower cost bottled water products or filtered tap water, or she would have paid less for Poland Spring Water had it been properly labeled as groundwater, well water, purified water or drinking water. Sometimes she has no choice but to buy Poland Spring Water in the PET market because it is the only available option.

d.      Stephen S. Shapiro, a resident of New York and formerly of New Jersey who has purchased Poland Spring Water in the Home & Office market since 2006.  Each month from October 2006 through October 2016, he purchased two 5-gallon jugs (paying $8.49 per bottle in 2006) and two cases of twenty-four half-liter bottles (paying $8.99 per case in 2006) of Poland Spring Water for his family.  Had he known that Poland Spring Water was ordinary groundwater rather than "100% Natural Spring Water" he would not have purchased Poland Spring Water and would have consumed lower cost bottled water

15

products or filtered tap water, or he would have paid less for Poland Spring Water had it been properly labeled as groundwater, well water, purified water or drinking water. Sometimes he has had no choice but to buy Poland Spring Water in the PET market because it is the only available option.

e.          Catherine Porter, a resident of New Jersey who has since November 5, 2003 purchased hundreds of dollars of Poland Spring Water at retail prices in the PET market.  Until February 2016, she purchased one 2.5-gallon bottle every two or three weeks at her local A&P (now ACME) supermarket.  She bought Poland Spring Water because she believed based on its "100% Natural Spring Water" labels that it was pure, natural and healthy and denoted safe, clean drinking water.  Had she known that Poland Spring Water was ordinary groundwater rather than "100% Natural Spring Water" she would not have purchased Poland Spring Water products and would have consumed filtered tap water, or she would have paid less for Poland Spring Water had it been properly labeled as groundwater, well water, purified water or drinking water. Sometimes she has had no choice but to buy Poland Spring Water in the PET market because it is the only available option.

f.          Erica Russell, a resident of New Jersey who has since November 5, 2003 purchased hundreds of dollars of Poland Spring Water in the PET market.  She purchased at least three to four bottles weekly between 2006 and 2016 from local Seven-Eleven and Wawa stores and, in recent years, purchased 24-bottle packages from grocery stores every two weeks.  She bought Poland Spring Water because she believed based on its "100% Natural Spring Water" labels that it was pure, natural and healthy and denoted safe, clean drinking water.  Had she known that Poland Spring Water was ordinary

groundwater rather than "100% Natural Spring Water" she would not have purchased Poland Spring Water products and would have consumed filtered tap water, or she would have paid less for Poland Spring Water had it been properly labeled as groundwater, well water, purified water or drinking water.  Sometimes she has had no choice but to buy Poland Spring Water in the PET market because it is the only available option.

g.      Tina Moretti, a resident of New Jersey, a former resident of New York and a part-time resident of Rhode Island between 2005 and 2013.  Since November 5, 2003 she has purchased hundreds of dollars of Poland Spring Water in the PET market, buying a case of 24 half-liter bottles every two weeks and, since 2014, at least once a month. While in New York, she had the cases delivered by Fresh Direct.  In Rhode Island, she bought the cases at her local Shaw's supermarket and also bought Poland Spring Water at her local CVS Drug Store.  Since moving to New Jersey, she has purchased Poland Spring Water from her local Shop-Rite grocery store.  She bought Poland Spring Water because she believed based on its "100% Natural Spring Water" label that it was pure, natural and healthy and denoted safe, clean drinking water.  Had she known that Poland Spring Water was ordinary groundwater rather than "100% Natural Spring Water" she would not have purchased Poland Spring Water and would have consumed filtered tap water, or she would have paid less for Poland Spring Water had it been properly labeled as groundwater, well water, purified water or drinking water.  Sometimes she has had no choice but to buy Poland Spring Water because it is the only available option.

h.      Bridget Kopet, a resident of Connecticut who has since November 5, 2003 purchased hundreds of dollars of Poland Spring Water at retail prices in the PET market. She purchased three to four cases of 16.9-ounce bottles weekly for ten years from local

Stop & Shop, Super Food Mart, Shop-Rite and Costco stores.  She bought Poland Spring Water because she believed based on its "100% Natural Spring Water" labels that it was pure, natural and healthy and denoted safe, clean drinking water.  Had she known that Poland Spring Water was ordinary groundwater rather than "100% Natural Spring Water" she would not have purchased Poland Spring Water products and would have consumed filtered tap water, or she would have paid less for Poland Spring Water had it been properly labeled as groundwater, well water, purified water or drinking water. Sometimes she has had no choice but to buy Poland Spring Water in the PET market because it is the only available option.

i.      Jennifer S. Cole, a resident of Massachusetts who has since November 5, 2003 purchased hundreds of dollars of Poland Spring Water at retail prices in the PET market.  She purchased three to four cases of 16.9-ounce bottles weekly for ten years from local Stop & Shop and Star Market grocery stores.  She bought Poland Spring Water because she believed based on its "100% Natural Spring Water" labels that it was pure, natural and healthy and denoted safe, clean drinking water.  Had she known that Poland Spring Water was ordinary groundwater rather than "100% Natural Spring Water" she would not have purchased Poland Spring Water products and would have consumed filtered tap water, or she would have paid less for Poland Spring Water had it been properly labeled as groundwater, well water, purified water or drinking water. Sometimes she has had no choice but to buy Poland Spring Water in the PET market because it is the only available option.

j.      Benjamin A. Fletcher, a resident of Maine who has since November 5, 2003 bought Poland Spring Water in the PET market, typically a bottle at a time when he

had no choice but to buy Poland Spring Water because it was the only available option. He bought Poland Spring Water because he believed based on its "100% Natural Spring Water" labels that it was pure, natural and healthy.  He would have paid less for Poland Spring Water if it had been properly labeled as groundwater, well water, purified water or drinking water instead of being mislabeled as "100% Natural Spring Water."

      k.     Diane Bogdan, a resident of New Hampshire who has since November 5, 2003 bought Poland Spring Water, usually 23.7-ounce bottles (most recently for $1.49), from local Cumberland stores because its labels claimed it was "100% Natural Spring Water." She would have paid less if it had been properly labeled as groundwater, well water, purified water or drinking water, or not have bought it at all.  Sometimes she has had no choice but to buy Poland Spring Water because it is the only available option.

      43.     Defendant Nestle Waters is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 900 Long Ridge Road, Building 2, Stamford, Connecticut.  Nestle Waters is a business unit of the Swiss multinational conglomerate, Nestle, S.A., the world's largest distributor of food and beverage products.

      44.     Nestle Waters locates, extracts, bottles and distributes under many different labels more than a dozen bottled water, sparkling bottled water and ready-to-drink tea products throughout the United States, including seven different brands of bottled "spring water," of which Poland Spring Water is the leading revenue-generating brand.  Nestle Waters is the third largest non-alcoholic beverage company in the U.S. by volume and the country's leading seller of bottled water products, with total annual sales now exceeding $4.3 billion.  Nestle Waters' bottled water products collectively account for approximately 30% of all U.S. bottled water sales. Nestle Waters sells one billion gallons of Poland Spring brand products a year in the U.S.

## JURISDCTION AND VENUE

45.     This Court has subject matter jurisdiction over this class action pursuant to the

Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because there are at least 100 members

of the proposed class, at least one of whom is a citizen of a different state than Defendant, and

the aggregate claims of the proposed class members exceed five million dollars ($5,000,000.00),

exclusive of interest and costs.

46.     Venue is proper under 28 U.S.C §1391(b)(1) and (c)(2) because Defendant is

subject to personal jurisdiction in, and a resident of, this Judicial District.

## GOVERNING FDA BOTTLED WATER REGULATIONS

47.     The FDA regulates the bottled water industry and prescribes the governing legal

standards for producing, labeling and identifying the sourcing of bottled spring water products.

48.     Under settled authority, the FDA's regulations do not preempt state consumer

protection and false advertising laws or state bottled water regulations unless the state rules seek

to impose stricter standards than those imposed by the FDA, which is not the case for any of the

state laws that Plaintiffs seek to enforce in this action.

49.     The FDA's standards for identifying and labeling bottled drinking water products

were initially adopted in November 1995 and appear currently at 21 C.F.R. § 165.110.

50.     Pursuant to the FDA's regulations, unless an exception applies, bottled water

intended for human consumption must be labeled as "bottled water" or "drinking water."  As

exceptions, bottled water products that meet specific FDA definitions referred to as "standards of

identity" may be labeled as (i) "artesian water"; (ii) "ground water"; (iii) "mineral water";

(iv) "purified water" (which alternatively may be described by the purification method used,

20

such as "distilled water," "deionized water" or "reverse osmosis water"); (v) "sparkling water"; (vi) "spring water"; (vii) "sterilized water"; or (viii) "well water."  21 C.F.R. § 165.110(a)(2).

51.     The FDA's standard of identity ("Identity Standard") for "spring water" defines three necessary characteristics that bottled water must possess before it can be labeled lawfully as spring water.  To be labeled as "spring water," Defendant's Poland Spring Water must be:

> (i) "derived from an underground formation";
>
> (ii) from which "a natural force" causes water to "flow to the surface";
>
> (iii) "through a natural orifice."

21 C.F.R. § 165.110(a)(2)(vi).  In other words, "spring water" must come from an underground water supply that, purely by the forces of nature, discharges flowing water at the earth's surface through a natural, rather than man-made, opening in soils or rock.

52.     To qualify as spring water, the water must "flow" to the surface, meaning it must have a perceptible current at the spring's orifice.  Groundwater that seeps diffusely into a depression in the ground, where the earth's surface intersects with the water table to form a pool, pond, lake, creek, stream, swamp or other wetland, is not a spring under the FDA's spring water Identity Standard.  Such groundwater "seeps" are not springs.  Otherwise, virtually every swamp, pond, lake or stream that is fed in part by diffuse groundwater discharge – even the ocean – would be a "spring."  To call groundwater that seeps diffusely into water table level surface water bodies such as streams, lakes, ponds and swamps a "spring" would enable bottlers to market a vast percentage of Maine's groundwater as "spring water."  That was not the FDA's intent.  The FDA ensured that "spring water" would consist only of water that flowed or could flow perceptibly to the earth's surface through a natural opening in the ground.

21

53.     The FDA's Identity Standard also defines the two exclusive means by which water meeting its three-part definition of spring water must be "collected" (*i.e.*, extracted or drawn) from the earth in order to remain qualified to be labeled as spring water.  Even water that meets the three-part definition cannot legally be called "spring water" unless it is collected by one of these two permissible methods.  The water must be collected:

>        (i) directly "at the spring"; or

>        (ii) through a "bore hole" (*i.e.*, a well) "tapping the underground formation feeding the spring."  *Id.*

54.     Defendant only uses wells to collect groundwater for its Poland Spring Water products.  It does not collect water at any natural or purported spring.

55.     If the water is collected by a well, the FDA Identity Standard also prescribes five collection conditions that must exist for that water to remain qualified to be labeled as spring water.  Even well water that otherwise meets the FDA's three-part definition for spring water cannot legally be labeled "spring water" unless the bottler's wells and water comply with each of these five bore hole collection requirements:

>        (i) the water collected from each bore hole must be "from the same underground stratum as the spring";[1]

>        (ii) there must be "a measurable hydraulic connection using a hydrogeologically valid method between the bore hole and the natural spring";[2]

---

[1]  A "stratum" is a layer of soil or rock that has distinct geophysical properties than the layers above and below it, including differences in mineral composition, grain size and orientation, or color.

[2]  A "hydraulic connection" between a well and a spring is shown, for example, when extracting water through the well at a rate commensurate with the spring's natural flow rate reduces the flow rate or volume of water at the spring.  A hydraulic connection can also be shown if natural or induced "tracer" isotopes travel to both the well and the spring.

(iii) the water must have "all the physical properties, before treatment, ... as the water that flows naturally to the surface of the earth" at the spring;[3]

(iv) the water must be "of the same composition and quality" before treatment as the water flowing naturally to the surface;[4] and

(v) water must continue "to flow naturally to the surface ... through the spring's natural orifice" – that is, if the use of wells stops the spring's natural flow of water, the water collected from the wells cannot be labeled as "spring water."

*Id.*

56.     Given these five collection requirements, simply building a well to draw water from a large aquifer that happens elsewhere to feed a spring does not qualify the well water as spring water.  The wells must tap the aquifer at the same layer, or stratum, from which water flows naturally into the spring, and the well water must be proven by valid scientific means to be interconnected with the water flowing at the spring.  The well water must also be proven by valid means to have all the same physical, chemical and quality characteristics before it is treated as the water that flows from the spring's natural orifice. In aquifers consisting of sand and gravel, like those at Defendant's well sites, the groundwater flow paths that naturally contribute to a spring are typically in the upper sediment layers located at or immediately below the water table, and they are hydraulically distinct from the deeper flow paths that *all* of Defendant's wells tap.

---

[3]  The "physical properties" of water include its color, clarity (or turbidity), temperature, odor and taste.

[4]  The "composition and quality" of water refers to its molecular makeup, including the ratio of free H+ and OH- ions and concentration of H+ ions (*i.e.*, its pH value), its dissolved and suspended mineral content, and its organic compound content, among other things.

57.     The FDA adopted and released its spring water and other bottled water standards of identity on November 13, 1995, and simultaneously published "Supplementary Information" that further clarified the standards and addressed comments the agency had received during its rulemaking notice and comment proceedings.  *See* 60 Fed. Reg. 57,076 (Nov. 13, 1995).

58.     <u>The FDA created a "rigorous" spring water Identity Standard in order to protect consumers</u>.  Based on a consumer survey submitted by a bottled water manufacturer, the FDA stated that it "agrees … with the conclusion … that consumers consider bottled water labeled as spring water to be of a higher quality than other kinds of bottled water."  *Id*. at 57,090.  To protect consumer expectations, the agency determined that the key factor in promoting "honesty and fair dealing," *id*. at 57,076, in the bottled spring water industry was to ensure that spring water manufacturers, such as Defendant, properly define "from where the water comes," *id*. at 57,090.  Consequently, "it is this aspect of the definition that FDA has made most rigorous."  *Id.*

59.     The FDA then expounded upon its "rigorous" requirement that manufacturers properly identify the source of their bottled spring water products in the following ways:

60.     <u>A spring water bottler must be able to identify the spring's "natural orifice"</u>.  The FDA defined "spring water" and "springs" to comport with consumers' perceptions of what the terms mean.  The common understanding of a spring is that of an identifiable orifice, *i.e.*, a visible channel, from which groundwater exits and flows naturally to the surface of the earth.

61.     The FDA requires bottled water manufacturers to prove the existence of an identifiable spring orifice and mandates that water must continue to flow at the spring when the bottlers' commercial wells are pumping groundwater from the earth.  To enable regulators to verify that there is, in fact, "an identifiable spring," the FDA stated that "it is critical that manufacturers of 'spring water' identify the exact location of the natural orifice where the spring

24

flows from the earth." *Id*. at 57,096.  Such information must be maintained by all bottled water manufacturers so they can "provide FDA with this information upon request."  *Id*.

62.     Nestle Waters has not identified the exact location of *any* "natural orifice" of a spring in *any* of its spring water related permit applications to Maine state regulators with respect to *any* of its eight purported spring sites.  Nor has it made available on its websites a single photograph or video of the natural orifice of any of its alleged "springs."  That is because none of Defendant's alleged springs *has* a natural orifice as required by FDA rules.

63.     <u>Well water must have "the same" physical and chemical characteristics – not "substantially" the same – as the water emerging from the spring orifice to be called spring water</u>.  Defendant's chief northeast hydrogeologist, Tom Brennan, has publicly asserted that Defendant's well water can be called spring water if its physical and geochemical characteristics are "substantially the same" as the water from Defendant's purported springs.  That is incorrect. The FDA made clear that "the water collected from a bore hole must be *the same* water that feeds the spring's natural orifice," that is, it must be *identical* to "water that actually flows to the surface."  *Id*. at 57,092.  The dictionary definition of "the same" is "identical," not "substantially the same," "essentially the same," "similar" or "very similar."

64.     The FDA's Supplemental Information repeatedly emphasized that its "rigorous" spring water Identity Standard requires the well water and spring water to be "the same."

65.     The FDA stated unequivocally that bottled water labeled as "spring water" must "always have the same physical properties, composition, and quality as water that flows naturally to the earth" at the spring's orifice.  *Id*. at 57,090.  *See also id*. at 57,091 ("as long as the physical properties, composition, and quality of the water that is captured by a bore hole are the same as those of the water from the same underground formation that flows to the surface, it is

appropriate to label the water as spring water"); *id*. at 57,093 (the well water "must have the same physical properties, quality and composition" as "the water emerging from" the spring's "natural orifice"); *id*. at 57,092 ("if the water collected through the bore hole has different characteristics from the water emerging from the spring orifice, the water is not spring water").

66.     The FDA's aim was to ensure that any spring water that was collected by a well had "traveled the same path" underground "as the water that flows from the natural orifice of the spring" so that there would be no difference – in terms of temperature, taste, color, turbidity, odor, hardness, pH balance, molecular structure, mineral and organic content or any other composition and quality characteristic – between a bottle of water that was collected at the spring and one that was collected from the well.  *Id*. at 57,093, 57,096.

67.     Many industry participants wanted the FDA to bar the use of wells altogether and to rule that all spring water had to be collected at the spring itself.  *See id*. at 57,089-92.  The FDA's rigid requirement that all water collected from wells had to be "the same" as the water emerging at the spring was the heart of the FDA's compromise permitting the use of wells at all. The FDA said it was "accommodating the use of bore hole technology so long as there is assurance that the water from the bore hole has the same composition and characteristics as the water from the natural orifice."  *Id*.

68.     Very plainly, the FDA did not permit commercial bottlers like Nestle Waters to use wells to collect and market as "spring water" any groundwater that is only "substantially the same" as the water emerging from a spring's natural orifice.

69.     Defendant has never satisfied, as to any of its eight Poland Spring Water collection sites, the FDA's requirement that water collected from its wells have "the same" physical properties, composition, and quality as water from a natural spring.

70.     <u>All well water must be drawn from the same stratum that feeds the spring</u>.  The FDA emphasized that all bottled water labeled as "spring water" must "be from the same underground stratum as the spring."  *Id*. at 57,090, 57,093.  "Spring water is water that emerges from the spring orifice or water from the stratum that feeds the spring."  *Id*. at 57,091.  If the well draws water from strata that do not feed the spring, the well water cannot be called spring water. *Id*. at 57,095.  The "source of the water" collected by the well must be "entirely" the same as the "source that feeds the spring."  *Id*. at 57,095.

71.     A well draws groundwater from an area surrounding the well that is called a "capture zone," *id*., or "zone of contribution."  If the well's capture zone is larger than the area that naturally feeds the spring and captures water from strata that do not feed the spring, the well water will not have travelled "the same path" as the water emerging from the spring, and it cannot be called "spring water."

72.     Likewise, if the well captures groundwater that originates deeper or further away from the flow path that naturally emerges at the spring, the well water cannot be called "spring water" because it will not have "traveled the same course as the water feeding the spring."  *Id*.

73.     Despite the FDA's clear mandate that all bottled spring water must come from the same sedimentary stratum that discharges water naturally to a spring, Defendant produces all of its Poland Spring Water from multiple strata or from portions of the aquifer that are unrelated to water that would naturally emerge at Defendant's alleged "springs" (if they actually existed).

74.     <u>The spring must continue to flow through its natural orifice at all times while the well is pumping</u>.  The FDA observed that pumping a well can cause a spring to stop flowing and can even induce a "reverse flow" whereby surface water (such as recent rainfall or water pooling near the spring's orifice) could be drawn down through the spring and into the well.  A reverse

flow would create a mixture of groundwater and surface water that, by definition, could not be called spring water because the source of the water collected by the well would no longer be "entirely" the same as the groundwater sourcing the spring. *Id*. at 57,094-95.

75.     Consequently, the FDA mandates that "water must continually naturally flow to the surface of the earth through the spring's natural orifice" if the "spring water is being collected with the use of external force," such as a pumping well. *Id* at 57,094. *See also id*. at 57,096. Again, the FDA emphasized: "Water that has not traveled the same course as the water feeding the spring, and, thus, that does not have the same characteristics as water from the spring, cannot be labeled as 'spring water.'" *Id*. at 57,095.

76.     Defendant has *never* appropriately measured or proven that its wells (i) are hydraulically connected to its alleged springs; (ii) draw water only from the same stratum as the alleged springs; or (iii) when operating, do not stop the natural flow of the alleged spring at any of its sites. Defendant has typically used "pump tests" that involved pumping its wells at high rates, causing the wells to draw water from an area that is much larger and deeper than the area that could naturally feed its purported "springs." During its tests, Defendant should have pumped the wells at the same flow rates as the water that flowed from the alleged "springs" themselves. By pumping the wells at much higher rates than those at which the alleged "springs" could have flowed naturally, Defendant drew in so much groundwater from such a large area that collecting *some* water that fed its purported "spring" was virtually guaranteed. Defendant's flawed methodology, therefore, by design created false positives in terms of demonstrating both hydraulic connectivity and that the alleged "springs" continued to flow while the wells were pumping.

77.   Spring water bottlers must *continually assure* that their wells collect "the same" water as that flowing from the spring.  The FDA found that using an external force to draw water from the ground, such as pumping a commercial well, may itself change the "the water flow" and "alter the composition of the ground water."  *Id*. at 57,094.  The FDA ruled that "if the properties of the water change as a result of the use of external force, the water is no longer spring water because the water is no longer the same water that flows through the natural spring orifice."  *Id*.

78.   If the bottler continues to pump the well after causing such a change in the water's properties, the water drawn from the well "can no longer be labeled 'spring water.'"  *Id*.

79.   Thus, Nestle Waters has an obligation to assure that the water it collects from its wells continues *at all times* to have "the same physical properties, composition, and quality" as the water that emerges from the natural orifices of its purported springs.

80.   Defendant has never met this continuing obligation at any of its eight well sites.

81.   Groundwater seeping diffusely to the surface is not spring water.  Highly relevant to Defendant's conduct here, two comments on the FDA's proposed definition of spring water asked "whether water emerging at the surface … as the result of seepage from a higher elevation surface water source reemerging at a lower elevation" was spring water.  *Id*. at 57,097.  The FDA replied that such reemerging surface water can be spring water only if it flows "through a natural orifice."  *Id*.

82.   The FDA also stated that such reemerging water cannot be under the direct influence of surface water.  If the water is subject to "significant and relatively rapid shifts in water characteristics such as turbidity, temperature, conductivity or pH which closely correlate to climatological or surface water conditions," the water is under the influence of surface water and does not qualify as "a ground water source that meets the definition of 'spring water.'"  *Id*.

83.     Defendant's purported "springs" at all eight locations include seeping water from higher elevation surface water (predominantly, ponds, wetlands and seasonal precipitation) that the FDA ruled is not "spring water" unless it emerges through a "natural orifice" and does not exhibit the dynamic characteristics of surface water.  For this reason alone, among others, those alleged springs do not meet the FDA's definition of a genuine spring.

84.     <u>Wet spots on the ground that bead water and produce a small trickle are not springs, nor are man-made alterations of the ground that intercept the water table.</u>  Another comment to the FDA's proposed spring water definition highly relevant to Defendant's conduct here "claimed that some members of industry consider any wet location on otherwise dry mountainside or flat pasture to be a spring" and "that sometimes these wet spots can bead water, producing a small trickle." *Id*.  The same comment also "contended that water has been known to come up in natural depressions in hillsides without flowing until the water is pumped," and asked "whether any alteration to the natural terrain that results in water coming spontaneously to the surface of the alteration" was a spring. *Id*.

85.     The FDA responded to both comments by once again emphasizing that to qualify as a spring "[t]here must be a natural force causing the water to flow to the surface through a natural orifice." *Id*.  Absent a perceptible flow through a natural opening in the ground, a wet spot or seep is not spring as the FDA has defined that term in its bottled water regulations.

86.     Furthermore, if "the water does not flow to the surface of the earth from the underground source without development of the area or the use of external force, then the water does not qualify for use of the name 'spring water.'" *Id*.

87.     None of the purported springs at Defendant's eight well sites emits a perceptible flow of water through a natural orifice.  Seven of Defendant's alleged "springs" are themselves

nothing more than small wells or ponds or streams that were formed or artificially enhanced by man-made site alteration or development. The eighth site, at Poland Spring itself, contains what Defendant claims are "subaqueous springs" at the bottom of a lake that do not, in fact, exist.

88.     The following illustration of a cross-section of typical Maine aquifer systems prepared by Maine's government helps explain the FDA's bore hole collection requirements.



89.     The illustration shows water sources in two types of aquifers. First are bedrock aquifers, shown as water-bearing fractures in the bedrock foundations of the earth's surface. Bedrock springs can sprout through visible cracks where the bedrock nears the surface.

90.     The second aquifer system is the water in the layers of soils and other materials (called the "overburden") above the bedrock. Groundwater in the overburden flows down from higher elevations to lower elevations through the various strata, sometimes seeping to the earth's surface in the form of streams, lakes, ponds, creeks, swamps or other wetlands when the water table meets the surface.

91.     The well dug into the till at the top left of the illustration would not collect water from the same stratum as a spring originating from the bedrock or from the other overburden strata – the wetland deposit, fine sand and silt, sand and gravel or clay strata – even if the well was in close proximity to the spring.  Similarly, the gravel-packed well in the large sand and gravel layer would not be in the same stratum as a spring originating from the sand and gravel layer near the stream because the two sand and gravel deposits are separated by two other strata, one consisting of fine sand and silt and the other of clay.

92.     Even if a spring was in the same sand and gravel stratum as the gravel-packed well, changes in the composition, density, porosity or permeability of the sand and gravel in different parts of that stratum could foreclose a hydraulic connection between the water feeding the well and the spring.  In that case, the well water could not be called spring water because the bottler would not be able to prove such a connection through a valid hydrogeological test.

93.     Those types of changes across the sand and gravel deposit, as well as changes in its mineral composition, could also change the physical and chemical attributes of the well water so that it does not have the same taste, color, clarity, temperature, smell, molecular makeup, pH value, or dissolved and suspended mineral or organic content as the water emerging at the spring, which would also disqualify the well water from being called spring water under the FDA rules.

94.     Finally, if the well drew water from a larger area than that which naturally feeds the spring, including from different strata, the well would not draw only water that "traveled the same path" as the water emerging from the spring and would not draw water that is physically and geochemically "the same" as the water emerging from the spring's orifice at the surface.  In that case, too, the well water could not be lawfully labeled as spring water.

32

95.     Plainly, the FDA's rigorous requirements are difficult to meet.  Unless a well is close to a spring with a natural orifice and draws from the exact same water flow that naturally emanates from the spring, the well water is not likely to have both the same physical properties and the same composition and quality as the water emerging at the spring.

96.     The FDA's spring water Identity Standard also includes two labeling requirements.  First, "the location of the spring shall be identified" on each water bottle label.  21 C.F.R. § 165.110(a)(2)(vi).

97.     Second, except for "purified" or "sterilized" water, any bottled water – including spring water – originating from a public water system that supplies residential or commercial tap water for human consumption must state on its label that it comes from "a community water system" or "a municipal source," whichever label applies under Environmental Protection Agency ("EPA") regulations.  21 C.F.R. § 165.110(a)(3)(ii) (citing 40 C.F.R. § 141.2).

98.     Also, the FDA's Supplementary Information issued in November 1995 stated that both the images and the corporate names and logos have to be accurate and cannot mislead consumers concerning the source of the water in bottled water products.  60 Fed. Reg. at 57,108.  The FDA ruled "that the use of certain graphics on a label of bottled water may be misleading to consumers if the source of the water is different than the source depicted or implied.  For example, a country setting on a label may mislead consumers into believing that the product is spring water when it is not."  *Id*. at 57,104.  "Thus, the use of terms or vignettes that state or imply that the source of the water is different than the actual source would misbrand the product."  *Id*. at 57,108.  Defendant's Poland Spring Water labels violate this regulation.

99.     In sum, bottled water that does not meet the FDA's three-part definitional test for spring water cannot be labeled or sold as "spring water," and even water that meets that

definition cannot be labeled or sold as "spring water" if it is collected through wells that fail to meet one or more of the FDA's five borehole collection conditions.  Bottled water that does not qualify as spring water must be labeled and sold as "bottled water" or "drinking water," unless it meets the FDA's Identity Standard for an alternative water product.

100.    The FDA's Identity Standards for "ground water," "well water" and "purified water" are also relevant here.

101.    "Ground water" is "water from a subsurface saturated zone that is under a pressure equal to or greater than atmospheric pressure."  21 C.F.R. 165.110(a)(2)(ii).  All of the water in the overburden in the illustration at paragraph 88 above is groundwater.

102.    To eliminate one source of health risks associated with bottled drinking water, the FDA prohibits bottling any groundwater (including spring water) that could be contaminated by surface water such as swamps, bogs, ponds, streams or lakes.  The FDA's rules state:  "Ground water must not be under the direct influence of surface water as defined in" EPA regulations.  *Id.* The FDA rule cites the EPA regulation at 40 CFR § 141.2, which provides in pertinent part that "Ground water under the direct influence of surface water … means any water beneath the surface of the ground with significant occurrence of insects or other macroorganisms, algae, or large-diameter pathogens such as Giardia lamblia or Cryptosporidium, or significant and relatively closely related rapid shifts in water characteristics such as turbidity, temperature, conductivity, or pH which closely correlate to climatological or surface water conditions."[5] Several of Defendant's sites should be tested for compliance with this provision.

---

[5]  The EPA requires the states to determine the influence of surface water based on "site-specific measurements of water quality and/or documentation of well construction characteristics and geology with field evaluation."  *Id*.

103.    "Well water" is "water from a hole bored, drilled, or otherwise constructed in the ground which taps the water of an aquifer."  21 C.F.R. § 165.110(a)(2)(viii).

104.    "Purified water" is "water that has been produced by distillation, deionization, reverse osmosis, or other processes and that meets the definition of 'purified water' in the United States Pharmacopeia, 23d Revision, January 1, 1995."  21 C.F.R. § 165.110(a)(2)(iv).[6]

## FACTUAL ALLEGATIONS

105.    The following detailed allegations are based on Plaintiffs' extensive investigation of Defendant's industry, business, products and marketing practices.  Plaintiffs' investigation included inspections of the areas surrounding Defendant's well sites, reviews of Maine real property records, geological records created and maintained by the Maine and United States governments, publicly available maps and aerial photographs, and approximately seventy-thousand pages of governmental records obtained from freedom of information requests issued to the FDA and to numerous Maine state and township agencies and officials.  Plaintiffs also obtained professional opinions and hydrogeological assessments of Defendant's spring water permit applications and other regulatory filings from retained forensic hydrogeological experts.

---

[6] Distillation is a water purification process that boils water into vapor to separate it from contaminants and then cools and condenses the water vapor to revert it to liquid form.  Because distillation cannot ensure a complete separation between water and minerals, bacteria or other materials, the process is often repeated to improve purity.

Deionization demineralizes water by removing positive ions through a two-step filtration process.  The first replaces positively charged metallic ions in the water, such as sodium, calcium, magnesium and iron, with positively charged hydrogen ions, making the water acidic.  The second releases negatively charged hydroxyl anions, which chemically combine with the positive hydrogen ions to produce $H_2O$ molecules that are the same as the water from which they were produced.  Deionization does not remove bacteria or other microorganisms present in the water.

Reverse osmosis uses pressure to pass water, which has been chemically pre-treated to remove biological microorganisms, through a semipermeable membrane that collects large mineral molecules like salt and fluoride to create potable water.  The process is typically used to desalinate sea water and does not efficiently remove smaller mineral ions.

I.    **DEFENDANT OBTAINED ITS SPRING WATER PERMITS IN MAINE
IMPROPERLY WITHOUT MEETING THE FDA's IDENTITY STANDARD**

106.    The FDA lacks resources to police and enforce all of its regulations.  As a practical matter, enforcement of the FDA's consumer protection rules for labeling and identifying the sources of bottled spring water are largely dependent upon state governments or private civil lawsuits such as this one.

107.    Unfortunately, bottled water consumers cannot depend on the state of Maine to effectively enforce the agency's bottled spring water regulations against Nestle Waters.  State regulators have historically misinterpreted and misapplied the FDA's Identity Standard when processing Defendant's spring water extraction and transportation permits.

108.    Defendant has also politically compromised Maine's spring water regulatory system.  For several decades, Defendant and its predecessor, Perrier Co., have influenced Maine's regulatory enforcement of its business by interweaving its corporate interests with those of the State.  Initially, it did so by leveraging its role as an important employer in the state.

109.    Then, in 1998, Defendant entered into a revenue-generating licensing agreement with the State with respect to two (and later three) commercial "spring water" production wells that Defendant drilled on state-owned land near its Poland Spring bottling plant.  Since 1998, Maine has collected many millions of dollars in fees from Defendant's operation of those wells, and it has not required Defendant to prove that the water produced from the three wells complies with the FDA's spring water Identity Standard.  (*See* paragraphs 308-324, 331-335 below.)

110.    In 2003, Nestle Waters literally became a fox guarding the spring water henhouse in Maine.  An agency called the Maine Drinking Water Program is charged with enforcing the FDA's spring water regulations in Maine.  The Drinking Water Program reports to the Maine Public Drinking Water Commission, a gubernatorial-appointed body that oversees, funds and

sets the salaries of the Drinking Water Program employees who pass on spring water permit applications. Despite a patent conflict of interest, since January 2003, the executive who directs Defendant's spring water permit application process in Maine, Tom Brennan, has been a member of the Drinking Water Commission. (*See* paragraphs 854-862 below.)

111.   From 1999 through 2013, moreover, the Drinking Water Program hydrogeologist who approved many of Defendant's spring water permit applications was Andrews Tolman. Tolman mentored Brennan while Brennan was preparing his college thesis, and Tolman later hired and worked with Brennan for ten years at a private engineering firm. From 2003 through 2013, these two long-term colleagues and former business partners were on both sides of the Nestle Waters spring water permitting process in Maine – Brennan representing the applicant, and Tolman approving, or having a role in approving, many of Defendant's applications.

112.   Consequently, enforcement of the FDA's spring water regulations against Nestle Waters has been lax and ineffective in Maine, and state permits for extracting and transporting supposed spring water were wrongly granted to Defendant and cannot be relied upon.

113.   For "evidence" that natural springs exist at Defendant's sites, Maine Drinking Water Program regulators have relied almost entirely on data and reports generated by Defendant's own employees or consultants, which were in every instance factually deficient from a scientific perspective and were often manipulated and tailored to suit Defendant's business interests.

114.   The Maine Drinking Water Program *never* obtained photographic proof that Defendant's purported springs had natural orifices from which water flowed naturally to the earth's surface, and it never demanded documentation of the natural orifices' precise locations, even though the FDA's rules require Nestle Waters to maintain such documentation.

115.    The Drinking Water Program never performed independent tests to verify that Nestle Waters had satisfied the elements of the FDA's Identity Standard.  Thus, Maine never independently confirmed:  (i) that the purported springs actually existed and were genuine springs as defined by the FDA; (ii) that Defendant's wells and purported springs were hydraulically connected; (iii) that water continued to flow from the alleged springs while Defendant's wells were operating; or (iv) that water flowing from the purported springs was physically and chemically the same as the water collected at the wells.

116.    The Drinking Water Program regularly failed to recognize that Defendant had not provided scientifically meaningful data showing that its wells and alleged springs were hydraulically connected or that the wells and "springs" produced the same water.

117.    The Drinking Water Program has never required Defendant to provide data on a regular basis, as the FDA requires, showing (i) that its well water and "springs" continue to produce the same water, or (ii) that pumping its commercial wells has not altered the supposed springs' water chemistry or properties.

118.    The Drinking Water program also failed to recognize in numerous instances that Defendant's *own test results and data* evidenced that its wells were inducing surface water to flow into the wells, which disqualifies the wells' water from being labeled as "spring water" and may disqualify some wells' water from being used in bottled water products altogether.

119.    The Drinking Water Program also overlooked or ignored patent discrepancies and contradictions contained within Defendant's spring water permit applications.  For example, the alleged locations of the "springs" at Defendant's two largest sites – Poland Springs and Hollis, from which Defendant together collects 55% to 60% of its Poland Spring Water annually – have shifted wildly over the years to suit Defendant's convenience.

120.     Despite Defendant's contrived and shifting identifications of purported "springs" and the other contradictions contained in Defendant's hydrogeological reports, Maine's Drinking Water Program has continued to issue and renew Defendant's spring water permits.  The Drinking Water Program has also continued to give ineffective scrutiny to Defendant's flawed data and reports pertaining to the other elements of the FDA's spring water Identity Standard that Defendant had to meet to qualify for legal spring water permits.

121.     Since Defendant began producing Poland Spring Water in 1993, the purported existence of natural springs at its eight well sites has been based on nothing other than Defendant's own say-so.  Neither the presence of those springs nor Defendant's ability to meet the FDA's standard of identity for spring water at those sites *has ever been independently tested or verified* by the State of Maine, the FDA or anyone else.

122.     Given the evidence compiled in this complaint that the alleged springs do not, in fact, genuinely exist and that Defendant cannot meet the FDA's Identity Standard in several other ways as to any of its eight sites, independent testing should be ordered immediately.

## II.     DEFENDANT'S FALSE AND DECEPTIVE PRODUCT LABELS

123.     On every Poland Spring Water label printed during the class period, Defendant has made two (and in most cases, three) misrepresentations to consumers:  First, every label has misrepresented that the product contains "100% Natural Spring Water" when it does not.

124.     Second, every label has misrepresented that Poland Spring Water is sourced from eight purported "natural springs" in Maine that are not, in fact, genuine springs – the "Clear Spring" in Hollis, "Evergreen Spring" in Fryeburg, "Spruce Spring" in Pierce Pond Township, "Garden Spring" in Poland, "White Cedar Spring" in Dallas Plantation, "Bradbury Spring" in Kingfield, "Poland Spring" in Poland Spring, and/or "Cold Spring" in Denmark.

125.    Third, nearly all Poland Spring Water labels have misleadingly depicted a pristine

mountain or forest spring to imply that a pure spring is the source of the water in the bottle.  The

first image below is the label that appeared on all the bottles sold between 2003 and mid-2016.

The second and third are labels that began appearing on Poland Spring Water in mid-2016.





126.    The first label above falsely states that Poland Spring Water is sourced "ONLY FROM CAREFULLY SELECTED NATURAL SPRINGS" and misleadingly identifies each of Defendant's eight well sites as "springs."   The latter two labels, which only recently began to appear, omit the phrase "only from carefully selected natural springs" but misleadingly continue to identify the eight supposed "springs" as the "sources" of Poland Spring Water.  The first two labels also depict misleading pristine scenes that falsely convey and imply purity to consumers.

127.    As detailed below, all eight of Defendant's supposed "natural springs" never genuinely existed or no longer exist.

128.    Plaintiffs' claims herein rest entirely on the three misrepresentations on Nestle Waters' Poland Spring Water labels.  But Defendant's print ads and website pages have also regularly misrepresented that Poland Spring Water is "sourced from natural springs."  Its ads have also falsely stated that its "brands meet all federal regulatory standards" when, in fact, Poland Spring Water does not meet the FDA's standard of identity for spring water.

129.    Defendant's website provides access to a document called the Poland Spring "Bottled Water Quality Report," which states that:  "In the heart of Maine, you'll discover some of the finest springs, the source of Poland Spring Brand® Natural Spring Water since 1845." _www.nestle-watersna.com/asset-library/Documents/PS_ENG.pdf_, at 2 (last visited November 29, 2016).

130.    None of Defendant's well sites has served as a source of Poland Spring Water "since 1845," and none is in "the heart of Maine."  Five of the well sites are in southwestern Maine, the most densely populated part of the state, within 30 miles of the New Hampshire border, as the maps below show.  The other three sites are all within 50 miles of the New Hampshire border:



"Spruce Spring"
Pierce Pond

"White Cedar Spring"
Dallas Plt.

"Bradbury Spring"
Kingfield

"Evergreen Spring"
Fryeburg

"Cold Spring"
Demark

"Garden Spring"
Poland

"Clear Spring"
Hollis

"Poland Spring"
Poland Spring

**Population Density by County**
**People per Square Mile 2010**

4.4
18.1 - 10.8
75.6 - 27.8
140.8 - 108.7
337.1 - 198.9

42

131.    While most Poland Spring Water labels depict a scene of pristine, blue mountain spring water flowing down a verdant hillside or a crystal forest lake, none of Defendant's eight well sites remotely resembles those images.  Each of the eight collection sites is in a valley or low lying plain that serves as a catch basin for rainwater and snowmelt from surrounding hills, where the water table naturally falls close to the surface and interconnects with bodies of surface water that are often very close to Defendant's wells.  Many of Defendant's collection wells were built near potential sources of pollutants and contaminants.

132.    In stark contrast to the public's image of "spring water" that is filtered by the earth over a long period before it naturally percolates to the surface far from population centers and potential pollutants, Defendant's Poland Spring Water is groundwater pumped from aquifers that may have been replenished by rainfall or snowmelt only days or weeks earlier.

## III.    FUNDAMENTAL CONCEPTS OF HYDROGEOLOGY

133.    To fully understand why Defendant's eight purported spring sites do not meet the FDA's spring water Identity Standard requires familiarity with some fundamental aspects of the science of groundwater hydrology and geology, or hydrogeology.

134.    All of the earth's water moves constantly through the "water cycle," starting as sea water and transforming in sequence to atmospheric moisture, precipitation, surface water, groundwater and back to sea water.

135.    Not every drop of water follows all of those steps in succession every time it travels through the water cycle.  Some surface water, for example, may be intercepted by vegetation or animals and then transpired back into air moisture, or it may flow directly into a river and into the sea without ever soaking into the ground to become groundwater.

136.    A version of the water cycle is shown in following illustration from the U.S. Geological Survey's website.  It shows, among other things, that some of the surface water from

rains and snowfall runs off the earth's surface into the sea, some runs into surface water bodies

such as lakes or streams, and some infiltrates the ground to become groundwater.   It shows also

that water that becomes groundwater can flow anywhere from deep below the earth's surface to

near the surface, and that it can flow underground all the way back into the sea or reemerge at the

surface as seeps, springs, streams, rivers, ponds and lakes, and then travel back to the sea.



    137.    The above illustration shows that precipitation that soaks into the ground to

become groundwater can take several different paths back to the sea depending on a number of

factors, including how deeply the water penetrates the earth.

    138.    Some groundwater can penetrate deeply into the soils or bedrock beneath the

surface and remain there for millennia.  Groundwater can also re-emerge as surface water by

seepage onto the ground to create wet spots or mud, seepage through the bottoms of lakes,

streams, swamps and other wetlands, or via genuine springs with natural orifices.

139.    The infiltration of water into the ground is referred to as the "recharge" of groundwater.  The re-emergence of water from the ground onto the surface, into a lake, stream, spring or other surface water body, or through a well, is called the "discharge" of groundwater.

140.    During long stretches of the year in Maine – specifically, the summer growing season and mid-winter when the ground is frozen – hardly any water from even very heavy rains or snowfalls becomes groundwater.  Instead, it all runs over the ground into surface water bodies, evaporates, or transpires after plants or animals consume the water.

141.    Consequently, in Maine, the rates of groundwater recharge and discharge vary, and the volume of groundwater saturating the subsurface of the earth varies.  When the discharge rate exceeds the recharge rate, the water table moves deeper.  When the recharge rate increases, the water table rises.  As the water table rises and falls, the depth of the unsaturated zone (also called the "zone of aeration") between the surface and water table shrinks and expands.

142.    These principles are illustrated in the following drawing from the "Ground Water Handbook for the State of Maine" (2d ed. 1987), published by Maine's government:



Figure 2.  Divisions of subsurface water.[4]

143.    In hilly areas, the water table generally mimics the topography of the earth's surface, and groundwater within the subsurface flows downhill from areas of high elevation above sea level to areas of low elevation, as seen in the following drawing:



Figure 8.  Ground water flow systems in unconsolidated materials.[3]

144.    The above drawing also shows that groundwater flowing near the land surface (called "local" flow) mostly moves downward under hills and towards surface water, and that local groundwater flowing from opposite sides of a surface water body will seep upwards to discharge into the surface water.  Deeper groundwater flows, called "intermediate" or "regional" flow systems, will pass under the hills and surface water to discharge into lower elevation surface water that serves as the major groundwater discharge point within the drainage basin.

145.    Springs can serve as discharge points for discrete flow paths of groundwater moving into the spring zone.  In areas where the subsurface is comprised of sand and gravel deposits, springs with orifices along valleys or on hill slopes receive their recharge from very narrow flow paths because water moves very easily through such deposits.  In contrast, recharge

46

areas for bedrock springs can be large because rock is effectively impermeable and the water must move through widely dispersed fractures in the rock that carry the water to the spring.

146.    The cross-section illustration at paragraph 143 above also introduces the concept of hydraulic groundwater "divides."  A hydraulic divide is an imaginary planar surface (the vertical dashed lines in the drawing) extending from the surface into the subsurface across which water – be it surface water or groundwater – cannot pass unless induced by human activity.  The hydraulic divides in the illustration consist of the hilltop and the swamp and stream bottoms. Rainwater that hits the hill left of the hilltop divide will flow down the hill towards the stream on the west, and rainwater that hits right of the hilltop will flow down into the swamp on the east. Rainwater that soaks into the ground on the hill and becomes part of the local flow system within the hill will flow in patterns that mimic the routes of the surface water flows.

147.    Although the divides for surface water and groundwater are typically identical, as in the above illustration, sometimes the groundwater divide may be as much as 100 or 200 feet away from the surface water divide.  This is shown in the following drawing where the highest point of the water table occurs on the flank of a hill:



Figure 9.  Non-coincident surface and ground water divides.

148.    Within any drainage basin there are "major" divides and "minor" divides.  Major groundwater divides will typically delineate the highest and lowest elevations within the drainage basin and govern the general flow directions of the deeper regional groundwater flows.  Minor divides will govern local groundwater flows that sometimes flow in different directions than the deeper regional flows.  The crest of the mountain in the illustration at paragraph 136 above is an example of a major divide.  The hill, swamp and stream in the drawing at paragraph 143 above are examples of minor divides.

149.    A critical factor in subsurface hydrogeology pertains to the "hydraulic conductivity" of the soils and materials, which relates to how quickly groundwater can flow through the material.  While surface water in a stream can often flow several feet per second, groundwater flowing near the stream bed flows much more slowly, on the scale of feet per day or, even, per year.  The hydraulic conductivity of a material is typically measured in terms of velocity, such as feet per day.  Some hydrological engineers use different units for this property, such as gallons per day per square foot.

150.    Different subsurface strata have different hydraulic conductivity.  Referring back to the illustration at paragraph 88 above, the hydraulic conductivity values of the different materials can vary by many magnitudes.  Representative values of various strata in Maine, as reported in the Maine government's Ground Water Handbook, can be as follows:

| Subsurface Material | Hydraulic Conductivity (gal/day/sq.ft.) | (feet/day) |
|---|---|---|
| Granite bedrock | 0.1 | 0.013 |
| Clay | 1.0 | 0.13 |
| Sand | 800 | 107 |
| Sand and gravel | 2000 | 267 |
| Pure gravel | 5000 | 670 |

48

151.    While groundwater in the illustration at paragraph 88 saturates each stratum shown and maintains the same water table level in each stratum, the groundwater flows through the different strata at very different rates of speed.  This has implications for how much water can be drawn from wells dug into each stratum.  It also has implications for how springs typically form in Maine.  Absent peculiar conditions that are not present at Defendant's sites, groundwater flow paths to springs are inherently narrower in aquifers with high hydraulic conductivity, such as the sand and gravel aquifers underlying all eight of Defendant's well sites.  Spring flow in such aquifers, if present, mostly occurs horizontally from strata near the spring or above it (that is, "up-gradient" from the spring).  The water does not come vertically from deep in the aquifer because the horizontal hydraulic conductivity of layered sand and gravel is much greater than its conductivity in the vertical direction upward.

152.    Two other factors that affect both wells and springs are that groundwater will always (1) follow the easiest path to its discharge point, and (2) try to rise to the level to which it would naturally rise given the "potential energy" the water contains.  The potential energy of groundwater is determined by how high the water is above sea level and how much pressure is on the water from higher groundwater above it in the saturated aquifer material.

153.    How these two principles can affect wells and springs is shown in the following two illustrations.  In both, the water table levels within the higher elevation areas (the stream banks in the first drawing and the hills in the second) naturally angle downward to follow the topographical surface contours until the surface dips below the water table.  At that point, the groundwater seeps diffusely into the surface water body (the stream in the first drawing and the kettle pond and swamp in the second).  The flat surface of the stream, pond or swamp that is

formed rises to meet height of the water table levels on both sides.  Maine's Ground Water

Handbook illustrated this ordinary seepage as follows:





154.    The important commonality in both illustrated examples is that the subsurface

soils are in the same stratum, so the sediments throughout the illustrations have roughly the same

hydraulic conductivity.  The groundwater flows along its easiest path until the point it connects

with the surface water body to discharge into that body.

155.    Things change, however, when a less permeable stratum with slow hydraulic

conductivity, like clay, impedes groundwater flowing through a more permeable stratum with

high conductivity, such as sand and gravel, as shown in the following illustration:

50



156.     In the above drawing, when precipitation recharges the groundwater in the permeable sand and gravel exposed at the top of the hill, the water table will generally conform to the contours of the hill as in the previous illustration.  However, because the sand and gravel stratum is confined by a less permeable clay stratum, much of the groundwater in the sand and gravel will favor flowing more quickly under the clay than very slowly through it.

157.     The groundwater flowing under the clay will become pressurized by the weight of the groundwater above it.  If a well is drilled through the clay to tap into the underlying sand and gravel, the pressurized groundwater will rise in the well up to its "potentiometric surface."  Such a well is called an "artesian well."  Because of the natural pressure of the confined groundwater, water flows unaided to the surface in an artesian well and does not need to be pumped to draw water, so long as the well's exit valve lies below the potentiometric surface.

158.     A similar situation can occur when artesian wells are placed next to streams, lakes or other surface water that serves as a groundwater discharge point, even if there is no confining layer, due to the naturally slight pressure or upwardly flow of seeping groundwater being drawn into the discharge area.

159.     Defendant routinely misuses this principle.  It places small wells near surface water bodies to force pressurized groundwater to rise above the surface and then claims either that the wells themselves are "springs" or that the wells prove the existence of springs when, in reality, they do not.  Because the horizontal conductivity of sand and gravel is typically much greater than its vertical conductivity, pressurized groundwater flowing in unconfined sand and gravel will *not* rise *naturally* to feed a spring.  But it *will* rise to the surface through an artesian well.  Defendant's artificial inducement of vertical artesian flow by using wells to tap pressurized groundwater beneath its alleged "spring areas" is *not* evidence that water is naturally emerging at nearby springs.  In fact, it evidences that *no springs exist*, because natural springs would *relieve the pressure* to the point that the artesian wells would no longer flow.

160.     If a descending tree root creates a hole through a confining layer above a sand and gravel aquifer and subsequently decays, an "artesian spring" with a natural orifice could conceivably develop.  But there are no artesian springs at any of Defendant's eight well sites.

161.     A spring can also form naturally when ground water flowing in a permeable stratum such as sand and gravel near the earth's surface meets a less permeable stratum lying underneath it.  Finding its easiest path, some groundwater could exit the earth rather than flow into the less permeable layer.  Such a spring, called a "contact" spring, is shown below:



Figure 17.   Contact spring in unconsolidated deposits at
             gravel/till interface.

162.    But to qualify as a spring under FDA rules, a contact spring must have natural orifice from which groundwater perceptibly flows.  It cannot be a diffuse groundwater emission that merely seeps onto or wets the ground and does not flow from the earth in a perceptible or measurable way.  There is no evidence that any contact springs exist at Defendant's sites.

163.    A spring can also form naturally, without the intercession of less permeable soils, in a natural ravine or ditch within a saturated stratum.  Again, to meet the FDA's definition of spring water such a "depression spring" must have a natural orifice from which groundwater flows.  A ditch that merely drops below the water table and intersects with it so that groundwater seeps in diffusely from the bottom of the ditch does not meet the FDA's definition.  A ditch in which seeping water rises above the rim of the ditch and begins to flow out forming a stream is also not a spring within the FDA's definition.  To qualify as a spring, there must be a flow of groundwater through a natural orifice *into* the ditch.  If water seeps into the ditch diffusely rather than through a natural orifice, it is not a spring, even if the water later flows out of the ditch.

164.    The below photos show various forms of genuine springs emanating, respectively, from fractured bedrock, coarse rock and boulders, and sand (where the flow forms a natural orifice by washing out sand grains to create a natural exit channel or quicksand):



165.    Defendant has no springs like these, or any other type of natural spring, on any of its properties.  Thus, its Poland Spring Water cannot lawfully be called "spring water."

## IV.   COMMMERICAL WELLS AND WELL-RELATED HYDROLOGY

166.    All of Defendant's commercial production wells in Maine used for extracting Poland Spring Water are gravel packed wells (see example below) drilled 30 to 80 feet deep into sand and gravel aquifers.  Groundwater is drawn in through screens at the bottoms of the wells.



167.    The screens in Defendant's wells are many tens of feet below the water table, below the level from which natural springs would be fed in sand and gravel.  The wells all capture deep groundwater, not local groundwater that is heading toward a natural spring.

168.    When a well is not pumping, the water table surrounding the well remains at its natural or "static" level.  Once pumping starts, the groundwater is drawn towards and into the screen at the bottom, causing the water table surface to slope inward toward the well, forming a "cone of depression" around the well.  A cone of depression is shown below, first in a cross-sectional view of the cone effect under the ground and, next, in an aerial (or map) view:

54



169.     The size of the cone of depression is referred to as the "lateral area of influence." Its size depends on a number of factors, including the rate at which the well is pumped.  A well pumped at 300 gallons per minute ("GPM") (or 20 liters/second) will have a more pronounced cone of depression, and will draw water from a larger area, than if it is pumped more slowly.

170.     The cone of depression is not the same thing as the "zone of contribution" or "capture zone" of a well.  The cone of depression reflects the area in which the water table is lowered when a well is pumping at a given rate.  The zone of contribution is typically a larger

region from which groundwater will be potentially drawn into the well over a span of time.  The

size and shape of a zone of contribution depends, among other things, on the subsurface geology

and topography, the length of time being considered, and the locations of any hydraulic divides

that limit and naturally bound the area into which the contribution zone can extend.

171.    Many wells at Defendant's eight groundwater collection sites are near lakes,

streams, swamps or other wetlands and have cones of depression and zones of contribution that

intersect the surface water in those bodies.  Pumping these wells can induce surface water into

the well and mix it with groundwater from the aquifer.  Defendant's wells near surface water

bodies, therefore, pose several threats to Defendant's Poland Spring Water products if the wells

induce infiltration of surface water:  namely, that (i) the well water will be mixed with surface

water and cannot legally be labeled "spring water"; (ii) the well water will be under the influence

of surface water as defined by the EPA, rendering it illegal to use as drinking water altogether;

and (iii) the well water will be contaminated by the surface water and be unsafe for drinking.

172.    Induced surface water infiltration is shown in the following two illustrations:





173.    The above panels A, B and C show a recharge and discharge system near a stream before (plate A) and after placement of both a lightly pumping well (Q1 in plate B) and a rapidly pumping well (Q2 in plate C) near the stream.  The minor groundwater divide between the well and stream insulates the lightly pumping well Q1 from induced surface water infiltration, but it does not insulate the rapidly pumping well Q2 from induced surface water infiltration.

174.    Defendant's wells that are susceptible to induced infiltration must be inspected to determine if they are collecting surface water.

## V.    THE MAINE GEOLOGICAL SURVEY

175.    For many decades, Maine's state government has engaged in a state-wide geological survey of Maine's complex geology, including its water resources, bedrock materials, mineral resources, coastal properties and related information, in order to create a publicly available database on which both governmental and private professionals can rely to address engineering safety, environmental impact and natural resource and development issues.

176.    That survey, called the Maine Geological Survey (the "Survey"), is currently managed by the Maine Department of Agriculture, Conservation and Forestry.  Survey data and results are available on thousands of publicly accessible web pages, maps and publications that can be ordered online in digital or paper format or downloaded from the internet free of charge.

177.    One chief project of the Survey is to map Maine's groundwater supplies, or aquifers.  According to the Survey, Maine has two types of aquifers, overburden aquifers consisting of loose soil materials (primarily sand and gravel deposits) or fractured bedrock.

178.    The Survey includes a series of topographical maps of Maine's significant sand and gravel aquifers.  *See http://www.maine.gov/dacf/mgs/pubs/online/aquifers/aquifers.htm*. Due to their porosity and high conductivity, sand and gravel mixtures provide better groundwater yields than most other overburden soils.  The Survey maps detail Maine's major water supplies in 526 separate areas – called "quadrangles" – within the state.  Each quadrangle map covers an approximately 3 mile x 4.25 mile geographic region and identifies the boundaries of each "significant" sand and gravel aquifer in the region – "significant" meaning locations from which a well can continuously extract water at a rate of at least 10 GPM.

179.    The purpose for and the methodology used to create the Survey maps are described in the margin of each map.  The maps are drawn by the state's Survey geologists based on data from already existing wells, seismic studies, aerial photographs and historical information such as topographical and other maps prepared over the years by the federal government's similar U.S. Geological Survey, among other tools.

180.    As an example, a portion of the 1999 Survey map of the "Minot Quadrangle" – which includes Defendant's Poland Spring site – appears below.  The full map can be seen at http://digitalmaine.com/cgi/viewcontent.cgi?article=2318&context=mgs_maps.



181.    The Maine Geological Survey maps are color coded.  According to the maps' index, yellow areas represent portions of aquifers that yield between 10 and 50 GPM of

groundwater.  Red areas depict portions with a "good to excellent potential ground-water yield" of more than 50 GPM.  Blue areas represent lakes, ponds, streams or other surface water. Importantly, the Survey maps also identify the locations of the state's known naturally occurring springs, as well as the direction in which water flows from each spring, using the symbol ⸸ . A copy of a portion of the Survey maps' index appears below.

### GEOLOGIC AND WELL INFORMATION

| | |
|---|---|
| *50* | Depth to bedrock, in feet below land surface |
| ≥*13* | Penetration depth of boring; ≥ symbol refers to minimum depth to bedrock based on boring depth or refusal |
| 6 ▣ | Depth to water level in feet below land surface (observed in well, spring, test boring, pit, or seismic line) |
| ✖ | Gravel pit (overburden thickness noted in feet, e.g. 5-12') |
| ✖ | Quarry |
| 4 GPM | Yield (flow) of well or spring in gallons per minute (GPM) |
| ⸸ | Spring, with general direction of flow |
| ◓ | Drilled overburden well |
| ■ | Dug well |
| ✚ | Observation well (project well if labeled; nonproject well if unlabeled) |
| ✦ | Test boring (project boring if labeled; nonproject boring if unlabeled) |
| ↓ | Driven point |
| ⊙ | Test pit |
| • | Drilled bedrock well |
| ▽ | Potential point source of ground-water contamination |
| + | Bedrock outcrop |
|  | Surface-water drainage-basin boundary; surface-water divides generally correspond to ground-water divides.  Horizontal direction of ground-water flow generally is away from divides and toward surface-water bodies. |

182.    Inverted triangles ( ▽ ) on the maps identify potential sources of groundwater contamination, such as waste dumps, salt storage areas or septic spray irrigation sites.

183.    Non-italicized numerals next to half-shaded rectangles ( ) on the maps indicate the general depth of the water table in terms of the number of feet below the surface.

184.    Each map also shows the location of dug wells ( ), drilled overburden wells ( ), observation wells ( ) and driven point wells ( ) that existed when the map was made, together with the GPM yields ( ) of some of the wells.  Each of these types of wells access groundwater in the soil and sediment (or "overburden") atop the bedrock foundation in the quadrangle.

185.    The maps also identify the location of then-existing drilled bedrock wells, which access bedrock fracture aquifers, together with the bedrock's depth below the surface ( ).

186.    Significantly, the red dashed lines on the maps ( ) identify the contours of surface water drainage divides, which generally correspond to groundwater divides.  Typically, surface water and groundwater both flow away from the divide boundaries and towards the surface water bodies – lakes or streams, etc. – located within the boundaries.  This is important with respect to contamination.  Pollution plumes in aquifers will follow the flow of groundwater away from the divides and towards the nearest surface water.  The flow of groundwater and contaminants within overburden aquifers is shown in the below illustration, which is included in the margin of every Survey map.



187.     The divide boundaries also provide evidence for lack of a hydraulic connection between a spring and a well.  Drawing in well water 100-200 feet from one side of a major divide, for example, typically will not affect the rate or volume of water flowing at a spring 100-200 feet away on the other side of the divide.

188.     As shown below, the Maine Geological Survey sand and gravel aquifer maps contain substantial, judicially noticeable evidence that Nestle Waters' Poland Spring Water products contain ordinary well water rather than spring water, as defined in FDA regulations.

## VI.     DEFENDANT'S EIGHT GROUNDWATER COLLECTION SITES DO NOT CONTAIN REAL SPRINGS, AND ITS WELLS DO NOT PRODUCE GENUINE "SPRING WATER" THAT MEETS THE FDA's IDENTITY STANDARD

### A.     The "Poland Spring" Is Not a Source of Water Used in Defendant's Poland Spring Water Products, and the Water Collected by Wells at Defendant's Poland Spring, Maine Site Is Not Spring Water

189.     Although Nestle Waters represents on its Poland Spring Water labels that the purported "100% Natural Spring Water" contained therein may be sourced from the well-known "Poland Spring" in Poland Spring, Maine, none of Defendant's water comes from the Poland Spring, or from any other natural spring that is near or hydraulically connected to its eight commercial production wells in Poland Spring, Maine.  Defendant's identification of the Poland Spring as a source for its bottled Poland Spring Water is false and fraudulent.

190.     According to a Nestle Waters spokesperson, 30% of all Poland Spring Water – almost 300 million gallons – is produced from Defendant's wells in Poland Spring, Maine.  None of that well water can be lawfully labeled as "spring water."

191.     All of Defendant's wells there are drilled into a sand and gravel aquifer.  The historic Poland Spring was a bedrock spring – not an overburden spring – and it commercially ran dry two decades before Nestle Waters acquired the Poland Spring brand name in 1992.

62

192.     In 1795, the family of Jabez Ricker acquired a house and 300 acres on what became known as "Ricker Hill" in South Poland, Maine, which contained near its summit a bedrock mineral spring.  The water at that spring flowed from fractures in granite.  It came to be called the "Poland Mineral Spring" and acquired a reputation for bestowing health benefits.  The Ricker family later opened an inn on the hill that, by 1913, grew into a large resort with a golf course and healing spa called the Riccar Inn.

193.     The first bottling plant opened at the Poland Spring site in 1845.  Sales first focused on local grocery stores and sea travelers but went national by 1883 and global ten years later, after Poland Spring's water won the "Medal of Excellence" at the 1893 Chicago World's Fair.  The Poland Spring brand sealed its reputation for purity when it won the Grand Prize at the 1904 World's Fair in St. Louis against America's best known spring waters.

194.     The original Poland Mineral Spring ceased producing at a commercially viable flow rate by the 1970's and has not been a source for Poland Spring Water for almost half a century.  It therefore cannot lawfully be cited by Defendant as a source for its products.

195.     Defendant's Poland Spring Water bottle labels also cannot lawfully represent that the historic Poland Spring is a source of that water because Defendant's wells do not draw water from "the same underground stratum" as that spring, failing the FDA's first bore hole collection requirement.  Defendant's eight wells in Poland Spring all tap a sand and gravel aquifer, not the bedrock aquifer that once fed the historic Poland Spring.

196.     Defendant's product labels nevertheless mislead consumers into believing that Poland Spring Water is still sourced in part from the original bedrock spring at Poland Spring.  Defendant deceives consumers in this manner to exploit the beneficial brand value associated with the genuine spring water that had been bottled lawfully at the Poland Spring for 175 years.

197.     According to Androscoggin County property records, the Ricker family still owned thousands of acres of land in Poland Spring in the 1960s, including Ricker Hill, the site of the original Poland Mineral Spring and the Riccar Inn.  The family also owned land to the east adjoining the southern shore of Lower Range Pond (pronounced "Rang Pond") between State Routes 122 and 26 ("Maine St."), which are shown on the below maps.



Google Maps

U.S. Geological Survey

198.     The historic Poland Spring is shown in the above U.S. Geological Survey map on the northeast slope of Ricker Hill, at an elevation of 500 feet above sea level (blue ⬩ ).

199.     In the 1960s, the Rickers sold 400 acres east of Ricker Hill to the State of Maine, including the eastern half of the kettle pond-studded valley beneath Ricker Hill, which now flanks Range Ponds State Park.  In 1973, the family sold the western half of the kettle valley, where Defendant's bottling plant is now located, to an entity called Waters of Maine, Inc.

200.     Waters of Maine installed two or three wells on Ricker Hill in an unsuccessful effort to capture the water that was no longer flowing from the original Poland Mineral Spring. In 1979, Waters of Maine sold its assets, including its land in the valley east of Ricker Hill along what is now called Poland Spring Drive, to Perrier, which built a small bottling plant in the valley.  Defendant took over Perrier in late 1992.  Nestle Waters expanded the bottling plant several times over the years and installed numerous wells in the valley.

201.     The recorded deed and plat drawings for the plot the Rickers sold to Waters of Maine in 1973 refer to a portion of that parcel as a "dump."  That dump was long used as a repository for the Riccar Inn's garbage.  The dump was located next to a kettle pond just east of Perrier's plant.  (*See* paragraphs 216-217 below.)  In 1979, Perrier is reported to have bulldozed the then-remaining dump debris into that kettle pond.

202.     The photograph below shows the site of the original bedrock Poland Spring near the summit of Ricker Hill (the looped roads east of the golf course), Defendant's bottling plant in the kettle valley 150 feet below the spring, and, adjacent to the parking lot in back of the plant, the (now small) kettle pond where Perrier is said to have dumped some of the Ricker resort's refuse in 1979.  A portion of the eastern side of the current Poland Spring bottling plant sits atop the old Ricker resort garbage dump.

65



Google Maps

203.      The Maine Geographical Survey map of the Minot Quadrangle, created in

1999, shows that Defendant's wells sit in the highest groundwater yielding zone of the sand and

gravel aquifer underlying the valley between Ricker Hill and Range Ponds State Park.



204.      The Survey map shows the historic Poland Spring but no other natural springs near the wells.

205.      The Survey map reflects two sources of potential groundwater contamination on the downslopes of Ricker Hill west and south of resort and spring, denoted as "Poland Spring Inn spray irrigation" sites.  Lacking sewers, the resort's "septic system" at least until the mid-1980s (or even into the 2000s) entailed spraying its guests' and staff's human excrements and waste products into the woods behind the resort.  The southern spray septic site is within the same major drainage divide as the kettle pond near the old dump.  Defendant now has a well 400 feet east of that kettle pond.  For many decades, precipitation sank into that spray septic zone, becoming groundwater that flowed as a contamination plume down the hill and into the ground that now underlies the bottling plant, the kettle pond and Defendant's well.

206.      The below photo shows the well house covering that well and the partly filled-in kettle pond west of it.  The well was built in 2007, after the 1999 Survey map was made.  The well is on State land and is licensed by Maine to Defendant to produce Poland Spring Water.



Google Maps

207.     The Survey map shows five of Defendant's now-eight overburden wells on Lower Range Pond's south shore (the Survey notes one collected groundwater at the rate of 100 GPM).  The water table under those five wells ranges from 7 to 18 feet beneath the earth's surface – the same level as the surface of Lower Range Pond, which is 10 to 20 feet below each well.  None of those five wells draws groundwater that could emerge naturally from the earth through a spring with a natural orifice, as the FDA's spring water Identity Standard requires.  Indeed, not one of Defendant's eight wells in Poland Spring produces genuine spring water.

208.     Defendant's first five wells are visible in the December 2002 aerial photo below.  The westernmost, in the green-roofed well house at the center left, is called "Production Borehole 4" (or "PB #4").  The next well to the east, by the road, is "PB #3."  The two wells near each other in the center of the photo, separated by trees from the southern shore of the square-shaped cove, are "PB #2" and "PB #1."  Well "PB #5" is in the bottom right of the photo.  The five wells are only 150, 200, 150, 175 and 250 feet, respectively, from Lower Range Pond.



Google Earth

209. As discussed below, given the five wells' proximity to Lower Range Pond, Defendant has induced pond water to flow into its wells, which disqualifies them as lawful sources of "spring water" under FDA regulations and subjects them to potential contamination.

210. Defendants' three other commercial wells, called "PB #9, PB#10 and PB #11," are on the State of Maine's land south of Lower Range Pond. Those three wells also appear to be drawing in surface water that disqualifies them as lawful "spring water" sources and exposes them to potential contamination. (*See* paragraphs 313-315 below.)

211. In the 1970s and 1980s, Perrier initially claimed its wells were hydraulically connected to the historic bedrock Poland Mineral Spring. That claim was specious because the wells tapped a sand and gravel aquifer, not the bedrock aquifer that fed the original spring.

212. Because the historic Poland Spring was a bedrock spring, all Poland Spring Water produced from Defendant' eight wells come from a different stratum and have neither "all the physical properties" nor "the same composition and quality" as any water that may still trickle to the surface at the historic Poland Spring.

213. Today, however, no water does trickle naturally to the surface at the historic Poland Spring. That spring is now enclosed in a shrine-like building, with the supposed spring bubbling into a pool of water that is shielded from public access by a glass barrier. The bubbles in the pool are man-made, generated by a machine that sits under a locked metal trap door outside the shrine. The water in the pool itself appears to be pumped into the shrine by the machinery underneath. If so, the historic Poland Spring no longer naturally exists at all.

214. On its website (but not on its Poland Spring Water labels), Defendant admits that it no longer uses the historic Poland Mineral Spring as a source for its Poland Spring Water. But Defendant's website does not state where its "spring" in Poland Spring is now located.

215.     Recognizing that it could not legitimately claim to be tapping the bedrock aquifer, Defendant has asserted to regulators since it bought Perrier in 1992 that the wells are hydraulically connected to "subaqueous springs" that allegedly lie at the bottom of Lower Range Pond, several hundred to several thousand feet away from Defendant's eight wells.  That claim is baseless, as shown below.  Defendant has proved neither the existence of genuine subaqueous springs that meet the FDA's Identity Standard or that the water from any such springs is the same as that collected by its eight production wells.  The precise locations of those "subaqueous springs," moreover, have shifted dramatically over time in Defendant's regulatory filings.

216.     In 1978, Perrier engaged a consultant, J.K. Richard ("Richard"), to find new groundwater resources.  Richard found that the kettle valley below Ricker Hill was a good potential source of drinking water because it contained an aquifer that filtered within a sand and gravel glacial deposit (called an esker) along the shore of Lower Range Pond.  Richard drew the following site map of the valley sometime between 1979 and 1982 (orange boxes added):



217.     Richard's site map showed the locations of Perrier's small bottling plant at the base of Ricker Hill and two of its then-new wells, one on the pond's shore north of Ricker Hill called "Well 4" and one at the western base of the esker called "Well 5."  Richard's map also showed the old Riccar Inn dump site and a former ash pile – both of which could potentially contaminate the groundwater below the site.

218.     In 1983, a New Jersey regulator questioned whether Perrier's two new wells were producing genuine spring water.  In response, Perrier asked a Maine official to send the New Jersey regulator a letter stating that there "is a very substantial flow of spring water on the Poland Spring property" and that "spring water flowing naturally to the surface at Poland Spring is identical, within testing tolerances, to that being bottled and sold" as Poland Spring Water.

219.     Neither of those statements was true then, nor are they true now.  There was and is no "flow of spring water" "naturally to the surface" "on the Poland Spring property" at all, much less a "very substantial flow."  And Poland Spring Water bottled in Poland Spring was not then, and is not now, "identical" to water supposedly flowing from any natural spring.

220.     Perrier did not claim in 1983 that there were subaqueous springs in the middle of Lower Range Pond.  Rather, Perrier conjectured that the kettle pond nearest its Well 5 was "spring fed."  It was not.  Even if it were, Well 5 was down gradient from the kettle pond, which meant that groundwater flowed from the kettle pond towards the well rather than the reverse.  Thus, Well 5 could not have intercepted any "spring water" before it discharged into the kettle pond and would not have "traveled the same path" as water emerging from the alleged spring.

221.     By 1986, Perrier had added two more production wells along the shore of Lower Range Pond and expanded its new bottling plant to meet increasing demand for Poland Spring Water.  The wells were each capable of producing groundwater at 100 to 150 GPM.

71

222.     In September 1987, Perrier, through one of Maine's preeminent law firms,

called at the time Pierce, Atwood, Scribner, Allen, Smith & Lancaster ("Pierce Atwood"),

applied for a Bulk Transport Permit to transport its "spring water" outside the boundaries of

Poland Township.  In a letter accompanying that application, Perrier claimed falsely that it was

producing Poland Spring Water "from a free flowing spring located on Ricker Hill," even though

that spring was no longer "free flowing."  Perrier also claimed that it was producing Poland

Spring Water from wells "drilled into the aquifer which is the source of the Ricker Hill spring."

That representation also was false because the original Poland Mineral Spring on Ricker Hill

came from a different aquifer – a bedrock aquifer – than the sand and gravel aquifer that sourced

the groundwater being collected by at least four of Perrier's wells.

223.     Perrier did not claim in 1987 that its wells were connected to subaqueous

springs in the middle of Lower Range Pond.

224.     In its 1987 application, Perrier emphasized that it only employed 50 people

when it took control of the Poland Spring site in 1980 but had grown to 150 employees by 1987,

and that granting the permit would be "critically important to Poland Spring's economic future

and to the ability of Poland Spring to maintain over the long-term current employment levels at

Poland, Maine."  Perrier also argued that granting the permit would enable it to increase its

market penetration, and that doing so "with a quality product identified with Maine can provide

only a positive benefit for the reputation of the State of Maine and its products."

225.     Maine's Department of Human Services granted Perrier's Bulk Transport

Permit on September 29, 1987.  "Relying in great part on facts submitted to the Department by

Poland Spring" (which the State had not checked or verified), the permit recited several factual

"findings" made by the State.  In its findings, the State adopted Perrier's false (and unprovable)

claim that "Poland Spring Water is obtained solely from a free-flowing spring located on Ricker Hill" and from "wells drilled into the Poland Spring Aquifer."  The State also accepted Perrier's scientifically implausible claim that the aquifer supplying its wells was the same aquifer that "is the source of the Ricker Hill Spring."  The permit also recited Perrier's promise to maintain its current level of 150 employees.

226.     By 1990, Perrier had again expanded its plant in the valley below Ricker Hill. Its consultant, Mr. Richard, had now formed the Wind River Group, Inc., which prepared a map showing the locations of four of Perrier's then-operating overburden wells.  The earlier drilled Well 5 and new Well 7 were along the esker about 150 feet from Lower Range Pond.  New Well 6 was on the shore of the pond north of the plant.  New Well 8 was in the southeastern portion of Perrier's property.  Wind River's new site map did not show the location of the old resort dump or ash pile that were shown on Richard's earlier site map (orange boxes added):



227.     By 1990, Perrier knew its initial story that the wells were drawing from the same aquifer as the original bedrock spring and later story that the kettle pond was "spring fed" would not withstand serious scientific scrutiny.  It was then that Perrier first adopted the theory that "subaqueous springs" existed in Lower Range Pond.

228.     In January 1992, Perrier's consultant, Mr. Richard at Wind River, issued a 102-page report that stated in its conclusions what its client wanted to hear:  that Perrier's wells in the kettle valley were hydraulically connected to those alleged subaqueous springs.  But buried deep in its report, Wind River *admitted* that it had found no scientifically valid proof that the subaqueous springs actually existed.

229.     Wind River began its discussion by correctly describing the difference between subaqueous springs and the "diffuse upward seepage through the bottom sediments" that is characteristic of most water table lakes.  Wind River also correctly noted that the

> lay perception of a spring is that of an identifiable orifice from which ground water emanates to the surface [and that the] most widely accepted scientific definitions of the term "spring" include the requirements that the water rise from the ground without the assistance of man and that the flow exit the discharge area via a channel.

230.     Wind River stated that "it has always been assumed that subaqueous springs" existed in Lower Range Pond "even though they had not been observed directly."  Using its correct definition of a spring, however, Wind River searched for the subaqueous spring orifices that were assumed to exist but found none.  Wind River first searched for springs by looking at the lake bottom with what it described as "water penetrating" color aerial photography.  That effort yielded the following map showing five potential spring areas off the shore of Lower Range Pond north of Defendant's property.  The five potential spring areas were marked on the map as areas "A through E" (orange boxes added):

74



231.     Scuba divers inspected these five locations to look for "[f]eatures indicative of possible spring discharge" such as the lack of vegetation and the lack of accumulated fine sediments that may have been removed by upwardly moving water.  The divers found such features only at Area E, which was located where the esker submerged into the pond.  The other four locations – including Areas C and D near the cove next to Perrier's Well 6 – "did not exhibit enough positive spring characteristics to warrant further investigation."

232.     Even as to Area E, however, Wind River found insufficient evidence to conclude that subaqueous springs existed.  While that area was devoid of vegetation and finer grained sands, the scuba divers had not actually seen any "upwelling water … as evidenced by sand boils or upward currents."  Because no "upwelling of water" was observed, Wind River concluded that the presence of a spring could not be scientifically substantiated.

233.     Wind River made a second effort to find subaqueous springs when Lower Range Pond began to freeze.  The presence of springs can delay the onset of ice directly above

75

them.  Wind River photographed four examples of unevenly freezing ice within the small cove between Well 6 and the esker.

234.     The four photos of unevenly forming ice, and a Wind River aerial photo showing where the four photos were taken, follow:



Photo #10



Photo #8



Photo #1

Photo #3

76



235.      Even though its earlier aerial photography had not shown that possible springs

existed at those four locations, Wind River stated that the photos of unevenly forming ice in the

cove "are considered to be direct evidence of spring discharge."  Wind River's report did not say

who believed the photos evidenced springs.  But whoever so believed was quickly proved wrong.

236.      Wind River's report stated that the lack of ice formation could be caused *either*

by (i) "moving water such as might be present in a spring area" *or* (ii) "ground water discharging

[which] is warmer than the surface water."  Since "[n]o motion was detected in the waters,"

Wind River concluded that "[i]t is likely that the resistance to freezing is the result of the

discharge of relatively warmer water from the aquifer to the pond."  Thus, Wind River found that

the unevenly forming ice resulted from general seepage into the pond, not from springs.

77

237.     Around the time Wind River issued its January 1992 report, Georgia regulators asked Maine's regulators and Perrier for proof that Perrier was selling genuine spring water under its Poland Spring label.  In a letter dated January 28, 1992, Francis Drake, Chief of Community Health Services at Maine's Department of Human Services, advised Georgia that all Poland Spring Water was collected from wells rather than at the source of a spring.

238.     Three weeks later, in a February 18, 1992 letter, Perrier's Poland Spring plant manager asked Mr. Drake to "issue a letter of clarification to the State of Georgia."  He asked Drake to explain the results of a "recently completed" study that culminated from "three years of intense research on the Poland Spring aquifer."  He was referring to Wind River's January 1992 report.  The plant manager wrongly told Drake that the study "definitively establishes" that the wells had a "hydraulic continuity" with the original Poland Mineral Spring and that "the water flow patterns within the aquifer (which pass through the boreholes) … ultimately drain into Lower Range Pond – via sub-aqueous springs, springs at the shore and general seepage."

239.     Drake did not send the requested letter.  But the very next day, on February 19, 1992, Maine's State Geologist, Walter Anderson, sent a two-page letter to Georgia's State Geologist, enclosing a "draft copy of part of a document and figures on the hydrologic system at Poland Spring, Maine," along with a "ground water flow net prepared by the Poland Spring Corporation" (apparently an exhibit to Wind River's report).  Anderson said that the flow net showed that groundwater "discharges via surface springs" at locations shown on the flow net "as well as via subaqueous springs discharging into Lower Range Pond."

240.     Anderson's letter also represented that Perrier's wells were "all … up gradient of the springs which discharge into Lower Range Pond and are located within the same stratum."  Anderson emphasized, however, that the document on which he was relying was "still in the

draft stage" and should not be relied upon except for informational purposes.  Anderson's representations that "surface springs" and "subaqueous springs" existed above and in Lower Range Pond were contradicted by Wind River's January 1992 report, which found neither.

241.     Why Anderson referred to the Wind River report as a "draft" when Perrier's plant manager had stated (correctly) that it was "recently completed" was not explained at the time.  But the reason was that Wind River had not found proof that subaqueous springs existed, and Perrier (and later Defendant) was commissioning another hydrogeological study that it hoped would be more favorable and better enable it to fend off Georgia's inquiry.

242.     On March 24, 1992, Perrier's Poland Spring plant manager again wrote to Francis Drake seeking the "clarification letter" he had previously requested on February 18.  The plant manager stated:  "Fran – As you know, this issue has profound and far reaching implications for the viability of the [Poland Spring] Corporation.  Your assistance in clarifying matters is greatly appreciated."

243.     Drake wrote to a Georgia regulator the next day.  He enclosed a copy of Mr. Anderson's letter.  Drake's letter itself, however, did not help Perrier.

244.     Drake's March 25 letter stated that he had met with the plant manager and Perrier's hydrogeologist, Mr. Richard, who "explained that water flowing from the springs" [meaning the original Poland Mineral Spring on Ricker Hill] "traveled downhill to the gravel strata and on down grade to the lake, where there are springs outcropping at the waterline of the lake according to pictures accompanying the explanation."  Drake did not write that he agreed with Richard's explanation.  In fact, he did not.

245.     Also, Drake wrote that Perrier merely "assumed" that the well water was "the same as the spring water."  He stated that he had not seen "any water quality test results from

waters at the original spring, wells, or the springs down at lakeside to compare results to determine if in fact the water quality was the same in all three cases or any two."

246.     Georgia's spring water definition in 1992, like the FDA's definition today, required that spring water collected by wells to "retain all the same physical properties of and be of the same composition and quality as the water that flows naturally to the surface" of a spring. Mr. Drake's March 25 letter demonstrated that Perrier had not satisfied this aspect of Georgia's spring water labeling requirements.

247.     Georgia regulators sued the Poland Spring Corporation in Georgia state court seeking an injunction banning the sale of Poland Spring Water in Georgia and removing all existing product inventory from store shelves.  Regulators from other states also began conducting inquiries.

248.     In October 1992, Mr. Richard of Wind River wrote to Perrier (copying the then-new Poland Spring plant manager) summarizing the purported "Relationship Between Production Boreholes and Spring Discharge" at Poland Spring.  Richard authorized Perrier to send his letter (but not Wind River's 102-page report) to the inquiring state regulators.

249.     Richard's letter did not mention the supposed "surface springs" that Maine State Geologist Anderson referred to in his February 19 letter.  Richard instead focused on what he now claimed were "subaqueous seepage and spring areas on the lake bottom and shoreline." He stated that Perrier's Poland Spring subsidiary was continuing to investigate "the hydraulic relationship between the subaqueous springs and seeps and its source boreholes" and predicted that, by the winter of 1993, he "fully expect[ed] that the results will clearly demonstrate that the water withdrawn from the boreholes at Poland Spring is the same water which discharges to Lower Range Pond via subaqueous springs and seeps."

250.     Richard also represented in his October 1992 letter that his photographs showing unevenly forming ice in the cove near Well 6 (*see* paragraph 234 above) evidenced the existence of subaqueous springs.  Richard did not disclose that he had found otherwise ten months earlier in the January 1992 Wind River report.

251.     Richard did not explain how the four "springs" he now claimed to have photographed were hydraulically connected to Perrier's wells or discharged the "same water" as that collected by the wells.

252.     Richard, moreover, illustrated the supposed hydraulic relationship between the wells and alleged subaqueous springs as follows:



253.     Richard's drawing depicts Lower Range Pond as a depression in the earth's surface that intersects the water table within in a uniform sand and gravel aquifer.  In that geological environment, groundwater will typically seep diffusely through the lake bottom, and there is little reason for Richard's posited subaqueous springs to form naturally.

254.     In a November 1992 letter to a California regulator, Maine regulator Francis
Drake again cast doubt on the validity of Perrier's claim that subaqueous springs existed along
the shore of Lower Range Pond.  Drake wrote that Mr. Richard had told Drake that he had
"found springs at the interface of the Range Pond water" and the company's land, but when
Drake was invited to inspect the area he "could not find any evidence of springs at the interface
of the lake" because it "was mid-winter and the pond and land were all frozen solid."

255.     By late 1992, Perrier was in the process of being acquired by Nestle Waters.
Defendant hired a hydrogeologist who was certified in Georgia, Philip E. LaMoreaux, whose
company, P.E. LaMoreaux & Associates (called "PELA"), prepared an 84-page report with 300
pages of appended charts, graphs and data (the "PELA Report"), dated February 12, 1993.

256.     The PELA Report did not even attempt to prove that subaqueous springs that
meet the FDA's current Identity Standard exist under Lower Range Pond.  All PELA showed
was that groundwater seeps diffusely through the bottom of that pond – which is true for just
about any lake that is formed by a surface depression intersecting the water table.

257.     The PELA Report, in fact, proves in several different ways that water bottled
from Defendant's Poland Spring wells is not genuine spring water and cannot be lawfully labeled
as spring water.

258.     First, PELA did not identify a single subaqueous spring with a natural orifice
through which a perceptible flow of groundwater emerges to the earth's surface, as required by
the FDA's spring water Identity Standard.  PELA did not even assert that it had found a spring
with a natural orifice.  PELA merely concluded that groundwater flows from the aquifer under
Defendant's wells "and discharges as diffuse spring flow into the pond."  PELA's reference to
"diffuse spring flow" throughout its report means ordinary groundwater seepage.

259.     PELA's illustration of its interpretation of the groundwater flow system within the drainage basin surrounding the Poland Spring site confirms that fact:



260.     PELA's illustration is indistinguishable from the Maine government's drawing of ordinary groundwater seepage into surface water bodies shown at paragraph 153 above.

261.     PELA used piezometers to measure the "diffuse spring flow," which are small wells that, in this case, measured flow three to four feet or more beneath the pond bottom.  But groundwater flow rates beneath the pond do not reflect its discharge rate at the pond's bottom.

262.     PELA also used seepage meters, which can more accurately measure discharge rates and volume of seepage from a lake bottom.  PELA stated that it found "significant"

discharge rates, but the actual measurements recorded by PELA's seepage meters lead to the exact opposite conclusion.  PELA focused on the highest discharge rates it found among its seepage meters, which showed discharge rates of *only 0.03 ounces per minute per square foot* of the lake bottom.  There are 128 fluid ounces in a gallon of water.  At these highest discharge rates found by PELA, a spring one square foot in size would yield only 0.023 gallons per minute and take almost 44 hours to produce a single gallon.  That is not evidence of genuine spring flow.

263.     Even if the alleged "spring" orifice was the size of a football field (which is unrealistic in any case and not the case here, as PELA found that much of the lake bed is far less permeable than at the points where it recorded its highest measurements), such a flow rate would yield only about 7 gallons per minute.  This is assuming that the highest rates PELA found existed throughout the football field-sized "spring area."  PELA measured some seepage meter flow rates that were far lower, which means that actual discharge into the pond is miniscule.

264.     Such miniscule discharge reflects nothing more than ordinary groundwater seepage.  Such diffuse, general discharge of groundwater into a water table level lake at the base of a drainage basin, like Lower Range Pond, is not a "spring" under the FDA's definition.  Otherwise, just about every one of the thousands of water table level lakes, ponds and streams in the Northeast would qualify as a spring, which was not the FDA's intent.

265.     Indeed, PELA stated that all three of the drainage basin's ponds – Upper Range Pond, Middle Range Pond and Lower Range Pond – were fed by PELA's conception of "spring flow."  Those three lakes collectively cover 1000 acres and contain billions of gallons of water.  To say all that water results from springs – as PELA would have it – would render the FDA's Identity Standard a mockery.  Groundwater discharging diffusely into a water table lake is not a spring.

266.     PELA cited other evidence to support its theory of subaqueous springs, but all of it was ambiguous at best.  PELA photographed unevenly freezing ice on Lower Range Pond's surface in November – the beginning of the winter freezing season, when ice naturally freezes unevenly.  Also, six geologists who scuba-dived and snorkeled in the pond had claimed to see changes in rock cover and mineralization (but without photographing any of it).  This, too, showed at most that groundwater seeps diffusely into the pond.  None of PELA's evidence proved that natural spring orifices exist at the pond's bottom.

267.     The PELA Report also contained data and illustrations showing that the three wells which were the subject of the report did not collect water from the same underground stratum that actually discharged groundwater into Lower Range Pond.

268.     During PELA's work, Defendant abandoned Wells 6 and 7 and drilled three new primary production boreholes, which PELA called "PW-1-92, PW-2-92, and PW-3-92." Their locations are shown in the site map at paragraph 270 below.  Most of PELA's analyses pertained to these three new wells rather than to Wells 5 and 8, even though Defendant continued to use those two wells.

269.     PELA found that the subsurface geological strata underneath Defendant's three new wells were comprised of "very heterogeneous" layers of sand mixed with layers of sand and gravel.  The sand and gravel strata are "irregular in shape and … laterally discontinuous."  The sand layers are "more stratified, cross-bedded, and more continuous."

270.     PELA illustrated these strata in four geologic cross-sectional drawings from locations shown in the below map (red boxes have been added to the map to identify the beginning and end points of the cross-sections, and orange boxes have been added to identify the locations of most of Defendant's then-existing old and new commercial production wells):

85



271.    Cross-sections A-A′ and D-D′ ran jaggedly south to north, ending in the Lower Range Pond cove near old Wells 6 and 7A.  Cross-section B-B′ ran west to east, crossing the esker and ending in the southern end of the main body of Lower Range Pond.  Cross-section C-C′ ran jaggedly northwest to southeast, ending at the base of the esker near old Well 7.

272.    PELA concluded that local groundwater (that nearest the surface) flowed east to west down Ricker Hill and that a deeper regional groundwater system flowed south to north towards Lower Range Pond.  Defendant's wells have *always* tapped the deeper regional flow.

273.    PELA's south-to-north cross-sectional diagrams showed that the wells collect water from different sand and gravel strata than the strata that discharge directly into Lower Range Pond.  The south-to-north cross-section A-A′ intersected well PW-2-92, which had a 20-foot long screen at the bottom and collected water flowing 47 to 67 feet below the surface:

86



274.     In PELA's above drawing, well PW-2-92's screen interval was at an elevation of between 266 and 286 feet above sea level (elevation above sea level is based on a standardized measurement called the "NGVD" scale).  Thus, PELA's diagram shows that the screen collected water from a sand and gravel stratum, and below that a sand stratum, that were beneath, and different than, the strata that discharged groundwater into the pond

275.     South-to-north cross-section D-D′ intersected well PW-1-92, which also had a screen 266 to 286 feet above sea level.  That well also collected groundwater from a sand and gravel stratum that was beneath, and different than, the strata which discharged groundwater into Lower Range Pond:



276.        PELA's Report also demonstrated that at least two of Defendant's then-existing wells – Wells 5 and 8 – were collecting surface water as well as groundwater and, therefore, were not collecting "the same" water as the groundwater that was allegedly emerging from the purported subaqueous springs.  By mixing in surface water, those wells were collecting water that had not "traveled the same path" as the groundwater that supposedly fed the alleged springs and could not be labeled as spring water.  PELA did not report this adverse information in the main body of its Report, however.  This information is discernible only from charts that PELA appended in the back of its Report.

277.        PELA, furthermore, concluded only that the well water and groundwater seeping into Lower Range Pond were "chemically equivalent."  It did not demonstrate that the

88

well water had all of the same physical and chemical characteristics as the water seeping through the pond bottom, which Defendant would have to prove under the FDA's Identity Standard if genuine subaqueous springs truly existed.

278.     PELA compared numerous samples that had been collected from 1991 through 1993 from Defendant's production wells with four samples that PELA collected from water flowing 4 to 5 feet beneath the pond and three samples PELA gathered from water seeping in through the pond's bottom.  PELA claimed that "diffuse subaqueous spring discharge" was occurring in many locations, but all of its samples were from the area where the pond merged with the cove near old Well 6.  PELA did not report test results for samples from numerous other "spring" locations, including from nearby spots in the cove itself.  PELA likely reported only the results of the samples that most closely matched the old well samples.

279.     Georgia officials accepted PELA's report without conducting an independent investigation to verify its results or test its conclusions (which would have been very expensive). Nestle Waters overwhelmed the state regulators with data that would have required substantial time and expense to refute.

280.     Defendant did not by any means prove through the PELA Report that the groundwater drawn from its production wells in Poland Spring, Maine, complied with the FDA's spring water Identity Standard in 1993, or that it complies today.

281.     In 1995, Defendant applied to Francis Drake, who was by then with the Maine Drinking Water Program, for approval to drill a new borehole to replace its Well 5.  The new well, called "PB #5," was 25 feet southwest of old Well 5.  Defendant supported its application with a report from a new hydrogeology consultant, Atlantic Geoscience Corporation.

282.     Like PELA, Atlantic stated that groundwater flowing from Ricker Hill "flows into Lower Range Pond as diffuse subaqueous ground-water discharge."  Atlantic added, however, that "[s]ome points of concentrated ground-water discharge are present off shore as subaqueous springs."  Atlantic stated it had relied entirely on Wind River's and PELA's earlier reports as the bases for this conclusion.  But as shown above, neither Wind River nor PELA had provided any evidence of concentrated spring discharge.

283.     Atlantic also stated that well PB #5 "intercepts groundwater that would discharge as springs," but it did not independently test or verify that such springs in fact existed. Atlantic's report, therefore, provided no scientific evidence supporting Defendant's claim that new well PB #5 met the FDA's spring water Identity Standard.

284.     Mr. Drake never approved Defendant's 1995 application.

285.     In September 1997, Defendant applied for a permit to install what it called "Replacement Borehole 2" (or "PB #2"), again supported by an Atlantic report.  This application was handled by a Drinking Water Program geologist named Paul Hunt instead of Mr. Drake.

286.     Well PB #2 was 20 feet from Well PW-1-92 (which was now called "PB #1"). Atlantic again relied entirely on Wind River's and PELA's earlier flawed reports to assert that new PB #2 intercepted spring water that would otherwise discharge into Lower Range Pond. Atlantic did not test whether the new well's water was the same as water emerging from a subaqueous spring.  Mr. Hunt, nevertheless, approved Defendant's application in one week.

287.     In December 1997, Defendant applied to Mr. Hunt for a permit to install a "Replacement Borehole 3" ("PB #3").  PB #3 was about 35 feet from well PW-3-92, which it was replacing.  Atlantic again supplied a report that relied on the flawed earlier Wind River and PELA reports to assert that subaqueous springs existed in Lower Range Pond.  Atlantic also

failed to compare the physical and chemical characteristics of PB #3's water to that of any alleged spring.  Hunt, nevertheless, approved Defendant's application in 10 days.

288.     In December 1997 and January 1998, Defendant submitted new Atlantic reports to New York, Maryland and California regulators purporting to demonstrate the hydraulic and geochemical relationship between PB #2, PB #3 and PB #5 and the alleged subaqueous springs.  These reports documented Atlantic's first independent effort to locate Defendant's alleged subaqueous springs.  Neither report, however, proved that Defendant met the FDA's spring water Identity Standard with respect to wells PB #2, PB #3 or PB #5.

289.     The California regulator specifically asked for proof that Defendant's alleged subaqueous spring had a natural "orifice" through which water flowed into the pond.  Atlantic responded by asserting that the Wind River and PELA reports had shown that "spring water discharges to Lower Range Pond through spring vents in the bottom of the pond."  Neither Wind River nor PELA had referred to spring "vents," however.  Atlantic simply lied to the regulator.

290.     Atlantic, moreover, did not find subaqueous springs where J.K. Richard or PELA had previously claimed they existed.  Rather, Atlantic's alleged subaqueous springs existed much further offshore, in the center of Lower Range Pond.  Atlantic's reports, however, failed to scientifically validate the existence of these new purported underwater springs.

291.     Atlantic stated it had collected and evaluated "water quality and remote sensing data" from the Poland Spring site between April and September 1997.  To "accurately locate the spring vents," Atlantic stated that it had surveyed the pond from 1,500 feet in the air, "using an airborne, thermal infrared scanner" immediately after the spring turnover of the lake water (which a later report said occurred on April 27, 1997) to generate "an infrared image of temperature variations present in the lake."  Atlantic did not report how it knew the spring

91

turnover had occurred and did not show how complete the turnover-related mixing of bottom and surface waters was at the time the aerial infrared photograph was taken.

292.     Why Atlantic resorted to this high altitude aerial infrared photography technique to "locate" spring vents that it claimed PELA had located five years earlier was not explained.  Nor was it explained why PELA had provided no underwater photographs of the supposed springs it found, or why Atlantic did not provide such photographs after it "located" the spring vents from the air.  Photographing subaqueous springs to prove that they exist is standard hydrogeological procedure.

293.     Indeed, the California regulator had expressly requested "photographs of the natural spring orifice."  Atlantic replied without explanation that the subaqueous "spring vents could not be photographed."  That was false.  Ample underwater camera technology existed at the time that could have been used to photograph the spring orifices had they truly existed.

294.     Atlantic's aerial infrared photography was not scientifically valid evidence that spring vents with natural orifices exist at the bottom of Lower Range Pond.  At an altitude of 1,500 feet, Atlantic's infrared camera's resolution, or "ground pixel dimension," was 4.4 feet – meaning any orifice smaller than 4.4 square feet would not have been captured by a thermal image.  Thus, to the extent the images showed genuine temperature variations in the lake, they did not reveal the presence of a natural spring orifice.

295.     Atlantic did not even *claim* that its thermal images were definitive proof that natural spring orifices exist on the bottom of Lower Range Pond.  Instead, Atlantic stated that its photographs showed merely the locations of "[t]hree prominent temperature anomalies" in the pond.  "Based on the physical size of the anomalies and the degree of thermal contrast," Atlantic

"interpreted" each anomaly "to reflect a pond temperature contrast created by spring water issuing into the pond."  Atlantic's thermal image of the "temperature anomalies" appears below:



296.     Atlantic "interpreted" this image as showing three "primary" subaqueous springs in Lower Range Pond.  A small one in the southwestern corner of the cove, which Atlantic dubbed "Spring #1," and two large, diffuse areas it called "Spring #4" and "Spring #5," both of which were about 1,000 feet away from Defendant's nearest wells.  Spring #1 was not in the same location as any of the "springs" that J.K. Richard claimed to have found in the same cove in October 1992.  *See* paragraphs 234, 250 above.  None of Atlantic's three "springs" was in the same location as any alleged point of "diffuse spring flow" identified by PELA in 1993.

297.     Atlantic's inference that subaqueous springs existed was scientifically unjustified.  The existence of purported springs that far out in the lake makes no hydrogeologic sense.  Typically, any focused groundwater discharge to lakes in sand and gravel environments

93

occurs at lake margins, *not* away from margins, since the lake bed deposits in the middle of lakes generally contain organic matter with low hydraulic conductivity through which water seeps slowly.  When springs do occur in middle of lakes, they typically occur because of fractures in underlying bedrock that deliver regional and deep groundwater to the lake, not from focused discharges from overburden sediments beneath the lake.  A thermal anomaly away from a lake's edge must be evaluated using hydraulic or other means to confirm any inference of spring discharge.  Atlantic provided no confirming evidence.

298.     The water temperature anomalies in Lower Range Pond can be explained by natural conditions that have nothing to do with subaqueous springs.  The pond's bottom varies substantially in depth, ranging from 4 feet to 41 feet deep.  Atlantic's inferred Springs #4 and #5 were in two of the deepest parts of the lake:



94

299.     Like many lakes in temperate zones such as Maine, Lower Range Pond thermally stratifies every summer.  According to the Maine Department of Inland Fisheries and Wildlife (whose map of Lower Range Pond appears above), the pond's water temperatures vary by 25 degrees or more in the summer.  Atlantic's infrared images could simply have recorded the early stages of the annual summer stratification or, given how scattered the greater temperatures were, incomplete mixing of water locally immediately after the spring turnover.  There also could be a bedrock spring that vents into the pond if the bedrock rises to the pond's bottom, but any such bedrock spring would not, and could not, be hydraulically connected to Defendant's overburden wells.  Atlantic did not consider these far more plausible explanations.  It leaped instead to an implausible interpretation that served its client's Nestle Waters' interest.

300.     Atlantic claimed it tracked down the "precise locations" of the three "spring vents" by comparing its thermal image with a map and discerning temperature differences between the pond's water and spring vents' water.  Atlantic, again, did not photograph the purported spring vents' natural orifices even after allegedly finding their "precise locations."

301.     Atlantic's December 1997 and January 1998 reports to New York's, Maryland's and California's regulators also failed to prove that Defendant's wells PB #2, PB #3 and PB #5 collected the same water that emerged from the three supposed subaqueous springs.

302.     Atlantic claimed it sampled water from the "spring vents" on both August 13 and September 22, 1997, by using collection devices called "Beta" or "Nansen" bottles.  Atlantic then sent the samples to a lab for testing and comparison to samples taken from PB #2, PB #3 and PB #5, and from Lower Range Pond itself.

303.     Atlantic found that the water from its alleged Spring #1 along the shore of the cove near Defendant's wells differed from the water collected by the wells.  Atlantic, thereby,

contradicted J.K. Richard's October 1992 claim that supposed springs along the shore of the cove qualified Defendant's wells as legitimate "spring water" sources.

304.      Atlantic wrote that the water from alleged Springs #4 and #5 in the middle of Lower Range Pond produced "essentially the same" water as the wells.  But a table in Atlantic's report shows differences between the wells' and alleged springs' water chemistries.  Notably, the silica in the wells' water exceeded that in the springs' water, which means the wells' water was *older* (*i.e.* in the ground longer) than that emerging from the "springs."  The wells, therefore, were *not* intercepting water "on its way to the springs."  The wells and "springs" waters also differed with as to hardness, alkalinity, manganese, iron, sulfate and calcium (quantities in mg/l):

| Analyte | PB #2 08/13 | PB #3 09/22 | PB #5 09/22 | Spring #4 08/13 – 09/22 | Spring #5 08/13 – 09/22 |
|---|---|---|---|---|---|
| Silica | 10.00 | 8.15 | 10.90 | 7.00 –  8.60 | 4.00 –  5.50 |
| Hardness | 34.20 | 50.50 | 33.50 | 20.80 – 22.10 | 20.00 – 18.50 |
| Alkalinity | 31.00 | 13.80 | 27.30 | 19.80 – 24.60 | 16.00 – 16.80 |
| Manganese | 0.01 | 0.01 | 0.03 | 0.88 –  1.00 | 0.01 –  0.57 |
| Iron | <0.01 | <0.01 | <0.01 | 7.48 – 11.82 | 0.03 –  0.58 |
| Sulfate | 4.75 | 3.88 | 8.07 | 1.71 – <0.05 | 3.87 –  2.51 |
| Calcium | 11.90 | 5.40 | 10.10 | 6.70 –  7.10 | 6.40 –  5.85 |

305.      Atlantic did not mention that the iron and manganese content of the water from alleged Springs #4 and #5 greatly exceeded maximum federal contamination levels ("MCLs").  The MCL for iron was 0.3 mg/l.  Spring #4 tested at 7.48 mg/l on August 13 and 11.82 mg/l on September 22 – almost 25 and 40 times MCL, respectively.  Spring #5 tested at .58 mg/l, almost double the limit, on September 22.  The manganese MCL was 0.05 mg/l.  Spring #4 tested at 0.88 mg/l and 1.00 mg/l – more than 17.5 and 20 times MCL, respectively.  Spring #5 tested at 0.57 mg/l on September 22, more than 11 times MCL.

306.      Plainly, the water collected by Defendant's wells was not "the same" as the water from the two alleged subaqueous springs, as Atlantic falsely claimed.

307.     Atlantic's December 1997 and January 1998 reports, instead, prove that wells PB #2, PB #3 and PB #5 do not collect "spring water" that meets the FDA's definition.

308.     Shortly after receiving this proof that Defendant's newest wells at its Poland Spring site were not producing "spring water" in compliance with the FDA's regulations, the State of Maine became a licensing partner in Defendant's spring water business.

309.     In February 1998, the Town of Poland's representative to the state legislature introduced a Governor's Bill to allow the state to license "groundwater extraction" wells at Range Ponds State Park.  The bill number was H.P 1568 – L.D. 2217.  The legislation would amend a 1985 statute establishing the Maine State Parks and Recreational Facilities Development Fund, which in 1998 was codified at 12 M.R.S. § 609.

310.     Under the proposed amendment, the state could license wells *only* to Defendant.  License revenues paid by Defendant were to be deposited into the fund used to develop, maintain and preserve Maine's state parks.

311.     The bill was signed by the governor and enacted into law on March 31, 1998.  After the license agreement was executed, the amendment was repealed during the next legislative session, wiping evidence of Maine's deal with Defendant from the books.  The license itself, however, remained in place, generating millions of dollars in fees for the State.

312.     Robert Marvinney, then Maine's State Geologist, wrote in a February 1998 memo that he had been working with Defendant on the licensing bill for 18 months.  The State's licensing fee for the first ten years was $.0063/gallon, which was to be adjusted in 2009.

313.     One week before the licensing bill became law, Defendant, through Atlantic, submitted a proposal seeking the state's approval to install two new wells on the Range Ponds State Park property.  The two new wells, ultimately known as "PB #9" and "PB #10", became

subject to the State's license.  Defendant represented that the two new wells were going to be built "600 feet" from Lower Range Pond's southern shore.

314.     Well PB #9, however, was eventually built only 185 feet from an inlet on the pond, as shown in the below site map prepared in 2007 (orange boxes added).  PB #9 in all likelihood draws in surface water from that inlet.



315.     By late November 2005, Defendant had paid Maine more than $3.6 million in license revenues.  Payments have likely doubled or tripled since then, in part because Defendant installed a new well on State property in 2007, "PB #11," which generated additional revenue. PB #11 is 200 feet north of a large kettle pond and 200 feet south of a smaller kettle pond, where "B-200" appears on the map above, and likely draws in surface water from both kettles.

316.     Maine *never* required Defendant to prove that the three state-licensed wells were hydraulically connected to a genuine spring or to otherwise demonstrate that the water collected by those wells complied with the FDA's spring water Identity Standard.

317.     Nevertheless, Maine's Drinking Water Program granted Defendant final approval to produce "spring water" from PB #9 and #10 in May 1999, and it approved PB #11 as a "spring water" source in May 2008.

318.     In May 1999, Haig Brochu of the Drinking Water Program represented to New York state regulators that the groundwater collected by PB #9 and PB #10 "is in fact spring water intercepted on its way to the subaqueous spring vents located in Lower Range Pond." Brochu reached that conclusion based on Atlantic Geosciences' scientifically inconclusive 1997 "thermal infrared image," which he stated "clearly shows" the existence of subaqueous springs.

319.     PB #9 and PB #10 are one-half mile – and separated by 2600 feet of water – from Atlantic's alleged subaqueous "Spring #4," and they are three-quarters of a mile – and separated by 3600 feet of water and a large sand and gravel esker – from alleged "Spring #5." Even if those were genuine springs (which they are not), the likelihood that those two state-licensed wells were collecting the same water from the same underground stratum as the purported springs was virtually nil.  Brochu could not have reasonably asserted otherwise without an analysis detailing the subsurface geology beneath the wells and between the wells and the alleged springs.  Defendant never provided such an analysis.  Nor did the State prepare one.

320.     In his representation to New York regulators, Brochu also relied on what he claimed was "pump test data and the geochemical signature of both borehole samples and samples taken from the subaqueous spring vents."  But Defendant never provided the State with pump test data showing that PB #9 and PB #10 were hydraulically connected to alleged Springs #4 and #5.  Nor did the State conduct its own pump tests to obtain such data.

321.     Defendant did provide lab reports for PB #9 and #10 from two different sampling dates in March 1999, but without assembling a table to compare the water samples'

99

geochemical characteristics with samples from the alleged subaqueous springs.  Doing that table now proves the well and "spring" waters were not the same, as the FDA requires.  Several elements and properties differed in the samples (quantities in mg/l – "NT" means not tested):

| Analyte | PB #9 03/02 – 03/03 | PB #10 03/11 – 03/15 | Spring #4 03/03 – 03/12 | Spring #5 03/03 – 03/12 |
|---|---|---|---|---|
| Silica | NT  –  9.00 | 11.00 –  NT | 6.00 –  5.50 | 5.00 –  5.00 |
| Chloride | 4.20 –  4.33 | 1.72 –  1.70 | 5.99 –  6.26 | 5.83 –  5.86 |
| Sodium | 3.00 –  3.20 | 2.08 –  2.00 | 4.60 –  4.50 | 4.30 –  4.40 |
| Hardness | 20.00 – 15.00 | 13.50 – 16.00 | 17.60 – 17.40 | 16.60 – 16.50 |
| Total Solids | 51.00 – 25.00 | 34.00 – 14.00 | 33.00 – 35.00 | 29.00 – 30.00 |

322.     Again, the significantly higher incidence of silica in the wells' water than the purported springs' water means – definitively from a geochemical perspective – that the two waters had not "traveled the same path" and were not "the same" water, as the FDA's spring water Identity Standard requires.  The presence of more silica in the wells' water means that the water collected by them was "older" – *i.e.*, it was in the ground longer – than the water emerging from the purported springs.  For well water to qualify as spring water, the well must be up-gradient from the spring, capturing water *before* it emerges from the spring.  The well's water, by definition, must be "newer" water than the spring's water.  It cannot be older water.

323.     In short, after effectively becoming Defendant's business partner in connection with PB #9 and PB #10, Maine's Drinking Water Program did not require Defendant to prove compliance with the FDA's spring water Identity Standard as to those wells, and the Program told New York's regulator that it had data showing compliance when it had no such data.

324.     The Drinking Water Program also did not disclose to New York's regulator that the State of Maine was profiting from Defendant through its PB #9 and PB #10 license fees or that Maine's regulators, therefore, had an actual or potential conflict of interest with respect to enforcing the FDA's spring water regulations as to those wells.

325.     In July 1998, Defendant applied to replace PB #1, supported by another report from Atlantic.  The report was prepared by Mark Dubois, who later became employed by Woodard & Curran, a hydrogeological consultant that worked for Nestle Waters on later projects.  In 2003 or 2004, Dubois began working in-house at Nestle Waters.

326.     Relying entirely on its and PELA's earlier flawed reports, Atlantic's July 1998 report assumed without conducting new tests that subaqueous springs existed in Lower Range Pond.  Atlantic did not test whether the new PB #1 was hydraulically connected to the alleged Springs #4 and #5 or any other springs, and it did not determine whether water collected by the new well was the same as water emerging from a supposed spring.

327.     Despite the lack of testing and lack of evidence, in January 1999, Mr. Brochu of the Maine Drinking Water Program advised New York state regulators that new PB #1 intercepted "spring water" on its way to subaqueous springs in Lower Range Pond.

328.     In March 1999, Defendant applied to replace its well PB #4 with a new borehole, again supported by an Atlantic report.  The new well was located northwest of PB #3, less than 200 feet from Lower Range Pond.



329.     Atlantic again performed no new tests to determine if genuine springs with a natural orifice existed in the pond and simply assumed based on the flawed earlier reports that so-called Spring #4 and Spring #5 were genuine springs.  Atlantic also did not test whether PB #4 was hydraulically connected to either of those alleged springs.

330.     Atlantic did compare the geochemical characteristics of water samples from PB #4 with samples from those alleged springs in 1999.  The well's water again had more than twice as much silica content as the alleged springs' water, proving that the well's water was older than the alleged springs' water and, therefore, plainly not "the same" as the FDA requires.

331.     In January 2008, Defendant applied to install well PB #11 on the State's property east of Defendant's bottling plant.  (*See* paragraphs 206 and 315 above.)  That well was subject to Maine's license with Nestle Waters.

332.     Defendant applied simultaneously to replace PB #5.  That well was not subject to the State's license agreement.

333.     PB #11 is almost two-thirds of a mile and three-quarters of a mile, respectively, from alleged Springs #4 and #5, and separated from them by several kettle ponds, an esker and thousands of feet of lake water.  Even if those were genuine springs, it is inconceivable that PB #11 is hydraulically connected to them or collects the same water that emerges from them.

334.     Defendant *never* submitted a hydrogeological report or other evidence to the State showing that either PB #5 or PB #11 met the FDA's spring water Identity Standard, and the State never asked for any such evidence.

335.     Maine's Drinking Water Program nonetheless approved both wells PB #5 and PB #11 as "spring water" sources in May 2008.

336.     Based on the foregoing, none of the eight commercial production wells that Defendant uses to produce Poland Spring Water at its Poland Spring site is a lawful spring water source under the FDA's regulations.

337.     There may be an additional reason that Defendant's products bottled from its Poland Spring wells cannot lawfully be labeled as spring water.  Defendant may be purifying the water it collects from those wells.

338.     In March 2000, Atlantic Geoscience submitted an "Engineering Design Report" relating to the bottling plant that Defendant was building at that time in Hollis, Maine. According to that report, the water then being produced from Defendant's wells in Poland Spring was demineralized upon arrival at the Poland Spring bottling plant to reduce manganese and radon.

339.     The FDA made clear in an August 2012 letter to Defendant that treating spring water to remove minerals requires it to be labeled as "purified water" rather than spring water.  If Defendant continues to demineralize the water from its wells in Poland Spring, then all Poland Spring Water products produced from those wells must be labeled as purified water.

340.     Defendant's Poland Spring site is inaccessible to the general public.  It is protected by "NO Trespassing – Violators will be Prosecuted" and other warning signs.

341.     All of the wells behind Defendant's bottling plant in Poland Spring are hidden from view by trees and blocked from public access by a fence.  Even the bottling plant is not visible from the roads, Ricker Hill or Range Ponds State Park, much less the wells.  There is no indication to passersby that anything other than a bottling plant exists on Defendant's site.  No signs indicate that water used in Poland Spring Water products is being collected from the valley east of Ricker Hill or from the southern shore of Lower Range Pond.

342.    In sum, all of Nestle Waters' Poland Spring Water labels identifying the Poland Spring as a source for its "spring water" products are false and misleading.  Nestle Waters does not collect water from the Poland Spring or any other genuinely existing spring source in Poland Spring, Maine.  Defendant's wells in Poland Spring, instead, collect ordinary groundwater from a sand and gravel aquifer lying close to the earth's surface.

343.    Far from collecting water flowing to the surface through a natural orifice at a pristine mountain spring, as most of its Poland Spring Water labels depict, Defendant collects ordinary groundwater in Poland Spring, Maine from wells in a low-lying valley in one of Maine's most populous counties, precariously near several bodies of potentially contaminating surface water, and directly down gradient from both a former spray septic field and an old refuse dump.  Rather than water that was cleansed by natural forces within the earth for years, the water Defendant collects in Poland Spring may have fallen as rain or snow only weeks earlier, and it may not be suitable for bottled water at all under FDA regulations given the existence of several bodies of surface water only feet from the wells.

344.    The water that Defendant collects in Poland Spring, Maine, does not meet the FDA's Identity Standard for spring water because (i) it does not meet the FDA's three-part definition of spring water; (ii) it is not collected in compliance with the FDA's bore hole collection requirements for spring water; and (iii) it is common groundwater that is falsely represented on Defendant's Poland Spring Water bottle labels to be "100% Natural Spring Water," in violation of the FDA's labeling requirements.  Defendant's wells in Poland Spring should be tested to determine if the groundwater they collect are under the influence of surface water, rendering the water illegal for use in bottled water altogether.  Defendant cannot use the "Poland Spring" brand name because that spring is not an actual source of its products.

**B.     Water Collected at Defendant's "Clear Spring" Site in Hollis
Is Not Spring Water Because the Clear Spring Is Man-Made**

345.     Although Nestle Waters represents on its Poland Spring Water labels that some

of the purported "100% Natural Spring Water" contained therein may be sourced from a spring

called the "Clear Spring" in Hollis, Maine, that spring does not genuinely exist.  What Defendant

calls the "Clear Spring" is, in reality, a wetland that contains man-made canals that have been

fitted with wells, pipes and plastic tubing that enable Defendant to mimic a spring.  None of

Defendant's water comes from a natural spring in Hollis, Maine.  Defendant's identification of

the "Clear Spring" as a source for its Poland Spring Water is fraudulent.

346.     Hollis Township is in heavily populated York County, the most southwestern

part of the state.  Defendant's wells and bottling plant are located in North Hollis, between Lily

Pond and Killick Pond, in a plain encircled on three sides by the Little Ossipee and Saco Rivers.



347.     In a series of transactions from 1999 through 2005, Defendant purchased more

than 1,400 acres of property, shown in red in the photograph below, between the eastern shore of

Killick Pond and the north side of Plains Road.  Defendant built a large bottling plant – described in some reports as the largest water bottling plant in the country – on a former potato farm on Killick Pond Road, where agricultural pesticides had been used for at least a dozen years.



348.     From 2000 to 2002, Defendant built five purported "spring water" production wells – called "PB-1" through "PB-5" in the photo above but also called "BH 1-5" – southwest of Wales Pond, which were connected to the bottling plant by a 1.5 mile-long pipeline.

349.     Defendant also built five utility wells during that period, including one called "UW-5" in the above photo, which was drilled in a field one mile northeast of its production

wells.  Maine regulators initially approved UW-5 in 2002 as a non-spring water source, and

Defendant used it for nine years to make purified bottled water, including Nestle Pure Life

products.  But at Defendant's request, to meet increasing spring water demand, Andrews Tolman

of Maine's Drinking Water Program re-designated UW-5 as a "spring water" source in 2011.  In

2013, a new "spring water" well was built at that same location, called "Borehole 6" ("BH-6").

  350.  The road leading to Defendant's first five wells in Hollis runs along a ridge

between Wales Pond and a large bog that Defendant calls "Stake Pond."  The land containing

Wales Pond east of that road and north of Defendant's wells is owned by the Shy Beaver

Hatchery, a century old trout breeding facility that currently discharges 1.5 million gallons per

day of fish hatchery wastewater into the Wales Pond Brook just north of the pond.  Hatchery

wastewater can contain dissolved substances that can sometimes contaminate groundwater.



Google Maps

351.     Defendant's wells are located on dead ends off the road that runs along the top of the ridge.  The road and wells sit on the ridge 20 feet above Stake Pond and 40-50 feet above Wales Pond and a wetland that contains man-made canals, visible in the first photo below, north and east of Defendant's five wells.  The fish hatchery's runways for its maturing trout are visible in the photo on the eastern shore of Wales Pond.

352.     The small wetland sources some of the influent water for the fish hatchery. Many years ago, the wetland was connected to the hatchery on the south side of Wales Pond by the man-made canals, which were dug into the earth and are, in many places, shored by wooden planks.  As seen in the two photos below taken in December 2002, the man-made canals begin in the far northwestern corner of the small wetland about 200 feet northeast of Defendant's westernmost well.  That the trenches are man-made is clearly visible in the two photographs.



Google Earth



353.     The area containing the small wetland and man-made canals is what Defendant fraudulently calls the "Clear Spring."

354.     The wetland is not a spring.  Nor is it sourced by a spring with a natural orifice. The water in the wetland comes from recent precipitation and groundwater seepage, or it emerges artificially through small artesian driven points and other wells, not springs. Defendant's alleged "Clear Spring," therefore, does not meet the FDA's definition of a spring, and the water drawn from wells PB-1 through PB-5 cannot be lawfully labeled as spring water.

355.     As shown below, Defendant's identification of the "Clear Spring" as a source of Poland Spring Water violates the FDA's Identity Standard for several other reasons as well.

356.     To perpetuate and conceal that violation, Defendant has installed or maintained driven point wells in the wetland and canals and has run pipes and green plastic tubing from one

or more wells on the ridge above to create an artificial water flow in the canals.  These artifices enable Defendant to mimic a spring when visitors ask to see the purported "Clear Spring."  To simulate a robust spring, Defendant channels water down the pipes and green tubing to enhance the already artificial flow of water flowing up from the driven point wells in the wetland and canals, making it appear as if there is a natural flow of water exiting from under the ridge.

357.    One artesian driven point well in Defendant's artificial Hollis spring can be seen in footage from a PBS NEWSHOUR segment on Nestle Waters that aired in August 2008. A portion of the segment was filmed on a platform at the base of a wooden staircase that Defendant built between one of its Hollis wells at the top of the ridge and the canals beneath it. The news camera by happenstance filmed water flowing from a man-made circular hole at the bottom of one of the canals.  *See www.pbs.org/newshour/bb/environment-july-dec08-waterbottle_08-18/*, at 2:10-2:22.  A close-up from the footage shows that man-made orifice and a resulting man-made flow of water.  That orifice is the top of an artesian driven point well that artificially causes pressurized groundwater flowing many feet below to spill into the canal.



358.    Photographs of another artesian driven point well and some green plastic tubing in the Hollis wetland that Defendant calls the "Clear Spring" appear below.  The first photo shows the white-colored top of a submerged driven point well that forces groundwater to bubble into the wetland.  The second photograph shows a green plastic tube, which appears to have once been buried but exposed over time, running alongside one of the man-made trenches in the wetland.  The third photograph shows two still-buried green plastic tubes emptying (at that time a trickle) of water into a man-made trench.







359.     That Defendant artificially created and enhanced alleged "spring flow" at its

Hollis site is corroborated by a December 2002 report by its consultant Woodard & Curran.  That

report stated that the flow rate in the alleged "spring canals" had ceased to the point that Defendant could not measure it.  To correct the problem, beginning in August 2002, Defendant had "taken proactive measures to … increase spring canal flow" that included "a plan to upgrade the spring canals and re-instate the flow of water in the canals."  Pursuant to that "plan," Defendant diverted well water through plastic tubes into the wetland and man-made canals.

360.    Killick Pond, Lily Pond and Wales Pond lie in natural depressions in the earth that intersect the water table.  As shown in the following historical topographical map available on the U.S. Geological Survey and derivative websites, the shores of all three bodies of water are steep 40 to 50 foot slopes.  (Dark brown lines represent a 50-foot elevation change, from 300 to 250 feet above sea level, and light brown lines represent a 10-foot elevation change.)  The map also shows Stake Pond, which lies immediately west of and 20 feet above Wales Pond.  The small wetland under the ridge east of Stake Pond was not identified as a spring on the map.



361.    Nor does that historical U.S. Geological Survey topographical map show any other natural spring near the southern shore of Wales Pond.

362.     The Maine Geological Survey maps of the Limington Quadrangle, in which Defendant's Hollis plant and PB 1-5 are located, and the Standish Quadrangle to the east, in which UW-5 is located, confirm the existence of a sand and gravel aquifer beneath Defendant's properties.  The Maine Survey map also does not show a natural spring near Wales Pond's southern shore.  Like the historical topographical map above, the Survey shows only a stream connecting Stake Pond to Wales Pond Brook, which flows from Wales Pond to the Saco River:



363.     The Survey map was created in 1998, before Defendant's wells were bored.  It shows that Defendant's wells access a "yellow" zone that generally provides a "ground-water yield" of between 10 and 50 GPM.  The Survey's index states, however, that groundwater yields in such zones can "exceed 50 gallons per minute in deposits hydraulically connected with surface water bodies."  Defendant's first five wells together collect water at a far greater rate than 250

GPM, suggesting that they are hydraulically connected to Wales Pond, Lilly Pond or Stake Pond. Defendant has never shown that its Hollis wells do not capture surface water.

364.    The falsity of Defendant's claim that a natural spring exists on its Hollis property is underscored by the fact that the exact nature and location of the supposed "Clear Spring" has shifted in Defendant's reports over time to suit Defendant's needs.

365.    When Defendant first investigated the Hollis site beginning in 1997, it initially identified as "springs" 13 locations behind its bottling plant along the shore of Killick Pond. Defendant also initially identified another four purported "springs" in a usually dry patch of ground about 1500 feet north of where Wales Pond empties into Wales Pond Brook, and one allegedly east of the brook, in the vicinity of UW-5.  (*See* site map at paragraph 369 below.)

366.    Defendant bored test wells near all 18 of these initially identified "springs" in Hollis, but those test wells did not yield commercially satisfactory results.  Other than near UW-5, Defendant abandoned using those areas for "spring water" wells and opted for the more viable production site along the ridge encircling the wetland and canals southwest of Wales Pond.

367.    In a May 1999 "Water Supply Site Location of Development Application" prepared by Defendant's then-consultant Atlantic Geosciences Corp. for submission to the Maine Department of Environmental Protection, Defendant identified a spring it called "PSP1" located within one of the fish hatchery's influent canals.

368.    In that same report, Atlantic referred to a seasonal seep of groundwater located one mile away near where UW-5 was later drilled as a "spring" called "HSP1."

369.    Atlantic referred to the four supposed springs west of Wales Pond Brook as "HSP 2-5," and the 13 other purported springs along the eastern shore of Killick Pond as "HSP 6-18."  Atlantic's reported "springs" are shown in its below diagram:



370.    In its May 1999 report, Atlantic referred to the purported "spring(s) PSP1" as "spring canals" and stated that the canals "are situated on the floor of a small valley incised into the outwash plain at Wales Pond," implying that the "valley" was "incised" by spring flow.  It plainly was not.  The "valley" containing the wetland is actually part of the kettle that, along with Wales Pond, was formed when a large block of ice melted long after the ice age glaciers that once surrounded it receded north.  The spring canals were "incised" by man.  Their natural flow rates are not remotely forceful enough to carve natural canals.

371.    Atlantic offered only speculation as to the geophysical cause for the alleged spring PSP1's existence.  Based upon what it called "a preliminary interpretation of available data," Atlantic wrote that "it appears that the springs occurred due to the thinning" of the sand

116

and gravel aquifer that caused groundwater flowing north to be "forced upwards, under a strong vertical gradient, to intersect the land surface and discharge at the spring orifices." But there were no data – preliminary or otherwise – that supported Atlantic's theory of spring formation.

372.     Atlantic's conjecture, moreover, was inconsistent with the only actual evidence of the underlying strata, which was obtained from a nearby test well called "PTW-1-99." That well had been drilled to a depth of 98 feet below ground and never encountered clay or less permeable soils that could potentially cause groundwater to flow vertically to the surface. There was no evidence that any less permeable layer rose up under the "springs," or that the permeable aquifer thinned there. Atlantic admitted, moreover, that its hypothesized "vertical gradient" at PSP1 was observed only in "well points" – meaning artesian driven point wells – that had been inserted into the man-made canals. The fact that groundwater rises to the surface in an artesian well means only that the groundwater is under pressure. It does not indicate that a "strong vertical gradient" sufficient to cause a *natural* spring exists. Even pressurized groundwater flowing only horizontally under the earth's surface will rise to the surface in an artesian well.

373.     Atlantic's theory for the "spring" called HSP1 one mile northeast of PSP1 was that it was a "contact spring" resulting from a low-permeability clay stratum near the surface that inhibited downward groundwater flow. But a nearby test well, called "HTW-2-98," encountered only permeable sand up to a depth of 76 feet, revealing no clay near the surface.

374.     Thus, the test well boring logs in Atlantic's own report recording the underlying strata contradicted Atlantic's spring formation theories for both "spring" locations.

375.     There was also no evidence of any natural spring "orifices" at either the PSP1 or HSP1 sites. Atlantic's May 1999 report presented no photographs of any spring orifice.

376.     Atlantic merely *assumed* that "spring orifices" existed in the PSP1 canal, stating:  "The vertical component has been observed as an upwelling in well points driven into the spring orifices in the canal fed by PSP1."  Well points are not natural spring orifices.  While Atlantic implied that the wells were driven into real orifices that lay somewhere in the man-made canals, it never stated that such orifices were actually found.  Drilling a well into the ground to create an opening for groundwater to emerge does not give rise to a natural spring.

377.     Neither the PSP1 nor HSP1 "springs" that Atlantic reported existed in May 1999 was a genuine, natural spring under the FDA's regulations.

378.     In March 2000, Atlantic prepared an Engineering Design Report in support of Defendant's application to build its bottling plant and drill its first four Hollis wells, BH 1-4. That report evidences that Defendant intended to purify the water collected from those four wells by using "a tray air stripper to remove radon."  Under FDA regulations, any well water that is demineralized by an air stripper must be labeled as purified water rather than spring water.

379.     In May 2000, Atlantic prepared a Final Installation Report for Defendant's application to produce "spring water" from BH-1 and BH-3.  Atlantic repeated its "strong upward gradient" theory of spring formation "along the valley floor" at PSP1, stating that the "the aquifer thins from south of the springs northward" causing vertical groundwater flow.

380.     Specifically, Atlantic stated that the depth of an impermeable clay stratum – called the "Presumpscot Formation" – "would appear to dip southward from the area of Stake Pond to the area south of" Defendant's wells and that "[h]orizontal (northward) groundwater flow from the aquifer towards Wales Pond intersects the boundary condition created by the low permeability Presumpscot Formation creating a strong, upward, vertical component of ground-water flow."  But Atlantic's thinning aquifer theory was indefensible based on its own data.

381.     Atlantic's site map, copied below, showed the locations of 19 test borings – all prefixed "PTW" – near Defendant's production wells, which were referred to as PB# 1-4.



382.     All of the test wells were on the ridge near the production wells.  No test wells were bored into the "spring area" or into any terrain for up to 3200 feet north of it.  Thus, Atlantic had no data showing how deep the asserted Presumpscot clay formation actually was beneath those areas.  It therefore had no data corroborating its theory that the aquifer thinned from south to north creating vertical groundwater flows.

383.     The test boring data that Atlantic relied on, in fact, shows that the aquifer thickens, rather than thins, from south of the springs in a northeastward direction, which is the direction in which the groundwater flows through the alleged spring area.

119

384.     Atlantic sought to support its model by way of a table that noted how far below ground each test boring first encountered silt, which Atlantic claimed marked the upward edge of the "transitional boundary" between the sand and gravel strata and the clay stratum.  Atlantic failed to report, however, that many of the test borings did not encounter any clay at all, and that some of those borings hit bedrock instead.  Rather than recording the depth of silt (which was too thin a layer to be impermeable here) to gauge aquifer thickness, Atlantic should have measured the depth of the impermeable clay or bedrock.  Doing that more scientifically relevant study would show that both the clay layer and the bedrock underlying the Hollis well site dip *downward* between the well locations and the "spring" area, not upward to create a vertical up-gradient of groundwater flow in the aquifer, as Atlantic conjectured.

385.     A cross-sectional drawing of the strata underlying the Hollis well site (shown in full and part below) prepared by another Nestle Waters consultant in 2000 corroborates this:



120



Figure 2-
North-south Cross Secti
Hydrogeologic Investigation Repo
Poland Spring Bottling Compan
Hollis, Mair

386.    The above model, prepared by Woodard & Curran, contradicts Atlantic's

theory that "strong upward gradients" caused natural spring flow in the canal area.  It shows that

all of the overburden strata and underlying bedrock dip downward under the "spring area," not

upward as Atlantic claimed.  (While Woodard & Curran assumed without supportive data that a

number of faults appear in the stratification *north* of the "spring area" and that the Presumpscot

121

formation dips upward about 800 feet north of the spring area, neither of those conditions, as modeled, would cause an upward flow of groundwater into the alleged spring area.)

387.     Woodard & Curran's model asserts that the "spring area" and the areas immediately south and north of it contain silt and clay interlayered with sand and gravel, including a clay layer at the base of the ridge.  Such confined conditions would *inhibit* rather than cause vertical flow upward.  Unless a fault lies within these tight materials (and none are shown), actual focused spring orifices could not exist, and only slow diffusive groundwater discharge through the sediments would occur, as in any groundwater discharge area.

388.     If natural springs existed in the area, moreover, the artesian driven point wells Defendant uses to force pressurized groundwater to flow upwards into the canals would have been both unnecessary and ineffective because the pressure at depth would have been naturally dissipated by the volumes of water discharging at the springs.

389.     Woodard & Curran's drawing also shows that the supposed "spring area" is merely a wetland – labeled in the drawing as the "Wales Pond Wetland" – which intersects the water table at its highest point during the March snowmelt season.  (*See* Note 4 of the drawing.)

390.     Finally, Woodard & Curran's drawing shows that Defendant's well PB-3 does not collect water from the same stratum that would feed any natural spring in the wetland.  That well's screen is 55 to 75 feet – and 6 sedimentary strata – below the wetland's bottom.

391.     Atlantic – despite having no supportive data for its model and notwithstanding Woodard & Curran's contrary model – still insisted in May 2000 that the Presumpscot Formation (the grey and black layer in the diagram below) rose under the "spring area" generating "strong upward gradients" that caused springs to flow into the canals.  Atlantic's spring formation "theory" was scientifically baseless and plainly contrived to suit Defendant's business interests.

392.     And while Atlantic's reports stated that the purported "springs" rose directly under the man-made canals, its model instead showed seven "springs" emanating from the *wall of the ridge* where the ridge meets the water table as it descends into the wetland and canal area:



393.     Atlantic created this false concept of multiple springs to feign compliance with the FDA spring water Identity Standard's requirement that the water from Defendant's wells and the allegedly related "springs" must be the same water.  (*See* paragraphs 399-403 below.)

394.     Atlantic's depiction of springs flowing from the walls or base of the ridge is in any event false.  The ridge walls are dry most of the year, except perhaps when they seep from recently fallen precipitation during the snowmelt season.  The only things that emanate from the base of the ridge year-round are man-made canals and green plastic tubing.

395.     Even the premise of Atlantic's demonstrably false spring formation theory was flawed.  While aquifer thinning (if it actually exists) can produce higher upward head gradients, the mere fact of higher upward gradients alone does not translate into proof of a natural spring as defined by the FDA.  There needs to be a clear natural place of discharge that is measureable and which includes an orifice.  Strong upward gradients, if they exist, can produce diffuse groundwater seepage in wetlands.  But such seepage faces are not springs.

396.     Atlantic's May 2000 report also demonstrated that Defendant did not meet the FDA's requirement that the water collected from BH-1 and BH-3 had to be "the same" as the water emanating from the alleged springs,

397.     First, Atlantic misstated the FDA standard.  Instead of ensuring that the well and spring waters were "the same," Atlantic asserted that it merely had to gather "compelling evidence of a similarity" between the physical and chemical properties of water samples collected from the spring and wells.

398.     Second, Atlantic never found that the water samples from the wells and "springs" were even similar, much less the same.  Rather, Atlantic concluded only that the water came from the same aquifer:  "[Atlantic] concludes that the water pumped from these two boreholes is derived from the same water source that discharges at the springs."  That finding does not satisfy the FDA's sameness requirement.

399.     Third, Atlantic's test results showed that the water collected from BH-1 and BH-3 were physically and chemically different, and that the water from both wells was different than the water from the alleged springs.  For testing purposes, Defendant claimed there were 12 "spring points" at the "Clear Spring."  Those 12 points are shown along the canals in red as "SP-1 through SP-12" on the site map at paragraph 381 above.  These "spring points" were not

natural spring orifices that enabled Atlantic to sample water that emerged at the surface.  All 12

were driven point wells that sampled groundwater flowing many feet beneath the surface.

Atlantic did not compare any water sampled from a production well to a sample gathered at the

natural orifice of a spring, as the FDA requires.  Atlantic compared samples of groundwater

collected by the production wells only to samples collected by other nearby wells.  Atlantic's

well-to-well comparisons were meaningless under the FDA's rules.

400.    Atlantic also picked and chose among Defendant's 12 "spring points" and

reported only the "spring samples" that most closely matched each of the production well's

samples.  Atlantic compared production well BH-1 only to the driven point wells designated as

SP-11 and SP-12, even though SP-10 was much closer to BH-1 than was SP-12.  Atlantic

compared production well BH-3 only to the driven point wells designated as SP-4 and SP-5,

even though SP-2, SP-3, and SP-6 were equally as close to BH-3.

401.    Atlantic's own tables demonstrate that BH-1 and BH-3 collect very different

water, and that their selectively chosen "spring points" did not collect "the same" water as both

production wells (Atlantic referred to BH-1 and BH-3 as PB #1 and PB #3):

| Constituent | Spring 11 4/11/00 | Spring 12 4/11/00 | PB #1 4/11/00 | Spring 4 3/30/00 | Spring 5 3/30/00 | PB #3 3/30/00 |
|---|---|---|---|---|---|---|
| $HCO_3$ (mg/l) | 6.1 | 6.1 | 7.3 | 12.2 | 13.4 | 14.0 |
| Cl (mg/l) | 0.8 | 1.0 | 1.1 | 13.0 | 11.0 | 11.0 |
| $SO_4$ (mg/l) | 2.0 | 1.6 | 1.7 | 2.0 | 2.0 | 2.0 |
| Ca (mg/l) | 1.4 | 1.3 | 1.7 | 5.9 | 5.0 | 5.0 |
| Fe (mg/l) | ND | ND | ND | ND | ND | ND |
| Mg (mg/l) | 0.2 | 0.2 | 0.26 | 1.0 | 0.9 | 1.0 |
| Mn (mg/l) | 0.007 | ND | ND | ND | ND | ND |
| K (mg/l) | 0.3 | 0.28 | 0.7 | 0.9 | 0.7 | 0.9 |
| Na (mg/l) | 1.5 | 1.7 | 1.7 | 6.9 | 6.9 | 7.0 |
| Conductivity (μS/cm) | 22 | 16 | 22 | 78 | 68.2 | 71 |
| TDS (mg/l) | 19 | 19 | 20 | 45 | 42 | 40 |
| Alkalinity (mg/l) | 5.0 | 5.0 | 6.0 | 10.0 | 11.0 | 11.5 |
| Hardness (mg/l) | 4.5 | 4.1 | 5.1 | 18.9 | 16.2 | 16.6 |
| pH (units) | 5.6 | 5.4 | 5.5 | 5.9 | 6.1 | 6.0 |

402.     BH-1 is less than 600 feet from BH-3, yet the two wells collect water that has very different chemical signatures, particularly with respect to their chloride, sodium, alkalinity, conductivity and hardness.  Defendant's Poland Spring Water labels claiming that both wells collect water that emanates from the same "Clear Spring" are highly misleading.

403.     The groundwater collected by BH-1 also was plainly not the same as the water from alleged Springs 11 and 12, which Atlantic chose to compare.  The water from those spring points was more dilute than the well's water.  The water from a spring must necessarily be more concentrated in dissolved substances because it emerges at the end of flow paths and stays in the ground longer than well water that is collected up-gradient along the same flow path.

404.     Notwithstanding the facial insufficiency of Atlantic's May 2000 report and Defendant's inability to demonstrate compliance with the FDA's Identity Standard, Maine's Drinking Water Program found that Atlantic had shown that BH-1 and BH-3 "intercepted" spring water "on its way to the spring vents" at "the naturally occurring springs."  The Drinking Water Program approved both boreholes as spring water production wells on June 27, 2000, one month after Defendant submitted Atlantic's report and applied for final approval.

405.     Atlantic also submitted a Final Installation Report for production wells BH-2 and BH-4 in support of Defendant's September 2000 application for final approval of those wells as "spring water" sources.  Atlantic's September 2000 report adopted its May 2000 report wholesale and, thus, suffers from all of the same flaws.  Atlantic also again compared the production wells' water to other well water sampled from some of the driven point wells that Defendant deceptively calls "spring points."

406.     Atlantic also again selectively chose from among Defendant's 12 "spring points" to try to obtain the best matches to the water sampled from the two production wells.  For

BH-2, Atlantic ignored the closest spring point, SP-1, and instead chose SP-12, which was more than twice as far away. Atlantic also compared BH-2's water to SP-3, but it ignored SP-2, SP-4 and SP-5, which were all within a few feet of SP-3.

407.    For BH-4, Atlantic compared SP-8 and SP-9, which were a few feet from each other in the man-made canals and about 250 feet northwest of BH-4. Those were the nearest spring points, but Atlantic ignored SP-7, which was only about a dozen feet west of SP-8.

408.    Atlantic's results, nevertheless, again showed that the water collected by BH-2 and BH-4 were different from each other and different from the spring points.

409.    Thus, Defendant failed to prove that BH-2 and BH-4 complied with the FDA's Identity Standard, and bottled water from those wells cannot be labeled lawfully as spring water.

410.    Notwithstanding the fatal deficiencies in Atlantic's September 2000 report, Maine's Drinking Water Program approved BH-2 and BH-4 as spring water production wells on October 2, 2000, a mere two weeks after Defendant submitted its application.

411.    In May 2002, Defendant applied to install its fifth production well on the ridge above the man-made canals it calls the "Clear Spring." The new well, called BH-5, was installed 180 feet east of BH-1. Woodard & Curran prepared the Final Installation Report for BH-5.

412.    Woodard & Curran now adopted Atlantic's theory that the "springs" allegedly feeding the man-made canals "occur because of a thinning of the aquifer in the vicinity of Wales Pond," but it did not adopt Atlantic's concept that the Presumpscot Formation formed a clay barrier north of the springs. Woodard & Curran disagreed with Atlantic on this, writing that "some layers of clay were deposited in and around" the kettle ponds in the area, including Wales and Stake Ponds, but that "[b]ecause of its limited extent, the silty clay has no major role in the movement of groundwater in the aquifer."

413.     Inconsistently, and without explanation, however, Woodard & Curran claimed that some silty clay was "acting as a local confining layer and inducing upward vertical gradients and associated springs in the Wales Pond area."

414.     But data from the test boring logs attached to Woodard & Curran's report contradicted this claim.  For example, the log from a new test well called "PTW-23" that was drilled in the purported "spring area" did not yield data supporting the existence of a confining clay stratum that causes an upward vertical groundwater flow.  The boring log for PTW-23 stated that it had encountered only fine to medium sand and gravel up to 40 feet beneath the "spring" and, then, fine to medium sand and mica between 40 and 45 feet beneath it.  That boring log showed that the sand and gravel aquifer extended at least 40 feet below the surface, and that there was no impermeable barrier even 45 feet beneath the surface that could have created an upward flow of groundwater.

415.     Woodard & Curran's September 2002 report, like Atlantic's earlier reports, referred to "well-defined spring vents" but failed to include a single photograph of a natural spring orifice or other tangible evidence of a genuine spring vent at Defendant's Hollis site.

416.     In fact, Woodard & Curran's report reinforces that the alleged "Clear Spring" is man-made.  Woodard & Curran wrote that the "[f]low of water in the spring vent areas are [sic] aided by spring points installed into the spring orifices."  It also wrote that it had found "three new spring points (SP-20, SP-21, and SP-22) ….  These spring points are 1.25-inch drive points installed during early hatchery operations to improve individual spring flow."

417.     In other words, Woodard & Curran conceded that the water flowing in the alleged spring area comes from driven point wells.  The existence of those man-made "springs" disqualifies the alleged "Clear Spring" under the FDA's rules from being a legitimate source of

spring water.  Even if the spring points only "improve" the flow rather than supply the entire

flow in the spring canals, the Clear Spring is still disqualified because the purported spring's

flow is artificially enhanced and any "natural flow" cannot be measured.

418.     If any natural "spring vents" do exist at the site, they were not photographed,

and neither Atlantic nor Woodard & Curran showed that they continued to flow while

Defendant's wells were pumping, as FDA rules require.

419.     Like Atlantic, Woodard & Curran also relied entirely on the "spring point"

wells when testing if BH-5 was hydraulically connected to the alleged spring.  Woodard &

Curran's diagram at paragraph 385 above shows that some of the spring points collected water

from 20 to 25 feet below ground.  None of the spring points collected water that emerged at the

earth's surface or at the bottom of the canals.  Thus, Woodard & Curran never showed that BH-5

was hydraulically connected to water emerging from a spring as the FDA's Identity Standard

requires.  At best, Woodard & Curran showed that BH-5 was hydraulically connected to other

nearby driven point wells.  That showing is irrelevant under the FDA's rules.

420.     Woodard & Curran also relied entirely on the driven "spring point" wells when

comparing the chemical similarity between BH-5's water and water from the alleged spring.

Like Atlantic, it only sampled water from many feet underground rather than water emerging at

the surface from a spring, which is a meaningless comparison under the FDA's rules.

421.     Woodard & Curran, moreover, reported only a comparison of BH-5's water

with a sample from *one* of the 23 spring points, SP-21, undoubtedly the most similar to BH-5's

sample.  Woodard & Curran also compared BH-5's water with water drawn from BH-1 (but not

from BH-2, -3 or -4).  The three samples Woodard & Curran chose to compare and report on

were each analyzed by Defendant's own laboratory rather than an independent testing facility.

Based on these limited and wholly irrelevant tests, Woodard & Curran falsely concluded there was "a strong chemical similarity between the on-site springs and the boreholes" and that there was a "direct … geochemical match between Borehole #5 and the spring."

422.     Despite the patent insufficiency of Woodard & Curran's report to establish compliance with the FDA's spring water Identity Standard, Maine's Drinking Water Program approved BH-5 as a spring water production well.

423.     In January 2002, Defendant applied to have its utility well UW-5 permitted only as a public drinking water supply source, not as a spring water source.  UW-5 was a mile northeast of Defendant's alleged "Clear Spring."

424.     UW-5 was drilled about 500 feet from alleged spring HSP-1 (*see* site map at paragraph 369 above), into a field where chemical fertilizers had been long-used and close to several other sources of potential contamination.  It was less than one-third of a mile from a 2.5-acre former town dump, equidistant from an old gravel pit, and less than one-half mile from a large former sand and gravel quarry, each of which can be seen on the map below east of what was called "Area II," where UW-5 was drilled (red box added):



425.    The Maine Geological Survey map at paragraph 362 above shows that the

three potential contamination sources are in the same drainage divide as HSP-1 and well UW-5.

Consistently, Atlantic's initial 1999 report showed that all three sites were within the well's area

of recharge, meaning that groundwater flowing from under them could be drawn in by the well:



426.    In December 2004, when Defendant applied to build UW-5 (which was near a

well called "TW-6"), Woodard & Curran re-drew the recharge area so that it skirted the outside

edge of the dump and quarry area but included most of the small gravel pit area:



427.    Later, in 2011, when Defendant was seeking to have UW-5 re-designated from a public water source to a spring water source, Woodard & Curran again re-drew the recharge area and moved its northeastern boundary 500 feet southwest, excluding all three contamination areas – including the smaller former gravel pit – from the recharge zone entirely:



428.    Woodard & Curran's reports stated no scientific basis for its successive shrinking and relocations of the recharge area.  Its above 2011 depiction of the recharge area had straight edges and corners, rather than the more naturally occurring rounded edges seen in the earlier depictions – as if a drawing of a more natural recharge area had been airbrushed.

429.    In December 2004, when Defendant applied to build UW-5, chemical analyses of the water collected from a well thirty-five feet from UW-5 detected levels of nitrate and nitrite that exceeded federal maximum permissible contaminant levels for drinking water.  Water from UW-5 surely had the same levels of these contaminants.

430.    For this reason, Woodard & Curran stated in its December 2004 report that "water from this watershed will pass through a reverse osmosis (RO) treatment facility," which Woodard & Curran noted was "currently in use for all utility water entering the plant" in Hollis.

431.     In September 2005, the Maine Drinking Water Program approved Defendant's application to use reverse osmosis to treat water from UW-5 "for the removal of Nitrate, due to the exceedance of the MCL [federal minimum contamination level] for Nitrate."  Because it was purified by reverse osmosis, all bottled water products sourced from UW-5 had to be labeled "purified water" or "reverse osmosis water" under the FDA's regulations, whether or not a spring existed near those wells.

432.     For the next six years, Defendant used UW-5 for its non-spring water lines, including its Nestle Pure Life brand of purified bottled water and some flavored water products.

433.     In September 2011, Defendant applied for a permit to convert UW-5 from a purified water source into a spring water source.  Woodard & Curran provided a supporting Hydrogeologic Report.  In that report, based on its second conveniently re-drawn recharge area shown in paragraph 427 above, Woodard & Curran stated that there were no "known potential contaminant sources within the modeled recharge area," other than past farming practices, which it did not anticipate would adversely affect the UW-5 well's water quality.

434.     UW-5 was 500 feet east of HSP-1, a depressed area of ground into which groundwater occasionally seeps and collects, primarily during the spring snowmelt season.  Woodard & Curran provided no photographs or other viable scientific analysis showing that HSP-1 is a genuine spring with a natural orifice that meets the FDA's definition of a spring.

435.     Even if HSP-1were a genuine spring, well UW-5 was not hydraulically connected to it.

436.     UW-5 was drilled to 75-feet below the surface and collected groundwater through a 15-foot screen in soils that are 58 to 73 feet below ground.  The nature and composition of those soils were depicted in cross-sectional diagrams in both Woodard &

Curran's 2005 report supporting Defendant's application to approve UW-5 as a reverse osmosis source well and in Woodard & Curran's September 2011 report supporting Defendant's application to upgrade UW-5 to a spring water source well.

437.     Both reports depicted the same two cross-sections, A-A′ running roughly south to north and B-B′ running roughly west to east.  The first map identifying the cross-sections below is from the 2005 report.  The second is from the 2011 report.  (Dark red boxes added.)



438.     The intricacy (and accuracy) of the cross-sectional diagrams, however, differed in the two reports, because Defendant's needs were different in 2005 and 2011.

439.     In the 2005 report, when approving UW-5 as a purified water source was the aim, Woodard & Curran portrayed a richly stratified, multilayered subsurface consisting of various different types and mixes of sedimentary materials.  As seen below, it is very clear from the 2005 illustration that a well in UW-5 and TW-6's location would draw groundwater from many different strata.

440.     In the 2011 report, however, when approving UW-5 as a spring water source was the aim, Woodard & Curran eliminated the stratification in order portray a subsurface suggesting that UW-5 would draw groundwater from only one sedimentary layer.

441.     The first two cross-sectional diagrams below are from Woodard & Curran's 2005 report.  The second two are from its 2011 report.  (The blue line represents the water table.)





442.    Woodard & Curran made the 2011 diagrams look as if UW-5 was drawing water from only one stratum rather than many in order to help Defendant meet the FDA spring water Identity Standard's requirement that the well's water must come from the same

underground stratum that sources the spring.  UW-5 was a 10- by 16-inch commercial well that pumped groundwater at a rate of at least 50 gpm/ft. through a fifteen-foot screen 58 to 73 feet below the surface.  That well plainly drew groundwater from multiple underground strata per the 2005 drawing, not all of which (nor even most of which) feed the "spring" – HSP-1 – that Defendant claims is hydraulically connected to UW-5.

443.     Woodard & Curran's 2005 drawings are certainly the accurate depictions of the subsurface under UW-5 and near the purported spring.  And they prove that Defendant cannot meet the FDA's requirement that the well's and spring's water come from the same stratum.

444.     Woodard & Curran also failed to establish compliance with the FDA's other spring water Identity Standard requirements because it did not measure whether UW-5 was hydraulically connected to water emanating from a natural orifice of the asserted spring HSP-1, and it did not determine whether the well's water had the same physical and chemical composition as water emerging at the surface from that alleged spring.

445.     Instead, Woodard & Curran used a driven point well to measure and sample groundwater from several feet below the surface of the purported spring.  Thus, it again measured irrelevant factors – the hydraulic connectivity between, and chemical comparability of, groundwater flowing under well UW-5 and groundwater flowing under another nearby well.

446.     By using only measurements from the driven point well, Woodard & Curran also failed to document whether pumping UW-5 stopped the flow of water emanating from the alleged spring at the surface.

447.     Woodard & Curran's September 2011 report did not include a table or append lab reports showing the physical and chemical characteristics of the water sampled from the driven point well near the asserted spring, which was denoted as "DP-1."  Woodard & Curran

137

nevertheless wrote that the water discharging to HSP-1 "is of the same composition as the water captured by Borehole UW-5."  Woodard & Curran based this finding in part on a diagram, called a Piper diagram, on which it plotted the chemical signatures of samples taken from DP-1 and UW-5 (as well as from a flume on the surface of Wales Pond Brook).  The Piper diagram, however, shows that the compositions of DP-1's water and UW-5's water were not even close:



448.     Another Woodard & Curran graph revealed that DP-1's water contained about 100% more sodium, 50% more chloride, sulfate and bicarbonate, and 30% more total dissolved solids than UW-5's water.  If DP-1's water had come from a genuine spring rather than from many feet below the ground, Woodard & Curran's report would have showed definitively that the water was not the same as the water collected by UW-5.

138

449.     Notwithstanding the plainly manipulated and insufficient data in Woodard & Curran's September 2011 report, Andrews Tolman of Maine's Drinking Water Program, in a November 1, 2011 letter to his former student and business partner Tom Brennan at Nestle Waters, re-classified UW-5 as a spring water source well.  Even Tolman, however, did not state that its water was "the same" as the alleged spring's water, as the FDA's Identity Standard mandates.  Tolman stated only that the "spring and borehole are geochemically correlated," which does not meet the FDA's rigid test.

450.     Defendant has never claimed that HSP-1 is part of its "Clear Spring" one mile away.  Yet Defendant has never identified HSP-1 as a "spring source" on Poland Spring Water labels.  Nor has the Drinking Water program required Defendant to identify that "spring source."

451.     In October 2013, Defendant applied to replace UW-5 with a new well adjacent to it called "Borehole-6 (BH-6)."  Defendant hired a new consultant, Luetje Geological Services, LLC, to submit a supporting report to the Drinking Water Program.

452.     Luetje did not attempt to prove that BH-6 was hydraulically connected to the alleged HSP-1 or that it collected water that has the same physical and chemical composition and quality as water emerging at the surface from that "spring."  Luetje instead compared BH-6 to UW-5.  That well-to-well comparison was irrelevant under the FDA's water Identity Standard.

453.     Defendant has never proved compliance with the Identity Standard as to BH-6.  Nevertheless, the Drinking Water Program has approved BH-6 as a spring water source.

454.     The road from Killick Pond Road to Defendant's Wales Pond wells is barred by a gate, "Private Property" and "Posted – No Trespassing" signs stating that trespassers "will be prosecuted to the full extent of the law."  The wetland and man-made canal area that Nestle

Waters calls the "Clear Spring" is on the Shy Beaver Hatchery's property.  But "Posted – No Trespassing" signs are affixed to trees along the ridge, where Defendant's property line begins.

455.     "Posted – No Trespassing" signs also exist along the entire perimeter of Defendant's property, sometimes with additional signs that depict a video camera and a "WARNING" that "This property is monitored by video surveillance."  Decker Circle, which led to the former Hollis town dump and gravel pits, and from which BH-6 can be accessed, was once a public road.  Defendant has now barred access to the portion that runs across its property by way of a gate that is protected by "No Trespassing" and "Video Surveillance" warning signs.

456.     The few road signs that exist in the area of Defendant's Killick Pond Road bottling plant that mention the name "Poland Spring" refer only to the plant.  There are no signs or other indications that Nestle Waters is operating groundwater wells in the area or that Poland Spring Water is being collected in the vicinity.

457.     In sum, Defendant's Poland Spring Water labels identifying a "Clear Spring" as a source for its "spring water" products are fraudulent because the "Clear Spring" is really a wetland that contains only man-made springs.  Nor does Nestle Waters collect water from any other spring source in Hollis.  Defendant's Hollis wells collect ordinary groundwater from a sand and gravel aquifer where the water table lies 20 to 50 feet below the surface.

458.     The water Defendant collects in Hollis, Maine does not meet the FDA's Identity Standard for spring water because (i) it does not meet the FDA's three-part definition of spring water; (ii) it is not collected in compliance with the FDA's bore hole collection requirements for spring water; and (iii) it is common groundwater that is falsely represented on Defendant's Poland Spring Water bottle labels to be "100% Natural Spring Water," in violation of the FDA's labeling requirements.

C.      Water Collected at Defendant's "Garden Spring" Site in Poland Is
        Not Spring Water, and the Garden Spring Is Not a Genuine Spring

459.      Although Nestle Waters represents on its Poland Spring Water labels that some

of the purported "100% Natural Spring Water" contained therein may be sourced from a spring

called the "Garden Spring" in Poland, Maine, that spring is man-made.  None of Defendant's

water comes from a natural spring located in Poland, Maine.  Much of the water collected at the

Poland site is drawn from a lake that is 175 feet from one of Defendant's wells.  Defendant's

identification of the "Garden Spring" as a source for its Poland Spring Water is fraudulent.

460.      The the water collected from Defendant's two wells in Poland does not meet a

single element of the FDA's spring water Identity Standard.

461.      According to Androscoggin County property records, Nestle Waters owns land

in a saturated valley adjoining the northern tip of Tripp Pond 4-1/2 miles northwest of Ricker

Hill and Defendant's wells on the southern edge of Lower Range Pond in Poland Spring.



Google Maps



mytopo.com

462.     Defendant owns 17 acres (red boundary on the above topographical map) one mile west of the "Five Corners" intersection of State Routes 11 and 26 and Winterbrook Road (also called Herrick Valley Road and Tenney Road).  The site is bounded by Winterbrook Road on the north, Tripp Pond on the south, wetlands that adjoin Tripp Pond on the west, and Winter Brook and its related wetlands on the east.  Winter Brook runs northwest along the town border (see red town boundary lines on the first map above).  It flows from the northern end of Tripp Pond, and a small adjacent bog called Mud Pond, towards Hogan Pond to the northwest.

463.     Defendant's facility and two wells at the northern tip of Tripp Pond have been built on top of old gravel pits between Tripp Pond and the Winter Brook wetlands, which are reflected in the above topographical map.  That map and the photos that follow show that Defendant's site and the entire valley are surrounded by and riddled with wetlands.

142



Google Earth



Mapquest

464.     Defendant's two wells are off its facility's entrance road and parking lot, which are frequented by tanker trucks and other vehicles.  In the photograph below, the first well ("Well #1) is the roofed cottage in the bottom south corner of the paved area, less than 175 feet

from Tripp Pond and 100 feet from the wetland that borders the west side of the building.  The

second well ("Well #2") is the roofed cottage just south of the entrance gate.  That well is only

70 feet from the wetland behind the building and 130 feet from the small pond across the road,

which, as shown below, was man-made and lies within the Winter Brook's seasonal floodplain.



465.     The extensive wetlands, including bogs and swamps, that surround Mud Pond

and interconnect with the Winter Brook reflect both the saturation level of the ground and a

potential for surface water contamination that exists at Nestle Waters' Poland site.



Google Earth



Google Maps

466.     The Maine Geological Survey map of the Mechanic Falls Quadrangle confirms that Defendant's property sits atop a narrow band that corresponds to the highest groundwater yielding portion of a sand and gravel aquifer that underlies Poland, Maine.  The Survey does not show any naturally occurring spring on Defendant's site.  Nor does any current or historical map produced by the U.S. Geological Survey or other source available on the internet.  A Google® search did not reveal a single reference to the existence of a "Garden Spring" in Poland other than the references on Defendant's websites and in its marketing and advertising materials.



467.     The "Garden Spring" that Nestle Waters represents on its Poland Spring Water labels as a "source" of its "100% Natural Spring Water" does not naturally exist.  Instead, Nestle Waters has maintained a fictional "Garden Spring" in an old gravel pit to falsely convey the image that Defendant is collecting water from a naturally occurring spring in an idyllic, garden-like setting in Poland, Maine.  Defendant uses its man-made "spring" to deceptively conceal the fact that Defendant is really collecting ordinary groundwater next to a parking lot in a populated area from wells that are only feet away from a potentially contaminating stream and lake.

468.     The fiction of a "Garden Spring" existing at the site now owned by Defendant began when workers excavating the old gravel pits on the site inadvertently struck the water table, leaving three man-made holes that seasonally filled with groundwater.  In 1989, a company called the Maine Bottling Company drilled a well near the holes left by the excavators and began selling the groundwater it collected under the brand name "Garden Spring Water."  One of the excavators' holes is precisely what Nestle Waters now calls the "Garden Spring."

146

469.     Defendant knows there was never a free flowing natural spring with a natural orifice in that area.  Initially, Maine officials did not certify the Maine Bottling Company's man-made holes as "springs" but, rather, merely permitted the company to sell "bottled water."  In the 1990s and early 2000s, after Defendant acquired the site, Maine officials renewed that "bottled water" permit.  In recent years, however, without requiring Defendant to submit the detailed hydrogeological data and geochemical water composition and quality analyses typically required to certify a "spring water" site, Maine officials have looked the other way and have described Defendant's "Garden Spring" property as a permitted "spring water" production site.

470.     In 1989, Maine Bottling Co., at times also called Maine Spring Water Co., dug its well near the old gravel pits and applied to the Town of Poland to build a small water bottling plant on the site that Defendant now owns.  In its application, the company referred to three purported "springs" on the site as "Springs A, B and C."  All three were man-made holes, which gravel excavators had dug and that seasonally intercepted the water table.

471.     After four years of operation and accumulating tens of thousands of dollars in unpaid tax liens, the Maine Bottling Co. and its well site were sold to one of Defendant's then-affiliates in January 1994.

472.     In May 1999, Defendant filed a "Shoreline Application and Conditional Use Application" with the Poland Town Planning Board seeking post-hoc permission to reclaim the gravel pit on which it had built its facility and to obtain approvals for its existing buildings and uses there.  Maps and sketches pertaining to the application referred to the areas surrounding the old gravel pits as "wetlands."  They did not refer or point to a single spring.

473.     Defendant's 1999 application also included a Wetland Report prepared in April 1998 by Jones Associates, Inc.  Jones described the area near Winter Brook where Defendant

147

now claims a spring exists as "wetlands associated with the floodplain adjacent to winter brook." Drawings submitted with the 1999 Application show that the brook's 100-year flood zone now encompasses the entirety of the area where Defendant's "Garden Spring" is purportedly located.

474.     During Jones' visit in late March 1999, the wetland area was inundated to within two feet of the 100-year flood zone water line.  Such high water levels exist seasonally at the site during the March-April snowmelt recharge season.  Defendant's purported spring area is regularly inundated with surface water, submerging the alleged "Garden Spring," making it yet another "subaqueous spring," according to Defendant.

475.     Jones also noted that areas near the Winter Brook "have been disturbed by past excavation activities" and that "the water table is described as being at or near the surface about half the time."  In other words, he saw man-made pits that at times intersected the water table.

476.     In June 2002, Defendant filed another application with the Maine DEP that was prepared by Jones.  That application sought a permit under Maine's Natural Resource Protection Act ("NRPA") allowing Defendant to dredge and modify a portion of the wetlands on the south bank of the Winter Brook.  The application sought to "isolate" a supposed "natural spring," which Defendant at that time *admitted* existed in a "previous borrow pit" – *i.e.*, an old gravel pit.

477.     In the 2002 NRPA application, Jones wrote:  "Previously, this area was the site of a borrow pit" and "[m]ounds of excavated material remain adjacent to" that old gravel pit. Jones did not know the "origin of the mounds," but stated that they were "deposited by a previous owner" of the site.  Jones overlooked the obvious – that the origin of the mounds was the "excavated material" that Jones itself said had remained "adjacent to" borrow pit from which the material had been removed.  That is, whoever dug the borrow pit and hit the water table deposited the excavated materials next to the pit, creating the mounds.

478.     This explanation was confirmed by the Maine DEP in its September 27, 2002 order approving Defendant's NRPA application.  That order parroted, without analysis or independent verification, Defendant's labeling of the borrow pit as a "spring," but DEP's description of the site makes plain that the "spring" was not naturally made:

> The immediate project area was historically altered by a previous owner through the removal of soil from the spring area and placement of such adjacent to the spring and within the floodplain wetland.

479.     In short, the alleged "spring" did not rise to the earth's surface naturally but seeped in from the bottom of a man-made excavated hole, much like water would seep into a basement constructed below the water table.  Then, in 2002, Defendant sought to "isolate" that man-made "spring" by making additional, man-made alterations to the old borrow pit.

480.     Because it was initially man-made (and may have been later altered by man rather than by nature), Defendant's "Garden Spring" fails to meet the FDA's definition of a spring, which requires water to flow naturally to the earth's surface through a natural orifice.

481.     Defendant's planned 2002 alterations of the old borrow pit "spring area" were extensive, and they were designed to artificially preserve the man-made spring's existence so that Defendant could falsely claim that the "Garden Spring" is a naturally occurring spring.

482.     Jones's description of the "isolation" project in Defendant's 2002 NRPA application stated that Defendant intended to "remove previously excavated mounds, restore the wetland and enhance the surrounding wetland area."  Jones also claimed that Defendant wanted to shield the purported spring from contamination by storm water runoff and the Winter Brook's seasonal flooding.

483.     Defendant's proposed "isolation" project entailed adding "approximately 453 square feet of fill" into the old gravel pit and installing a three-foot diameter stainless steel

149

cylinder around the purported spring, which would be buried two feet into the ground and rise two feet above the surface.  On top of that steel "riser," Defendant intended to build a Gazebo with a transparent floor through which visitors could observe the "spring."  As shown in the aerial photographs and construction plans below, Defendant's project sought to dramatically enlarge and alter the site's natural condition – in which no natural spring ever existed.

484.    The excavated borrow pit that Defendant calls its "Garden Spring" is located on the south shore of the Winter Brook, less than 200 feet from where the brook exits the northern end of Defendant's property through a culvert under Winterbrook Road.  The below photograph was taken in May 2010, when the Winter Brook's waters and the groundwater table were still high.  The photo shows the Winter Brook at the top, flowing northwesterly to the culvert.  The purported "spring" area is the flooded hole on the edge of the tree line just northeast of the access road entrance gate.



485.     The above photograph was taken several years after Defendant proposed altering the site to "isolate" the "Garden Spring."  The following photograph, however, taken in December 2002, showing the unaltered site, tells a different story.



486.     The above photo confirms that the "spring area" was initially a hole in the ground that the gravel excavators had dug on the bank of Winter Brook and its adjoining wetland.  The hole was separated from the brook by a natural bank of earth that was part of the sand and gravel esker that gave rise to the underlying aquifer.  The excavators had deposited soil they removed from the hole on top of that natural earth bank.  After the water table was struck, two straight, rectangular-edged canals were dug at the northern end of the pit to enable groundwater seeping into the hole to exit into the brook.  That exit route, however, also enabled

the brook's seasonal floodwaters to back into the excavated hole, creating a new backwater channel and wetland on what was once dry ground.  The man-made canals are clearly visible in a close-up view of the photo.



487.    The extent to which Defendant intended to alter that old gravel pit is seen in a diagram from Defendant's 2002 NRPA application, shown in pertinent part below:



488.    The red dashed "existing contour" lines depicted on the 2002 site plan do not show the man-made trenches that are visible in the December 2002 photographs above.

489.    Neither Defendant's 1999 Jones report nor its 2002 NRPA application contains a single picture of the supposed spring's natural orifice or any other visual proof that a natural spring exists at Defendant's "Garden Spring" site.

490.     Even if there were a natural spring in the old gravel pit next to Winter Brook, historical lab analyses from the Poland site show that the water from that "spring" is not the same as the groundwater that Defendant collects from its two production wells in Poland.

491.     In 1990, Maine Bottling Co. claimed three "springs" existed on the site. Its well was drilled near where Defendant's Well #1 is now located, in the southeastern corner of the site, and its "Spring A" was "close to the road," approximately 500 feet from the well, in or near the former borrow pit that Defendant now calls the "Garden Spring." Maine Bottling Co.'s "Springs B and C" were only 100 to 120 feet from its well, in a pit above which Defendant's facility was later built. Defendant does not now claim that either of those two "springs" exists.

492.     Maine Bottling Co.'s well was 66 feet deep and collected water from a zone of contribution that included the northern tip of Tripp Pond and the wetland west of the well. The groundwater seeping into its "Spring A" came predominantly from shallow groundwater flows, including water interconnected with the Winter Brook and its adjoining wetlands. Consequently, laboratory test results from 1989 and 1990 showed that the quality and composition of the water seeping into "Spring A" differed in many respects from the water collected from the well. The flows into the well were so dynamic, in fact, that there were material differences in the water's properties from year to year. The following chart identifies the values of several major properties of and compounds in water samples collected from "Spring A" in 1990, the well in 1990 and the well in 1989:

| **Analyte** | **"Spring A" 1990** | **Well 1990** | **Well 1989** |
|---|---|---|---|
| pH | 6.4 | 7.8 | 6.6 |
| Hardness | 17.0 | <50.0 | 25.4 |
| Iron | .13 mg/l | .013 mg/l | .04 mg/l |
| Nitrate/Nitrites | 1.20 mg/l | <.5 mg/l | .22 mg/l |
| Chloride | 15.0 mg/l | <10.0 mg/l | <10.0 mg/l |

493.     Given these differences, Francis Drake of the Maine Drinking Water Program determined that while the well and "Spring A" (as well as "Springs B and C," which had yet different characteristics than either "Spring A" or the well) were "basically the same" water, "the only conclusion" he could "arrive at is the waters in all the samples are [from] the same source aquifer."  The fact that the well water was from "the same source aquifer" as the water seeping into "Spring A" does not mean that the water collected from those two sources have the same physical and chemical properties, as the FDA Identity Standard requires.

494.     Drake visited the Maine Bottling Co.'s site to observe its three alleged "springs."  Drake described them as "three areas of free standing water," not as flowing springs.  Drake wrote that Maine Bottling Co.'s "Spring A" in the old borrow pit "appeared to be an outbreak of the water table in the gravel aquifer."  Drake thereby corroborated the fact that whomever dug the borrow pit merely hit the water table beneath the surface and that no preexisting natural spring had emerged from the surface before the pit was excavated.

495.     In August 1990, the Drinking Water Program concluded that Maine Bottling Co.'s well was "adequately protected" and "a good source of water" that had tested below all maximum contamination levels.  Accordingly, the well was approved by the State, but "for bottling purposes" only.  The well was not certified as a spring water source in 1990.

496.     In February 1995, a year after acquiring the property, Defendant installed a new 53-foot deep well (now called Well #2) along the entrance road to its facility, approximately 130 feet south of the old gravel pit that Defendant calls the "Garden Spring."

497.     In August 1995, the Drinking Water Program also approved Well #2 "as a source of bottled water."  The State did not certify the new well as a spring water source in 1995.  Nor did the State certify the preexisting Well #1 as a spring water source at that time.

498.    In 1996 – six years before Defendant sought to "isolate" its "Garden Spring" – Defendant claimed that there were three springs in the wetlands along the south bank of the Winter Brook.  Two, which Defendant denoted "Spring A" and "Spring B," were in the old gravel pit, where Maine Bottling Co.'s alleged "Spring A" had been located.  Defendant's "Spring C" was further northeast in the wetland, closer to the Winter Brook.

499.    After installing Well #2, Defendant hired Atlantic Geoscience Corp. in 1996 to compare the composition and quality of the groundwater collected by Well #2 with that of the water collected at the three "springs."  Atlantic was not asked to compare the water collected from Well #1 to the "springs."  A site plan – which Atlantic wrote it had "prepared for the sole purpose of showing selected existing site conditions as requested by [Defendant]" – showed the locations of Defendant's wells and the purported 1996 "Springs A, B and C" (red boxes added):



500.    The following site plan dated April 2002 shows that alleged "Springs A and B" are both located within the formerly excavated borrow pit (orange boxes added):



501.    A cross-sectional diagram of Defendant's site prepared in 2008 shows that the old borrow pit "spring areas" are merely holes in the ground that intersect the water table. The first drawing below shows where the cross-section drawing on the next page was located:



157



502.    The two man-made "spring" holes are the dips in the land's surface shown on the right of the cross-section near what is identified as test well "TW-4-00."  The red horizontal line in the diagram shows the water table at its lowest level, and the grey line above shows it at its highest annual level.  In both cases, the "spring holes" simply fill with water seeping in from the water table.  There is no scientific reason that groundwater would enter those holes through a focused spring orifice in the undifferentiated sand and gravel sediments depicted in the drawing.

503.    The drawing also shows that the screen in Well #1 collects water 55 to 70 feet below the surface and 45 to 60 feet below the water table.  In that sand and gravel environment, water flowing that deeply beneath the surface would flow mostly horizontally and never emerge naturally into the alleged spring pools, which are fed diffusely by local flows near the surface.

504.    Even if the man-made holes were genuine springs, therefore, Well #1 would not collect water from the same flow path – or "the same" water – as the "springs."  Nor would Well #2, which is just as deep as Well #1.

158

505.     Atlantic assumed for purposes of its 1996 report that "Springs A and B are located hydraulically down gradient" from Well #2.  Atlantic, however, did no tests to confirm its assumption, and it erroneously concluded that Well #2 "intercepts ground water before it discharges at Springs A and B."  As shown at paragraphs 533-534 below, another consultant that Defendant hired in 2009 showed that the groundwater flow tapped by Well #2 was northward, not eastward from the well toward the "springs" as Atlantic had assumed.

506.     Defendant asked Atlantic to compare the chemical signatures of water samples collected at Defendant's "springs" with samples collected by Well #2.  While it used conflicting terminology within its report, Atlantic concluded that the data it received back from Defendant's lab indicated that water from "Springs A, B and the Borehole [Well #2]" exhibited "the same basic chemical properties."  Atlantic also wrote that water samples from Springs A and B were "essentially the same" or "very similar" to each other and that the well water was "virtually identical" to both of the alleged spring sources.

507.     Atlantic found that the well water and samples from "Spring C" were "somewhat different" because that spring had "a higher content of chloride" than Springs A and B.  Spring C, thus, did "not closely match the signatures" from Springs A and B or Well #2.  Atlantic also noted Spring C's chemistry "may also be influenced by adjacent surface waters."  It did not explain why the same would not be true for alleged Springs A and B, which, like alleged Spring C, were also within the Winter Brook's floodplain.

508.     Despite Atlantic's report, the Maine Drinking Water Program did *not* certify Defendant's Well #2 as a "spring water" source in 1996.

509.     On August 4, 2000, a Compliance Officer for the Drinking Water Program sent a letter to one of Defendant's consultants stating that "Poland Springs Garden" had been

159

approved "to sell bottled water" since August 29, 1990.  The letter also stated that Defendant was "in compliance with CFR 21 Part 129 of the U.S. FDA Regulations" – which are the FDA's regulations setting factory and production standards for processing and bottling drinking water. The letter did not state that Defendant was in compliance with the FDA's spring water Identity Standard, which is at 21 C.F.R. Part 165.  Thus, as of August 2000, both Wells #1 and #2 were still permitted as "bottled water" sources only, not as spring water sources.

510.    Two months later, on October 10, 2000, the consultant who had received the Compliance Officer's August 4, 2000 letter faxed the officer a copy of the FDA's spring water Identity Standard in an effort to obtain certification of the Garden Spring site as a spring water source.  The consultant's effort was unsuccessful.

511.    A year later, in a November 7, 2001 letter approving a modification of the water treatment process at Defendant's Garden Spring facility, the Drinking Water Program again merely granted permission to produce and sell "bottled water," not spring water.

512.    The following year, in October 2002, the Drinking Water Program approved an application submitted by Mark Dubois – who was then at Woodard & Curran – to replace Well #1 with a new well drilled 15 feet east of the original well (and 15 feet closer to Tripp Pond). The new Well #1 was 55 feet deep, with a 15-foot screen at the bottom.

513.    The Drinking Water Program's approval stated only that new Well #1 produced water "within the safe limits for drinking water standards."  The well was not certified as a spring water source at that time.

514.    In May 2003, the Drinking Water Program asked Defendant to conduct a Microparticulate Analysis (or "MPA test") on both Garden Spring site production wells to determine if the wells were under the influence of surface water.  Defendant only submitted

MPA test results for Well #2, the same well that Atlantic had sampled seven years earlier in 1996.  Defendant did not explain why it did not provide MPA data for Well #1, even though the State had expressly asked for it.  The State *never* pressed Defendant to cure this omission.

515.     The 1996 and 2003 tests on Well #2's samples yielded dramatically different results, and they varied widely with Maine Bottling Co.'s 1990 tests on the "spring" in the borrow pit that Defendant now calls the "Garden Spring."  Hence, the water composition and qualities at Defendant's site are highly dynamic and require frequent testing and comparison to the water from the alleged "springs" to ensure compliance with FDA rules.

516.     The 1996 and 2003 data (and to lesser extent the 1990 data) measured several common elements, compounds and properties in the Well #2 and "spring" samples.  The results are compared below (all units are in mg/l except as to conductivity, turbidity and pH):

| Analyte | Well #2 1996 | Well #2 2003 | "Spring" 1990 |
|---|---|---|---|
| Bicarbonate | 20.74 | 46.40 | |
| Chloride | 1.57 | 65.00 | 15.00 |
| Nitrate/Nitrite | 0.00 | 0.05 | 1.20 |
| Sulfate | 1.86 | 15.00 | |
| Silica | 13.61 | 16.50 | |
| Sodium | 1.98 | 35.00 | |
| Potassium | 0.44 | 2.00 | |
| Magnesium | 0.78 | 3.00 | |
| Calcium | 4.31 | 21.80 | |
| Conductivity (uS/cm) | 44.50 | 309.00 | |
| Total dissolved solids | 34.00 | 200.00 | |
| Total alkalinity | 17.00 | 38.00 | |
| Hardness | 14.00 | 66.80 | 17.00 |
| Turbidity (ntu) | 0.00 | 2.80 | |
| pH | 6.85 | 6.93 | 6.40 |

517.     In 2003, Well #2's chloride and sodium levels revealed road salt contamination, and its turbidity that year almost tripled the maximum federal contamination level of 1.00 ntu.

518.    Two other elements, iron and manganese, also exceeded EPA maximum
contamination levels in 2003.  The iron content was .522 mg/l, well above the MCL of .300 mg/l.
The manganese content was .052 mg/l, slightly above the MCL of .050 mg/l.[7]

519.    There is no evidence in the public record that Defendant stopped producing
Poland Spring Water from Well #2 as a result of these contamination issues.  Nor is there
evidence that the Drinking Water Program ever pressed Defendant to comply with its earlier
request for MPA tests on Well #1.  Instead of pressing for more tests, a mere month after
receiving what should have been disturbing 2003 Well #2 results, the Drinking Water Program
renewed Defendant's Bulk Water Transport Permit for the Garden Spring site, finding that
transporting water from there would "not constitute a threat to public health, safety or welfare."

520.    When applying for a renewal of the Bulk Transport Permit in 2006,
Defendant's Quality Assurance Manager represented to the State of Maine that Defendant
maintained a monitoring program at its Garden Spring site that, among other things, kept track of
"seep levels … and spring outflow."  An official with the Maine DEP then asked for that data.
Among other uses, data about the spring outflow would evidence whether the purported springs
continued to flow when Defendant's wells were in operation, as the FDA spring water Identity
Standard requires.  But that data did not actually exist.

521.    Defendant hired Sevee & Maher Engineers, Inc. to respond to the Maine
DEP's inquiry.  In a letter dated November 7, 2006, Sevee & Maher demonstrated that
Defendant had falsely represented that it had been monitoring its "spring outflow."

522.    Sevee & Maher stated that only the "water stage and elevation" levels of the
backwater channel in which the alleged springs were located had been monitored.  "[D]ischarge

---

[7]  The characteristics of water sampled from Wells #1 and #2 differed from the 1996 and 2003 results yet
again when analyzed in both 2012 and 2013.  The two wells' results also again differed from each other in
those years.  The wells plainly produce different water, and neither yields the same water as the "spring."

monitoring" to gauge the volume or rate of water flowing from the "springs" themselves was not done "[b]ecause Winterbrook [sic] often floods back into the spring."

523.      Thus, Defendant had no evidence that its "springs" continued to emit flowing water while its wells were pumping, as the FDA requires.  Defendant's explanation for why it failed to maintain that required data – because the Winter Brook "often" flooded the purported spring – was an inadequate excuse.  "Often" flooded does not mean always flooded.  If Defendant's "springs" did indeed flow when the brook's waters were below flood levels, Defendant could have gauged the flow at those times.  But Defendant did not do so because no flowing springs genuinely exist at the Garden Spring site.

524.      Notably, Sevee & Maher's letter repeatedly referred only to "spring seeps" and called the old borrow pit area the "historical spring seeps."  It did not say that there were any genuinely flowing springs on the site or that it observed water emerging from the earth through a natural orifice.  Nor did Sevee & Maher provide photographs of the supposed "springs."

525.      In March 2007, Sevee & Maher prepared an "Annual Monitoring Report" for the 2006 year for the Garden Spring site, which Defendant submitted to the Drinking Water Program.  Sevee & Maher again reported that Defendant only monitored water levels in the borrow pit and did not monitor the flow rate of the "historic spring seeps."

526.      Sevee & Maher wrote that the Winter Brook "has a low gradient, which combined with the small culvert at Tenney Road often causes back flooding into the spring area. Because of this, spring discharge monitoring is not feasible, so the spring is instead monitored by water stage/elevation."

527.      Thus, Defendant also had no evidence in 2006 that its alleged "springs" continued to flow while it wells were pumping, in accordance with FDA requirements.

528.     While water levels in the backwater channel containing the alleged "springs" were measured, that was irrelevant under the FDA's spring water Identity Standard – especially since the water levels were admittedly the result of "back flooding" from the Winter Brook rather than supposed discharge from the alleged springs.

529.     Notwithstanding Defendant's admission that spring flow measurements were never taken and the facial irrelevancy of the water level measurements that were in fact taken, the Drinking Water Program official assigned to review the 2006 Annual Report – Tom Brennan's former partner Andrews Tolman – concluded that the report satisfied FDA standards.

530.     In a memorandum dated April 6, 2007, Tolman stated that "we have reviewed the report … for compliance with the definition of 'spring water.'  Generally speaking, water extraction for bottling must be managed to maintain spring flow. … The data submitted by Nestle indicates that the extraction is being managed appropriately, and that a continuing designation of 'spring water' is appropriate for this site."  Tolman had absolutely no scientifically valid basis for that conclusion.

531.     Despite using the phrase "continuing designation of 'spring water,'" moreover, Tolman's memorandum was the first written statement by a Drinking Water Program official that approved Defendant's Garden Spring site as a spring water source.

532.     Tolman approved the site despite the fact that Defendant had never submitted any proof that the water drawn from its wells at the site complied with the FDA's spring water Identity Standard.  Specifically, Defendant had never submitted evidence showing (i) that a genuine spring naturally existed at its alleged "Garden Spring"; (ii) that water flowed naturally by the force of nature through a natural orifice located there; (iii) that the water continued to flow at the "spring" while Defendant's wells were operating; (iv) that either Well #1 or Well #2 drew

groundwater from the same underground stratum as the spring; (v) that either Well #1 or Well #2 could be shown by scientifically valid hydrogeological measures to be hydraulically connected to the purported spring; or (iv) that the water collected by both Well #1 and Well #2 had "the same" physical properties and composition and quality as the water emerging from the alleged spring. Indeed, Tolman overlooked that the little data that had been collected over the prior 25 years demonstrated that the wells' and "spring's" waters were different.

533.     Defendant also has never proved that the water collected at its Garden Spring wells was not under the direct influence of surface water.  Based on the below groundwater flow net diagram, Defendant *admitted* in a 2009 NRPA application that "Tripp Pond plays a major role in groundwater recharge to the spring."  Thus, Tripp Pond also recharges Defendant's wells.



534.     Both of Defendant's "Garden Spring" site wells draw water from other surface water bodies as well.  Well #1 is only 100 feet from the wetland southwest of the site.  Well #2 is only 70 feet from that wetland and 130 feet from the man-made backwater channel under which the "Garden Spring" supposedly exists.  Defendant's 2009 NRPA application included the below diagram demonstrating that Tripp Pond and the nearby wetland are within Well #1's zone of contribution, and that the regularly flooded man-made backwater channel and nearby Winter Brook wetlands are within Well #2's zone of contribution.



535.     Defendant's consultants' data show that water from Tripp Pond can reach Well #1 in less than 7 days when the well is pumping at its maximum rate of 100 GPM, and even if

pumping at its average rate of 75 GPM.  Consequently, there is no assurance that the water it collects is suitable for use in bottled water at all under FDA rules.

536.     Sevee & Maher submitted Annual Monitoring Reports to the Drinking Water Program on Defendant's behalf for each of the years 2007, 2008 and 2009.  Each year Defendant continued to monitor only water levels at its flooded "spring" site and never measured the supposed spring's outflows.  Each year, the Drinking Water Program continued without any valid scientific basis whatsoever to approve the Garden Spring site as a spring water source.

537.     Sevee & Maher's 2009 Annual Report included an updated schematic of Defendant's purported "Garden Spring."  The diagram does not show the Gazebo or "isolated" spring that Defendant had applied to build in 2002.  Nor is the Gazebo visible in any post-2002 aerial photography available on the internet.  The post-2002 documents in the public record also make no mention of either the Gazebo or the "steel riser" by which Defendant said it intended to "isolate" a spring in the old borrow pit area to protect that alleged spring from surface water contamination.  The Gazebo and steel riser apparently were never built.

538.     Whether they were built or not, "isolating" the spring in the manner Defendant proposed in 2002 would not have spared the alleged spring from surface water contamination.  The old gravel pit is often flooded.  During flooding, the groundwater table rises and mixes with the flooding surface waters, which interconnect and stay mixed both above and below the ground.  A two-foot deep steel cylinder cannot prevent that mixed water from seeping under the rim of the cylinder or otherwise into the groundwater flowing towards the supposed spring.

539.     A history of contamination of Defendant's "Garden Spring" wells is clear from the data in the public record.  (*See* paragraphs 516-518 above.)  Defendant's Garden Spring site in Poland is not situated in a remote, pristine mountain forest like Defendant's Poland Spring

Water product labels depict.  Defendant's site is actually the funnel of a low lying drainage basin in a populated town, where its wells intercept surface water and groundwater flowing north from Tripp Pond towards the Winter Brook and Hogan Pond.

540.     The Maine Geological Survey map reveals a potential for contamination at Defendant's wells in Poland, both from surface water infiltration and because Tripp Pond, Mud Pond and the underlying aquifer are all part of a natural drainage system that conveys various forms of human generated contaminants away from the Town of Poland.

541.     The Survey map at paragraph 466 above shows that two solid waste facilities, a landfill, a sand-salt storage facility, and potential septic and other waste from the Township high school and nearby businesses are all within the same groundwater divide as a stream and swamp that interconnect with Mud Pond and the Winter Brook.  In a large storm event, contaminants from all those facilities will naturally drain into the stream, swamp and Mud Pond, and from there potentially flow down the Winter Brook and into Tripp Pond and their adjoining wetlands, including into the often flooded gravel pit where the "Garden Spring" is allegedly located.  Since the Winter Brook wetland and Tripp Pond are within the zones of contribution of Defendant's two wells, any contaminated surface water could in certain instances mix with the groundwater being collected at the wells.

542.     Notwithstanding the potential for contamination of the groundwater underlying Defendant's wells in Poland, Defendant extracts up to 82 million gallons of that groundwater annually from those wells and sells it to consumers as "spring water."

543.     Defendant's facility and two wells on the north shore of Tripp Pond are secured by a gated fence, and Defendant's land is posted with signs stating "NO TRESPASSING – Violators will be Prosecuted."

544.     By contrast, the entrance to a Town of Mechanic Falls public water supply well 890 feet northeast of Defendant's Well #1 (on Winter Brook's north bank) is gated, but the gate is there to ward off unnecessary vehicular traffic, not to impede public scrutiny.  No warnings or "No Trespassing" signs guard the Town's property, which is easily accessible by foot.

545.     Defendant's site is devoid of the Nestle Waters or Poland Spring names or logos.  There are no indications on the nearby roads that Poland Spring Water is being collected from wells in the area.

546.     In sum, Nestle Waters' Poland Spring Water labels identifying the Garden Spring as a source for its "spring water" products are fraudulent because the Garden Spring does not naturally exist.  Nor does Nestle Waters collect water from any other genuinely existing spring source in Poland, Maine.  Defendant's wells there instead collect ordinary groundwater.

547.     Far from collecting water bubbling to the surface from a pristine mountain spring as most of its Poland Spring Water labels depict, the water that Defendant collects in Poland, Maine comes from a low-lying valley in one of Maine's most populous counties, from wells precariously near several bodies of potentially contaminating surface water.

548.     The water Defendant collects in Poland, Maine does not meet the FDA's Identity Standard for spring water because (i) it does not meet the FDA's three-part definition of spring water; (ii) it is not collected in compliance with the FDA's bore hole collection requirements for spring water; and (iii) it is common groundwater that is falsely represented on Defendant's Poland Spring Water bottle labels to be "100% Natural Spring Water," in violation of the FDA's labeling requirements.  Defendant's wells in Poland should be tested to determine if the groundwater they collect are under the influence of surface water, rendering the water illegal for use in bottled water altogether.

**D.   Water Collected at Defendant's "Evergreen Spring" Site in Fryeburg Is Not Spring Water, and the Evergreen Spring Is Not a Genuine Spring**

549.     Although Nestle Waters represents on its Poland Spring Water labels that some of the purported "100% Natural Spring Water" contained therein may be sourced from a spring called the "Evergreen Spring" in Fryeburg, Maine, that purported spring is a man-made pond, not a genuine spring.  All the water from Fryeburg used in Poland Spring Water is collected from a well in the center of that populated town, and it is not the "same as" its purported spring's water.  Defendant's identification of the "Evergreen Spring" as a source for Poland Spring Water is fraudulent.  Defendant, moreover, buys 100% of its well water from a public utility that supplies Fryeburg's tap water and, thus, has violated FDA regulations by failing to identify on its Poland Spring Water labels that its water comes in part from "a municipal source."

550.     Fryeburg is a village of 3,500 residents on the New Hampshire border, just southeast of the White Mountain National Forest in southeastern Oxford County, Maine.  It lies in a low-lying plain, bordered by the Saco River on the west and Lovewell Pond on the east.



Google Maps

170

551.     As shown on the topographical map below, Fryeburg is bounded on the north and south by hills, for which the town and surrounding area serve as a natural drainage basin.

552.     The four hills on the south drain into a stream, called Wards Brook, which was dammed in Fryeburg to form a small, narrow man-made pond called Wards Pond.



myopo.com



Google Maps

553.     The Wards Brook's headwaters are enclosed in a bog, seen below, which

Oxford County land records refer to as the "Wards Brook bog."



Google Earth

554.     The Maine Geological Survey map for the Fryeburg Quadrangle, reprinted in

pertinent part below, reveals that the town of Fryeburg, and the acreage surrounding Wards Pond

in particular, sits atop the most productive zone of an extensive sand and gravel aquifer that runs

along the Saco River as it winds its way around the mountains and hills of southwestern Maine.

555.     The Survey map, made in 1998, shows two overburden wells northeast of Wards Pond near the southern bank of Wards Brook, between Wards Pond and Lovewell Pond, in the red zone representing "deposits with good to excellent potential ground-water yield."



556.     Those two wells were then, and are now, owned by the Fryeburg Water Co., a private entity that was charted in the late 1800s as a public utility to supply Fryeburg's municipal water needs.  The southwestern well – known as "FWC #1" – was drilled in 1994 and collected groundwater in 1998 at the rate of 220 GPM.  The second well – "FWC #2" – was drilled in 1997 and collected water at 350 GPM.  The Survey map shows that both wells tap groundwater from an aquifer where the water table is practically at the surface, less than 1 foot deep.

557.     What Defendant calls the "Evergreen Spring" is a small man-made pond located near FWC #1, which was used by the Fryeburg Water Co. to supply water to the town before FWC #1 was built in 1994.  If the pond were a genuine spring that had been used for decades as a public water supply, that spring would assuredly appear on the Maine Survey map. The Survey, however, does not show the existence of any natural spring near either of the two

wells.  Likewise, no natural spring in Fryeburg or near Fryeburg is recorded in the current or historical maps available on the U.S. Geological Survey and derivative websites or any other historical resource available on the internet, other than sites and sources that rely on Defendant's own statements or on its Nestle Waters or Poland Spring web sites.

558.     In 1997, Hugh Hastings and his family owned a controlling interest in the Fryeburg Water Co.  That year, Hastings decided to sell some of the water collected by his company to private bottlers for a profit, including Nestle Waters.  Hastings built FWC #2 in 1997 to supply the town and then dedicated FWC #1 primarily to supply Defendant.

559.     Since 1997, Nestle Waters has collected water from FWC #1 under bulk water purchase contracts and leases with the Fryeburg Water Co. or an affiliate.  FWC #1 is 20 feet from the pond that Defendant calls the "Evergreen Spring" and has a screen 62-70 below the surface.  The well is connected by a pipeline to a nearby pumping station for loading water tankers that deliver water to Defendant's bottling plants in Poland Spring and Hollis, and Framingham, Massachusetts.

560.     Today, FWC #2 continues to supply the village's tap water.  But FWC #1 has always served as the village's back up supply well if needed.  Indeed, at Defendant's urging, since 2011 the State's Bulk Water Transport permits for FWC #1 have stated that the well "is a public water system which is not used solely to bottle water for sale because the source water site is also used as a reserve water source for the Fryeburg Water Company municipal system."

561.     Despite knowing that FWC #1 supplied the village before 1997, has served as a reserve well for the village since then, and is deemed a municipal supply well by the State, Defendant has never identified on its Poland Spring Water labels that water from its purported "Evergreen Spring" in Fryeburg comes from a "municipal source," as FDA regulations require.

174

562.     In 1997, when Hastings decided to sell water to Defendant, Maine's Public

Utilities Commission prohibited public utilities from selling water to any entity at prices higher

than its state-approved published rates, and Maine law encouraged Fryeburg Water Co. to

reinvest any excess profits in its infrastructure or to otherwise benefit the public or municipality.

Hastings worked around these restrictions by setting up a "middleman" entity, called Pure

Mountain Springs, which was partly owned by his son, John, but whose shares Hugh Hastings

controlled.  Hastings' partner in Pure Mountain Springs was Eric Carlson, an engineer and

hydrogeologist at the engineering firm Woodard & Curran (which since then has been one of

Nestle Waters' regular consultants for spring water permit applications).

563.     After Pure Mountain Springs was established, that entity began buying water

from FWC #1 at Fryeburg Water Co.'s ordinary low public rates and reselling it at a profit to

Nestle Waters (then called Poland Spring Water Co.).

564.     Fryeburg Water Co. underwent a reorganization in 2008 that was approved by

the Public Utilities Commission.  As part of the reorganization, Defendant bought Pure Mountain

Springs and assumed its bulk water supply contract with Fryeburg Water Co.  That acquisition

enabled Defendant to stop paying higher premium prices and to purchase bulk water at Fryeburg

Water Co.'s low state-approved public rates, which in October 2014 was about one-tenth of a

cent per gallon.  The prices Defendant paid per gallon between 1997 and 2008 and the premiums

the Fryeburg Water Co. (through Pure Mountain Springs) charged Defendant above the low

public prices were never made public.  But from 2003 to 2007, Pure Mountain Springs had

$3,000,000 in revenue and paid the Fryeburg Water Co. only $700,000 in rents and fees.

565.     In 2014, over substantial public opposition, two temporary members of the

Public Utilities Commission (whom the governor appointed because all three regular members

had ties to Defendant and recused themselves) approved a new 25- to 40-year contract by which

Defendant agreed to pay Fryeburg Water Co.'s public rates for water plus $12,000 per month to

lease land around FWC #1 and for maintenance and repairs of that well.  Under the new contract,

Defendant is permitted to extract 600,000 gallons per day, and Defendant has guaranteed to pay

Fryeburg Water Co. for a minimum of 75 million gallons of groundwater per year.  In recent

years Defendant has extracted up to 110 million gallons annually from FWC #1, for which it

paid Fryeburg Water Co. about $110,000 annually.

566.    Oxford County property records confirm that Fryeburg Water Co. owns the

land containing its two overburden wells.  That parcel is just northeast of the Fryeburg Dam,

across Maine Route 113 (also called Portland Street), off a service lane known as Fire Lane 4.

567.    The below aerial photograph shows the site of the two wells off Fire Lane 4.

The pumping station for loading Defendant's tanker trucks is next to the two tanker trucks.  A

former sand and salt storage site, which is also shown on the Survey map above, is visible at the

bottom left, 850 feet up-gradient from the well that supplies Defendant's groundwater.



Google Earth

176

568.     The photo above (at the top right corner) and the photo below show the small man-made pond near FWC #1 that Defendant calls the "Evergreen Spring."  That shallow pond is fed in part by groundwater seeping in from the naturally high water table.  Based on the evidence discussed below, it was built by man, and it appears also to be fed in part by an underground pipe or driven point well.  It either event, it is not a genuine spring, which must flow to the surface through a natural orifice, not seep in from the water table or flow from a well.



Google Earth

569.     Elizabeth Royte, author of the 2008 book *Bottlemania*, wrote that John Hastings showed her the supposed "Evergreen Spring."  Royte wrote that the "kidney-shaped pool of water" had "cemented stone walls … and a bloom of rust on some sunken stones."

570.     While Royte saw "sand bubbling up" from the pool's bottom, the rust suggests a pipe or driven point well exists beneath the surface.  Because the water table rises to within a foot of the earth's surface in the location of FWC #1, there is no hydrogeological reason for a natural spring to exist at the pool's bottom to cause such bubbling.  Absent a natural hole in a confining layer of less permeable material or a forceful focused flow of water sufficient to create

177

quicksand, the conditions for a spring to sprout in a sand or gravel surface environment will not exist and groundwater will simply seep in diffusely from the sides and bottom.  The pond with "cemented stone walls" is at most a man-made or man-altered seep, not a spring.

571.     A photograph of FWC #1's well house and the nearby pond was taken in 2005 by a consulting firm, Emery & Garrett Groundwater, Inc., which Fryeburg Township had hired to study the aquifer beneath Fryeburg.  That photo shows a section of the pond's stone wall.



Fryeburg Water Company Well #1, used by Poland Spring Bottling Co.

572.     Other photos show that the pond is very shallow, with a flat bottom.



573.     The conveniently piled rocks in the bottom left of the first photograph above appear to be the rust encrusted sunken stones to which Royte referred from which water bubbled, as shown in the first photograph below.  In all likelihood the water bubbles from a well or a rusted pipe like the one protruding elsewhere on the Fryeburg site in the second photo below.



574.     Since the pond is man-made or, at best, a natural area of diffuse seepage that was enhanced by man, and not a genuine spring, water collected by Defendant 20-feet away at FWC #1 cannot be lawfully labeled as "spring water."

575.     That the pond is not a spring from which water flows through a natural orifice is corroborated by Pure Mountain Springs' own initial application to Maine officials seeking to certify FWC #1 as a spring water source.  That application, dated June 25, 1997, was submitted by Eric Carlson, co-owner of Pure Mountain Springs, and supported by a hydrogeological report prepared by Carlson's then-employer, Woodard & Curran.

576.     That report stated that FWC #1 was drilled into "a high producing spring area in the Wards Brook Stream Valley" where the Town had previously "collected the water from the spring at the surface" for distribution to Fryeburg's residents.

577.     In its detailed description of the site, however, the report stated that the "spring holes" in Fryeburg *all discharged directly into Wards Brook*, not into the pond near FWC #1.

The report described the surface water pooling near FWC #1 as "discharges" of water from the high water table, *i.e.*, a seep – not as "spring holes" with natural orifices:

> The site [FWC #1] is located approximately 200 feet from Wards Brook within the stream valley.  The potentiometric surface in the stream valley is approximately 3.2 to 5 feet above the ground surface in the location of the test wells.  Groundwater discharges freely to the ground surface forming small drainage channels which eventually flow into Wards Brook.  Wards Brook is a gaining stream.  Spring holes within the Brook channel are easily seen discharging groundwater in a sandy gravely stream bed.

578.    The "spring holes" that Woodard & Curran related to FWC #1 were (if they existed) all located in the "stream bed" of Wards Brook, at least 200 feet away from the well. Elsewhere in the stream valley, "groundwater discharges freely to the ground surface" diffusely, through seeps.  Throughout the report, Woodard & Curran referred to the "spring" and "spring area" interchangeably.  Other than the "spring holes" in the Wards Brook stream bed, the report did not identify any "spring holes" with natural orifices anywhere within the spring area.

579.    Woodard & Curran's report did not describe the concrete-walled pond 20 feet from FWC #1 as a spring.  The report did not even mention that pond.  Nor did it describe any other surface ponds as springs from which water flowed through a natural orifice.

580.    Woodard & Curran's report did not include any photographs of the pond that Defendant now calls the "Evergreen Spring," or of any natural spring.  The report did not even include a diagram identifying the locations of the pond or the "spring holes" in Wards Brook.

581.    Woodard & Curran did not itself sample water from FWC #1 for laboratory analysis in 1997, but its report attached the results of lab tests on samples that were taken in 1994 when FWC #1 was installed.  Woodard & Curran did not compare those 1994 samples to see if they contained "the same" water as samples from any of the springs along Wards Brook.  Thus, Pure Mountain Springs' 1997 application for spring water certification did not prove an essential

element of the FDA's spring water Identity Standard – that the waters collected from FWC #1 and at the alleged spring were the same water.

582.     The appendix to the 1997 application contained old laboratory reports from Fryeburg Water Co. samples taken in 1990 and 1992 – before FWC #1 was built – which Woodard & Curran did not discuss in its report.  These samples must have been taken from the same pond that Defendant now calls the "Evergreen Spring," since Fryeburg Water Co. was at that time using surface water from that pond to supply the Town's tap water.

583.     Comparing common elements, compounds and properties from the 1990 and 1992 pond samples to the 1994 FWC #1 samples shows that the water from FWC #1 and the pond were not the same, and that many characteristics of the water from both sources changed dramatically over short periods (all values are in mg/l except for color, turbidity and pH):

| **Analyte** | **Pond 1990** | **Pond 1992** | **FWC #1 1994** |
|---|---|---|---|
| Chloride | 38.40 | 244.60 | <10.00 |
| Copper | 0.17 | 0.12 | 0.02 |
| Fluoride | 0.99 | 1.91 | 0.27 |
| Iron | 0.10 | 0.03 | < 0.03 |
| Sodium | 23.00 | 175.00 | 2.60 |
| Color (in units) | 5.00 | 15.00 | 0.00 |
| Turbidity (in ntu) | 0.20 | 0.20 | 0.05 |
| Hardness | 10.70 | <10.00 | <10.00 |
| pH | 7.4 | 9.2 | 7.2 / 6.1[8] |

584.     The levels of chloride, copper, fluoride and sodium in the two pond samples were vastly greater than in the well sample.  The high chloride and sodium levels reflect likely salt contamination of the pond, and the high copper and fluoride content suggests the pond was contaminated by local residents' septic stems or leaky town water pipes.  Even the fluoride level in the well was extraordinarily high for water that dilute, although it was not above MCL levels.

---

[8]  A FWC #1 sample collected in December 1994 had a pH of 7.2.  A sample collected from that well three months earlier, in September 1994, had a pH of 6.1.

585.     Plainly, if the FDA-mandated comparison of FWC #1's water to the alleged Evergreen Spring's water had been performed in connection with Pure Mountain Springs' 1997 application for "spring water" certification, the waters would not have been the same.

586.     Woodard & Curran's report also shows that the well and pond waters were not the same because pumping FWC #1 during pump tests induced surface water into the well.  The engineering results of the pump tests attached to the report include graphs that "flatten out" toward the end of the tests, meaning that the aquifer was being recharged before the tests ended. Woodard & Curran erroneously attributed this effect to the high water table.  But the water table is part of the aquifer being tested and gets drawn down within the cone of depression during the test.  The flattening of the results towards the end of the test could only come from adding water to the aquifer being tested – that is, from surface water being induced into the aquifer.

587.     The surface water could have come from Ward's Brook, Ward's Pond or both. In any event, even if the "Evergreen Spring" were a genuine spring, water from FWC #1 cannot be labeled as spring water under FDA rules if the water is collected by pumping the well and if doing so mixes surface water with the groundwater collected by the well.

588.     Notwithstanding the patent deficiencies in Pure Mountain Springs' 1997 application, on January 23, 1998, the Maine Drinking Water Program certified the water collected by FWC #1 (and sold to Defendant for bottling) as "spring water."

589.     The Drinking Water Program's approval letter on its face reveals that the State incorrectly applied the FDA's spring water Identity Standard.  It wrongly asserted that the FDA permitted well water to be labeled as spring water merely if it is "'derived from an underground formation from which the water flows naturally to the earth.'"  The letter failed to note that the spring water must flow through a natural orifice, which does not exist in the man-made pond.

590.     The State's approval letter did not mention the concrete-walled pond that Defendant now calls the "Evergreen Spring," much less confirm that it was a genuine spring. The Drinking Water Program did not require Pure Mountain Springs to identify the specific location of its alleged spring at all.  It approved FWC #1 as a spring water source simply because the well was in a glacial valley purportedly "characterized by numerous springs."

591.     The Drinking Water Program's approval letter also did not state that the groundwater collected by FWC #1 was the same as the water emerging from a spring.  Whether the waters were the same had not even been tested by Pure Mountain Springs.

592.     Based on the Drinking Water Program's faulty 1998 approval of FWC #1 as a "spring water" source, for each of the past 18 years, Defendant has unlawfully sold up to 110 million gallons of groundwater drawn from that well as "spring water."

593.     During that 18-year period, Defendant, Pure Mountain Springs and Fryeburg Water Co. never submitted data demonstrating that the purported "Evergreen Spring" meets the FDA's definition of a genuine spring or that water from that "spring" is the same as the water collected by FWC #1.

594.     The Fryeburg Planning Board commissioned the 2005 Emery & Garrett study mentioned in paragraph 571 above to model the underlying aquifer's groundwater flow and to determine its sustainable yield given the number of commercial wells that were tapping into it. Emery & Garrett was also retained to evaluate inconsistent hydrogeological data that had been presented to the Town over the years, mostly by applicants seeking large groundwater withdrawal permits for commercial purposes, including Nestle Waters.

595.     Emery & Garrett was not retained to certify or verify whether water collected from area wells met the FDA's definition of "spring water."  But it recognized that definition

was "crucial" to Nestle Waters and to Pure Mountain Springs.  Emery & Garrett noted that

Nestle Waters' Tom Brennan, Pure Mountain Springs' co-owner Eric Carlson and Carlson's

employer Woodard & Curran all "contributed time, data, and insights," without which

"[c]onstruction and verification" of Emery & Garrett's model "would not have been possible."

596.     Relying on Maine's regulatory definition of spring water, Emery & Garrett

wrote that "spring water can be derived from a borehole that has been demonstrated to be

hydraulically connected to a spring where water flows naturally to the surface."  Emery &

Garrett did not mention the FDA's requirements that the water flowing to the surface had to exit

through a "natural orifice" and had to be "the same" as the water collected from the borehole.

597.     Emery & Garrett also did not opine on whether the pond with cemented stone

walls that Defendant calls the "Evergreen Spring" is a natural depression in the ground, and it

did not state whether water seeps into it or emerges through a natural orifice.   Emery & Garrett,

like the 1997 Woodard & Curran report, referred to the Pure Mountain Springs site as a "spring

area" and stated that the aquifer drains out in part "through springs into Wards Brook."  But

nothing in its report suggests that its definition of "springs" matched the FDA's definition, and

its report had no data showing that any genuine springs existed at the site.

598.     Details in Emery & Garrett's report, in fact, again demonstrated that the well

water from FWC #1 is not "spring water" under the FDA's definition.

599.     First, Emery & Garrett noted that the "springs" near FWC #1 were *altered

manually* after that well was built:  it stated that the "springs" that "used to be tapped as the

water source serving the Fryeburg Water Company" were "partially exposed and made to collect

into a pond that flows out into Ward's Brook."  Thus, Emery & Garrett's report confirms that the

pond near FWC #1 which Defendant calls the "Evergreen Spring" is not a natural formation.

184

The preexisting natural terrain and sources of discharging water there were reconstructed by man and shaped into the pond that Defendant calls the "Evergreen Spring."

600.     Second, Emery & Garrett noted that monitoring results over two years showed that water table elevations in the aquifer area varied between two and five feet, except for the purported "spring" near FWC #1, "which hardly varies at all from season to season." The man-altered pond's consistently high water table level suggests that water is flowing into the pond through artificial means, such as a buried driven point artesian well, which is consistent with Royte's having seen rusted rocks and "bubbling sand" at the shallow pond's bottom.

601.     Finally, Emery & Garrett found that the "vertical to horizontal conductivity" ratio in the prime aquifer was 1:7, which means that the ease with which water in the aquifer moves horizontally is seven times greater than the ease with which it moves up or down. Therefore, most of the groundwater being drawn in by FWC #1 through its screen 62 to 70 feet below ground will enter the well from deep horizontal groundwater flows, and the groundwater seeping into the pond will also enter horizontally from local groundwater flows much closer to the surface. The deep groundwater captured by FWC #1 cannot be the same as the local water that seeps into the pond, and there is no natural hydraulic connectivity between them. Because the water seeping into the pond comes from strata closer to the surface, it cannot be the same as the water collected by the well, as is required under the FDA's spring water Identity Standard.

602.     Woodard & Curran submitted annual reports monitoring the water levels and supposed "spring flow" from the pond near FWC #1 to Fryeburg Township officials in 2005, 2006 and 2007. Defendant submitted similar reports to the Town after it acquired Pure Mountain Springs in 2008, at least for that year and for 2009 and 2012. None of the monitoring reports identified whether the pond that Defendant calls the "Evergreen Spring" meets the FDA's

definition of a genuine spring, and none provided a geochemical analysis comparing the water in that pond with water collected by FWC #1 to determine if they were the same water.

603.     Nevertheless, based solely on these inadequate reports, the Drinking Water Program issued memoranda in 2007 and 2008 stating that "a continued designation of 'spring water' is appropriate for this site."  The Drinking Water Program also wrote memoranda in 2012 and 2014 wrongly finding that water from "the site is appropriately classified as spring water."

604.     The entire acreage surrounding Fryeburg Water Company's two wells off Fire Lane 4 is enclosed by a perimeter fence that precludes the public from inspecting the wells or the small, man-made pond.  The fence appears to have been built by Defendant or at its expense – "Video Surveillance" warning signs posted near the fence are identical to signs posted at Defendant's other sites – but Defendant's name or logo appears nowhere on or near the fence-enclosed site.  Rather, the signs all refer only to Fryeburg Water Company.  One type of sign states "NO TRESPASSING – Public Water Supply – Per Fryeburg Water Company."  Another sign states "WELL HEAD PROTECTION ZONE – Fryeburg Water Company."

605.     The No Trespassing signs and fence at the Fire Lane 4 site stand in stark contrast to Fryeburg Water Company's other landholdings in Fryeburg.  At its site just east of Wards Brook bog, for example, Fryeburg Water Company posted an identical "Well Head Protection Zone" sign on the west side of Porter Road but included language that permitted hiking on its land, even though a well is in the area.  Thus, but for Defendant's influence at the Fire Lane 4 site, Fryeburg Water Company, like the Mechanic Falls water utility in Poland, would appear to have no natural inclination to cloak its wells or sites in security and secrecy.

606.     Oxford County property records show that Nestle Waters' landholdings include a 40-acre property about 2000 feet southeast of FWC #1.  That parcel is on the southeastern

corner of Mountain Division Trail and Porter Road, east of the section of Wards Brook that

flows northward from the Wards Brook bog to Wards Pond.  The parcel includes a former

furniture manufacturing and saw mill site.

607.    The following aerial photographs show the location of the Porter Road site vis-

à-vis the Fire Lane 4 site and a close-up of the abandoned Porter Road property, respectively.



Google Earth



Google Earth

187

608.     Defendant's Porter Road site is marked only by the type of ordinary, orange and black "Posted – No Trespassing – Keep Out" signs that are available in retail stores. Nothing at that 40-acre site or along the fence surrounding it hints that Defendant owns it.

609.     Defendant's old furniture and saw mill site on Porter Road was severely contaminated in several spots by oil spills.  Because the oil spill sites were within 2000 feet of "four water supply wells," the Maine DEP ruled they required "Stringent" level cleanup under the DEP's guidelines for remediating "Oil Contaminated Soil and Ground Water."  Fryeburg Water Co.'s two wells off Fire Lane 4 are 2000 feet away.

610.     In 2007, Defendant agreed to remediate the contamination at its Porter Road site.  Its contractors ultimately excavated and disposed of more than 1,880 tons of oil impacted soil and pumped out 2,477 gallons of fuel oil impacted groundwater.

611.     The Maine DEP approved the remediation because the "majority" of "the known" contaminated soil had been removed and the remaining "known" toxic soils were not expected to impact "off site groundwater."  DEP's completion certification was subject to certain conditions, including a prohibition against installing groundwater extraction wells on the 40-acre property.  In October 2008, Defendant executed and recorded an Environmental Covenant to implement DEP's ban against extracting groundwater from the 40-acre site.

612.     The Maine Geological Survey map at paragraph 555 above shows that Defendant's Porter Road property is in the same groundwater divide as Wards Pond.  Emery & Garret's 2005 model is consistent with that and shows that groundwater from and beneath Wards Pond flows into the area underneath FWC #1.  Emery & Garret's model, however, inconsistently suggests that the groundwater flowing toward FWC #1 (the green lines leading past Defendant's contaminated plot to the wells in the illustration below) all originates west of Porter Road and

that "[n]o portion of groundwater contribution to the wells originates from … more or less east

of the Porter Road," where Defendant's oil contaminated property lies.



613.     But, contrary to its above drawing, Emery & Garrett's depiction of FWC #1's

capture zone includes the western portion of Defendant's oil spill site (green line below):



614.    In 2004, Woodard & Curran much more plausibly modeled the zone of contribution for FWC #1 to include most of Defendant's Porter Road site.



615.    Apparently recognizing the problem of potential contamination from Defendant's Porter Road site, by mid-2007, the Fryeburg Planning Board ignored Emery & Garrett's model and added the entirety of Defendant's 40-acre site and about 70 acres of Oak Hill's northwestern slope adjoining Defendant's site to the Town's wellhead protection zone. The Board would not have needed to do that if it accepted Emery & Garrett's conclusion that areas east of Porter Road were not within the zone of contribution that feeds one or more of Fryeburg's commercial wells.

616.    Emery & Garret's recommended wellhead protection zone did include the populated southeastern section of Fryeburg Village just west of Wards Pond (within the red dashed-line on the map at paragraph 613 above).  Emery & Garrett concluded that FWC #1 draws water from that area, in which septic systems could contaminate the groundwater.

617.    In sum, for the past 18 years Defendant has bought groundwater used in its Poland Spring Water products from a public utility in Fryeburg that supplies municipal tap

water, and Defendant collects that water from a well that provided tap water before the public

utility devoted it to supplying Defendant's bulk water purchases and still serves as a backup

public supply well.  For the first 11 years, Defendant bought the water from the Fryeburg Water

Co. through its commonly controlled affiliate, Pure Mountain Springs.  Since 2008, Defendant

has purchased the groundwater directly from the Fryeburg Water Co.  Yet at no time has

Defendant identified on its Poland Spring Water labels that it was sourcing water in part from a

"municipal source" in Fryeburg, as required by FDA regulations.

618.    Defendant's Poland Spring Water labels identifying an "Evergreen Spring" as

a source for its "spring water" products are also fraudulent because the Evergreen Spring is a

man-made or man-enhanced seep pond, and it does not emanate water that is physically and

geochemically the same as the water collected by Defendant's source well, FWC #1.  Nor does

Nestle Waters collect water from any other genuinely existing spring source in Fryeburg, Maine.

Far from collecting water bubbling to the surface from a pristine mountain spring as most Poland

Spring Water product labels depict, the water that Defendant collects in Fryeburg, Maine comes

from a well in a sand and gravel aquifer in the center of a populous Maine town that is near a

potentially not-fully remediated toxic petroleum dump site.

619.    The water Defendant collects in Fryeburg, Maine does not meet the FDA's

Identity Standard for spring water because (i) it does not meet the FDA's three-part definition of

spring water; (ii) it is not collected in compliance with the FDA's bore hole collection

requirements for spring water; (iii) it is common groundwater that is falsely represented on

Defendant's Poland Spring Water labels to be "100% Natural Spring Water"; and (iv) it is

sourced from a municipal water system that is not identified on Defendant's labels, in violation

of the FDA's labeling requirements.

**E.    Water Collected at Defendant's "Cold Spring" Site in Denmark
Is Not Spring Water, and No Genuine Spring Exists at that Site**

620.      Although Nestle Waters represents on its Poland Spring Water labels that some of the purported "100% Natural Spring Water" contained therein may be sourced from a spring called the "Cold Spring" in Denmark, Maine, that spring either no longer exists or, if it still exists, is not hydraulically connected to Defendant's wells.  None of Defendant's water comes from a natural spring located in Denmark, Maine.  Rather, Defendant has created an artificial spring in wetlands on its Denmark property to feign compliance with FDA rules.  Defendant's identification of the "Cold Spring" as a source for its Poland Spring Water is fraudulent.

621.      Denmark, Maine is a township of approximately 30 square miles located in Oxford County.  Its western border is less than 3 miles east of Fryeburg and 5 miles from the New Hampshire border.  Northwestern Denmark, where Defendant's wells are located, sits in a drainage basin between the Saco River and 2000-foot high Pleasant Mountain.



Google Maps



mytopo.com

622.     Oxford County property records show that in numerous transactions between November 2005 and April 2006 and in 2011 and 2014, Nestle Waters acquired land and easements that collectively encompass a narrow, approximately three mile long strip of property in northwestern Denmark.  The strip begins on the north bank of the Beaver Brook in West Denmark and runs to the Township's northern border above Liberty Corner.  Defendant has also acquired an approximately mile long stretch of adjoining land directly above it, between the Township border and State Route 302 in East Fryeburg, which is four miles east of Fryeburg.

623.     Defendant acquired this land, shown roughly in the map below, to build an underground 3.1 mile long pipeline between its wells at the south end of the strip in Denmark and a pumping station off Route 302, from which 8400-gallon capacity tanker trucks transport groundwater drawn from the wells to Defendant's bottling plants in Hollis or Poland Spring.



Google Maps

624.    Defendant's wells are located at the southern end of its property on the above map, between the Beaver Brook and Firelane 86, due south of what is called Long Pond.

625.    As shown in the below aerial photographs, the area in which Defendant's property is located is studded with creeks, bogs and ponds.

626.    The path of Defendant's 3.1 mile long pipeline is visible from the air, as seen in the following three photographs (of different scales).

194



Google Maps



Google Maps



Google Maps

627.    Defendant operates two wells south of Long Pond.  The well in the center of the photo below ("Well 1") is 400 feet north of Beaver Brook and 150 feet east of a wetland. Well 2 is 620 feet north of Well 1 and 250 feet from the wetland.  The wells are on a ridge (a glacial esker).  Wells 1 and 2 are about 20 feet and 33 feet, respectively, above the wetland.



Google Earth

628.    The entrance off Firelane 86 to Defendant's wells is barred by a gate with Defendant's customary "Video Surveillance" sign.  The entire property is posted with warnings

that trespassers "Will Be Prosecuted to the Fullest Extent of the Law."  The signs identify

"Poland Spring Bottling Co." as the owner of the land, but there are no signs or indications on

Firelane 86 or nearby roads that Poland Spring Water is being collected in the area.



Google Maps

629.     Defendant's pumping station at the north end of its pipeline off Route 302 (also

called Bridgton Road) houses a water storage tower.  The pumping station is enclosed by a fence

and guarded by a sign stating it is private property and that people should "Keep Out," as well as

by the same "Video Surveillance" and "No Trespassing" signs that appear at Defendant's wells.



Google Maps



Google Maps

630.    The Maine Geological Survey map of the Hiram Quadrangle, where

Defendant's wells are located, was prepared in 1998 and does not show Defendant's wells,

which were bored in July and August 2005.

631.    The Survey does not show the existence of a spring called the "Cold Spring" or

any other natural spring near Defendant's wells in Denmark.  Nor do the current U.S. Geological

Survey maps of the Hiram Quadrangle, or earlier editions of those maps published in the early

1960s available on the U.S. Survey's website.



632.    The only historical mention of a Cold Spring in Denmark found through internet searches is from a 130-year old traveler's account, dated 1886, that refers to "Long Pond, with the remarkable Cold Spring just south-east of it, near the road to West Denmark."

633.    While this old reference, and the fact that Firelane 86 is also called Cold Spring Dr., evidences that there once may been a spring called Cold Spring somewhere off the eastern half of Firelane 86 between Long Pond and Beaver Brook (*see* map at paragraph 623 above), there is no evidence that spring still exists.  The historic Cold Spring was certainly not in the wetland 1000 feet south of Long Pond, where Defendant now claims its "Cold Spring" exists.

634.    What Defendant calls the "Cold Spring" is not a natural spring at all.  It is man-made.  Defendant has created a fake "spring" in a wetland that is seasonally saturated by snowmelt and beaver activity in Beaver Brook.  As shown in photographs taken by a local news photographer for a 2009 story about Nestle Waters' Denmark wells, Defendant has driven small artesian wells with valves into the ground to allow pressurized groundwater to flow to the surface through an artificial orifice, enabling Defendant to mimic a spring.  Defendant's artesian wells in Denmark do not qualify as springs under FDA regulations.



Mainebiz

199

635.     While groundwater may diffusely discharge at times into the wetland where Defendant's artesian wells have been driven, there is no evidence that any natural spring with a natural orifice exists in the wetland.  Given the hydraulic head evidenced by the flow emerging from the wells in the above photos, the natural discharge rate from any natural spring would be just as forceful as that emerging from the wells' valves.  The flow from such a spring would be so apparent and visible that Defendant would have no need to fake the existence of springs by using artesian wells in the first place.

636.     Defendant's phony "Cold Spring" is located just west of Defendant's two wells, in the wetland visible left of the road in the photograph at paragraph 627 above, which lies in a kettle valley just west of the seismic study markings on the Survey map (*see* paragraph 631).  Water flows in that wetland only when it is flooded or when Defendant wants it to, for show or otherwise, by opening the valves on its driven point wells.  There is no natural spring orifice from which water flows year round, as is required under the FDA's spring water regulations.

637.     Defendant's 2005 application to the Town of Denmark for a Water Extraction Permit ("Denmark 2005 Application"), prepared by Defendant's engineering consultants, Wright-Pierce and Woodard & Curran, proves that no genuine spring meeting the FDA's Identity Standard exists at the Cold Spring site.  While Woodard & Curran's materials refer gratuitously to "spring activity" and "onsite springs" in the wetlands at the site, the details in Woodard & Curran's reports and test results belie the presence of genuine springs – in six different ways.

638.     First, the extensive Denmark 2005 Application materials contain no photographs or even drawings showing the purported springs' natural orifices.  Woodard & Curran's May 2005 Hydrogeologic Report mentions "spring vents" located "down-gradient" from a test borehole ("TB-1") (which was later rebuilt as Well 1).  But it describes the "spring

area" as consisting of "multiple seeping areas adjacent to the Western and Southern base" of the esker into which the wells are drilled.  Woodard & Curran later (in 2008) described the origins of these alleged "spring vents" as "daylighting," which means "seepage of groundwater at the surface."  *http://www.ecy.wa.gov/programs/sea/pubs/95-107/sldrain01.html*.  The "vents" down-gradient from Well 1 that Defendant calls "springs" are nothing more than a seasonal seepage face where the underlying water table intersects with the surface and feeds into the Beaver Brook.  Seeps are not springs under the FDA's regulations.

639.     Second, Woodard & Curran initially classified the "Cold Spring" area as two different types of wetlands in which the water table merely saturates or occasionally floods the surface.  Woodard & Curran's 2005 Baseline Biomonitoring Results included a Wetland Classification analysis prepared by Woodlot Alternatives, Inc. in August 2005.  Using the then-standard 1979 U.S. Fish & Wildlife Service Wetlands Inventory classification system, Woodlot classified the northern section of the wetland under the code "PFO4Bg" – which means it is a palustrine forested system dominated by needle-leaved evergreens, with predominantly organic soil that is "saturated to [the] surface for extended periods during the growing season," but on which "surface water is seldom present" otherwise.  The soil consists primarily of decomposed plant matter that "accumulates in wetlands as a result of the anaerobic conditions created by standing water or poorly drained conditions."  These organic soils are sometimes associated with "peatlands, fens, and bogs."

640.     Woodlot's report included charts summarizing three different plots within the northern part of the wetland.  Woodlot described the hydrology in all three plots as consisting of "saturated depressions."  Woodlot did not record the existence of a spring in any of the three plots in the northern portion of the wetland (those near Defendant's Well 2) in 2005.

641.     Woodlot classified the southern portion of the wetland (leading and adjacent to the Beaver Brook) as "PSS1Eb" – which is a palustrine system dominated by broad-leaved deciduous scrubs and shrubs that is seasonally flooded early in the growing season and remains saturated later in the growing season, even "when surface water is absent."  The special modifier "b" at the end of the classification code means that the seasonal flooding is caused by beavers – not by springs:  "These wetlands have been created or modified by the action of beaver …. Beaver activity (such as dam building) may flood vegetation …."

642.     Woodlot did not record the existence of any springs in the southern portion of the wetland in August 2005, which is where the "multiple seeping areas" down-gradient from Well 1 that Woodard & Curran said it had observed earlier in 2005 would have existed.

643.     Third, Woodard & Curran's reports demonstrate how Defendant uses artesian driven point wells (which Defendant deceptively refers to as "spring points") to artificially mimic a spring where none naturally exists.

644.     The wetlands that Defendant falsely claims contain springs lie in a kettle valley where the ground drops below the potentiometric surface – that is, below the level to which the water table would naturally rise in an artesian well.  Woodlot found that most of the wetland is covered by "murky" organic soils that are poorly-to-moderately draining and moderately impermeable.  Below the organic soils, Woodard & Curran found fine silty sand, which is less permeable than the sand and gravel that lies within and beneath the esker.  By placing driven wells in the ground, Defendant penetrated the less permeable soils, enabling the underlying groundwater to travel up the wells to meet the natural potentiometric surface of the underlying aquifer above the land surface.  Opening the valves at the tops of the wells allows the upward traveling water to spill onto the ground, forming the artificial "springs."

645.     How Defendant creates artificial springs by placing driven point wells below

the potentiometric surface in the wetland area is best illustrated by revisiting how groundwater

reaches the potentiometric surface in "confined" sand and gravel aquifer systems.  (*See*

paragraphs 155-159 above.)  In unconfined aquifers, if the land surface drops below the water

table, groundwater can seep onto the land to form ponds, streams, swamps or other surface water

bodies.  In confined sand and gravel aquifers, a less permeable layer above the aquifer, such as

clay, silty sand or some organic soils, inhibits some groundwater that is flowing down from an

elevated recharge area from moving horizontally and upward, thereby increasing the pressure of

the groundwater in the confined sand and gravel below.  In these places, a well that punctures the

confining layer will release pressure, enabling the water to flow up the well and reach its

potentiometric surface.  These constructs are illustrated below.  The east-to-west dashed lines

represent the water table level in an unconfined system (first drawing) and the potentiometric

surface in a confined system (second drawing).



646.     Woodard & Curran's May 2005 Hydrogeologic Report submitted as part of

Defendant's Denmark 2005 Application included three illustrations (copied below) which show

how Nestle Waters uses driven point wells (its so-called "spring points") in the wetland to create

the artesian wells it fraudulently calls "springs."

647.     Woodard & Curran described Defendant's "spring points" as driven point

wells on top of which Defendant affixed clear plastic tubes (called manometers) and valves "to

allow for the free flow of water."  (*See* photos at paragraph 634 and illustration below.)  "When a

valve is closed, the tube fills with water expressing the total head."  The height of the "head" is

the vertical reach of the water that is freed by the hollow well to seek its natural level.  The head

measures the natural (or "static") potentiometric surface, and how far the potentiometric surface

drops when Defendant's Wells are pumping and drawing groundwater from beneath the wetland.



Figure 4-2
Spring Point Schematic
Cold Spring Site
Denmark, Maine
WOODARD&CURRAN

648.       Woodard & Curran's above illustration of the "spring points" that Defendant

installed in the wetland near Defendant's wells shows how the device works:  Water enters

through the screen at the bottom of the pipe and, seeking its level, travels up the well towards the

valve and the clear plastic manometer.  The valve can be opened to take samples of the water

that enters the screen below the surface, and to create an artificial flow of water.

649.     Woodard & Curran's second illustration is a west-to-east cross-section of the

wetland and esker at the latitude where Well 2 is now located on the esker.  The location of this

cross-section, referred to as cross-section B-B′, is shown on the below Woodard & Curran map:



650.     Cross-section B-B′ charts where a spring point called "SP-02" was placed in

the kettle valley, and shows that SP-02's valve was below the potentiometric surface while the

top of its plastic manometer tube rose above it, creating an artesian well:



651.    Instead of truthfully stating that the "spring points" were placed strategically to create artesian wells, Woodard & Curran wrote that "springs" were fed by an "up-gradient" flow of water traveling westward from the esker into the kettle valley.

652.    Woodard & Curran's illustration above shows that the kettle valley west of the esker, where the wetland lies, has a subsurface of "brown fine silty sand" that extends from the base of the esker to at least 800 feet west of it.  Beneath that stratum, sand and gravel extends up to 250 feet west into the kettle valley.  SP-02 was driven through the brown silty sand stratum directly into the sand and gravel stratum below, where its screen collects water flowing in the sand and gravel approximately 23-24 feet below the earth's surface.

653.    That SP-02 penetrates both strata is better seen in the following close-up of Woodard & Curran's illustration:

206



654.    Woodard & Curran also drew a north-to-south cross-section, denoted A-A′, which shows that Spring Point No. 4 ("SP-04"), next to Beaver Brook, was also an artesian well positioned to create an artificial spring.  SP-04's valve also lies below the potentiometric surface and draws subsurface water upwards (oranges boxes added):



Figure 8-1
Cross-Section A-A'
Cold Spring Site
Denmark, Maine

WOODARD& CURRAN

655.     Based on this illustration, the groundwater flows primarily horizontally rather than vertically at the depth of Well 1's screen (Well 1 is called "TB-1" in the illustration), which is 25 to 30 feet beneath the point where the water table seeps into Beaver Brook.  Even if that diffuse seepage could be called a "spring" (which it cannot), the water discharging diffusely into the brook would be water flowing at or near the water table level, not 25 to 30 feet below it.

656.     Although not depicted in Woodard & Curran's cross-sectional drawings, Spring Point No. 1, near SP-02, and Spring Point No. 3, in the southern portion of the wetlands near Well 1, were also artesian wells positioned to create artificial springs.

657.     After obtaining its Water Extraction Permit in 2005, Defendant filed a renewal application in 2008 (the "Denmark 2008 Renewal Application") in order to, among other things, add Well 2 to its Extraction Permit.  Woodard & Curran's 2008 version of its 2005 drawing at paragraph 654 shows the purported groundwater flow lines from Long Pond to Beaver Creek:



Figure 4-7
Conceptual Flow Net Cross-Section A-A'
Cold Spring Site
Denmark, Maine
WOODARD&CURRAN

658.    Woodard & Curran's flow lines are nonsensical.  There is no plausible hydrogeologic reason that groundwater would *naturally* flow vertically in the permeable sand and gravel from the underlying glacial till and bedrock below it.  In this hydrogeologic setting, natural flow will be almost completely horizontal from North to South along this cross section with minor upward gradients towards the creek high in the aquifer sufficient to create artesian conditions.  Deeper flows would bypass the creek entirely, passing under it to the south.  The water seeping naturally into Beaver Brook comes from the upper part of the flow system, not deep within it.  Defendant, however, by pumping Well 1 at a sufficient rate, could *artificially* induce deep groundwater flow into the brook that would not naturally discharge there.

659.    The fourth way in which the Woodard & Curran's Hydrogeologic Reports show that no genuine spring exists at Defendant's Denmark site is by Woodard & Curran's "pump test" data.  In both 2005 and 2008, Defendant relied on the fact that, during its pump tests of Wells 1 and 2, water continued to flow through the valves on its artesian wells (its so-called

"spring points"), but at a reduced pace.  This, according to Defendant, purportedly proved that it had met the FDA's requirements (i) that water collected from its wells are hydraulically connected to a natural spring, and (ii) that operating the wells does not stop the flow of water at the natural spring.  But Defendant's pump tests proved neither point.

660.     Defendant's pump tests showed (at best) that water collected by its two commercial production wells may have been hydraulically connected to other wells – its artesian "spring point" wells.  That is irrelevant under FDA regulations, which require showing a hydraulic connection to a natural spring.  The fact that Defendant's artesian wells continued to flow while the wells were pumping is similarly irrelevant under FDA rules, which require that a natural spring must continue to flow during pumping.

661.     Defendant's spring points, in any event, had screens that collected groundwater flowing 10 to 24 feet below the surface.  They did not collect water emerging at the surface, where the orifice of a natural spring would have been.  In its Pump tests, Woodard & Curran measured how far the "head" at Defendant's spring points dropped when its wells were in use and submitted logs showing that water levels at the spring points did not drop below the earth's surface at any time.  But the fact that groundwater continued to flow 10 to 23 feet underground with reduced head while the wells were pumping is a natural consequence of pumping the wells. It says nothing about whether water continued to flow at the surface through a purported natural spring during the pump tests.

662.     Defendant's pump test data were useless for the purpose of substantiating a hydraulic connection between the water collected at the well and water flowing from a supposed natural spring at the surface.  The data were also useless for determining if using the well stopped water from flowing at the surface.

663.     Woodard & Curran and its successor have submitted monthly reports and pump tests to Denmark officials since 2005, all of which were equally useless and misleading because they also failed to measure water flows and volume at the surface, as FDA rules require.

664.     Because Woodard & Curran measured the "head" from the same spring points every month, it only measured water flows that were 10 to 24 feet underground.  It never once gauged the flow of water at the earth's surface, which is what must be measured to establish a hydraulic connection between a purported surface spring and the groundwater collected by Defendant's wells.  Nor has it ever tested whether operating the wells stopped any water from flowing at the surface.  All Defendant's Pump Tests have ever shown was that its Denmark well water is hydraulically connected to other groundwater flowing 10-24 feet below the surface near its wells, and that using the wells does not stop the flow of that other groundwater.  Proof of those facts is totally irrelevant to any element of the FDA's spring water Identity Standard.

665.     Fifth, the pump test data recorded in Woodard & Curran's reports reveal that Defendant never proved that the water collected at its Denmark wells has the same physical properties, composition and quality as the water that flows naturally to the surface (of a supposed spring).  Woodard & Curran only compared groundwater from Wells 1 and 2 to samples of groundwater collected from Defendant's spring point wells, which collected water from many feet below the surface rather than water that exited at the surface.  Defendant has never shown that its well water has the same characteristics as water flowing at a surface spring.

666.     As an initial matter, Woodard & Curran also misconstrued the FDA standard. Rather than testing if the water collected from Well 1 was "the same" as the water from the spring points, Woodard & Curran's objective was to find a "geochemical similarity" between the

211

water drawn from the well and the spring points, and stated that its "data indicate[d] a good geochemical match," rather than an identical match, as FDA rules require.

667.     Woodard & Curran, moreover, manipulated the data because it only compared Well 1's water to water drawn from SP-04 and its three "deep" spring point wells, which had screens 20 to 24 feet below the surface.  All four of those wells collected water flowing at or near the same depth as water collected by its production Wells 1 and 2, and they would be the most likely to match the wells' water.  Woodard & Curran did not test (or chose not to report) the physical and chemical characteristics of water captured by three "shallow" spring point wells, which drew water from 10 to 13 feet below the earth's surface and were less likely to match the deeper water captured by Wells 1 and 2.

668.     But even the water from the deep spring points did not match Well 1's and Well 2's water.  The results of Defendant's tests of five major analytes that were common to the production wells' water and to the water samples from SP-04 and deep spring points show variability and lack of homogeneity in the deeper aquifer system.  There is no assurance from Woodard & Curran's tests that the water characteristics and properties at the surface of the alleged "springs" are the same as that of the deep groundwater collected by Wells 1 and 2.

669.     The monthly reports that Defendant has submitted to the Town of Denmark since 2005 do not monitor the geochemical structure of the water collected at the production wells or compare it to the water collected even at the spring points, much less from a natural spring flowing at the surface.  Nor has Defendant provided any evidence over the past eleven years by which regulators can judge whether pumping the production wells has altered the chemistry of the groundwater that purportedly emerges at the surface from its "springs," which must also be tested to meet the FDA's requirements.

212

670.     The sixth way Defendant's Denmark 2005 Application proves that water collected by its wells does not qualify as "spring water" is that it shows that the wells draw water from strata that do not feed the purported springs.  Woodard & Curran described the "spring activity" as seepage or daylighting.  Putting aside that such diffuse discharges of water are not springs, a seep typically has an imperceptible rate of flow, which makes it highly improbable that the seeping water originated from the same sources, and followed the same path, as the water collected at 200 GPM to 300 GPM from 39-55 feet below ground at Defendant's two wells.

671.     A drawing prepared by a hydrogeologist retained by a party to the Town of Denmark's proceedings considering Defendant's 2008 Renewal Application shows that the zone of contribution for Defendant's wells extends from Long Pond to Beaver Brook, an area that includes several strata (*see* Woodard & Curran's drawings at paragraphs 654 and 657 above) besides the sand and gravel stratum that Woodard & Curran stated was the source of the seeps.



672.     The accuracy of the above chart is corroborated by Defendant's own chart modeling the "cone of depression" surrounding its wells – which shows the area in which the water table drops when Defendant's wells are pumping and drawing groundwater into the well.



Figure 1
Constant Rate Cone of Depression 03/16/05
Cold Spring-Denmark, Oxford County, Maine

June 2005
DRAFT

673.     Both the zone of contribution chart and the cone of depression model show that the wells draw groundwater from a large subsurface area that includes not only the sand and gravel stratum under the esker but also the "brown/orange fine sand" stratum under the southern

edge of Long Pond and the "brown silty sand" stratum that underlies the kettle valley west of the esker.  Woodard & Curran said that the seeps at the western and southern base of the esker it observed in March 2005 were sourced in that sand and gravel esker.  That daylighting resulted from the snowmelt occurring at the time and the seasonally high water table within the esker. Even if those conditions existed all year rather than seasonally, it does not demonstrate that the water discharging from those seeps came from the same large area and all the same strata that contribute groundwater to Defendant's wells.

674.    Defendant's Denmark 2005 Application contains no photographs of a natural spring, much less of a spring from which water flows through a natural orifice.  The only photo in the application, shown below, was of a wet spot on the ground in which Defendant had placed spring points SP-01S and SP-01D and opened the valves to mimic a spring flow.



675.    Woodlot took photos very near SP-01 and SP-02.  They show no springs.

 

**Photo 1.**  MP-1 from NW corner to SW corner – Denmark Cold Spring site.
Woodlot Alternatives, Inc.  August 12, 2005.

**Photo 2.**  MP-2 from SE corner to NE corner – Denmark Cold Spring site.
Woodlot Alternatives, Inc.  August 12, 2005.

676.    Defendant's Denmark 2008 Renewal Application similarly did not include any photographs of the purported springs or the natural orifices from which water flowed.  At the November 2008 Town hearing on that application, however, Defendant represented that the following photograph showed a purported Denmark spring:



677.     That shallow puddle of standing water is not a spring under the FDA's Identity Standard.  It appears to have either seeped up from the underlying saturated wetlands or accumulated after a recent rainfall.  It also could have been caused to form by Defendant itself, either by drilling and then burying or removing a driven point well, or simply because Defendant's pumping of its well had altered the underlying strata or water flow near the surface, creating a wet spot.  There is certainly no evidence that the puddle in the picture existed in 2005 or exists today, or that it flows and continues to flow when Defendant's wells are in operation.

678.     Nor is there evidence that Defendant has ever tested the physical and chemical properties of the water in that puddle, much less demonstrated that the puddle's water is the same as the water that is collected by Defendant's two wells.

679.     Defendant cannot cite that small puddle as legal justification within the meaning of the FDA's Identity Standard for collecting millions of gallons of "spring water" annually from the sand and gravel aquifer 39 to 55 feet below its two wells in Denmark.

680.     In sum, the Water Extraction Permit that Defendant received in 2005 from the Town of Denmark and a Bulk Water Transport Permit that Defendant received from the Maine Drinking Water Program in 2005 were both obtained under false pretenses because Defendant used driven point wells (its "spring points") to create artesian wells and phony springs at its Denmark site and submitted irrelevant pump test and geochemical data from its "spring points" to misrepresent (i) that there was a hydraulic connection between its wells and water exiting the ground at a purported natural spring; (ii) that the use of its wells did not stop that supposed spring flow; (iii) that groundwater collected at its wells had the same physical and chemical properties as the water flowing from a spring's natural orifice; and (iv) that its wells drew water only from the same underground stratum that sourced the purported springs.

217

681.     Maine and Denmark officials relied exclusively on Defendant's submissions to conclude that a genuine spring existed and failed to recognize (or turned a blind eye to) the substantial contrary evidence embedded in the details of Woodard & Curran's reports.  State and Town officials also never demanded proof that a natural spring "orifice" existed at the Denmark site or independently inspected the site to confirm that one existed.

682.     The Drinking Water Program approved the "Cold Spring" as a "spring water" site in an undated, one-page memorandum.  The approval memorandum was prepared by Tom Brennan's former business partner Andrews Tolman.

683.     Tolman's memorandum confirms that he did not independently verify that a genuine spring meeting the FDA Identity Standard existed at the site and that he wrongly accepted Defendant's scientifically irrelevant data from its artesian "spring point" wells as proof that the FDA's requirements were met.

684.     Denmark officials later relied upon Tolman's wrongly issued approval letter to grant Defendant's water extraction permit.

685.     Maine officials also never assessed if the water collected from Defendant's Denmark wells was impermissibly under the influence of surface water and unsuitable for bottling under FDA regulations.  According to the Maine Geological Survey, Defendant's Denmark wells access a "yellow" zone where the yield "may exceed 50 gallons per minute in deposits hydraulically connected with surface-water bodies."  Defendant's permit from the Town of Denmark allows it to extract 300,000 gallons per day, which is more than 200 GPM. Defendant's collection rate makes it likely that its wells are hydraulically connected to Long Pond, Beaver Brook or both.

686.     Woodard & Curran's groundwater flow and cone of depression diagrams (*see* paragraphs 657 and 672 above) and other geologic evidence confirm the wells' hydraulic connection to Long Pond.  Woodard & Curran found that operating the wells reduces water table levels from the south shore of Long Pond to the north bank of Beaver Brook and draws water from an area that stretched equally far if the aquifer was not replenished (or "recharged") for several months, which often occurs during the summer in Maine.  Woodard & Curran also expressly found that Long Pond itself "recharges the groundwater aquifer," which means the pond is interconnected with the water that enters Defendant's wells.

687.     In sum, Defendant's Poland Spring Water labels identifying a "Cold Spring" as a source for its "spring water" products are fraudulent because the Cold Spring either no longer exists or is not near Defendant's wells.  Nor does Nestle Waters collect water from any other genuinely existing spring source in Denmark, Maine.  Defendant's wells in Denmark instead collect ordinary groundwater from a sand and gravel aquifer lying close to the surface.

688.     Far from collecting water bubbling to the surface from a pristine mountain spring as most Poland Spring Water labels depict, the water that Defendant collects in Denmark, Maine comes from a low-lying basin from wells drilled near a pond and stream that interconnect with the sand and gravel aquifer supplying Defendant's wells.

689.     The water Defendant collects in Denmark, Maine does not meet the FDA's Identity Standard for spring water because (i) it does not meet the FDA's three-part definition of spring water; (ii) it is not collected in compliance with the FDA's bore hole collection requirements for spring water; and (iii) it is common groundwater that is falsely represented on Defendant's Poland Spring Water bottle labels to be "100% Natural Spring Water," in violation of the FDA's labeling requirements.

F.     **Water Collected at Defendant's "White Cedar Spring"**
       **Site in Dallas Plantation Is Not Spring Water, and the**
       **White Cedar Spring Does Not Naturally Exist**

690.     Although Nestle Waters represents on its Poland Spring Water labels that some

of the purported "100% Natural Spring Water" contained therein may be sourced from a spring

called the "White Cedar Spring" in Dallas Plantation ("Dallas Plt."), Maine, that spring does not

naturally exist.  What Defendant calls the "White Cedar Spring" is a man-made groundwater

discharge pond that was created when a berm to support a railroad track was built through a

wetland a few feet north of where Defendant's two Dallas Plt. wells are located.  None of

Defendant's water comes from a natural spring located in Dallas Plt., Maine.  Defendant's

identification of the "White Cedar Spring" as a source for its Poland Spring Water is fraudulent.

691.     Dallas Plt. is in Franklin County, 70 miles northeast of Fryeburg and 23 miles

from the New Hampshire border.  It is northeast of Rangeley Lake and sits in the drainage basin

of 4000-foot high Saddleback Mountain and neighboring hills, just west of a U.S. Navy facility.



692.     Franklin County property records show that in 2006, Defendant purchased 1000 acres 2.5 miles to the east of State Route 16, along Redington Road, just east of where the Cold Stream and the Redington Stream merge into the south branch of the Dead River.

693.     Defendant's Redington Road site is shown roughly in the topographical map below, which also shows two gravel pits on that property. Defendant has now built a pumping station near the western gravel pit and two wells on the site of the eastern gravel pit.



694.     The western gravel pit near Defendant's Redington Road property is visible from the air. Defendant's pumping station is roughly 600 feet east of that gravel pit.



695.     Defendant's pumping station is surrounded by a fence and guarded by a plain "Keep Out – Private" sign.  There are no signs, logos or other indications that Nestle Waters is operating, or Poland Spring Water is being collected, in the area.



696.     Defendant's two wells further east are 800 feet and 500 feet, respectively, from Redington Stream to the north and the Cold Stream to the south.



697.     The two wells are enclosed in fences, and the access road to them is barred by a gate and a "Keep Out – Private" sign.  Again, there is no indication that Defendant is drawing groundwater for its Poland Spring Water products or otherwise operating in the area.



Google Maps



Google Maps

698.     Defendant's property in Dallas Plt. is reflected on the Survey map of the Saddleback Mountain Quadrangle.  The map, made in 2001 before Defendant's wells were bored, shows that the wells access a "yellow" zone that generally yields only 10 to 50 GPM.  Seismic refraction studies performed near Defendant's well site shows groundwater levels are

generally 7 to 11 feet below the surface, which the topographic map at paragraph 693 above shows is the same as the surface water level in the two adjacent streams.



699.     The Survey map does not show the existence of a "White Cedar Spring" or any other natural spring in the vicinity of Defendant's wells on Redington Road.  Nor do any historical maps available on the U.S. Geological Survey or derivative websites.  There is no reference to such a spring on the internet that is not based on Defendant's websites or materials. Defendant's current website proclaims that "loggers and trappers" know about the "White Cedar Spring."  If that were true, the spring would have appeared on the Survey map.

700.     The below aerial photograph, taken in 2002 before Defendant's wells existed, shows two surface water bodies near what is Defendant's current well site.  As shown on the historical topographical map following the photograph, both are wetland areas.

701.     What Defendant calls the "White Cedar Spring" is the small narrow pond just south of Redington Road to the northwest of the old gravel pit where Defendant's two production wells now sit.  That pond was created when a berm was built to support a railway line through the Redington Stream wetlands in the late 1800s.  Later, a portion of Redington Road

was built on the abandoned berm.  The berm was built by depositing a relatively impermeable silty sand fill in the wetland, trapping groundwater saturating the wetland south of the road behind the embankment and forcing it to pool at the surface.  After pooling, the water flows in a man-made canal and then through a culvert under Redington Road towards Redington Stream.



Google Earth



mytopo.com

225

702.     The old railway line and berm can be seen in the below topographical map and aerial photo from 2002.  The "Old RR Grade" diverges to the west, on top of a continuing berm, while the current Redington Road continues towards the northwest about two-thirds of a mile east of Defendant's pump station.



703.     Defendant's wells sit on the south bank of a glacial esker that divides the Cold and Redington Streams.  The purported "White Cedar Spring" is simply a seep of groundwater that diffusely discharges and pools between the north bank of the esker and the Redington Road berm.  The discharged surface water runs west and then northwest along the berm's southern embankment until a point about 200 feet east of the southeastern entrance to Defendant's pump station.  There the water is diverted north through a culvert under Redington Road toward Redington Stream.  The alleged "spring" is visible in the 2002 photograph at paragraph 701 above and in the 2012 photo below.



Google Earth

704.    The photograph below shows the water from Defendant's purported "spring" flowing in a man-made channel that was dug south of the man-made berm supporting Redington Road.  The second and third photographs show the inlet and outlet, respectively, of the culvert through which the water runs under Redington Road north towards Redington Stream.





705.     Defendant first applied to develop the Dallas Plt. site in 2005.  Woodard &
Curran prepared a hydrogeologic report for the site dated June 2005, which Defendant submitted
to the Maine Land Use Regulation Commission.  That report shows that the pond south of
Redington Road that Defendant calls the "White Cedar Spring" is not a natural spring.

706.     Woodard & Curran's hydrologic report did not mention the berm – even
though it is a critical feature of the hydrological landscape at the site – and failed to report that
sand fill was deposited during a construction project to dissect the wetland and build the berm
immediately north of the alleged spring.  This deliberate or reckless oversight enabled Woodard
& Curran to claim falsely that upward gradients cause groundwater to discharge as a "spring"
when, in truth, the berm simply causes surface and seeping groundwater to pool behind it.

707.     Woodard & Curran's June 2005 report related solely to Defendant's first well
built in Dallas Plt., the westernmost well, referred to at that time as test "Borehole #1."  The
report identified the site's surficial geology as "glacial outwash, eskers and moraines, etc."  The
esker is composed of "cobbles and large boulders," and the underlying aquifer into which both
wells were eventually drilled consists of sand and gravel.  Woodard & Curran conjectured that

228

"spring vents" formed north of the esker when glacial ice melted, groundwater began flowing predominantly from east to west and "upgradient water drained from the aquifer."

708. As with its purported "Clear Spring" in Hollis and "Cold Spring" in Denmark, Defendant found supposed upward gradients by installing "spring points" – driven point wells with valves through which water naturally flowed due to artesian pressure. Woodard & Curran reported that Defendant had installed three pairs of spring points. Each pair had one "shallow" and one "deep" well. The three pairs were denoted as SP01S and SP01D, SP02S and SP02D, and SP05S and SP05D. The "spring points" had screens at depths varying from 3-4 feet (SP01S) to 27-30 feet (SP05D). The locations of the "spring points," boreholes and various monitoring wells and staff gauges at the site are shown on Woodard & Curran's site map:



229

709.     As in its Denmark "Cold Spring" reports, Woodard & Curran's June 2005 report for the "White Cedar Spring" emphasized in some instances only data that supported Defendant's need to satisfy elements of the FDA's spring water Identity Standard and ignored or omitted equally relevant data that was (or must have been) harmful to Defendant's objective.

710.     For example, Woodard & Curran conducted a seven-day pump test to, among other things, determine if the "spring" was hydraulically connected to Borehole #1 and continued to flow while the well was pumping.  In summarizing the results, Woodard & Curran reported data only from the three *deep* spring points – SP01D, SP02D and SP05D, each of which collected water flowing between 20 and 30 feet below the surface – stating that they "responded well" to the pump test because water levels at all three deep spring points dropped but continued to flow during the test.  All that really showed, however, was that the well when pumping was hydraulically connected to water that flowed 20 to 30 feet beneath the so-called "White Cedar Spring."  It did not prove that the water emerging from the earth's surface at a supposed "spring" was hydraulically connected to the well or that any such water continued to emerge from a "spring" while the well was pumping.

711.     Woodard & Curran did prepare a table that included data from the three shallow spring points, SP01S (3-4 feet below the surface), SP02S (10-12 feet below) and SP05S (13-15 feet below), but Woodard & Curran did not summarize or highlight the shallow well data because these spring points responded less well to the pump tests.  But even these shallow spring points measured water flows that were several feet underground, not the water that flowed from a natural orifice of a spring at the surface.  Even if those flows had upward gradients, there was no evidence that they discharged to the surface through a natural spring orifice rather than diffusely through the bottom of the pooling surface water in the man-created pond.

230

712.    Woodard & Curran also wrote that it measured "spring flow" during the pump test by monitoring the water level at staff gauge 3 ("SG03").  But that gauge was located more than 2,100 feet away from the well, near the culvert through which the groundwater trapped on the south side of the Redington Road berm exits towards Redington Stream.  (SG03 is in the very top left corner of the site map shown in paragraph 708 above.)  Thus, that measurement, which gauged the flow of *all* the groundwater that had pooled south the Redington Road, was useless for purposes of measuring either the well's hydraulic connection to a naturally flowing spring or whether water continued to flow through a natural spring's orifice when the well was operating.

713.    Because Woodard & Curran failed to measure spring flow in a manner that is relevant to proving the elements of the FDA's Identity Standard, Defendant did not scientifically show in 2005 (a) that its "White Cedar Spring" is a natural spring; (b) that it is hydraulically connected to the well; or (c) that it continues to flow while the well is pumping.

714.    Woodard & Curran's water quality tests were equally useless.  Woodard & Curran measured whether the well's water was "geochemically similar to" rather than "the same as" the water allegedly flowing from the spring, and it tested only samples from the deep spring points, not the shallow well points that were more likely to capture at least some water that could discharge naturally into the pond.  The tests irrelevantly compared water from two wells that collected water flowing at roughly the same depth, and which were likely to match.  Woodard & Curran did not compare the well's water to any water emerging from the supposed "spring."

715.    Woodard & Curran also sampled water collected at a staff gauge ("SG02") that was located approximately 700 feet down gradient from the well, a distance by which some of the water flowing past the well could have seeped to the surface and that, again, was likely to be more similar to the well's water than the shallow spring points.  Woodard & Curran did not

231

report the geochemistry of any water sampled from the three shallow spring points or from a staff gauge ("SG01") that was much closer to Borehole #1

716.     Defendant plainly did not prove in 2005 that the water from Borehole #1 was "the same" as the water from its alleged spring, as the FDA requires.

717.     Woodard & Curran's June 2005 hydrogeological report did not identify the specific location of the supposed spring's natural orifice.  Nor did it contain a photograph of any focused point of discharging water that looks like a natural spring.

718.     The only photographs Defendant submitted were of "spring points" drilled into a saturated man-made wetland.  The first photograph below, which Woodard & Curran itself called a "Spring Point Photo," shows SP01S (on the right) and SP01D (on the left).  The second photograph, from elsewhere in Defendant's 2005 application, shows someone purporting to measure "spring flow" by opening the valve of another spring point well.



719.     The mere existence of upward gradients in Defendant's artesian "spring point" wells does not prove the existence of a spring.  Upward gradients in unconsolidated materials typically discharge to the surface through diffuse seepage rather than springs.  And in this case,

the pooling of surface water in the so-called "spring area" was influenced by the less permeable fill that was used to build the man-made berm just north of that area.

720.      Woodard & Curran found that there was a regional westerly flow of groundwater through the sand and gravel aquifer feeding Defendant's well.  Woodard & Curran then claimed that a rise in the underlying bedrock forced that flow to emerge "via strong upward gradients … through the White Cedar Spring vents to reach the wetlands."

721.      Woodard & Curran's depicted its upward gradients theory in its cross-section A to A′ diagram (*see* site map at paragraph 708 above) (red contour line added):



722.      This drawing shows that the purported "spring area" is simply a wetland formed by the ground intersecting the water table.

723.      The drawing's theory of "strong upward gradients" resulting from a thinning aquifer is undermined by tables in Woodard & Curran's report that record the depths at which each monitoring well struck the bedrock.  The bedrock's depth (in feet below the surface) under each well is shown in boldface at the bottom of the drawing and reveals that the bedrock is

shaped differently than Woodard & Curran depicted.  Woodard & Curran ignored a large, 31-foot rise (red line) in the bedrock under MW-14 – from 60 feet to only 28.5 feet deep – which is almost three magnitudes greater than the 12-foot rise (from 60 to 48 feet deep) beneath the alleged "spring area."  That larger, steeper rise would have caused more severe upward gradients than under the "spring."  But Woodard & Curran reported no springs or even wet spots near MW-14.  Nor did it report that the upward gradients there caused MW-14 to overflow naturally from the resulting pressure.  That those things did not occur undermines the likelihood that strong upward gradients, rather than water table seepage, forms the alleged spring area.

724.     Woodard & Curran also failed to note Darcy's Law, a basic hydrology concept holding that thinning aquifers in discharge areas increase horizontal as well as vertical gradients.

725.     Woodard & Curran also claimed that a local northerly groundwater flow exited the "spring" due to "steep groundwater gradients perpendicular to the esker slope."

726.     Woodard & Curran's cross-section B to B′ (*see* site map at paragraph 708) depicts its theory of the northerly local flow and purported "steep … perpendicular" gradients.



727.     But the above drawing shows only that the standing water in the "spring area" results from the ground intersecting with the water table, not from upward gradients.

728.     Woodard & Curran provided no data supporting its purported "steep" gradient theory.  Gradients are derived by comparing how much hydraulic head changes between points divided by the distance between the points.  In this case, it should have been derived by comparing head from deep wells with head at wells with screens at the water table level.  There is no way to measure a gradient from only deep wells, as Woodard & Curran purported to do. While artesian conditions can cause upward gradients, the actual vertical gradient at this site is not determinable from the data.  The actual gradient and distribution of head within the aquifer must be known to conclude validly that subaqueous springs flow at focused locations within the pond.  Here, at most, groundwater is discharging diffusely into the pond.

729.     Just as at Defendant's Denmark "Cold Spring" site, the artesian conditions observed in this hydrogeologic setting must be created by high Kh/Kv ratios (horizontal to vertical gradient ratios).  That means horizontal flow is much faster than vertical flow and *precludes* much upward flow naturally.  If upward flow were easy, the head gradient creating the artesian conditions would diminish, and strong artesian conditions would not occur.

730.     In short, the two drawings that Woodard & Curran used to depict its theory of upward gradients at the site fail to prove the existence of a genuine spring because (a) they do not show the existence of any actual spring "vents" and depict only the more likely scenario that groundwater is discharging through diffuse seepage into the wetland; (b) they do not accurately depict the flow conditions at the site; (c) they are not supported by data that is necessary to prove that springs exist; and (d) they do not take into account the man-made berm or the role it plays in causing groundwater to pool and flow after it diffusely seeps into the wetland area.

731.     Consistent with this lack of evidence of a genuine spring at the "White Cedar Spring" site, Woodlot Alternatives, in a 2005 Baseline Biological Monitoring Report, did not report any springs.  Rather, it referred to the alleged "spring area" as a "bog" and a "saturated depression" in which it observed about one inch of standing water.

732.     Maine's Land Use Regulation Commission retained a hydrogeologist, Keith Taylor, to review Woodard & Curran's June 2005 report.  In a letter dated September 9, 2005, Taylor questioned Woodard & Curran's theory of spring formation and asked for more information to verify the alleged "White Cedar Spring's" existence.  Taylor stated:

> The report describes how "gradients converge" to form the springs due to a rising bedrock surface.  We believe that scaled cross-sections with vertical flow nets would illustrate this condition much more clearly and would allow a better understanding of the interrelationships between surface water, ground water and the springs.

733.     In a response dated September 30, 2005, Nestle Water's consultant, McDonald Morrissey Associates, Inc., which worked with Woodard & Curran, addressed Taylor's criticism concerning insufficient information about how the alleged spring formed by stating that:  "There *are not enough vertical data points* to produce detailed flow nets in a cross section[,] however, the scaled cross sections [the drawings at paragraphs 721 and 726 above] illustrate our concept of ground-water flow in the vicinity of the springs."  McDonald Morrissey, in other words, *admitted* information was lacking due to the absence of water table level data, but said it was nevertheless sticking to Woodard & Curran's theory, even though it was not substantiated.

734.     Despite the admitted lack of data substantiating the existence of a genuine spring, Defendant continued to press its dubious spring formation theory and re-submitted Woodard & Curran's report in December 2005, exchanging only a few of Woodard & Curran's graphics with immaterially altered substitutes from McDonald Morrissey dated September 2005.

735.     Defendant's June and December 2005 reports both predicted that "Borehole #1 will be permitted as 'Natural Spring Water'" because Woodard & Curran had shown that Defendant had met the FDA's Identity Standard.  Both reports based this prediction simply on (i) having conducted a very limited (and admittedly inadequately informative) "[i]nspection of subsurface materials through monitoring well installation"; (ii) its "[m]anual water level measurements [and] observations" at the monitoring wells, spring points and other gauges; and (iii) its "water quality results" that compared the well's water to water from the deep "spring points" and the remote staff gauge 700 feet from Borehole #1.

736.     As shown above, all three of these assessments were scientifically irrelevant or inconclusive and did not suffice to meet any element of the FDA's Identity Standard.

737.     In April 2006, Defendant submitted a supplemental hydrogeological report for Borehole #2, which was drilled after Borehole #1.  That second well is 48 feet deep with a 6.3-foot screen at the bottom.  The April 2006 report contained the same flaws and misleading analyses as the 2005 reports on Borehole #1.  No natural spring orifice was shown to exist.  The alleged "spring flow" and hydraulic connectivity data rested primarily on the draw down rates of the irrelevant deep "spring points" during pump tests.  The geochemical characteristics and properties of Borehole #2's water were compared only to water samples drawn from the same deep spring points and the remotely located SG02.

738.     Despite all these repeated flaws, and despite Defendant's refusal to supply data sufficient to satisfy Keith Taylor's well-placed criticism of Defendant's "spring formation" theory, Defendant's application to bottle the groundwater collected at the two wells on the site as "spring water" was approved by the Maine Drinking Water Program.

739.    Woodard & Curran's June 2005 hydrogeological report contained a map of Borehole #1's zone of contribution, and its April 2006 report included a map of Borehole #2's zone of contribution.  Those maps are shown (in different scales), respectively, below.



740.     The maps reveal that both wells draw water from an area that includes several surface water bodies – the pool of discharged groundwater in the supposed "spring area," a seasonal tributary south of Defendant's wells that runs from the mountain into the Cold Stream, and the Cold Stream itself, which McDonald Morrissey called a "losing stream," meaning that on balance it "leaks" and recharges the aquifer rather than serves as a groundwater discharge point.

741.     Even if there were a genuine spring at Defendant's site, if aquifer tests confirm that the wells induce surface water infiltration, the water drawn from the wells cannot be called "spring water" under the FDA's regulations because they collect surface water that, by definition, does not follow the same path as the groundwater naturally feeding the alleged spring.

742.     In sum, Defendant's Poland Spring Water labels identifying a "White Cedar Spring" as a source for its "spring water" products are fraudulent because the White Cedar Spring does not exist.  Nor does Nestle Waters collect water from any other existing spring source in in Dallas Plantation, Maine.  Defendant's wells there instead collect ordinary groundwater from a sand and gravel aquifer lying close to the surface.

743.     The water Defendant collects in Dallas Plt., Maine does not meet the FDA's Identity Standard for spring water because (i) it does not meet the FDA's three-part definition of spring water; (ii) it is not collected in compliance with the FDA's bore hole collection requirements for spring water; and (iii) it is common groundwater that is falsely represented on Defendant's Poland Spring Water bottle labels to be "100% Natural Spring Water," in violation of the FDA's labeling requirements.  Defendant's wells in Dallas Plt. should be tested to determine if the groundwater they collect are under the influence of surface water, rendering the water illegal for use in bottled water altogether.

G.     **Water Collected at Defendant's "Spruce Spring" Site in Pierce Pond Is Not Spring Water, and the Spruce Spring Does Not Genuinely Exist**

744.     Although Nestle Waters represents on its Poland Spring Water labels that some of the purported "100% Natural Spring Water" contained therein may be sourced from a spring called the "Spruce Spring" in Pierce Pond Township, Maine, that spring does not genuinely exist.  None of Defendant's water comes from a natural spring located in Pierce Pond.  For at least five years between September 2009 and August 2014, Defendant collected no water at all from its Pierce Pond site for use in Poland Spring Water, and may still not do so.  Defendant's identification of the "Spruce Spring" as a source for its Poland Spring Water is fraudulent.

745.     Pierce Pond Township is in Somerset County in western Maine, 43 miles east of the New Hampshire border.  County property records show that, in 2004, Defendant purchased 473 acres of land in the southwestern corner of Pierce Pond Township, less than one mile from Long Falls Dam, where Flagstaff Lake empties into the north branch of the Dead River.  Defendant's land is depicted roughly in red on the below map (red outline added):



Google Maps

240

746.     Topographical maps available on the U.S. Geological Survey and derivative websites reveal that Defendant's property lies in a saturated drainage basin on Flagstaff Lake's northeastern shore that is surrounded on three sides by mountains.



747.     Nestle Waters' site includes a decades-old trout breeding and rearing facility called the Dead River Fish Hatchery, which Defendant itself has owned since 2004.  Nestle Waters pumps 1.75 million gallons of hatchery wastewater into the Black Brook per day and likely disposes of an unknown amount of solid fish hatchery waste on its property.  The fish hatchery's runways are shown in both the old topographical map and aerial photograph below.

748.     Defendant's land encompasses a stretch of the Cold Brook (the southern creek on the map below), from where it crosses the southern boundary of Pierce Pond Township until it merges with the Black Brook (the northern creek) at the Township's western boundary.



mytopo.com



Google Maps

749.      In the first photo below, the Dead River Fish Hatchery is visible at the end of Ratchet Road.  Defendant has a pumping station at the site, at the circular end of what is called Axle Drive south of the Cold Brook.  The second photo shows two wells east of the pumping station along what is called North Bowtown Road.  Ratchet Road and North Bowtown Roads were once public thoroughfares.  Defendant has now gated them to seal off all public access.



Google Maps



Google Earth

750.      Defendant's wells are less than 140 feet from the Cold Brook.  The wells and pumping station are entirely fenced in.  The entrance to Axle Drive is guarded by a gate and "No

Trespassing" signs that do not reveal that Nestle Waters owns the site. No signs in the area

indicate that Defendant is collecting Poland Spring Water in the vicinity.



Google Earth



Google Maps



Google Earth

244

751.     Defendant's entire Pierce Pond property is encircled by similar nondescript signs stating "POSTED – Private Property" and warning that "violators will be prosecuted."

752.     The Maine Geological Survey map of the Little Bigelow Mountain Quadrangle, in which Defendant's wells are located, was prepared in 2001 and does not show Defendant's wells, which were bored in 2004.



753.     The Survey does not show the existence of a spring called the "Spruce Spring" or any other natural spring near Defendant's wells in Pierce Pond Township.  Nor do the current or historical U.S. Geological Survey maps of the Little Bigelow Mountain Quadrangle, or any other historical source found on the internet other than those that cite Defendant's own marketing materials, websites or other representations.  The deeds for Defendant's land purchases refer to other bodies of water on the property, such as Cold Brook and Black Brook, but they do not mention a so-called "Spruce Spring" or any other spring.

754.     Maine DEP "Fact Sheets" attached to pollution permits granted to Nestle Waters reflect that Defendant has represented to DEP that influent water for the Dead River Fish

245

Hatchery is obtained from the Cold Brook and Black Brook and from unnamed and unspecified "on-site groundwater springs." The Fact Sheets then contradict that by stating that the Cold and Black Brooks provide most of the operational water needs "with the remainder provided by … groundwater sources." Those "groundwater sources" are identified not as springs but as "ten, 4-foot to 5-foot diameter overburden tiles, which are connected to provide a source of 500-600 gallons per minute (GPM) … year round." Overburden tiles are catch basins that use gravity to collect groundwater. Site plans dated 2005 attached to the Fact Sheets do not show any springs.

755. Defendant applied for a spring water permit for Pierce Pond in 2004, supported by a Woodard & Curran March 2004 hydrogeological report, which it amended in April 2004. The report attaches a 1944 fish hatchery site plan, which identifies "springs" along the northern bank of Cold Brook in the southeast corner of the property – up-gradient from Defendant's wells.



756.     The "springs" identified on the 1944 map were located near the town border, directly south of Black Brook Pond.  The town border is the dashed line on the below map, and the eastern "proposed property line" on the 1944 map above is located approximately on the below map's right edge.  Comparing the two maps places the "springs" identified in 1944 just south of the intersection of North Bowtown Road and Carrying Place Road.  The aerial photo below shows that area is 1200 to 1600 feet east of Defendant's two wells.



mytopo.com



Google Earth

757.     That location is not what Defendant calls the "Spruce Spring." To meet the FDA's rules, Defendant's wells must intercept water on its way to a spring. The 1944 springs are up-gradient from the wells, so water would emerge from them before reaching the wells.

758.     Defendant instead claims that its "Spruce Spring" exists along the southern bank of Cold Brook directly northeast of Defendant's wells.

759.     Defendant's 2004 hydrogeological report and an August 2014 Amendment to Defendant's permit for the Pierce Pond site both state that the supposed "springs" at the site are "spring points" located on the southern bank of Cold Brook, 180 feet northeast of the two wells south of North Bowtown Road.

760.     Thus, as at several other sites, Defendant unlawfully calls its "spring point" wells at Pierce Pond "springs." Defendant's purported "Spruce Spring" is nothing but a few artesian wells planted along the seepage face of a stream, where the water table intersects with the surface and seeps groundwater into the Cold Brook. Defendant's alleged "Spruce Spring" is not a genuine spring discharging a focused flow of water from a natural orifice. No natural spring is hydraulically connected to Defendant's wells in Pierce Pond.

761.     Defendant's 2014 Permit Amendment attached a site plan prepared by one of Defendant's consulting firms. Reprinted in part below, that site map identifies the location of the two wells, called "Borehole-1" and "Borehole-2," and the location of four "spring points" (denoted "SP-1," "SP-2," "SP-6" and "SP-7") on the bank of Cold Brook (red boxes denoting wells and orange boxes denoting spring points added):



762.     SP-6 and SP-7, which are 180 feet northeast of (and up-gradient from) Boreholes-1 and 2, respectively, are the "spring points" on which Defendant deceptively relies to hydraulically connect the "Spruce Spring" to its wells.  SP-1 and SP-2, which are about 500 feet west of (and down gradient from) Borehole-2, were not affected by the wells' pump tests, and, thus, Defendant could not even attempt to claim they were hydraulically connected to the wells.

763.     The "spring point" wells used at Pierce Pond are similar to the "spring points" Defendant uses at its Denmark and Dallas Plantation sites.  They measure and sample water flowing 15 to 20 feet beneath the earth's surface.  They do not sample or measure the rate of flow emerging from a spring's natural orifice at the earth's surface.

764.     Woodard & Curran's 2004 report stated that Defendant installed a series of piezometers (narrow pipes that are used like monitoring wells to measure the water table level)

with screens that were 15-20 feet below the surface.  Woodard & Curran's report *admits* that when some of those piezometers "overflowed freely onto the ground … [t]he overflowing piezometers were re-named 'spring points.'"

765.     In other words, Defendant identified the locations of its "spring points" not because it had observed genuine spring activity nearby, but because it jumped to the false and convenient conclusions that the overflowing piezometers evidenced "upward gradients" and equated to the existence of a natural spring.  The horizontal flow of pressurized groundwater that created artesian conditions causing head in the piezometers is *not* evidence of "strong upward gradients."  It suggests instead that natural springs do *not* exist at the site, because the presence of springs would reduce the pressure that created the artesian conditions in the first place.

766.     By anointing those piezometers as its "spring points," Defendant never measured the rate or composition of any water emerging from the earth at a natural spring.  Rather, Defendant only measured the flow and composition of water that was flowing 15 to 20 feet below the surface, which is irrelevant under the FDA's spring water Identity Standard.

767.     Woodard & Curran made clear in a July 2004 report to the Maine DEP that the purported "spring" at Pierce Pond is mere groundwater seeping into Cold Brook.  That report referred to Cold Brook as a "gaining stream" – meaning a stream into which groundwater generally discharges.  Woodard & Curran then stated that the stream "is fed by the springs" and that "for the springs to maintain flow, Cold Brook must remain a gaining stream."  But whether Cold Brook is a gaining stream has nothing to do with ensuring continuing spring flow.  If the springs were focused flows from natural orifices along the riverbank or within the stream rather than diffusely discharging groundwater, Defendant would simply measure the spring flow at the spring orifices.  By attempting to equate spring flow with whether Cold Brook remains a gaining

stream, Woodard & Curran's report to the Maine DEP actually evidences that no genuine springs meeting the FDA's Identity Standard for spring water exist at the site.

768.     Additional evidence that Defendant's "springs" are nothing more than diffuse groundwater seepage is drawn from the fact that Woodard & Curran's reports refer to the ten overburden tiles on the property as "spring water catchments."  Overburden tiles use gravity to capture seeping groundwater in man-made catchments.  The four catchments closest to Defendant's wells are identified in the site plan at paragraph 761 above – denoted as "C-6," "C-7," "C-9" and "C-10."  The 2004 hydrogeological report included an illustration of the ten catchments, which line 640 feet of the southern bank of Cold Brook near Defendant's wells.



769.     Woodard & Curran's 2004 report also contains two illustrations that show that the "spring catchments" are simply containers in pits dug a few feet deep in the ground, which intercept the water table to capture seeping groundwater and funnel it down gradient toward the fish hatchery.  The "spring catchments" do not capture water flowing from real springs.

251

770.    The first of the two drawings, which is a southeast to northeast cross-section near Defendant's wells, also shows that the "spring points" were once again positioned below the water table level – or potentiometric surface – inducing water to flow up the manometers.



771.    The second illustration is a west to east cross-section of the narrow strip of land between Defendant's two wells and Cold Brook.  The brook runs parallel to (and, if visualized, behind) the cross-section from point B in the west until the brook turns south shortly before the eastern edge of the drawing at point B′.  (*See* site plan at paragraph 772 below.)  In addition to showing that the catchments were positioned to capture groundwater seeping in from the water table, it shows that Cold Brook is a gaining stream because its surface is equal to the water table level and serves as a natural groundwater discharge stream.  The "strong upward gradients" that Woodard & Curran claimed evidenced springs are the same type of small upward gradients that occur at any stream that discharges local groundwater flows.



772.    The locations of the two cross-sections are shown on the below 2004 site plan.



773.     Since Woodard & Curran did not install water table monitoring wells at the "Spruce Spring" site, as it similarly failed to do at the Denmark "Cold Spring" and Dallas Plt. "White Cedar Spring" sites, Woodard & Curran did not collect the data that is scientifically necessary to prove the "strong upward gradients" that are necessary for a natural spring to emerge near a water basin discharge point like Cold Brook.  Woodard & Curran failed to use modern techniques to evaluate if spring discharge occurred at that gaining stream, such as heat tracing, mini-piezometer nests, seepage meters or natural or induced tracer methods, among others.  It implausibly assumed that the gaining stream must be gaining through focused spring discharge rather than by the typical seepage discharge that occurs at basin discharge points.

774.     Woodard & Curran claimed to have identified "at least 15 separate spring vent areas" along Cold Brook, but it provided no photographs of the alleged "spring vents" or of any natural spring orifices in its hydrogeographical report or other publicly filed documents.

775.     The only photograph in the 2004 hydrogeological report was of one of the "spring points" on the shore of Cold Brook.  A "spring point" is a well, not a spring.



776.     Because Defendant's "spring points" measured groundwater that was flowing 15 to 20 feet beneath the surface, its pump tests to determine whether operating its wells stopped the "spring" flow were irrelevant.  They did not show that the alleged spring continued to flow at the surface, as the FDA's Identity Standard requires.  Those tests also failed to prove that the wells were hydraulically connected to water emerging from a spring at the surface.

777.     The depth of the "spring points" also rendered Defendant's water quality tests useless for determining whether the well water and the purported spring's water had the same physical and chemical properties.  Both of Defendant's wells capture groundwater from screens that extend from 44 to 59 feet underground, and they lie approximately 180 feet southwest of, and at a ten foot elevation above, the two spring points (SP-6 and SP-7) that were compared to the wells for water quality and composition purposes.  Those two spring points, with screens 15 to 20 feet below ground, are within the two wells' zone of contribution.  The fact that the water samples from those spring points and the wells are similar is unsurprising but irrelevant, since the FDA requires the wells' water to be compared to water emerging at the surface of a genuine spring.  Defendant did not perform such a test.

778.     Defendant also manipulated its water quality comparisons to convey a misleading degree of geochemical similarity between the wells and its purported "springs."

779.     First, since Defendant did not sample water from an actual focused flow of water from a natural spring, it was able to pick and choose among its "spring points" to select those that gave it the best results.  In its amended hydrolgeological report dated April 2004, Woodard & Curran prepared a table summarizing its water sample comparisons.  That table presented only the results of samples from SP-6, SP-7 and two of the ten "spring catchments," denoted as "C-6" and "C-10."  The site plan shown at paragraph 761 above, however, reveals

that Defendant had initially identified a "spring point" about 200 feet northwest of (and down-gradient from) Borehole-2, between piezometers "4 shallow" ("PZ-4S") and "4 deep" ("PZ-4D").  There also were two other "spring catchments" near Borehole-1 and one near Borehole-2 – C-7 and C-8, and C-9, respectively.  Without explaining why, Woodard & Curran's April 2004 report omits to mention any water quality results from the spring point near Borehole-2 or catchments 7, 8 or 9, and it summarizes only data from SP-6, SP-7, C-6 and C-10.

780.    Second, the March report showed that the results for conductivity varied widely among the samples.  The April report deleted the conductivity data to avoid that problem.

781.    Third, the April 2004 report only summarized data from samples drawn on one day, February 10, 2004, whereas the original March version of the report had also reported data from two earlier dates, February 4 and 8, 2004, as well as data from a SP-6 sample drawn on September 24, 2003 and historical data for C-6 and C-10 from April 1998.  The more detailed data in the water quality summary table in the March version of the report showed greater dissimilarity among the samples than the highly edited version of the same table in the April version of the report.  As to every analyte that was detected, moreover, the data for the February 10 samples were changed between the March and April reports – and each alteration benefitted Defendant by making the sample appear more similar to the wells' water.

782.    Fourth, neither the March 2004 nor April 2004 versions of the hydrological report that were submitted to Maine's Drinking Water Program appended the detailed laboratory reports that typically accompany hydrogeological reports and enable the regulator to verify the data in the reports' water quality tables.  The March report only attached actual lab results for the two wells – and only for the February 4 and 8 samples, not for the February 10 2004 sample. The April report attached actual lab results only for the February 10 Borehole-2 sample and a

Borehole-1 sample that was taken on March 17, 2004 (a date that was not even included on the water quality tables). The March and April reports did not attach lab results for any SP-6, SP-7, C-6 or C-7 water samples. Without those customarily provided lab results, the data summarized in the water quality tables are impossible to verify, and the reasons for the changes in those tables between the March and April versions of report are inscrutable.

783.     These data discrepancies (and others) show that Defendant manipulated the water quality analysis summary in the final, April 2004 version of Woodard & Curran's hydrogeological report in order to show that the water from its selected "spring points" had a greater geochemical similarity to the water from Defendant's wells than was actually the case.

784.     None of the monitoring reports for the Pierce Pond site submitted to Maine officials since 2004 have attempted to demonstrate that operating Defendant's wells has not changed the geochemistry of the alleged "Spruce Spring's" water. Even if the waters had been "the same" in 2004, there is no evidence that they are the same today, and the waters must be re-tested now to ascertain if they are in compliance with the FDA's spring water Identity Standard.

785.     In 2004, Defendant was permitted to withdraw up to 80 million gallons per year from its two wells. That equates to 222 GPM, a rate that was confirmed by Defendant's pump tests.

786.     In its 2014 Permit Amendment, Defendant represented to Maine officials that it had withdrawn significantly less than the 80 million gallons per year it was permitted in 2004 to withdraw.

787.     In fact, Defendant represented in that report that it had not transported *any* water off site for five years between September 2009 and August 2014. Although no water was being sent to its bottling facilities from its Pierce Pond wells during that period, Nestlé Waters'

labels for Poland Spring Water products dated 2013 and 2014 (and likely from 2009 through 2012 as well) represented falsely that the "Spruce Spring" was a source for those products.

788.     Defendant may still not be using well water collected at its "Spruce Spring" site in Poland Spring Water products.  If not, Defendant continues to mislabel those products by misrepresenting that water from that site is being used.

789.     If Defendant has resumed using well water from its "Spruce Spring" site since August 2014, Defendant continues to mislabel its Poland Spring Water products by referring to the "Spruce Spring" as a source of "natural spring water" when, for the reasons shown above, its wells in Pierce Pond do not collect water that meets the FDA's spring water Identity Standard.

790.     In sum, Defendant's Poland Spring Water labels identifying a "Spruce Spring" as a source for its "spring water" products are fraudulent because the Spruce Spring does not genuinely exist.  Nor does Nestle Waters collect water from any other existing spring source in in Pierce Pond Township, Maine.  Defendant's wells in Pierce Pond instead collect ordinary groundwater from a sand and gravel aquifer lying close to the surface.

791.     The water Defendant collects in Pierce Pond Township, Maine does not meet the FDA's Identity Standard for spring water because (i) it does not meet the FDA's three-part definition of spring water; (ii) it is not collected in compliance with the FDA's bore hole collection requirements for spring water; and (iii) it is common groundwater that is falsely represented on Defendant's Poland Spring Water bottle labels to be "100% Natural Spring Water," in violation of the FDA's labeling requirements.  Defendant's wells in Pierce Pond also should be tested to determine if the groundwater they collect are under the influence of surface water, rendering the water illegal for use in bottled water.

**H.     Water Collected at Defendant's "Bradbury Spring" in Kingfield
Is Not Spring Water, and the Bradbury Spring Is Not a Genuine Spring**

792.     Although Nestle Waters represents on its Poland Spring Water labels that some

of its purported "100% Natural Spring Water" may be sourced from a "Bradbury Spring" in

Kingfield, Maine, no genuine spring exists at Defendant's site in Kingfield.  Defendant has

created an artificial spring there.  The groundwater water Defendant collects from its wells in

Kingfield, thus, cannot legally be labeled as spring water.  Defendant's identification of the

"Bradbury Spring" as a source for its Poland Spring Water is fraudulent.

793.     The Town of Kingfield is located in Franklin County.  Kingfield Village,

where Defendant's wells and a bottling plant are located, sits in a river valley surrounded by the

Longfellow Mountain Range, in the drainage basin of 4200-foot high Sugarloaf Mountain and

4000-foot Mount Abraham to the west, and other mountains to the north, east and south.



259

794.    Kingfield is located at the junction of the Carrabassett River and its West Branch, which gathers the rainfall and snowmelt from the surrounding peaks.



795.    In 2006, Defendant purchased more than 30 acres of land off State Route 27 south of Kingfield, on which it built a bottling plant that began operation in late 2008.

796.    In 2006, Defendant also bought 196 acres of woods and former farmland known as the "Bradbury Farm" between West Kingfield Road and the West Branch of the Carrabassett River (called simply the "West Branch").  Defendant has built five commercial production wells on the old farm site.  Between late 2006 and 2008, Defendant acquired interests in additional adjoining property east, west and south of its plant, as well as land along State Route 142 south of the West Branch in order to build a pipeline between its wells and plant.

797.    Defendant's Bradbury Farm tract is bounded by West Kingfield Road on the north, Rapid Stream on the west and working farms on the east.  The site extends south beyond some active channels of the West Branch and, in places, borders that river's main channel. Defendant's Bradbury Farm site is shown in the following map, and its five wells, referred to as

"KTB-1, 2, 3, 4 and 5," are shown in the below aerial photograph.  The road in the center of the photo runs north to south, then northwest and south again, alongside, in succession, KTB-1, KTB-3, KTB-2 and KTB-4.  KTB-5 is in the top right corner of the photo, due east of KTB-1.



Google Earth

798.     Defendant ultimately connected its wells on its Bradbury Farm site to its bottling plant by constructing a three-mile underground pipeline between the wells and the plant. The pipeline's path is roughly depicted below.



Google Maps

799.     The road leading from West Kingfield Road to Defendant's wells, called Bradbury Road, is blocked by a gate posted with a "Video Surveillance" warning and "POSTED – No Trespassing" signs promising to prosecute violators "to the fullest extent of the law."



Google Maps

800.     The No Trespassing signs identify the landowner as Poland Spring Bottling Co., but there are no signs, logos or other express indications that Poland Spring Water is being collected in the vicinity.  Defendant's wells on Bradbury Farm are not visible from any public road.

801.     Defendant's extensive security surrounding its well site contrasts starkly with the lack of security of the Kingfield public water system, which has a well and pump station on West Kingfield Road one mile east of the entrance to Defendant's site.  The public water supply site has no signs warning off visitors, and its gate is often unlocked and open, even on weekends.

802.     Although Defendant's property deeds and other public records reference both Bradbury Road and the Bradbury Farm, none of those documents refer to a "Bradbury Spring." Nor do any historical records available on the internet, other than those based on Defendant's own statements or marketing materials.

803.     According to a local news source, Nestle Waters' interest in Kingfield began in 2003 when the executive director of the Greater Franklin Development Corporation urged a senior Nestle Waters official "to consider Kingfield's vast aquifer as a possible bottling plant site."  In 2004, according to the news source, Defendant's "hydrologists confirmed that Bradbury Spring in Kingfield would indeed be a good site" for sourcing Poland Spring Water products. That statement by Nestle Waters appears to be the first mention of a so-called Bradbury Spring.

804.     The Maine Geological Survey map of the Kingfield Quadrangle shows a sand and gravel aquifer beneath and west of Kingfield Village.  The map was created in 2007, shortly before Defendant's wells were bored.  Defendant's wells access the far western end of a "red" zone that provides a groundwater yield exceeding 50 GPM, where the groundwater is generally only 9 to 17 feet below the surface.



805.    The Survey map shows no springs on Defendant's Bradbury Farm site.

806.    In 2011, the Town of Kingfield issued a permit to Nestle Waters allowing it to produce 200 million gallons of groundwater per year at its Bradbury Farm site.  But Defendant only produced 64.6 million to 78.4 million gallons per year from 2011 through 2013, which equates to a groundwater withdrawal rate of 123 to 149 GPM during that time.

807.    In December 2006, Defendant received a Bulk Transport Permit from Maine's Drinking Water Program pertaining to the first four of the five wells it installed at Bradbury Farm, KTB-1, -2, -3 and -4.  Defendant received Drinking Water Program final approval to use KTB-5 to supply public drinking water in March 2016.

808.     Defendant supported its 2006 permit application with Hydrogeological Reports dated March 2006 and June 2006 by its consultant, Drumlin Environmental, LLC.  Drumlin's reports were evaluated for FDA spring water compliance by Tom Brennan's colleague, Drinking Water Program hydrogeologist Andrews Tolman, who stated in an August 4, 2006 memorandum that Drumlin's reports "document the existence of several natural springs on the site."

809.     Tolman relied on Drumlin's reports and did not state that he had personally inspected the site to confirm Drumlin's conclusions.  Tolman recommended that the Drinking Water Program "classify boreholes KTB-1, 2, 3, and 4 as 'spring water' under" the FDA's definition.  Tolman did so without basis given what Drumlin's reports actually show.

810.     Drumlin's March 2006 Hydrogeological Report pertained only to KTB-1 and KTB-2.  A site map from the March 2006 report identified two alleged "spring areas" at the site (depicted as blue-green dots below), one southeast of KTB-1 and one southeast of KTB-2.



811.     While Drumlin's report concludes that all of the FDA's spring water Identity Standard requirements were met as to the two alleged "spring areas" and wells KTB-1 and KTB-2, details within Drumlin's report contradict Drumlin's conclusions.

812.     Drumlin describes the two supposed spring areas in several different ways in its report.  It refers to four "distinct spring vents," to "diffuse groundwater seepage in wet areas and direct groundwater discharge to runoff channels" and, at times, to "active vents within areas of diffuse seepage."  Drumlin, however, does not include a photograph of any natural orifice or "spring vent" through which water flows to the surface.  Instead, Drumlin's report evidences that all four supposed "distinct spring vents" are nothing more than areas of diffuse groundwater seepage where the water forms pools that subsequently flow towards the nearby West Branch.

813.     No genuine natural springs meeting the FDA Identity Standard exist at the site.

814.     Drumlin states that the four "[d]istinct spring vents" were called "SP-1, SP-2, SP-4 and SP-5."  Their alleged locations are shown as red circles on Drumlin's site map:



815.     The above image also shows Drumlin's view of the static groundwater flow conditions at the Bradbury Farm site.  Groundwater generally flows from higher elevations in the northwestern part of the site, where the water table according to the Survey map is typically 9 to 17 feet below the surface, towards the southeast, where some of the groundwater seeps to the surface about 20 feet down-gradient before discharging into the West Branch.  Drumlin's own depictions of the site in its cross-sectional illustrations A-A′ and B-B′ show that groundwater seeps to the surface rather than emerges through focused springs (orange boxes added):



SPRING OCCURENCE
ALONG GEOLOGIC PROFILE A-A'
BRADBURY SPRING SITE
FIGURE 3-3

816.     Cross-section A-A′ transects KTB-1 and "spring vents" SP-1 and SP-2 (which are about 750 feet and 900 feet southeast of KTB-1, respectively).  The supposed springs are but groundwater seepage faces located where the land's surface lies close to the water table.  There is no geologic reason under the circumstances depicted for the water to emerge through a

267

focused spring opening rather than diffusely through the sediments. Hydrologists consider such seepage points (even if they form streams, lakes or other surface water bodies) to be mere "outcrops of the water table," and their elevations are mapped as data points on water table maps.

817.     Drumlin's cross-section B-B′ transects KTB-2 and "spring vent" SP-4 (which is mislabeled on its drawing as "SPZ-4"). It shows that alleged "spring" is also nothing but a dip in the land where the ground intersects the water table, causing the emerging groundwater to seep diffusely to the surface rather than through a focused natural spring orifice.



SPRING OCCURENCE
ALONG GEOLOGIC PROFILE B-B′
BRADBURY SPRING SITE
FIGURE 3-4

818.     The above illustrations also show, in Drumlin's words, "two shallow well points" – identified as "SPZ-1" on drawing A-A′ and "SP-4" on drawing B-B′ – which "were installed at the spring vent locations SP-1 and SP-4, respectively." Thus, Defendant installed "spring points" at the Bradbury Farm site, as it did at other sites, to measure supposed "spring

flow," which would not have been necessary if the groundwater emerged from a genuine spring orifice. If the water was emerging in a focused flow from a genuine opening in the ground, the flow could have (and would have) been measured directly at the opening. Defendant had to use "spring point" wells instead to measure the alleged "spring flow" because the groundwater was seeping diffusely to the surface rather than through a genuine spring orifice.

819.    In addition, Drumlin did not install water table monitoring wells to compare water table elevations to water levels recorded by deeper piezometers. Therefore, there is no evidence that the groundwater moves upward towards the alleged "springs" as the drawings imply. Drumlin's actual data suggests that groundwater flow is almost completely horizontal with, at best, seasonal upwelling toward the diffuse discharge zones misidentified as "springs."

820.    A Biological Baseline Report prepared in February 2011 by Stantec Consulting (which merged with Woodlot Alternatives, Inc. in 2007) contained a photograph of Defendant's so-called "spring vent" SP-4. That photo reveals that SP-4 is an area of diffuse groundwater discharge in a wetland which at times pools into a stream. It is not a spring with a natural orifice.



**Photo 12a.** SP-4 Stream headwater.
Stantec Consulting, August 16, 2010.

269

821.    Some of the water gathering in the pool visible in Stantec's above photograph may even have been induced to the earth's surface artificially, rather than naturally.

822.    A Drumlin Monitoring Report submitted to the Drinking Water Program in February 2011 stated that Defendant built a "stream flow supplementation" system in 2010 that enables Nestle Waters to augment "stream flows along the stream" leading away from SP-4's headwaters.  Drumlin's report noted that this "augmentation system" includes electronically controlled well pumps.

823.    A site plan map that Drumlin prepared (but did not give to the Drinking Water Program) shows that the "augmentation system" consists of a well 100 feet from the West Branch, called "LB-2," and a pipeline between LB-2 and a point just east of SP-4.



824.    Paths leading to the location of the "augmentation" well – called the "Supplementation Well Area" – and the pipeline's path are visible in the below aerial photo:



Google Earth

825.     Drumlin's monitoring report stated that Defendant's staff was taught how to operate the augmentation system, which is "on standby for stream supplementation, if needed."

826.     In short, Defendant has built a system that enables it manually to "augment" the alleged "spring flow" emanating from its purported "spring" SP-4.  If the water diffusely discharging and pooling at that location runs dry – either naturally or due to Defendant's operation of KTB-2, 3 and 4, which are alleged to be hydraulically connected to SP-4 – the augmentation system enables Defendant to simulate a flowing "spring" at SP-4 at will.  Such a man-made "spring" does not satisfy the FDA's spring water Identity Standard.

827.     Defendant also may have artificially augmented its other alleged Bradbury Farm "springs," referred to on Drumlin's site map at paragraph 814 above as SP-1, SP-2 and SP-5.  The following photograph from a pool of water that Defendant alleges to be a spring shows both a pipe that looks like the top of a driven point well and a submerged white pipe that appears to be injecting flowing water into the purported "spring."  The top of the well is at the top of the photo under the plank footbridge.  The submerged pipe is on the bottom right:

271



828.     Drumlin's conclusion that the Kingfield site satisfies the FDA's spring water Identity Standard is further undermined by a finding in its March 2006 Hydrogeological Report that the capture zone of the Town's public water supply well near the West Branch one mile east of Bradbury Farm "has been interpreted to extend to the river and induce surface water recharge into the aquifer."

829.     The Town's well appears on the Maine Geological Survey map just north of the river (see purple box below).  Because the Town's well is so close to the river – 250 to 300 feet – pumping the well pulls in river water, causing the well to collect surface water as well as groundwater.  For that reason, the Town's water cannot lawfully be called spring water.



830.     Two of Defendant's wells – KTB-3 and KTB-4 – are equally close to channels of the very same river, and therefore could also draw in surface water.  Although Drumlin did not record the size or shape of the those two wells' capture zones, it stated in its March 2006 report that KTB-1's zone of influence extends 700 to 800 feet from the well and that KTB-2's extends "400 feet toward the southeast" and "700 feet toward the northeast."  KTB-3 and KTB-4 pump largely at the same rates as KTB-1 and were built into the same type of terrain.  Their zones of influence should be roughly same size as KTB-1's and, thus, extend to the surface water that pools at SP-4 and to a West Branch channel that is 200 to 300 feet from those wells.

831.     If so, the water collected at KTB-3 and KTB-4, like the Town's well, is mixed with surface water and cannot qualify as "spring water" even if a genuine spring exists nearby.

832.     Since the water collected by those two wells is mixed in one pipeline with water from the other three wells before it gets to Defendant's Kingfield bottling plant, all of the water received at the plant would be a mixture of ground and surface water.  Consequently, none of the water collected by any of Defendant's five wells can be labeled as spring water.

833.     Drumlin's March 2006 Hydrogeological Report also failed to establish that the water collected by wells KTB-1 and KTB-2 is "the same" as the water emerging at Defendant's alleged springs, or that the alleged springs are hydraulically connected to those wells.

273

834.     Rather than collecting samples of water emerging from the earth's surface from the "springs" and measuring the flow rates of that water at the surface, Drumlin sampled and measured the flow rates of groundwater that was flowing from a "spring point" piezometer drilled near SP-1 called "SPZ-1." The screen on that piezometer was 14 feet deep and collected water from that depth, not from a natural spring at the earth's surface.

835.     Drumlin compared KTB-2's data with that from a piezometer near SP-4 called "SPZ-4," which had a screen 13 feet below the surface. The composition and flow rates of groundwater that far beneath the earth's surface are irrelevant to proving compliance with the FDA's rules requiring the well's and spring's water to be hydraulically connected and the same.

836.     The irrelevant water samples that Drumlin collected from SPZ-1 and SPZ-4, in any event, were not geochemically the same as the well water collected by KTB-1 and KTB-2.

837.     As shown in the following table, while all the samples showed the water was quite dilute (which reflects it had all soaked into the ground from recent precipitation events), the quantities of several elements and compounds were different in the water samples collected from the two wells than the samples from their corresponding alleged "springs" (in mg/L):

| Analyte | KTB-1* | SPZ-1* | KTB-2* | SPZ-4* |
|---------|--------|--------|--------|--------|
| Bicarbonate | 25.0 | 14.0 | 18.0 | 12.0 |
| Calcium | 6.36 | 4.4 | 5.36 | 3.51 |
| Potassium | 0.21 | 0.46 | 1.21 | 0.92 |
| Magnesium | 1.62 | 0.98 | 1.48 | 0.84 |
| Sodium | 2.34 | 1.74 | 2.10 | 1.66 |
| Sulfate | 4.4 | 3.3 | 4.2 | 2.4 |

*  The figures are from Drumlin's report. The lab results Drumlin attached, however, had different results for KTB-1 and KTB-2, and included no results for SPZ-1 or SPZ-4.

838.     The water from the two alleged "springs" was *less* dilute than the water from the two wells, which collect water that is *older* and more mineral rich. This means that the wells

are not intercepting groundwater on its way to the "springs" as the FDA's spring water Identity

Standard requires and that the wells' water is definitively not the same as the "springs'" water.

839.     Consequently, water collected by the two wells cannot be labeled spring water.

840.     Defendant installed KTB-5 in 2015, and Drumlin submitted a Hydrogeological

Report for that well dated August 2015 to the Maine Drinking Water Program.  Drumlin

purported to measure and compare KTB-5's water with water from what Drumlin called "Spring

#2," which appears to correspond to what Defendant had previously called SP-2.

841.     Drumlin's August 2015 report stated that spring flow at Spring #2 was

measured "by manual stream gauging" rather than by way of a piezometer, but Drumlin did not

state where that stream gauging occurred.  Since Drumlin did not state that the gauging occurred

at the orifice of a natural spring, its "spring flow" measurements are scientifically meaningless.

842.     Drumlin likewise did not state how or from where it collected water samples

from Spring #2 for purposes of comparing it to well water collected at KTB-5.  Thus, Drumlin's

finding that the well and spring water "matche[d] closely" is also meaningless.

843.     Drumlin's report reveals, in any event, that the two water samples were not the

same.  Drumlin sampled water on two successive days, July 22 and 23, 2015.  Its results were:

| Analyte | KTB-5 | Spring #2 |
|---|---|---|
| Bicarbonate | 26.0/25.0 | 15.0/15.0 |
| Calcium | 6.81/6.43 | 4.31/4.34 |
| Potassium | 0.74/0.68 | 0.51/0.52 |
| Magnesium | 1.79/1.72 | 0.92/0.95 |
| Sodium | 2.10/2.10 | 1.39/1.41 |
| Sulfate | 3.80/4.0 | 3.20/3.10 |

844.     Again, KTB-5 was shown to be collecting older, more mineral rich water

rather than intercepting groundwater that would emerge naturally at the surface down-gradient

through a genuine spring.

845.     Drumlin's August 2015 report, accordingly, established that the groundwater collected at KTB-5 does not qualify as "spring water" under the FDA's Identity Standard.

846.     Even if water from KTB-5 did satisfy the FDA's Identity Standard, it is transported through the same pipeline to Defendant's Kingfield bottling plant as the well water collected by KTB-1, 2, 3 and 4, which, as shown above, is not spring water.  Thus, water from KTB-5 cannot satisfy the FDA's Identity Standard under any circumstances.

847.     In sum, Defendant's Poland Spring Water labels identifying a "Bradbury Spring" as a source for its "spring water" products are fraudulent because the Bradbury Spring does not genuinely exist.  Defendant's wells on the site do not collect genuine spring water, and the groundwater collected by those wells is mixed with surface water.  Water from Defendant's Kingfield site, therefore, cannot be legally labeled as "spring water."

848.     Far from collecting water bubbling to the surface from a pristine mountain spring as its Poland Spring Water labels depict, the water that Defendant collects in Kingfield, Maine is ordinary groundwater (likely mixed with surface water) drawn from wells drilled into a sand and gravel aquifer lying near the surface under former farm land in a drainage basin.

849.     The water Defendant collects in Kingfield, Maine does not meet the FDA's Identity Standard for spring water because (i) it does not meet the FDA's three-part definition of spring water; (ii) it is not collected in compliance with the FDA's bore hole collection requirements for spring water; and (iii) it is common groundwater that is falsely represented on Defendant's Poland Spring Water bottle labels to be "100% Natural Spring Water," in violation of the FDA's labeling requirements.  Defendant's wells in Kingfield should be tested to determine if the groundwater they collect are under the influence of surface water, rendering the water illegal for use in bottled water altogether.

## VII.    MAINE'S COMPROMISED SPRING WATER REGULATORY PROCESS

850.    The FDA relies in part on state regulatory officials to ensure compliance with its standard of identity for spring water.  The Identity Standard states that bottlers "shall demonstrate, on request, to appropriate regulatory officials, using a hydrogeologically valid method, that an appropriate hydraulic connection exits between the natural orifice of the spring and the bore hole" wells used by the bottlers.  21 C.F.R. § 165.110(a)(2)(vi).  While Maine's governing statute has adopted the FDA's spring water Identity Standard and Maine has established a regulatory structure designed to ensure compliance with it, as shown above, Maine has not properly enforced compliance against Nestle Waters.  The state's failure to do so has resulted in large measure because Defendant has manipulated and compromised Maine's regulatory process.

851.    Maine's bottled water industry is regulated by several agencies, including the Maine DEP, the Maine Department of Agriculture, Conservation and Forestry ("DACF"), and the Maine Department of Health and Human Services ("DHHS"), which includes Maine's Drinking Water Program ("DWP").

852.    Groundwater extraction permits in unorganized or deorganized townships and plantations (such as Pierce Pond Township and Dallas Plt.) were granted by the DACF's Land Use Regulation Commission ("LURC") before 2012 and by the Land Use Planning Commission ("LUPC") since 2012.  With respect to organized townships, permits can be granted by the Towns themselves (examples include Hollis, Fryeburg, Denmark and Kingfield), by Maine's DEP or by the DHHS, which acts upon the recommendation of the DWP staff.

853.    Since 2005, these agencies have cooperated to eliminate redundancies in their regulatory responsibility by allocating certain responsibilities exclusively to one agency.

Pursuant to that scheme, responsibility for evaluating compliance with the FDA's spring water Identity Standard lies exclusively with the Drinking Water Program, whose environmental engineers, hydrogeologists and staff members are alone responsible for ensuring compliance with the FDA's spring water Identity Standard in Maine.

854.     Among other things, the DWP is supposed to review whether genuine springs actually exist and have a natural orifice from which water flows naturally to the surface.  If wells are used, the DWP is supposed to conduct "a hydrogeological and geochemical evaluation of the connection between the natural spring and the point of collection."  The DWP also regulates Maine bottled water producers, including Defendant, in other ways.

855.     The DWP is overseen by a nine-member committee called the Maine Public Drinking Water Commission (the "Water Commission").  Created by statute in 1995, the Water Commission consists of the DHHS Commissioner (or a designee – which since at least 2005 has been the DWP's Director), and eight other members appointed by the Governor for four-year terms.  Under the statute, three of the eight members must work with a public water system (*i.e.*, a municipal or community tap water supplier) and "represent the water purveying community." Two of the members must be users of "noncommunity water systems" (such as office building or campground owners).  The final three members "must represent the drinking water public."

856.     In January 2002, Maine's Governor appointed Tom Brennan to the Water Commission as one of the three members who was duty-bound to "represent the drinking water public."  Although the governing statute does not grant a seat on the Water Commission to a purveyor of commercial bottled water, such as Nestle Waters, Maine's governors have continued to appoint Brennan to the Water Commission since he became employed as a Nestle Waters Natural Resources Manager in January 2003.  For three successive four-year terms,

including a current term scheduled to expire in August 2017, Brennan has continued to be appointed to one of the seats reserved for a representative of "the drinking water public" – that is, to a seat that under Maine law should be held by a someone who represents consumers.

857.     The conflict of interest could not be more blatant.  Brennan is Nestle Waters' chief hydrogeologist in the northeast who, among other things, is responsible for submitting Defendant's applications to the DWP seeking permits to extract "spring water" and transport it to and from Defendant's well sites and plants.  Brennan's patent purpose for remaining on the Water Commission is to represent Nestle Water's commercial interests, including its interest in perpetuating its deceptive bottling and marketing of Poland Spring Water.  Brennan is not there to represent the interests of "the drinking water public," whom Defendant is deceiving.

858.     Brennan is a forceful presence on the Water Commission.  He is its longest-serving member and served as Vice-Chair of the Commission from mid-2008 through mid-2010 and served as Chair for a year during 2011 and 2012.  Brennan has routinely called Commission meetings to order even when not serving in those capacities.

859.     The Water Commission officially meets four times annually.  Some of its meetings have been hosted by Defendant at its bottling plants in Poland Spring and Hollis.

860.     Among other things, the Water Commission "determines [the] funding and fee collection necessary to meeting Drinking Water Program workloads, staffing and resource requirements."  Per statute, the DWP is funded by annual fees that the Water Commission imposes on in-state bottled water producers and bottled water vending machine operators.  Upon securing the fees, the Water Commission sets the DWP's annual budget and approves the DWP staff's salaries.

861.     The Water Commission members discuss DWP staff openings and new appointments during every formal Commission meeting.  The Water Commission also awards an annual "Staff Merit Award" to a DWP hydrologist, engineer, field inspector or other staff member.  Tom Brennan has volunteered at times to serve on the sub-committee that recommends the annual Merit Award winner.  Recent winners have included DWP staff members who were personally involved in reviewing Defendant's spring water sites or its applications for spring water permits, including, in 2013, Andrews Tolman.

862.     In short, Defendant has secured a leading management role in the state entity that oversees and pays the state officials responsible for enforcing Defendant's own compliance with the FDA's spring water Identity Standard.  That is a patent conflict of interest.

## VIII.   ALL STATUTES OF LIMITATIONS ARE TOLLED

### A.     Fraudulent Concealment

863.     Defendant has known that it has been falsely and deceptively mislabeling and marketing its Poland Spring Water products as "100% Natural Spring Water" since the FDA enacted the spring water Identity Standard in 1995.

864.     Defendant's fraudulent labeling and marketing of Poland Spring Water is observable to and known only by Defendant and its agents and employees, and it is concealed from Plaintiffs and Class members and other consumers of Poland Spring Water.

865.     Instead of disclosing its fraudulent scheme, or that the purportedly "100% Natural Spring Water" in its Poland Spring Water did not actually contain any natural spring water, Nestle Waters' product labels falsely represented to consumers that Poland Spring Water complied with FDA regulations, and falsely portrayed itself as a reputable manufacturer whose representations could be trusted.

866.     Since at least November 5, 2003, all applicable statutes of limitations have been tolled by Nestle Waters' knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

**B.     Estoppel**

867.     Defendant was and is under a continuous duty to disclose to Plaintiffs and the Class members the true characteristics and nature of its Poland Spring Water products. Defendant has actively, and in extraordinary fashion beyond Plaintiffs' and the Class's control, concealed and made knowing misrepresentations about the true characteristics and nature of those products.

868.     Plaintiffs and the Class members reasonably relied on Defendant's knowing and affirmative misrepresentations and could not discover Defendant's active concealment of these facts despite diligently pursuing their rights.  Based on the foregoing, Defendant is estopped from relying on any statute of limitations in defense of this action.

**C.     Discovery Rule**

869.     The causes of action alleged herein did not accrue until Plaintiffs and the Class discovered that Defendant's Poland Spring Water did not contain genuine spring water.

870.     Plaintiffs and Class members had no realistic ability to discern that Poland Spring Water does not contain genuine spring water until this action was filed or the results of the investigation leading to this action became known to them.

## CLASS ALLEGATIONS

871.     Plaintiffs' and the Class members' claims all derive from a single course of conduct by Defendant, which engaged in uniform and standardized conduct toward Plaintiffs and the Class.  Defendant did not differentiate, in degree of care or candor, in its actions or inactions, or in the content of its Poland Spring Water labels, among individual Class members.

872.     The objective facts are the same for all Class members.  Within each Claim for Relief asserted by the Class and Sub-Classes defined below, the same legal standards govern.  Additionally, many states, and for some claims all states, share the same legal standards and elements of proof, facilitating the certification of state, multistate or nationwide classes for some or all claims.

873.     Plaintiffs, accordingly, bring this action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3).  Plaintiffs seek to represent a nationwide class initially defined as:

> All persons or entities in the United States that purchased Poland Spring Water for consumptive purposes after November 5, 2003 (the "**Nationwide Class**" and, collectively, the **"Class"** or **"Class members"**).

874.     In addition, each Plaintiff seeks to represent a sub-class of Class members that purchased Poland Spring Water in that Plaintiff's home state, each state being within the Poland Spring brand's primary marketing area consisting of the eight northeastern states from New Jersey to Maine, between November 5, 2003 and the present (the "Class Period").  These state sub-classes (the "State Sub-Classes") are:

> a.     All Class members that purchased Poland Spring Water in the State of New Jersey (the "**New Jersey State Sub-Class**").
>
> b.     All Class members that purchased Poland Spring Water in the State of New York (the "**New York State Sub-Class**").
>
> c.     All Class members that purchased Poland Spring Water in the State of Connecticut (the "**Connecticut State Sub-Class**").

d.      All Class members that purchased Poland Spring Water in the Commonwealth of Massachusetts (the "**Massachusetts State Sub-Class**").

e.      All Class members that purchased Poland Spring Water in the State of Rhode Island (the "**Rhode Island State Sub-Class**").

f.      All Class members that purchased Poland Spring Water in the State of Vermont (the "**Vermont State Sub-Class**").

g.      All Class members that purchased Poland Spring Water in the State of New Hampshire (the "**New Hampshire State Sub-Class**").

h.      All Class members that purchased Poland Spring Water in the State of Maine (the "**Maine State Sub-Class**").

875.    Finally, Plaintiffs Julie Harding, Heather Harrington and Stephen S. Shapiro seek to represent a sub-class that purchased Poland Spring Water in the Home & Office Market in each of those states and nationwide (the **"Home & Office Sub-Class"**).

876.    The Class and Sub-Classes exclude Nestle Waters, its affiliates, wholly or partly owned subsidiaries, and any entity in which Nestle Waters' has a controlling interest, as well as their respective officers, directors, employees, agents, legal representatives, successors and assigns.  The Class also excludes the judicial officers presiding over this matter and their immediate family members.

877.    This action has been brought and may be properly maintained on behalf of the Class and each Sub-Class proposed herein under Federal Rule of Civil Procedure 23.

878.    <u>Numerosity</u>:  This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1) because the members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  While Plaintiffs are informed and believe that there are millions of members of the Class, and tens of thousands or more members of each

Sub-Class, the precise number of Class and Sub-Class members is unknown.  Class members may be identified by objective means through reasonable effort and may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

879.    Commonality and Predominance:  This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for each of the respective Classes predominate over any questions affecting individual Class members, including, without limitation:

a)    Whether Nestle Waters engaged in the conduct alleged herein;

b)    Whether Nestle Waters, by labeling its Poland Spring Water products as "100% Natural Spring Water," bottled, marketed, distributed, sold or otherwise placed Poland Spring Water into the stream of commerce in the United States under false and deceptive circumstances;

c)    Whether Poland Spring Water complies with FDA regulations concerning bottled spring water;

d)    Whether any of the eight purported springs from which Nestle Waters allegedly sources its Poland Spring Water actually exists and, if so, whether the water Defendant collects at its wells and bottles as Poland Spring Water meets the FDA's (i) three-part definition of spring water; (ii) five bore hole collection requirements; and (iii) labeling requirements;

e)    Whether Nestle Waters' conduct violates consumer protection statutes, false advertising laws, common law fraud and contract laws as asserted herein;

f)      Whether Defendant's unlawful, unfair and/or deceptive practices harmed Plaintiffs and the Classes;

g)      Whether Defendant breached its Home & Office delivery contracts;

h)      Whether Defendant's conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppel;

i)      Whether Plaintiffs and the other Class members overpaid for Poland Spring Water;

j)      Whether Plaintiffs are entitled to equitable relief, including, but not limited to, restitution and injunctive relief; and

k)      Whether Plaintiffs and the other Class members are entitled to damages, punitive damages and other monetary relief and, if so, in what amounts.

880.    Typicality:  This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the other Class members' claims since, among other things, all Class members were comparably injured through Nestle Waters' wrongful conduct described above and Plaintiffs seek the same relief as that sought by all Class members.

881.    Adequacy:  Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Plaintiffs' interests do not conflict with the interests of the other members of the Class or their respective Sub-Classes, they have retained counsel competent and experienced in complex class action and consumer protection litigation, and they and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the resources to do so.

285

882.     <u>Declaratory and Injunctive Relief</u>:  This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Nestle Waters has acted or refused to act on grounds generally applicable to Plaintiffs and other members of the Class, and the Plaintiffs and Class members remain exposed to future harm resulting from Defendant's misconduct, thereby making appropriate final injunctive relief with respect to the Class as a whole.

883.     <u>Superiority</u>:  This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to any other available means for the fair and efficient adjudication of this controversy.

884.     Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.

885.     The common questions of law and of fact regarding Defendant's conduct and responsibility predominate over any questions affecting only individual Class members.

886.     The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Nestle Waters, such that it would be impracticable for the members of the Class to seek redress individually for Nestle Waters' wrongful conduct.

887.     Most or all Class members, accordingly, would have no rational economic interest in individually controlling the prosecution of individual or separate actions.

888.     Even if Class members could afford and cost-effectively prosecute individual litigation, the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

889.     Individualized litigation of the facts and issues presented by this matter would also create a potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

## CLAIMS BROUGHT ON BEHALF OF THE NATIONWIDE CLASS

### Count I

### Fraud

890.     Plaintiffs reallege all prior allegations as though set forth fully herein.

891.     Plaintiffs bring this Count on behalf of the Nationwide Class.

892.     Nestle Waters intentionally concealed that its Poland Spring Water does not comply with the FDA's standard of identity for spring water and does not contain "100% Natural Spring Water," or acted with reckless disregard for the truth, and deprived Plaintiffs and Class members of material information that was highly relevant to their purchasing decision.

893.     Nestle Waters affirmatively misrepresented to Plaintiffs on Poland Spring Water labels that Poland Spring Water is "100% Natural Spring Water" sourced from naturally occurring springs in Maine when, in fact, Poland Spring Water is not "100% Natural Spring Water" because does not contain genuine natural spring water and may be unsuitable for use in bottled water altogether.

894.     Nestle Waters knew its representations were false when made.

895.     Under FDA regulations, Nestle Waters had a duty to label its Poland Spring Water bottles as "bottled water," "drinking water," "well water," "groundwater," "purified water" or some form of purified water rather than "100% Natural Spring Water" because none

287

of the water bottled as Poland Spring Water was sourced from naturally-occurring springs or complied with the FDA's Identity Standard.  Defendant also has a duty not to use the misleading "Poland Spring" brand name because none of its products is sourced from that well-known spring.

896.     Plaintiffs and the Class members relied on Nestle Waters' labels misrepresenting that the Poland Spring Water they were purchasing was genuine spring water. If the truth had been disclosed, Plaintiffs and the other Class members would not have purchased Poland Spring Water or would paid substantially lower prices for it.

897.     The misrepresentations on Poland Spring Water labels were material because they were facts that would typically be relied on by a person purchasing bottled spring water for human consumption.

898.     As a result of their reliance on Defendant's false and deceptive Poland Spring Water labels, Plaintiffs and the Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase of Poland Spring Water.

899.     Nestle Waters' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the Class members.  Plaintiffs and the Class are therefore entitled to an award of punitive damages.

900.     Plaintiffs and the Class are threatened with continuing harm arising from Defendant's deceptive practices and are entitled to a permanent injunction barring Defendant from labeling and selling Poland Spring Water as "spring water."

## Count II

### Breach of Contract

901.    Plaintiffs reallege all prior allegations as though set forth fully herein.

902.    Plaintiffs bring this Count on behalf of the Nationwide Home & Office Sub-
Class under the common law of breach of contract, as there are no true conflicts (case-
dispositive differences) among various states' contract laws and remedies.

903.    In the alternative, Plaintiffs bring this claim under the laws of the states where
Plaintiffs and Sub-Class members reside and/or purchased Poland Spring Water.

904.    Plaintiffs who purchased Poland Spring Water in the Home & Office market
did so pursuant to express or implied contracts between them and Nestle Waters by which
Nestle Waters agreed to periodically deliver, and Plaintiffs agreed to accept and pay for at an
agreed upon price, containers of Poland Spring Water that Nestle Waters represented was
"100% Natural Spring Water."

905.    The terms and conditions of the parties' contracts were reflected in monthly or
other periodic invoices that Nestle Waters delivered to Plaintiffs.

906.    Defendant's promise to deliver "100% Natural Spring Water" to Plaintiffs was
a material term of the parties' contracts.

907.    Nestle Waters breached that promise and contract term because it did not at
any time deliver genuine spring water to Plaintiffs.

908.    The prices that Defendant charged, and that Plaintiffs paid, for the Poland
Spring Water products that were delivered included a premium charge for "spring water" that
would not have been charged or paid had the products been properly labeled.

909.     As a result of Nestle Waters' conduct, Plaintiffs and the Sub-Class members have been damaged because they paid the premium and were consequently overcharged.

910.     Accordingly, Nestle Waters is liable to Plaintiffs and the Sub-Class for breach of contract, in the amount of the premiums they overpaid, which amounts will be proven at trial.

911.     Plaintiffs and the Sub-Class are threatened with continuing harm arising from Defendant's deceptive practices and are entitled to a permanent injunction barring Defendant from labeling and selling Poland Spring Water as "spring water."

## CLAIMS BROUGHT ON BEHALF OF THE STATE SUB-CLASSES

### Count III

**Violations of the New Jersey Consumer Fraud Act**
**(N.J. STAT. ANN. §§ 56:8-1, *et seq.*)**

912.     Plaintiffs reallege all prior allegations as though set forth fully herein.

913.     Plaintiffs bring this Count on behalf of the New Jersey State Sub-Class.

914.     The New Jersey Consumer Fraud Act, N.J. STAT. ANN. §§ 56:8-1, *et seq.* ("NJ CFA"), prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

915.     In the course of Nestle Waters' business, it willfully failed to disclose and actively concealed that its Poland Spring Water did not comply with FDA regulations regarding bottled spring water, that it was not "100% Natural Spring Water," that it was not collected or sourced from natural springs, as labeled, and that, in fact, the springs from which Nestle Waters claimed to have sourced its Poland Spring Water do not genuinely exist.

916.     Accordingly, Nestle Waters engaged in unfair and deceptive trade practices, including, *inter alia*:  (1) representing that its Poland Spring Water has characteristics, benefits, and qualities that it does not have; (2) advertising its Poland Spring Water with the intent to sell

a product that was different than the product that was advertised; and (3) otherwise engaging in conduct likely to deceive.

917.     Further, Nestle Waters' acts and practices described herein offend established public policy because the harm they cause to consumers outweighs any benefits associated with such practices, and because Nestle Waters fraudulently concealed the substandard nature of its Poland Spring Water from consumers.

918.     Nestle Waters' actions as set forth above occurred in the conduct of trade or commerce.

919.     Nestle Waters' conduct proximately caused injuries to Plaintiffs and the other New Jersey State Sub-Class members.

920.     Plaintiffs and the other New Jersey State Sub-Class members were injured as a result of Defendant's conduct, in that Plaintiffs and the other New Jersey State Sub-Class members overpaid for their Poland Spring Water and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

921.     Plaintiffs and the New Jersey State Sub-Class members are entitled to compensatory damages, restitution by way of full refunds of the purchase price for all their purchases of Poland Spring Water, treble or other punitive damages, attorneys' fees and a permanent injunction banning Defendant from marketing and selling Poland Spring Water as "100% Natural Spring Water."

922.     Plaintiffs will comply with N.J. STAT. ANN. § 56:8-20 by mailing a copy of this Complaint to the New Jersey Attorney General within 10 days.

## Count IV

**Violations of New York General Business Law § 349**
**(N.Y. GEN. BUS. LAW § 349)**

923.    Plaintiffs reallege all prior allegations as though set forth fully herein.

924.    Plaintiffs bring this Count on behalf of the New York State Sub-Class.

925.    New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

926.    In the course of Nestle Waters' business, it willfully failed to disclose and actively concealed that its Poland Spring Water did not comply with FDA regulations regarding bottled spring water, that it was not "100% Natural Spring Water," that it was not collected or sourced from natural springs, as labeled, and that, in fact, the springs from which Nestle Waters claimed to have sourced its Poland Spring Water do not genuinely exist.

927.    Accordingly, Nestle Waters engaged in unconscionable acts or practices and unfair or deceptive acts or practices as defined in N.Y. GEN. BUS. LAW § 349, including, *inter alia*:  (1) representing that its Poland Spring Water has characteristics, benefits, and qualities that it does not have; (2) advertising its Poland Spring Water with the intent to sell a product that was different than advertised; and (3) otherwise engaging in conduct likely to deceive.

928.    Nestle Waters' actions as set forth above occurred in the conduct of trade or commerce.

929.    Because Nestle Waters' deception takes place in the context of public health, safety and welfare, its deception affects the public interest.

930.    Further, Nestle Waters' unlawful conduct constitutes unfair acts or practices that have the capacity to deceive consumers, and that have a broad impact on consumers at large.

931.    Nestle Waters' conduct proximately caused injuries to Plaintiffs and the other New York State Sub-Class members.

932.    Plaintiffs and the other New York State Sub-Class members were injured as a result of Nestle Waters' conduct, in that Plaintiffs and the other New York State Sub-Class members overpaid for their Poland Spring Water and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of Nestle Waters' misrepresentations and omissions.

933.    Plaintiffs, individually and on behalf of the other New York State Sub-Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Nestle Waters from continuing its unfair, unlawful, and/or deceptive practices and a permanent injunction banning Defendant from marketing and selling Poland Spring Water as "100% Natural Spring Water."

934.    Plaintiffs and the New York State Sub-Class members are entitled to recover their actual damages or $50, whichever is greater.  Because Nestle Waters acted willfully and/or knowingly, Plaintiffs and the other New York State Sub-Class members also seek to recover an amount not to exceed three times actual damages, up to $1,000, as well as attorneys' fees.

## Count V

### Violations of New York General Business Law § 350
### (N.Y. GEN. BUS. LAW § 350)

935.    Plaintiffs reallege all prior allegations as though set forth fully herein.

936.    Plaintiffs bring this Count on behalf of the New York State Sub-Class.

937.    New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]"  False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect,"

taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity…."  N.Y. GEN. BUS. LAW § 350-A.

938.    Nestle Waters caused to be made or disseminated throughout New York, through labeling of its Poland Spring Water, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Nestle Waters, to be untrue and misleading to consumers, including Plaintiffs and the other New York State Sub-Class members.

939.    Nestle Waters has violated N.Y. GEN. BUS. LAW § 350 because the misrepresentations and omissions regarding Poland Spring Water's compliance with FDA regulations, and the labeling of Poland Spring Water as "100% Natural Spring Water," as described above, were material and likely to deceive a reasonable consumer.

940.    Plaintiffs and the other New York State Sub-Class members have suffered injury, including the loss of money, as a result of Nestle Waters' false advertising.  In purchasing Poland Spring Water, Plaintiffs and the New York State Sub-Class members relied on the misrepresentations and omissions of Nestle Waters with respect to the nature and quality of Poland Spring Water.  Defendant's representations were untrue, because Poland Spring Water did not comply with FDA regulations.  Had Plaintiffs and New York State Sub-Class members known this, they would not have purchased Poland Spring Water or would have paid less for it.

941.    Accordingly, Plaintiffs and the other New York State Sub-Class members overpaid for their Poland Spring Water and did not receive the benefit of the bargain for their Poland Spring Water.

942.     Plaintiffs, individually and on behalf of the other New York State Sub-Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Nestle Waters from continuing its unfair, unlawful, and/or deceptive practices and a permanent injunction banning Defendant from marketing and selling Poland Spring Water as "100% Natural Spring Water."

943.     Plaintiffs and the New York State Sub-Class members are each entitled to recover their actual damages or $500, whichever is greater.  Because Nestle Waters acted willfully and/or knowingly, Plaintiffs and the other New York State Sub-Class members are each entitled to recover three times actual damages, up to $10,000, as well as attorneys' fees.

### Count VI

### Violations of the Connecticut Unfair Trade Practices Act
(CONN. GEN. STAT. ANN. §§ 42-110A, *et seq.*)

944.     Plaintiffs reallege all prior allegations as though set forth fully herein.

945.     Plaintiffs bring this Count on behalf of the Connecticut State Sub-Class.

946.     Plaintiffs, the Connecticut State Sub-Class and Nestle Waters are each "persons" as defined by CONN. GEN. STAT. ANN. § 42-110a(3).

947.     The Connecticut Unfair Trade Practices Act ("CUTPA") provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  CONN. GEN. STAT. ANN. § 42-110g(a).  The CUTPA further provides a private right of action under CONN. GEN. STAT. ANN. § 42-110g(a).

948.     By failing to disclose and actively concealing that Poland Spring Water was not FDA-compliant and did not contain "100% Natural Spring Water," Nestle Waters engaged in deceptive business practices prohibited by the CUTPA, including, *inter alia*: (1) representing that its Poland Spring Water has characteristics, benefits, and qualities that it does not have; (2)

295

advertising its Poland Spring Water with the intent to sell a product that was different than advertised; and (3) otherwise engaging in conduct likely to deceive.

949.     Nestle Waters made material statements about the characteristics of Poland Spring Water on its Poland Spring Water labels that were either false or misleading. Each of these statements contributed to the deceptive context of Nestle Waters' unlawful advertising and representations as a whole.

950.     Nestle Waters knew that Poland Spring Water was not "100% Natural Spring Water," did not meet the FDA's standard of identity for spring water, and may not be suitable for use as bottled drinking water altogether. Nestle Waters nevertheless failed to warn Plaintiffs about these defects, despite having a duty to do so.

951.     Nestle Waters owed Plaintiffs a duty to disclose the substandard nature of its Poland Spring Water brand, because Nestle Waters:

> a)     Possessed exclusive knowledge of the defects rendering Poland Spring Water illegal to sell under FDA standards;
>
> b)     Intentionally concealed the defects associated with Poland Spring Water through its deceptive labeling that it designed to hide the defects in Poland Spring Water; and/or
>
> c)     Made untruthful or incomplete representations about the characteristics and quality of Poland Spring Water generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

952.     Nestle Waters' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true quality and characteristics of Poland Spring Water.

953.      As a result of its violations of the CUTPA detailed above, Nestle Waters caused actual damage to Plaintiffs and the other members of the Connecticut State Sub-Class and, if not stopped, will continue to harm Plaintiffs and the other members of the Connecticut State Sub-Class.

954.      Plaintiffs and the Connecticut State Sub-Class sustained damages as a result of Nestle Waters' unlawful acts and are, therefore, entitled to damages and other relief as provided under the CUTPA, including restitution by way of full refunds of the purchase price for all their purchases of Poland Spring Water, and a permanent injunction banning Defendant from marketing and selling Poland Spring Water as "100% Natural Spring Water."

955.      Plaintiffs also seek court costs and attorneys' fees as a result of Nestle Waters' violation of the CUTPA as provided in CONN. GEN. STAT. ANN. § 42-110g(d).

956.      A copy of this Complaint has been mailed to the Attorney General and the Commissioner of Consumer Protection of the State of Connecticut in accordance with CONN. GEN. STAT. ANN. § 42-110g(c).

## Count VII

### Violations of the Massachusetts Consumer Protection Act
### (MASS. GEN. LAWS CH. 93A, §§ 1, *et seq.*)

957.      Plaintiffs reallege all prior allegations as though set forth fully herein.

958.      Plaintiffs bring this Count on behalf of the Massachusetts State Sub-Class.

959.      Plaintiffs, the Massachusetts State Sub-Class, and Defendant are "persons" within the meaning of MASS. GEN. LAWS CH. 93A, § 1(a).

960.      Defendant engaged in "trade" or "commerce" within the meaning of MASS. GEN. LAWS CH. 93A, § 1(b).

961.     The Massachusetts Consumer Protection Act (the "Massachusetts CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." MASS. GEN. LAWS CH. 93A, § 2.  Defendant participated in misleading, false, and deceptive acts that violated the Massachusetts CPA.  By failing to disclose that the allegedly "100% Natural Spring Water" bottled as Poland Spring Water actually did not contain any natural spring water at all, and by representing that Poland Spring Water was sourced and bottled in compliance with FDA regulations, Nestle Waters engaged in deceptive business practices prohibited by the Massachusetts CPA.

962.     In the course of Nestle Waters' business, it willfully failed to disclose and actively concealed information about the true quality and characteristics of Poland Spring Water as described herein, and otherwise engaged in activities with a tendency or capacity to deceive.

963.     Nestle Waters also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Poland Spring Water.

964.     Nestle Waters has known it was using ordinary groundwater in its Poland Spring Water and the true nature and characteristics of Poland Spring Water for at least two decades, but concealed that information.

965.     Nestle Waters was also aware that it valued profits over honesty, consumer welfare, efficiency, and lawfulness, and that it was bottling, selling, and distributing Poland Spring Water throughout the United States that did not comply with FDA regulations.  Nestle Waters concealed this information as well.

298

966.     By failing to disclose and by actively concealing that Poland Spring Water was not FDA-compliant and not "100% Natural Spring Water," Nestle Waters engaged in deceptive business practices prohibited by the Massachusetts CPA, including, *inter alia*: (1) representing that its Poland Spring Water has characteristics, benefits, and qualities that it does not have; (2) advertising its Poland Spring Water with the intent to sell a product that was different than advertised; and (3) otherwise engaging in conduct likely to deceive.

967.     In the course of Nestle Waters' business, it willfully failed to disclose and actively concealed that its Poland Spring Water did not comply with FDA regulations regarding bottled spring water, that it was not "100% Natural Spring Water," that it was not collected or sourced from natural springs, as labeled, and that, in fact, the springs from which Nestle Waters claimed to have sourced its Poland Spring Water do not genuinely exist.

968.     Nestle Waters' unfair and deceptive acts and practices had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs and other members of the Massachusetts State Sub-Class, about the true quality and characteristics of Poland Spring Water.

969.     Nestle Waters intentionally and knowingly misrepresented material facts regarding its Poland Spring Water brand with an intent to mislead Plaintiffs and the Massachusetts State Sub-Class.

970.     Nestle Waters knew or should have known that its conduct alleged herein violated the Massachusetts CPA.

971.     As alleged above, Nestle Waters made material statements about the quality and characteristics of its Poland Spring Water brand that were either false or misleading.

972.     Nestle Waters owed Plaintiffs and the other members of the Massachusetts State Sub-Class a duty to disclose the true quality and characteristics of Poland Spring Water because Nestle Waters:

> a)     Possessed exclusive knowledge that it valued profits over consumer welfare, truthful advertising, and lawfulness, and that it was labelling, selling, and distributing Poland Spring Water throughout the United States that did not comply with FDA regulations;
>
> b)     Intentionally concealed the foregoing from Plaintiffs and the other members of the Massachusetts State Sub-Class; and/or
>
> c)     Made untruthful or incomplete representations about the quality and characteristics of Poland Spring Water generally, and the true nature of the groundwater it bottled as "100% Natural Spring Water" in particular, while purposefully withholding material facts from Plaintiffs and the other members of the Massachusetts State Sub-Class that contradicted these representations.

973.     Nestle Waters' failure to disclose and active concealment of the true quality and characteristics of its Poland Spring Water were material to Plaintiffs and the other members of the Massachusetts State Sub-Class.  Bottled spring water that is actually sourced from naturally-occurring springs is worth more than bottled water sold by a disreputable and dishonest bottler of ordinary groundwater that falsely represents that its water is "100% Natural Spring Water" and conceals the true quality and characteristics of its bottled water.

974.     Plaintiffs and the other members of the Massachusetts State Sub-Class suffered ascertainable loss caused by Nestle Waters' misrepresentations and its failure to disclose material information.  Had Plaintiffs and the other Massachusetts State Sub-Class

members known the true quality and characteristics of Poland Spring Water, specifically that the water was not "100% Natural Spring Water," as labeled, they would not have purchased Poland Spring Water or would have paid less for it.  Plaintiffs and the Massachusetts State Sub-Class did not receive the benefit of their bargain as a result of Nestle Waters' misconduct.

975.     Nestle Waters' violations present a continuing risk to Plaintiffs, to the Massachusetts State Sub-Class, and to the general public.  Nestle Waters' unlawful acts and practices complained of herein affect the public interest.

976.     As a direct and proximate result of Nestle Waters' violations of the Massachusetts CPA, Plaintiffs and the Massachusetts State Sub-Class have suffered injury-in-fact and/or actual damage.

977.     Pursuant to MASS. GEN. LAWS CH. 93A, § 9, Plaintiffs and the Massachusetts State Sub-Class seek monetary relief against Nestle Waters, measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff and each Massachusetts State Sub-Class member.  Because Nestle Waters' conduct was committed willfully and knowingly, or because Defendant has in bad faith refused to cure its violations and wrongdoing despite having been given pre-complaint notice and more than a 30-day opportunity to do so, Plaintiffs are entitled to recover, for each Plaintiff and each Massachusetts State Sub-Class Member, up to three times actual damages, but no less than two times actual damages.

978.     Plaintiffs also seek an order enjoining Nestle Waters' unfair and/or deceptive acts and practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts CPA, including restitution by way of full refunds of the purchase price for all their purchases of Poland Spring Water and a permanent injunction

banning Defendant from marketing and selling Poland Spring Water as "100% Natural Spring Water."

979.     More than 30 days before filing this complaint, Plaintiffs' counsel, on behalf of Plaintiffs, sent a letter to Nestle Waters, complying with Mass. Gen. Laws Ch. 93A, § 9(3), providing Nestle Waters with notice of its alleged violations of the Massachusetts CPA relating to its Poland Spring Water purchased by Plaintiffs and the Massachusetts State Sub-Class, and demanding that Nestle Waters correct or agree to correct the actions described therein.  Because Nestle Waters failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all relief to which Plaintiffs and the Massachusetts State Sub-Class are entitled.

## Count VIII

### Violations of the Rhode Island Unfair Trade Practices and Consumer Protection Act (R.I. GEN. LAWS § 6-13.1, *et seq.*)

980.     Plaintiffs reallege all prior allegations as though set forth fully herein.

981.     Plaintiffs bring this Count on behalf of the Rhode Island State Sub-Class.

982.     Plaintiffs and the Rhode Island State Sub-Class are persons who purchased Poland Spring Water primarily for personal, family, or household purposes within the meaning of R.I. GEN. LAWS § 6-13.1-5.2(a).

983.     Rhode Island's Unfair Trade Practices and Consumer Protection Act ("Rhode Island CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including, *inter alia*:  "(v) [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "(vii) [r]epresenting that goods or services are of a particular standard, quality, or grade…, if they are of another"; "(ix) [a]dvertising goods or services with intent not to sell them as advertised"; "(xii) [e]ngaging in any other conduct that similarly creates a likelihood of confusion or of

misunderstanding"; "(xiii) [e]ngaging in any act or practice that is unfair or deceptive to the consumer"; and "(xiv) [u]sing any other methods, acts or practices which mislead or deceive members of the public in a material respect."  R.I. GEN. LAWS. § 6-13.1-1(6).

984.     Nestle Waters engaged in unlawful trade practices, including, *inter alia*: (1) representing that its Poland Spring Water has characteristics, benefits, and qualities that it does not have; (2) representing that its Poland Spring Water is of a particular standard and quality when it is not; (3) advertising its Poland Spring Water with the intent not to sell it as advertised; and (4) otherwise engaging in conduct likely to deceive.

985.     Nestle Waters' actions as set forth above occurred in the conduct of trade or commerce.

986.     In the course of its business, Nestle Waters labeled regular bottled groundwater as "100% Natural Spring Water," concealed that its Poland Spring Water failed to comply with the FDA standard of identity for spring water and other regulations described herein, and otherwise engaged in activities with a tendency or capacity to deceive.

987.     Nestle Waters also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Poland Spring Water.

988.     Nestle Waters has known it was using ordinary groundwater in its Poland Spring Water and the true nature and characteristics of Poland Spring Water for at least two decades, but concealed that information.

989.     Nestle Waters was also aware that it valued profits over consumer welfare, efficiency, and lawfulness, and that it was bottling, selling, and distributing Poland Spring

303

Water throughout the United States that did not comply with FDA regulations.  Nestle Waters concealed this information as well.

990.     By failing to disclose and by actively concealing the true quality and characteristics of Poland Spring Water, by labeling Poland Spring Water as "100% Natural Spring Water," and by presenting itself as a reputable company that valued consumer welfare and provided truthfully labeled high quality products, Nestle Waters engaged in unfair and deceptive business practices in violation of the Rhode Island CPA.

991.     In the course of Nestle Waters' business, it willfully failed to disclose and actively concealed the use of ordinary groundwater and the true quality and characteristics of Poland Spring Water, as discussed above.  Nestle Waters manifested the deception by repeatedly using labels stating that Poland Spring Water was "100% Natural Spring Water."

992.     Nestle Waters' unfair and deceptive acts and practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other members of the Rhode Island State Sub-Class, about the true quality and characteristics of Poland Spring Water.

993.     Nestle Waters intentionally and knowingly misrepresented material facts regarding Poland Spring Water with an intent to mislead Plaintiffs and the Rhode Island State Sub-Class.

994.     Nestle Waters knew or should have known that its conduct violated the Rhode Island CPA.

995.     As alleged above, Nestle Waters made material statements about the quality and characteristics of Poland Spring Water and the Nestle Waters brands that were either false or misleading.

996.     Nestle Waters owed Plaintiffs and the other members of the Rhode Island State Sub-Class a duty to disclose the true quality, and characteristics of Poland Spring Water because Nestle Waters:

> a)     Possessed exclusive knowledge that it valued profits over consumer welfare, truthful advertising, and lawfulness, and that it was labeling, selling, and distributing Poland Spring Water throughout the United States that did not comply with FDA regulations;
>
> b)     Intentionally concealed the foregoing from Plaintiffs and the other members of the Rhode Island State Sub-Class; and/or
>
> c)     Made untruthful or incomplete representations about the quality and characteristics of Poland Spring Water generally, and the true nature of the groundwater it bottled as "100% Natural Spring Water" in particular, while purposefully withholding material facts from Plaintiffs and the other members of the Rhode Island State Sub-Class that contradicted these representations.

997.     Nestle Waters' fraudulent use of ordinary groundwater instead of natural spring water in its Poland Spring Water and its concealment of the true quality and characteristics of Poland Spring Water were material to Plaintiffs and the Rhode Island State Sub-Class.  Bottled spring water that is actually sourced from naturally-occurring springs is worth more than bottled water sold by a disreputable and dishonest bottler of ordinary groundwater that falsely represents that its water is "100% Natural Spring Water" and conceals the true quality and characteristics of its bottled water.

998.     Plaintiffs and the Rhode Island State Sub-Class suffered ascertainable loss caused by Nestle Waters' misrepresentations and its concealment of and failure to disclose

material information.  Plaintiffs and the Rhode Island State Sub-Class either would have paid less for Poland Spring Water or would not have purchased Poland Spring Water at all.

999.    Nestle Waters' unlawful acts and practices complained of herein affect the public interest.

1000.    As a direct and proximate result of Nestle Waters' violations of the Rhode Island CPA, Plaintiffs and the Rhode Island State Sub-Class have suffered injury-in-fact and/or actual damage.

1001.    Plaintiffs and the Rhode Island State Sub-Class are entitled to recover the greater of actual damages or $200 pursuant to R.I. GEN. LAWS § 6-13.1-5.2(a).  Plaintiffs and the Rhode Island State Sub-Class also seek punitive damages in the discretion of the Court because of Nestle Waters' egregious disregard for consumer welfare and its long-running concealment of the true origins of its Poland Spring Water brand.

1002.    Plaintiffs and the Rhode Island State Sub-Class also seek all available equitable remedies, including restitution by way of full refunds of the purchase price for all their purchases of Poland Spring Water, attorneys' fees and a permanent injunction banning Defendant from marketing and selling Poland Spring Water as "100% Natural Spring Water."

## Count IX

### Violations of the Vermont Consumer Fraud Act
### (VT. STAT. ANN. TIT. 9, § 2451, *et seq.*)

1003.    Plaintiffs reallege all prior allegations as though set forth fully herein.

1004.    Plaintiffs bring this Count on behalf of the Vermont State Sub-Class.

1005.    Nestle Waters is a seller within the meaning of VT. STAT. ANN. TIT. 9, § 2451(a)(c).

1006.     The Vermont Consumer Fraud Act ("Vermont CFA") makes unlawful "[u]nfair or deceptive acts or practices in commerce…."  VT. STAT. ANN. TIT. 9, § 2453(a). Nestle Waters engaged in unfair and deceptive acts and practices in trade or commerce in violation of the Vermont CFA by fraudulently labeling its Poland Spring Water as "100% Natural Spring Water."

1007.     In the course of its business, Nestle Waters labeled its Poland Spring Water as "100% Natural Spring Water" and concealed that its Poland Spring Water failed to comply with the FDA standard of identity for spring water and other regulations as described herein, and otherwise engaged in activities with a tendency or capacity to deceive.

1008.     Nestle Waters also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of material facts with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Poland Spring Water.

1009.     Nestle Waters has known it was using ordinary groundwater in its Poland Spring Water and has been misrepresenting the true nature of Poland Spring Water for at least two decades, but concealed that information.

1010.     Nestle Waters was also aware that it valued profits over consumer welfare, truthful advertising, and lawfulness, and that it was bottling, selling and distributing Poland Spring Water throughout the United States that did not comply with FDA regulations.  Nestle Waters concealed this information as well.

1011.     By failing to disclose and by actively concealing the true quality and characteristics of Poland Spring Water, by labeling Poland Spring Water as "100% Natural Spring Water," and by presenting itself as a reputable company that valued consumer welfare

and provided truthfully labeled high quality products, Nestle Waters engaged in unfair and deceptive business practices in violation of the Vermont CFA.

1012.   In the course of Nestle Waters' business, it willfully failed to disclose and actively concealed its use of ordinary groundwater and the true quality and characteristics of Poland Spring Water.  Nestle Waters manifested the deception by repeatedly using labels stating that Poland Spring Water was "100% Natural Spring Water."

1013.   Nestle Waters' unfair and deceptive acts and practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other members of the Vermont State Class, about the true quality and characteristics of Poland Spring Water.

1014.   Nestle Waters knowingly misrepresented material facts regarding Poland Spring Water with an intent to mislead Plaintiffs and the Vermont State Sub-Class.

1015.   Nestle Waters knew or should have known that its conduct violated the Vermont CFA.

1016.   As alleged above, Nestle Waters made material statements about the quality and characteristics of Poland Spring Water that were either false or misleading.

1017.   Nestle Waters owed Plaintiffs and the other members of the Vermont State Sub-Class a duty to disclose the true quality and characteristics of Poland Spring Water because Nestle Waters:

> a)   Possessed exclusive knowledge that it valued profits over consumer welfare, truthful advertising, and lawfulness, and that it was labeling, selling, and distributing Poland Spring Water throughout the United States that did not comply with FDA regulations;

308

b)      Intentionally concealed the foregoing from Plaintiffs and the other

members of the Vermont State Sub-Class; and/or

c)      Made untruthful or incomplete representations about the quality and

characteristics of Poland Spring Water generally, and the true nature of the

groundwater it bottled as "100% Natural Spring Water" in particular, while

purposefully withholding material facts from Plaintiffs and the other members

of the Vermont State Sub-Class that contradicted these representations.

1018.      Nestle Waters' fraudulent use of ordinary groundwater as opposed to natural

spring water in its Poland Spring Water and its concealment of the true quality and

characteristics of Poland Spring Water were material to Plaintiffs and the Vermont State Sub-

Class.  Bottled spring water that is actually sourced from naturally-occurring springs is worth

more than bottled water sold by a disreputable and dishonest bottler of ordinary groundwater

that falsely represents that its water is "100% Natural Spring Water" and conceals the true

quality and characteristics of its bottled water.

1019.      Plaintiffs and the Vermont State Sub-Class suffered ascertainable loss caused

by Nestle Waters' misrepresentations and its concealment of and failure to disclose material

information.  Plaintiffs and the Vermont State Sub-Class either would have paid less for Poland

Spring Water or would not have purchased Poland Spring Water at all.

1020.      Nestle Waters had an ongoing duty to all Poland Springs Water customers to

refrain from unfair and deceptive acts or practices under the Vermont CFA.  All purchasers of

Poland Springs Water suffered ascertainable loss in the form of overpayment they made for

Poland Spring Water as a result of Nestle Waters' deceptive and unfair acts and practices that

occurred in the course of Nestle Waters' business.

1021.    Nestle Waters' violations present a continuing risk to Plaintiffs and the Vermont State Sub-Class, as well as to the general public.  Nestle Waters' unlawful acts and practices complained of herein affect the public interest.

1022.    As a direct and proximate result of Nestle Waters' violations of the Vermont CFA, Plaintiffs and the Vermont State Sub-Class have suffered injury-in-fact and/or actual damage.

1023.    Plaintiffs and the Vermont State Sub-Class are entitled to recover "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]" pursuant to VT. STAT. ANN. TIT. 9, § 2461(b).

1024.    Plaintiffs and the Vermont State Sub-Class are entitled to "appropriate equitable relief," including a permanent injunction banning Defendant from marketing and selling Poland Spring Water as "100% Natural Spring Water."

## Count X

### Violations of the New Hampshire Consumer Protection Act
### (N.H. REV. STAT. ANN. § 358-A:1, *et seq.*)

1025.    Plaintiffs reallege all prior allegations as though set forth fully herein.

1026.    Plaintiffs bring this Count on behalf of the New Hampshire State Sub-Class.

1027.    Plaintiffs, the New Hampshire State Sub-Class, and Nestle Waters are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. REV. STAT. § 358-A:1.

1028.    Nestle Waters' actions as set forth herein occurred in the conduct of "trade commerce" as defined under N.H. REV. STAT. § 358-A:1.

1029.     The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but … not limited to, the following: … (V) [r]epresenting that goods or services have … characteristics, … uses, benefits or quantities that they do not have;" "(VII) [r]epresenting that goods or services are of a particular standard, quality, or grade, … if they are of another;" and "(IX) [a]dvertising goods or services with intent not to sell them as advertised."  N.H. REV. STAT. § 358-A:2.

1030.     Nestle Waters participated in unfair and deceptive acts and practices that violated the New Hampshire CPA as described above and below.  By fraudulently labeling its Poland Spring Water to make it appear that the bottles contained "100% Natural Spring Water," Nestle Waters engaged in deceptive business practices prohibited by the New Hampshire CPA, including, *inter alia*:  (1) representing that its Poland Spring Water has characteristics, benefits, and qualities that it does not have; (2) representing that its Poland Spring Water is of a particular standard and quality when it is not; (3) advertising its Poland Spring Water with the intent not to sell it as advertised; (4) representing that the subject of a transaction involving Poland Spring Water has been supplied in accordance with a previous representation when it has not; and (5) engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce.

1031.     In the course of its business, Nestle Waters labeled regular bottled groundwater as "100% Natural Spring Water," concealed that its Poland Spring Water failed to comply with the FDA's standard of identity for spring water and other regulations as described herein, and otherwise engaged in activities with a tendency or capacity to deceive.

1032.     Nestle Waters also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or

omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Poland Spring Water.

1033.    Nestle Waters has known it was using ordinary groundwater in its Poland Spring Water and the true nature of Poland Spring Water for at least two decades, but concealed that information.

1034.    Nestle Waters was also aware that it valued profits over consumer welfare, efficiency, and lawfulness, and that it was bottling, selling, and distributing Poland Spring Water throughout the United States that did not comply with FDA regulations.  Nestle Waters concealed this information as well.

1035.    By failing to disclose and by actively concealing the true quality and characteristics of Poland Spring Water, by labeling Poland Spring Water as "100% Natural Spring Water," and by presenting itself as a reputable company that valued consumer welfare and provided truthfully labeled high quality products, Nestle Waters engaged in unfair and deceptive business practices in violation of the New Hampshire CPA.

1036.    In the course of Nestle Waters' business, it willfully failed to disclose and actively concealed that its Poland Spring Water did not comply with FDA regulations regarding bottled spring water, that it was not "100% Natural Spring Water," that it was not collected or sourced from natural springs, as labeled, and that, in fact, the springs from which Nestle Waters claimed to have sourced its Poland Spring Water did not genuinely exist.

1037.    Nestle Waters' unfair and deceptive acts and practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the New Hampshire State Sub-Class, about the true quality and characteristics of Poland Spring Water.

1038.    Nestle Waters knowingly misrepresented material facts regarding its Poland Spring Water brand with an intent to mislead Plaintiffs and the New Hampshire State Sub-Class.

1039.    Nestle Waters knew or should have known that its conduct violated the New Hampshire CPA.

1040.    As alleged above, Nestle Waters made material statements about the quality and characteristics of Poland Spring Water and the Nestle Waters brands that were either false or misleading.

1041.    Nestle Waters owed Plaintiffs and the other members of the New Hampshire State Sub-Class a duty to disclose the true quality and characteristics of Poland Spring Water and the devaluing of integrity at Nestle Waters, because Nestle Waters:

a)    Possessed exclusive knowledge that it valued profits over consumer welfare, truthful advertising, and lawfulness, and that it was labeling, selling, and distributing Poland Spring Water throughout the United States that did not comply with FDA regulations;

b)    Intentionally concealed the foregoing from Plaintiffs and the other members of the New Hampshire State Sub-Class; and/or

c)    Made incomplete representations about the quality and characteristics of Poland Spring Water generally, and the true nature of the groundwater it bottled as "100% Natural Spring Water" in particular, while purposefully withholding material facts from Plaintiffs and the other members of the New Hampshire State Sub-Class that contradicted these representations.

1042.     Nestle Waters' fraudulent use of regular groundwater as opposed to natural spring water in its Poland Spring Water and its concealment of the true quality and characteristics of Poland Spring Water were material to Plaintiffs and the New Hampshire State Sub-Class.  Bottled spring water that is actually sourced from naturally-occurring springs is worth more than bottled water sold by a disreputable and dishonest bottler of regular groundwater that falsely represents that its water is "100% Natural Spring Water" and conceals the true quality and characteristics of its bottled water.

1043.     Plaintiffs and the New Hampshire State Sub-Class suffered ascertainable loss caused by Nestle Waters' misrepresentations and its concealment of and failure to disclose material information.

1044.     Nestle Waters had an ongoing duty to all purchasers of Poland Spring Water to refrain from unfair and deceptive acts and practices under the New Hampshire CPA.

1045.     All purchasers of Poland Spring Water suffered ascertainable loss in the form of overpayment they made for Poland Spring Water as a result of Nestle Waters' deceptive and unfair acts and practices that occurred in the course of Nestle Waters' business.

1046.     Nestle Waters' violations present a continuing risk to Plaintiffs as well as to the general public.  Nestle Waters' unlawful acts and practices complained of herein affect the public interest.

1047.     As a direct and proximate result of Nestle Waters' violations of the New Hampshire CPA, Plaintiffs and the New Hampshire State Sub-Class have suffered injury-in-fact and/or actual damage.

1048.     Because Nestle Waters' willful conduct caused injury to New Hampshire State Sub-Class members' property through violations of the New Hampshire CPA, each

member of the New Hampshire State Sub-Class seeks recovery of their actual damages or $1,000, whichever is greater, treble damages, costs and reasonable attorneys' fees.

1049.     Plaintiffs and the New Hampshire Sub-Class members are also entitled to a permanent injunction against Nestle Waters' unfair and/or deceptive acts and practices and banning Defendant from marketing and selling Poland Spring Water as "100% Natural Spring Water," and any other just and proper relief under N.H. REV. STAT. § 358-A:10.

## Count XI

### Violations of the Maine Unfair Trade Practices Act and the Maine Uniform Deceptive Trade Practices Act (ME. REV. STAT. ANN. TIT. 5 § 205-A, *et seq*. & ME. REV. STAT. ANN. TIT. 10 §§1211-1216)

1050.     Plaintiffs reallege all prior allegations as though set forth fully herein.

1051.     Plaintiffs bring this Count on behalf of the Maine State Sub-Class.

1052.     Plaintiffs and the Maine State Sub-Class are persons who purchased Poland Spring Water primarily for personal, family, or household purposes within the meaning of ME. REV. STAT. ANN. TIT. 5 § 213(1).

1053.     Maine's Unfair Trade Practices Act (the "Maine UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  ME. REV. STAT. ANN. TIT. 5 § 207.

1054.     Nestle Waters engaged in unlawful trade practices including, *inter alia*:  (1) representing that its Poland Spring Water has characteristics, benefits, and qualities that it does not have; (2) representing that its Poland Spring Water is of a particular standard and quality when it is not; (3) advertising Poland Spring Water with an intent not to sell it as advertised; and (4) otherwise engaging in conduct likely to deceive.

315

1055.    Nestle Waters' actions as set forth above occurred in the conduct of trade or commerce within the meaning of ME. REV. STAT. ANN. TIT. 5 § 206(3).

1056.    In the course of its business, Nestle Waters labeled regular bottled groundwater as "100% Natural Spring Water," concealed that its Poland Spring Water failed to comply with the FDA standard of identity for spring water and other regulations as described herein, and otherwise engaged in activities with a tendency or capacity to deceive.

1057.    By failing to disclose and by actively concealing the true quality and characteristics of Poland Spring Water, by labeling Poland Spring Water as "100% Natural Spring Water," and by presenting itself as a reputable company that valued consumer welfare and provided truthfully labeled high quality products, Nestle Waters engaged in unfair and deceptive business practices in violation of the Maine UTPA.

1058.    Nestle Waters' unfair and deceptive acts and practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other members of the Maine State Sub-Class, about the true quality and characteristics of Poland Spring Water.

1059.    Nestle Waters' conduct, as described herein, caused substantial injury to consumers who purchased Poland Spring Water but did not receive the benefit of their bargain because they paid substantially more than they should have for Defendant's products, believing they were purchasing "100% Natural Spring Water" when, in fact, they were purchasing regular groundwater.

1060.    Nestle Waters' fraudulent use of ordinary groundwater instead of natural spring water in its Poland Spring water and its concealment of the true quality and characteristics of Poland Spring Water were material to Plaintiffs and the Maine State Sub-Class.  Bottled spring water that is actually sourced from naturally-occurring springs is worth

more than bottled water sold by a disreputable and dishonest bottler of ordinary groundwater that falsely represents that its water is "100% Natural Spring Water" and conceals the true quality and characteristics of its bottled water.

1061.     Nestle Waters' conduct is not outweighed by any countervailing benefits to consumers or competition.  In fact, there are no countervailing benefits to consumers or competition resulting from Nestle Waters' unfair and deceptive acts or practices.  Consumers have paid a premium for natural spring water that they have not actually received and, because Nestle Waters is not actually sourcing its Poland Spring Water from natural springs, it can produce higher quantities of water at lower prices than its competitors, thus unfairly distorting the competitive landscape of the bottled spring water market.

1062.     The unfair and deceptive acts and practices complained of herein were not reasonably avoidable by consumers, because Nestle Waters:

> a)     Possessed exclusive knowledge that it valued profits over consumer welfare, truthful advertising, and lawfulness, and that it was labeling, selling, and distributing Poland Spring Water throughout the United States that did not comply with FDA regulations;
>
> b)     Intentionally concealed the foregoing from Plaintiffs and the other members of the Maine State Sub-Class; and/or
>
> c)     Made incomplete representations about the quality and characteristics of Poland Spring Water generally, and the true nature of the groundwater it bottled as "100% Natural Spring Water" in particular, while purposefully withholding material facts from Plaintiffs and the other members of the Maine State Sub-Class that contradicted these representations.

317

1063.    Plaintiffs and the Maine State Sub-Class suffered ascertainable loss caused by Nestle Waters' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Maine State Sub-Class either would have paid less for Poland Spring Water or would not have purchased Poland Spring Water at all.

1064.    Nestle Waters' acts and practices, as outlined above, were willful and knowing.

1065.    As a direct and proximate result of Nestle Waters' violations of the Maine UTPA, Plaintiffs and the Maine State Sub-Class have suffered a loss of money and/or property.

1066.    Plaintiffs and the Maine State Sub-Class are entitled to recover actual damages in an amount to be established at trial, restitution by way of full refunds of the purchase price for all their purchases of Poland Spring Water and any other equitable relief, which the Court determines to be necessary and proper pursuant to ME. STAT. ANN. TIT. 5 § 213(1).

1067.    Additionally, Defendant has engaged in deceptive trade practices, pursuant to ME. REV. STAT. ANN. TIT. 10, §§ 1212(1), by, among other things, representing that its Poland Spring Water has characteristics and ingredients that it does not have.  Therefore, pursuant to Me. Rev. Stat. Ann. tit. 10, § 1213, Plaintiffs and the Maine State Sub-Class are entitled to equitable relief, including a permanent injunction banning Defendant from marketing and selling Poland Spring Water as "100% Natural Spring Water."

1068.    Furthermore, in accordance with ME. STAT. ANN. TIT. 5 § 213(2), Nestle Waters is liable to the Plaintiffs for reasonable attorneys' fees and costs incurred in connection with this action.

1069.     More than 30 days before filing this complaint, Plaintiffs' counsel, on behalf

of Plaintiffs, sent a letter to Nestle Waters, complying with ME. STAT. ANN. TIT. 5 § 213(1-A),

providing Nestle Waters with notice of its alleged violations of the Maine UTPA relating to its

Poland Spring Water purchased by Plaintiffs and the Maine State Class, and demanding that

Nestle Waters correct or agree to correct the actions described therein.  Because Nestle Waters

failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all

damages and relief to which Plaintiffs and the Maine State Class are entitled.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment

against Nestle Waters and award the following relief:

A.     On the First Claim for Relief, a judgment awarding compensatory and punitive

damages and permanent injunctive relief for fraud to members of the Nationwide Class;

B.     On the Second Claim for Relief, a judgment awarding compensatory damages and

permanent injunctive relief for breach of contract to members of the Home & Office Sub-Class;

C.     On the Third Claim for Relief, a judgment awarding members of the New Jersey

State Sub-Class full restitution or their actual damages, treble damages, reasonable attorneys'

fees and costs, and civil penalties of up to $10,000 for a first violation of the New Jersey CFA

and up to $20,000 for each subsequent violation of the New Jersey CFA, a permanent injunction,

and any other further relief the Court deems just and proper;

D.     On the Fourth Claim for Relief, a judgment enjoining Nestle Waters from

continuing its unlawful and deceptive acts and practices, awarding each member of the New

York State Sub-Class his or her actual damages or $50, whichever is greater, including treble

damages up to $1,000, granting members of the New York State Sub-Class reasonable attorneys'

fees and costs, a permanent injunction, and awarding any further relief the Court deems just and proper;

E.        On the Fifth Claim for Relief, a judgment enjoining Nestle waters from continuing its unfair, unlawful, and deceptive practices, awarding each member of the New York State Sub-Class his or her actual damages or $500, whichever is greater, including treble damages up to $10,000, granting members of the New York State Sub-Class reasonable attorneys' fees, a permanent injunction, and awarding any further relief the Court deems just and proper;

F.        On the Sixth Claim for Relief, a judgment awarding each member of the Connecticut State Sub-Class full restitution or his or her actual damages, court costs and reasonable attorneys' fees, a permanent injunction, and any other relief the Court deems necessary or proper;

G.        On the Seventh Claim for Relief, a judgment enjoining Nestle Waters' unfair and deceptive acts and practices by way of a permanent injunction, an award to each member of the Massachusetts State Sub-Class of monetary relief measured as the greater of actual damages or $25 or, because Nestle Waters' conduct was committed willfully and knowingly, three times actual damages, but no less than two times actual damages, costs and reasonable attorneys' fees, and any other just and proper relief available under the Massachusetts CPA;

H.        On the Eighth Claim for Relief, a judgment awarding each member of the Rhode Island State Sub-Class his or her actual damages or $200, whichever is greater, punitive damages at the discretion of the Court because of Nestle Waters' egregious disregard for consumer welfare and its long-running concealment of the true origins of Poland Spring Water, a permanent injunction, and any further relief the Court may deem necessary or proper;

I.      On the Ninth Claim for Relief, a judgment awarding appropriate equitable relief by way of a permanent injunction, the amount of damages suffered by each member of the Vermont State Sub-Class, full restitution of the value of the consideration given by each member of the Vermont State Class, or statutory damages, plus exemplary damages not to exceed three times the value of the consideration given by each member of the Vermont State Sub-Class, reasonable attorneys' fees, and any further relief the Court deems necessary and proper;

J.      On the Tenth Claim for Relief, a judgment enjoining Nestle Waters' unfair and deceptive acts and practices, an award of actual damages or $1,000, whichever is greater, to each member of the New Hampshire State Sub-Class, three times actual damages, but no less than two times actual damages, an award of costs and reasonable attorneys' fees, a permanent injunction, and any further relief the Court deems just and proper; and

K.      On the Eleventh Claim for Relief, a judgment enjoining Nestle Waters' unfair and deceptive acts and practices by way of a permanent injunction, an award of actual damages to each member of the Maine State Sub-Class, or full restitution, costs and reasonable attorneys' fees, and any other relief the Court deems necessary and proper.

## <u>DEMAND FOR JURY TRIAL</u>

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure and otherwise, Plaintiffs hereby demand a trial by jury with respect to all issues and claims, asserted by any party, triable of right by a jury, in this action.

Dated:  August 15, 2017                  Respectfully submitted,

                                              s/ Craig A. Raabe
Alexander H. Schmidt (*pro hac vice* pending)    Craig A. Raabe (ct04116)
ALEXANDER H. SCHMIDT, ESQ.                Robert A. Izard (ct01601)
Fairways Professional Plaza              IZARD, KINDALL & RAABE, LLP
5 Professional Circle, Suite 204         29 S. Main St., Suite 305
Colts Neck, NJ 07722                     West Hartford, CT 06107
Tel:  (732)  226-0004                    Tel:  (860) 493-6292
Fax:  (732)  845-9087                    Fax: (860) 493-6290
alex@alexschmidt.law                     craabe@ikrlaw.com
                                         rizard@ikrlaw.com


Steven N. Williams (*pro hac vice* pending)    Steven G. Sklaver (*pro hac vice* pending)
COTCHETT, PITRE & MCCARTHY, LLP 840       Amanda Bonn (*pro hac vice* pending)
Malcolm Road, Suite 200 Burlingame, CA    Oleg Elkhunovich (*pro hac vice* pending)
94010                                    SUSMAN GODFREY L.L.P.
Tel:  (650) 697-6000                     1901 Avenue of the Stars, Suite 950
Fax:  (650) 697-0577                     Los Angeles, CA 90067
swilliams@cpmlegal.com                   Tel:  (310) 789-3100
                                         Fax: (310) 789-3150
Alexander E. Barnett (*pro hac vice* pending)    ssklaver@susmangodfrey.com
COTCHETT, PITRE & MCCARTHY, LLP           abonn@susmangodfrey.com
40 Worth St., 10th Floor                 oelkhunovich@susmangodfrey.com
New York, NY 10013
Tel:  (212) 201-6820
Fax:  (646) 219-6678
abarnett@cpmlegal.com


*Counsel for Plaintiffs*