UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------X

MARK J. PATANE, JULIE HARDING,
HEATHER HARRIGAN, STEPHEN S.
SHAPIRO, CATHERINE PORTER,   Civ. No.:  3:17-cv-01381-JAM
ERICA RUSSELL, TINA MORETTI,
BRIDGET KOPET, JENNIFER S. COLE,   ALL CASES
BENJAMIN A. FLETCHER, DIANE
BOGDAN, and MICHAEL BROWN,
Individually and on Behalf of
All Others Similarly Situated,

      Plaintiffs,

    -v-

NESTLE WATERS NORTH AMERICA, INC.,

       SEPTEMBER 14, 2018
      Defendant.

-------------------------------------------------------X


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

PERTINENT FACTS AND PROCEDURAL HISTORY............................................................2

   I.   The Initial Complaint and Early Discovery. ....................................................................2

   II.  The May 17, 2018 Order. ..............................................................................................3

   III. Plaintiffs' Amended Complaint. ...................................................................................4

   IV. Maine's Regulators Are Potentially Compromised By Pecuniary Interests. ....................6

   V.  The FDA Has Not Confirmed That Poland Spring® Is Genuine Spring Water. ...............7

STANDARD OF REVIEW ....................................................................................................8

ARGUMENT ......................................................................................................................9

   I.   THE FDCA DOES NOT PREEMPT PLAINTIFFS'
       PROPERLY PLEADED STATE LAW CLAIMS ............................................................9

      A.  Plaintiffs Cured The Original Pleading's Defects By Expressly
          Bringing All Amended Claims Under State Law. ........................................................9

      B.  Federal Courts Rarely Preempt Claims Involving The Historic
          Police Powers Of The States, Such As Plaintiffs' Claims Here. ................................11

      C.  The FDCA Does Not Preempt Plaintiffs' Statutory Trade Practices Claims
          Because Defendant Violated Specific State Statutes By Falsely And
          Deceptively Labeling Poland Spring® as "100% Natural Spring Water." ................16

      D.  The FDCA Does Not Preempt Plaintiffs' State Law Statutory Claims
          Because Plaintiffs Properly Allege That Nestlé Violates State Laws
          Substantively Identical To Federal Law. ..................................................................22

      E.  Plaintiffs Satisfy The *Buckman* Standard Because Counts III-XII All
          Depend On An Independent Provision Or Requirement Of State Law. ....................24

      F.  The FDCA Does Not Expressly Preempt Plaintiffs' Claims
          Because Plaintiffs Do Not Seek to Add Any Non-Identical
          Requirements To The Standard Of Identity. .............................................................26

G. The FDCA Does Not Preempt Plaintiffs' Common Law Fraud
Claim Because States Have Long Permitted Consumers To
Bring Such Claims Against Unscrupulous Corporations. ...........................................30

H. The FDCA Does Not Preempt Plaintiffs' Breach Of Contract Claim
Because Plaintiffs Could Bring The Cause of Action Even Had
Congress Never Passed The FDCA. ..........................................................................32

I. Conflict Preemption Does Not Apply Here Because The FDCA
Does Not Have A Robust Certification Procedure In Place. ......................................33

II. *BURFORD* ABSTENTION IS WHOLLY INAPPROPRIATE IN THIS CASE..............35

A. *Burford* Abstention Is An Exceedingly Narrow And
Rarely Applied Doctrine. ...........................................................................................35

B. Nestlé's Request for This Court to Abstain Fails Because Several
Necessary Prerequisites For *Burford* Abstention Do Not Exist Here. ........................38

   1. The *Burford* Doctrine Does Not Apply to
   Claims for Damages. .........................................................................................38

   2. Plaintiffs Have No Timely and Adequate State
   Court Review Available, Thus Precluding the Court
   from Applying the *Burford* Doctrine. .............................................................41

   3. Allowing Plaintiffs to Litigate their Valid State Law
   Claims Would Not Disrupt Any State's Efforts to
   Establish a Coherent State Policy. ...................................................................45

   4. The *Bethphage* Factors Cannot Salvage Nestlé's
   Abstention Request. .........................................................................................48

C. The Court Cannot Abstain In Favor Of Conflicted Maine Regulators. ......................51

III. NESTLÉ DOES NOT QUALIFY FOR SAFE HARBOR PROTECTION ......................52

A. Nestlé's Conduct Does Not Fit Within Any "Safe Harbor." ........................................53

B. Maine's Compromised Regulatory Process Voids Any "Safe Harbor." .....................64

IV. PLAINTIFFS' ADEQUATELY PLEAD A COMMON LAW
FRAUD CLAIM............................................................................................................65

A. Defendant Improperly Raises New Defenses That The Court
Should Not Countenance Under Rule 12(g)(2). ..........................................................65

ii

B.  Plaintiffs Adequately Plead Deception. ........................................................................66

V.  PLAINTIFFS ADEQUATELY PLEAD A BREACH
OF CONTRACT CLAIM...............................................................................................70

VI. THE PRIMARY JURISDICTION DOCTRINE DOES NOT APPLY HERE .................73

CONCLUSION.......................................................................................................................75

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abel v. Murphy*,
    91 N.Y.S. 26 (N.Y. App. Term 1904) ..................................................................32

*Abounader v. Strohmeyer & Arpe Co.*,
    154 N.E. 309 (N.Y. 1926) ...................................................................19, 20

*Adamson v. Ortho-McNeil Pharm., Inc.*,
    463 F. Supp. 2d 496 (D.N.J. 2006) ......................................................66

*Ades v. CareFirst, Inc.*,
    No. ELH-17-1557,
    2018 WL 690837 (D. Md. Feb. 2, 2018) ...............................................42

*Adkins v. VIM Recycling, Inc.*,
    644 F.3d 483 (7th Cir. 2011) ..........................................40, 42, 49-50

*Aetna Life Ins. Co. v. Lavoie*,
    475 U.S. 813 (1986) ...........................................................................52

*Ala. Pub. Serv. Comm'n v. S. R. Co.*,
    341 U.S. 341,384 (1951) ....................................................................42

*Ames v. Comm'r of Motor Vehicles*,
    839 A.2d 1250 (Conn. 2004) ..............................................................69

*In re Anheuser-Busch Beer Labeling, Marketing and Sales Practices Litig.*,
    2014 WL 12659447 (N.D. Ohio June 2, 2014) ....................................63

*Arden House, Inc. v. Heintz*,
    612 F. Supp. 81 (D. Conn. 1985) ........................................................41

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................8

*Ask Techs., Inc. v. Cablescope, Inc.*,
    No. 01 Civ. 1838(RLC),
    2003 WL 22400201 (S.D.N.Y. Oct. 20, 2003) ....................................72

*Aspinall v. Philip Morris, Inc.*,
    902 N.E.2d 421 (Mass. 2009) .............................................................59

*Assured Guar. (UK) Ltd. v J.P. Morgan Inv. Mgt. Inc.*,
    18 N.Y.3d 341 (2011) ..........................................................................69

*Atl. Ambulance Corp. v. Cullum,*
    166 A.3d 260 (N.J. App. Div. 2017)......................................................................56

*Aurora Dairy Corp. Organic Milk Mktg. & Sales Pract. Litig.,*
    621 F.3d 781 797 (8th Cir. 2010) ........................................................................36

*Averill v. Cox,*
    761 A.2d 1083 (N.H. 2000) ..................................................................................62

*Barry v. St. Paul Fire & Marine Ins. Co.,*
    555 F.2d 3 (1st Cir. 1977)....................................................................41, 43, 49

*Bausch v. Stryker Corp.,*
    630 F.3d 546 (7th Cir. 2010) ................................................................................31

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).................................................................................................8

*Berman Enters. v. Jorling,*
    3 F.3d 602 (2d Cir. 1993)......................................................................................41

*Bethphage Lutheran Serv., Inc. v. Weicker,*
    965 F.2d 1239 (2d Cir. 1992)...............................................36, 37, 41, 42, 48, 50

*Bierig v. Everett Square Plaza Assocs.,*
    611 N.E.2d 720 (Mass. App. Ct. 1993) ...............................................................59

*Biro v. Condé Nast,*
    807 F.3d 541 (2d Cir. 2015)....................................................................................8

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.,*
    178 F. Supp. 2d 198 (E.D.N.Y. 2001) ...........................................................57, 64

*Brower v. Campbell Soup Co.,*
    243 F. Supp. 3d 1124 .............................................................................................27

*Brown v. State,*
    674 N.E.2d 1129 (N.Y. 1996)...............................................................................19

*Buchholz v. Waterville Estates Ass'n,*
    934 A.2d 511 (N.H. 2007) ..............................................................................62, 66

*Buckman Co. v. Plaintiffs' Legal Comm.,*
    531 U.S. 341 (2001)...............................................................12, 24-25, 30-31

*Burford v. Sun Oil Co.,*
    319 U.S. 315 (1943)..........................................................................................36, 46

*Cablevision of Boston, Inc. v. Public Improvement Commission*
*of the City of Boston,*
   38 F. Supp. 2d 46 (D. Mass. 1999) ......................................................59

*Caliendo v. Sec'y of State,*
   No. CV-87-226,
   1987 Me. Super. LEXIS 214 (Me. Super. Ct. July 28, 1987)...................44

*Campbell v. First Am. Title Ins. Co.,*
   644 F. Supp. 2d 126 (D. Me. 2009) .....................................................53

*In re Cardiac Devices Qui Tam Litig.,*
   221 F.R.D. 318 (D. Conn. 2004)..........................................................70

*Chapin v. Aguirre,*
   No. 05VC1906,
   2006 U.S. Dist. LEXIS 91773 (S.D. Cal. Dec. 14, 2006).......................40

*Chavers v. Fleet Bank (R.I.), N.A.,*
   844 A.2d 666 (R.I. 2004) ....................................................................60

*Chiropractic Am. v. LaVecchia,*
   180 F.3d 99 (3d Cir. 1999)..................................................................41

*Cipollone v. Liggett Grp., Inc.,*
   505 U.S. 504 (1992).....................................................................31, 32

*City of Danbury v. Dana Inv. Corp./Lot No. GO8065,*
   730 A.2d 1128 (Conn. 1999) ..............................................................58

*Coal. for Health Concern v. LWD, Inc.,*
   60 F.3d 1188 (6th Cir. 1995) ..............................................................41

*Colman v. Precourt,*
   No. AP-17-05,
   2017 Me. Super. LEXIS 63 (Me. Super. Ct. May 12, 2017) ...................44

*Colo. River Water Conservation Dist. v. United States,*
   424 U.S. 800 (1976).....................................................................37, 41

*Connelly v. Hous. Auth. of City of New Haven,*
   567 A.2d 1212 (Conn. 1990) ..............................................................58

*Courtney v. Bassano,*
   733 A.2d 973 (Me. 1999).....................................................................17

*Cty. of Suffolk v .Long Island Lighting Co.,*
   907 F.2d 1295 (1990)...............................................................45, 47, 50

*D'Ercole Sales v. Fruehauf Corp.*,
    501 A.2d 990 (N.J. App. Div. 1985)...................................................................17

*Davis v. Hain Celestial Grp., Inc.*,
    297 F. Supp. 3d 327 (E.D.N.Y. 2018) ................................................................16

*DePriest v. AstraZeneca Pharm., L.P.*,
    351 S.W.3d 168 (Ark. 2009)..............................................................................67

*Desiano v. Warner–Lambert & Co.*,
    467 F.3d 85 (2d Cir.2007).............................................................................12, 31

*Dig. Equip. Corp. v. Desktop Direct, Inc.*,
    511 U.S. 863 (1994) ...........................................................................................61

*Dittmer v. Cty. of Suffolk*,
    146 F.3d 113 (2d Cir. 1998)...............................................................................40

*Doug Grant, Inc. v. Greate Bay Casino Corp.*,
    232 F.3d 173 (3d Cir. 2000)...............................................................................56

*Doug Grant, Inc. v. Greate Bay Casino Corp.*,
    3 F. Supp. 2d 518 (D.N.J. 1998) ........................................................................69

*Elkins v. Microsoft Corp.*,
    817 A.2d 9 (Vt. 2002) ..................................................................................61, 64

*Ellis v. Gallatin Steel Co.*,
    390 F.3d 461 (6th Cir. 2004) .................................................................40, 41, 49

*Ellis v. Tribune Television Co.*,
    443 F.3d 71 (2d Cir. 2006)................................................................................73

*English v. Dyke*,
    23 F.3d 1086 (6th Cir. 1994) .............................................................................65

*Faham v. Pallito*,
    No. 5:12-cv-212,
    2013 WL 1292687 (D. Vt. Jan. 15, 2013) .....................................................48-49

*Falcon v. City Univ. of N.Y.*,
    No. 15-cv-3421 (ADS)(ARL),
    2016 WL 3920223 (E.D.N.Y. July 15, 2016) ....................................................65

*Farkas v. D'Oca*,
    857 F. Supp. 300 (S.D.N.Y. 1994) ....................................................................41

*In re Farm Raised Salmon Cases*,
    42 Cal. 4th 1077 (2008) ........................................................................ 12-16, 23

*Fay v. Erie Ins. Grp.*,
    723 A.2d 712 (Pa. Super. Ct. 1999) ..............................................................63

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
    373 U.S. 132 (1963) ..........................................................................................12

*Fleming v. Nat'l Union Fire Ins. Co.*,
    837 N.E.2d 1113 (Mass. 2005) ..................................................................59, 64

*Fraker v. KFC Corp.*,
    No. 06-cv-1284,
    2007 WL 1296571 (S.D. Cal. Apr. 30, 2007) ...............................................16

*French v. Vining*,
    102 Mass. 132 (1869) .......................................................................................69

*Friends of Santa Fe Cty. v. Lac Minerals*,
    892 F. Supp. 1333 (D.N.M. 1995) ............................................................41, 49

*Frompovicz v. Niagara Bottling, LLC*,
    No. 18-54,
    2018 WL 2363475 (E.D. Pa. May 24, 2018) ................................................25

*Gen. Motors Corp. v. Abrams*,
    897 F.2d 34 (2nd Cir. 1990) ............................................................................12

*Gibbs, Nathaniel (Canada), Ltd. v. Int'l Multifoods Corp.*,
    804 F.2d 450 (8th Cir. 1986) ...........................................................................32

*Gibson v. Berryhill*,
    411 U.S. 564 (1973) ........................................................................................51

*Gilmore v. Shearson/American Express, Inc.*,
    811 F.2d 108 (2d Cir. 1987) ............................................................................65

*Good v. Altria Grp., Inc.*,
    501 F.3d 29 (1st Cir. 2007) .........................................................................53, 59

*Goya Foods, Inc. v. Tropicana Prods., Inc.*,
    846 F.2d 848 (2d Cir. 1988) ............................................................................73

*Great Lakes Cheese of N.Y., Inc. v. Agri-Mark, Inc.*,
    No. 7:14-CV-0232,
    2016 WL 5717337 (N.D.N.Y. Sep. 30, 2016) ..............................................32

*Greene v. Gerber Prods. Co.*,
  262 F. Supp. 3d 38 (E.D.N.Y. 2017) ...................................................70

*Greenspan v. Allstate Ins. Co.*,
  937 F. Supp. 288 (S.D.N.Y. 1996) ...................................................57

*Grudkowski v. Foremost Ins. Co.*,
  2013 WL 816666 (E.D. Pa. Mar. 5, 2013)...........................................63

*Gwaltney of Smithfield v. Chesapeake Bay Found.*,
  484 U.S. 49 (1987)...........................................................................49

*Hachamovitch v. Debuono*,
  159 F.3d 687 (2d Cir. 1998).............................................37, 40, 47, 48, 50

*Haerum v. Air Line Pilots Assoc'n*,
  892 F.2d 216 (2d Cir. 1989)............................................................49

*Happy Dack Trading Co. v. Agro-Industries, Inc.*,
  602 F. Supp. 986 (S.D.N.Y. 1984) ...................................................72

*Hawks v. Hamill*,
  288 U.S. 52 (1933)...........................................................................41

*Hayes v. New Eng. Tel. & Tel. Co.*,
  174 A. 49 (N.H. 1934) ....................................................................20

*Henderson v. Berce*,
  50 A.2d 45 (Me. 1946).............................................................. 69, 71-72

*Heritage Farms, Inc. v. Solebury Township*,
  671 F.2d 743 (3d Cir. 1982)............................................................51

*Hood v. Wholesoy & Co.*,
  No.12-cv-5550-YGR
  2013 WL 3553979 (N.D. Cal. July 12, 2013)......................................74

*Hughes v. Bos. Sci. Corp.*,
  631 F.3d 762 (5th Cir. 2011) ..........................................................31

*Hughes v. DiSalvo*,
  729 A.2d 422 (N.H. 1999) ...................................................... 62. 64-65, 66

*In re Insurance Stacking Litigation*,
  754 A.2d 702 (Super. Ct. Pa. 2000)..................................................63

*Jamison v. Longview Power, LLC*,
  493 F. Supp. 2d 786 (N.D. W. Va. 2007) .........................................41, 49

*Jermyn v. Best Buy Stores, L.P.*,
   256 F.R.D. 418 (S.D.N.Y. 2009) ....................................................69

*Johnson v. Collins Entm't Co.*,
   199 F.3d 710 (4th Cir. 1999) ........................................................40

*Kelley v. Cowesett Hills Assocs.*,
   768 A.2d 425 (R.I. 2001) ...............................................................60

*Kirschner v. Klemons*,
   225 F.3d 227 (2d Cir. 2000).........................................................39

*Koster v. Scotch Assocs.*,
   640 A.2d 1225 (N.J. Super. Ct. 1993) ......................................19, 69

*La Vigne v. Costco Wholesale Corp.*,
   284 F. Supp. 3d 496 (S.D.N.Y. 2018)..........................................27

*Landau v. Virdian Energy PA LLC*,
   223 F. Supp. 3d 401 (E.D. Pa. 2016) ..........................................63

*Langan v. Johnson & Johnson Consumer Cos.*,
   95 F. Supp. 3d 284 (D. Conn. 2015)............................................73

*Lanier v. Bats Exch., Inc.*,
   838 F.3d 139 (2d Cir. 2016)............................................................8

*Lawrence v. Philip Morris, USA, Inc.*,
   No. 09-CV-518,
   2010 N.H. Super. LEXIS 183 (Nov. 22, 2010)..........................17

*Lemelledo v. Beneficial Mgmt. Corp. of Am.*,
   696 A.2d 546 (N.J. 1997)..........................................................55, 64

*Leyse v. Bank of Am. Nat'l Ass'n*,
   804 F.3d 316 (3d Cir. 2015)...........................................................65

*Liberty Mut. Ins. Co. v. Hurlbut*,
   585 F.3d 639 (2d Cir. 2009)......................................................42, 48

*Lindemann v. Comm'n on Governmental Ethics & Election Practices*,
   961 A.2d 538 (Me. 2008)................................................................44

*Liss & Marion, P.C. v. Recordex Acquisition Corp.*,
   983 A.2d 652 (Pa. 2009)................................................................69

*Loreto v. Procter & Gamble Co.*,
   515 F. App'x 576 (6th Cir. 2013) ..............................................21, 23

*Lynch v. Conley*,
   853 A.2d 1212 (R.I. 2004) ........................................................................60

*M&M Stone Co. v. Pennsylvania*,
   No. 07-CV-04784,
   2008 WL 4467176 (E.D. Pa. Sep. 29, 2008) ............................................51

*Manahawkin Convalescent v. O'Neill*,
   43 A.3d 1197 (N.J. App. Div. 2012)..........................................................56

*Marentette v. Abbot Labs., Inc.*,
   886 F.3d 112 (2d Cir. 2018)............................................................ 11, 33-36

*Marentette v. Abbot Labs., Inc.*,
   201 F. Supp. 3d 374 (E.D.N.Y. 2016) .................................................. 34-36

*McClellan v. I-Flow Corp.*,
   776 F.3d 1035 (9th Cir. 2015) ............................................................. 30-31

*Meaunrit v. Pinnacle Foods Grp., LLC*,
   No. C 09-4555 CW,
   2010 WL 1838715 (N.D. Cal. May 5, 2010) ............................................27

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996)....................................................................11, 12, 14, 31

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
   725 F.3d 65 (2d Cir. 2013)..................................................................11, 31

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
   341 F. Supp. 2d 386 (S.D.N.Y. 2004).......................................................31

*Montgomery v. Nat'l City Mortg.*,
   No. C-12-1359 EMC,
   2012 WL 1965601(N.D. Cal. May 31, 2012) .........................................40

*Morgan v. Wallaby Yogurt Co.*,
   No. 13-cv-00296-WHO,
   2013 WL 5514563 (N.D. Cal. Oct. 4, 2013).............................................16

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983)..................................................................................36, 42

*Naylor v. Case & McGrath, Inc.*,
   585 F.2d 557 (2d Cir. 1978)......................................................................41

*Neal v. Bavarian Motors, Inc.*,
   882 A.2d 1022 (Pa. Super. Ct. 2005)........................................................62

*Nergaard v. Town of Westport Island*,
   973 A.2d 735 (Me. 2009) ................................................................................44

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
   491 U.S. 350 (1989) ............................................................... 36-39, 42, 45

*New York State Rest. Ass'n v. New York City Board of Health*,
   556 F.3d 114 (2d Cir. 2009) ..................................................................12, 35

*Newly Wed Foods, Inc. v. Superior Nut Co.*,
   No. 05-0454E,
   2010 WL 1178404 (Mass. Super. Ct. Feb. 18, 2010) .............................16

*Ng v. Wells Fargo Bank, N.A.*,
   No. 12-cv-05630 NC,
   2012 WL 12921072 (N.D. Cal. Nov. 27, 2012) ......................................40

*Normand Josef Enter., Inc. v. Conn. Nat'l Bank*,
   646 A.2d 1289 (Conn. 1994) ...........................................................58, 65

*O'Hara v. Diageo-Guinness, USA, Inc.*,
   306 F. Supp. 3d 441 (D. Mass. 2018) ..................................................59

*Orr v. Town of Standish*,
   No. CV-11-420,
   2011 Me. Super. LEXIS 230 (Me. Super. Ct. Dec. 1, 2011) ................44

*In re Packaged Seafood Prods. Antitrust Litig.*,
   277 F. Supp. 3d 1167 (S.D. Cal. 2017) ................................................66

*Palumbo v. Waste Technologies Indus.*,
   989 F.2d 156 (4th Cir. 1993) ...........................................................41, 49

*Pediamed Pharms., Inc. v. Breckenridge Pharm, Inc.*,
   419 F. Supp. 2d 715 (D. Md. 2006) ......................................................16

*Pekular v. Eich*,
   513 A.2d 427 (Pa. Super. Ct. 1986) ..............................................62, 65

*People v. Gen. Elec.*,
   302 A.D.2d 314 (1st Dep't 2003) ..........................................................57

*In re PepsiCo, Inc., Bottled Water Marketing and Sales Practices Litig.*,
   588 F. Supp. 2d 527 (S.D.N.Y. 2008) ....................................................26

*Pineman v. Oechslin*,
   637 F.2d 601 (2d Cir. 1981) ...................................................................41

*Pirozzi v. Penske Olds-Cadillac-GMC, Inc.*,
  605 A.2d 373 (Pa. Super. Ct. 1992)......................................................................17

