# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARK J. PATANE *et al.*,<br>      *Plaintiffs*,<br><br>    v.<br><br>NESTLÉ WATERS NORTH AMERICA,<br>INC.,<br>      *Defendant*. | No. 3:17-cv-01381 (JAM) |

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANT'S MOTION TO DISMISS

Plaintiffs have filed this class action lawsuit alleging that defendant Nestlé Waters North America, Inc. fraudulently markets its Poland Spring water products as "spring water" when in fact it is not "spring water" as defined by law. Last year I dismissed the initial complaint without prejudice on the ground that its state law causes of action were all preempted by the federal Food, Drug, and Cosmetic Act (FDCA). *See Patane v. Nestlé Waters N. Am., Inc.*, 314 F. Supp. 3d 375 (D. Conn. 2018).

Plaintiffs have now re-framed their claims and filed an amended complaint that seeks class action relief for consumers under the laws of nine different States. Nestlé in turn has moved to dismiss the amended complaint on multiple grounds.

I will grant in part and deny in part Nestlé's motion to dismiss. First, I decline to abstain on grounds of *Burford* abstention or under the doctrine of primary jurisdiction. Second, I conclude that plaintiffs' state law claims are not preempted except for their Vermont law claims. Third, I decline to rule at this time on Nestlé's "safe harbor" defense against the statutory claims because the record is not yet sufficient to determine the facts necessary to resolve this claim. Lastly, I decline on similar grounds to dismiss the common law fraud and contract claims.

The amended complaint (Doc. #160) alleges state law claims on behalf of consumers in Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, and Vermont. It alleges common law causes of action for fraud and for breach of contract as well as statutory causes of action for consumer fraud and unfair trade practices.[1] It seeks damages for alleged misconduct dating back to 2003 as well as prospective injunctive relief.

All of plaintiffs' claims are based on a core of allegations that Nestlé has fraudulently labeled its Poland Spring water products as "100% Natural Spring Water" while knowing that the product is not "spring water" as that term is defined by law. Doc. #160 at 39 (¶ 101). According to plaintiffs, the multiple sites in Maine where Nestlé obtains Poland Spring water and that are identified by name on Poland Spring labels are not natural springs. *Ibid.* (¶ 102).[2] Plaintiffs allege that Nestlé has unlawfully profited from its misleading marketing of Poland Spring water because consumers are willing to pay a premium price for "spring water" over other forms of bottled water.

---

[1] The state consumer statutes alleged to be violated include: Connecticut Unfair Trade Practices Act, CONN. GEN. STAT. ANN. §§ 42-110a–42-110q; Maine Unfair Trade Practices Act, ME. STAT. tit. 5, §§ 205-a-214; Maine Uniform Deceptive Trade Practices Act, ME. STAT. tit. 10 §§ 1211-1216; Massachusetts Consumer Protection Act, MASS. GEN. LAWS ch. 93A, §§ 1-11; New Hampshire Consumer Protection Act, N.H. REV. STAT. ANN. §§ 358-a:1–358-a:13; New Jersey Consumer Fraud Act, N.J. STAT. ANN. §§ 56:8-1, *et seq.*; New York General Business Law § 349, N.Y. GEN. BUS. LAW § 349; New York General Business Law § 350, N.Y. GEN. BUS. LAW § 350; Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.A. STAT. §201-2, 201-3; Rhode Island Unfair Trade Practices and Consumer Protection Act, R.I. GEN. LAWS §§ 6-13.1-1–16-13.1-29; and Vermont Consumer Fraud Act, VT. STAT. ANN. tit. 9, § 2451, *et seq.*

[2] The amended complaint also alleges that Poland Spring labels "have misleadingly depicted a pristine mountain or forest spring to imply that a pure spring is the source of the water in the bottle." Doc. #160 at 39 (¶ 103). Because the parties' briefing does not meaningfully address any distinction to be drawn between the words that appear on the Poland Spring label and the imagery, I will assume for present purposes that this additional allegation is a subset of plaintiffs' broader allegation that the labeling is misleading because it misrepresents Poland Spring water to be "spring water" as defined by law.

