UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARK J. PATANE, JULIE HARDING, HEATHER HARRIGAN, STEPHEN S. SHAPIRO, CATHERINE PORTER, ERICA RUSSELL, TINA MORETTI, BRIDGET KOPET, JENNIFER S. COLE, BENJAMIN A. FLETCHER, DIANE BOGDAN and PARESHKUMAR BRAHMBHATT, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>NESTLE WATERS NORTH AMERICA, INC.,<br><br>        Defendant. | Case No.  17-cv-01381-JAM<br><br>ECF Case<br><br>CLASS ACTION<br><br><br><br><br><br>JANUARY 10, 2020 |

**PLANTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFFS' REQUEST FOR LEAVE TO FILE A SECOND SUPPLEMENTAL DECLARATION IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs respectfully submit this memorandum to respond briefly to the legal arguments made in Nestlé's January 8, 2020 brief ("Df. Br.") opposing Plaintiffs' request to file a Second Supplemental Declaration ("Schmidt Decl.") opposing summary judgment.

Plaintiffs' proffered newly discovered evidence, including excerpts of Kevin Mathews' and Jennifer Rock's deposition testimony concerning state regulatory functions and Dr. Donald Siegel's declaration concerning the new artificial spring at Dallas Plantation, is relevant to Nestlé's "safe harbor" summary judgment argument because it undermines the central factual premise of Nestlé's defense. Dr. Siegel's declaration is also relevant to the private right of action issue because it evidences that Nestlé engages in "inherently deceptive" conduct.[1]

---

[1] Pursuant to the Court's unsealing order, Doc. 269, an unredacted copy of Dr. Seigel's declaration is being filed herewith.

### A. The Rock and Mathews Deposition Testimony and Dr. Siegel's Declaration are Relevant to the Safe Harbor Issue.

Nestlé's safe harbor argument in its summary judgment brief relied entirely on Mr. Mathews' sworn factual assertion that the regulatory agencies in all eight states at issue "determined . . . that the named spring sources provided water to each facility in compliance with the [FDA's] standard of identify of spring water." Doc. 219-3, ¶¶ 4 & 50; *see also id.* at ¶ 46; Doc. 219-1 at 2. Mr. Mathews' and Ms. Rock's testimony plainly contradict this factual premise. *See* Schmidt Decl. ¶¶ 7-15, 17-20.

Nestlé has now walked away from its initial premise for summary judgment and fallen back to the untenable proposition that the mere issuance of permits to bottle water or to use a spring water label immunizes it from civil liability for mislabeling ordinary groundwater as premium spring water. Df. Br. at 3; Doc. 233 at 4-5. But Rock's testimony undermines even that proposition by stating the obvious: that a state's mere approval of "a site" like Nestlé's well sites "for the purpose of bottled water manufacturing does not necessarily say that the water they're going to put in bottles and sell is spring water." Schmidt Decl. ¶ 10 (quoting Tr. 76:6-10). Nestlé's labels identifying its well sites as purported "spring" sources were approved in seven states by "simply relying on information that CDI provided."[2] *Id*. ¶ 8 (quoting Tr. 38:23-39:3,

---

[2] With respect to Maine, the Court has previously recognized that discovery is needed concerning Plaintiffs' allegations of regulatory capture there. Doc. 179 at 19 & n.6. While Plaintiffs believe sufficient record evidence of a genuine factual dispute on that issue already exists, *see* Doc. 229 at 8; Doc. 229-2, ¶¶ 44-49 & Exs. 9-13, Maine's regulators have not yet produced all their relevant documents, *see* Doc. 254, ¶ 36, and depositions of the regulators and Nestlé personnel on that topic must await that production. Plaintiffs' experts will show, based on their inspections and other evidence, that Poland Spring Water is not genuine spring water. That evidence, combined with the proof that Nestlé has since 1997 paid Maine millions of dollars under a 30 to 50-year license to bottle State-owned ordinary groundwater as "spring water" and that Nestlé's chief northeast hydrogeologist has since 2003 sat on the commission that manages Maine's spring water regulators, could easily be outcome determinative and lead "a reasonable jury" to reject Nestlé's safe harbor defense under Maine law. *See* Df. Br. at 2-3 (citations omitted); Doc. 229 at 26-28. Consumers have the right to protect themselves if a regulatory process ostensibly protecting them has been compromised by conflicts of interest, *see* Doc. 170 at 64-65, and deferring to compromised regulators violates consumers' due process rights, *id*. at 51-52.

