# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MARK J. PATANE *et al.*,
    *Plaintiffs*,

    v.

NESTLÉ WATERS NORTH AMERICA, INC.,
    *Defendant*.

No. 3:17-cv-01381 (JAM)

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs have filed this class action lawsuit alleging that defendant Nestlé Waters North America, Inc. ("Nestlé") fraudulently labels and sells its Poland Spring bottled water product as "spring water" when in fact it is not spring water as defined by law. Nestlé has now moved for summary judgment on all of plaintiffs' claims arising under the laws of Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, and Rhode Island. For the reasons set forth below, I will deny the motion except as to one of plaintiffs' claims under Rhode Island law.

Nestlé argues for dismissal on the ground that there is no private right of action for the violation of state "spring water" standard laws and, alternatively, that any right of action is foreclosed by safe harbor exemptions under state law and by doctrines that limit collateral attacks on state-issued permits or licenses. Based on my state-by-state evaluation of these arguments, I generally conclude that the lack of a specific right of action for the violation of a state law spring water standard does not foreclose the underlying conduct from being actionable under separate state statutes that prohibit unfair and deceptive trade practices or from being actionable to the extent that they amount to fraud and breach of contract. I further conclude—

1

with the exception of Rhode Island—that at least a genuine issue of fact remains whether Nestlé

is entitled to the benefit of any regulatory safe harbor exemptions or whether plaintiffs' claims

amount to an impermissible collateral attack on state-issued licenses or permits.

## BACKGROUND

Nestlé labels and sells its Poland Spring water products as "spring water" in retail, home,

and office markets. Doc. #229-1 at 1 (¶ 1). Plaintiffs have purchased Poland Spring water since

2003 and reside in Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York,

Pennsylvania, and Rhode Island. *Ibid.* (¶ 2). Nestlé has packaged its water at bottling facilities in

Poland Spring and Hollis, Maine, and Framingham, Massachusetts, since 2003, and since 2009

has also used a fourth facility in Kingfield, Maine. *Id.* at 2 (¶¶ 3-4). From 2003 to 2017, the

water packaged at these four facilities came from eight sites in Maine. *Ibid.* (¶ 5).[1]

In 2018, I dismissed plaintiffs' initial complaint because their state law claims as framed

were all preempted by the federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301-

392. Doc. #142; *Patane v. Nestlé Waters N. Am., Inc.*, 314 F. Supp. 3d 375 (D. Conn. 2018).

Plaintiffs then filed an amended complaint on behalf of consumers in the eight states listed above

as well as Vermont, alleging state common law claims for fraud and breach of contract in

addition to state statutory claims for consumer fraud and unfair trade practices. Doc. #160. I

dismissed the Vermont law claims and allowed the rest to proceed. Doc. #179; *Patane v. Nestlé*

*Waters N. Am., Inc.*, 369 F. Supp. 3d 382 (D. Conn. 2019). Plaintiffs seek, among other

remedies, money damages and a permanent injunction enjoining Nestlé from selling its Poland

---

[1] Nestlé contends that this is the class period; plaintiffs argue that it extends to the present. Doc. #229-1 at 2 (¶ 5). Plaintiffs have not yet filed their motion for class certification, at which time it would be appropriate for the Court to decide the class period, if any. Nevertheless, the fact that there has been no class certification determination poses no bar to ruling on Nestlé's motion for summary judgment. *See Schweizer v. Trans Union Corp.*, 136 F.3d 233, 239 (2d Cir. 1998); *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 507 (E.D.N.Y. 2017).

Spring water as "spring water." Doc. #160 at 283-324. Nestlé now moves for summary judgment on all of plaintiffs' claims. Doc. #219.

**DISCUSSION**

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues of fact but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir. 2019).

This case involves state law claims over which the Court has federal diversity jurisdiction. Absent a controlling decision from a state's highest court on a question of state law, a federal court's role is to carefully predict how the state court would rule on the issue presented. *See Haar v. Nationwide Mut. Fire Ins. Co.*, 918 F.3d 231, 233 (2d Cir. 2019). In so doing, a federal court should give proper regard to the relevant rulings of the state's lower courts and may also consider decisions from other jurisdictions on the same or analogous issues. *See In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013) (subsequent case history omitted).

Nestlé moves for summary judgment on three grounds. First, Nestlé argues that there is *no private right of action* under applicable state law for the claimed violations by Nestlé of state law "spring water" standards. Doc. #219-1 at 18-27. Second, Nestlé argues that applicable state

3

law recognizes a *safe harbor defense* to foreclose liability against Nestlé in light of alleged state regulatory approvals of Nestlé "spring water" for sale. *Id.* at 27-38. Third, Nestlé argues that this lawsuit functions as an *impermissible collateral attack* on the administrative approvals of state regulators for the sale of Nestlé's product as "spring water." *Id.* at 39-48.

In the discussion below, I will address this trio of arguments with respect to each of the applicable States in alphabetical order. Because the parties' briefing overwhelmingly focuses on plaintiffs' statutory claims, I will address those claims before turning to the common law claims.

### *Connecticut*

#### *1.  Private right of action under Connecticut law*

In Count VI of the amended complaint, plaintiffs allege a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a–42-110q, a law which creates a private right of action to recover damages for "[a]ny person who suffers any ascertainable loss of money or property . . . as a result of the use or employment of a method, act or practice" that amounts to "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Id.* §§ 42-110g(a), 42-110b(a). CUTPA is expressly intended to "be remedial and be so construed." *Id.* § 42-110b(d).

As I have previously ruled, Connecticut law adopts the federal "spring water" standard. *See Patane*, 369 F. Supp. 3d at 392-93 (citing Conn. Gen. Stat. §§ 21a-150(14) and 150e(c)). The Connecticut Food, Drug and Cosmetic Act ("CFDCA"), Conn. Gen. Stat. § 21a-91 *et seq.*, provides in turn that "[a] food shall be deemed to be misbranded . . . [i]f its labeling is false or misleading in any particular," *id.* § 21a-102(a), and "food" is defined to include "articles used for . . . drink for humans," *id.* § 21a-92(10). Yet the CFDCA does not provide a private right of

action; instead, it states that "[a]ll such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the state of Connecticut." *Id.* § 21a-99.

Nestlé argues that plaintiffs' CUTPA claim may not proceed on the basis of a statute such as the CFDCA that does not itself provide for a private right of action and allows only for its public enforcement by the State of Connecticut. According to Nestlé, "the Connecticut Supreme Court has repeatedly held private plaintiffs cannot predicate a CUTPA claim on violations of law barring private enforcement actions." Doc. #219-1 at 24. In fact, however, the Connecticut Supreme Court has ruled to the contrary in cases that Nestlé fails to cite or acknowledge. *See Artie's Auto Body, Inc. v. Hartford Fire Ins. Co*., 119 A.3d 1139, 1150-51 (Conn. 2015) (allowing CUTPA claim based on violation of the Connecticut Unfair Insurance Practices Act, which itself has no private right of action provision and which allows only for enforcement by the insurance commissioner); *Eder Bros. v. Wine Merchants of Connecticut, Inc.*, 880 A.2d 138, 146-47, 149-50 (Conn. 2005) (allowing CUTPA claim based on violation of the Liquor Control Act, notwithstanding that the Liquor Control Act vests exclusive authority for its enforcement in the department of consumer protection). Thus, as the Connecticut Supreme Court has recently noted, "a plaintiff may predicate a CUTPA claim on violations of statutes or regulations that themselves do not allow for private enforcement." *Cenatiempo v. Bank of Am., N.A.*, 219 A.3d 767, 792 n.16 (Conn. 2019).

Nestlé relies instead on cases that have nothing to do with whether a CUTPA claim may proceed on the basis of a violation of a different statute for which there is no private right of enforcement. Doc. #219-1 at 24 nn.8-9. For example, Nestlé cites *Perez-Dickson v. City of Bridgeport*, 43 A.3d 69 (Conn. 2012), a case that does not mention CUTPA and that stands for the unremarkable proposition that a plaintiff may not sue under a statute unless the legislature

intended a suit to be brought under the statute. Of course, CUTPA itself expressly provides for a

private right of action, so *Perez-Dickson* is irrelevant here.

Nestlé also relies on *Connelly v. Housing Authority of City of New Haven*, 567 A.2d 1212

(Conn. 1990), a case in which the Connecticut Supreme Court concluded that the acts of a local

housing authority were subject to one of CUTPA's exemptions, Conn. Gen. Stat. § 42-110c. This

exemption has nothing to do with whether a CUTPA claim may be predicated on conduct in

violation of another statute that does not itself provide for a private right of action.

Nestlé similarly misplaces its reliance on *Blass v. Rite Aid of Connecticut, Inc.*, 16 A.3d

855 (Conn. Super. Ct. 2009), *aff'd*, 16 A.3d 737 (Conn. App. 2011). There, the court held that

consumers could not bring a CUTPA claim to recover overpaid sales taxes in part because the

relevant state sales tax statute expressly creates an alternative administrative remedy to recover

any such overpayment—specifically, consumers could apply to the Commissioner of Revenue

Services for a refund. *See Blass*, 16 A.3d at 860-63. Here, however, the CFDCA provides no

alternative means of recovery for consumers. Nor is there any Connecticut statute that precludes

the use of CUTPA to seek a remedy for a violation of the CFDCA. *See, e.g.*, *Water Pollution

Control Auth. of the City of Norwalk v. Flowserve US, Inc.*, 782 F. App'x 9, 15 (2d Cir. 2019)

(no CUTPA claim for violation of the Connecticut Product Liability Act which has a provision

that makes it the exclusive means by which a party may secure a remedy for an injury from a

defective product). Accordingly, I conclude that the lack of a private right of action under the

CFDCA does not preclude plaintiffs' CUTPA claim.

### 2. *Safe harbor exemption under Connecticut law*

Nestlé claims the benefit of CUTPA's "safe harbor" exemption provision. CUTPA

expressly exempts from liability "[t]ransactions or actions otherwise permitted under law as

administered by any regulatory board or officer acting under statutory authority of the state or of the United States," and it places "[t]he burden of proving exemption . . . upon the person claiming the exemption." Conn. Gen. Stat. § 42-110c.

To determine the application of this exemption, a court must first identify the "transactions or actions" at issue by determining "the broader pattern of activity by the defendant, not the specific allegations of misconduct." *Garcia v. Fry*, 186 F. Supp. 3d 228, 234 (D. Conn. 2016) (citing *Connelly*, 567 A.2d at 1213, 1216); *see also Wind Corp. v. Wesko Locks, Ltd.*, 2018 WL 8729585, at *4 (D. Conn. 2018) (conduct at issue is "importing foreign-manufactured products into the United States for sale to furniture manufacturers," not the alleged "making [of] false declarations regarding the country of origin of a product"). Here, Nestlé's broader pattern of activity is its sale of bottled water as "spring water" in Connecticut. A court must also determine whether the conduct at issue—the sale of bottled water as "spring water"— is "expressly authorized and pervasively regulated." *Normand Josef Enterprises, Inc. v. Connecticut Nat. Bank*, 646 A.2d 1289, 1305 (Conn. 1994) (emphasis omitted).

According to Nestlé, it is entitled to the benefit of the safe harbor exemption because "regulatory agencies in the eight states at issue, charged by law with regulating the sale of bottled water, have indisputably preapproved and authorized the sale of Poland Spring® as 'spring water,' including the use of the terms 'spring water' and 'natural spring water' on its labels." Doc. #219-1 at 27. The trouble, however, is that the evidence submitted by Nestlé does not conclusively show that Connecticut regulators specifically approved Nestlé's sale of bottled water as "spring water." Nestlé's evidence with respect to Connecticut regulatory approvals includes but a smattering of annual licenses for just some of the years within the class period and that were issued by the Connecticut Department of Consumer Protection, and these licenses

reflect permission for bottled water in general and without any further reference or approval specific to spring water. Doc. #219-3 at 104-114 (Mathews Decl. Exs. DD, EE, and FF); *see also* Doc. #229-19 (Connecticut license application requiring applicant to identify "Type of product" as "Bottled Water" or "Other Beverage" but without specification of "spring water").

