UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARK J. PATANE, ET AL.,<br>*Plaintiffs,* | :<br>:<br>: | |
| v. | : | No. 3:17-CV-1381 (JAM) |
| | :<br>: | |
| NESTLÉ WATERS NORTH AMERICA, INC.,<br>*Defendant.* | :<br>:<br>: | |

### Order as to Plaintiff's Motion to Compel, Doc. No. 307

For the reasons set forth in detail on the record in a discovery conference and hearing conducted on February 22, 2022, and for those reasons set forth in hearings, of which there are transcripts docketed, conducted on June 24, 2021 (Doc. No. 344), July 7, 2021 (Doc. No. 334), October 25, 2021 (Doc. No. 381) and January 27, 2022 (Doc. No. 407), which are incorporated by reference, Plaintiff's *Motion to Compel* (Doc. No. 307) is **GRANTED in part** and **DENIED in part**. Defendant shall produce the designated categories of documents ordered to be produced by the Court by April 25, 2022. The Court's standards of review, conclusions and Order are summarized below.

I.  The Applicable Standards

Parties may obtain discovery regarding any non-privileged matter that is relevant to the subject matter involved in the pending litigation. Fed. R. Civ. P. 26(b)(1). The information sought does not need to be admissible at trial; it need only be reasonably calculated to lead to the discovery of admissible evidence. *Id.* "Relevance" under Federal Rules of Civil Procedure 26(b)(1) has been defined broadly to include "any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Oppenheimer*

1

*Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978). In the discovery phase of a case, "[t]his obviously broad rule is liberally construed." *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991) (citing *Oppenheimer*, 437 U.S. at 351). Since the concept of relevance is not limited by considerations of evidentiary admissibility at the discovery stage, *see* Fed. R. Civ. P. 26(b)(1), "[i]t is well established that relevance for the purpose of discovery is broader in scope than relevance for the purpose of the trial itself." *Vaigasi v. Solow Mgmt. Corp.*, No. 11-CIV-5088 (RMB) (HBP), 2016 WL 616386, at *11 (S.D.N.Y. Feb. 16, 2016); *accord Pal v. Cipolla*, No. 3:18-CV-616 (MPS) (TOF), 2020 WL 564230, at *7 (D. Conn. Feb. 5, 2020) (relevance is "construed broadly" in discovery); *Martino v. Nationstar Mortg. LLC*, No. 3:17-CV-1326 (KAD), 2019 WL 2238030, at *1 (D. Conn. May 23, 2019) (at discovery stage, relevance is "an extremely broad concept").

Once the party seeking discovery establishes some threshold relevance to the material sought, the party resisting discovery bears the burden of showing that the requested discovery is disproportionate to the needs of the case. *See S.C. Johnson & Son, Inc., v. Henkel Corp.*, No. 3:19-CV-805 (AVC), 2020 WL 5640528, at *2 (D. Conn. Sept. 22, 2020). When determining whether discovery is "proportional to the needs of the case," Rule 26(b)(1) of the Federal Rules of Civil Procedure requires a court to consider the following factors, "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*

II.     The Court's Analysis, Findings and Conclusions

In assessing relevance, the Court has reviewed and is guided by the allegations of the operative complaint. Doc. No. 160. Plaintiffs allege that defendant labels and sells its Poland

Spring water products as "spring water" in retail, home and office markets. Doc. No. 160, ¶¶19-20. Plaintiffs have purchased Poland Spring water since November 5, 2003 and reside in Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania and Rhode Island. Doc. No. 160, ¶22.[1] Plaintiffs allege that "[n]one of Defendant's wells at its eight 'spring' sites extracts genuine spring water" and that "Defendant has gone so far as to build or maintain phony, man-made 'springs' at six of its sites." Doc. No. 160, ¶¶6-7. Plaintiffs further allege that "[t]hrough its more than two decades-long pattern of deception, Defendant has built its Poland Spring Water brand into the country's largest bottled spring water brand." Doc. No. 160, ¶14. Plaintiffs claim that Poland Spring Water sales in the U.S. "have been between $300 million and $900 million annually for each of the past eleven years" and that "[d]efendant's consumer fraud-based business model for Poland Spring Water has enabled it to unduly penetrate and profit from the bottled spring water market" because defendants are able to capture consumers of premium water who are willing to pay premium prices. Doc. No. 160, ¶¶14-15. Plaintiffs identify multiple ways in which they perceive defendant benefits economically from the fraud defendant is alleged to perpetrate on the bottled water market. Doc. No. 160, ¶¶15-17.