*Planned Parenthood v. Steinhaus*,
  60 F.3d 122 (2d Cir. 1995.............................................................................47, 50

*Plumley v. Massachusetts*,
  155 U.S. 461 (1894)..........................................................................................30

*POM Wonderful LLC v. Coca-Cola Co.*,
  __U.S. __, 134 S. Ct. 2228 (2014)....................................................14, 16, 24

*Prohias v. Pfizer, Inc.*,
  490 F. Supp. 2d 1228 (S.D. Fla. 2007) ..........................................................66, 67

*Provencher v. T & M Mortg. Solutions, Inc.*,
  No. 08-31-P-H,
  2008 WL 2447472 (D. Me. June 18, 2008) ........................................................53

*Quackenbush v. Allstate Ins. Co.*,
  517 U.S. 706 (1996)......................................................................................37-40

*Quaker Oats Co. v. Riverbend Prods., Inc.*,
  No. 89 C 5173,
  1990 WL 37639 (N.D. Ill. Mar. 16, 1990)...........................................................32

*Ricci v. Superintendent, Bureau of Banking*,
  485 A.2d 645 (Me. 1984)....................................................................................44

*Ricci v. Superintendent, Bureau of Banking*,
  485 A.2d 645 (Me. 1984)....................................................................................44

*Riegel v. Medtronic, Inc.*,
  552 U.S. 312 (2008).............................................................................................26

*Roberts v. Anheuser-Busch Brewing Ass'n*,
  211 Mass. 449, 98 N.E. 95 (1912)......................................................................30

*Sandoval v. Pharmacare US, Inc.*,
  145 F. Supp. 3d 986 (S.D. Cal. 2015)................................................................16

*Scovish v. Upjohn Co.*,
  No. 526520,
  1993 Conn. Super. LEXIS 2565 (Super. Ct. Oct. 1, 1993)................................20

*Sears Petroleum & Transp. Corp. v. Ice Ban Am. Inc.*,
  217 F.R.D. 305 (N.D.N.Y. 2003) .......................................................................65

*Sheerbonnet, Ltd. v. Am. Express Bank*,
    17 F.3d 46 (2d Cir. 1994) ........................................................................37

*Shell Oil Co. v. Wentworth*,
    822 F. Supp. 878 (D. Conn. 1993) ..........................................................17

*Showpiece Homes Corp. v. Assurance Co. of Am.*,
    38 P.3d 47 (Colo. 2001) .....................................................................54, 64

*Silva v. Unique Bev. Co., LLC*,
    No. 3:17-cv-00391-HZ,
    2017 WL 2642286 (D. Or. June 15, 2017) ............................................15

*Small v. Lorillard Tobacco Co.*,
    94 N.Y.2d 43 (1999) ...............................................................................22

*Smerling v. Harrah's Entertainment, Inc.*,
    912 A.2d 168 (N.J. App. Div. 2006) .......................................................56

*Sojitz Am. Capital Corp. v. Keystone Equip. Fin. Corp.*,
    88 F. Supp. 3d 59 (D. Conn. 2015) .........................................................40

*Sparta Food, Inc. v. Rupari Food Servs.*,
    No. 99-2041,
    2003 WL 22047865 (D. Minn. Aug. 29, 2003) .....................................32

*State v. Piedmont Funding Corp.*,
    382 A.2d 819 (R.I. 1978) ........................................................................60

*Stewart v. Smart Balance, Inc.*,
    No. 11-6174 (JLL),
    2012 WL 4168584 (D.N.J. June 25, 2012) ......................................15, 16

*Stoltz v. Fage Dairy Processing Indus., S.A.*,
    No. 14-CV-3826 (MKB),
    2015 WL 5579872 (E.D.N.Y. Sep. 22, 2015) ........................................16

*T. J. Stevenson & Co. v. 81,193 Bags of Flour*,
    629 F.2d 338 (5th Cir. 1980) ..................................................................32

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*,
    752 F.3d 239 (2d Cir. 2014) .....................................................................8

*Taradejna v. General Mills*,
    909 F. Supp. 2d 1128 (D. Minn. 2012) ...................................................74

*In re Trader Joe's Tuna Litigation*,
    289 F. Supp. 3d 1074 (C.D. Cal. 2017) ..................................................23

*Trazo v. Nestlé USA, Inc.*,
  No. 5:12-CV-2272 PSG,
  2013 WL 4083218 (N.D. Cal. Aug. 9, 2013) ........................................................................15

*Tribune Co. v. Abiola*,
  66 F.3d 12 (2d Cir. 1995)................................................................. 37-39, 45, 47, 49

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001)........................................................................................28

*Tumey v. Ohio*,
  273 U.S. 510 (1927)......................................................................................51

*Turek v. Gen. Mills, Inc.*,
  754 F. Supp. 2d 956 (N.D. Ill. 2010) ....................................................................26

*Vermont Pure Holdings, Ltd. v. Nestle Waters N. Am., Inc.*,
  No., Civ. A. 03-11465 DPW,
  2006 WL 839486 (D. Mass. Mar. 28 2006)...............................................26, 29, 35

*Verzani v. Costco Wholesale Corp.*,
  No. 09 Civ. 2117(CM),
  2010 WL 3911499 (S.D.N.Y. 2010)................................................................ 20-21

*In re: Volkswagen "Clean Diesel" Mktg., Sales Practices and Prods. Liab. Litig.*,
  310 F. Supp. 3d 1030 (N.D. Cal. 2018) ..................................................................20

*Ward v. Monroeville*,
  409 U.S. 57 (1972)........................................................................................51

*Weigel v. Cook*,
  142 N.E. 444 (1923)......................................................................................33

*Winey v. William E. Dailey, Inc.*,
  636 A.2d 744 (Vt. 1993) ................................................................................61

*Winton v. Johnson & Dix Fuel Corp.*,
  515 A.2d 371 (Vt. 1986) ................................................................................17

*Wuebker v. Wilbur-Ellis Co.*,
  418 F.3d 883 (8th Cir. 2005) ...........................................................................12

*Wyeth v. Levine*,
  555 U.S. 555 (2009)..........................................................................11, 15, 35

*Wynder v. McMahon*,
  360 F.3d 73 (2d Cir. 2004)...............................................................................70

**Federal Statutes**

Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq.* ..................................................68

Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 331................................................................21

Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 337(a) ............................................12, 14, 15

Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 343-1 ...............................................13, 14, 23

Nutrition Labeling and Education Act of 1990..................................................... 5, 12-15, 35

Organic Foods Production Act of 1990 ............................................................... 33-34, 36

**State Statutes**

Connecticut General Statutes Ann. § 19a-341 ..................................................................69

Connecticut General Statutes Ann. §§ 21a-150–150j...................................................67

Connecticut General Statutes Ann. § 21a-150a(a)–(b) ..................................................67

Connecticut General Statutes Ann. § 21a-150a(3)(b)....................................................22

Connecticut General Statutes Ann. § 42-110b(a) ...........................................................18

Connecticut General Statutes Ann. § 42-110c(a)(1)........................................................57

Connecticut General Statutes Ann. § 42-110g(a)-(b) ......................................................18

Connecticut General Statutes Ann. § 42a-2-714(1)..........................................................72

Maine Administrative Procedures Act........................................................................ 43-44

Maine Revised Statutes Ann., tit. 5 § 207......................................................................18

Maine Revised Statutes Ann., tit. 5 § 208(1)...................................................................53

Maine Revised Statutes Ann., tit. 5 § 213(1)...................................................................18

Maine Revised Statutes Ann., tit. 10 § 1212..................................................................19

Maine Revised Statutes Ann., tit. 10 § 1213..................................................................18

Maine Revised Statutes Ann., tit. 10 § 1214(1)................................................................54

Maine Revised Statutes Ann., tit. 22, §§ 2155-A & 2157(7).......................................53

Massachusetts General Laws ch. 93A ...................................................................17, 58, 59

Massachusetts General Laws ch. 93A § 2(a) ...................................................................18

Massachusetts General Laws ch. 93A § 9(1)-(2) ............................................................18

New Hampshire Revised Statutes § 358-A:10(I)............................................................18

New Hampshire Revised Statutes § 358-A:2..................................................................18

New Hampshire Revised Statutes § 358-A:3(I)..............................................................61

New Jersey Statutes Ann. 12A:2-714(1) ........................................................................72

New Jersey Statutes Ann. 56:8-2 ...............................................................................17, 55

New York General Business Law § 349..........................................................................21

New York General Business Law § 349(a) .....................................................................18

New York General Business Law § 349(d) .....................................................................56

New York General Business Law § 349(h) .....................................................................17

New York General Business Law § 350......................................................................16, 18

New York Uniform Commercial Code § 2-714(1)..........................................................72

Pennsylvania Consolidated Statutes Ann., tit. 3 § 5733(f) ............................................23

Pennsylvania Consolidated Statutes Ann. § 201-3 ...................................................19, 62

Pennsylvania Consolidated Statutes Ann. § 201-9.2(a).................................................19

Rhode Island Admin. Code § 50-10-4.3(A)(3)(s)...........................................................23

Rhode Island General Law § 6-13.1-2 ...........................................................................18

Rhode Island General Law § 6-13.1-4 ...........................................................................60

Rhode Island General Law § 6-13.1-5.2(a)-(b) ..............................................................18

Vermont Statutes Ann., tit. 9 § 2453(a) ....................................................................18, 60

Vermont Statutes Ann., tit. 9 § 2461 ..............................................................................18

Vermont Statutes Ann., tit. 10 § 1416(4) .......................................................................23

Vermont Statutes Ann., tit. 10, § 1672-73 .....................................................................20

Vermont Statutes Ann., tit. 10, § 1682 ...............................................................20

Vermont Statutes Ann., tit. 18, § 122 .................................................................20

**Rules**

Federal Rules of Civil Procedure 9(b) ................................................................70

Federal Rules of Civil Procedure 12(b)(1)...........................................................8

Federal Rules of Civil Procedure 12(b)(6)............................................................8

Federal Rules of Civil Procedure 12(g)(2).................................................... 65-66

Federal Rules of Civil Procedure 12(h) ..............................................................65

**Other Authorities**

Cooley on Torts (Vol. 2 [3d ed.], p. 1408) ..........................................................20

Bruce A. McGlauflin, *The Exception That Threatens to Swallow the Statute:*
   *The Statutory Exception to Maine's Unfair Trade Practice Act,*
   21 ME. BAR J. 152 (2006) ............................................................................54

Restatement 2d of Torts § 874A (1979) ...............................................................19

## INTRODUCTION

Plaintiffs took the Court's guidance to heart and now rely exclusively on state law to advance the claims in the Consolidated Amended Class Action Complaint (Dkt. 160, "Complaint" or "Compl."). Plaintiffs now bring only causes of action based on Defendant Nestlé Waters North America, Inc.'s ("Nestlé") breach of duties imposed by state law and state regulations, all of which would succeed even had Congress never enacted the FDCA. Plaintiffs' Complaint alleges that Nestlé fraudulently and deceptively represents on its Poland Spring® labels that it sells a product different from what it actually provides to consumers. Rather than provide "100% natural spring water" to consumers as represented, Nestlé actually provides common groundwater, Compl. ¶ 4, and seven of the "100% natural springs" supposedly used by Nestlé do not even exist. *See id*. ¶ 7. Those allegations, if proven, constitute textbook examples of fraud and deceptive business practices, which are totally independent of the FDCA or any FDA regulation.

Federal courts across the country routinely reject preemption defenses in cases such as this and allow consumers to prosecute similar claims, which arise under state law and do not depend on a federal statute or regulation to impose liability. The FDCA merely informs Plaintiffs' amended claims because it forbids state law from using a definition of "spring water" different than the FDA's. The FDCA thus affects what Plaintiffs must prove to prevail on their claims—without the FDCA Plaintiffs could have simply relied on the jury's commonsense understanding that ordinary groundwater drawn from wells near an excavated gravel pit, swamp, lake or stream rather than a genuine spring is not "100% natural spring water," whereas now Plaintiffs will submit evidence and expert testimony to establish that Nestlé's bottled groundwater does not qualify as "100% natural spring water" under state law that mirrors the FDA's identity standard. But the need to reference the FDA's definition does not preempt Plaintiffs' state law claims.

Apparently recognizing the weakness of its preemption argument as to Plaintiffs' amended claims, Nestlé now introduces an entirely new argument based on the *Burford* abstention doctrine in an attempt to avoid liability, claiming that doctrine obligates the Court to abdicate its jurisdiction in this case in blind deference to Maine's and other states' spring water regulators that granted permits for Poland Spring® water.[1] In doing so, Nestlé fails to acknowledge governing Supreme Court and Second Circuit precedent that makes *Burford* abstention wholly improper in this case.

Nestlé's "safe harbor" argument, which the Court already described as "highly fact-laden," fails because no state mandates Nestlé to falsely represent it sells "100% natural spring water." Nestlé cannot escape liability when it <u>voluntarily</u> makes false representations about its "premium" product. Finally, there is no basis for referring this matter to the FDA under the primary jurisdiction doctrine. Despite Nestlé's attempt to confuse, this case at bottom is simple: it takes no special agency expertise to ascertain whether a genuine spring exists or whether Nestlé's groundwater wells produce the same water as Nestlé's claimed springs. This is squarely the type of case that courts and jurors (aided as necessary by experts) routinely and competently adjudicate.

## PERTINENT FACTS AND PROCEDURAL HISTORY

### I.   The Initial Complaint and Early Discovery.

Plaintiffs filed this action on August 15, 2017, alleging that Nestlé has for decades falsely labeled Poland Spring® water as "100% Natural Spring Water" when it is not, in fact, spring water. Dkt. 1, ¶¶1–8. Based on an extensive pre-complaint investigation, *id.* ¶105, Plaintiffs alleged that Nestlé's then-eight well sites in Maine did not contain genuine springs and that Defendant had faked the existence of springs at several sites. While Nestlé's first motion to dismiss was pending,

---

[1] Nestlé raised *Burford* only as an afterthought in its reply brief on its initial motion to dismiss. *See* Dkt. 80 at 11-12.

the Court authorized Plaintiffs and their experts to engage in early discovery inspections of Defendant's eight well sites. Dkt. 77. Plaintiffs' team inspected the sites in two phases in early December 2017 and early May 2018. Plaintiffs' inspections confirmed that Nestlé has phony or non-existent springs at seven of its eight alleged spring sites. At the eighth, Nestlé collects deep-flowing groundwater from wells that is geochemically different than the water that naturally emerges from small high-water table springs there. Results from Plaintiffs' early discovery appear in the Complaint.[2]

**II.  The May 17, 2018 Order.**

The Court dismissed Plaintiffs' initial complaint without prejudice on May 17, 2018, finding two interrelated deficiencies that made it subject to dismissal on implied preemption grounds. First, the Court determined that Plaintiffs had relied "solely and exclusively on" the FDA's standard of identity for spring water and had not pleaded reliance "on an independent state law duty that parallels or mirrors the FDCA's requirement for 'spring water.'" Dkt. 141 at 14. Second, the Court held that Plaintiffs' claims under state law cannot be based on "conduct that is 'wrong' only because it happens to violate . . .  the FDCA," and it found that Plaintiffs had not shown that Nestlé's misconduct underlying their claims was "'the type of conduct that would traditionally give rise to liability under state law . . . even if the FDCA had never been enacted.'" *Id*. (quoting *Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 579 (6th Cir. 2013)). The Court instructed that:

---

[2] *See* Compl. 160 ¶¶ 312-15, 339, 346, 349, 425, 490, 507, 558, 567, 604, 649, 741-42, 772-73, 791-92.

Last month Nestlé added a new, ninth claimed spring source on Poland Spring® labels, which it calls the "Bella Luna" spring in the eastern Maine town of Lincoln. News reports state Nestlé buys water from a well owned by Lincoln's municipal water supplier, whose water allegedly comes from that claimed spring.

> It is one thing for a State . . . to outright adopt an FDCA standard and then for a plaintiff to sue under state law for the violation of that standard. But it is wholly another thing for a State *not* to adopt or mirror an FDCA standard then for a plaintiff to sue under a generic state law claim (such as for fraud, breach of contract, or unfair trade practices) that would not be actionable absent a violation of the FDCA standard.

*Id*. at 15 (emphasis in original). The Court granted Plaintiffs leave to file an amended complaint pleading non-preempted claims within 30 days. *Id*. at 22.

### III. Plaintiffs' Amended Complaint.

Plaintiffs amended their Complaint, curing the two deficiencies observed in the Court's May 17 Order as follows:

<u>First</u>, Plaintiffs' pleaded that each of the nine states whose law is at issue has enacted statutes or regulations that "adopt or mirror" the FDCA standard of identity for spring water. *See* Compl. ¶¶ 52–53, 55, 62 (reciting statutes and regulations), 63–64. Plaintiffs assert under each claim they bring that Nestlé's misconduct underlying that claim violated a state law duty informed by those state standards of identity for spring water. *See id*. ¶¶ 838, 841, 848, 860, 872, 885, 896, 911, 935, 959, 983, 1007, 1028.

<u>Second</u>, Plaintiffs pleaded that the misconduct underlying each of their claims is "the type of conduct that would traditionally give rise to liability under state law . . . even if the FDCA had never been enacted." Specifically, the Complaint alleges:

> 40. The misbranding of food products and other goods has long been unlawful and remediable through private civil lawsuits under state common and statutory law, including pursuant to false advertising and consumer protection laws enacted by most state legislatures.

> 41. Mislabeling an ordinary product as a "premium" product—such as calling a cubic zirconium a "diamond," regular olive oil "virgin" olive oil, and ordinary groundwater "spring water"—has historically been actionable by private plaintiffs under the laws of all nine states at issue in this action. It has long been unlawful under state laws for a manufacturer to pawn off an ordinary product as a premium product in order to fraudulently induce consumers to overpay.

4

*Id*. ¶¶ 40–41.

Plaintiffs also allege that long before the FDA adopted a standard of identity for spring water in 1995, merchants whose products "did not comply with . . . consumer expectations" about spring water—for example, by "labeling ordinary groundwater as 'spring water' or selling 'spring water' that came from anything other than natural springs"—could be held liable under state consumer protection statutes, "which always barred pawning off ordinary products as premium products to obtain premium prices." *Id*. ¶ 50. When enacting the Nutrition Labeling and Education Act ("NLEA") amendments to the FDCA in 1990, Congress "recognized that states had long regulated food labeling and branding pursuant to their sovereign police powers," *id*. ¶ 45, and expressly authorized states to "continue to enforce mislabeling violations," including through consumers pursuing "traditional civil remedies available under state tort and consumer protection laws," *id*. ¶47. Given that congressional intent, the FDA's "act of defining a uniform standard of identity for spring water" did not "preempt consumers' ability to sue manufacturers who falsely labeled common groundwater as 'spring water.'" *Id*. ¶ 51.

Plaintiffs' state law unfair trade practices claims, moreover, allege that each state's statute "has always prohibited providers of goods from pawning off ordinary products, such as common groundwater, as premium products, such as spring water, and continues to impose such duties and prohibit such conduct." *Id*. ¶¶ 848, 860, 872, 885, 896, 911, 935, 959, 983, 1007, 1028.

Plaintiffs assert claims for fraud, breach of contract, and under the false advertising and deceptive trade practice statutes of the nine northeastern states within Defendant's Poland Spring® marketing region. *Id*. ¶¶ 14, 22-23. They seek damages or statutory penalties and punitive damages for Nestlé's past overcharges of premium prices for falsely labeled Poland Spring® water, and a permanent injunction barring Nestlé from mislabeling Poland Spring® water in the future, plus

fees and costs. *Id*. ¶¶ 844-46, 855-56, 867-68, 880-81, 890-91, 903-04, 928-29, 953-54, 976-77, 1001-02, 1020-22, 1036. Plaintiffs do not seek to overturn Nestlé's existing state spring water permits or to enjoin any state regulators from issuing future permits.

### IV. Maine's Regulators Are Potentially Compromised By Pecuniary Interests.

Anticipating that Nestlé might seek to rely on its state-issued permits as a defense, Plaintiffs' Complaint makes highly particularized allegations that Maine's regulators—for more than 20 years—have had conflicts of interest that may have compromised Maine's ability to fairly and impartially apply the standard of identity when evaluating Defendant's spring water permit applications. *Id*. ¶¶ 86–99, 283–299, 306–310, 796–808.

Since 1998, the State of Maine has sold groundwater drawn from wells in a state park to Nestlé pursuant to a license <u>knowing</u> Nestlé would sell it as "100% natural spring water" and, in return, the State has "collected many millions of dollars in fees" from Nestlé. *Id*. ¶ 88. "By late November 2005," six years into the contract, "Defendant had paid Maine more than $3.6 million in license revenues," which has (conservatively) tripled over the last 13 years since then. *See id*. ¶ 290. The <u>license is effective for 30 to 50 years</u>, initially until 2029, and then renewable at Defendant's option for two additional ten-year terms, through 2049.[3]

Nestlé also has direct influence over the individual pecuniary interests of the Maine regulatory personnel who review Nestlé's spring water permits. Since 2003, Tom Brennan, Nestlé's senior executive in charge of submitting spring water permit applications to Maine's Drinking Water Program, has been a member of "the Maine Public Drinking Water Commission,

---

[3] *See* attached Exhibit 1, licensing agreement incorporated in the Complaint; §3 of which specifies its 30- to 50-year term, produced by the Maine government pursuant to a Plaintiffs' request made under the Maine Freedom of Access Act.

a gubernatorial-appointed body that oversees [and] funds the Drinking Water Program" and which hires and "sets the salaries of Drinking Water Program employees who pass on spring water permit applications." Compl. ¶¶ 89, 801, 803, 806. Brennan is the Commission's longest continuously serving member, has served as its Chair and Vice-Chair, and routinely "calls Commission meetings to order even when not serving in those capacities." *Id*. ¶ 804. Thus, Nestlé for the past 15 years has had "a leading management role in the state entity that oversees and pays the state officials" who reviewed Nestlé's compliance with Maine's standard of identity for spring water, *id*. ¶ 808, and, in the face of much evidence of non-compliance, recommended granting Nestlé's spring water permits, *id.* ¶¶ 92-99.

## V.   The FDA Has Not Confirmed That Poland Spring® Is Genuine Spring Water.

Contrary to Nestlé's assertion, the FDA has <u>not</u> stated that the issuance of Nestlé's state spring water permits makes it "appropriate" for Nestlé to label Poland Spring® as "100% natural spring water." Def. Br. 5, 6. The FDA's February 10, 2017 letter, on which Nestlé relies, was issued in response to a request from a Nestlé lawyer asking the FDA "to confirm" that Maine's issuance of spring water permits "substantiates [Nestlé's] 'spring water' claim" and proves that Nestlé's "spring water" labels "are not misbranded." *See* Mathews Decl. Ex. A, Dkt. 53-3 at 5. The FDA refused, stating:

> As you are aware, **FDA does not provide approval** for the use of the term "spring water" for bottled water. However, we recognize that some states have certification programs that evaluate whether bottled water may be designated as "spring water" under state regulations that incorporate FDA's requirements under 21 CFR 165.110. If the state certification requirements are consistent with those in 21 CFR 165.110, documentation that [Nestlé] is required to provide to the state would help demonstrate compliance with FDA's standard of identity regulation for "spring water." For example, … [by] show[ing] that an appropriate hydraulic connection exists between the natural orifice of a spring and the bore hole …. **If** the water and its source satisfy this requirement **and the other requirements for "spring water" in 21 CFR 165.110, then** the use of the term 'spring water' on the product label would be appropriate.