As I discussed at length in my prior ruling granting Nestlé's motion to dismiss, the FDCA establishes basic definitions (known as "standards of identity") for food products and prohibits the false labeling of such food products. The U.S. Food and Drug Administration (FDA) has promulgated a detailed regulatory definition of "spring water" that distinguishes it from other kinds of bottled water that may be marketed for public sale. *See* 21 C.F.R. § 165.110(a)(2)(vi).

According to the FDA's regulation, if a water product is to be labeled and sold as "spring water," the water must be "derived from an underground formation from which water flows naturally to the surface of the earth," and there must be a "natural force causing the water to flow to the surface through a natural orifice." *Ibid.* The FDA's regulation further provides that "spring water" can be "collected only at the spring or through a bore hole tapping the underground formation feeding the spring," and that if it is collected "with the use of an external force," the water must be "from the same underground stratum as the spring, as shown by a measurable hydraulic connection using a hydrogeologically valid method between the bore hole and the natural spring, and shall have all the physical properties, before treatment, and be of the same composition and quality, as the water that flows naturally to the surface of the earth." *Ibid.*

Following the filing of the amended complaint, Nestlé has again moved to dismiss on multiple grounds pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## DISCUSSION

The standard that governs motions to dismiss under Rule 12(b)(1) and Rule 12(b)(6) is well established. A complaint may not survive unless it alleges facts that, taken as true, give rise to plausible grounds to sustain the Court's subject matter jurisdiction and to sustain plaintiffs' claims for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Kim v. Kimm*, 884 F.3d

98, 103 (2d Cir. 2018); *Lapaglia v. Transamerica Cas. Ins. Co.*, 155 F. Supp. 3d 153, 155-56 (D. Conn. 2016).

### *Burford abstention*

Nestlé argues that the Court should dismiss this action pursuant to the doctrine known as *Burford* abstention. *See Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). *Burford* abstention applies "only in extraordinary circumstances" and where a case "presents difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar, or if its adjudication in a federal forum would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 726-27 (1996) (cleaned up); *see also Liberty Mut. Ins. Co. v. Hurlbut*, 585 F.3d 639, 650 (2d Cir. 2009) (discussing factors for courts to consider when deciding whether to invoke *Burford* abstention, including "(1) the degree of specificity of the state regulatory scheme; (2) the need to give one or another debatable construction to a state statute; and (3) whether the subject matter of the litigation is traditionally one of state concern").

This is not the type of extraordinary case for which *Burford* abstention is warranted. To begin with, *Burford* abstention is most appropriate when a plaintiff seeks injunctive or prospective relief that would interfere with the ongoing authority of the state to apply and enforce its laws. *See Tribune Co. v. Abiola*, 66 F.3d 12, 13, 17 (2d Cir. 1995) ("[W]e hold that it is generally appropriate for a district court to abstain on *Burford* grounds only when asked to provide equitable relief," and "the plaintiffs in this case have brought garden-variety claims for money damages . . . that present no danger of interfering with any proceeding or order of the New York State Workers' Compensation Board"). Although it is true that plaintiffs here seek

injunctive relief, the bulk of this action is for money damages from many years of past alleged violations of their rights.

So far as I can tell from the present record, even though plaintiffs challenge the integrity of prior regulatory actions in Maine (Doc. #160 at 273-76 (¶¶ 796-808)), the litigation of plaintiffs' claim for money damages poses no danger of interfering with any *ongoing* regulatory functions of the State of Maine or any of the other States at issue in this case. If such concerns arise in the future, I would be prepared to consider whether appropriate action should be taken on the basis of a substantiated record.

Nor does this case present difficult questions of state law where adjudication in a federal forum would disrupt state efforts to establish a coherent policy with respect to a matter of substantial public concern. For the most part, the state laws at issue merely incorporate the federal "spring water" standard in order to avoid being subject to preemption. "Congress and the FDA appear to have made a conscious choice to allow the several states to regulate bottled water so long as the state standards employed are identical to those adopted by the FDA. The requirement of identity promotes uniformity in that courts in every state look to the same standard." *Vt. Pure Holdings, Ltd. v. Nestlé Waters N. Am., Inc.*, 2006 WL 839486, at *7 (D. Mass. 2006).

Accordingly, I decline to dismiss or stay this case on *Burford* abstention grounds. This ruling is without prejudice to renewal of Nestlé's motion in the event that plaintiffs seek to effectuate any judgment for injunctive relief or to otherwise take action that would obstruct or impede any state authority's ongoing administration of the law.