39:24-40:5). Mathews likewise admitted he had no knowledge whether those states' regulators did anything other than rely on the information Nestlé supplied. *Id*. ¶ 18 (quoting Tr. at 57:19-22). Those seven states' permits, thus, do not verify that Nestlé's well sites are genuine spring sources and are not probative evidence—much less undisputed proof as a matter of law—that those states authorized Nestlé to use its sites as spring sources even if they do not contain genuine springs.[3]

Dr. Siegel's declaration is relevant to Nestlé's safe harbor defense because it evidences—and enables a reasonable jury to find—that Nestlé is actively seeking to deceive regulators, experts and other "dignitaries" who may seek proof that genuine springs exist. Siegel Decl. ¶¶ 3-16. Dr. Siegel is an eminent hydrogeologist who formerly chaired the Earth Sciences department at Syracuse University and currently serves as the member-elected president of the country's leading geologist professional organization, the Geological Society of America. *See id*. ¶ 1; Doc. 234-2, ¶ 2. Dr. Siegel's sworn testimony describes Nestlé's new walkway and viewing platform at Nestlé's Dallas Plantation well site, which were built over a feature that Dr. Siegel "expected from experience to be a valid spring." *Id*. ¶¶ 4-5. However, he learned that he "had been cleverly deceived" by a "mock spring." *Id*. ¶¶ 14-15. His team's inspection revealed that buried metal pipes rather than natural spring orifices were causing water to flow from the ground at the spring-like feature he had been shown, and Nestlé later admitted it was a "man-made feature," *id*. ¶¶ 8-13. Nestlé also admitted that it built the new wooden walkway and viewing platform "to

---

[3] Nestlé confuses the issues by arguing that Plaintiffs are attempting to impose independent verification requirements on state regulators. Df. Br. at 4 n.2. Plaintiffs' claims seek to impose no such requirement. Nestlé has raised the state permits as a defense, arguing they show that states have approved Nestlé's well sites as genuine springs. Plaintiffs' point is an evidentiary one refuting that assertion: because the states have not verified that genuine springs exist, their permits are not evidence that the states have found genuine springs to exist or have approved Nestlé's sale of non-spring water as spring water—especially given that six states have already reported or revealed that they make no effort to determine whether Poland Spring Water qualifies as genuine spring water. *See* Doc. 254, ¶¶ 11-33 & Exs. H-P.

bring 'dignitaries' to the site to see springs." *Id*. ¶ 16. However, there was nothing resembling a spring observable from the platform (or elsewhere at the site) other than the mock spring. *Id*.

If an expert of Dr. Siegel's stature was deceived by Nestlé's cleverly concealed artificial spring, less experienced regulators and other experts could also be easily deceived. A factfinder could plausibly infer from Dr. Siegel's testimony (and other evidence Plaintiffs' inspections have revealed) that Nestlé has actively deceived regulators in the past. In that case no safe harbor applies since no state has authorized Nestlé to sell "spring water" sourced from artificial springs.

Nestlé' argues that Dr. Siegel has "mischaracterized" the events at Dallas Plantation and accuses Dr. Siegel of attempting "to cast aspersions" on "NWNA and its counsel." Df. Br. at 6.[4] But Nestlé does not dispute any potion of Dr. Siegel's description of the events as they unfolded during the Dallas inspection on November 15, and Nestlé does not introduce admissible evidence contradicting Dr. Siegel's conclusion that he had been deceived by a man-made spring. Nestlé's unsworn assertion in its brief that the man-made feature and walkway were constructed "as part of site maintenance and for safety reasons," Df. Br. at 6, is not admissible and cannot be considered on summary judgment. *Knapp v. Am. Cruise Lines, Inc.*, Civil Action No. 3: 17-CV-2130 (CSH), 2018 U.S. Dist. LEXIS 181884, at *34 n.10, 2018 WL 5263275 (D. Conn. Oct. 23, 2018). But even if it were, at best, Nestlé's unexplained (and facially nonsensical) assertion would create a fact question for the jury.[5]

---

[4] Plaintiffs do not assume that Attorney Mayhew knew in advance that the spring-like feature was man-made. He, too, may have been misled. Plainly, Nestlé knew the feature was artificial, and it told or allowed Mayhew to believe that the new walkway had been built to help visitors like Dr. Siegel "see springs."