Nestlé has also submitted correspondence from its compliance consultant to the Connecticut Department of Consumer Protection stating Nestlé's intent to sell its water as "spring water." Doc. #219-3 at 116-122 (Mathews Decl. Exs. GG and HH). But the relationship of these representations by Nestlé to the approval and issuance of licenses is unclear.

Kevin Mathews—a former Nestlé employee responsible for obtaining its licenses from 1989 to March 2019—otherwise attests that for Connecticut and all the other states at issue in this case "each issued licenses, permits or certificates approving the sale of Poland Spring bottled water as 'spring water' in their respective states." Doc. #219-3 at 2 (¶ 4). But this claim (that the licenses specifically approved the sale of Poland Spring water "as 'spring water'") is disputed by plaintiffs and it is not conclusively corroborated by reference to the legal or agency materials that establish the scope and effect of the issued licenses. *See also* Doc. #254 at 4 (¶ 15) (plaintiffs' supplemental declaration re lack of information from Connecticut regulators re approval of spring water designation); Doc. #266-1 at 4-5 (¶¶ 15-19) (plaintiffs' second supplemental declaration re depositions of compliance consultant and Mathews showing their lack of first-hand knowledge concerning scope of administrative review and approval); Doc. #265-1 at 16 (Nestlé compliance consultant deposition testimony re lack of knowledge that Connecticut "affirmatively determined that Poland Spring water complies with the FDA identity standard"). The documents do not conclusively corroborate Mathews's claim that Connecticut specifically approved the sale of Poland Spring bottled water *as spring water*, and Mathews otherwise

8

acknowledged at his deposition (Doc. #265-4 at 8) that he had no personal knowledge for his conclusory statements about the scope and effect of state-issued licenses. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) (district court may not rely at summary judgment on evidence that would be inadmissible hearsay at trial).[2]

Nestlé argues that "[f]or safe harbor immunity to attach, it is only legally relevant what action the states took (*i.e.*, did the state issue a permit or license authorizing the sale of Poland Spring® bottled water as spring water?)" and that "[h]ow a state reached its determination to authorize the sale of Poland Spring® bottled water as spring water is not relevant to the safe harbor defense." Doc. #267 at 3. Even assuming this to be so, a genuine fact issue remains as to whether the Connecticut licenses actually constituted an authorization for the sale of Poland Spring bottled water *as spring water*. Accordingly, I conclude that a genuine fact issue remains with respect to whether the CUTPA safe harbor exemption provision applies.

### 3. *Collateral attack under Connecticut law*

Nestlé further argues that plaintiffs' CUTPA claim amounts to an improper collateral attack on the issuance of a license to sell bottled water by the Connecticut Department of Consumer Protection. But even assuming Connecticut law limits lawsuits that function as a collateral attack on the issuance of a regulatory permit, plaintiffs do not seek to penalize or enjoin Nestlé's sale of bottled water in general, and as explained above a genuine fact issue remains whether Connecticut regulatory authorities expressly approved Nestlé's sale of bottled water as "spring water" within the meaning of Connecticut law. Accordingly, a genuine fact

---

[2] The Mathews declaration makes a similar conclusory and hearsay assertion for each one of the other states at issue in this litigation in addition to Connecticut. For the same reason as explained here and because Mathews does not have firsthand knowledge and any demonstrated admissible basis for knowledge beyond what is stated in the documents attached to his declaration, I decline to conclude that such statements by Mathews characterizing the scope and effect of each state's regulatory actions is sufficient to preclude a genuine fact issue on the issue of whether any of the states approved the sale of Poland Spring water as spring water.

issue remains before I can determine whether plaintiffs' lawsuit functions as an improper collateral attack of a regulatory permit under Connecticut law.

### *Maine*

**1.  *Private right of action under Maine law***

In Count XI of the amended complaint, plaintiffs allege a violation of both the Maine Unfair Trade Practices Act ("MUTPA"), Me. Rev. Stat. tit. 5, §§ 205-A–214, and the Maine Uniform Deceptive Trade Practices Act ("MUDTPA"), Me. Rev. Stat. tit. 10 §§ 1211-1216. MUTPA creates a private right of action to pursue damages and equitable relief for "[a]ny person who purchases . . . goods . . . primarily for personal, family or household purposes and thereby suffers any loss of money or property . . . as a result of the use or employment by another person of a [prohibited trade practice]." Me. Rev. Stat. tit. 5, § 213. MUDTPA in turn creates a private right of action to seek injunctive relief against any person who, "in the course of his business . . . [r]epresents that goods . . . have . . . characteristics . . . that they do not have . . . ; [r]epresents that goods . . . are of a particular standard . . . if they are of another; . . . [a]dvertises goods . . . with intent not to sell them as advertised . . . ; or [e]ngages in any other conduct which similarly creates a likelihood of confusion or misunderstanding." Me. Rev. Stat. tit. 10, §§ 1212(1), 1213. Its remedies are "in addition to remedies otherwise available against the same conduct under the common law or other statutes of [Maine]." *Id.* § 1213.

As I have previously ruled, Maine law adopts the federal "spring water" standard. *See Patane*, 369 F. Supp. 3d at 392-93 (citing Code Me. R. 10-144 Ch. 231, § 2). Nestlé argues that Maine law does not provide for a private right of action for a violation of the state law "spring water" standard. Nestlé further argues that because the law of Maine does not expressly create a private right of action for the misbranding of a product as spring water, then plaintiffs may not

rely on MUTPA or MUDTPA to pursue such a claim. But Nestlé does not cite authority to show that an action for a violation of MUTPA or MUDTPA is precluded if the action is based on a violation of a state law regulation for which there is no standalone cause of action.

Nestlé misplaces its reliance on *Wawenock, LLC v. Dep't of Transp.*, 187 A.3d 609 (Me. 2018), a case in which the Maine Supreme Judicial Court restated the general rule that "[w]hen a private right of action exists . . . it is most often created by express language," *id.* at 612, and concluded that a particular Maine law known as the Sensible Transportation Policy Act did not create a private right of action. The ruling in *Wawenock* did not address MUTPA or MUDTPA. In light of the remedial purposes of MUTPA and MUDTPA and in the absence of precedent to suggest that these statutes should be given a restrictive interpretation, I decline to conclude that under Maine law a cause of action under MUTPA or MUDTPA may not proceed if the underlying unfair or deceptive conduct constitutes a violation of a regulatory or statutory provision of Maine law for which there is no independent cause of action.

Nestlé also cites *First of Maine Commodities v. Dube*, 534 A.2d 1298 (Me. 1987), but that case has nothing to do with allowance of a private right of action. Instead, it discusses an express exemption under MUTPA, *id.* at 1301-02, an issue that goes to Nestlé's safe harbor defense rather than the existence of a private right of action. Accordingly, I conclude that the lack of an express private right of action for the violation of Maine's spring water standard does not preclude a cause of action under MUTPA or MUDTPA.

### 2. *Safe harbor exemption under Maine law*

MUTPA expressly exempts from liability "[t]ransactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the State or of the United States." Me. Rev. Stat. tit. 5, § 208(1). The statutory provision was

amended in September 2007 to expressly require that a party seeking immunity show both that "[i]ts business activities are subject to regulation by a state or federal agency" and that "[t]he specific activity that would otherwise constitute a violation of [MUTPA] is authorized, permitted or required by a state or federal agency or by applicable law, rule or regulation or other regulatory approval." *Id.* § 208(1)(A)-(B).[3]

The parties do not dispute that Nestlé's "business activities" are generally "subject to regulation" by an agency. The sale of bottled water in Maine is regulated by the Maine Commissioner of Agriculture, Conservation and Forestry, *see* Me. Rev. Stat. tit. 32, §§ 1751-1854, and the Maine Department of Health and Human Services, *see* Code Me. R. 10-144 Ch. 231, §§ 1-11.

To evaluate Nestlé's claim to the exemption, then, I must initially determine what is Nestlé's "specific activity that would otherwise constitute a violation of [MUTPA]" by considering "the allegedly illegal conduct." *Campbell v. First Am. Title Ins. Co.*, 644 F. Supp. 2d 126, 134 (D. Me. 2009) (citing *Good v. Altria Group, Inc.*, 501 F.3d 29 (1st Cir. 2007), *aff'd*, 555 U.S. 70 (2008), and *Provencher v. T & M Mortg. Sols., Inc.*, 2008 WL 2447472, at *7 (D.

---

[3] A preliminary issue is whether the amendment to the MUTPA should apply retroactively or only prospectively from its effective date. *See Hulin v. Fibreboard Corp.*, 178 F.3d 316, 318-19 (5th Cir. 1999) (state retroactivity doctrines substantive for purposes of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)). In Maine, "absent language to the contrary, legislation affecting procedural or remedial rights should be applied retroactively, whereas legislation affecting substantive rights should be applied prospectively," and at the same time, "all statutes will be considered to have a prospective operation only, unless the legislative intent to the contrary is clearly expressed or necessarily implied from the language used." *Greenvall v. Maine Mut. Fire Ins. Co.*, 788 A.2d 165, 166-67 (Me. 2001). Amendments are non-substantive if they "do not change the *legal significance* of acts occurring before the amendments." *Id.* at 167. I find that the second part of the amendment is non-substantive because it "does not alter existing rights or obligations, but merely clarifies what those existing rights and obligations have always been." *Maine Sch. Admin. Dist. No. 27 v. Maine Pub. Employees Ret. Sys.*, 983 A.2d 391, 399 (Me. 2009) (cleaned up). It simply clarified the "transactions or actions" at issue, what it means for them to be "otherwise permitted," and what are "laws as administered by any regulatory board or officer acting under statutory authority of the State or of the United States." *But see Provencher v. T & M Mortg. Sols., Inc.*, 2008 WL 2447472, at *7 n.5 (D. Me. 2008) (finding, without explanation, amendment was "clearly substantive"). Even assuming the first part of the amendment is substantive (because a business's specific "transactions or actions" can be regulatorily approved without its general "business activities" being subject to regulation), whether that has been the case here is not disputed.

Me. 2008)). Here, the specific activity alleged to violate MUTPA is Nestlé's sale of ordinary groundwater as "spring water" in Maine. *Cf. Good*, 501 F.3d at 55-58 (cigarette manufacturer's use of the terms "light" and "lowered tar and nicotine" in its product advertisements is the specific activity at issue).

Next I must determine whether Nestlé's sale of its water as "spring water" "is "authorized, permitted or required" by law. *See Campbell*, 644 F. Supp. 2d at 134. This express requirement was added in 2007 in an apparent attempt by the Maine legislature to clarify that MUTPA exempts only those transactions "otherwise *permitted*, not otherwise *regulated*." *Id.* at 133 (quoting *Good*, 501 F.3d at 58); *see also Provencher*, 2008 WL 2447472, at *7 ("The defendants do not identify any of their actions, which the plaintiff has alleged violated [MUTPA], as being specifically permitted by any statute or regulation.").[4]

A similar analysis applies under MUDTPA which expressly exempts from liability "[c]onduct in compliance with the orders or rules of, or a statute administered by, a federal, state or local governmental agency." Me. Rev. Stat. tit. 10, § 1214(1)(A). It further provides that MUDTPA "shall be construed to effectuate its general purpose to make uniform the law of those states which enact it." *Id.* § 1215.