While perhaps an oversimplification of a very lengthy complaint, plaintiffs have filed this putative class action suit alleging that defendant fraudulently labels and sells its Poland Spring bottled water product as "spring water" when in fact it is not spring water as defined by law and that putative class members have overpaid for Poland Spring Water as a result of the misleading labels. Doc. No. 160, ¶¶2, 4, 6, 8, 12-13, 19, 24-25. Plaintiffs allege a class period dating back

---

[1] Plaintiffs originally also sought to include common law claims under Vermont law and proposed consumers from Vermont as part of the proposed class but the Court dismissed the Vermont law claims. Doc. No. 179.

to November 5, 2003 to the present and seek certification of a class of consumers who have purchased Poland Spring Water in Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania and Rhode Island (hereafter, the "eight proposed class states"), including sub-classes in the retail market and the home/office market. Doc. No. 160, ¶22.

### A. The Requests for Production

With this backdrop, the Court ruled as follows as to the specific requests for production and Rule 30(b)(6) topics for deposition at issue in Plaintiffs' *Motion to Compel*.

1. With respect to Request for Production 9 which seeks all annual financial reports submitted to parent entities, financial institutions or the government between November 5, 2003 or, alternatively, internal annual financial reports that summarize annual financial performance, income, assets and liabilities (Doc. No. 307-4, at 13), the motion to compel is denied without prejudice. At this time, the request is overbroad as it sweeps in financial performance as to defendant's product lines not at issue in this litigation. Furthermore, to the extent that considerations of financial standing company-wide might arguably be relevant to consideration of punitive damages, such a request is premature. As a preliminary matter, it appeared undisputed that punitive damages that may be available under state common law claims asserted by plaintiffs are limited to attorneys' fees and costs. Thus, the defendant's financial standing has no relevance in that context. Further, to the extent that punitive damages beyond attorneys' fees and costs are available pursuant to plaintiffs' claim under the Connecticut Unfair Trade Practices Act ("CUTPA"), the Court notes that an "award of punitive damages under CUTPA is reserved to the discretion of the trial court, not the jury." *Ulbrich v. Groth*, 310 Conn. 375, 450 (2013); *see also* C.G.S. § 42-110g. If liability on the merits of a CUPTA claim is established in this case, the trial court may find such information relevant to any consideration of punitive damages

at that juncture. If so, the trial court can exercise its discretion to order the production of such material. Accordingly, the motion to compel such material at this time is denied without prejudice.

2. As to Request for Production 17, the material sought is subsumed within information at issue in plaintiffs' supplemental motion to compel, Doc. No. 68, as to which the Court has scheduled a hearing and argument on March 8, 2022. As such, request for production 17 is denied as moot and without prejudice.

3. Request for Production 18 seeks all invoices remitted since November 5, 2003 to Home and Office customers in the eight proposed class states. Doc. No. 307-5, at 10. In considering this request, the Court has reviewed the declaration and deposition of Eric Lord, defendant's Vice President of Business Development, who is responsible for business intelligence, pricing and driving business improvement through process development and technology implementation. Doc. No. 310-3, ¶2. Mr. Lord estimates that, since May 2017, this request would involve location, compilation and production of 24,500,000 invoices. Doc. No. 310, ¶4. Production of hard copy invoices dating back to 2003 obviously would increase this number substantially. This is entirely consistent with plaintiffs' allegations in their complaint that 13,000,000 consumers nationwide buy Poland Spring Water each year. Doc. No. 160, ¶14. After considering this information and recognizing that consolidated sales data is maintained in defendant's computer system and in archived data storage and provides an adequate alternative, the Court finds that production of hard copy invoices dating back to November 5, 2003 for home and office customers, given their volume, is unduly burdensome and disproportionate to the needs of the case. Accordingly, the motion to compel request for production 18 is denied.