*Id.* at 6-7 (emphases added). The FDA itself therefore does not accept a state permit as proof that that bottled "spring water" is accurately labeled. The FDA does not approve spring water labels for bottlers, much less <u>require</u> bottlers to use any particular label. *See* 21 CFR 165. 110(a)(2)(vi) ("The name of water derived from an underground formation from which water flows naturally to the surface of the earth <u>may be</u> 'spring water.'") (emphasis added). Instead, as shown below, Congress and the FDA allow the states to enforce the uniform national standards of identity for bottled water if they so choose, including by allowing consumers to litigate those issues where the states have provided consumers with standing to do so, which all nine states at issue have done.

## **STANDARD OF REVIEW**

On a Rule 12(b)(6) motion to dismiss the Court accepts "as true the factual allegations in the complaint" and "draw[s] all inferences in the plaintiff's favor." *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015) (citations omitted). The motion shall be denied if the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction," which has the burden of establishing it exists. *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citation omitted).

Only Nestle's *Burford* argument falls under Rule 12(b)(1). Its other arguments, including preemption, fall under Rule 12(b)(6). *See Lanier v. Bats Exch., Inc.*, 838 F.3d 139, 146 n.5 (2d Cir. 2016) (on preemption).

8

## ARGUMENT

### I.   THE FDCA DOES NOT PREEMPT PLAINTIFFS' PROPERLY PLEADED STATE LAW CLAIMS

#### A.   Plaintiffs Cured The Original Pleading's Defects By Expressly Bringing All Amended Claims Under State Law.

Following the Court's guidance, Plaintiffs bring routine claims under state law against Nestlé for falsely and deceptively representing that it sells a product different from what it actually provides to consumers in order to extract a premium price. Consider the following scenario:

- Corporation N represents that its bottles contain "100% natural spring water";

- Consumer A discovers that Corporation N fills its "100% natural spring water" bottles out of the gutter behind its factory;

- Consumer A brings claims against Corporation N under state law for fraud, breach of contract and deceptive business practices for falsely representing that its gutter water was "100% natural spring water"; and

- Corporation N moves to dismiss the claims as preempted under federal law because the FDA, pursuant to its authority under a federal statute, defined "spring water."

No one would reasonably expect under those facts that Corporation N could successfully defeat Consumer A's routine state law fraud, false advertising and breach of contract claims simply because the federal government issued a uniform definition for "spring water" for use throughout the country. Whatever definition the government used, it certainly would not include "gutter water" within the meaning of "spring water." Corporation N's labels calling gutter water "spring water" would be just as false and fraudulent—and just as actionable under state law—after the FDA's adoption of a definition as it was before. Consumer A's ability to bring state law claims would not be dependent upon on the federal standard.

That is precisely the scenario Plaintiffs present. Plaintiffs allege that Nestlé represents Poland Spring® contains "100% natural spring water" from eight genuine springs. Rather than

provide natural spring water to consumers as represented, however, Plaintiffs allege that Nestlé's labels are false, that Nestlé actually sells common groundwater at premium spring water prices, that seven of its supposed "natural springs" do not even exist, and that the wells at Nestlé's eighth site do not collect the same water that flows from the small springs on that site. Those allegations, if proven, constitute textbook examples of fraud and deceptive business practices, which are totally independent of the FDCA or any FDA regulation. Nestlé cannot legally sell "spring water" under any reasonable definition if it has no springs or if it is selling groundwater that is not the same as water that flows from a spring. Nestlé's representations are false and deceptive for at least those reasons, and Plaintiffs are entitled to pursue their traditional state law claims.

Plaintiffs bring the same type of common and routine claims that consumers have brought for decades under state law when a company fraudulently and deceptively represents that it sells a product different than it actually provides. When Nestlé charges a substantial premium to consumers in order to provide pure, healthy, 100% natural spring water, but it actually collects and bottles water that seeps into an old excavated gravel pit, that's unfair. *See* Compl. ¶¶ 457-58. When Nestlé represents that it bottles water from naturally flowing springs, but in reality, the "spring" flows out of a manmade pipeline camouflaged by rocks, that's deceptive. *Id*. ¶¶ 553-57. When Nestlé represents that its bottled "100% natural spring water" comes from one of eight different springs, and seven of those springs do not even exist, that's fraud. *Id*. ¶ 938. While the Court previously found that the initial complaint's "claims are wholly FDCA-dependent," Dkt. 141 at 17, that is no longer the case. Now, each and every claim not only arises under state law, but will be proven according to state law definitions of "spring water." Each and every claim is of the type that consumers could and did bring for decades under state law, and would exist even had Congress never passed the FDCA.

10

### B.  Federal Courts Rarely Preempt Claims Involving The Historic Police Powers Of The States, Such As Plaintiffs' Claims Here.

While the Supremacy Clause of the Constitution grants Congress the power to preempt state law, the Supreme Court has repeatedly instructed that "[i]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field in which States have traditionally occupied, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (ellipsis in original) (citations and internal quotation marks omitted). *See also Marentette v. Abbot Labs., Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) ("The presumption against federal law preempting state law is particularly strong when Congress legislates in a field traditionally occupied by states. . . . In this context, the Court should only find preemption if the conflict between state law and federal policy is 'a sharp one.'") (citations omitted). "[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). "In light of this assumption" against preemption, "the party asserting that federal law preempts state law bears the burden of establishing preemption." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013) (citations omitted). Nestlé has failed to meet its high burden here.

Pursuant to the overriding principles of federalism that guide preemption analysis, federal courts rarely dismiss false advertising-based claims on preemption grounds because they prototypically arise from "the historic police powers of the States [that are] not to be superseded" absent Congress's "clear and manifest purpose" to do so. *Wyeth*, 555 U.S. at 565. The Supreme Court made plain decades ago that "the States have always possessed a legitimate interest in 'the protection of . . . [their] people against fraud and deception in the sale of food products' at retail

11

markets within their borders." *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 144 (1963) (alterations in original) (citation omitted) (collecting cases); *see also Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 41-42 (2nd Cir. 1990) ("Because consumer protection law is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area."). As the Second Circuit explained:

> Given the traditional "primacy of state regulation of matters of health and safety," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 . . . (1996), courts assume "that state and local regulation related to [those] matters . . . can normally coexist with federal regulations." *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 718 … (1985); *see also Desiano v. Warner–Lambert & Co.*, 467 F.3d 85, 94 (2d Cir.2007), *aff'd by equally divided court sub nom Warner–Lambert & Co. v. Kent*, ––– U.S. –––, 128 S. Ct. 1168 . . . (2008). As a result, where the text of a preemption clause is ambiguous or open to more than one plausible reading, courts "have a duty to accept the reading that disfavors pre-emption." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 … (2005).

*New York State Rest. Ass'n v. New York City Board of Health*, 556 F.3d 114, 123 (2d Cir. 2009).

Since states have such a strong interest in protecting resident food consumers, preemption is particularly rare in cases like this one. The "presumption against preemption" precludes finding that the FDA's act of defining a food in a standard of identity has preemptive effect absent Nestlé establishing that "it was the 'clear and manifest purpose of [the FDA]' to supersede state authority." *Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883, 887 (8th Cir. 2005) (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). But Nestlé cannot meet that burden because the evidence from the legislative and regulatory history of the NLEA amendments to the FDCA reveals no such purpose. Indeed, it was Congress's and the FDA's clear and manifest intent <u>not</u> to displace traditional state tort and consumer protection remedies through the NLEA. The California Supreme Court's extensive analysis in the *Salmon Cases* cogently explained why.

In the *Salmon Cases*, the Court reversed a lower court ruling that had relied on *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001), to hold that FDCA § 337(a) impliedly

12

preempted state consumer protection claims against grocers that had failed to disclose artificial coloring had been added to farm-raised salmon products, as required by both the FDCA and California's parallel Sherman Law. *In re Farm Raised Salmon Cases*, 42 Cal. 4th 1077, 1083, 1085-89 (2008). The California Supreme Court held that while the lower court's reasoning might be "plausible . . . when section 337(a) [providing for no private right of action under the FDCA] is considered in isolation, its reasoning is seriously undermined when section 343-1 [NLEA's express preemption provision] is taken into account." *Id.* at 1089.

The Court found that Congress "clearly and unmistakably" authorized states to enact laws mirroring FDCA requirements in § 343-1, but "said absolutely nothing about proscribing the range of available remedies states might choose to provide for the violation of those laws, such as private actions." *Id.* at 1090. "Nor is there anything in the legislative history suggesting that any proponent of the legislation intended a sweeping preemption of private actions predicated on requirements contained in state laws." *Id.* Indeed, the NLEA sponsor's discussion of the bill suggested "that Congress did not intend to alter the status quo, i.e., states may choose to permit their residents to file unfair competition or other claims based on the violation of state laws." *Id.* at 1091. Congress was well aware that "virtually every state" permitted private citizens to enforce state laws "prohibiting deceptive or unfair acts and practices in the marketplace," so "its failure to even hint" at any intent to "preclude states from providing private remedies" means that Congress had no such intent. *Id.* (citations and internal quotations omitted) . The Court reasoned further:

> Indeed, the NLEA was enacted in 1990 primarily to establish a national uniform labeling standard in place of the patchwork of different state standards that existed at the time. <u>Under defendants' interpretation of the FDCA, private claims based on those pre-NLEA state labeling laws would have been permitted (since they were presumably different from the FDCA), but Congress's adoption of a uniform standard in the form of the NLEA had the effect of eliminating private causes of action based on state labeling laws</u>. It is hard to believe that Congress would have intended such a result without saying so.

*Id.* at 1091 n.12 (emphasis added). Thus, the Court held, "Congress's decision not to expressly supplant private claims based on those state laws authorized by section 343-1 should be interpreted as its considered decision to continue to allow states to provide such private remedies." *Id.* at 1091. *Cf. POM Wonderful LLC v. Coca-Cola Co.*, __U.S. __, 134 S. Ct. 2228, 2238 (2014) ("By taking care to mandate express pre-emption of some state laws, Congress if anything indicated it did not intend the FDCA to preclude requirements arising from other sources.") (citation omitted).

On implied preemption, the Court followed Supreme Court precedent to explain that a statute's express preemption language "'implies—*i.e.*, supports a reasonable inference—that Congress did not intend to pre-empt other matters . . . .'" *Salmon Cases*, 42 Cal. 4th at 1092 (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995)). The many express preemption provisions within the various amendments to the FDCA "clearly demonstrate that . . . 'the [FDCA] evidences, far from implied preemption, an instance of implied *non*preemption . . . .'" *Id.* (citation omitted). While "section 337 bars private enforcement of the FDCA," plaintiffs bringing consumer protection claims "do not seek to enforce the FDCA. Their action is based on the violation of *state law*—albeit state law that" complies with section 343-1. *Id.* at 1093 (emphasis in original). "Concluding that section 343-1 permits private claims based on state law does not affect section 337's preemption of efforts to enforce the FDCA." *Id.* (discussing *Medtronic*, 518 U.S. at 470, 474) (state negligence claims not preempted by FDCA). Section 337, "by its very terms, only implicates efforts to enforce *federal law*. What section 337 does *not* do is limit, prohibit or affect private claims predicated on *state* laws." *Id.* at 1095-96 (citation omitted) (emphases in original).[4]

---

[4] *Accord Silva v. Unique Bev. Co., LLC*, No. 3:17-cv-00391-HZ, 2017 WL 2642286, at *6 (D. Or. June 15, 2017) (under § 337(a), "state law claims that seek only to enforce federal law, nothing more, are impliedly preempted," but "Congress did not intend to prevent private citizens from bringing unfair competition or other state-law claims, so long as they did not impose different or additional requirements from those set forth in the FDCA") (citations and internal quotation marks

The Supreme Court observed in *Wyeth* that the 1938 Congress did not include a private right of action in the FDCA because "[e]vidently, it determined that widely available state rights of action provided appropriate relief for injured consumers." *Wyeth*, 555 U.S. at 574. Indeed, "the first version of the bill that became the FDCA would have provided a federal cause of action for damages for injured consumers" but was ultimately omitted after "witnesses testified that such a right of action was unnecessary because common-law claims were already available under state law." *Id*. at 574 n.7 (citing Hearings on S. 1944 before a Subcommittee of the Senate Committee on Commerce, 73d Cong., 2d Sess., 400 (1933)). Plainly, even the 1938 Congress did not intend to limit consumers' private civil remedies, which explains why the preemptive scope of § 337(a) properly has been limited to claims that seek to enforce <u>new</u> mislabeling violations that would not be unlawful but for the fact that the FDA declared it unlawful. "If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year [now 80-year] history." *Id*. at 574.

"No court, particularly after passage of the NLEA, has ever held that states may not provide a private remedy for the violation of state laws imposing requirements identical to those imposed by federal law." *Salmon Cases*, 42 Cal. 4th at 1096. Consequently, Nestlé's "assertion that Congress intended, without so saying, to limit states' long-standing ability to allow private remedies for violations of their own laws has no support in either statutory language, legislative

---

omitted); *Trazo v. Nestlé USA, Inc.*, No. 5:12-CV-2272 PSG, 2013 WL 4083218, at *6 (N.D. Cal. Aug. 9, 2013) ("While state law tort actions cannot be used to improperly intrude on the FDA's exclusive jurisdiction, Plaintiffs here sue under state law - namely, the Sherman Law, UCL, FAL, and CLRA - and so their claims are not impliedly preempted."); *Stewart v. Smart Balance, Inc.*, Civ. Action No. 11-6174 (JLL), 2012 WL 4168584, at *6 (D.N.J. June 25, 2012) (claims that milk fat content on labels were false "do not purport to bring a cause of action pursuant to the FDCA" but "are grounded in state consumer protection laws" and therefore are not preempted).

history, or case law—and therefore" Nestlé has "not overcome the strong presumption against

preemption applicable here." *Id*. at 1098-99.[5]

     **C.**   **The FDCA Does Not Preempt Plaintiffs' Statutory Trade Practices Claims Because Defendant Violated Specific State Statutes By Falsely And Deceptively Labeling Poland Spring® As "100% Natural Spring Water."**

All nine states at issue have consumer protection statutes protecting their residents against

deceptive business practices by (1) prohibiting deceptive conduct and (2) providing for a private

right of action. Plaintiffs' claims under those statutes (Claims III through XII) do not depend on

the FDCA, do not seek to enforce the FDCA, and are not preempted under any theory. Rather, they

are precisely the types of claims that states have allowed consumers to bring for decades against

unscrupulous companies who use deceptive practices to sell overpriced and under quality goods.[6]

---

[5] *See also Morgan v. Wallaby Yogurt Co.*, No. 13-cv-00296-WHO, 2013 WL 5514563, at *6 (N.D. Cal. Oct. 4, 2013) (rejecting argument that claims seeking to enforce standard of identity for yogurt were preempted by § 337(a); holding claims did "not 'depend on the FDA, except in the sense that the Sherman Law mirrors the requirements of the FDCA.' . . . Wallaby has cited no authority showing that this is impermissible and, as explained earlier, Congress has not forbidden it through preemption, express or implied.").

Nestlé's reliance on *Fraker v. KFC Corp.*, No. 06-cv-1284, 2007 WL 1296571 (S.D. Cal. Apr. 30, 2007), is misguided because that case involved "non-actionable puffery" on which "[n]o reasonable consumer would rely" rather than actual false statements, *id* . at *2, and that court's preemption discussion is no longer followed in California federal courts in light of the *Salmon Cases*' far more rigorous analysis. *See Sandoval v. Pharmacare US, Inc.*, 145 F. Supp. 3d 986, 995 (S.D. Cal. 2015) (citing cases). The other case on which Nestlé relies, *Pediamed Pharms., Inc. v. Breckenridge Pharm, Inc.*, 419 F. Supp. 2d 715, 727 (D. Md. 2006), is a Lanham Act case, not a preemption case, and the court's terse discussion there is inconsistent with the Supreme Court's later decision in *POM Wonderful*, 134 S. Ct. at 2238.

[6] *See*, *e.g.*, *Davis v. Hain Celestial Grp., Inc*., 297 F. Supp. 3d 327, 336 (E.D.N.Y. 2018) (sustaining NY GBL §§ 349, 350 claims where lemon juice labels allegedly misrepresented juice was "never heated" and "not cooked" or "cold pressed"); *Stoltz v. Fage Dairy Processing Indus., S.A.*, No. 14-CV-3826 (MKB), 2015 WL 5579872, at *13-30 (E.D.N.Y. Sep. 22, 2015) (yogurt label touting product as "0%" without specifying its meaning actionable under Pennsylvania, New Jersey and New York consumer protection statutes); *Stewart v. Smart Balance*, 2012 WL 4168584, at *7 (sustaining unlawful conduct element of NJ CFA claim alleging milk labels misrepresented fat content); *Newly Wed Foods, Inc. v. Super. Nut Co.*, No. 05-0454E, 2010 WL 1178404, at *3-5

Defendant attempts to confuse the relevant issue by (1) complaining that the state statutes "do[] not create a stand-alone, state-law identity standard that can be separately enforced without referring to and applying the FDA Standard," Def. Br. at 25–26—even though no court has ever found that necessary; and (2) erroneously contending that "not one of the counts in Plaintiffs' Complaint seeks to directly enforce a violation of any state statute or regulation," *id.* at 24, which is patently false. Plaintiffs specifically allege that Nestlé violates all nine states' consumer protection acts (as well as their rules mirroring the FDA's). These state statutes each specifically impose "an individual state law duty" on Nestlé when it does business within each state:

| **Count** | **State** | **Prohibited Conduct** | **Private Right of Action** |
|---|---|---|---|
| III | New Jersey | "The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." N.J. Stat. Ann. § 56:8-2. | N.J. Stat. Ann. § 56:8-2.12 |
| IV & V | New York | "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby | N.Y. Gen. Bus. Law § 349(h) |

(Mass. Super. Ct. Feb. 18, 2010) (food label failing to disclose it contained peanuts violated Mass. G.L.c. 93A); *Lawrence v. Philip Morris, USA, Inc.*, No. 09-CV-518, 2010 N.H. Super. LEXIS 183, at *12 (Nov. 22, 2010), *rev'd on other grounds* 53 A.3d 525 (N.H. 2012) (failing to receive "qualities and economic value of a low tar, low nicotine cigarette" as labeled violates NH CPA); *Courtney v. Bassano*, 733 A.2d 973, 974-76 (Me. 1999) (antique dealer advertising table with replacement wood as "original" liable under Maine UTPA); *Shell Oil Co. v. Wentworth*, 822 F. Supp. 878, 885 (D. Conn. 1993) (selling non-Shell gasoline as Shell gasoline violates CUTPA); *Pirozzi v. Penske Olds-Cadillac-GMC, Inc.*, 605 A.2d 373, 376 (Pa. Super. Ct. 1992) (repaired auto pawned off as new violated PA UTPCPL); *Winton v. Johnson & Dix Fuel Corp.*, 515 A.2d 371, 372 (Vt. 1986) (ads misrepresenting that hot water heater qualified for tax credit violated VCFA); *D'Ercole Sales v. Fruehauf Corp.*, 501 A.2d 990, 996 (N.J. App. Div. 1985) (NJ CFA is aimed at "unlawful sales and advertising practices designed to induce consumers to purchase merchandise").

| | | | |
|---|---|---|---|
| | | declared unlawful." N.Y. Gen. Bus. Law § 349(a).<br><br>"Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 350. | |
| VI | Connecticut | "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. § 42-110b(a). | Conn. Gen. Stat. Ann. § 42-110g(a)-(b) |
| VII | Massachusetts | "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Mass. Gen. Law 93A § 2(a). | Mass. Gen. Law 93A § 9(1)-(2) |
| VIII | Rhode Island | "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful." R.I. Gen. Law § 6-13.1-2. | R.I. Gen. Law § 6-13.1-5.2(a)-(b) |
| IX | Vermont | "Unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce are hereby declared unlawful." 9 Vt. Stat. Ann. § 2453(a). | 9 Vt. § 2461(b) |
| X | New Hampshire | "It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. Rev. Stat. § 358-A:2. | N.H. Rev. Stat. § 358-A:10(I) |
| XI | Maine | "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful." Me. Rev. Stat. 5 § 207.<br><br>"A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he<br><br>. . .<br><br>**D.** Uses deceptive representations or designations of geographic origin in connection with goods or services; | Me. Rev. Stat. 5 § 213(1)<br><br>Me. Rev. Stat. 10 § 1213 |

| | | **E.** Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation or connection that he does not have; . . . <br> **G.** Represents that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another." Me. Rev. Stat. 10 § 1212. | |
|---|---|---|---|
| XII | Pennsylvania | "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . are hereby declared unlawful." 73 Pa. Stat. § 201-3. | 73 Pa. Stat. § 201-9.2(a) |

As evidenced in the table above, each state specifically prohibits "deceptive" conduct and provides a private right of action for a harmed consumer. That the FDCA and some of the "spring water" standards identified in each state may not provide for a specific private right of action is irrelevant, as Nestlé has an equal duty to honestly label Poland Spring® water under <u>both</u> those state spring water statutes <u>and</u> the consumer protection statutes.[7] Plaintiffs can rely entirely on the

---

[7] Defendant's argument that the state spring water laws afford no private cause of action is in any event incorrect. Each State has a nearly identical food misbranding law, which is the paradigmatic type of statute that implies a private remedy for violations, and would provide Plaintiffs with yet another basis on which to sue. *See* Restatement 2d of Torts § 874A (1979). For example, the New York Court of Appeals has long held that because the purpose of the Agriculture and Markets Law's misbranded food prohibitions is to "protect[] the members of the public from fraud and misrepresentation in the character of foods," the statute provides an "implied[] cause of action in favor of the [consumer] . . . who has been injured by its violation." *Abounader v. Strohmeyer & Arpe Co.*, 154 N.E. 309, 311 (N.Y. 1926). "The fact that penalties are ordained for violations of course furnishes no argument against this conclusion," and "it makes no difference whether the person seeking damages has been injured in his person or in his property rights . . . ." *Id.* at 311–12; *see also Brown v. State*, 674 N.E.2d 1129, 1139 (N.Y. 1996) (citing *Abounader* and applying similar reasoning to find a private right of action under another statute).

Courts have reached similar conclusions as to other states' laws. *See Koster v. Scotch Assocs.*, 640 A.2d 1225, 1228–29 (N.J. Super. Ct. 1993) (violation of New Jersey's Food and Drug Act imposes civil liability because statute incorporated the preexisting, high standard of care for food sellers

fact that Nestlé's deceptive conduct violates the consumer protection statutes in each state, which unquestionably do provide for a private right of action. As Judge Breyer recently explained in the *Volkswagen* cases, even if a federal statute expressly precludes a State <u>government</u> from enforcing certain federal requirements, as under the Clean Air Act provisions at issue there, consumers are not precluded from bringing consumer protection claims challenging conduct that violates those federal requirements when the conduct also constitutes deceit under state law and induces them to purchase a product under false pretenses. *In re: Volkswagen "Clean Diesel" Mktg., Sales Practices and Prods. Liab. Litig.,* 310 F. Supp. 3d 1030, 1049 (N.D. Cal. 2018) ("Under those circumstances, . . . the consumers' fraud claims were not preempted by the Clean Air Act because the claims were not an attempt to enforce EPA's emission standards, but rather were an attempt to hold the manufacturers liable for their false promises and deceit.").