*Primary jurisdiction*

Nestlé argues that "the Court should dismiss this action in deference to the primary jurisdiction of the FDA to exercise its expertise and authority to determine in the first instance whether Poland Spring Water meets the FDA Identity Standard." Doc. #164 at 3. The doctrine of primary jurisdiction seeks to "promot[e] proper relationships between the courts and administrative agencies charged with particular regulatory duties," and it applies when "enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Ellis v. Tribune Television Co*., 443 F.3d 71, 81 (2d Cir. 2006) (internal citations and quotations omitted). While there is "[n]o fixed formula" for deciding when to invoke the doctrine, courts generally examine whether the case involves "technical or policy considerations within the agency's particular field of expertise," and "whether the question at issue is particularly within the agency's discretion," among other factors. *Id.* at 82-83 (internal citations omitted).

The Second Circuit has cautioned that the primary jurisdiction doctrine has a "relatively narrow scope," and does not apply when the claim involves matters within the "traditional realm of judicial competence." *Goya Foods, Inc. v. Tropicana Prods., Inc.*, 846 F.2d 848, 851 (2d Cir. 1988). When the primary jurisdiction doctrine does apply, a court will either stay the case or dismiss it without prejudice. *See Johnson v. Nyack Hosp.*, 86 F.3d 8, 11 (2d Cir. 1996).

According to a letter from the FDA that Nestlé has previously submitted as part of the record, the "FDA does not provide approval for the use of the term 'spring water' for bottled water," and "recognize[s] that some states have certification programs that evaluate whether bottled water may be designated as 'spring water' under state regulations that incorporate FDA's requirements under 21 C.F.R. § 165.110." Doc. #53-3 at 5-6. This letter suggests that the FDA

leaves it to the States to decide if particular water products meet the federal "spring water" standard. Although Nestlé now urges me to allow the FDA to determine whether Poland Spring Water meets the federal standard, Doc. #164 at 3, the letter from the FDA that Nestlé has submitted raises significant doubt in my mind about whether the FDA stands ready and willing to make some kind of case-specific determination that might advance the litigation here. It does not appear that Nestlé has yet invited a team of expert FDA investigators to come inspect its properties and issue a ruling on whether all of its sites comply with federal "spring water" requirements.

Moreover, the federal definition of "spring water" is now well established, and Nestlé does not suggest that this definition is under active federal review. This is not a case where there are reasons to conclude that the FDA is in the throes of rulemaking or poised anytime soon to refine definitional aspects of its "spring water" rule. *Compare In re KIND LLC "Healthy & All Nat." Litig.*, 209 F. Supp. 3d 689, 697 (S.D.N.Y. 2016) (staying case in light of FDA announcement of ongoing rulemaking regarding the use of the term "natural" on food labels), *with In re KIND LLC "Healthy & All Nat." Litig.*, 2019 WL 542834, at *4 (S.D.N.Y. 2019) (lifting same stay in light of years-long delay by FDA action to promulgate rule).

Accordingly, I decline to dismiss or stay this case on primary jurisdiction grounds. Nestlé has not shown adequate reason to believe that any kind of referral to the FDA would advance this litigation and do so without occasioning needless delay.

### *Preemption*

Nestlé argues that plaintiffs' newly alleged causes of action are all preempted by federal law. In my ruling on Nestlé's prior motion to dismiss, I explained at length the governing preemption principles for state law claims that allege fraudulent or wrongful labeling of products

for which the FDCA defines an "identity standard." I explained how a court must conduct a dual evaluation of any state law claim to determine if it is *either* expressly preempted under 21 U.S.C. § 343-1(a)(1) by reason of its departing from the federal law standard, *or* impliedly preempted under 21 U.S.C. § 337(a) by reason of it effectively amounting to a cause of action based on no more than a violation of federal law. *See Patane*, 314 F. Supp. 3d at 384-86. "The upshot," as I concluded, "is that only a narrow range of state law claims involving mislabeling of 'spring water' may escape preemption by the FDCA. In order to survive preemption, a state law claim must rely on an independent state law duty that parallels or mirrors the FDCA's requirement for 'spring water,' but must not solely and exclusively rely on violations of the FDCA's own requirements." *Id.* at 386.