[5] Nestlé's representation that Nestlé has not yet shown its new mock spring to regulators is also inadmissible. Df. Br. at 7. Nestlé had an incentive to deceive regulators in 2019 because it released a new spring water product in 2019—called Poland Spring "Origin"—that is bottled exclusively from its Dallas site. *See* Exhibit 1. Maine's regulators had to visit the site to approve that product, and regulators from other states in which Nestlé sells or plans to sell that product may also visit Dallas to "see springs."

There would be no need to build a fake spring at Dallas if real springs existed there. The jury is entitled to see Dr. Siegel's evidence of the newly built feature when considering whether Maine's safe harbor applies because, among other things, it makes it more likely than not that Maine's regulators did not really see genuine springs at Dallas in 2006. Nestlé's argument (Df. Br. at 7) that the feature which Dr. Siegel concluded is a new man-made spring is irrelevant simply because Nestlé—once it was caught[6]—has decided not to claim "in this litigation" that the feature is a spring is an improper attempt to withhold important evidence from the jury.

**B.   Dr. Siegel's Declaration is also Relevant to the Private Right of Action Issue.**

Although the existence of a private right of action is a question of law, New York's analysis of that issue includes a fact-based inquiry concerning whether Nestlé's challenged conduct is "inherently deceptive." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 127 (2d Cir. 2017). While Plaintiffs submit that any mislabeling of an inferior product as a premium product is inherently deceptive because it is "'likely to mislead a reasonable consumer acting reasonably under the circumstances,'" *id.* at 124 (quoting *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000)), the existence of evidence that Nestlé has built a new fake spring—in the midst of this lawsuit accusing it of faking springs—is also relevant to whether Nestlé has engaged in inherently deceptive conduct.

Dr. Siegel's testimony about the newly discovered man-made spring at Dallas, therefore, is evidence that should inform the Court's analysis of whether a private right of action exists in New York.

---

[6] Nestlé admitted the feature was man-made only after Nestlé stopped Plaintiffs' experts from digging up the suspected pipes and a discussion among counsel ensued. Siegel Decl. ¶¶ 10-13. During that discussion, Plaintiffs' counsel asked to call the Court, pursuant to the Inspection Protocol, for a ruling on whether the suspected pipes could be exposed to see if they were the sources of the two flows of water. Only then did counsel call Nestlé and report back that the feature was man-made.

## **CONCLUSION**

Plaintiffs' application to submit a Second Supplemental Declaration opposing summary judgment should be granted.

Dated: January 10, 2020                                    Respectfully submitted,

*s/ Alexander H. Schmidt*
Alexander H. Schmidt (admitted *pro hac vice*)
Fairways Professional Plaza
5 Professional Circle, Suite 204
Colts Neck, NJ 07722
Phone: (732) 226-0004
alex@alexschmidt.law

Steven G. Sklaver (admitted *pro hac vice*)
Oleg Elkhunovich (admitted *pro hac vice*)
Amanda Bonn (admitted *pro hac vice*)
Bryan J. Caforio (admitted *pro hac vice*)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067
Phone: (310) 789-3100
ssklaver@susmangodfrey.com
oelkhunovich@susmangodfrey.com
abonn@susmangodfrey.com
bcaforio@susmangodrefy.com

Max I. Straus (admitted *pro hac vice*)
Y. Gloria Park (admitted *pro hac vice*)
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY  10019
Phone: (212) 336-8330
mstraus@susmangodfrey.com
gpark@susmangodfrey.com

Steven N. Williams (admitted *pro hac vice*)
Gwendolyn Giblin (admitted *pro hac vice*)
Anupama K. Reddy (admitted *pro hac vice*)
JOSEPH SAVERI LAW FIRM
601 California Street, Suite 1000
San Francisco, CA 94108
Phone: (415) 500-6800

6

swilliams@saverilawfirm.com
ggiblin@saverilawfirm.com
areddy@saverilawfirm.com

*Plaintiffs' Interim Co-Lead Counsel*

Craig A. Raabe (ct04116)
Robert A. Izard (ct01601)
Mark P. Kindall (ct13797)
Christopher M. Barrett (ct30151)
IZARD, KINDALL & RAABE, LLP
29 S. Main St., Suite 305
West Hartford, CT 06107
Phone: (860) 493-6292
craabe@ikrlaw.com
rizard@ikrlaw.com
mkindall@ikrlaw.com
cbarrett@ikrlaw.com

*Plaintiffs' Interim Liaison Counsel*