Maine courts appear to have only once had occasion to apply the MUDTPA exemption. In *Laing v. Clair Car Connection*, 2003 WL 1669624 (Me. Super. 2003), a used-car purchaser's MUDTPA claim against the dealer for failure to disclose the car's accident history failed under the exemption "[b]ecause [the dealer] properly complied with . . . [a] statute specifically

---

[4] Nestlé's reliance on *First of Me. Commodities v. Dube*, 534 A.2d 1298 (Me. 1987), and *Wyman v. Prime Disc. Sec.*, 819 F. Supp. 79 (D. Me. 1993), which itself relies on *Dube*, ignores that the First Circuit understood *Dube* to hold that the exemption applies to conduct that "is subject to specific standards left to the enforcement of an administrative agency, not merely those circumstances in which the agency's regulatory scheme is generally 'extensive' or 'detailed.'" *Good*, 501 F.3d at 58.

enumerating the disclosure duties of used car dealers." *Id.* at *3. The statute in question required dealers to disclose any damage the vehicle sustained "if that information is known to the dealer," Me. Rev. Stat. tit. 10, § 1475(2-A)(D), and the purchaser did not dispute that the dealer had obtained two inspections of the vehicle that showed no damage. *See Laing*, 2003 WL 1669624, at *1. The court's interpretation of MUDTPA's text would appear to exempt from liability conduct that is alleged to be unlawful under MUDTPA, but that also complies with the terms of a statute that specifically sets forth duties governing such conduct.

Because the parties have not cited, and I have not found, any other authority defining the proper scope of the MUDTPA exemption, I turn to the statute itself, mindful that MUDTPA was enacted in 1969 and went into effect in 1973. In Maine, statutes are interpreted to give effect to the legislature's intent. *See Ford Motor Co. v. Darling's*, 151 A.3d 507, 515 (Me. 2016). Accordingly, courts start by attempting to apply a statute's plain language in the context of the statutory scheme, construing it to avoid surplusage, interpretations "inimical to the public interest," and absurd or illogical results. *Ibid.* Only if a statute's text is ambiguous will courts turn to legislative history and other indicia of legislative intent. *Ibid.*

First, I must determine the "conduct" at issue. Nestlé appears to allege that the conduct at issue is its sale of Poland Spring water as "spring water," Doc. #219-1 at 30; plaintiffs appear to allege that it is the misleading of consumers, Doc. #229 at 35. As I have already noted, the *Laing* court appears to have interpreted the conduct at issue as the behavior alleged to violate the MUDTPA. I agree with that interpretation. That the word "conduct" appears in an exemption provision and is followed by the phrase "in compliance with [certain other law]" suggests that the conduct at issue must at least be arguably unlawful. The MUDTPA liability provision lists a series of behaviors that constitute deceptive trade practices, including "[r]epresent[ing] that

14

goods . . . have . . . characteristics, [or] ingredients . . . that they do not have," and concluding with "any other *conduct* which similarly creates a likelihood of confusion or of misunderstanding." Me. Rev. Stat. tit. 10, § 1212(1) (emphasis added). This interpretation also promotes harmony with the MUTPA exemption. Here, Nestlé's alleged unlawful behavior is its allegedly deceptive sale of ordinary groundwater as "spring water" in Maine.

Second, I must determine whether the conduct is "in compliance with" certain other law. Because MUDTPA instructs that it is to be interpreted in conformity with other such statutes, I look to other states that, like Maine, have adopted the federal Uniform Deceptive Trade Practices Act ("UDTPA"), 7A U.L.A. 265 (1964 & 1966), including its exemption provision, *id.* § 4(a). For example, the Colorado Supreme Court has interpreted the phrase "in compliance with" to mean "required by" or "specifically authorized by" other statutes or regulations, while also noting the statute's "broad remedial purposes." *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 56 (Colo. 2001). The exemption has been interpreted similarly by the Illinois Supreme Court. *See Johnson v. Marshall Field & Co.*, 312 N.E.2d 271, 274-76 (Ill. 1974) (finding conduct at issue was exempt because the "authority" to engage in it was "explicitly" granted by statute). The Oregon Court of Appeals interpreted its exemption even more narrowly "to exempt only *conduct* that is *mandated* by other laws," noting that the underlying purpose of the statute "is to protect consumers from certain acts." *Hinds v. Paul's Auto Werkstatt, Inc.*, 810 P.2d 874, 876 (Or. App. 1991). From all this, I interpret the exemption to apply only if Nestlé's conduct was either required or specifically authorized by law.[5]

---

[5] I acknowledge that similar exemption provisions have been interpreted differently by other states, such that entire industries are exempt if regulated under a separate statutory scheme. *See, e.g.*, *Ne. Georgia Cancer Care, LLC v. Blue Cross & Blue Shield of Georgia, Inc.*, 676 S.E.2d 428, 433-34 (Ga. App. 2009). But I find these interpretations to be in the minority and textually unpersuasive, because MUDTPA's exemption requires that conduct be "in compliance with," not simply "regulated by," certain other laws. MUDTPA also expressly provides that its remedies are not preempted by remedies available in other Maine statutes.

Third, I must determine whether the conduct is in compliance with "the orders or rules of, or a statute administered by, a federal, state or local governmental agency." For the reasons stated in my discussion of the MUTPA exemption, Nestlé has failed to show that its sale of Poland Spring water as "spring water" is required or specifically authorized by any agency order or rule, or by any statute. Rather, the statutes and regulations Nestlé cites show only that the bottled water industry is regulated through licensure and that bottled water must conform with the legal standard of identity for spring water. *See* Me. Rev. Stat. tit. 32, §§ 1751-1854; Code Me. R. 10-144 Ch. 231, §§ 1-11. Crucially, these statutes do not make the grant of a license contingent on approval of how the bottled water is to be labeled or otherwise marketed. For example, although the agency must approve the source of the water (*e.g.*, spring, borehole, well), that approval is based on the source's "water quality" (*i.e.*, whether or not it is safe for consumption), Code Me. R. 10-144 Ch. 231, § 3(J)(3), namely maximum contaminant levels, *id.* app. A, rather than a finding that the source identity is what the applicant says it is.

Nestlé has submitted numerous documents from Maine regulatory agencies. First, Nestlé submits licenses for 2003 and 2017 but none for the intervening years. Doc. #219-3 at 18-26 (Mathews Decl. Exs. A and B). These licenses do not purport to authorize Nestlé to sell Poland Spring water as spring water. Under a heading of "License Type," the licenses state "Beverage Plant," and under a heading for "Authorizations," the licenses state "Water." *Ibid.* The licenses do not refer to the term "spring water," and therefore even as to the years 2003 and 2017 they do not establish on their face that the State of Maine issued a license or permit for Nestlé to sell Poland Spring water as spring water. Although the declaration of Kevin Mathews asserts that "[t]he DWP's [Drinking Water Program's] issuance of these licenses was Maine's approval and authorization to sell Poland Spring® bottled water in Maine as 'spring water,'" Doc. #219-3 at 3

(¶ 5), there is no non-hearsay basis to credit Mathews's characterization of the scope and effect of these licenses.

Nestlé also submits a hodgepodge of letters it received at various times over the course of two decades from various compliance officers and geologists at the Drinking Water Program of the Maine Department of Health and Human Services. Doc. #219-3 at 27-49 (Mathews Decl. Ex. Exs. C, D, E, F, G, H, I, J, K, and L). About half of these letters state no more than the "opinion" of the Drinking Water Program that water produced from various Nestlé borehole locations meet the definition of spring water.[6] These "opinion" letters appear to be non-binding "advisory rulings," rather than binding orders. *See* Code Me. R. tit. 10-144 Ch. 231, § 1-B(A) (citing Me. Rev. Stat. tit. 5, § 9001). Nestlé does nothing to show that such an "opinion" constitutes a license, permit, or other approval that is necessary to invoke a safe harbor exemption to MUTPA or MUDTPA.

The remaining letters go further to state that certain boreholes "[a]re approved by the DWP as public water supply sources" and that they "[m]eet the U.S. FDA definition of 'spring water' according to 21 CFR § 165.110(a)(2)(vi)."[7] Even assuming that these letters have legally operative force for purposes of invoking a safe harbor exemption under MUTPA or MUDTPA,

---

[6] *See* Doc. #219-3 at 28 (Mathews Decl. Ex. C) (compliance officer "opinion" letter of December 30, 2003 for certain boreholes in the vicinity of the Poland Spring bottling plant in Poland Spring, Maine); *id.* at 32 (Mathews Decl. Ex. E) (compliance officer "opinion" letter of October 31, 2000 for certain boreholes in Poland, Maine); *id.* at 34 (Mathews Decl. Ex. F) (compliance officer "opinion" letter of July 2, 2004 for certain boreholes in Pierce Pond Township, Maine); *id.* at 36 (Mathews Decl. Ex. G) (compliance officer "opinion" letter of June 14, 2006 for certain boreholes in Dallas Plantation, Maine); *id.* at 41-42 (Mathews Decl. Ex. I) (geologist "conclusion" letter of December 23, 2013 for a borehole in Hollis, Maine).

[7] *See* Doc. #219-3 at 44 (Mathews Decl. Ex. J) (compliance officer letter of August 15, 2012 for multiple boreholes serving the Nestlé bottling plant in Kingsfield, Maine); *id.* at 46 (Mathews Decl. Ex. K) (compliance officer letter of April 15, 2014 for multiple boreholes serving the Nestlé bottling plant in Framingham, Massachusetts); *id.* at 48 (Mathews Decl. Ex. L) (geologist letter of August 28, 2017 for multiple boreholes serving the Nestlé bottling plant in Hollis, Maine); *see also id.* at 30 (Mathews Decl. Ex. D) (geologist letter of January 23, 1998 stating that "the Drinking Water Program approved your application to label water from the Pure Mountain Spring borehole as 'spring water'"); *id.* at 38 (Mathews Decl. Ex. H) (compliance officer letter of September 12, 2007 stating that the "[t]he NWNA-Bradbury Spring sources and bulk water loadout facility are hereby approved" and to be "bottled under the label: 'Poland Spring Natural Spring Water.'").

Nestlé does not show that these approvals cover all sources of water and the entire time period at issue in this action. Indeed, even the declaration of Kevin Mathews is equivocal about whether alleged approvals extended to all of the Poland Spring water produced, stating that "[t]he spring water sources that supplied water to each of [Nestlé's] four bottling facilities for the Poland Spring® brand during the period 2003 through 2017, included *some or all* of the eight springs referenced in Plaintiffs' complaint." Doc. #219-3 at 2 (¶ 3) (emphasis added). Accordingly, I conclude that at least a genuine fact issue remains whether the safe harbor exemption applies to defeat plaintiffs' MUTPA and MUDTPA claims under Maine law.

### 3. *Collateral attack under Maine law*

Nestlé further argues that plaintiffs' MUTPA and MUDTPA actions amount to an improper collateral attack on Maine agency determinations. But, as explained above, the predicate for this argument is missing: there remains a genuine fact issue whether the State of Maine approved the sale of all the Poland Spring bottled water as spring water that is the subject of the complaint in this action. Accordingly, it is premature to consider any argument that this action constitutes an impermissible collateral attack on licenses or permits issued by the State of Maine.

### <u>*Massachusetts*</u>

### 1. *Private right of action under Massachusetts law*

Count VII of the amended complaint alleges a violation of the Massachusetts Consumer Protection Act ("MCPA"), Mass. Gen. Laws ch. 93A, §§ 1-11, which prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). The MCPA (which is commonly referred to simply as "Chapter 93A") creates a private right of action to pursue damages and equitable relief

for consumers "injured by another person's use or employment of any [prohibited trade practice]." *Id.* § 9(1).