4. Request for Production 29 seeks monthly or quarterly net sales information for the period of November 5, 2003 to the present for Poland Spring Water products and Pure Life products in the United States and for the nine states that were at issue in the original complaint for the wholesale, retail and home/office markets. Doc. No. 307-5, at 14. A few preliminary points deserve mention here. First, during argument, it was undisputed that defendant does not sell directly to the retail consumer market. Defendant sells its water products to wholesalers who, in turn, sell to the retail market. Thus, the Court will at the outset limit its consideration of the motion to compel to sales data in the wholesale and home/office markets. Second, the states currently at issue in the operative complaint are the eight proposed class states. Accordingly, to the extent that request for production 29 seeks data as to the entire United States and also for Vermont, the motion to compel is overbroad and is denied. Third, defendant argues that production request 29 did not specifically request unit price data or volume of product sold data per transaction. While the Court accepts that may be literally true as to request for production 29, the Court observes that request for production 31 seeks "documents evidencing" average pricing for the same period of time and geographic areas as set forth in request 29. The Court recognizes that average pricing is not a metric maintained by defendant in the ordinary course of business, but it does appear that defendant maintains data as to unit price and/or volume of product sold within its sales data which permit plaintiffs to calculate average pricing on their own and, therefore, in the Court's view, such information as to unit price and volume of product sold fairly constitutes material "*evidencing*" average pricing. Therefore, the Court will issue a ruling as to request 29 which effectively consolidates the information sought in both requests 29 and 31.

In its analysis of relevance and proportionality, the Court has considered the declaration and deposition of Eric Lord. Doc. No. 310-3; Doc. No. 404-2. In summary, it is clear that defendant maintains for the home/office market, sales data for the period of November 5, 2003 to the present that includes the type, volume and price per unit of products delivered. Transactions after 2017 to the present time appear to be maintained in a live database known as RMS. Transactions for 2003-2017 are archived in a data warehouse maintained in Phoenix, Arizona, which can be queried. Doc. No. 404, at 36-38, 66-67, 94-96, 107-111, 127-130. Mr. Lord further indicated such data could be produced and filtered by customer for each of the eight proposed class states with customer addresses restored to ensure that transactions resulted in a delivery to the eight proposed states for the duration of the period sought. Doc. No. 404, at 107-111, 127-130. To produce accurate monthly sales data going back to 2003, Mr. Lord estimated that this process would take 3-4 weeks at a cost of approximately $100,000.00, a point that neither party contests. Doc. No. 407, at 5-17.

While it is clear to the Court that defendant has the capability of producing the requested data, the Court's initial inquiry is whether the information sought is relevant to the claims asserted in this action. The Court has concluded that it is relevant. First, plaintiffs allege that defendant has engaged in a massive scheme to defraud consumers in the eight proposed class states into paying premium prices for bottled water that consumers have been led to believe is natural spring water when it is, in fact, not. Plaintiffs further allege that engaging in such a scheme constitutes common law fraud under the laws of the proposed class states and that such fraud has allowed defendants to generate sizeable market share in the spring water market and reap substantial profits. In short, it is clear that plaintiffs allege that defendant has been economically incentivized to continue this fraud scheme and to intentionally conceal it from the