Nestlé's deceptive conduct alleged here differs markedly from the claims in *Verzani v. Costco Wholesale Corp.*, No. 09 Civ. 2117(CM), 2010 WL 3911499 (S.D.N.Y. Sept. 28, 2010), and the cases *Verzani* relied upon. In *Verzani*, the plaintiff challenged conduct "[a] reasonable consumer would not believe" to be deceptive and attempted to get around the fact that the labels

---

under common law as opposed to creating a new duty); *Scovish v. Upjohn Co.*, Nomapa. 526520, 1993 Conn. Super. LEXIS 2565, at *1 (Super. Ct. Oct. 1, 1993) (similar as to Connecticut statute); *cf. Hayes v. New Eng. Tel. & Tel. Co.*, 174 A. 49, 50 (N.H. 1934) ("The violation of an express statutory [prohibition] ordinarily carries with it civil liability to any persons injured by the creation of a danger which the statute was designed to prevent."). The duty owed under these statutes is manifestly for the protection and benefit of consumers, and Plaintiffs can accordingly bring a cause of action either based on <u>or</u>, as here, informed by the violation of the statute. *See Abounader,* 154 N.E. at 311 (citing Cooley on Torts (Vol. 2 [3d ed.], p. 1408)).

Vermont, moreover, expressly provides a private right of action for damages or equitable relief to "[a]ny person injured or damaged by a violation of [title 18, including the food misbranding law], of a rule adopted pursuant thereto, or of a permit or order issued thereunder." Vt. Stat. Ann. tit. 18, § 122; *see also id.* tit. 10 §§ 1672-73 & 1682 (separately requiring compliance with standard of identity for bottled water under natural resources law and providing same remedy for injured consumers as under the public health law).

accurately listed the net weight of the product by arguing that the label's failure to comply with 21 U.S.C. § 331 constituted "deception" under N.Y. Gen. Bus. Law § 349. *See Verzani*, 2010 WL 3911499, at *2-3. Given the lack of any actual deception traditionally actionable under state law, the court reasonably rejected that argument because it was clear plaintiff's "true purpose is to privately enforce alleged violations of the FDCA, rather than to bring a claim for unfair and deceptive business practices." *Id.* That is not this case. Plaintiffs allege Nestlé misrepresented specific facts that were always actionable if untrue, including that seven springs its Poland Spring® water supposedly comes from do not even exist. That deceptive conduct violates each of the state statutes at issue, whether the FDCA was enacted or not.

Plaintiffs' claims now closely parallel the non-preempted claim in *Loreto v. Procter & Gamble Co.*, 515 F. App'x 576 (6th Cir. 2013). The *Loreto* plaintiffs advanced two theories: "(1) that the products were illegal because the label did not comply with FDCA requirements" mandating specific label disclosures, "and (2) that the label was false or misleading." Dkt. 141 at 18 (citing *Loreto*, 515 F. App'x at 579). This Court summarized the key facts and analysis from *Loreto* as follows:

> The court held that the first theory was impliedly preempted under *Buckman* because it "depends entirely upon an FDCA violation—i.e., the only reason Procter & Gamble's products were allegedly 'illegal' was because they failed to comply with FDCA labeling requirements." [*Loreto*, 515 F. App'x] at 579. In contrast, the court allowed the second theory to proceed because it would be actionable under state tort law regardless whether it was also required by the FDCA. In other words, the label's representation about the efficacy of Vitamin C was misleading because—entirely apart from the FDCA—the claims were allegedly factually false.

*Id.* While this Court found that Plaintiffs' claims from the initial complaint all matched the first theory of liability from *Loreto*—failure to comply with the FDCA—the causes of action in the Amended Complaint now mirror the second theory of liability—that Nestlé's representations "were allegedly factually false." For example, Nestlé represents to the public that its "100% natural

spring water" comes from one of eight springs, yet seven of those springs do not exist. That is fraud pure and simple given the materiality of that "allegedly factually false" representation. Plaintiffs' claims would exist even in the absence of the FDCA. In fact, not only are these the specific types of claims that consumers have been able to bring under state law for decades, but in an *amicus* brief from 1999, the New York Attorney General used almost this precise hypothetical as a prototypical example of a clearly legitimate claim.[8]

### D. The FDCA Does Not Preempt Plaintiffs' State Law Statutory Claims Because Plaintiffs Properly Allege That Nestlé Violates State Laws Substantively Identical To Federal Law.

As this Court recognized in the May 17 Order, one "kind of state law claim that may survive preemption is well demonstrated in the *Salmon Cases*." Dkt. 141 at 15. Plaintiffs' amended causes of action fall cleanly within the standards outlined in the *Salmon Cases* and approved by this Court because they all arise under state consumer protection statutes as informed by individual state laws that mirror the requirements laid out in the FDCA. *See* Compl. ¶¶ 857-1036.[9]

---

[8] In *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 56 n.5 (1999) (emphasis added), the New York Court of Appeals stated:

> The Attorney General, who appears as *amicus curiae* in support of appellants' position, likens this case to a situation where a distributor asserts that its bottled water is from a pure and pristine mountain stream while in reality, it was only tap water. The Attorney General may be right that a plaintiff might have a claim for the higher price the consumer paid for the product as a result of the misrepresentation in that circumstance. That is not this case. Plaintiffs do not contend that the deception here caused an inflated price.

[9] *See* Conn. Gen. Stat. Ann. §21a-150a(3)(b) ("No bottled water shall be sold or distributed which does not comply with the quality standards set forth in 21 CFR 165.110 . . . ."); Code Me. R. tit. 10-144 Ch. 231, §2 ("Spring water must comply with the . . . U.S. Food and Drug Administration Regulations at 21 C.F.R. §165.110 (a)(vi)."); 105 Mass. Code Regs. 500.090(I)(2) ("The term 'spring,' 'springs' or 'spring water' shall not be used as a product name or a brand name on a label unless the water source meets the definition of spring water in 21 C.F.R. § 165.110(a)(2)(vi)."); N.H. Code Admin. R. He-P 2102.03 ("Spring water shall meet all requirements set forth in 21 CFR 165.110(a)(2)(vi) . . . ."); N.J. Admin. Code § 8:21-5.5(a) ("Bottled water shall be labeled and conform with the nomenclature established under 21 C.F.R. § 165.110(a) (identity)."); N.Y. Comp.

This is precisely what this Court directed Plaintiffs to do when it granted Nestlé's first motion to dismiss with leave to amend. It is also precisely what the California Supreme Court permitted in the *Salmon Cases*: "The FDA has opined that because '[section 337] applies only to proceedings to enforce the [FDCA] . . . , nothing in [section 337] would preclude a State from taking action against a particular food under *its own State law*.'" *Salmon Cases*, 42 Cal. 4th at 1096 (quoting 58 Fed. Reg. 2458) (emphasis and bracketed alterations in original).

Other courts considering similar claims have reached the same conclusion. *See*, *e.g.*, *In re Trader Joe's Tuna Litigation*, 289 F. Supp. 3d 1074, 1084 (C.D. Cal. 2017) (plaintiffs' state law claims not preempted by FDCA § 343-1 "because they incorporate the FDCA's requirements wholesale, and do not impose any additional obligations"). That many of the states here simply incorporate the federal standard, as opposed to promulgating the identical standard themselves, makes no difference, as states need not repeat the federal text verbatim in the state code and may incorporate the federal statute by reference:

> The fact that the California law does not specifically set forth the Pressed Weight Standard results from consideration of practicalities. If California were required to update its statutes every time the federal government changed a standard, it would constantly have statutes stating standards that did not mirror the federal scheme, which would then be expressly preempted by Section 343–1(a).

*Id*. at 1084. When a plaintiff's claim imposes no requirement on the standard of identity for spring water beyond that provided under that state law, the plaintiff alleges "a violation of a state-law

---

Codes R. & Regs. Tit. 10, § 5-6.3(s) ("Spring water shall mean water derived from an underground formation from which water flows naturally to the surface of the earth."); 3 Pa. Stat. Ann. § 5733(f) ("All regulations . . . adopted under the Federal acts which relate to food . . . are adopted as regulations in this Commonwealth . . . ."); *id.* § 5736(a) ("[T]he provisions of this subchapter and the regulations promulgated under this subchapter shall be construed in a manner that is consistent with the Federal acts and regulations promulgated under those acts."); 216 Rhode Island Admin. Code § 50-10-4.3(A)(3)(s) (adopting federal spring water standard wholesale); 10 Vermont Stat. Ann. § 1416(4) ("'Spring' means a groundwater source where groundwater flows naturally to the surface of the earth.").

duty that is parallel to, but independent of, the requirements of the FDCA. This combined with the presumption against preemption in areas historically governed by the states, leads the Court to conclude Plaintiffs' claims in the SAC are not impliedly preempted." *Id.* at 1085.

### E. Plaintiffs Satisfy The *Buckman* Standard Because Counts III-XII All Depend On An Independent Provision Or Requirement Of State Law.

*Buckman* in no way changes the analysis above. In *Buckman*, the entire thrust of plaintiffs' claims boiled down to alleged misrepresentations that a medical device manufacturer made to the FDA during the course of making <u>affirmative disclosures</u> to the FDA <u>required</u> by the Medical Device Amendments ("MDA") to the FDCA in order to receive pre-market approval from the FDA. *Id.* at 344. Given those circumstances, it was not difficult for the Supreme Court to find that the claims were entirely dependent on federal law: There, "petitioner's dealings with the FDA were prompted by the MDA, and the very subject matter of petitioner's statements were dictated by that statute's provisions." *Id.* at 347–48. The Court was particularly concerned that a company could "fear that their disclosures to the FDA, although deemed appropriate by the Administration, will later be judged insufficient in state court. Applicants would then have an incentive to submit a deluge of information that the Administration neither wants nor needs, resulting in additional burdens on the FDA's evaluation of an application." *Id.* at 351.[10]

---

[10] That *Buckman* involved the pre-market approval process for medical devices is a significant distinction for other reasons as well. *Cf. POM Wonderful*, 134 S. Ct. at 2239 (citations omitted):

> Unlike other types of labels regulated by the FDA, such as drug labels, . . . it would appear the FDA does not preapprove food and beverage labels . . . . Because the FDA acknowledges that it does not necessarily pursue enforcement measures regarding all objectionable labels, . . . if Lanham Act claims were to be precluded then commercial interests—and the public at large—could be left with less effective protection in the food and beverage labeling realm than in many other, less regulated industries. It is unlikely that Congress intended . . . less policing of misleading food and beverage labels than in competitive markets for other products.

No such concern exists here. The FDA does not approve spring water labels or review them for appropriateness. *See* 7-8, *supra* (discussing FDA's February 10, 2017 letter to Nestlé). The FDA certainly does not require Nestlé to represent that it sells "100% natural spring water," or to make any affirmative representation at all. *See* 21 C.F.R. § 165.110(a)(2)(vi) water meeting the identity standard "<u>may be</u> 'spring water.'") (emphasis added). Nestlé has voluntarily chosen to represent to the public that its bottles contain "100% natural spring water" because it knows it can sell "spring water" for a premium. As with any factual representation a corporation decides to make to potential consumers in order to sell its products, state law requires the statement not be deceptive.

Accordingly, unlike *Buckman*, this is not a case in which Plaintiffs' claim of "[f]raud depends wholly on what the FDA requires in the first instance." Dkt. 141 at 19 n.11. Consumers have always had the right to sue companies that make false representations when selling their products, and every state at issue here has passed a specific statute prohibiting the very type of deceptive conduct Plaintiffs complain about here. Nestlé fails to identify even a single case to ever find a plaintiff's claims preempted simply because the FDA implemented an identity standard that <u>defined</u> a food to meet consumer expectations (as opposed to a standard that <u>required</u> a specific disclosure on a food label).[11]

---

[11] One court recently declined to find implied preemption in a case involving spring water, correctly noting that the parties here would provide further briefing. *Frompovicz v. Niagara Bottling, LLC*, Civ. Action No. 18-54, 2018 WL 2363475, at *10 n.13 (E.D. Pa. May 24, 2018).

**F. The FDCA Does Not Expressly Preempt Plaintiffs' Claims Because Plaintiffs Do Not Seek to Add Any Non-Identical Requirements To The Standard Of Identity.**

The scope of FDCA express preemption in food labeling cases is well-settled: "state law causes of action are not preempted where they merely provide a damages remedy for claims premised on a violation of federal law that does not itself provide a private right of action, but are preempted where they impose obligations not imposed by federal law." *In re PepsiCo, Inc., Bottled Water Marketing and Sales Practices Litig.*, 588 F. Supp. 2d 527, 532 (S.D.N.Y. 2008) (citing *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008)). Nestlé attempts to sow confusion by arguing that several of Plaintiffs' allegations seek to impose requirements "not identical to" the FDA's. Def. Br. at 40–50. Nestlé either misreads the FDA's rules or mischaracterizes Plaintiffs' <u>evidence</u> of non-compliance with those rules as a new requirement. Whether Plaintiffs' alleged facts and evidence support Plaintiffs' claims are merits questions to be resolved later in this litigation.

"The term 'identical' means that the language is substantially the same language as the comparable provision of the [FDCA], and that any difference does not result in the imposition of materially different requirements." *Vermont Pure Holdings, Ltd. v. Nestlé Waters N. Am., Inc.*, No. Civ. A. 03-11465 DPW, 2006 WL 839486 at *5 (D. Mass. Mar. 28 2006) (citations omitted). Accordingly, the purpose of the FDCA preemption provision "is not to preclude *all* state regulation . . . , but to 'prevent State and local governments from adopting inconsistent requirements with respect to the labeling of nutrients.'" *Turek v. Gen. Mills, Inc.*, 754 F. Supp. 2d 956, 958 (N.D. Ill. 2010), *aff'd as modified*, 662 F.3d 423 (7th Cir. 2011) (quoting H. Rep. No. 101–538, at 10 (1990)).

Plaintiffs do not seek to impose any new requirements. First and foremost, Nestlé does not—and cannot—contend that requiring the existence of genuine natural springs rather than fake springs is a new requirement. Nor can Nestlé contend that labeling water as "100% natural spring

26

water" when it is not "the same" as water that flows from any natural spring is a new requirement. Since Plaintiffs rely primarily on those two requirements, and will prevail on the merits by proving either to be true at each of Nestlé's well sites, Nestlé's fact-intensive arguments as to Plaintiffs' other reasons why Poland Spring® water fails to meet the identity standard cannot be dispositive on this motion.[12] Nestlé's claimed "new requirements" are baseless in any event.

Nestlé's contention that allowing Plaintiffs (rather than just state regulators) to test if "a hydraulic connection exists" between Nestlé's wells and alleged springs echoes Nestlé's errant state permits-based arguments. *See* Sections II, III, *infra*. Since the permits do not preclude Plaintiffs' claims, Plaintiffs are entitled to discovery under the Federal Rules of Civil Procedure to gather supporting evidence by conducting their own tests. Nestlé cites no authority or evidence from the FDCA's legislative and regulatory history indicating that the FDA's verbiage referring to "appropriate regulatory officials" in connection with <u>one</u> of the several definitional elements of spring water was intended to preclude consumers from substantiating state law claims through discovery. As shown above, Congress's and the FDA's intent was to the contrary.

Nestlé's argument that groundwater seeps with imperceptible, diffuse emissions "between grains of sand" over large areas can be "springs" under the identity standard rests on sleight of hand and defies commonsense. Def. Br. at 44-45. While the identity standard does begin its

---

[12] Nestlé's reliance on *La Vigne v. Costco Wholesale Corp*., 284 F. Supp. 3d 496 (S.D.N.Y. 2018), is misplaced. That court concluded that the plaintiffs were seeking to impose a new requirement because they had misread the governing federal standard and, consequently, the defendant's conduct did not actually "amount[] to a violation of" that standard. *Id*. at 510. The court also found that the plaintiffs' claims would not have been actionable under traditional state consumer protection laws. *Id* at 512-17. Here, Nestlé's conduct is actionable under state consumer protection statutes. Nestlé's other cited cases are distinguishable for similar reasons. *See Brower v. Campbell Soup Co.*, 243 F. Supp. 3d 1124, 1129 (S.D. Cal. 2017 (claims that would impose new labeling requirements for federally pre-approved products preempted); *Meaunrit v. Pinnacle Foods Grp., LLC*, No. C 09-4555 CW, 2010 WL 1838715, at * 8 (N.D. Cal. May 5, 2010) (same).

definition by stating that spring water must be "[w]ater derived from an underground formation where water flows to the surface," *id.* at 45, Nestlé omits to mention that the standard immediately thereafter requires that "there must be a 'natural force causing the water to flow to the surface through a natural orifice.'" Dkt. 141 at 2 (quoting 21 C.F.R. § 165.110(a)(2)(vi)). Nestlé cannot erase the words "natural orifice" and "natural force causing . . . flow" from the definition. *See*, *e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (citation omitted). The common "'lay perception of a spring is that of an identifiable orifice from which ground water emanates to the surface.'" Compl. ¶ 50 (quoting Nestlé consultant). Under Nestlé's theory that seeps can be springs, "virtually every swamp, pond, lake or stream that is fed in part by diffuse groundwater discharge—even the ocean—would be a 'spring,'" within the meaning of the standard of identity, *id.* ¶ 56, which would make a mockery of the regulatory intent, *id.* ¶ 241. Nestlé's preposterous factual argument—which logically leads to the absurd conclusion that swamp water and sea water can be lawfully and non-deceptively sold as "100% natural spring water"—does not make Plaintiffs' allegation that "seeps are not springs" a new requirement.

The standard of identity, moreover, uses the words "same stratum," not "same aquifer," which Nestlé prefers. Def. Br. at 45-46. The "same path" requirement relates directly to the standard of identity's mandate that Poland Spring® water must be physically and geochemically "the same" as a natural spring's water. *See* Compl. ¶ 63(b); 60 Fed. Reg. 57076, *57095 ("Water that has not traveled the same course [*i.e.*, path] as the water feeding the spring, and, thus, that does not have the same characteristics as water from the spring, cannot be labeled as 'spring water.'"). Nestlé's contentions concerning "maps and photos" and wells flowing at "higher rates,"

producing "older water" than the purported springs, and not being in close "proximity" to them, all misconstrue <u>evidence</u> by which Plaintiffs' experts will show Poland Spring® is not spring water as being new requirements. Nestlé's claim that it can call Poland Spring® "100% natural spring water" despite purifying it is deceptive and contravenes the standard of identity, *see* 60 Fed. Reg. 57076, \*57098 (water that "has been treated in such a way that it differs significantly from the source water … is no longer unmodified spring water and … the fact that the water has been altered significantly must be disclosed"). Nestlé's contention that it is allowed to "alter the natural orifice" at its alleged Fryeburg spring ignores Plaintiffs' well-pled allegation that no natural orifice actually exists there. Compl. ¶¶ 553-58. It is also irrelevant. As Nestlé admits, alteration is allowed only to enable "bottlers who bottle from the natural orifice . . . to properly engineer" collecting the water, Def. Br. at 49, and Nestlé undisputedly does not collect water from that supposed spring. Alteration of a water source to fake a spring's existence—which is what Nestlé does—is not allowed.

Finally, that Defendant's deceptive and fraudulent behavior will be judged in a courtroom rather than by a state or federal regulator also does not support Nestlé at this stage. *See id*. at 42. As the court in *Vermont Pure* explained when rejecting Nestlé's identical argument:

> There is the prospect that judges and juries in 50 different states interpreting a precise FDA definition and then imposing injunctions and damages on a bottled water producer will generate inconsistencies in interpretation of the identical provision. But Congress and the FDA appear to have made a conscious choice to allow the several states to regulate bottled water so long as the state standards employed are identical to those adopted by the FDA. The requirement of identity promotes uniformity in that courts in every state look to the same standard. Permitting states to interpret FDA definitions also allows for additional resources to be brought to bear in the enforcement of national standards upon regional and local markets.

*Vermont Pure*, 2006 WL 839486, at \*7.

### G. The FDCA Does Not Preempt Plaintiffs' Common Law Fraud Claim Because States Have Long Permitted Consumers To Bring Such Claims Against Unscrupulous Corporations.

Whether via common law or enacted statutes, states have long provided legal recourse and protection against fraud and misrepresentation in the labeling of food and beverages. *See Plumley v. Massachusetts*, 155 U.S. 461, 472 (1894) ("If there be any subject over which it would seem the States ought to have plenary control, . . . it is the protection of the people against fraud and deception in the sale of food products."). In the absence of any FDCA requirement, Plaintiffs would still have a viable fraud claim under the common law of each state. *See, e.g.*, *Roberts v. Anheuser-Busch Brewing Ass'n*, 211 Mass. 449, 452, 98 N.E. 95, 96 (1912) (holding "defendant's representations must be treated as made to that ultimate consumer, upon who the injurious consequences of their falsity would fall"); *see also* Restatement (Second) of Torts §§ 526, 529, 531-36. Nestlé fails to overcome that strong presumption against preemption.

Plaintiffs' common law fraud claim imposes requirements on Nestlé that mirror those established under the FDCA. Plaintiffs allege Nestlé misrepresented that Poland Spring® comports with the standard of identity for spring water under state law, and "intentionally concealed," or "acted with reckless disregard for," the truth. *See* Compl. ¶ 838, 841. These allegations do not depend on a definition of "spring water" that is different from or in addition to those established under the FDCA and the parallel state law requirements. Thus, the fraud claim is not preempted. *See Medtronic*, 518 U.S. at 495 ("nothing" in a similarly worded FDCA preemption provision "denie[d] [a state] the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements").

*Buckman* again presents no obstacle here. Plaintiffs' fraud allegations do not conflict with the FDCA and "have little to do with direct regulatory interaction with the FDA." *McClellan v. I-*

30

*Flow Corp.*, 776 F.3d 1035, 1041 (9th Cir. 2015). Not one of Plaintiffs' claims "derives from, or is based on, a <u>newly concocted duty</u> between a manufacturer and a federal agency." *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 94-95 (2d Cir. 2006) (emphasis added). The FDA has never even approved Nestlé's Poland Spring® labels or its use of the phrase "100% natural spring water," let alone Nestlé's fraudulent campaign to conceal the false representations on those labels. In fact, such approvals would fall entirely outside the FDCA or the FDA's regulatory framework.[13] This action therefore cannot be considered a private action to enforce the FDA. Plaintiffs' fraud claim is instead based on the long-standing traditional state law tort duty not to commit fraud.[14] The FDA's standard of identity for spring water, as codified in state laws, simply informs the true definition of "spring water" from which Nestlé's fraudulent misrepresentations become apparent. Such claims are not preempted under *Buckman*.

---

[13] FDA regulations do "not require that the government agency having jurisdiction identify or certify that the source is a spring source." 60 Fed. Reg. 57076, 57096. "**Firms**"—that is, the bottlers themselves, not the FDA nor any delegated state agencies—"are responsible for ensuring that their products comply with the particular source requirements in § 165.110(a)(2)(vi)." *Id.* (emphasis added). Further, non-action or silence by the FDA as to a particular label does not indicate that the FDA found the label accurate. *See Hughes v. Bos. Sci. Corp.*, 631 F.3d 762, 774 (5th Cir. 2011) (holding same as to medical device).