In other words, a court must first determine if the state law standard that is relied on by a plaintiff *mirrors* the federal law identity standard. Then a court must determine if the state law standard is indeed an *independent legal standard*, even if the State has chosen simply to mirror or track the standard already set forth by the FDCA.

As I explained, "[i]t is one thing for a State . . . to outright adopt an FDCA standard and then for a plaintiff to sue under state law for the violation of that standard. But it is wholly another thing for a State *not* to adopt or mirror an FDCA standard and then for a plaintiff to sue under a generic state law claim (such as for fraud, breach of contract, or unfair trade practices) that would not be actionable absent a violation of the FDCA standard." *Id.* at 386-87. Thus, "a plaintiff may not simply dress up a generic state law claim of wrongful conduct to prosecute conduct that is 'wrong' only because it happens to violate the federal law requirements of the FDCA." *Id.* at 386.

In light of this framework, I dismissed plaintiffs' claims, concluding in light of how they were specifically alleged in the complaint that they did not rest on any independent state law standard but solely and exclusively on federal law. *Id.* at 387-88. On the other hand, I explained how certain types of state law claims are not preempted if they are based on an independent state law duty, even if the State has chosen merely to incorporate or otherwise track a federal law standard. Thus, for example, a claim that arises under California's food-and-drug statute that expressly incorporated FDCA standards was not preempted, because it "mirrored in substance the FDCA's requirements," while also being based on "an independent state law duty, such that it could not be said that the claim was merely an attempt to enforce the FDCA." *Id.* at 386 (citing *In re Farm Raised Salmon Cases*, 175 P.3d 1170, 1175-1184 (Cal. 2008) and *In re Trader Joe's Tuna Litig.*, 289 F. Supp. 3d 1074, 1082-85 (C.D. Cal. 2017)).

That brings me now to Nestlé's renewed motion to dismiss on preemption grounds. In contrast to the prior version of the complaint, the amended complaint now alleges specific state law provisions from each of nine States that plaintiffs contend are the independent state law standards that give rise to each of their statutory causes of action for unfair trade practices.

Before I review the laws of each one of these States, it is important to clarify to what degree any state standard must mirror or be identical to the federal standard. As defined by the FDA, the statutory phrase "not identical" contemplates differences in *meaning* as opposed to differences in words.

> "Not identical to" does not refer to the specific words in the requirement but instead means that the State requirement *directly or indirectly imposes obligations* or contains provisions concerning the composition or labeling of food, or concerning a food container, that:
>
> (i) *Are not imposed by* or contained in the applicable provision (including any implementing regulation) of section 401 or 403 of the act; or

(ii) *Differ from those specifically imposed by* or contained in the applicable provision (including any implementing regulation) of section 401 or 403 of the act.

21 C.F.R. § 100.1(c)(4)(i)-(ii) (emphasis added); *In re PepsiCo, Inc., Bottled Water Mktg. & Sales Practices Litig.*, 588 F. Supp. 2d 527, 532 (S.D.N.Y. 2008). To similar effect, the Supreme Court has made clear that "[i]n undertaking a pre-emption analysis at the pleadings stage of a case, a court should bear in mind the concept of equivalence," and that "[t]o survive pre-emption, the state-law requirement need not be phrased in the *identical* language as its corresponding [federal] requirement," and "[i]f a case proceeds to trial, the court's jury instructions must ensure that nominally equivalent labeling requirements are *genuinely* equivalent." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 454 (2005).

The laws in five of the States that are named in the complaint—Massachusetts, New Hampshire, New Jersey, Pennsylvania, and Rhode Island—expressly incorporate the federal standard without material changes in wording:

- **Massachusetts.** Under Massachusetts law, "[t]he term 'spring,' 'springs,' or 'spring water' shall not be used as a product name or a brand name on a label unless the water source meets the definition of spring water in 21 CFR § 165.110(a)(2)(vi)." 105 MASS. CODE REGS. 500.090(I)(2).

- **New Hampshire.** The law of New Hampshire provides that "'[s]pring water' means 'spring water' as defined in 21 CFR 165.110 (a)(2)(vi), namely 'water derived from an underground formation from which water flows naturally to the surface of the earth.'" N.H. CODE ADMIN. R. HE-P 2101.01(ab). The Code further provides that "[a]ll labeling shall be in compliance with . . . federal bottled water regulations 21 CFR Part 165.110," *id.* at § 2104.1, and sets forth a series of conditions for spring

water that quote directly from the federal standard, with no changes or additions, *id.* at § 2102.03.