As I have previously ruled, Massachusetts law adopts the federal "spring water" standard. *See Patane*, 369 F. Supp. 3d at 391 (citing 105 Mass. Code Regs. 500.090(I)(2)). Nestlé argues that Massachusetts law does not provide a private right of action for this regulatory provision. *See, e.g.*, *Barbuto v. Advantage Sales & Mktg., LLC*, 78 N.E.3d 37, 49-50 (Mass. 2017) (discussing general principles governing whether to imply a private right of action from a statute that does not create one).

Even assuming that there is no private right of action for the violation of the Massachusetts spring water regulation, the relevant question is whether a cause of action under Chapter 93A may be based on conduct that violates the Massachusetts spring water standard. The answer under Massachusetts law is that a cause of action under Chapter 93A may be based on conduct that violates another provision of law for which there is no private right of action provided that two conditions are met: (1) if the violation amounts to an unfair or deceptive act in and of itself; and (2) if recovery under Chapter 93A would be compatible with the objectives and enforcement mechanisms of the underlying law. *See Drakopoulos v. U.S. Bank Nat. Ass'n*, 991 N.E.2d 1086, 1097 n.19 (Mass. 2013); *Whitehall Co. v. Merrimack Valley Distrib. Co.*, 780 N.E.2d 479, 483 (Mass. App. Ct. 2002); *Squizzero v. U.S. Bank Nat'l Ass'n for Residential Funding Mortg. Sec. I, Inc.*, 2018 WL 3651351, at *3 (D. Mass. 2018).

I conclude that both of these requirements are met. First, plaintiffs allege that Nestlé has engaged in conduct that is unfair or deceptive in and of itself—that Nestlé has sold them one thing (ordinary groundwater) while passing it off as something else (spring water). The complaint is replete with allegations that Nestlé has not merely engaged in a hypertechnical

violation of the spring water standard but has violated the standard by inherently deceptive and fraudulent means. At least a genuine fact issue remains whether Nestlé did so.[8]

Second, allowing recovery under Chapter 93A for an inherently unfair or deceptive violation of the spring water standard would be compatible with the objectives and enforcement mechanisms for a violation of the Massachusetts spring water standard. The objective of the standard is to distinguish between spring water and other forms of water, and recovery under Chapter 93A is compatible with Massachusetts law prohibiting the misbranding of bottled water and violations of the standard of identity for spring water in marketing. *See* 105 Mass. Code Regs. 500.090. Notwithstanding the absence of an express private right of action for a violation of the Massachusetts spring water standard, this does not mean that it would be incompatible with or frustrate the enforcement mechanisms for a violation of the Massachusetts spring water standard to allow a violation of the standard to serve as the basis for a private cause of action. Moreover, although Massachusetts law provides for public enforcement of a misbranding of bottled water, *see* Mass. Gen. Laws ch. 94, §§ 10E½, 10F, there is no further provision barring private enforcement or specifying an alternative remedial scheme for those who may be injured as a consequence of a violation of the spring water standard.

Not to the contrary are cases cited by Nestlé. For example, in *McGonagle v. Home Depot, U.S.A., Inc.*, 915 N.E.2d 1083 (Mass. App. Ct. 2009), the Massachusetts Appellate Court declined to allow a Chapter 93A claim to proceed for a violation of an otherwise non-actionable sales tax regulation where there was no allegation that the defendant profited from the alleged violation and where state law otherwise allowed for an alternative administrative remedy for the

---

[8] This case is distinguishable, for example, from *Whitehall* in which the Massachusetts Appellate Court concluded that a Chapter 93A claim was properly dismissed because it was premised on an allegation of price discrimination in violation of a different statute without additional allegations of an adverse impact on competition, and price discrimination alone was not a prohibited trade practice under Chapter 93A. 780 N.E.2d at 483-87.

overcollection of sales tax. *Id.* at 1089-90; *see also Whitehall*, 780 N.E.2d at 487 (competitor's bare allegation of price discrimination in violation of a state statute and without additional allegations of harm to competition did not amount to the type of violation that is actionable under Chapter 93A).[9] I conclude that plaintiffs have a right of action to pursue their Chapter 93A claim on the basis of the conduct they allege that violates the Massachusetts spring water standard.

### 2.   *Safe harbor exemption under Massachusetts law*

Chapter 93A expressly exempts from liability "transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth or of the United States," and places "the burden of proving exemptions . . . upon the person claiming the exemptions." Mass. Gen. Laws ch. 93A, § 3. As the Massachusetts Supreme Judicial Court has noted, "[t]hat burden is a heavy one." *Aspinall v. Philip Morris, Inc.*, 902 N.E.2d 421, 424 (Mass. 2009). It is heavy because "a defendant must show more than the mere existence of a related or even overlapping regulatory scheme that covers the transaction" but rather "must show that such scheme affirmatively *permits* the practice which is alleged to be unfair or deceptive." *Ibid.* (internal quotations and citation omitted); *see also Malden Transp., Inc. v. Uber Techs., Inc.*, 386 F. Supp. 3d 96, 103 (D. Mass. 2019) (same).

Here, there is clearly a regulatory scheme that covers the labeling and sale of bottled water in Massachusetts, including through licensure under the Massachusetts Department of Public Health. *See* Mass. Gen. Laws ch. 94, §§ 10A-10G, 187-192; 105 Mass. Code Regs.

---

[9] Nestlé also quotes *Animal Legal Def. Fund Bos., Inc. v. Provimi Veal Corp.*, 626 F. Supp. 278 (D. Mass.), *aff'd*, 802 F.2d 440 (1st Cir. 1986), for the proposition that plaintiffs cannot "enforce chapter 94, the Massachusetts statute which parallels the FDCA, in a private action under the Massachusetts consumer protection [] statute." *Id.* at 283. But the court in *Provimi* ultimately ruled on grounds that a state law cause of action would be preempted by federal law, *id.* at 286 n.5—an issue that I have separately addressed in my prior rulings in this action. *See also Dumont v. Reily Foods Co.*, 934 F.3d 35, 43 (1st Cir. 2019) (MCPA action under Chapter 93A involving food labeling not preempted by federal law where "the conduct that does violate the federal regulations is also deceptive under Massachusetts law by virtue of its nature rather than its federal illegality").

500.001-500.008, 500.090-500.213. But although bottled water may only be sold as "spring water" if it meets the applicable standard of identity, 105 Mass. Code Regs. 500.090(I)(2), a genuine fact issue remains for the reasons detailed below whether the State of Massachusetts has specifically *permitted* Nestlé to sell its bottled water as spring water.

Massachusetts law requires the submission of water quality test results to the Massachusetts Department of Public Health for licenses to sell drinking water from out-of-state sources. *Id.* 500.093. But the law does not require that a regulator affirmatively approve that the bottled water or its labels comply with the spring water standard of identity. For out-of-state sources of water, the law requires that they "shall be licensed or approved by the government agency having jurisdiction, if such jurisdiction issues such licenses or approvals," and "[a] copy of the current such license or approval shall be provided to the Department by the bottler upon application and reapplication for a license, and upon substantial modification of the source or source treatment, or upon the addition of a new source." *Id.* 500.091(C)(1). Moreover, "[a]ll bottlers who use an out-of-state or foreign water source shall provide documentation to the Department from the appropriate government agency regarding the type of water source to be used in finished products, as specified in 21 CFR 165.110: *Bottled Water* (*e.g.* well, spring, *etc.*)." *Id.* 500.091(C)(2).

The regulations further specify an approval process for the sale of "new" sources of water. One of the regulations provides as to out-of-state sources like Poland Spring water that "[p]rior to the sale of products using any new or substantially modified source or new or substantially modified treatment, the bottler shall submit to the Department the information specified in 105 CMR 500.091(A)(4) and (6)." *Id.* 500.091(C)(2). These cited provisions in turn require the specific identification of "[t]he type of source (e.g. well, spring)," a "detailed location

22

of the source," any "[i]nformation about the use and treatment of the source," and "if the source is not a public water system," the provision of analytic information about the water's microbiological, physical, radiological, and chemical quality as required to be submitted for in-state sources of water. *Id.* 500.091(A)(4)(a), (b), (d), and (f) (citing 105 Mass. Code Reg. 500.093(A)(1)(a)).

In addition, for any source of "new" water the applicant must also submit "[o]ne label for each container size and brand name of the product that is proposed to be sold." *Id.* 500.091(A)(6)(a). As to such "new" sources of water, the regulations state that "[t]he bottler shall not sell products manufactured with water from the new or substantially modified source or new or substantially modified treatment until written approval is received from the Department." *Id.* 500.091(C)(4).

This review process comports with the Massachusetts bottled water license application, which requires that applicants self-identify the water source type and submit "[l]abels for each container size and brand name of the product that are sold in Massachusetts." Doc. #229-17 at 5. It further provides that they submit "all required source and finished product analysis." *Id.* at 2.

Nestlé has submitted an assortment of permits issued by the State of Massachusetts and the Town of Framingham. *See* Doc. #219-3 at 67-75 (Mathews Decl. Exs. S, T, and U). None of these permits refers to spring water. Thus, the permits themselves do not substantiate the declaration by Kevin Mathews that "[t]he MDPH issued permits to NWNA for its bottling facilities after it determined the spring water sources supplying water to those facilities were compliant with the FDA standard of identity of spring water . . . ." *Id.* at 8 (¶ 22). This case is therefore distinguishable from *O'Hara v. Diageo-Guinness, USA, Inc.*, 306 F. Supp. 3d 441 (D. Mass. 2018), *on reconsideration*, 370 F. Supp. 3d 204 (D. Mass. 2019), in which the court

applied the safe harbor exemption in part and insofar as the regulatory agency specifically reviewed and approved that aspect of the product bottle label (but not the product's carton) concerning the product's source that the plaintiffs contended was misleading.

On the other hand, Nestlé has also submitted numerous approval letters from the Department following Nestlé's notification through its compliance consultant to the Department at various times of "new" sources of Poland Spring water. Doc. #219-3 at 76-84 (Mathews Decl. Exs. V and W).  For example, one of the letters issued by the Department states as follows:

> This letter is in response to your letter of March 6, 2003, requesting approval of a new spring product being produced at the Poland, ME plant which is a blend of three springs, Poland Spring, Evergreen Spring, and Garden Spring. I have reviewed the analytic results and labels sent and am approving the addition of the product to the permit.

*Id.* at 77 (Mathews Decl. Ex. V); *see also id.* at 79-84 (Mathews Decl. Ex. W) (compilation of six letters or email from the Department on various dates from 2003 to 2014 approving addition of new spring water sources to Nestlé's existing permits). Although these suggest that Massachusetts affirmatively permitted *some* of Nestlé's water sources specifically as spring water sources, Nestlé's submissions do not make clear whether these extend to *all* of the Poland Spring water product during the relevant class period from 2003 to 2017. Moreover, the scope and strength of this conclusion is called into question by plaintiffs' submission of a letter from the Department of Public Health stating that the Department "permits out of state bottled water manufacturer to sell or distribute bottled water in Massachusetts" but that the Department "does not and is not required by state statute or regulation to independently verify whether that water is from a 'spring' as described in 105 CMR 500.090(I)(2)." Doc. #254-11 at 2. Accordingly, even as to the approval by Massachusetts of new water sources, a genuine fact issue remains about the application of the safe harbor exemption to this case.