7

consuming public for nearly two decades. Viewed in the context of these allegations, the Court finds that the sales data dating back to November 2003 and up to the present sought by the plaintiffs is relevant for a number of reasons. First, whether defendant was, in fact, able to reap premium prices for the sale of Poland Spring Water as compared to other water products in its portfolio and derived substantial economic benefit is at the heart of plaintiffs' allegations of defendant's motivation to commit fraud. In this vein, information from the sales data is probative of defendant's state of mind, specifically whether defendant acted with the requisite intent to deceive required for common law fraud and whether they had a financial incentive to act with such intent and commit the fraud alleged. Further, to the extent that plaintiffs may be able to demonstrate that financial gain motivated defendant to intentionally conceal their fraud from consumers, this also bears upon their allegations of fraudulent concealment that is a predicate for equitable tolling of the statute of limitations. Second, based on their premium price theory, the information is relevant to plaintiffs' and their experts' calculation of damages for the class period, which is alleged in their complaint to be November 5, 2003 to the present, the same time period for which they seek the sales data. *See Hilsley v. Ocean Spray Cranberries, Inc.*, No. 17-CV-2335 (GPC) (MDD), 2019 WL 3006465, at *4 (S.D. Cal. Jul. 10, 2019) (noting that actual pricing, volume of products sold and retail sales data is relevant to price premium damages in a consumer class action); *see also Hadley v. Kellogg Sales Co.*, 324 F.Supp.3d 1084, 1005 (N.D. Cal. Aug. 17, 2018).

      While the defendant argues that such damages-related discovery is not relevant at this time prior to putative class certification, the Court disagrees. As noted above, the financial discovery has bearing on liability-related issues such as the alleged existence of fraudulent intent. Moreover, discovery has not been phased in this case. Thus, there is no reason to limit or stay an

aspect of discovery, such as liability-related or damages-related discovery, at this time. Further, the sales data which can be broken down by customer for each of the eight proposed class states for the alleged class period permits plaintiffs arguably to establish that the class members can be ascertained for the alleged classes and sub-classes and thereby establish a predicate requirement for class certification purposes. *See In re Petrobras Secs.*, 862 F.3d 250, 260 (2d Cir. 2017) (for class certification, plaintiffs must satisfy "an implied requirement of ascertainability" to ensure that the class is sufficiently definite so that the Court can determine whether a particular individual is a member); *see also In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-415 (S.D.N.Y. 2015) (whether there is an acceptable class-wide damages approach, such as price premium theory, is part of the predominance requirement for class certification). In short, the Court harbors no doubt that the requested financial data is relevant, is reasonably calculated to lead to the discovery of admissible evidence and, at the very least, involves matters that bear on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case.

The Court's consideration of whether the information sought is proportional to the needs of the case gave it far greater pause than relevance issues. At first glance, when viewed in a vacuum, a three to four week process to produce the information at a cost of $100,000.00 may appear to be disproportionate. However, upon consideration of the proportionality factors under the unique circumstances of this matter, the Court concludes that it is not. As to the importance of the issues at stake for the parties in this litigation, this action may not necessarily fall into the category of "bet the company" litigation, but, at a minimum, it certainly bets the defendant's most iconic brand. Indeed, at stake is the reputation of arguably the most recognized brand of bottled water in the country, which appears to be a flagship product of a multi-billion dollar company. No doubt defendant has an exceptionally keen interest in defending the integrity of

aspect of discovery, such as liability-related or damages-related discovery, at this time. Further, the sales data which can be broken down by customer for each of the eight proposed class states for the alleged class period permits plaintiffs arguably to establish that the class members can be ascertained for the alleged classes and sub-classes and thereby establish a predicate requirement for class certification purposes. *See In re Petrobras Secs.*, 862 F.3d 250, 260 (2d Cir. 2017) (for class certification, plaintiffs must satisfy "an implied requirement of ascertainability" to ensure that the class is sufficiently definite so that the Court can determine whether a particular individual is a member); *see also In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-415 (S.D.N.Y. 2015) (whether there is an acceptable class-wide damages approach, such as price premium theory, is part of the predominance requirement for class certification). In short, the Court harbors no doubt that the requested financial data is relevant, is reasonably calculated to lead to the discovery of admissible evidence and, at the very least, involves matters that bear on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case.