[14] *See, e.g.*, *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 341 F. Supp. 2d 386, 410-11 (S.D.N.Y. 2004) ("the duty not to commit fraud" arises "independently of the [federal] regulation") (citing *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 530 (1992)), *aff'd* 488 F.3d 112, 135 (2d Cir. 2006). *Accord McClellan*, 776 F. 3d at 1041; *Bausch v. Stryker Corp.*, 630 F.3d 546, 557 (7th Cir. 2010) (holding claims based on well-recognized common law duty not to sell defective goods were not expressly or impliedly preempted; defendant's noncompliance with FDA's rule prohibiting sale of "adulterated medical devices" evidenced violation of that state law duty).

**H. The FDCA Does Not Preempt Plaintiffs' Breach Of Contract Claim Because Plaintiffs Could Bring The Cause of Action Even Had Congress Never Passed The FDCA.**

Plaintiffs' breach of contract claim is not preempted for many of the same reasons presented as to their statutory and common law fraud claims. First, Plaintiffs would have been able to bring their breach of contract claim even if the FDCA or FDA spring water regulations did not exist. *See, e.g.*, *Abel v. Murphy*, 91 N.Y.S. 26 (N.Y. App. Term 1904) (delivery of "shaddock" fruit in place of grapefruit breached contract despite the fruits' scientific relation and similarity).

Second, like Plaintiffs' other claims, the contract claim runs parallel to federal requirements and presents no conflicting or additional state law requirements. Applying state contract law to remedy Nestlé's breach of <u>private legal obligations</u> it entered into voluntarily does not directly or indirectly establish any state <u>law</u> requirements for spring water or its labeling.[15]

---

[15] *See Cipollone*, 505 U.S. at 525 ("A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty. Accordingly, the 'requirement[s]' imposed by an express warranty claim are not 'imposed under State law,' but rather imposed <u>by the warrantor</u>." (emphasis and alterations in original)).

Indeed, the regular functioning of business and sales relating to foods with defined standards of identity continues to be conducted like all other foods, namely under contracts enforceable under state law. *See, e.g.*, *Great Lakes Cheese of N.Y., Inc. v. Agri-Mark, Inc.*, No. 7:14-CV-0232 (GTS/ATB), 2016 WL 5717337, at *8-10 (N.D.N.Y. Sep. 30, 2016) (contract claim based on purchase of contaminated milk); *Quaker Oats Co. v. Riverbend Prods., Inc.*, No. 89 C 5173, 1990 WL 37639, at *1-2 (N.D. Ill. Mar. 16, 1990) (contract for sale of tomato paste, one of first identity standards FDA ever promulgated). In fact, those dealing in foods subject to FDA identity standards sometimes add a provision to their contracts warranting that the goods will be merchantable in accordance with applicable FDA standards. *See, e.g.*, *Sparta Food, Inc. v. Rupari Food Servs.*, No. 99-2041 (MJD/JGL), 2003 WL 22047865, at *2 (D. Minn. Aug. 29, 2003) (contract warranted cheese snacks "shall be merchantable in accordance with FDA standards"); *Gibbs, Nathaniel (Canada), Ltd. v. Int'l Multifoods Corp.*, 804 F.2d 450, 451 (8th Cir. 1986) (contract provided peanuts would meet FDA standards); *T. J. Stevenson & Co. v. 81,193 Bags of Flour*, 629 F.2d 338, 350 (5th Cir. 1980) (contract warranted compliance with FDCA provisions as to flour). No one would add such provisions if there was any colorable basis for believing that adding them would deprive them of their contract remedies on preemption grounds in the event of a breach.

Even if it did, Plaintiffs do not allege that Nestlé's voluntary contracts defined "spring water" in a manner different from the federal identity standard. *See* Compl. ¶¶ 847–56. Rather, Plaintiffs request relief from Nestlé's digression from its voluntarily assumed contractual duty to deliver "100% natural spring water," as defined by state laws mirroring the federal identity standard. *See id.* ¶¶ 63-64, 852.[16]

## I. Conflict Preemption Does Not Apply Here Because The FDCA Does Not Have A Robust Certification Procedure In Place.

Defendant's reliance on *Marentette* is misplaced. *Marentette* is both factually and legally distinct from the instant litigation and provides no basis to dismiss the Amended Complaint as conflict preempted. The May 17 Order properly failed to accept Nestlé's identical previous arguments.[17]

The *Marentette* consumers alleged that Abbott's Similac infant formula—branded as organic and displaying the "USDA Organic" seal (issued by the United States Department of Agriculture ("USDA"))—contained ingredients prohibited under the Organic Foods Production Act ("OFPA"). In holding that the plaintiffs' state-law claims were impliedly preempted by the OFPA, the Second Circuit relied heavily on the robust federal certification and enforcement mechanisms the USDA had established to effectuate the OFPA. Under that scheme, manufacturers seeking organic certification must submit an "organic plan" to the USDA that "list[s] each substance to be used as an input" to the product, so that a USDA-accredited certifying agent can

---

[16] "Spring water" has long been a distinct type of water product. *See, e.g.*, *Weigel v. Cook*, 142 N.E. 444, 445 (N.Y. 1923) (contract remedy warranted where defendant fraudulently represented spring water to which chemicals had been added to be natural "mineral water"), *superseded on other grounds by statute as stated in 3801 Beach Channel, Inc. v. Shvartzman*, No. 05-CV-0207 (CBA) (JO), 2010 WL 6471990, at *15 (E.D.N.Y. Sep. 30, 2010). Contracts for "spring water" are now governed by the standard of identity, unless the contracting parties define it differently.

[17] The Court ordered supplemental briefing after *Marentette* was issued. *See* Dkt. Nos. 129-131.

approve the plan as OFPA compliant. *Marentette v. Abbott Labs., Inc.*, 886 F.3d 112, 116 (2d Cir. 2018). "Under the OFPA, the word 'Organic' is under the federal government's control and is only permitted on a product after <u>approval</u> by a USDA-accredited certification agent." *Marentette*, 201 F. Supp. 3d 374, 384 (E.D.N.Y. 2016) (emphasis added). Given the USDA's active and pervasive control over both organic product ingredients and ensuring OFPA compliance, allowing private causes of action to challenge OFPA organic certifications would unduly interfere with the federal enforcement scheme. *Marentette*, 886 F.3d at 120.

The FDCA is a fundamentally different statute. The FDA has not developed a mechanism comparable to the USDA's scheme under the OFPA to ensure compliance with its bottled water regulations. The FDA does not issue a seal of regulatory approval akin to the "USDA Organic" seal. There is, in fact, no federal certification process for bottled water labels whatsoever.[18] The FDA merely defines standards of identity for spring water and other types of bottled drinking water and relies largely on industry self-regulation to achieve compliance. The FDA emphasizes that it is the bottler's responsibility to identify the location of the spring, to demonstrate that water is flowing naturally to the surface through a natural orifice, to verify the existence of a measurable hydraulic connection between a well and a spring, and to ensure that the well's water is continually "the same" as the spring's. *See* 21 C.F.R. § 165.110(a)(2)(vi); 60 Fed. Reg. 57076, 57096–97 (Nov. 13, 1995); *see also Marentette*, 201 F. Supp. 3d at 384 (in contrast to OFPA's USDA approval process, the FDCA "created a regulatory scheme in which manufacturers 'bear[] responsibility for the content of [their] label at all times'") (alterations in original) (citation omitted).

---

[18] Nestlé knows this, though it argues to the contrary. The FDA guidance letter that Nestlé cited with significant omissions and alterations clearly states: "As you are aware, FDA does not provide approval for the use of the term 'spring water' for bottled water." *See* 7-8, *supra*.

*Marentette* also found that the OFPA's complex federal agency–level remedial enforcement scheme evidences "that Congress did not want individuals to be able to challenge the merits of a decision to certify a product as organic." *Marentette*, 886 F.3d at 120. The FDA's remedial scheme, by contrast, is not exclusively federal. The FDA can opt to enforce its standards of identity itself, but it leaves enforcement largely to consumers and the states (at the state's option). *See* 21 C.F.R. § 129.3(a); 60 Fed. Reg. 57076, 57096 ("[T]he source is approved by the government agency or agencies having jurisdiction . . . , [which] in many cases . . . will be a State agency."); *accord Vt. Pure Holdings*, 2006 WL 839486, at *7 ("Congress and the FDA appear to have made a conscious choice to allow the several states to regulate bottled water so long as the state standards employed are identical to those adopted by the FDA.").

The OFPA's "extensive" and "unique regulatory scheme" putting both approval and enforcement squarely under federal control is "exactly the situation" in which the "rare remedy" of implied "obstacle preemption" applies. *Marentette*, 201 F. Supp. 3d at 384–85 & n.22. Preemption analyses under the FDCA "warrant . . . different outcomes." *Id.* at 384 (citing *Wyeth*, 555 U.S. at 555). The FDA's bottled water regulations put neither label approval nor enforcement firmly in federal hands, which explains why Congress, the FDA, and the Second Circuit have all concluded there can be no implied preemption of any kind under the NLEA amendments to the FDCA. *Marentette* did not cite, much less overrule, *New York State Rest. Ass'n*, 556 F.3d at 123, which held that the NLEA bars implied preemption of state laws.

Even if *Marentette* applied, it would be factually inapposite. The plaintiffs there did "not allege that Abbott's organic plan was improperly certified" or "that Abbott deceived the certifying agent as to the actual ingredients" in its product. *Marentette*, 886 F.3d at 119; *see also id.* at n.4. "It is important to distinguish between state law challenges to the certification determination itself,

which conflict with the OFPA, and state law challenges to the facts underlying certification . . . , [which] do not necessarily conflict with the OFPA's purposes." *Aurora Dairy Corp. Organic Milk Mktg. & Sales Pract. Litig.*, 621 F.3d 781 797 (8th Cir. 2010). Here, Plaintiffs allege substantial details regarding "facts underlying certification" (assuming a certification process existed) which "would preclude" approving Poland Spring® as spring water. *Id.* at 798. Plaintiffs' claims therefore are not like the "state law challenges to the certification determination itself" that *Marentette* held non-actionable, but fit well with the category of claims the Second Circuit distinguished as not preempted even under the OFPA. *See Marentette*, 886 F.3d at 118 (quoting *Aurora*, 621 F.3d at 796–97).

## II. *BURFORD* ABSTENTION IS WHOLLY INAPPROPRIATE IN THIS CASE

### A. *Burford* Abstention Is An Exceedingly Narrow And Rarely Applied Doctrine.

Federal courts have a "'virtually unflagging' obligation . . . to exercise the jurisdiction given them," *Bethphage Lutheran Serv., Inc. v. Weicker*, 965 F.2d 1239, 1242 (2d Cir. 1992) (citation omitted), and a constitutional duty "to adjudicate a controversy properly before it." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 14 (1983) (internal quotation marks and citations omitted); *see also New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 358-59 (1989) (citations omitted) ("*NOPSI*"). Abstention in any form "is an extraordinary and narrow exception" to that duty. *Moses H. Cone*, 460 U.S. at 14. "Abdication of the obligation to decide cases" is justified under abstention doctrines "only in the exceptional circumstances" where directing the parties to "*repair to [a] State court* would clearly serve an important countervailing interest." *Id.* (internal quotation marks and citations omitted) (emphasis added).

Under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), abstention applies only in rare cases "[w]here timely and adequate state-court review is available" for the plaintiff and a federal court's

review of a state law question in connection with equitable claims would disrupt comprehensive state regulatory efforts. *See NOPSI*, 491 U.S. at 362 (citation omitted); *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976) (citing *Burford*); *Bethphage*, 965 F.2d at 1243; *Sheerbonnet, Ltd. v. Am. Express Bank*, 17 F.3d 46, 48 (2d Cir. 1994). The "power to dismiss recognized in *Burford* represents an 'extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it.'" *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996) (quoting *Burford*, 319 U.S. at 334 and *NOPSI*, 491 U.S. at 362–63) (other citations and internal quotation marks omitted).

The Supreme Court has accordingly "cautioned the lower federal courts to limit their invocation of *Burford* abstention." *Hachamovitch v. Debuono*, 159 F.3d 687, 697 (2d Cir. 1998). District courts have "little or no discretion to abstain in a case which does not meet traditional abstention requirements." *Id.* at 693 (quoting *In re Joint E. & S. Dist. Asbestos Litig.*, 78 F.3d 764, 775 (2d Cir. 1996)); *see Tribune Co. v. Abiola*, 66 F.3d 12, 15 (2d Cir. 1995) (courts have "considerably broader discretion to retain jurisdiction over the complaint" than to abstain).

Nestlé's argument seeking abstention boils down to the proposition that this Court should abdicate its duty to resolve Plaintiffs' state common law and statutory claims simply because Nestlé is a regulated entity that has received state permits to sell bottled water. But the Court cannot blindly rely on Nestlé's state permits to deprive Plaintiffs of their rights to assert their claims in a federal forum absent a legitimate basis for abstention. *See In re Joint E. & S. Dist. Asbestos Litig.*, 78 F.3d at 776 (quoting *Meredith v. Winter Haven*, 320 U.S. 228, 232 (1943)). "While *Burford* is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in cases where there is a 'potential for conflict' with state regulatory law or policy." *NOPSI*, 491 U.S. at 362 (citation

omitted). Nestlé fails to satisfy several *Burford* elements, and the Court must reject Nestlé's request asking the Court to sit back and let Nestlé deceive its consumers with impunity.

> **B. Nestlé's Request For This Court To Abstain Fails Because Several Necessary Prerequisites For *Burford* Abstention Do Not Exist Here.**

As the Second Circuit has noted, the Supreme Court "took pains in *NOPSI* to reiterate the narrow reach of *Burford* abstention, and to distill the distinctively equitable principles underlying that doctrine" into a two-pronged test:

> 'Where timely and adequate state-court review is available, a federal court **sitting in equity** must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'"

*Tribune Co*, 66 F.3d at 15 (emphasis in original) (quoting *NOPSI*, 491 U.S. at 361) (internal citations and quotation marks omitted).[19] Because (a) this Court is not sitting in equity, (b) there is no timely and adequate state court review available, and (c) the Court may consider Plaintiffs' claims without interfering with state administrative processes, the Court should reject Nestlé's arguments and allow Plaintiffs to continue litigating their legitimate claims.

> **1. The *Burford* Doctrine Does Not Apply to Claims for Damages.**

As a threshold issue, the *Burford* doctrine only applies to courts "sitting in equity." It does not apply to claims at law seeking damages. The Supreme Court held unequivocally that "courts have the power to dismiss or remand cases based on abstention principles only where the relief being sought is equitable or otherwise discretionary," *Quackenbush*, 517 U.S. at 731, that is, only

---

[19] Nestlé quotes this standard but deletes the phrase "sitting in equity" to avoid this central prerequisite to applying *Burford*. Def. Br. at 14. Nestlé also fails to even cite *Quackenbush* or *Tribune Co.*—Supreme Court and Second Circuit precedents that govern this case—which plainly hold that claims at law for damages, like Plaintiffs', cannot be dismissed under *Burford*.

in "suits for injunctive relief . . . [and for] certain classes of declaratory judgments." *Id*. at 718. Because *Quackenbush* was a damages action, "the District Court's remand order was an unwarranted application of the *Burford* doctrine." *Id*. The rule that damages actions cannot be dismissed, the Court explained, evolved from the fact that Congress conferred on federal courts only the powers courts had at common law, and courts historically could decline to exercise jurisdiction only when sitting as courts of equity. *Id*. at 717–18; *see also NOPSI*, 491 U.S. at 359.

Even before *Quackenbush*, the Second Circuit had also held that "it is generally appropriate for a district court to abstain on *Burford* grounds only when asked to provide equitable relief." *Tribune Co.*, 66 F.3d at 13; *see also Kirschner v. Klemons*, 225 F.3d 227, 238 (2d Cir. 2000) (citing *Tribune Co.*, 66 F.3d at 16). The Second Circuit provided the additional rationale that "garden-variety claims for money damages . . . present no danger of interfering with any proceeding or order of the [state regulatory agency]." *Tribune Co.*, 66 F.3d at 17. In *Tribune Co.*, as here, the plaintiffs did "not request an injunction barring the defendants from pursuing . . . [related claims] before the [agency]" and did "not seek to overturn any . . . award" previously granted by the agency." *Id*. *Burford*'s concern over not interfering with complex state regulatory schemes addressing local state matters simply does not exist in a damages case.[20]

*Quackenbush* and *Tribune Co*. destroy Nestlé's effort to dismiss Plaintiffs' claims under *Burford*. Because Plaintiffs seek damages at law, the Court may not dismiss these claims under *Burford* even though Plaintiffs also request the Court enjoin Nestlé's <u>future</u> mislabeling of Poland

---

[20] While a damages "award by the district court might be used as a basis for offensive collateral estoppel" in later "proceedings before the [agency] or a state court," the Second Circuit found the fact that "further proceedings would be necessary" <u>proved</u> that exercising jurisdiction over a damages claim could "in no way" interfere with already existing agency orders, *id*. at 17-18, such as Nestlé's spring water permits.

Spring® water. *See Chapin v. Aguirre*, No. 05VC1906, 2006 U.S. Dist. LEXIS 91773, at *6-7

(S.D. Cal. Dec. 14, 2006) ("Although plaintiffs include generalized claims for equitable relief,

considering the factual basis for their claims . . . and the specifically-plead request for damages, it

is clear that the crux of the relief sought is legal, not equitable, in nature."). *Accord Ng v. Wells*

*Fargo Bank, N.A.*, No. 12-cv-05630 NC, 2012 WL 12921072, at *2 (N.D. Cal. Nov. 27, 2012)

("[W]hile plaintiff makes claims for equitable relief, she also seeks legal damages and thus does

not trigger the abstention principles established in *Quackenbush*."); *Montgomery v. Nat'l City*

*Mortg.*, No. C-12-1359 EMC, 2012 WL 1965601, at *3-4 (N.D. Cal. May 31, 2012) (refusing to

abstain where plaintiff sought equitable injunction and rescission remedies along with damages,

punitive damages and civil penalties); *see also Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 466, 472,

481 (6th Cir. 2004) (abstaining as to claim seeking to enjoin existing permits, but affirming

injunction and damage award on plaintiffs' state law claim).

　　Unsurprisingly, Nestlé does not cite a single post-*Quackenbush* case dismissing a damages

claim under *Burford*. Nestlé's post-*Quackenbush* cases all involved equitable or other

discretionary claims, predominantly directed at directly enjoining prior state agency actions or

declaring those actions invalid.[21] Indeed, not even Defendant's *pre-Quackenbush* cases support

---

[21] In the order they appear in Defendant's brief, *see Sojitz Am. Capital Corp. v. Keystone Equip. Fin. Corp.*, 88 F. Supp. 3d 59, 61 (D. Conn. 2015) (seeking dissolution of corporation and appointment of receiver); *All. of Auto. Mfrs., Inc. v. Currey*, 984 F. Supp. 2d 32, 39, 51 (D. Conn. 2013) (abstention not granted in declaratory judgment action against state agency commissioner); *Johnson v. Collins Entm't Co.*, 199 F.3d 710, 715 (4th Cir. 1999) (vacating injunction against South Carolina video poker operators but staying, not dismissing, damages claims), *reh'g denied*, 204 F.3d 573 (4th Cir. 2000); *Hachamovitch*, 159 F.3d at 689-90, 693, 698 & n.4 (abstention proper as to claim to enjoin state licensing officials' order imposing professional discipline but not as to due process claim); *Dittmer v. Cty. of Suffolk*, 146 F.3d 113, 114-15, 117 (2d Cir. 1998) (declining to abstain from claims to enjoin state and local officials and declare state act unconstitutional), *later appeal at* 59 F. App'x 375 (2d Cir. 2003) (affirming district court's final judgment); *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 486-90, 506 (7th Cir. 2011) (declining to abstain from citizen's Resource Conservation and Recovery Act ("RCRA") injunctive suit where

dismissing damages claims under *Burford*.[22] In short, Nestlé cannot cite any precedent permitting this Court to dismiss this case under *Burford*, and clear Supreme Court and Second Circuit authority forbids it.

---

plaintiffs added state common law damages claims for nuisance, trespass and negligence); *Chiropractic Am. v. LaVecchia*, 180 F.3d 99, 101-02 (3d Cir. 1999) (seeking declaration that regulations issued by state agency were unconstitutional); *Ellis*, 390 F.3d at 466, 472, 481 (abstaining as to Clean Air Act ("CAA") citizen's suit injunction claim because state was then addressing very same issue, but <u>affirming grant of injunction and damage award</u> on plaintiffs' state-law nuisance claim); *Jamison v. Longview Power, LLC*, 493 F. Supp. 2d 786, 786-87 (N.D. W. Va. 2007) (CAA citizen's suit seeking to declare a permit invalid and enjoin its continuing effect where permit issues had been resolved through state court settlement and consent decree).

[22] *See Burford*, 319 U.S. at 317-18 (action to enjoin state commission's order); *Berman Enters. v. Jorling*, 3 F.3d 602, 604, 607-08 (2d Cir. 1993) (affirming abstention as to declaratory relief against state agency and commissioner; damages claims dismissed solely on sovereign immunity grounds); *Farkas v. D'Oca*, 857 F. Supp. 300, 303, 305 (S.D.N.Y. 1994) (staying, but not dismissing, RICO claims pending ongoing state court matrimonial action's resolution of state law issues); *Hawks v. Hamill*, 288 U.S. 52, 53, 60 (1933) (action to enjoin activities of state agency and attorney general); *Bethphage*, 965 F.2d at 1240, 1242 (seeking injunctive and declaratory relief against state officials); *Arden House, Inc. v. Heintz*, 612 F. Supp. 81, 83-86 (D. Conn. 1985) (dismissing damages claims against state Medicaid officials on grounds that court had no federal or pendent jurisdiction); *Palumbo v. Waste Technologies Indus.*, 989 F.2d 156, 157-60, 161-62 (4th Cir. 1993) (state attorney general sought federal declaratory and injunctive relief that attorney general had been already twice denied in state court and federal agency proceedings); *Friends of Santa Fe Cty. v. Lac Minerals*, 892 F. Supp. 1333, 1337-38, 1347 (D.N.M. 1995) (CAA and RCRA citizen's suit to compel gold mine to obtain permits and pay plaintiff's attorney's fees and civil penalties to U.S. government where plaintiffs had failed to obtain same relief in extensive proceedings before state agency); *Barry v. St. Paul Fire & Marine Ins. Co.*, 555 F.2d 3, 5, 12-13 (1st Cir. 1977) (abstaining from doctors' and patients' antitrust and fraud class action claiming state malpractice insurers conspired on insurance rates where state insurance rate-setting apparatus would "soon be wrestling with plaintiffs' claim"); *Naylor v. Case & McGrath, Inc.*, 585 F.2d 557, 558-59 563-65 (2d Cir. 1978) (where no federal jurisdiction existed, remanding on *Pullman* abstention grounds to permit state courts to address novel statutory interpretation questions arising from then-recently enacted CUTPA); *Pineman v. Oechslin*, 637 F.2d 601, 602-06 (2d Cir. 1981) (similarly exercising *Pullman*-type abstention to enable state courts to consider new Connecticut employee pension statute); *Colo. River*, 424 U.S. at 814-15 (declining to apply *Burford* altogether); *Coal. for Health Concern v. LWD, Inc.*, 60 F.3d 1188, 1194-95 (6th Cir. 1995) (seeking declaratory and injunctive relief where federal claims were intertwined with state law issues).