- **New Jersey.** The New Jersey administrative code states that "[b]ottled water shall be labeled and conform with the nomenclature established under 21 CFR 165.110(a) (identity)." N.J. ADMIN. CODE § 8:21-5.5(a). The regulation further provides that "[p]roducts which are not in conformance with the above referenced bottled drinking water labeling requirements shall be deemed misbranded as defined at N.J.S.A. 24:5-16 and 17." *Ibid.*

- **Pennsylvania.** Under Pennsylvania law, "[a] food shall be misbranded…[i]f it is represented as a food for which a definition and standard of identity has been prescribed by regulation under this subchapter or under any of the Federal acts, unless it conforms to the definition and standard…" 3 PA. CONS. STAT. § 5729(a)(6). Another state statute prohibits the state from promulgating food labeling regulations that would "cause a food to be in violation of any applicable requirements under the Federal acts." 3 PA. CONS. STAT. § 5736(a)(4).

- **Rhode Island.** The law of Rhode Island affirmatively adopts the standards of identity set forth in 21 C.F.R. Part 165. *See* 216 R.I. CODE R. § 50-10-4.3(A)(3)(s). Rhode Island law also states that "[a]ll nonalcoholic beverage, drink, or juice regulations and any amendments to them adopted pursuant to the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq., are the bottled beverage regulations in this state." R.I. GEN. LAWS § 21-23-4.[3]

---

[3] While the latter statute authorizes the state health department to adopt additional regulations, the parties have not identified any other state regulations on bottled water that would be expressly preempted by federal law.

The laws of three more States—Connecticut, Maine, and New York—affirmatively adopt spring water standards but include at least some language that does not also appear in the federal standard:

- **Connecticut**. Under Connecticut law, "'[s]pring water' means natural water obtained from an underground formation from which water flows naturally to the surface of the earth[.]" CONN. GEN. STAT. § 21a-150(14). The words "natural water obtained from" do not appear in the federal standard, but the rest of the sentence appears in both the state and federal laws. Connecticut law also provides that "[a] bottler shall collect spring water at a spring or through a hole bored adjacent to the place where a spring emerges from the ground. A bottler may use external force to collect spring water, provided such force does not alter the composition or quality of such water." CONN. GEN. STAT. § 21a-150e(c). This language is not identical to the federal spring water identity standard, which does not use the words "bottler" or "adjacent," but does provide that "spring water collected with the use of an external force shall . . . be of the same composition and quality, as the water that flows naturally to the surface of the earth." 21 C.F.R. § 165.110(a)(vi).[4]

<hr>

[4] Defendants claim that § 21a-150e(c) does not apply here because it "does not define spring water" and instead "provides for how the water that meets the Connecticut definition of spring water is to be collected in order to be certified for sale as bottled water by the Connecticut Department of Consumer Protection." Doc. #164-1 at 48. I disagree. While the statute doesn't use the word "define," it describes the process by which spring water may be removed from the ground—an issue at the heart of what constitutes spring water under the federal standard. *See* CONN. GEN. STAT. § 21a-150e(c) ("A bottler may use external force to collect spring water, provided such force does not alter the composition or quality of such water.").

Defendants also claim that the Connecticut water identity standard is expressly preempted because the FDA explicitly rejected the use of the word "adjacent" in the federal standard. Doc. #164-1 at 26 (citing 60 Fed. Reg. 57,076, 57,093 (Nov. 13, 1995) (The "FDA concludes that the requirement of a measurable hydraulic connection between the bore hole and the spring's natural orifice adequately encompasses the intent of the proposed adjacency requirement. Therefore, the agency is deleting the requirement in §165.110(a)(2)(vi) that the bore hole be adjacent to the point of emergence of a spring.")). Given the pleading standard of substantive equivalence, there is no cause at this stage for me to decide whether the use of the word "adjacent" renders the state statute expressly preempted where the FDA has elected to use different words to "encompass[] the intent" of an adjacency requirement.

- **Maine.** The law of Maine expressly references the federal identity water standard and describes spring water as "water derived from an underground formation from which water flows naturally to the surface of the earth." 10-144-231 MAINE CODE R. § 2. Maine law also uses language to describe spring water that is not present in the federal standard, such as an explanation of how a "water chemistry comparison is typically performed." *Ibid*.