The cases that Nestlé relies on are distinguishable because they do not involve the factual and regulatory ambiguity that is present here. In *Cablevision of Boston, Inc. v. Pub. Imp. Comm'n of City of Bos.*, 38 F. Supp. 2d 46 (D. Mass.), *aff'd*, 184 F.3d 88 (1st Cir. 1999), an electric utility was alleged to have illegally expanded its conduit's capability into telecommunications, but for purposes of considering a motion for preliminary injunction the court found that the conduct was "likely" exempt from Chapter 93A because a municipal regulator had issued the utility a series of amended grants to reflect that the conduit would be used for more than electric cable. *Id.* at 61. The regulator was "generally aware" of the utility's expansion plans at the time it issued the amended grants. *Id.* at 51. Here, apart from Nestlé's notifications and the Department's approval concerning "new" sources of waters, the evidence does not conclusively show the Department's knowledge and approval of the spring water identity of all Poland Spring water sold by Nestlé in Massachusetts during the class period.[10] Accordingly, notwithstanding Nestlé's showing suggesting that at least some of its water sales were approved as "spring water," I find that Nestlé has not met its burden of proving the MCPA exemption as to all of its Poland Spring water sales in Massachusetts.

### 3.   *Collateral attack under Massachusetts law*

Nestlé further argues that plaintiffs' MCPA or Chapter 93A action amounts to an improper collateral attack on Massachusetts agency determinations. But, as explained above, the predicate for this argument is missing: there remains a genuine fact issue whether the State of Massachusetts approved the sale of all the Poland Spring bottled water as spring water that is the

---

[10] Similarly, in *Rogers v. Comcast Corp.*, 55 F. Supp. 3d 711 (E.D. Pa. 2014), the defendant Comcast was exempt from a Chapter 93A claim because the plaintiffs "specifically premise[d] liability under Chapter 93A on Comcast's clustering scheme," and "the transactions that created the cluster were approved by regulators." *Id.* at 719, 721; *see also Riccio v. Ford Motor Credit Co.*, 238 F.R.D. 44, 47 (D. Mass. 2006) (no Chapter 93A claim against auto credit company on the basis of tax charges that the "regulations establish with certitude" were "governed, contemplated, and permitted by the regulations").

subject of the complaint in this action. Accordingly, it is premature to resolve any argument that this action constitutes an impermissible collateral attack on agency action by the State of Massachusetts.

### *New Hampshire*

### *1.   Private right of action under New Hampshire law*

Count X of the amended complaint alleges a violation of the New Hampshire Consumer Protection Act ("NHCPA"), N.H. Rev. Stat. §§ 358-A:1–358-A:13, which provides that "[i]t shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. Rev. Stat. § 358-A:2. Among other specifically defined unfair trade practices within the scope of the NHCPA is "[r]epresenting that goods or services are of a particular standard, quality, or grade, . . . if they are of another." N.H. Rev. Stat. § 358-A:2(VII). The statute creates a private right of action to pursue damages and equitable relief for "[a]ny person injured by another's use of any [prohibited trade practice]." N.H. Rev. Stat. § 358-A:10.

As I have previously ruled, New Hampshire law adopts the federal "spring water" standard. *See Patane*, 369 F. Supp. 3d at 391 (citing N.H. Code Admin. R. He-P 2101.01(ab)). Nestlé argues that New Hampshire law does not provide a private right of action for a violation of this regulatory provision. *See, e.g.*, *Gauthier v. Manchester Sch. Dist.*, 123 A.3d 1016 (N.H. 2015) (no private right of action based on breach of statutory duty to report school bullying and where statute expressly precludes private right of action). Although Nestlé asserts that "[t]he New Hampshire Legislature has provided state regulatory actions as the only enforcement mechanism for violations of bottled water licensing requirements," Doc. #219-1 at 26, the only support it cites for this proposition is an administrative regulation, rather than any kind of

legislative enactment. Moreover, the regulation cited does not purport to preclude private enforcement actions but merely authorizes the relevant New Hampshire agency to revoke a registration if there is reason to believe that bottled water being sold "represents a threat to the public health and safety." N.H. Code Admin. R. He-P 2107.05.

Nestlé does not cite authority showing the intent of the New Hampshire legislature to bar private rights of action based on a violation of New Hampshire's spring water regulation or the fraudulent mislabeling of bottled water in general. More significantly still, Nestlé does not cite authority to suggest that a violation of the NHCPA may not rest on conduct involving the violation of a regulatory standard for which there is no independent private right of action. In the absence of such authority, I conclude that New Hampshire would follow the majority of state courts that allow for an unfair trade practice action to proceed if a plaintiff can show a violation of an otherwise non-actionable regulation in a manner that involves unfair or deceptive conduct that is otherwise within the scope of the unfair trade practices act. *See, e.g.*, *Remsburg v. Docusearch, Inc.*, 816 A.2d 1001, 1011 (N.H. 2003) (noting that "the Massachusetts Consumer Protection Act . . . is similar in many respects to the [NHCPA]").

### 2.   *Safe harbor exemption under New Hampshire law*

Nestlé argues that its alleged conduct falls within the scope of the NHCPA's safe harbor exemption. Prior to 2002, the NHCPA expressly exempted from liability "[t]rade or commerce otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of this state or of the United States." *See Elmo v. Callahan*, 2012 WL 3669010, at *10 n.11 (D.N.H. 2012). In 2002, however, the relevant safe harbor exemption was amended to exempt only "[t]rade or commerce that is subject to the jurisdiction of the bank commissioner, the director of securities regulation, the insurance commissioner, the public

utilities commission, the financial institutions and insurance regulators of other states, or federal banking or securities regulators who possess the authority to regulate unfair or deceptive trade practices." N.H. Rev. Stat. § 358-A:3(I).

The trouble for Nestlé is that bottled water is regulated by the New Hampshire Department of Health and Human Services ("NHDHHS"), *see* N.H. Code Admin. R. He-P 2101.01-2107.07, and this department is not on the enumerated list of regulatory departments under New Hampshire's safe harbor exemption. Other than selectively and misleadingly quoting the statute to omit the limited number of regulatory departments within the scope of the New Hampshire safe harbor exemption, *see* Doc. #219-1 at 35-36, Nestlé makes no non-frivolous argument why the safe harbor exemption should apply. For example, Nestlé relies on *Buchholz v. Waterville Estates Ass'n*, 934 A.2d 511 (N.H. 2007), despite the fact that this case does not cite or apply the safe harbor exemption. The court in *Buchholz* held that a condominium association's manner of collecting fees was not an unfair or deceptive trade practice because it was "explicitly allowed" by the state Condominium Act. *Id.* at 516. By comparison, Nestlé has not shown that New Hampshire law "explicitly allowed" it to sell water as "spring water" if it was not actually "spring water." To the contrary, New Hampshire defines it to be a prohibited trade practice to "[r]epresent[] that goods or services are of a particular standard, quality, or grade . . . if they are of another." N.H. Rev. Stat. § 358-A:2(VII).

Even assuming that New Hampshire's safe harbor exemption applied to regulatory approvals by NHDHHS, a genuine fact issue remains about whether NHDHHS specifically approved Nestlé's sale of bottled water as "spring water" throughout the relevant time period from 2003 to 2017. Nestlé has submitted only registration certificates for 2003 and 2017. *See* Doc. #219-3 at 137-46 (Mathews Decl. Exs. MM and NN). The 2003 registration certificates do

not reference "spring water" and state only that Nestlé is registered to sell "beverages and/or beverage concentrates, in accordance with the terms of the application filed with this Department . . . ." *Id.* at 138-41 (Mathews Decl. Ex. MM). But Nestlé does not include the referenced application materials. The 2017 licenses bear the title "License to Bottle Beverages" without any reference to spring water or the scope of their approval. *Id.* at 143-46 (Mathews Decl. Ex. NN).

Other than these licenses, Nestlé submits three emails from 2005, 2006, and 2009. *Id.* at 148-50 (Mathews Decl. Ex. OO). These three emails appear to be from a supervisor of the relevant department at NHDHHS to Nestlé's compliance consultant. Two of the emails state without elaboration that specific sources submitted by Nestlé will be "added" to the "file." *Id.* at 148, 150. These two emails do not reference the term "spring water."

Just one of the three emails (dated June 20, 2006) specifically references "spring water," stating that "I have reviewed the information you submitted with regards to the addition of White Cedar Spring as a spring water source for the Nestlé Waters North America, Inc., in Poland Spring and Hollis, Maine. The water from this source may be sold as spring water in New Hampshire." *Id.* at 149. This single email referencing a single source for a single year is not enough to show the absence of any genuine issue of fact about the scope and effect of New Hampshire's regulatory approval of the sale of Poland Spring water as "spring water" in New Hampshire.

The declaration of Kevin Mathews describes these documents to suggest that they constituted specific approvals for spring water sales, *see id.* at 14-15 (¶¶ 44-45). But an examination of the documents themselves do not support Mathews's exaggerated and misleading claims about what they say, and—as discussed above—Mathews has not been shown to have any independent basis for knowledge other than what is stated in the documents themselves.

Moreover, plaintiffs themselves have made an inquiry to NHDHSS for any "documents created or prepared after November 5, 2003 relating to whether Poland Spring® brand bottled spring water products contain genuine 'spring water' as defined" under New Hampshire law. Doc. #254 at 8 (¶ 32). The NHDHSS responded that it had no such documents. *Id.* (¶ 33).

The regulations cited by Nestlé prohibit bottled water mislabeling, but they do not require the regulator to confirm that the water source is in fact spring water or that the label is accurate. *See* N.H. Code Admin. R. He-P 2102.03(f) (requiring direct proof that a water source is in fact spring water only "on request" from the regulator); *id.* 2107.01(b)(2) (requiring for out-of-state bottled water labeled as "spring water" proof that a "government agency with the authority to approve sources for bottled water" approved the source of the water as such). Only sellers of bottled water from *in-state* facilities are even required to submit proposed labels. *Compare id.* 2104.01(b)(1), *with id.* 2107.01.

Nestlé has not met its burden of proving the safe harbor exemption under New Hampshire law. It has not shown that New Hampshire law extends a safe harbor exemption from NHCPA liability to activities that have been regulatorily approved by NHDHHS. And it has not shown the absence of a genuine issue of fact on the issue of the scope and effect of NHDHHS regulatory approvals.

### 3. *Collateral attack under New Hampshire law*

Nestlé further argues that plaintiffs' NHCPA action amounts to an improper collateral attack on New Hampshire's agency determinations. But, as explained above, the predicate for this argument is missing: there remains a genuine fact issue whether the State of New Hampshire approved the sale of all the Poland Spring bottled water as spring water that is the subject of the

complaint in this action. Accordingly, it is premature to resolve any argument that this action constitutes an impermissible collateral attack on agency action by the State of New Hampshire.

### *New Jersey*

#### 1. *Private right of action under New Jersey law*

Count III of the amended complaint alleges a violation of the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. § 56:8-1 *et seq.*, which creates a private right of action for "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any [prohibited trade practice]." *Id.* § 56:8-19. It prohibits "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . ." *Id.* § 56:8-2. The NJCFA is "remedial legislation which should be construed liberally." *Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d 1076, 1079 n.1 (N.J. 2007).

As I have previously ruled, New Jersey law adopts the federal "spring water" standard. *See Patane*, 369 F. Supp. 3d at 391 (citing N.J. Admin. Code § 8:21-5.5(a)). New Jersey law requires that bottled water labels conform with the FDA standard of identity for spring water, or else such water will be deemed misbranded under sections 24:5-16 and 24:5-17 of the New Jersey Food and Drug Act ("NJFDA"), N.J. Stat. §§ 24:1-1–24:21-53. *See* N.J. Admin. Code § 8:21-5.5(a), (c). Misbranding is subject to civil actions for penalties and equitable relief under the NJFDA, *see* N.J. Stat. §§ 24:17-1, 24:17-4, as well as administrative license revocation, *see* N.J. Admin. Code § 8:21-5.19. The NJFDA further provides for exclusive public enforcement:

that "[e]xcept as otherwise specifically provided, any and all penalties prescribed by any provision of this subtitle shall be sued for and recovered in a civil action by and in the name of the State Department of Health, or . . . the local board of health . . . ." N.J. Stat. § 24:17-5; *see also Cameron v. Monkey Joe's Big Nut Co.*, 2008 WL 6084192, at *6 (N.J. Super. L. 2008) (the NJFDA does not "confer[] private rights on consumers").