The Court's consideration of whether the information sought is proportional to the needs of the case gave it far greater pause than relevance issues. At first glance, when viewed in a vacuum, a three to four week process to produce the information at a cost of $100,000.00 may appear to be disproportionate. However, upon consideration of the proportionality factors under the unique circumstances of this matter, the Court concludes that it is not. As to the importance of the issues at stake for the parties in this litigation, this action may not necessarily fall into the category of "bet the company" litigation, but, at a minimum, it certainly bets the defendant's most iconic brand. Indeed, at stake is the reputation of arguably the most recognized brand of bottled water in the country, which appears to be a flagship product of a multi-billion dollar company. No doubt defendant has an exceptionally keen interest in defending the integrity of

that product.  On the other hand, plaintiffs claim that proposed class members, who may number well into the millions, have been the victims of a massive fraud perpetrated steadily over twenty years and they seek to vindicate the potential class members' rights.  The intensity with which this litigation has been waged over the past five years, including multiple dispositive motions and contentious discovery battles, only underscores how important this litigation is to both sides and the financial and reputational stakes involved.

      The amount in controversy is also substantial and vastly exceeds the discovery cost at issue before the Court.  Plaintiffs allege that defendant, through fraud in connection with Poland Spring Water, has created "economies of scale" that have enabled it to generate annual revenues of $300 to $900 million and obtain a significant share of the premium water market.  Doc. No. 160, ¶15.  Plaintiffs suggest that every year millions of consumers have fallen prey to the scheme and have been deceived into paying a price premium for a product that in actuality was something other than what they were led to believe.  Doc. No. 160, ¶24.  If plaintiffs were to ultimately prevail in obtaining class certification for a period from November 5, 2003 to the present and then succeed on the merits, damages could be in the tens of millions, if not greater.  As far as the parties' resources, this factor weighs heavily in favor of requiring the production of the financial material sought despite the estimated cost.  Defendant allegedly generates annual nine-figure revenues for Poland Spring Water.  Publicly available information suggests that defendant company-wide generates well in excess of $1 billion in annual revenues.  While plaintiffs and their counsel have proven capable of pursuing this litigation, defendant's resources clearly exceed those of the plaintiffs.

      With respect to the parties' relative access to this information, this factor weighs in favor of requiring production of the material sought.  It is clear that from the Lord deposition that the

material sought is maintained by the defendant and that defendant has personnel with the specialized knowledge to query the archived data and retrieve the information sought.  Doc. No. 404, at 41.  For the same reasons identified in its relevance analysis, the information requested is important in resolving issues that are at the very heart of allegations and claims asserted in this action.  When considering the totality of these circumstances and in the exercise of this Court's discretion, three to four weeks of effort at a cost of $100,000.00 simply does not outweigh the likely benefit of this information to resolution of issues in this litigation.  Indeed, the stakes in this case dwarf the cost of producing this discovery.  As was observed in *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 321 (S.D.N.Y. 2003), "[a] response to a discovery request costing $100,000 sounds (and is) costly, but in a case potentially worth millions of dollars, the cost of responding may not be unduly burdensome."  For the reasons identified, this is precisely such a case.

Accordingly, defendant is ordered to produce monthly sales data for the home/office market from November 2003 to the present, to include price per unit and volume of product sold, by customer in each of the eight proposed class states, namely Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania and Rhode Island, with customer addresses restored.  For similar reasons of relevance, defendant is ordered to produce monthly wholesale sales data, including price per unit and volume of product sold, by customer for the period 2011-present for the eight proposed class states, which is readily available from the Global SAP system per the Declaration of Suzanne DiCintio.[2]  Doc. No. 409.  With respect to wholesale sales data for the period from 2007 to 2010, as the Court explained, it was not

---

[2] Suzanne DiCintio is defendant's Vice President and Corporate Controller.  In reaching its conclusions, the Court reviewed both her declaration, Doc. No. 409, and her deposition, Doc. No. 411-1.