41

### 2. Plaintiffs Have No Timely and Adequate State Court Review Available, Thus Precluding the Court from Applying the *Burford* Doctrine.

As another threshold matter, *Burford* abstention applies only "[w]here timely and adequate state-court review is available" to address Plaintiffs' claims. *NOPSI*, 491 U.S. at 361; *see also Moses H. Cone*, 460 U.S. at 14 ("Abdication of the obligation to decide cases" is justified only where directing the parties to "repair to [a] State court would clearly serve an important countervailing interest") (internal quotation marks and citations omitted). Nestlé does not ask this Court to abstain so that a state court can review Plaintiffs' claims. Rather, it asks this Court to prevent Plaintiffs from bringing their claims against Nestlé at all simply because Nestlé obtained state permits to sell bottled water.

When applying *Burford*, the Supreme Court has "emphasized the importance of the availability of recourse to the state courts." *Liberty Mut. Ins. Co. v. Hurlbut*, 585 F.3d 639, 649–50 (2d Cir. 2009) (citing *Ala. Pub. Serv. Comm'n v. S. R. Co.*, 341 U.S. 341, 384 (1951)). Indeed, a "federal court should not abstain if there is any 'substantial doubt' that a state court can provide a prompt and complete resolution of the dispute." *Bethphage*, 965 F.2d at 1246 (quoting *Moses H. Cone*, 460 U.S. at 28); *see also Adkins*, 644 F.3d at 504 (for *Burford* to apply, "the mere existence of a statewide regulatory regime is not sufficient. The state must 'offer some forum in which claims may be litigated.'") (citation omitted); *Ades v. CareFirst, Inc.*, Civ. Action No. ELH-17-1557, 2018 WL 690837, at *7 (D. Md. Feb. 2, 2018) (abstention improper when "*there is no pending state proceeding*" to which the court can refer the parties) (emphasis in original) (citation omitted). Nestlé asserts that Plaintiffs have an available state forum because Maine has "robust procedures" enabling "any person who is aggrieved by" an agency permitting decision to appeal to a state court under Maine's Administrative Procedures Act. Def. Br. at 20. But that procedure only applies to bottlers like Nestlé who wish to complain if and when an agency denies a permit; Maine does not

42

provide <u>any</u> administrative or judicial review for consumers who might be aggrieved by the State's errant grant of a spring water permit.

<u>First</u>, consumers are not parties to Maine's permitting process, which involves an ex parte application by a company, like Nestlé, that is reviewed and acted upon by Maine's Drinking Water Program without notice to consumers.[23] While a bottler denied a spring water permit can seek administrative and judicial review of that denial, there is no avenue for administrative or judicial review under Maine's bottled water rules or Administrative Procedures Act ("MAPA") for consumers seeking to challenge permits that have been granted under Maine's regulatory scheme.[24]

---

[23] To obtain Maine regulators' approval, a "Public Water System" such as Nestlé need only file an application with the agency for the agency's review. Neither Maine's governing Safe Drinking Water Act nor its attendant regulations provide for public notice or for a means for consumers to object to the application or participate in the spring water permitting process. *See* Me. Rev. Stat. Ann. tit. 22, §§ 2611-17; *see also* 10-144-231 Me. Code R. § 2 (defining "Public Water System" to include "Spring Water" bottlers); § 3(A) (providing agency 30-days to review submitted plans); §3(C) (requiring plan submission to agency); § 3(J)(1-4) (requiring applications to be submitted for agency approval of bottled water sales, significant groundwater well construction, bottled water sources and bottled water production facilities).

[24] The regulation that Nestlé cites to argue that "any decision" by Maine's Drinking Water Program is subject to administrative and judicial appeal, Def. Br. at 20, provides only that a "Public Water System" such as Nestlé can appeal a Drinking Water Program decision. The provision states: "Appeals by a Public Water System are limited to appeals contending that a decision . . . misapplies applicable laws, procedures, or rules; or is based upon a significant factual error to the detriment of the Public Water System." 10-144-231 Me. Code R. § 1-B(2). No provision grants a hearing or appeal rights to any other adversely impacted person. Only an aggrieved Public Water System has a right to request an administrative hearing or an appeal from such a hearing. *See id*. § 1-B(3-5).

Defendant has not cited a single case in which a consumer was allowed to intervene in any state's spring water permitting process or to appeal any state's grant of a spring water permit. Defendant's sole citation, to the First Circuit's 1977 decision in *Barry*, Def. Br. at 21, says nothing about state permitting procedures. The plaintiffs there challenged state insurance rates set under the McCarran-Ferguson Act's broad grant of state power to regulate the insurance business. 555 F.2d at 5-6, 9, 12. The court abstained because the state's courts had never ruled on whether a cause of action to challenge insurance rates even existed and would soon be "wrestling with" that "novel and controlling question" of state law. *Id*. at 12-13.

Second, under MAPA only parties to agency actions can appeal final agency rulings to Maine's courts, and even parties cannot appeal unless they have suffered a "particularized injury" that is "distinct from any injury experienced by the public at large." *Lindemann v. Comm'n on Governmental Ethics & Election Practices*, 961 A.2d 538, 543 & n.9 (Me. 2008) (citations omitted); *see also Nergaard v. Town of Westport Island*, 973 A.2d 735, 740 (Me. 2009); *Ricci v. Superintendent, Bureau of Banking*, 485 A.2d 645, 647 (Me. 1984). Plaintiffs were not (and could not be) parties to the permitting process, and their complaint that they paid higher prices for Poland Spring® would not satisfy MAPA's particularized injury requirement. *See Colman v. Precourt*, No. AP-17-05, 2017 Me. Super. LEXIS 63, at *3-4 (Me. Super. Ct. May 12, 2017) (claim that decreased tax revenues would cause plaintiff to pay higher rents "not distinct from the harm experienced by the public at large"); *Orr v. Town of Standish*, No. CV-11-420, 2011 Me. Super. LEXIS 230, at *7 (Me. Super. Ct. Dec. 1, 2011) (claim that "officials acted outside of the scope of" town rules "and conferred an unjust enrichment on the applicants" not a distinct injury that confers standing); *Caliendo v. Sec'y of State*, No. CV-87-226, 1987 Me. Super. LEXIS 214, at *11 (Me. Super. Ct. July 28, 1987) (plaintiffs suing in capacities as "citizens, electors, taxpayers and rate payers" do not allege injuries "distinct or greater than" those suffered by the general public).

Third, nothing in Maine's bottled water statutes or regulations grants Maine's regulators jurisdiction to hear consumer false advertising, fraud, or breach of contract claims, or to award consumers compensatory or punitive damages under state consumer protection statutes.

Consequently, Plaintiffs' only recourse for those claims are plenary actions in the federal or state courts. The Maine permitting procedure to which Nestlé asks the Court to defer does not provide the adequate state court procedure required under *Burford*.

The Second Circuit addressed an analogous situation in *Tribune Co*., where several employers brought RICO claims stemming from an alleged conspiracy among unions to file false claims before the New York State Workers' Compensation Board. The defendants and the Board urged the court to abstain under *Burford* and to allow the Board to re-open over 300 cases that the plaintiffs had settled before uncovering the conspiracy. *Tribune Co*., 66 F.3d at 13–14. The Second Circuit affirmed the district court's refusal to abstain. It held that even if the cases were reopened, "the review provided by the state administrative agency is not comparable to that afforded by the federal court" for several reasons, including because the "principal defendants in this case [the unions] are not proper parties to workers' compensation proceedings in New York" and the "substance of the plaintiffs' RICO claims . . . cannot be adjudicated in proceedings before the New York Workers' Compensation Board." *Id*. at 17. Significantly, the Board had no jurisdiction to "award the treble damages or attorneys' fees that are available under RICO." *Id*. (citing *Cty. of Suffolk v .Long Island Lighting Co.*, 907 F.2d 1295, 1309 (1990) ("the unavailability of treble damages and attorneys' fees in an action before [a state tribunal] . . . militates against" *Burford* abstention)). Maine's spring water permitting agency suffers from the same and even more limitations. Plaintiffs have no right to appear before that agency, which lacks jurisdiction to adjudicate their state law claims or award damages, and therefore *Burford* does not apply.

### 3.   Allowing Plaintiffs to Litigate their Valid State Law Claims Would Not Disrupt Any State's Efforts to Establish a Coherent State Policy.

Plaintiffs would not "disrupt" any state's efforts to establish a "coherent state policy" by continuing to litigate their claims. "*Burford* is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in cases where there is a 'potential for conflict' with state regulatory law or policy." *NOPSI*, 491 U.S. at 362 (citation omitted).

45

*Burford* itself illustrates the type of circumstances in which abstention may be proper. There, an intricate regulatory system was devised by the Texas legislature to address a purely Texas problem, the conservation of oil and gas in the East Texas oil field, which had given rise to more than 60 litigations in 1941 alone involving "geological-legal problems of novel nature." *Burford*, 319 U.S. at 318, 324 & n.17. Texas's interests in applying consistent standards to these cases was critical to "the whole economy of the State," and any one case could "necessarily affect the entire state conservation system." *Id.* at 320, 324–25. To address these important and complex issues, the Texas legislature assigned regulatory jurisdiction to the Texas Railroad Commission to set policy and adjudicate disputes between oil and gas well operators and the State and "established a system of thorough judicial review by its own state courts"—initially by a single "state district court in Travis County" with authority to review Commission determinations and whose decisions could be appealed to the State's higher courts. *Id.* at 325–26. Limiting review to one state court was designed to avoid the "interminable confusion" that would result from reviewing the same issues by "various courts and counties of the state." *Id.* at 326 (citation and internal quotation marks omitted).

Rather than following Texas's special intra-state review process, the *Burford* plaintiffs sought to enjoin a Railroad Commission order in federal district court, which, the Court held, could result in the "very 'confusion' which the Texas legislature . . . feared might result" from multiple avenues of review. *Id.* at 317. In the context of that type of state regulatory regime, "[d]elay, misunderstanding of local law, and needless federal conflict with state policy, are the inevitable product of this double system of review." *Id.* The Court concluded it "should leave these problems of Texas law to the state court" and to abstain from resolving a case that "so clearly involves basic problems of Texas policy." *Id.* at 332 (citation omitted).

46

This case is nothing like *Burford*. Not a single one of the relevant factors informing the result in *Burford* exists here. Every state at issue in this case has adopted a state standard of identity consistent with the federal standard. Given Congress's intended purpose of establishing uniformity, <u>less</u> confusion should result from federal courts reviewing spring water issues than adjudicating them in the courts of various states that may have differing local interests. *See Cty. of Suffolk*, 907 F.2d at 1310 (refusing to apply "primary jurisdiction" doctrine in favor of a state agency, stating that since "application of the doctrine in such a context might well result in review by fifty different state agencies with fifty different charters, resort to state agencies is more likely to ensure non-uniformity" than uniformity in the application of a federal law).

The Second Circuit has held abstention improper in cases involving far more intricate state regulatory systems than those that exist here. *See, e.g.*, *Hachamovitch*, 159 F.3d at 697-98 (declining to defer to comprehensive state medical disciplinary scheme where review was unavailable because doctor's proceeding before agency could not be reopened); *Tribune Co.*, 66 F.3d at 15, 17 (refusing to defer to New York's workers' compensation system); *Planned Parenthood v. Steinhaus*, 60 F.3d 122, 127 (2d Cir. 1995) (New York General Municipal Law provision seeking to avoid wasting public funds and regulations governing procedures for modifying multi-year social services plans held "not sufficiently complex to weigh in favor of abstention"). *See also All. of Auto. Mfrs.*, 984 F. Supp. 2d at 40-41, 52-53 (involving state's decades-long regulation of automobile dealer-manufacturer warranty service arrangements).[25]

---

[25] Nestlé tries to enhance the weight of its argument by asserting that the regulatory regimes of all nine states will be impacted by the Court's exercise of jurisdiction, not just Maine's regulatory system. *See* Def. Br. at 9, 14, 17. However, Plaintiffs assert that the other eight states relied on Maine's permit approvals and did not independently scrutinize Defendant's spring sites for compliance with the standard of identity, a point Nestlé concedes, *see* Def. Br. at 8–13. Thus, there is no basis for finding that the Court will unduly interfere with those other states' regulatory schemes by exercising its jurisdiction.

47

### 4. The *Bethphage* Factors Cannot Salvage Nestlé's Abstention Request.

The Second Circuit applies three "*Bethphage* factors" as an analytical tool for evaluating *Burford* cases.[26] But since Nestlé cannot establish any of the essential prerequisites to applying the *Burford* doctrine as discussed above, analyzing the three *Bethphage* factors does not save Nestlé's argument. Moreover, the *Bethphage* factors also disfavor abstention here.

The first factor concerning the "specificity" of the state scheme actually "focuses more on the extent to which the federal claim requires the federal court to *meddle* in a complex state scheme." *Hachamovitch*, 159 F.3d at 697 (emphasis in original). Maine's regulatory regime is not "complex," and the Court will not need to reach any unique issues involving state spring water permitting regimes, much less "meddle" in them.

The entire factual predicate of Nestlé's first factor argument—that Plaintiffs' claims are a "collateral attack" on the Maine Drinking Water Program's orders granting Nestlé's spring water permits—is flat wrong. Plaintiffs do not seek to enjoin or have this Court overturn a single state permit. The Complaint merely anticipates that Nestlé would try to use its permits defensively and recites factual evidence showing that Maine's permits cannot be relied upon given Maine's longstanding pecuniary interest in granting Nestlé's spring water permits and its other conflicts of interest. A "collateral attack," by definition, is an affirmative attempt to void a judgment or order in a proceeding other than a direct appeal. *See Faham v. Pallito*, No. 5:12-cv-212, 2013 WL

---

[26] "We have identified three factors to consider in connection with the determination of whether federal court review would work a disruption of a state's purpose to establish a coherent public policy on a matter involving substantial concern … : '(1) the degree of specificity of the state regulatory scheme; (2) the need to give one or another debatable construction to a state statute; and (3) whether the subject matter of the litigation is traditionally one of state concern.'" *Liberty Mut. Ins. Co.*, 585 F.3d at 650 (citation omitted).

1292687, at *4 (D. Vt. Jan. 15, 2013) (quoting Black's Law Dictionary 278 (8th ed. 2004). To constitute a collateral attack, the precise issue must have been litigated by a party to the prior judgment or order. *See Haerum v. Air Line Pilots Ass'n*, 892 F.2d 216, 219-20 (2d Cir. 1989) (federal lawsuit is not an impermissible collateral attack on a prior agency order if the same issue was not actually litigated by the parties in the agency proceeding).

Plaintiffs were not party to Nestlé's state permit proceedings, which in any event did not adjudicate whether Defendant's permits violated the false advertising, tort or contract laws recited in the Complaint. Nor do Plaintiffs "request an injunction barring the defendant[] from pursuing" any future spring water permits or "seek to overturn any" past permits Nestlé has been granted. *Tribune Co.*, 66 F.3d at 17. "[B]ecause further state proceedings would be necessary to invalidate the state agencies' [permits], . . . the district court's exercise of jurisdiction over the plaintiffs' damages claims would in no way 'interfere with [*i.e.*, "meddle in"] the proceedings or orders' of the" state agencies. *Id.* at 18 (citation omitted).

Simply put, despite Nestlé's effort to spin it otherwise, "this is not a permit case." *Adkins*, 644 F.3d at 504 n.10. Nestlé's cases are readily distinguishable. Five were "citizen's suits" under the Clean Air Act ("CCA") or Resource Conservation and Recovery Act ("RCRA), in which Congress authorized citizens to sue state agencies to "supplement," but not "supplant," the agencies' anti-pollution efforts. *See Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 60-61 (1987). The plaintiffs typically were parties to agency proceedings who sought improperly to enjoin agency orders, or permits they were prohibited by statute from challenging. *See Adkins*, 644 F.3d at 506 (citing 42 U.S.C. § 6972(b)(2)(D)).[27] Unlike the FDCA, the CCA and

---

[27] *See* notes 21-22, *supra* (discussing *Adkins*, *Ellis*, *Jamison*, *Palumbo* and *Friends of Sante Fe Cty.*). Nestlé's sixth cited case did not involve a permitting process at all. *See* notes 22, 24, *supra* (discussing *Barry*).

RCRA provide procedures for "special masters" and concentrated appellate review of agency decisions, but even in such cases the Seventh Circuit concluded that "the mere existence of a state regulatory regime . . . does not permit federal courts to abstain." *Id*. at 505.

The second *Bethpage* factor concerns whether the district court will have to engage in a "discretionary interpretation of state statutes." *Hachamovitch*, 159 F.3d at 697. Because each state has adopted the federal standard, Plaintiffs' claims here would not require the Court to interpret an unclear statute that is unique to any one state. This is not a situation, as in Nestlé's cases, where Congress articulated a standard and gave each state leeway to apply it pursuant to its own state-specific polices. *See Planned Parenthood*, 60 F.3d at 127 ("We foresee no 'conflicts in the interpretation of state law, dangerous to the success of state policies . . . .'") (citations omitted).

The final *Bethphage* factor "looks to whether the subject matter is of unique importance to the state." *Id*. Again, the proper application of the federal spring water standard is not of unique importance to Maine or to any other single state. Every state shares the same standard of identity for spring water, and that uniform standard should not be interpreted differently by states based on their own particular interests in "regulating their natural resources," as Nestlé argues. Def. Br. at 19. While that approach was proper in a few of the CCA and RCRA cases Nestlé cites, enabling different states to define "spring water" in light of their own policies would lead to a lack of uniformity, contravening Congress's express purpose. *See Cty. of Suffolk*, 907 F.2d at 1310 (resort to 50 state agencies "more likely to ensure non-uniformity").

"The *Bethpage* factors . . .  therefore do not favor abstention." *Hachamovitch*, 159 F.3d at 698. There is "no federal meddling in an undeniably complex area of state concern, merely the analysis of what [the standard of identity] demands. The federal courts are well-placed to undertake such analysis without undue intrusion upon the states' interests and prerogatives." *Id*.

### C.  The Court Cannot Abstain In Favor Of Conflicted Maine Regulators.

Even if Nestlé could satisfy the elements of *Burford* abstention, the Court still should not defer to Maine's regulators given the evidence that the State and its regulators may be conflicted by their pecuniary interests. A dismissal under an abstention doctrine "naturally presupposes the opportunity to raise and have [the issues] timely decided by a competent state tribunal." *Gibson v. Berryhill*, 411 U.S. 564, 577 (1973). A federal court cannot abstain in favor of a state agency that is potentially "biased" by "pecuniary interest [such] that it could not conduct hearings" consistent with due process, including where the agency's decision "would possibly redound to the personal benefit of members of the [agency]." *Id*. Even if their pecuniary interests are "indirect," *id*. at 579 (citation omitted), deferring to regulators with a "pecuniary interest in reaching a [particular] conclusion" violates due process, *Tumey v. Ohio*, 273 U.S. 510, 522-23 (1927).

The principle that federal courts should not defer to state or local officials who are potentially compromised by pecuniary interests has been recognized in the *Burford* abstention context. *See Heritage Farms, Inc. v. Solebury Township*, 671 F.2d 743, 748 (3d Cir. 1982) (*Burford* should not apply in favor of local officials who were alleged to be part of a conspiracy to injure plaintiff as a competitor); *M&M Stone Co. v. Pennsylvania*, Civ. Action No. 07-CV-04784, 2008 WL 4467176, at *36 (E.D. Pa. Sep. 29, 2008) ("*Burford* abstention does not apply" where a plaintiff alleges a conspiracy involving state agencies and officials with private actors).

The test under these cases is whether an "average" person in the regulator's position might succumb to the "possible temptation" to ignore proper legal standards to reach a revenue-generating result. *Ward v. Monroeville*, 409 U.S. 57, 57–58, 59–60 (1972) (mayor disqualified to adjudicate offenses where "major part of village income" derived from penalties imposed in mayor's court) (citation and internal quotation marks omitted) The State of Maine has over the

past 20 years received millions of dollars in licensing fees by selling Defendant groundwater drawn from wells on State-owned property for use in Poland Spring® "spring water" products and stands to gain millions more over the next 30 years. The State's direct and substantial pecuniary interest in granting Nestlé's spring water permits violates the principle that "under the Due Process Clause no judge 'can be . . . permitted to try cases where he has an interest in the outcome.'" *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).

The salaries of the Maine Drinking Water Program staff that reviews Nestlé's spring water applications have for the last 15 years been dependent on the state Water Commission on which Tom Brennan has been a prominent member. An "average" person in that position, pressured both by a need to please the Commissioner and by the State's desire to perpetuate its licensing income stream, might succumb to the "possible temptation" to ignore the proper legal standard of identity for spring water when considering Nestlé's applications. *Ward*, 409 U.S.at 60. The possibility that Maine's regulators, if they even had jurisdiction to hear Plaintiffs' claims, which they do not, could be motivated by conflicts of interest pecuniary interests to misapply the standard of identity to Poland Spring® water, makes *Burford* abstention all the more inappropriate in this case.

### III.  NESTLÉ DOES NOT QUALIFY FOR SAFE HARBOR PROTECTION

None of Nestlé's arguments for exemption from the nine states' consumer protection statutes hold water. Nestlé proffers its permits to bottle and sell spring water issued by agencies in those states as the sole reason that those states' laws should not apply to its conduct. Outside of Maine, however, these permits merely certify Nestlé to bottle and sell water within their states; most of them do not even mention spring water, let alone certify Poland Spring® as "100% natural spring water" under state law. The Court should reject Nestlé's arguments that its permits

constitute sufficient grounds to immunize it from consumer protection statutes meant to protect the public against the type of deceptive business practices that Plaintiffs allege here.

### A.  Nestlé's Conduct Does Not Fit Within Any "Safe Harbor."

**Maine.** Although Maine's Unfair Trade Practices Act ("Maine UTPA") and Uniform Deceptive Trade Practices Act ("Maine UDTPA") contain narrow exemptions, neither "permits" nor applies to Nestlé's fraudulent conduct in this case.

The Maine UTPA exempts "[t]ransactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under [federal or state] statutory authority." Me. Rev. Stat. Ann. tit. 5 § 208(1). In *Provencher v. T & M Mortg. Solutions, Inc.*, No. 08-31-P-H, 2008 WL 2447472 (D. Me. June 18, 2008), the court held that the defendants' failure to identify a statute or regulation that "specifically permitted" their actions was "determinative" that the exemption was unavailable to them. *Id.* at *7. Nestlé cannot point to a statute or regulation that permits it to falsely label spring water or make false representations to consumers,[28] and nothing about Maine's regulatory process transforms Nestlé's unlawful conduct into actions "permitted under laws." Thus, Nestlé enjoys no Maine UTPA exemption.

Defendants rarely successfully invoke the UTPA exemption. *See Good v. Altria Grp., Inc.*, 501 F.3d 29, 56, 58 (1st Cir. 2007) (exemption not applicable to Philip Morris's use of terms "light" and "Lowered Tar and Nicotine" in cigarette products even though Federal Trade Commission policy allowed—without expressly authorizing—some use of such terms; mere fact that a practice is regulated does not equate to its being permitted); *Campbell v. First Am. Title Ins. Co.*, 644 F. Supp. 2d 126, 133 (D. Me. 2009) (rejecting title insurer's argument that "comprehensive oversight" of its practices under Maine Insurance Code exempted it from Maine

---

[28] In fact, Maine law expressly bans that conduct. *See* Me. Rev. Stat. tit. 22, §§ 2155-A & 2157(7).