- **New York.** Under New York law, "[s]pring water shall mean water derived from an underground formation from which water flows naturally to the surface of the earth." 10 N.Y.C.R.R. § 5-6.3(s). This exact language also appears in the federal standard. The New York law also includes language that is very similar to but not exactly the same as the federal standard. For example, in New York, "[s]pring water shall be collected only at the natural orifice of the spring or through a bore hole that is adjacent to the natural orifice," *id.* at § 5-6.4(c)(5), while under the federal standard, "[s]pring water shall be collected only at the spring or through a bore hole tapping the underground formation feeding the spring," 21 C.F.R. § 165.110(a)(vi).

While there may be some differences between the language in the laws of these eight States and the wording of the federal identity standard, it appears that the state standards are substantively equivalent to the federal law standard. *See Bates*, 544 U.S. 454. It would be premature to dismiss any of the claims, especially in the absence of any indication that plaintiffs intend to rely on any particular portion of the state statutory language that may arguably depart from the federal standard.

A different conclusion follows for Vermont which has not affirmatively adopted the federal "spring water" standard or an equivalent requirement. Plaintiffs identify only a general

consumer protection statute, which does not mention spring water, along with two statutory provisions authorizing the Secretary of the Agency of Natural Resources to establish rules or requirements for drinking water quality and public water systems and requiring sellers of bottled water to provide various certifications. Doc. #160 at 28, 305-306 (citing VT. STAT. ANN. tit. 9, § 2451, *et seq.*; tit. 10, ch. 56, §§ 1672(b) and 1673(f)). Though the latter two provisions involve water, and § 1673(f) requires that importers of bottled drinking water identify "the name, source and the location of the bottler of spring, artesian, or municipal water," neither provision expressly defines spring water or affirmatively adopts the federal standard.

Similarly, Vermont law provides that "[a] bottler of spring or artesian water may apply to the Secretary of Agriculture, Food and Markets for a specially designated identification label to indicate that the water originated and was bottled in Vermont and that it complies with any quality requirements adopted by the Agency." 6 V.S.A. § 2964a. Plaintiffs do not cite any regulatory standards promulgated for spring water pursuant to this statute.

Plaintiffs argue that, because Vermont requires out-of-state bottled water sellers to be certified by the regulatory agency with jurisdiction over the sellers, VT. STAT. ANN. tit. 10, §§ 1672(b) and 1673(f), which in this case is Maine, and because Maine regulators apply the Maine identity standard, which in turn is the same as the federal standard, Vermont law by extrapolation requires compliance with the federal identity standard. But this basis and connection is too tenuous. Just because Vermont law requires Poland Spring water to be certified by a regulator in another State does not mean that Vermont has independently and affirmatively adopted the federal identity standard as its own law.[5]

_____

[5] In their reply brief, doc. #170 at 42, plaintiffs also point to VT. STAT. ANN. tit. 10, ch. 48, §1416, "Groundwater Withdrawal Program," in which "spring" is defined as "a groundwater source where groundwater flows naturally to the surface of the earth and is collected with a developed structure that is designed to locate or extract groundwater." A state regulation defines spring in similar terms, as "a groundwater source entirely dependent on gravity to move

None of this means that the Vermont Consumer Fraud Act is *expressly* preempted; there is no indication that it rests on an underlying state law standard that actually departs from the federal spring water standard. On the other hand, the Vermont Consumer Fraud Act claim is *impliedly* preempted, because it does not rest on any independent state law of Vermont that defines a state standard for spring water. Absent such an underlying standard, plaintiffs' Vermont claim is, in reality, just an attempt to sue for a violation of federal law, which is the type of claim that is subject to implied preemption.

Nestlé argues that some of the state law "spring water" standards do not give rise to a private cause of action. This is not an argument about federal preemption but about whether a particular statute or regulation gives rise to a cause of action under state law. It is common, moreover, for consumer protection and unfair trade practices statutes to serve as a vehicle for a cause of action based on conduct that violates an independent state law standard that is not itself otherwise actionable. *See, e.g.*, *Nick's Garage, Inc. v. Progressive Cas. Ins. Co*., 875 F.3d 107, 126-27 (2d Cir. 2017). Therefore, the fact that any particular state law standard is not independently actionable or directly enforceable is neither grounds to reach a *non sequitur* conclusion that the standard must be preempted by federal law, nor to conclude that the standard has no legal weight as a state law duty that is independent of federal law. *Cf. Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist*., 541 U.S. 246, 252-54 (2004) (distinguishing in preemption context between "standards" and "methods of standard enforcement").