Notwithstanding the lack of a private right of action to enforce New Jersey's spring water branding regulation, the relevant question is whether a cause of action may proceed under the NJCFA on the basis of conduct that amounts to the alleged fraudulent misbranding of ordinary groundwater water as "spring water." The answer to this question is in the text of the NJCFA itself: it expressly includes claims for the fraudulent misbranding of food products. It provides that "[t]he identity of said food or food products shall be deemed misrepresented if . . . [i]ts description is false or misleading in any particular," or "[i]t is served, sold, or distributed under the name of another food or food product," or "[i]t purports to be or is represented as a food or food product for which a definition of identity and standard of quality has been established by custom and usage unless it conforms to such definition and standard." *Id.* § 56:8-2.10; *see also Gupta v. Asha Enterprises, L.L.C.*, 27 A.3d 953, 959 (N.J. Super. App. Div. 2011).

Nor is there anything in the text of the NJCFA that bars its application to conduct for which there is not an independent private right of action; to the contrary, the text of the NJCFA provides that its "rights, remedies and prohibitions" are "in addition to and cumulative of any other right, remedy or prohibition accorded by the common law or statutes of this State . . . ." N.J. Stat. § 56:8-2.13; *see also Sun Chem. Corp. v. Fike Corp.*, --- A.3d ----, 2020 WL 4342658, at *6-7 (N.J. 2020) (discussing broad applicability of NJCFA). In view that the NJCFA expressly

extends to claims for the misrepresentation of the identity of food products, there is no merit to

Nestlé's claim that plaintiffs may not maintain a private right of action under the NJCFA.

### 2. *Safe harbor exemption under New Jersey law*

Although Nestlé argues that it is entitled to a "safe harbor" exemption under New Jersey

law, it does not point to any statute that creates such a "safe harbor" from an action under the

NJCFA or from any other form of action. Instead, Nestlé argues for a judicial "safe harbor" in

accordance with the New Jersey Supreme Court's decision in *Lemelledo v. Beneficial Mgmt.*

*Corp. of Am.*, 696 A.2d 546 (N.J. 1997). In *Lemelledo*, the New Jersey Supreme Court construed

the NJCFA not to apply to conduct for which there is a "real possibility"—as opposed to a "mere

possibility"—"that a direct and unavoidable conflict exists between application of the [NJCFA]

and application of the other regulatory scheme or schemes," and "that the other source or sources

of regulation deal specifically, concretely, and pervasively with the particular activity . . . ." *Id.* at

554. The court noted that "[i]n the modern administrative state, regulation is frequently

complementary, overlapping, and comprehensive," and therefore "[i]t is not readily to be

inferred that the Legislature, by enacting multiple remedial statutes designed to augment

protection, actually intended that parties be subject only to one source of regulation." *Ibid.*

Clearly, there is overlap in function between the NJCFA and NJFDA, but they do not

align completely. "The [NJCFA] has three main purposes: to compensate the victim for his or

her actual loss; to punish the wrongdoer through the award of treble damages; and, by way of the

counsel fee provision, to attract competent counsel to counteract the community scourge of fraud

by providing an incentive for an attorney to take a case involving a minor loss to the individual."

*Lettenmaier v. Lube Connection, Inc.*, 741 A.2d 591, 593 (N.J. 1999) (citations omitted). In cases

of bottled-water misbranding, the NJFDA allows for administrative penalties and license

revocation—common tools employed by other New Jersey agencies to deter further wrongdoing. *See, e.g.*, *Caride v. Fisher*, 2019 WL 4858324, at *6-8 (N.J. Super. App. Div. 2019). But the NJFDA does not offer the victims of misbranding compensatory damages, nor does it require that the New Jersey Department of Health's limited enforcement resources be deployed in cases involving only small claims—two of the NJCFA's primary purposes.

There is no "real possibility" of an irreconcilable conflict between the two statutes' deterrence functions. Rather, the NJCFA will tend to augment the NJFDA's deterrence function; treble damages won by private plaintiffs will deter minor cases of misbranding, while civil penalties sought by the state will deter major ones. Of course, there may be instances where treble damages and penalties are sought for the same violation. The New Jersey Supreme Court recognized this possibility in *Lemelledo*, in which NJCFA damages were sought when other statutes exposed the defendant to public fines and license revocation, but it permitted the NJCFA claim to proceed, reasoning that "a court can assess damages in addition to any other penalty to which a defendant is subject" and that courts will be able to construe the statutes and regulatory schemes at issue so as "not to impose conflicting duties or duplicative financial obligations on the regulated party." 696 A.2d at 555. Thus, as the Third Circuit has concluded, "[t]he allowance of a private right of action in conjunction with regulatory action does not amount to 'a direct and unavoidable conflict' reproved by *Lemelledo*." *Alpizar-Fallas v. Favero*, 908 F.3d 910, 917 (3d Cir. 2018).

Nestlé misplaces its reliance on *Daaleman v. Elizabethtown Gas Co.*, 390 A.2d 566 (N.J. 1978), which had "unique facts," *Shaw v. Shand*, 217 A.3d 1180, 1200 (N.J. Super. App. Div. 2019), and is among the "few, very limited exceptions to the [NJCFA]'s reach," *Real v. Radir Wheels, Inc.*, 969 A.2d 1069, 1077 (N.J. 2009). In *Daaleman*, a Public Utilities Commission

regulation permitted privately owned public utilities to include in their tariffs a clause allowing them to automatically adjust the otherwise fixed rate to account for variations in the cost of gas, so long as the utilities submitted to the Commission "detailed statements as to such cost figures and adjustments in billings made [under the regulation]." 390 A.2d at 568. In response to the plaintiffs' claim that the defendant utility overstated the cost of gas in its filed tariff and in customer billings, the New Jersey Supreme Court found that "application of the [NJCFA] to utility rate-setting could have [led] to the anomalous result of a tariff approved by the [Public Utilities Commission] but rejected and penalized by the Division of Consumer Affairs or the courts applying the [NJCFA]." *Lemelledo*, 696 A.2d at 553 (discussing *Daaleman*).

Here, the applicable regulation requires that a bottled-water seller submit to the New Jersey Department of Health what type of water it plans to sell, the labels it plans to use, and information about the water quality, but the regulation does not aim to verify that the water source type is what the seller says it is, *see* N.J. Admin. Code § 8:21-5.15, and Nestlé's submissions do not show otherwise, Doc. #219-3 at 85-101 (Mathews Decl. Exs. X, Y, Z, AA, and BB). The record reflects that Nestlé represented to the Department that its water was spring water by way of a simple checkmark, *see, e.g.*, *id.* at 99, and any labeling approvals it received were pursuant to that alleged misrepresentation. This is hardly a *Daaleman* situation.

Nestlé relies on several cases that apply the "learned professional" exemption to the NJCFA, which is a separate judicially recognized exemption that plainly does not apply here. *See Macedo v. Dello Russo*, 840 A.2d 238, 242 (N.J. 2004). Nestlé also cites *Hampton Hosp. v. Bresan*, 672 A.2d 725 (N.J. Super. App. Div. 1996), which predates *Lemelledo*, was expressly "limited to an exclusion of hospitals from the purview of the [NJCFA] for services rendered to its patients, pursuant to medical judgment," *id.* at 731 n.3, and involved conduct that "did not fit

the traditional understanding of the type of acts prohibited by the [NJCFA]," *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 674 A.2d 582, 586 (N.J. Super. App. Div. 1996), *aff'd*, 696 A.2d 546 (N.J. 1997).

Finally, Nestlé cites *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173 (3d Cir. 2000), where the Third Circuit, applying *Lemelledo*, held that blackjack players' claim that a casino's countermeasures against their card-counting violated the NJCFA was precluded by the New Jersey Casino Control Commission's pervasive regulation of casino gaming and its "particularized expertise in these matters not possessed by courts and juries." *Id.* at 188-89. The court "emphasiz[ed]" that "the Casino Control Act presupposes that the consumers as a group, *i.e.*, the players, will lose their money, a contemplated result that hardly is the object of the [NJCFA]," and which creates a "real possibility of conflict" between the two statutes. *Ibid.* Here, by contrast, "it is well within the conventional experience of courts to address consumer fraud issues" such as this "ordinary question[]" of whether the labels at issue "contain false, deceptive or misleading statements." *Smerling v. Harrah's Entm't, Inc.*, 912 A.2d 168, 175 (N.J. Super. App. Div. 2006). Nestlé has not met its burden to show that its alleged misbranding activity is subject to any safe harbor exemption under the NJFCA.

### 3. Collateral attack under New Jersey law

Nestlé argues that this lawsuit amounts to an improper collateral attack on permits issued to Nestlé by New Jersey. But Nestlé's evidence of its licensing status through the relevant time period is thin. Nestlé's materials include only bottled water certifications from 2003, 2009, and 2017. *See* Doc. #219-3 at 85-96 (Mathews Decl. Exs. X, Y, and Z). These certifications bear the title of "Bottled and Bulk Water Certification," and they do not state any specific authorization for Nestlé to sell its Poland Spring product as "spring water" in New Jersey. Nestlé further

adduces a single one-year license application document from 2002 in which it check-marked a box for "spring water." *Id.* at 97-99 (Mathews Decl. Ex. AA); *see also* Doc. #254 at 7-8 (¶¶ 28-30) (describing documents produced to plaintiffs by the New Jersey Department of Health reflecting lack of "indicat[ion] that the Department ever determined whether Poland Spring water qualifies as 'spring water,'" as well as ambiguity about Nestlé's representations to the Department about the nature of the water subject to its bottled water certifications). This is not enough to preclude a genuine fact issue about the scope and effect of Nestlé's certifications under New Jersey law. Accordingly, there is at least a genuine fact issue that prevents any determination that plaintiffs' claims constitute an impermissible collateral attack on agency action by the State of New Jersey.

### *New York*

#### *1. Private right of action under New York law*

Counts IV and V of the amended complaint allege violations of New York's consumer protection laws. Section 349 of New York's General Business Law ("GBL § 349") creates a private right of action against persons who engage in deceptive acts or practices in the conduct of any business, trade or commence. Similarly, section 350 of New York's General Business Law ("GBL § 350") creates a private right of action against persons who engage in false advertising in the conduct of any business, trade or commence. *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 122 (2d Cir. 2013).

As I have previously ruled, New York regulations essentially adopt the federal "spring water" standard. *See Patane*, 369 F. Supp. 3d at 392-93 (citing 10 N.Y.C.R.R. § 5-6.3(s), 5-6.4(c)(5)). New York regulations similarly impose labeling requirements to require identification of spring water on bottled water labels. *See* 10 N.Y.C.R.R. § 5-6.12(a)(1)(i). A violation of these

regulatory requirements "may subject the owner or operator of the bottled . . . water facility to civil penalties of up to $2,000 per violation, revocation of their certificate of approval to distribute bottled . . . water within New York State and/or a recall of all products on the market in New York State." *Id.* § 5-6.17. The New York Commissioner of Health "shall enforce the public health law, [and] the sanitary code . . . ." N.Y. Pub. Health Law § 206(1)(f).

Although Nestlé insists that there is no private right of action for violating these regulatory requirements, the relevant question is whether a private right of action under GBL § 349 and § 350 may proceed on the basis of the alleged conduct that amounts to a violation of these regulatory requirements. In *Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*, 875 F.3d 107 (2d Cir. 2017), the Second Circuit affirmed that GBL § 349 permits private actions based on conduct that violates other state laws that are not otherwise actionable, but also noted "a limited preclusion of liability under § 349" where such actions are premised on "acts [that] are not inherently deceptive so as to violate GBL § 349, regardless of whether they violate another statute." *Id.* at 126-27. In other words, a plaintiff may "'make a free-standing claim of deceptiveness under GBL § 349 that happens to overlap with a possible claim' under another statute," but may not "re-characterize[] [acts] as 'deceptive' simply on the grounds that they violate another statute which does not allow for private enforcement . . . ." *Id.* at 127 (distinguishing *Conboy v. AT & T Corp.*, 241 F.3d 242 (2d Cir. 2001), and *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187 (2d Cir. 2005)).