11

entirely clear whether similar information could be produced as is within the NPS accounting framework or whether significant and burdensome reconfiguration of the data to an NNS format might be required.  As for wholesale sales data prior to 2007, defendant's counsel represented that to the best of their knowledge at this time, such data no longer exists.  Therefore, in light of these considerations, the motion to compel as to wholesales sales data for the period of November 5, 2003 to 2010 is denied without prejudice, in the event that further information as the availability of data for these time periods is developed in on-going discovery.

5.   In Request for Production 30, plaintiffs seek monthly data relating to gross profits and gross profit margins for sales of Poland Spring Water products and Pure Life Water products from November 5, 2003.  Doc. No. 307-5, at 14.  For reasons previously explained, the Court will limit this request to the eight proposed class states and concludes that the information sought is relevant to and bears upon issues that are material to this action.  In short, to the extent that plaintiffs can demonstrate that Poland Spring Water is more profitable relative to other water products sold by the defendant, such an economic benefit is probative of plaintiffs' allegations that defendant has had a continuing and long-standing financial motivation to fraudulently mislabel Poland Spring Water as such.  Therefore, defendant is ordered to produce the requested documents for the period of November 5, 2003 to the present for the proposed eight class states.

6.   In light of the Court's order as to Request for Production 29, the motion to compel as to request for production 31 is denied as moot.

7.   With respect to Requests for Production 59 and 61, the Court notes that defendant does not maintain any average pricing as a metric in the ordinary course of its business and, in any event, the Court has ordered production of material in response to request for production 29

which will permit plaintiffs to engage in their own calculations of average pricing. Therefore, the motion to compel as to Requests for Production 59 and 61 is denied.

8. Production Requests 62 and 63 request documents and studies defendant has used to determine Manufacturers Suggested Retail Price (hereinafter, the "MSRP") for various Poland Spring, Pure Life and Deer Park bottled water products and documents sufficient to show the average MSRP on a monthly or quarterly basis from November 5, 2003 to the present for the same designated products. Doc. No. 307-10, at 11. In considering this request, the Court has reviewed the declaration of Alyssa Goldberg who serves as defendant's Senior Manager, Customer Development, and has responsibility for commercial strategy and operations within the retail sales team. She avers that defendant "does not, in the ordinary course, maintain one record or a single source reflecting [MSRP] for any of its bottled water products." Doc. No. 310-5, at 1. Further, defendant "does not consistently maintain documents reflecting [MSRP] for any of its bottled water products." *Id*. Nor does defendant maintain records of average MSRP for any of its bottled water products. *Id*., at 1-2. Ms. Goldberg does state that she searched records in the possession of defendant's key account managers and other employees who might be "reasonably likely" to have documents containing MSRP information and she confirms that "[a]s a result of that reasonably diligent search, I found and compiled the [MSRP] from documents referred to as 'Go-to-Market Guidelines[]' for the years 2013 through 2017 into a single document[.]" Doc. No. 310-5, at 2. Defendant has produced this document to plaintiffs. Based on the Goldberg declaration, which plaintiffs have not controverted, defendant does not appear to have any other documents responsive to production requests 62 and 63. Accordingly, the motion to compel as requests for production 62 and 63 is denied without prejudice in the event that further discovery

in this matter reveals the existence of information that arguably falls within the scope of these requests.

                B.    The Rule 30(b)(6) Deposition Topics

9.      Rule 30(b)(6) deposition topics 10-13 inquire into defendant's financial data and information regarding Poland Spring bottled water products and the manner that such data is maintained in defendant's systems. Doc. No. 307-8, at 8-9. For instance, topic 10 seeks inquiry into the revenues, costs, profits, profit margins and net sales of Poland Spring Water including the profitability of Poland Spring Water relative to other water brands sold by defendant. Doc. No. 307-8, at 8. Topics 11 and 12 seek to explore the methodology, systems and databases with which defendant tracks sales and costs of Poland Spring Water as compared to defendant's other brands. Doc. No. 307-8, at 8-9. Lastly, in topic 13, plaintiffs seek to inquire about how financial documents produced in this matter were compiled or generated, including inquiry into terms, abbreviations and other content of those documents. Doc. No. 307-8, at 9. As already explained in relation to the documents ordered to be produced in response to production request 29, the Court has concluded that financial performance of Poland Spring water products relative to other water products sold by defendant is relevant and central to allegations that have been asserted in the operative complaint. Accordingly, defendant is ordered to designate a corporate deponent with knowledge of topics 10-13 and plaintiffs are permitted to conduct inquiry into topics 10-13.