53

UTPA; "section 208(1) exempts only those transactions 'otherwise permitted, not otherwise regulated.'" *Id.* at 133 (quoting *Good*, 501 F.3d at 58)). Similarly, the Maine UDTPA "does not apply to . . . [c]onduct in compliance with the orders or rules of, or a statute administered by, a federal, state or local governmental agency." Me. Rev. Stat. Ann. tit. 10 § 1214(1). Citing Colorado's version of UDTPA, the Colorado Supreme Court noted the exemption's purpose "is to insure that a business is not subjected to a lawsuit under the Act when it does something required by law, or . . . which is allowed under other statutes or regulations." *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 56 (Colo. 2001) (citation omitted). The *Showpiece Homes* court observed that while "actions that are 'in compliance' with other laws" are exempt, "[c]onduct amounting to deceptive or unfair trade practices . . . would not appear to be 'in compliance' with other laws." *Id.* at 56. The court emphasized the "broad remedial purposes" of the consumer fraud statute and cautioned against unduly capacious interpretations of the exemption. *Id.*

Nestlé offers no support for its proposition that a state agency's mere grant of a permit confers immunization from that state's consumer fraud laws. Nestlé refers only to three Maine cases that are no longer good authority, as they addressed § 208(1) before it was amended in 2007 to make clear that regulated industries are not exempt from the Maine UTPA merely because they are regulated. *See* Bruce A. McGlauflin, *The Exception That Threatens to Swallow the Statute: The Statutory Exception to Maine's Unfair Trade Practice Act*, 21 Me. Bar J. 152 (2006). None of Nestlé's cases involved a purely voluntary false representation, which is what is at issue here.

**New Jersey.** The New Jersey Consumer Fraud Act ("NJCFA" or "CFA"), N.J. Stat. Ann. § 56:8-2, contains no express exemption for any regulated entities or activities, and while the New Jersey Supreme Court has recognized a possible exemption, the court has also emphasized its extremely narrow nature.

Nestlé's quote from *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 696 A.2d 546 (N.J. 1997), to prove the judicially created exemption is divorced from context. *See* Def. Br. at 58. *Lemelledo*— which held that the NJCFA applied to the practice of "loan packing," *see* 696 A.2d at 548–49— reaffirmed the "presumption that the CFA applies to covered practices, even in the face of other existing sources of regulation," which "preserves the Legislature's determination to effect a broad delegation of enforcement authority to combat consumer fraud." *Id.* at 554. While the strong presumption of the NJCFA's application can be overcome if there is "direct and unavoidable conflict . . . between application of the CFA and application of the other regulatory scheme," the court "stress[ed] that the conflict must be patent and sharp, and must not simply constitute a mere possibility of incompatibility. If the hurdle for rebutting the basic assumption of applicability of the CFA to covered conduct is too easily overcome, the statute's remedial measures may be rendered impotent as primary weapons in combatting clear forms of fraud simply because those fraudulent practices happen also to be covered by some other statute or regulation." *Id.* at 554. Ultimately, *Lemelledo* found no irreconcilable conflict between the CFA and myriad banking statutes that regulated loan packing, noting instead that the "agencies and courts with overlapping jurisdiction can coordinate the exercise of their regulatory and adjudicatory responsibilities." *Id.* at 555. *Lemelledo* demonstrates New Jersey's extreme reluctance to exempt entities from the NJCFA—a stance which is reinforced by the fact that the statute itself includes no exceptions.

New Jersey's bottled water regulations that Nestlé cites as purportedly conflicting with the NJCFA are hardly in "irreconcilable conflict" with it. The labeling regulation merely requires that bottled water labels conform to the standard of identity, N.J. Admin. Code § 8:21-5.5, and the certification regulation requires that "bottling plant and/or bulk water handling facilities . . . that sell or distribute bottled and/or bulk water in New Jersey shall apply to the Department [of Health]

annually for a bottled water certification." *See id.* § 8:21-5.15. These regulations do not conflict with the NJCFA, which bars deceptive sales or advertising of goods.[29]

The New Jersey licenses that Nestlé submits as evidence of preemption do not even mention spring water. *See* Mathew Decl. Ex. D, Dkt. 53-3 at 16–19. Those documents merely grant "bottled and bulk water certification" and are not evidence that Nestlé has complied with the FDA standard of identity for spring water.

**New York.** New York's General Business Law provides a "complete defense" for a deceptive act or practice that is "subject to and complies with the rules and regulations of" a federal agency, Gen. Bus. Law § 349(d), and for advertising that "is subject to and complies with the rules and regulations of . . . the Federal Trade Commission" or a New York state agency, *id.* § 350-d. These exceptions do not apply here because Nestlé has not complied with "the rules and regulations" of the FDA or any other agency.

---

[29] *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173 (3d Cir. 2000), where the Third Circuit affirmed dismissal of a claim that casino operators' Blackjack card-counting "shuffle-at-will" countermeasures violated the CFA because they were explicitly permitted by the Casino Control Act ("CCA"), is easily distinguished. In New Jersey, card-counting in the gaming industry, unlike permitting of bottled water, is "specifically, concretely, and pervasively" regulated, *id.* at 188, and the CCA "presupposes that the consumers as a group, i.e., the players, will lose their money, a contemplated result that hardly is the object of the Consumer Fraud Act," *id.* at 189. As recognized in *Smerling v. Harrah's Entertainment, Inc.*, 912 A.2d 168, 192 (N.J. App. Div. 2006), claims based on advertising that "raise only ordinary questions whether they contain false, deceptive or misleading statements" are not barred as typically "the agency has no special preemptive competence to judge the fairness of these ads"—"it is well within the conventional experience of courts to address consumer fraud issues." *Id.* at 192–93. Unlike in *Doug Grant*, Plaintiffs' claims here present no "'real possibility of conflict' in the application of the dual regulatory schemes of consumer fraud and [state water regulations]." 232 F.3d at 188.

Nestlé's citations to *Atl. Ambulance Corp. v. Cullum*, 166 A.3d 260 (N.J. App. Div. 2017), and *Manahawkin Convalescent v. O'Neill*, 43 A.3d 1197 (N.J. App. Div. 2012), are also off-mark as both dealt with application of the "learned professional" exception to the CFA, which has no bearing here.

In *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 178 F. Supp. 2d 198 (E.D.N.Y. 2001) (citation omitted), *rev'd on other grounds*, *Empire Healthchoice, Inc. v. Philip Morris USA, Inc.*, 393 F.3d 312 (2d Cir. 2004), the court stated:

> [O]nly . . . when a federal statute or regulation directly negates the scope of New York's General Business Law will it be preempted. In the case of federal regulatory programs designed to set a minimum standard there is in principle no difficulty in allowing tort liability to play a supplemental role in addressing those risks that remain after the minimum standards has been satisfied. No case holds that when deception is alleged, unrelated regulatory supervision immunizes.

*Id.* at 266. Likewise, New York's Appellate Division has ruled that "making deceptive statements cannot be considered compliance with federal rules regulations, and statutes, as required by General Business Law § 349(d)." *People v. Gen. Elec.*, 302 A.D.2d 314, 315 (1st Dep't 2003). Nestlé has failed to point to a federal law that "directly negates" the application of the General Business Law to its deceptive labeling and advertising practices.

Nestlé's New York licenses do not evidence an exemption. *See* Mathews Decl. Ex. E., Dkt. 53-3 at 21–24. These licenses are merely "Certificate[s] of Approval To Operate a Bottled Water Facility." While they list types of water sources as "Spring (Borehole)," "Well," "Spring," or "Municipal (Surface)" for each source from which Poland Spring Water is allegedly drawn, these licenses say nothing about Nestlé's compliance with spring water regulations or that the New York Department of Health has actually approved each source as the type that they are indicated to be. "The highly regulated nature of [an] industry" alone does not preclude claims under §§ 349–350. *Greenspan v. Allstate Ins. Co.*, 937 F. Supp. 288, 293 (S.D.N.Y. 1996).

**Connecticut.** The Connecticut Unfair Trade Practices Act ("CUTPA") exempts "[t]ransactions or actions otherwise permitted under law as administered by any regulatory board or officer acting under statutory authority of the state or of the United States." Conn. Gen. Stat. Ann. § 42-110c(a)(1). Connecticut courts have held that this exemption applies almost exclusively

to governmental defendants, not to private parties like Nestlé. *See City of Danbury v. Dana Inv. Corp./Lot No. GO8065*, 730 A.2d 1128, 1140 (Conn. 1999) (rejecting argument that City's foreclosing on municipal tax liens constituted a violation of CUTPA and ruling that City is exempt because "[t]he process by which the city assesses real estate is authorized and regulated expressly by a pervasive statutory scheme"); *Connelly v. Hous. Auth. of City of New Haven*, 567 A.2d 1212, 1216 (Conn. 1990) (exempting municipal housing agency from CUTPA because the agency is a "creature of statute" whose "actions . . . are expressly authorized and pervasively regulated by both the state department of housing and HUD" ).

Despite the fact that the banking industry is comprehensively regulated under federal law, that industry was found not to fall within CUTPA's exemption. *Normand Josef Enter.*, *Inc. v. Conn. Nat'l Bank*, 646 A.2d 1289, 1304–05 (Conn. 1994). "The mere existence of generic state and federal banking regulations does not exclude CUTPA coverage. CUTPA is applicable even when its regulatory scheme overlaps that authorized by another statute or regulation." *Id.* at 1305. Likewise, the mere fact that the bottled water industry is subject to federal and state regulation is insufficient to exempt Nestlé from CUTPA.

Connecticut's licenses merely certify that Nestlé is licensed as a Non-Alcoholic Beverage & Water Bottler. *See* Mathews Decl. Ex. F, Dkt. 53-3 at 26–29. The documents do not state that Poland Spring® water qualifies as spring water.

**Massachusetts.** Massachusetts's consumer protection statute exempts "transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under [federal or state] statutory authority." Mass. Gen. Laws ch. 93A, at § 3. To qualify, "a defendant must show more than the mere existence of a related or even overlapping regulatory scheme that covers the transaction. Rather, a defendant must show that such scheme affirmatively

permits the practice which is alleged to be unfair or deceptive.'" *Bierig v. Everett Square Plaza Assocs.*, 611 N.E.2d 720, 728 n.14 (Mass. App. Ct. 1993) (emphasis added).

The "burden of proving exemptions from the provisions" of Chapter 93A is "heavy." *Rini v. United Van Lines, Inc.*, 903 F. Supp. 224, 231 (D. Mass. 1995), *rev'd on other grounds*, 104 F.3d 502 (1st Cir. 1997). As such, in *Rini*, the court found that the exemption did not apply to a moving company, rejecting that company's argument that its conduct was "not only permitted but required by the rules and regulations of the [then-existing Interstate Commerce Commission]." *Id.* at 232. In *Aspinall v. Philip Morris, Inc.*, 902 N.E.2d 421 (Mass. 2009), the Court refused to apply the exemption to Philip Morris, rejecting its argument that its cigarette labeling was "condoned," "authorized," and "permitted" by the FTC. *See id.* at 424 (citing *Good*, 501 F.3d 29); *see also Fleming v. Nat'l Union Fire Ins. Co.*, 837 N.E.2d 1113, 1121 (Mass. 2005) (commenting that workers' compensation insurer, sued for allegedly deceptive method of computing wages, could not have met the "difficult" burden to qualify for the exemption).

Although Nestlé again points to its permits received from the Massachusetts Department of Public Health, Nestlé fails to cite a single case suggesting that the existence of a license is sufficient to meet the heavy burden of proof for those who seek exemption from Chapter 93A. And, in any event, the Massachusetts licenses state only that Nestlé can "[m]anufacture bottle water" with no mention of spring water. *See* Mathews Decl. Ex. G, Dkt. 53-4 at 2–9. Thus, unlike Nestlé's-cited *O'Hara v. Diageo-Guinness, USA, Inc.*, 306 F. Supp. 441 (D. Mass. 2018), where the Alcohol and Tobacco Tax and Trade Bureau approved allegedly deceptive beer labels, the Massachusetts licenses offer Nestlé no safe harbor from the fraud alleged in this case.[30]

---

[30] Nestlé's citation to *Cablevision of Boston, Inc. v. Public Improvement Commission of the City of Boston*, 38 F. Supp. 2d 46 (D. Mass. 1999), and other cases, Def. Br. at 62 n.93, are similarly

**Rhode Island.** Rhode Island's Deceptive Trade Practices Act ("RIDTPA") exempts "actions or transactions permitted under laws administered by . . . [a] regulatory body or officer acting under statutory authority of this state of the United States." R.I. Gen. Laws § 6-13.1-4.

Rhode Island courts employ a two-step test to determine the applicability of RIDTPA's exemption. First, the party claiming exemption must show "that the general activity in question is regulated by a 'regulatory body or officer.'" *State v. Piedmont Funding Corp.*, 382 A.2d 819, 822 (R.I. 1978). If so, the burden shifts to the opposing party to "show[] that the specific acts at issue are not covered by the exemption." *Id.* Applying this test, the Rhode Island Supreme Court has exempted activities that are regulated by a Rhode Island or federal agency, even though such activities were expressly prohibited by the law. *See id.* (sale of insurance and mutual funds); *Lynch v. Conley*, 853 A.2d 1212, 1215 (R.I. 2004) (sale of residential property without disclosing the existence of lead paint); *Chavers v. Fleet Bank (R.I.), N.A.*, 844 A.2d 666, 671 (R.I. 2004) (bank's practices regarding credit card solicitations); *Kelley v. Cowesett Hills Assocs.*, 768 A.2d 425, 432 (R.I. 2001) (landlord's removal of asbestos from tenant's apartment).

Still, Nestlé cannot avail itself of the exemption. Rhode Island's license is merely a "Bottlers' Permit" that allows Nestlé "to operate a Bottling Business." *See* Mathews Decl. Ex. H, Dkt. 53-4 at 11–14. It does not indicate that Rhode Island has approved Poland Spring Water as being in compliance with the state law definitions.

**Vermont.** The Vermont Consumer Fraud Act ("VCFA") declares unlawful all "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce." Vt. Stat. Ann. tit. 9, § 2453(a). "The Act provides 'a much broader right than common law fraud.'

---

off-point because in those cases government regulators explicitly approved the conduct that was claimed to be unlawful.

Thus, plaintiff need only show that there was a representation likely to mislead her, that she interpreted it reasonably under the circumstances and that the misleading nature of the representation was likely to affect her conduct or decision." *Winey v. William E. Dailey, Inc.*, 636 A.2d 744, 748 (Vt. 1993) (citation omitted). The VCFA has no express exemption for any regulated activities, and Nestlé concedes that VCFA has no "safe harbor." Def. Br. at 63.

Nestlé also admits that no judicially created exemptions exist, but it asks the Court to predict that the Supreme Court of Vermont would still rule in Nestlé's favor—without citing a single Vermont consumer protection case to support its position. *Id.* Nestlé asserts that the VCFA and Vermont bottled water laws are in "conflict," when, in fact, the VCFA reinforces the laws and regulations governing bottled water by providing means of private enforcement. This is not only consistent with the legislative intent behind the VCFA but also with the canon of statutory interpretation that statutes be read in harmony with one another wherever possible. *See Elkins v. Microsoft Corp.*, 817 A.2d 9, 13 (Vt. 2002) ("The Legislature clearly intended the VCFA to have as broad a reach as possible in order to best protect consumers against unfair trade practices.  This intent underlies a private remedy section that allows suits by 'any consumer . . . .'"); *Dig. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 879 (1994) ("[W]hen possible, courts should construe statutes . . . to foster harmony with other statutory and constitutional law.").

**New Hampshire.** The New Hampshire Consumer Protection Act ("NHCPA") was amended in 2002 to enumerate the industries that are exempt from it: "Trade or commerce that is subject to the jurisdiction of the bank commissioner, the director of securities regulation, the insurance commissioner, the public utilities commission, the financial institutions and insurance regulators of other states, or federal banking or securities regulators who possess the authority to regulate unfair or deceptive trade practices." N.H. Rev. Stat. § 358-A:3(I). Notably absent from

this list is trade or commerce subject to the jurisdiction of the New Hampshire Department of Health and Human Services ("NHDOH") or the FDA, as Nestlé concedes. Def. Br. at 64 n.98.

Given the exemption's unambiguous exclusion of entities subject to bottled water regulation, it does not apply to Nestlé. Although "not unlimited in scope," the NHCPA "is a comprehensive statute whose language indicates that it should be given broad sweep." *Hughes v. DiSalvo*, 729 A.2d 422, 424 (N.H. 1999). Even before the 2002 amendments, the NHCPA exemption did not apply to "[m]ere licensing requirements" but only to events "governed by a statutorily authorized regulatory regime that protects consumers from the same deception, fraud, and unfair trade practices as intended by" the NHCPA. *Averill v. Cox*, 761 A.2d 1083, 1088 (N.H. 2000) (citation omitted). The 2002 amendment to enumerate exempt industries was a conscious decision by the legislature to prevent more capacious readings of the exemption. This Court should not undo that legislative choice by broadening the exemption to other industries or by interpreting it even more broadly than it had been before 2002, as Nestlé asks the Court to do.[31]

In any event, New Hampshire's license only enables Nestlé to bottle beverages and has no bearing on the identity of the water. *See* Mathews Decl. Ex. J, Dkt. 53-4 at 27–30.

**Pennsylvania.** The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPL") prohibits "unfair and deceptive" trade practices. 73 Pa. Stat. § 201-3. The general purpose of this consumer protection law is to protect the public from fraud and unfair or deceptive business practices. *Neal v. Bavarian Motors, Inc.*, 882 A.2d 1022, 1029 (Pa. Super. Ct. 2005). The PUTPCPL "is to be construed liberally to effect its object of preventing unfair or deceptive practices." *Pekular v. Eich*, 513 A.2d 427, 432 (Pa. Super. Ct. 1986) (citation omitted).

---

[31] *Buchholz v. Waterville Estates Ass'n*, 934 A.2d 511 (N.H. 2007), does not support Nestlé. There the court found a condominium association's fee collections were explicitly allowed by the Condominium Act. No New Hampshire law explicitly allows the fraudulent conduct alleged here.

In advancing its safe harbor argument under Pennsylvania law, Nestlé fails to acknowledge that courts have held that "[i]n fact, no such defense exists in Pennsylvania." *Landau v. Virdian Energy PA LLC*, 223 F. Supp. 3d 401, 419 (E.D. Pa. 2016). In *Landau*, the court held that alleged regulatory compliance by electricity supply company did not bar consumer claims against it under PUTPCPL, and that defendant's "regulatory compliance" defense was "without precedential support." *Id.* at 420. Nestlé relies on *Fay v. Erie Ins. Grp.*, 723 A.2d 712 (Pa. Super. Ct. 1999), but there the court dismissed a PUTPCPL claim for failure to satisfy its elements, not because an exemption applied. *Id.* at 714-15. As explained in *Landau*, *Fay* did not establish a "safe harbor" (or "regulatory compliance") defense. *Fay*'s observation that "motor vehicle insurance is a matter that is heavily regulated by both statute and the Insurance Commissioner," and that the policy at issue "complied with the MVFRL and [the defendant] is entitled to charge premiums, the rates of which are approved by the Insurance Commissioner," *id.*, "was *dicta* justifying on public policy grounds a set of seemingly unfair results." 223 F. Supp. 3d at 420.[32]

---

[32] *Landau* similarly held that the PUTPCPL claim in *Grudkowski v. Foremost Ins. Co.*, 2013 WL 816666 (E.D. Pa. Mar. 5, 2013), was rejected "for reasons that were unrelated to the defendant's compliance with governing regulations." 223 F. Supp. 3d at 420. Nothing in the Third Circuit's affirmance of *Grudkowski*, 556 F. App'x 165, 169 (3d Cir. 2014), cited by Nestlé, Def. Br. at 66 n.105, is to the contrary.

Nestlé also cites *In re Insurance Stacking Litigation*, 754 A.2d 702 (Super. Ct. Pa. 2000). But in that case, consistent with *Landau*, the court made clear that its "decision in *Fay* did not hold that no judicial remedy existed. . . . We instead merely indicated that if the premiums charged by the insurers, as authorized by law, were unfair, then it was a matter for either the legislature or the Insurance Commissioner to resolve." *Id.* at 711.

While the out-of-state decision in *In re Anheuser-Busch Beer Labeling, Marketing and Sales Practices Litig.*, 2014 WL 12659447 (N.D. Ohio June 2, 2014), summarily cited *Fay* in *dicta* for the proposition that Pennsylvania has adopted the "safe harbor" doctrine, that *dicta* conflicts with the later decision in *Landau* and is rightly ignored.

Finally, Nestlé's Pennsylvania "Public Water Supply Permit" is "to sell bottled water in Pennsylvania" under certain brands and from certain sources. *See* Mathews Decl. Exs. A–B, Dkt. 164-2 at 4–9. It does not indicate that Pennsylvania has approved Poland Spring® as being in compliance with Pennsylvania state law definitions.

### B.  Maine's Compromised Regulatory Process Voids Any "Safe Harbor."

The fact that Maine's compromised regulators issued spring water licenses to Nestlé fortifies the conclusion that Nestlé is not entitled to an exemption from any state's consumer protection law. To grant Nestlé safe harbor as a matter of law when the regulators' conflicts are direct and substantial enough to give rise to due process concerns would not advance the state legislatures' purposes for enacting safe harbor provisions. Plaintiffs allege that the regulators' conflicts led to tangible deficiencies in the enforcement of spring water regulations against Nestlé. *See* Compl. ¶¶ 86–100, 796–808. These allegations make clear Nestlé's permits are presumptively unreliable because the regulators appear to have not properly performed their duties, which taints any permits and licenses issued in the other eight states. Under each state's rules, the bottled water regulators necessarily relied on the integrity of Maine's certifications because each state requires assurances from the regulator "having jurisdiction" that the bottler is selling what it claims to be selling. *See* 47 n.25, *supra*; Def. Br. at 8-13. Here, the regulator with "jurisdiction" is Maine's DWP, whose regulatory process was compromised. The other states' dependence on Maine's regulatory integrity precludes Nestlé's exemption under every state's law.

Consumer protection laws are read broadly to achieve their remedial purpose, and exemptions to them are strictly construed to limit defendants' capacity to get away with fraud. *See Lemelledo*, 696 A.2d at 554; *accord Blue Cross & Blue Shield of N.J.*, 178 F. Supp. 2d at 232–33; *Fleming*, 837 N.E.2d at 1121; *Elkins*, 817 A.2d at 13; *Showpiece Homes*, 38 P.3d at 56; *Hughes*,

729 A.2d at 424; *Normand Josef Enter.*, 646 A.2d at 1305; *Pekular*, 513 A.2d at 432. There should

be no "safe harbor" if the harbors were polluted by Nestlé's own conduct.