---

water from the source to the distribution system." Vᴛ. Cᴏᴅᴇ R. 12-030-003 ch. 21, §2. But neither the statute nor the regulation uses the phrase "spring water," and the regulation's only use of "spring" that is in any way connected to bottled water labeling requirements is the provision that "all bottled water labels shall contain the following information . . . source, i.e. private spring, private well, or the name of the Public water system supplying the water," *id.*, ch. 21, §11.1.2(g)(4). This short definition of the word spring, absent any reference to the federal spring water identity standard, does not constitute affirmative adoption of the federal standard.

Nor is there a basis to conclude that plaintiffs' common law claims are preempted except for the reasons already discussed as to the common law claims for Vermont. The fraud claim alleges in relevant part that there was fraud in each of the alleged States because Nestlé "intentionally concealed that its Poland Spring Water does not comply with the standard of identity for spring water *under state law*" and "affirmatively misrepresented to Plaintiffs on Poland Spring Water labels that Poland Spring Water is '100% Natural Spring Water' sourced from naturally occurring springs in Maine when, in fact, Poland Spring Water is not '100% Natural Spring Water' because [it] does not contain genuine natural spring water *as defined by state law*." Doc. #160 at 283 (¶¶ 838-39) (emphasis added). Similarly, the contract claim alleges that Nestlé promised to deliver "100% Natural Spring Water" when in fact "it did not at any time deliver genuine spring water *as defined under state law* to Plaintiffs." *Id.* at 285 (¶¶ 851-52) (emphasis added). Because these common law claims are predicated on a violation of a state law standard for "spring water" and because (as I have discussed above) each one of the nine States except Vermont has state law standards for "spring water" that are equivalent to the federal standard, these common law claims under the laws of Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, and Rhode Island are not preempted by federal law.

Nestlé next argues that plaintiffs seek to enforce a definition of "spring water" that, in hydrogeological terms, goes well beyond what is required by the federal identity standard and cognate state law standards. Doc. #164-1 at 64-70 (citing multiple examples). But I am convinced by plaintiffs' response that they do not seek to proceed on a theory of relief that would depart from any "spring water" requirement that differs from the federal "spring water" identity standard and that the specific evidentiary details they cite in the complaint are solely in the

nature of evidence they expect to support their claim that Nestlé's product did not meet the "spring water" standards that have been adopted by multiple States and that mirror the federal "spring water" standard.

There is no cause for me at this pleading stage to evaluate the strength or relevance of particular items of plaintiffs' evidence, and any surplusage of evidentiary detail in the allegations of the complaint does not furnish a basis for dismissal. This is without prejudice to Nestlé's opportunity to show at a later evidentiary stage of this action that plaintiffs' "evidence" is not merely evidence of a violation of the existing "spring water" standard but actually represents an effort to enforce a different standard.

Nestlé further argues that plaintiffs' claims are subject to "conflict" preemption pursuant to *Marentette v. Abbott Labs., Inc*., 886 F.3d 112 (2d Cir. 2018). I do not agree. Conflict preemption is just "one form of implied preemption" and applies "where compliance with both state and federal law is a physical impossibility, or, as relevant here, where the state law at issue stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 117 (internal quotation marks and citation omitted). As an initial matter, Nestlé makes no showing that it is impossible for it to comply with both the federal and state law standards—and it cannot do so, because these standards are the same as one another as I have discussed.

Nor has Nestlé shown how the allowance of state causes of action to enforce any of the state law standards will pose an obstacle to Congress's purposes. Although the FDCA itself forecloses civil action to directly enforce the federal "spring water" standard, *see Patane*, 314 F. Supp. 3d at 385, there is no indication that Congress meant to foreclose the States from creating remedies that are predicated on state law standards that are identical to the federal "spring water"

standard. The FDCA limits its express preemptive effect in allowance and contemplation of such state law remedies. *Id.* at 384 n.8. Thus, the FDCA allows a State to "impose the identical requirement or requirements, and by doing so be enabled . . . to enforce a violation of the [FDCA] as a violation of state law." *Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 426 (7th Cir. 2011) (Posner, J.).