Here, at least a genuine issue of fact remains whether Nestlé's labeling of its Poland Spring water as "spring water" is inherently deceptive and false or misleading. I understand "inherently deceptive" to mean that the conduct, as alleged and without reference to any law, meets the ordinary definition of "deceptive"—*i.e.*, conduct that is "likely to mislead a reasonable

consumer acting reasonably under the circumstances." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995). Thus, when a consumer alleges a manufacturer sold her one thing as another, she has a claim regardless of whether that other thing is defined by law, because a reasonable consumer is likely to be misled by such conduct. On the other hand, if a consumer alleges that in violation of other laws with no private rights of action she was "harassed" by her creditor's repeated phone calls over a debt that she owed, *cf. Conboy*, 241 F.3d at 257-58, or that her cable provider offered a reduced seasonal rate to others without offering it to her, *cf. Broder*, 418 F.3d at 199-200, that is not what one would ordinarily think of as deceptive and so the claims would fail.

Here, plaintiffs have alleged that Nestlé sold them one thing (*i.e.*, ordinary groundwater) as another (*i.e.*, "spring water")—conduct for which there is at least a genuine issue of fact whether it is inherently deceptive for purposes of GBL § 349 and inherently false or materially misleading for purposes of GBL § 350. Accordingly, I will deny summary judgment on Nestlé's claim that there is no private right of action under GBL §§ 349 and 350.

### 2. *Safe harbor exemption under New York law*

Nestlé argues that its activities are subject to the statutory safe harbor exemption that is available under GBL §§ 349 and 350. In particular, GBL § 349 makes it "a complete defense that the [alleged deceptive] act or practice is, or if in interstate commerce would be, subject to and complies with the rules and regulations of, and the statutes administered by, the federal trade commission or any official department, division, commission or agency of the United States . . . ." N.Y. Gen. Bus. Law § 349(d). Likewise, GBL § 350 makes it "a complete defense that the [alleged false] advertisement is subject to and complies with the rules and regulations of, and the statutes administered by the Federal Trade Commission or any official department, division,

commission or agency of the state of New York." *Id.* § 350-d. "Courts have construed § 350-d to be congruent with § 349(d) and also to cover regulations promulgated by federal agencies other than the FTC." *Marcus v. AT & T Corp.*, 938 F. Supp. 1158, 1173 (S.D.N.Y. 1996), *aff'd*, 138 F.3d 46 (2d Cir. 1998).

"[T]he GBL's safe harbor provisions . . . provide[] a complete defense [when] the act or practice at issue is subject to and complies with federal rules and regulations . . . ." *Bourbia v. S.C. Johnson & Son, Inc.*, 375 F. Supp. 3d 454, 465 (S.D.N.Y. 2019). Here, there is a clear fact issue whether Nestlé has complied with the New York regulations that adopt the federal definition of spring water. "[M]aking deceptive statements cannot be considered *compliance* with federal rules, regulations, and statutes, as required by [GBL] § 349(d)." *People ex rel. Spitzer v. Gen. Elec. Co.*, 302 A.D.2d 314, 315 (N.Y. App. Div. 2003).

Nestlé's evidence includes certificates of approval issued by the New York Department of Health in 2003, 2016, and 2017. *See* Doc. #219-3 at 50-57 (Mathews Decl. Exs. M and N). These certificates bear the title "Certificate of Approval to Operate a Bottled Water Facility" and list specific sources by the designation of "Spring" or "Spring (Borehole)" as their "Type." *Ibid.* These certificates at most establish approvals for a very limited time period and do not further explain their scope and effect with respect to the designation of a source as "spring water."

Nestlé also includes a fragmentary collection of four letters from the New York Department of Public Health. *See* Doc. #219-3 at 58-66 (Mathews Decl. Exs. O, P, Q, and R). First, there is a 2014 letter from the New York Department of Health stating that the department "has modified your certificate to include an additional water source, Spring Borehole #6, which will be used to produce spring and purified water products," and further stating that "[b]ased on the hydrogeological and chemical data submitted to this office for review, the NYSDOH concurs

that the new Borehole #6 is appropriately classified as spring water." *Id.* at 59 (Mathews Decl. Ex. O). Another letter from March 2003 states in connection with a certificate that was to expire on October 31, 2003, that the Department has "reviewed the information sent in concerning the new composite spring water finished product," and "[t]his product is approved for distribution in New York State along with the following labels," followed by a list of labels for "Poland Spring Natural Spring Water" in varying bottle sizes. *Id.* at 64 (Mathews Decl. Ex. Q). Still another letter from June 2003 for a certificate that was to expire on November 30, 2003, states that the Department "is pleased to approve the following labels for distribution in New York State" and followed by designation of "Poland Springs Natural Spring Water" in varying bottle sizes. *Id.* at 64 (Mathews Decl. Ex. R).[11]

These letters at best establish "spring water" approvals for a very limited time and not necessarily for all the sources of Poland Spring water sold by Nestlé in New York State. Moreover, it is far from clear that such letters qualify as "rules" or "regulations" within the scope of the GBL safe harbor provisions. *See Greene v. Gerber Prod. Co.*, 262 F. Supp. 3d 38, 71 (E.D.N.Y. 2017) (denying motion to dismiss under GBL safe harbor defense where unclear that a regulatory agency letter constituted a "rule" or "regulation" within the scope of the safe harbor provisions). Moreover, GBL § 349's safe harbor provision does not apply to approvals by *state* agencies at all. *See Carias v. Monsanto Co.*, 2016 WL 6803780, at *8 (E.D.N.Y. 2016). A genuine issue of fact remains concerning the application of the safe harbor defenses under GBL §§ 349 and 350.

---

[11] The fourth letter submitted by Nestlé does not purport to approve any labels but to the contrary faults Nestlé for failing to identify sources of its water that are consistent with those in the Department's database and warns that Nestlé's failure to respond may result in removal of Nestlé from the list of active bottlers in New York State. Doc. #219-3 at 61-62 (Mathews Decl. Ex. P). This letter tends to undercut Nestlé's argument.

### 3.   Collateral attack under New York law

Nestlé further argues that plaintiffs' claims amount to an improper collateral attack on New York's agency determinations. But, as explained above, the predicate for this argument is missing: there remains a genuine fact issue whether the State of New York has approved the sale of all the Poland Spring bottled water as spring water that is the subject of the complaint in this action. *See also ABN AMRO Bank, N.V. v. MBIA Inc.*, 17 N.Y.3d 208, 226-27 (N.Y. 2011) (declining to preclude private action absent opportunity by plaintiffs to have participated in the regulatory approval at issue). Accordingly, it is premature to resolve any argument that this action constitutes an impermissible collateral attack on agency action by the State of New York.

### <u>Pennsylvania</u>

### 1.   Private right of action under Pennsylvania law

Count XII of the amended complaint alleges a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPL"), 73 Pa. Stat. §§ 201-2, 201-3, which creates a private right of action to pursue damages and "additional relief" for "[a]ny person who purchases or leases goods . . . primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property . . . as a result of the use or employment by any person of a [prohibited trade practice]." *Id.* § 201-9.2.

The PUTPCPL "aims to protect the consumers of the Commonwealth against fraud and unfair or deceptive business practices," and "[a]s a remedial statute, it is to be construed liberally to effectuate that goal." *Commonwealth v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1023 (Pa. 2018). Among those actions that specifically qualify as an unfair or deceptive act or practice is "[r]epresenting that goods or services are of a particular standard, quality or grade . . . if they are of another." 73 Pa. Stat. § 201-2(4)(VII).

42

As I have previously ruled, Pennsylvania law adopts the federal "spring water" standard along with a consistent labeling requirement. *See Patane*, 369 F. Supp. 3d at 391 (citing 3 Pa. Cons. Stat. §§ 5729(a), 5736(a)(4)). Although it does not appear that Pennsylvania law creates a specific cause of action for violation of these state spring water standards, the relevant question is whether an action may proceed under the PUTPCPL on the basis of fraudulent or deceptive conduct violating Pennsylvania's spring water standard notwithstanding the absence of a direct right of action. The answer to this question is that "even where the unlawful practice is directly addressed by another consumer-related statute, a plaintiff may nevertheless pursue his action under the [PUTPCPL] since that statute is broad enough to encompass all claims of unfair and deceptive acts or practices in the conduct of any trade or commerce." *Ash v. Cont'l Ins. Co.*, 932 A.2d 877, 881-82 (Pa. 2007); *see also Pekular v. Eich*, 513 A.2d 427, 432 (Pa. Super. 1986).

Nestlé cites *Estate of Witthoeft v. Kiskaddon*, 733 A.2d 623 (Pa. 1999), which merely held that "[t]he violation of a statute and the fact that some person suffered harm does not automatically give rise to a private cause of action in favor of the injured person," absent one "expressly provided" or a "statutory basis to imply the same." *Id.* at 627-28. But here of course Pennsylvania has "expressly provided" a cause of action for unfair or deceptive trade practices which specifically include "[r]epresenting that goods or services are of a particular standard, quality or grade . . . if they are of another." 73 Pa. Stat. § 201-2(4)(VII).

 Nestlé also cites a predecessor to the Pennsylvania Food Safety Act, which was not privately enforceable because it was "entirely criminal and [did] not provide a private right of action for its violation." *Clouser v. Shamokin Packing Co.*, 361 A.2d 836, 838 n.1 (Pa. Super. 1976). The remaining two cases cited by Nestlé held that the court did not yet have jurisdiction to decide a PUTPCPL claim premised on a violation of a separate statute because the statute in

question provided for administrative review of precisely that question, which review the plaintiff

had not exhausted. *See Moy v. Schreiber Deed Sec. Co.*, 572 A.2d 758, 760-61 (Pa. Super. 1990);

*Gordon v. Pennsylvania Blue Shield*, 548 A.2d 600, 603 (Pa. Super. 1988). All these cases are

inapplicable here. Accordingly, I will deny summary judgment on Nestlé's claim that there is no

private right of action under the PUTPCPL.

### 2. *Safe harbor exemption under Pennsylvania law*

Nestlé argues that it is entitled to a safe harbor defense under Pennsylvania law but fails

to cite any provision of the PUTPCPL that creates any safe harbor exemption from its

application. Indeed, as one federal court in Pennsylvania has ruled, there is no "regulatory

compliance defense" to an otherwise proper claim under the PUTPCPL. *See Landau v. Viridian

Energy PA LLC*, 223 F. Supp. 3d 401, 420 (E.D. Pa. 2016).

Nestlé nonetheless relies on *Fay v. Erie Ins. Grp.*, 723 A.2d 712 (Pa. Super. 1999),

for the proposition that Pennsylvania has "explicitly adopted or applied the 'safe harbor' doctrine

which precludes civil remedies for conduct that is expressly permitted under federal or state

law." *In re Anheuser-Busch Beer Labeling, Mktg. & Sales Practices Litig.*, 2014 WL 12659447,

at *6 (N.D. Ohio 2014) (citing *Fay*, 723 A.2d at 715, in a string cite of seven state laws), *aff'd*,

644 F. App'x 515 (6th Cir. 2016). "In *Fay*, the Superior Court affirmed the dismissal of a

[PUTPCPL] claim against an insurer where the plaintiff alleged that she purchased three

accidental death policies, but that the terms of the policies reduced their value by prohibiting the

stacking of benefits." *Grudkowski v. Foremost Ins. Co.*, 556 F. App'x 165, 169 n.7 (3d Cir.