      Plaintiffs' motion to compel with respect to Rule 30(b)(6) deposition topic 20 is denied without prejudice. In topic 20, plaintiffs seek to inquire regarding communications between defendant and any regulatory agencies and government officials since December 1, 2015, and the dispute over this topic essentially centers around a 2017 meeting between defendant's counsel and representatives of the FDA. The meeting appears to have resulted in a

letter from the FDA regarding standards of identity for spring water that defendant is likely to utilize in its efforts to refute plaintiffs' claims that Poland Spring Water is not, in fact, spring water.  To the extent that the requisite designee may be defendant's counsel, the Court must consider "the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted." *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 72 (2d Cir. 2003).  Here, questioning the lawyers about communications they had with the FDA is fraught with the risk of intruding on both attorney-client and work product privilege.  Any questioning as to how the attorneys prepared for the meeting, the documents they chose to review for the meeting, their process in choosing points of emphasis for the meeting and their strategies for how to conduct the meeting implicates potential attorney-client and work product protections.  Further, there is an adequate alternative, namely the depositions of FDA personnel as to communications they had with defendant's counsel and what transpired in the meeting with the FDA.  Thus, there is no need to depose defendant's counsel where there is a clear and viable avenue to obtain the information.

Plaintiffs argue that the 30(b)(6) designee who testifies about counsel's communications need not have been present at the meeting and can be another employee the defendant designates. Plaintiffs are correct, but when a party seeks to depose a corporation or other organization and announces the subject matter of the proposed deposition, that entity must produce someone familiar with that subject, who is able "to give complete, knowledgeable and binding answers" on its behalf.  *Reilly v. Natwest Markets Group Inc.,* 181 F.3d 253, 268 (2d Cir. 1999) (internal quotations omitted).  Rule 30(b)(6) deponents need not have personal knowledge concerning the matters set out in the deposition notice. *Gucci Am ., Inc. v. Exclusive Imports Intern.,* No. 99-

15

CIV-11490 (RCC) (FM), 2002 WL 1870293, at *8 (S.D.N.Y. Aug. 13, 2002). However, if they do not possess such personal knowledge, however, the corporation is obligated to prepare them so that they may give knowledgeable answers. In this context, any corporate designee would have to educate himself or herself through inquiry of defendant's counsel as to the circumstances surrounding the meeting. This creates the specter of the designee simply parroting hearsay testimony of defendant's counsel and does nothing to mitigate, and may increase, the risk of intrusion upon privileged material through inadvertent disclosure. In light of a viable alternative from whom the requisite may be available, the court sees no need to assume such a risk at this juncture. Accordingly, the motion to compel is denied without prejudice to renewal at a later time should circumstances warrant.

Lastly, in light of the sensitive commercial and proprietary nature of the financial records and information ordered to be produced by the defendant, the content of any documents shall be designated Confidential-Attorneys Eyes Only and the content of such documents shall be subject to all limitations and conditions applicable to such a designation under the District Court's Standing Protective Order.

This is not a recommended ruling. This is an order regarding case management which is reviewable pursuant to the "clearly erroneous" statutory standard of review. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); and D. Conn. L. Civ. R. 72.2. As such, it is an order of the Court unless reversed or modified by the District Judge upon motion timely made.

**SO ORDERED**, on this 28th day of February, 2022, at Bridgeport, Connecticut.

*/s/ S. Dave Vatti  .*
Hon. S. Dave Vatti
United States Magistrate Judge