### IV. PLAINTIFFS ADEQUATELY PLEAD A COMMON LAW FRAUD CLAIM

#### A.  Defendant Improperly Raises New Defenses That The Court Should Not Countenance Under Rule 12(g)(2).

A party making a second Rule 12 motion generally must not raise "a defense or objection

that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2); *see*

*Sears Petroleum & Transp. Corp. v. Ice Ban Am. Inc.*, 217 F.R.D. 305, 307 (N.D.N.Y. 2003)

(defendant may not "advance arguments that [it] could have . . . made in the first motion to dismiss

but neglected to do so").[33] When a plaintiff amends a complaint, the "defendant may bring a second

motion under Rule 12 to object to the new allegations only." *Sears Petroleum*, 217 F.R.D at 307.[34]

Despite arguing that Plaintiffs' claims are "the same [as] pled in [Plaintiffs'] initial complaint,"

Def. Br. at 67, Nestlé improperly presents brand-new arguments against the common law fraud

and contract claims in the instant motion. These new arguments, which concern the sufficiency of

Plaintiffs' pleading of deception and the effect of Plaintiffs' acceptance of the goods on their

contract claim, could have been but were not raised in Defendant's previous motion. Under Rule

12(g)(2), the Court should disregard such improperly raised arguments. Even if the Court does not

---

[33] *See also Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 321 (3d Cir. 2015) (district court erred by allowing second pre-answer motion to dismiss that did not fall within a Rule 12(h) exception); *English v. Dyke*, 23 F.3d 1086, 1090 (6th Cir. 1994) (Defendant "cannot delay the filing of a responsive pleading by interposing these defenses and objections in piecemeal fashion but must present them simultaneously.") (citation omitted).

[34] An amended complaint "does not automatically revive all of the defenses and objections that a defendant" omitted in response to the initial complaint. *Gilmore v. Shearson/American Express, Inc.*, 811 F.2d 108, 112 (2d Cir. 1987), *overruled on other grounds by Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271 (1988). "For this reason, courts have refused to consider arguments that could have been made in an original motion to dismiss that were [newly] asserted in a motion to dismiss an amended complaint." *Falcon v. City Univ. of N.Y.*, No. 15-cv-3421 (ADS)(ARL), 2016 WL 3920223, at *14 (E.D.N.Y. July 15, 2016).

conclude that these new arguments evidence Nestlé's intent to delay or ambush, the Court should apply Rule 12(g)(2) to deter Nestlé and other defendants from the practice of "continually hamstring[ing] a plaintiff with wave after wave of motions to dismiss." *In re Packaged Seafood Prods. Antitrust Litig.*, 277 F. Supp. 3d 1167, 1174-75 (S.D. Cal. 2017).

### B.  Plaintiffs Adequately Plead Deception.

Nestlé's new argument that its state permits legally preclude finding the deception element of Plaintiffs' fraud claim parrots its failing safe harbor argument against Plaintiffs' consumer protection claims. *See* Def. Br. at 88. The argument fails because the state permits do not endorse, allow, or insulate from liability Nestlé's deceptive acts. The FDA does not rely on state permits to assume bottled water is properly labeled. *See* 7-8, *supra*. Nor should the Court.

To advance its erroneous argument, Nestlé relies on a series of cases that actually demonstrate why Nestlé's arguments fail. First, several of Nestlé's citations do not even involve common law fraud claims. *See Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d 1228, 1234 (S.D. Fla. 2007); *Adamson v. Ortho-McNeil Pharm., Inc.*, 463 F. Supp. 2d 496, 502 (D.N.J. 2006); *Buchholz*,  934 A.2d at 516 (no statutory consumer protection claim lies where allegedly deceptive fee collection procedures were "explicitly allowed by the Condominium Act"). And unlike in Nestlé's cases, no law applicable here explicitly allows Nestlé to engage in the deceptive acts alleged.[35]

---

[35] *Adamson* is also readily distinguished by the peculiar nature of Adamson's claim regarding the promotion of a generic drug as "therapeutically equivalent" to a brand-name version produced by the same manufacturer. 463 F. Supp. 2d at 502. Adamson did not claim that the drugs failed to meet the regulatory standards necessary to be deemed "therapeutically equivalent." Rather, Adamson's claim was based on a contention that the branded and generic versions were not simply therapeutically equivalent but <u>identical</u> in all respects but name because they were produced by the same manufacturer. *Id.* As a matter of law, however, the court held the term "therapeutically equivalent" was appropriately used to describe generic and branded versions of a drug made by same manufacturer. Thus, on Adamson's facts, the claim failed. Here, by contrast, Defendant presents a highly fact-laden argument seeking to counter the allegations made in Plaintiffs' complaint regarding the source water used in Poland Spring® bottled water.

*Prohias* and *DePriest v. AstraZeneca Pharm., L.P.*, 351 S.W.3d 168, 177 (Ark. 2009), for example, both turned on the fact that, under federal regulations, regulatory approval of a new drug product requires the FDA to <u>specifically determine</u> that the drug's label is not false or misleading. *See Prohias*, 490 F. Supp. 2d at 1235 (citing 21 C.F.R. § 314.125(b)(6)); *DePriest*, 351 S.W. 3d at 177 (same). Thus, the courts reasoned, in approving the drugs at issue for sale, the FDA necessarily determined that language on the drug labels was neither false nor misleading. Based on that requisite finding by the FDA, the courts held that advertising using FDA-approved language from the drug product labels was not false or misleading as a matter of law.

This Court cannot draw the same conclusion here as Nestlé again fails to identify a single case holding that simply by issuing a permit to sell a product a state agency collaterally estops consumers from suing a manufacturer for fraud and deceptive conduct. And, as Plaintiffs have alleged, no state has authorized Nestlé to sell "100% natural spring water" that Nestlé misrepresents to consumers comes from springs that don't exist or that otherwise does not qualify as spring water. *See, e.g.*, Compl. ¶¶ 298-310, 328, 440-43, 459. Indeed, in some states, identification of the type of water source is not part of the certification or approval process at all. *See, e.g.*, Conn. Gen. Stat. § 21a-150a(a)–(b) (requirement that bottlers' obtain approval from Department of Public Health as to water quality and safety or submit such approval from another state is separate from requirement that bottled water comply with the standards set forth in 21 C.F.R. 165.110)[36]; 216 R.I. Code R. 050-10-4 § 4.9 (not specifying any particular requirements

---

[36] Connecticut's application for license to sell bottled water does not require the applicant to identify the source type. *See* https://portal.ct.gov/-/media/DCP/pdf/applications_added_2013/NAB1101Modpdf.pdf?la=en and https://portal.ct.gov/-/media/DCP/pdf/forms/analysisrevisedpdf.pdf?la=en. In any event, the Connecticut approval process, as in other states, does not require the state agency to determine that a source type representation is not false or misleading. *See* Conn. Gen. Stat. §§ 21a-150–150j.

for permit approval other than compliance with drinking water quality standards). For instance, certification to sell bottled water under the Pennsylvania Drinking Water Program—the only Pennsylvania certification Nestlé points to—requires approval of sources by Pennsylvania or another state, but such approval does not require determining whether a groundwater source is "spring water." *See* 25 Pa. Code § 109.1005(e)(4), (e)(6).[37] Instead, the state law definition of "spring water" and associated regulations are provided under Pennsylvania's Food Safety Act, which is administered by the Department of Agriculture, not the Department of Environmental Protection's Drinking Water Program. *See* 3 Pa. Cons. Stat. Ann. §§ 5722 & 5733(f) (adopting all regulations adopted under Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, as regulations of the Commonwealth of Pennsylvania, "which shall remain in effect unless subsequently modified or superseded by regulations promulgated by the [Pennsylvania Department of Agriculture]").

In sum, despite Defendant's attempts to cloak its fact-laden argument in the garb of a legal one, serious questions of fact exist as to whether Nestlé acted deceptively. Taking Plaintiffs' factual allegations as true and in the light most favorable to Plaintiffs, Plaintiffs have more than adequately alleged deception.

---

[37]   The Penn. Dept. of Environmental Protection's public Drinking Water Reporting Website System, which provides source information for all active and inactive permitted bottled water providers including Defendant, does not differentiate between springs and other sources of groundwater.   *See*   http://www.drinkingwater.state.pa.us/dwrs/HTM/SelectionCriteria.html. Similarly, the Department's application packet and accompanying guidance do not make any mention   of   certification   of   the   source   type.   *See* http://www.depgreenport.state.pa.us/elibrary/GetDocument?docId=11625&DocName=PUBLIC %20WATER%20SUPPLY%20MODULE%2016B%20-%20OUT-OF-STATE%20BOTTLED%20WATER%20SYSTEMS.PDF%20%20%3Cspan%20style%3D%22c olor%3Ablue%3B%22%3E%3C%2Fspan%3E.

*Doug Grant, Inc. v. Greate Bay Casino Corp.*, 3 F. Supp. 2d 518 (D.N.J. 1998), similarly lends no support to Nestlé. *See* 56 n.29, *supra*. General advertising and sales-related frauds, much unlike harms related to casino gambling, are harms traditionally covered by the common law. *See, e.g.*, Restatement 2d of Torts, §§ 525, 550-52 (1979); *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 423 (S.D.N.Y. 2009) (certifying class action on claims including common law false advertising); *French v. Vining*, 102 Mass. 132, 136 (1869) ("The buyer has a right to suppose that the [food] which he buys . . . is what it appears to be, and such purchases are usually made with a reliance upon the supposed skill or actual knowledge of the [food] vendor."); *see also* 11-22, 30-33, *supra*. Further, unlike *Doug Grant*, the state drinking water and food safety statutes implicated in this case, together with their accompanying regulations, do not comprehensively define the rights and obligations of the parties here, if at all.

Additionally, none of the state laws evidences any intent to displace or modify the common law remedies traditionally available to purchasers defrauded by a food seller's misrepresentations in sales or advertising.[38] State legislatures know how to preclude common law remedies when they want to,[39] and they did not do so here. *See, e.g.*, *Koster*, 640 A.2d at 1228–29 (holding that

---

[38] *See Assured Guar. (UK) Ltd. v J.P. Morgan Inv. Mgt. Inc.*, 18 N.Y.3d 341, 350 (2011) ("It is well settled that 'when the common law gives a remedy, and another remedy is provided by statute, the latter is cumulative, unless made exclusive by the statute.' . . . 'a clear and specific legislative intent is required to override the common law' and . . . [it] must be 'unambiguous.'") (citations omitted); *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 983 A.2d 652, 660 (Pa. 2009) (a statute does not modify common law beyond what is strictly necessary to carry the statute into effect); *Ames v. Comm'r of Motor Vehicles*, 839 A.2d 1250, 1255 (Conn. 2004) ("We recognize only those alterations of the common law that are clearly expressed in the language of the statute because the traditional principles of justice upon which the common law is founded should be perpetuated." (citation omitted)); *Henderson v. Berce*, 50 A.2d 45, 49 (Me. 1946) ("A new statute will not be considered as intending a reversal of the long-established principles of law and equity unless such intention unmistakably appears." (citation and alteration omitted)).

[39] *See, e.g.*, Conn. Gen. Stat. § 19a-341 (precluding nuisance claims for alleged objectionable noise from wells if certain conditions are met).

violation of New Jersey's Food and Drug Act imposes civil liability despite Act's silence on civil liability and private right of action).[40]

## V.   PLAINTIFFS ADEQUATELY PLEAD A BREACH OF CONTRACT CLAIM

The Court in the May 17 Order declined to consider Nestlé's "highly fact-laden arguments that state regulators have authorized its actions in a manner that precludes plaintiffs' breach of contract claim." Dkt. 141 at 20 n.13. In addition to re-airing its fact-laden state-authorization argument, which is inappropriate for resolution on a motion to dismiss, Nestlé now presents two new baseless arguments the Court should similarly reject.

First, Plaintiffs' reference to the "common law" of contracts rather than the UCC's sale of goods provision is not a basis for dismissal. "Rule 8's 'liberal pleading principles' do not permit dismissal for 'failure in a complaint to cite a statute, or to cite the correct one. Factual allegations alone are what matters.'" *Wynder v. McMahon*, 360 F.3d 73, 77 (2d Cir. 2004) (quoting *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46 (2d Cir. 1997)) (ellipsis omitted). Plaintiffs clearly allege the necessary elements of their breach of contract claim. Plaintiffs can readily amend the complaint to delete "common law" or to reallege "other applicable state law" (the language used in the original complaint) if the Court so orders. The presence or absence of such magic words,

---

[40] Defendant's cursory footnoted argument that Plaintiffs' have not sufficiently complied with Rule 9(b) to provide Defendant with notice of Plaintiffs' fraud claim should be ignored. Def. Br. at 67 n.106. Plaintiffs adequately allege the <u>what</u> (false "100% Natural Spring Water" labels), <u>who</u> (Nestlé), <u>where</u> (on the labels and the eight Maine well sites), and <u>when</u> (2003 to present) of their fraud claim. *See, e.g.*, Compl. ¶¶ 7-9, 13-15, 62-69, 101-07, 335-49, 425, 457-58, 464-76, 481-84, 553-558, 602, 640, 683, 740-41, 836-46. Plaintiffs also specifically explain the many ways <u>how</u> Poland Spring® labels were misleading. *See id.*; *see also id.* ¶¶ 323, 448, 535, 590, 654, 708, 753, 795. These alleged facts are more than sufficient. *See Greene v. Gerber Prods. Co.*, 262 F. Supp. 3d 38, 66 (E.D.N.Y. 2017); *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 333 (D. Conn. 2004) (collecting cases), *overruled on other grounds by United States v. Baylor Univ. Med. Ctr.*, 469 F.3d 263 (2d Cir. 2006).

however, is no basis for dismissal of this claim, particularly where, as here, the defendant clearly has notice of the nature of the claim.

Plaintiffs also adequately allege that they did not receive the benefits of their bargain. Plaintiffs contracted with Nestlé for delivery of "100% Natural Spring Water." Compl. ¶ 904. Defendant's promise to deliver "100% Natural Spring Water" was a material term of the parties' contracts that Nestlé breached because it did not at any time deliver genuine spring water. *Id.* ¶¶ 906-07. These allegations sufficiently allege breach of contract.

Defendant's state permits do not preclude Plaintiffs' contract claim because the permitting statutes do not evince any legislative intent to do so. *See* 69 n.38, *supra*. The Maine Supreme Court's decision in *Henderson* is particularly instructive. *Henderson* held that the State Department of Agriculture's inspection and certification of seeds as to their variety did not bar a buyer's common law claims. 50 A.2d at 48-49. The court based its decision on the language and history of the certification statute, which authorized the State Department of Agriculture to inspect and issue labels designating the certified variety of the seeds, the Department's inspection date and inspector, and the state seal. *Id.* at 47-48. Further, one of the objectives of the statute was to protect the purchasers of certified seed, but the statute did not provide any remedy for the buyer if the seeds were not as represented by the certificate or tag. *Id.* at 48. Legislative intent to reverse the longstanding common law principles underlying the plaintiff's contract claim, however, was not clearly evident. The Maine Supreme Judicial Court therefore concluded that

> the certificate provides prima facie evidence that the goods sold were certified seed[s] of the variety described on the tag or certificate within the varietal tolerance allowed, and grown according to the regulations of the commissioner of agriculture. The inspection, issuance and affixing of the certificate to the container are official acts. The law raises the presumption that the public officers have acted with fidelity and properly discharged their duties, but this presumption, like the presumption of innocence, is undoubtedly a legal presumption, and <u>it does not supply proof of independent and substantive facts, and when met by competent evidence it is</u>

<u>destroyed</u>. Such presumption in the present case is rebutted by the admitted substantive facts which destroy the probative value of the certificate.

*Id.* (emphasis added).

As in *Henderson*, Plaintiffs' fact allegations here are more than sufficient to rebut any facts that the state certificates might presumptively represent. The presumption here, if any applies, is considerably weaker than in *Henderson* because no states have independently inspected or verified the claims Nestlé has made in its submissions to Maine's compromised regulators, and unlike the seed-seller in *Henderson*, Nestlé engaged in pervasive fraud and deceit. *Cf. id.* at 47, 49.

Plaintiffs' acceptance of Poland Spring® products also does not preclude their breach of contract claim. Defendant overlooks a fundamental tenet of contract law: following delivery of an allegedly nonconforming good, buyers have the option to "(1) reject the non-conforming goods; (2) accept the goods and later revoke acceptance; [or] (3) <u>accept the goods and sue for damages resulting from the non-conformity</u>." *Ask Techs., Inc. v. Cablescope, Inc* No. 01 Civ. 1838(RLC), 2003 WL 22400201, at *3 (S.D.N.Y. Oct. 20, 2003) (emphasis added) (citing *Cliffstar Corp. v. Elmar Indus., Inc*, 254 A.D.2d 723, 724 (N.Y. App. Div. 1998)); *see also*, *e.g.*, N.J.S.A. 12A:2-714(1) (buyers may sue for breach of contract and recover for damages for any nonconformity in the goods, despite acceptance); N.Y. U.C.C. Law § 2-714(1) (same); Conn. Gen. Stat. § 42a-2-714(1) (same). The law of contracts in the nine states allows a buyer who accepted nonconforming goods to bring a breach of contract claim to recover "damages in any manner which is reasonable." *Happy Dack Trading Co. v. Agro-Industries, Inc.*, 602 F. Supp. 986, 993-94 (S.D.N.Y. 1984).

Plaintiffs have alleged that Poland Spring® water did not conform with the specifications Defendant provided, namely that the water was genuine "spring water" as defined under state law. Compl. ¶¶ 851-52. This nonconformity is enough for Plaintiffs to recover damages in the amount

of the premiums Plaintiffs paid "for 'spring water' that would not have been charged or paid had the products been properly labeled." *Id.* ¶ 852.

## VI. THE PRIMARY JURISDICTION DOCTRINE DOES NOT APPLY HERE

Nestlé's last-ditch attempt to have this action dismissed under the primary jurisdiction doctrine is ineffective. The doctrine of primary jurisdiction seeks to "promot[e] proper relationships between the courts and administrative agencies charged with particular regulatory duties," and it applies when "enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Ellis v. Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006)(citations omitted). Courts determine the doctrine's applicability on a case-by-case basis, guided its "relatively narrow scope," which calls for it to be invoked "only when a lawsuit raises an issue, frequently the validity of a commercial rate or practice, committed by Congress in the first instance to an agency's determination, 'particularly when the issue involves technical questions of fact uniquely within the expertise and experience of an agency.'" *Goya Foods, Inc. v. Tropicana Prods., Inc.*, 846 F.2d 848, 851 (2d Cir. 1988) (quoting *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 304 (1976)).

In *Langan*, this Court rejected an argument that the doctrine of primary jurisdiction necessitated dismissal of an action concerning representations that sunscreen and baby wash products were "natural." *Langan v. Johnson & Johnson Consumer Cos.*, 95 F. Supp. 3d 284, 292 (D. Conn. 2015). Although "the FDA has special competence to determine" whether ingredients are "natural" and has the authority to regulate use of the word, the dispute ultimately involved whether using the word on the products at issue conveyed a deceptive message. Adjudicating the misleading nature of labeling "is not a technical area in which the FDA has greater expertise than the courts." *Id.* (citation omitted).

So too here. While Nestlé labors to emphasize the scientific aspects of Plaintiffs' Complaint, *see* Def. Br. at 70 & 72–73, this dispute primarily concerns Nestlé deceptively representing Poland Spring® as "100% natural spring water" and selling it to consumers at a premium over alternative non-spring water products. Plaintiffs do not ask the Court to promulgate new regulations or otherwise make policy decisions regarding spring water identity. Rather, Plaintiffs will ask the jury simply to determine whether Nestlé's representations about its Poland Spring® water are deceptive. Such a determination does not entail sufficient technical expertise to trigger the application of the primary jurisdiction doctrine.

The cases on which Nestlé relies involve materially different circumstances and fail to further its argument that invoking the primary jurisdiction doctrine is appropriate here. Nestlé primarily relies on two yogurt labeling cases—*Hood v. Wholesoy & Co.*, No. 12–cv–5550–YGR, 2013 WL 3553979 (N.D. Cal. July 12, 2013), and *Taradejna v. General Mills*, 909 F. Supp. 2d 1128 (D. Minn. 2012). In *Hood*, the court concluded that the allegedly misleading terms at issue ("evaporated cane juice" and "yogurt") involved a lack of "uniform enforcement standard" and no "clear guidance for food producers or the Court." *Hood*¸ 2013 WL 3553979, at *5–6. Similarly, in *Taradejna*, the court found the key issue underlying the dispute—"whether MPC is a proper, permitted ingredient in yogurt"—was not clearly determinable under the FDA's existing guidance, which the court concluded did not "constitute a model of clarity." 909 F. Supp. 2d at 1134. The court further found it important that the FDA had issued a proposed revision to the standard of identity for yogurt and that it would be imprudent for the court to opine on the issues while the revision was pending. *Id*. at 1135. None of the special circumstances in *Hood* and *Taradejna* exist here. The FDA identity standard adopted by the states is not unsettled, and Nestlé does not contend otherwise. There are no pending revisions to it. Nestlé's argument boils down its contention that

74

"[t]he core questions in this case are technical and scientific in nature," Def. Br. at 72, but Nestlé points to no authority that divests this Court of ability to decide technical and scientific issues where such technical and scientific standards are well-settled.

This case does not require the Court to weigh in on the reasonableness of the FDA's standard of identity for spring water or on any other regulation. It simply asks the Court to apply state law definitions mirroring that standard of identity to Poland Spring® and determine whether that water meets the standard. The doctrine of primary jurisdiction has no place in this case. This Court has ample experience and expertise to adjudicate all of Plaintiffs' claims.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss the Amended Complaint should be denied in its entirety.

Dated:  September 14, 2018

Respectfully submitted,

*s/ Alexander H. Schmidt*
Alexander H. Schmidt (admitted *pro hac vice*)
ALEXANDER H. SCHMIDT, ESQ.
Fairways Professional Plaza
5 Professional Circle, Suite 204
Tel:  (732) 226-0004
Fax:  (732) 845-9087
alex@alexschmidt.law

Steven N. Williams (admitted *pro hac vice*)
V Prentice (admitted *pro hac vice*)
JOSEPH SAVERI LAW FIRM
601 California Street, Suite 1000
San Francisco, CA 94108
Tel:  (415) 500-6800
Fax: (415) 395-9940
swilliams@saverilawfirm.com
vprentice@saverilawfirm.com

Steven G. Sklaver (admitted *pro hac vice*)
Oleg Elkhunovich (admitted *pro hac vice*)
Amanda Bonn (admitted *pro hac vice*)
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Tel:  (310) 789-3100
Fax:  (310) 789-3150
ssklaver@susmangodfrey.com
oelkhunovich@susmangodfrey.com
abonn@susmangodfrey.com

*Plaintiffs' Interim Co-Lead Counsel*

Craig A. Raabe (ct04116)
Robert A. Izard (ct01601)
Mark P. Kindall (ct13797)
Christopher M. Barrett (ct30151)
IZARD, KINDALL & RAABE, LLP
29 S. Main St., Suite 305
West Hartford, CT 06107
Tel:  (860) 493-6292
Fax: (860) 493-6290
craabe@ikrlaw.com
rizard@ikrlaw.com
mkindall@ikrlaw.co
cbarrett@ikrlaw.com

*Plaintiffs' Interim Liaison Counsel*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 14th day of September, 2018, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

_s/ Alexander H. Schmidt_
Alexander H. Schmidt