The law at issue before the Second Circuit in *Marentette* was a different federal statute—the Organic Foods Production Act. Accordingly, because preemption is primarily an inquiry about Congress's specific intent as to a specific statutory scheme, the facts and particulars of the *Marentette* decision are of little use in evaluating the scope of preemption under the FDCA.

In short, I conclude for the most part that plaintiffs' claims in the amended complaint are not preempted by federal law. Except for plaintiffs' Vermont law claims, the FDCA does not preempt plaintiffs' statutory and common law claims from Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, and Rhode Island.

### Safe harbor

Nestlé moves to dismiss plaintiffs' statutory claims for consumer fraud and unfair trade practices on the ground that "[r]egulators specifically authorized the sale of Poland Spring as 'spring water' after they determined it complied with the FDA Identity Standard" and that the state statutory causes of action have "safe harbor" protections to the effect that these statutes do not apply to actions that have been "specifically approved and authorized pursuant to a regulatory regime administered by a dedicated regulatory agency." Doc. #164-1 at 77. To support this argument, Nestlé has appended to its papers a collection of letters, certifications, and other documents from multiple state regulatory agencies. Doc. #53-3 at 7-29; Doc. #53-4 at 1-20; Doc. #164-2 at 1-10.

Like any other affirmative defense, a "safe harbor" defense may be raised on a motion to dismiss, but only "if the defense is based on facts appearing on the face of the complaint." *Mercer v. Gupta*, 712 F.3d 756, 759 (2d Cir. 2013) (*per curiam*). Because Nestlé's "safe harbor" argument turns on fact-laden issues of what actions specific regulatory bodies have taken (and whether such actions constitute sufficient authorization to qualify for any "safe harbor"), it is not appropriate for me to resolve the application of the "safe harbor" defense on a motion to dismiss.[6]

Moreover, the amended complaint alleges unlawful conduct dating back to 2003. For the most part, however, Nestlé's submissions include documents that only show current, single-year certifications and authorizations, such that I am in no position—even if I were to fully credit the documents that Nestlé has submitted to date—to evaluate Nestlé's authorization status in prior years. Accordingly, I will deny Nestlé's motion to dismiss insofar as it is based on a "safe harbor" defense but without prejudice to renewal of such a defense at the conclusion of discovery.

### Adequacy of state common law claims

Nestlé argues that plaintiffs have not alleged plausible grounds for relief to support their common law fraud and contract claims in light of the fact that Nestlé obtained regulatory approvals. But, as with the "safe harbor" defense, the validity and status of regulatory authorizations is a fact-based argument that is not appropriate for me to address at the pleadings stage.

---

[6] Although the amended complaint does allege some specifics of regulatory actions taken in Maine, it does so in the context of alleging that these regulatory actions were not proper. Therefore, it would be premature for me to make a fact-based determination at this time about the validity of these actions.

Nestlé further argues that plaintiffs' contract claim must be evaluated under the Uniform Commercial Code rather than under Connecticut common law and that plaintiffs cannot state a breach of contract claim because they are deemed under the UCC to have accepted the goods. Doc. #164-1 at 89-90. But Nestlé did not raise this specific UCC argument in its prior motion to dismiss, *see* Doc. #53-1 at 73-74, and Rule 12(g)(2) of the Federal Rules of Civil Procedure provides that "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." *See also Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316, 320-21 (3d Cir. 2015) (district court erred under Rule 12(g)(2) by allowing bank defendant to file successive motion to dismiss raising statutory standing argument not raised in initial motion to dismiss). Accordingly, I will decline at this time to consider Nestlé's argument under the UCC for dismissal of the contract claim. *See, e.g., E. Coast Test Prep LLC v. Allnurses.com, Inc.*, 2016 WL 5109137, at *4 (D. Minn. 2016).

## CONCLUSION

For the foregoing reasons, Nestlé's motion to dismiss (Doc. #164) is GRANTED in part as to plaintiffs' Vermont law claims but DENIED as to all other claims.

It is so ordered.

Dated at New Haven this 28th day of March 2019.


/s/ ***Jeffrey Alker Meyer***
Jeffrey Alker Meyer
United States District Judge