2014) (citing 723 A.2d at 713-14). The holding did not rest on a regulatory compliance defense

but rested on the plaintiff's concession that the clear policy language preventing stacking was not

a misrepresentation, the plaintiff's failure to allege reliance on any misrepresentation, and the

fact that the policy was otherwise lawful. *See Fay*, 723 A.2d at 715; *see also Landau*, 223 F. Supp. 3d at 420 (distinguishing *Fay* on the ground that it was decided on the merits and *dicta* as to any regulatory compliance defense).

Even if Pennsylvania law recognized a safe harbor exemption, a genuine fact issue remains whether Pennsylvania regulators approved all of Nestlé's sales of Poland Spring water as spring water meeting the standard of Pennsylvania law. The sale of bottled water in Pennsylvania is regulated by the Pennsylvania Department of Environmental Protection, and nothing in its regulations requires that it verify that the water source type listed on bottled water labels is accurate prior to issuing a water supply permit, *see* 25 Pa. Code §§ 109.1-109.1307, and nothing in Nestlé's submissions shows that its labels were verified as such, Doc. #219-3 at 151-71 (Mathews Decl. Exs. PP, QQ, RR, SS, and TT). All this comports with a letter from the Department stating that it "does not make determinations as to whether bottled waters contain genuine 'spring water,'" and that "an applicant for a bottled water system is not required to provide information as to whether a source of bottled water is spring water." Doc. #229-3 at 2. Moreover, it is not possible to determine whether the water supply permits proffered by Nestlé extend to the entire time period and all sources of water at issue in this case. A genuine issue of fact remains as to any safe harbor exemption under Pennsylvania law.

### 3. *Collateral attack under Pennsylvania law*

Nestlé further argues that plaintiffs' claims amount to an improper collateral attack on Pennsylvania's regulatory determinations. But, as explained above, the predicate for this argument is missing: there remains a genuine fact issue whether Pennsylvania has approved the sale of all the Poland Spring bottled water as spring water that is the subject of the complaint in

this action. Accordingly, it is premature to resolve any argument that this action constitutes an impermissible collateral attack on agency action by the State of Pennsylvania.

### *Rhode Island*

#### 1. *Private right of action under Rhode Island law*

Count VIII of the amended complaint alleges a violation of the Rhode Island Deceptive Trade Practices Act ("RIDTPA"), R.I. Gen. Laws §§ 6-13.1-1 *et seq*. The Act prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." R.I. Gen. Laws § 6-13.1-2. "The [RIDTPA] is a remedial act and it should be liberally construed." *Long v. Dell, Inc*., 984 A.2d 1074, 1081 (R.I. 2009).

As I have previously ruled, Rhode Island regulations adopt the federal "spring water" standard. *See Patane*, 369 F. Supp. 3d at 391 (citing R.I. Gen. Laws § 21-23-4 and 216 R.I. Code R. § 50-10-4.3(A)(3)(s)). Although Rhode Island law does not appear to create a cause of action for the violation of its spring water standard, the relevant question is whether a RIDTPA action may be maintained on the basis of conduct that violates the spring water standard.

In arguing that the answer to that question is no, Nestlé cites two cases holding that no right of action should be implied if the statutes in question did not expressly provide for one. *See Tarzia v. State*, 44 A.3d 1245, 1258 (R.I. 2012); *Cummings v. Shorey*, 761 A.2d 680, 685 (R.I. 2000). But these cases do not stand for the proposition that an otherwise unfair or deceptive act is not actionable under RIDTPA if the act violates another statute or regulation for which there is no independent cause of action: "it would lead to an absurd result if . . . the [alleged conduct] is the deceptive trade practice and the [RIDTPA] was not available as a remedy." *Long*, 984 A.2d at 1081. In the absence of any contrary case law cited by Nestlé, I will deny summary judgment on Nestlé's claim that there is no private right of action under the RIDTPA.

### 2.  *Safe harbor exemption under Rhode Island law*

Nestlé argues that it is entitled to RIDTPA's safe harbor exemption. RIDTPA quite broadly exempts "actions or transactions permitted under laws administered by the department of business regulation or other regulatory body or officer acting under statutory authority of this state or the United States." R.I. Gen. Laws § 6-13.1-4.

The party claiming this exemption must "demonstrate that the general activities complained of are subject to monitoring or regulation by a state or federal government agency," after which "the burden shifts to the party seeking to enforce the [RIDTPA] to establish that 'the specific acts at issue are not covered by the exemption.'" *Lynch v. Conley*, 853 A.2d 1212, 1214 (R.I. 2004) (quoting *State v. Piedmont Funding Corp.*, 382 A.2d 819, 822 (R.I. 1978)). Critically, the Supreme Court of Rhode Island has made clear that "the exemption applie[s] to all activities subject to monitoring by governmental agencies, not simply activities permitted under state or federal law." *Id.* at 1215.

Here, the "general activity complained of" is the labeling of bottled water in connection with its sale. *Cf. id.* at 1213, 1215 (for allegation "that defendant had sold property without disclosing the existence of lead paint contamination," the "general activity complained of" was "[l]ead paint disclosure in connection with the sale of residential real estate"). Nestlé has shown that Rhode Island Department of Health regulations require that bottled water sellers accurately label their products, *see* 216 R.I. Code R. 50-10-4.9.2, or else their licenses may be suspended or revoked, *see* R.I. Gen. Laws § 21-23-3. Accordingly, Nestlé has sufficiently shown that the general activities at issue are "subject to monitoring or regulation" by a government agency. *Cf. Piedmont Funding*, 382 A.2d at 822 (the defendants' "evidence that the sale of insurance and of mutual funds is regulated by the insurance commissioner and the SEC respectively," and "that

failure to comply with the rules and regulations promulgated by these agencies will result in the revocation of the license to sell insurance or mutual funds" together "is sufficient to bring the businesses involved in this action within the exemption provision of § 6-13.1-4").

The burden then shifts to plaintiffs to demonstrate that the "specific acts at issue" are "not covered by the exemption." Here, the specific act at issue is Nestlé's alleged sale of bottled, ordinary groundwater as "spring water" in Rhode Island. *Cf. Lynch*, 853 A.2d at 1216 (specific act at issue is "the allegedly deceptive conduct" of "defendant's [failure] to provide the purchaser of a residential property notification and/or disclosure of lead paint"). That act is covered by the exemption because it is subject to the aforementioned regulations that set forth the standard of identity for spring water and limit when sellers may label their bottled water products as "spring water." *Cf. ibid.* ("[T]he Attorney General is unable to demonstrate that the allegedly deceptive conduct is not subject to government regulation, and the exemption applies."); *see also Petrarca v. Garrison Prop. & Cas. Ins. Co*, 2019 WL 1453058, at *2 (D.R.I. 2019) (dismissing RIDTPA claim alleging that insurance company failed to properly settle plaintiffs' claim because "[t]he motor vehicle insurance policy at issue here is regulated by Rhode Island's Department of Business Regulation"); *Kelley v. Cowesett Hills Assocs.*, 768 A.2d 425, 432 (R.I. 2001) (*per curiam*) (affirming dismissal of tenants' RIDTPA claim against landlord for failure to remove asbestos from apartment because "[t]he removal of asbestos is governed by . . . [the] Asbestos Abatement Act").

Plaintiffs rely on a single case noting in *dicta* that a statute requiring debt collectors to register with an agency may not be sufficient regulation or monitoring under the exemption but declining to decide whether the exemption applied. *See Laccinole v. Twin Oaks Software Dev., Inc.*, 2014 WL 2440400, at *8, 12 n.14 (D.R.I. 2014). Here, not only was Nestlé subject to

licensure, but the misconduct alleged by plaintiffs risks it having its license suspended or

revoked. Accordingly, because RIDTPA's safe harbor exemption is significantly broader in

scope than the safe harbor exemption under the laws of the other states at issue in this case and

because Nestle has shown that it was subject to monitoring in relevant respects by the Rhode

Island Department of Health, Nestle has shown that it qualifies for the RIDTPA safe harbor

exemption, and I will grant Nestlé's motion for summary judgment with respect to plaintiffs'

RIDTPA claim.[12]

### Common law fraud and breach of contract claims

Plaintiffs allege common law claims for fraud and breach of contract in Counts I and II of

the amended complaint. Nestlé's briefing devotes very little attention to these common law

claims. For each of its state-by-state trio of arguments (lack of private right of action, safe harbor

exemption, and collateral attack), Nestlé does not explain how its arguments should apply to the

common law claims differently than the statutory claims (*e.g.*, why the common law claims

should fall even if the statutory claims survive).[13]

Nor is it self-evident why the common law claims should not survive at least for the

seven states for which I have denied summary judgment as to the statutory unfair trade practice

claims. For example, if it is fair to say that a legislature intended a consumer to be able to sue for

---

[12] Because the relevant inquiry is merely whether the activity is subject to monitoring or regulation by a state or federal government agency, I need not evaluate Nestlé's evidence that it was actually approved to sell Poland Spring water in Rhode Island. *See* Doc. #219-3 at 13-14 (¶¶ 39-43). Nor do I need to address Nestlé's argument that plaintiffs may not collaterally attack any permits issued by Rhode Island.

[13] Whenever Nestlé refers to the common law claims in its briefing, it argues that the common law claims should be dismissed for the same reasons that the statutory claims should be dismissed. For example, after advancing a lengthy argument why the New York statutory claims should not proceed in light of the lack of a private right of action for the violation of the New York spring water standard, Nestlé tags on the following statement with no further explanation: "Not only are Plaintiffs barred under New York law from pursuing GBL §§ 349 and 350 claims predicated on violations of New York statutes that do not provide for private enforcement, but they are proscribed from pursuing fraud and breach of contract claims premised on those same violations."  *See* Doc. #219-1 at 21. Later in its briefing, Nestlé argues without citation or elaboration that "[p]roviding a safe harbor defense for statutory fraud claims but not common-law fraud claims would not only be illogical and contrary to law, but would frustrate the legislative intent behind enacting safe harbors for less-demanding consumer protection statutes." *Id.* at 38.

fraud or deception under an unfair trade practices statute even for conduct that is not otherwise independently actionable under a separate statutory cause of action, there is no reason to suppose that the legislature would intend differently for a common law claim of fraud that rests on the same conduct that supports the unfair trade practices claim. As Nestlé itself argues, "Plaintiffs' theories of common-law fraud (Count I) and breach of contract (Count II) are identical to that of each of their statutory claims: that Poland Spring® does not comply with the FDA Standard mirrored in state law." Doc. #219-1 at 37.

Similarly, as to Nestlé's arguments concerning the statutory safe harbor exemption, there is no reason to suppose that, if the statutory exemption does not apply to bar an unfair trade practices act claim, it should nonetheless bar a *non*-statutory common law cause of action. Even for Rhode Island (for which I have found its very broad statutory safe harbor exemption to bar the statutory RIDTPA claim), it is a stretch to conclude that the legislature's enactment of a statute-specific exemption should be extrapolated to bar any common law cause of action for conduct that is subject to government regulation. Because it is ultimately Nestlé's burden to establish the merits of its summary judgment motion and because Nestlé's briefing specific to the common law claims is insubstantial, I will deny the motion for summary judgment as to plaintiffs' common law claims for fraud and breach of contract as alleged in Counts I and II of the amended complaint.

## CONCLUSION

For the reasons set forth above, the Court GRANTS the motion for summary judgment (Doc. #219) as to Count VIII (Rhode Island Deceptive Trade Practices Act claim) and DENIES the motion for summary judgment as to all other claims.

It is so ordered.

Dated at New Haven this 12th day of August 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge