**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MARK PATANE *et al.*, <br>     *Plaintiffs*, <br><br>   v. <br><br> NESTLÉ WATERS NORTH AMERICA, <br> INC., <br>     *Defendant*. | No. 3:17-cv-1381 (JAM) |

**ORDER GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In this putative class action, a group of eleven named plaintiffs allege that defendant Nestlé Waters North America, Inc. (Nestlé) has been falsely labeling and selling its Poland Spring brand bottled water (PSW) as "spring water." Plaintiffs maintain that PSW does not meet the definition of spring water as established by the laws of Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, and Rhode Island. Accordingly, they seek to hold Nestlé liable for fraud, breach of contract, and violations of various state consumer protection laws.

After extensive discovery, Nestlé now moves for summary judgment on all of plaintiffs' claims. Nestlé primarily argues that plaintiffs' claims are barred by the resolution of an earlier class action, that PSW is demonstrably spring water, that plaintiffs' claims are preempted by federal law, that PSW's marketing is not deceptive, and that plaintiffs cannot prove their damages.

For the reasons discussed in detail below, I will grant Nestlé's motion in part and deny it in part. I will grant the motion as to the following:

(1) All of plaintiffs' claims for injunctive relief;

(2) Benjamin Fletcher's claims under the Maine Unfair Trade Practices Act;

(3) Bridget Kopet's claims under the Connecticut Unfair Trade Practices Act;

(4) Julie Harding's claims under New York law for breach of contract;

(5) Stephen Shapiro's claims under New York law for breach of contract from prior to August 15, 2013;

(6) Plaintiffs' claims for violation of New York's General Business Law §§ 349-50 from prior to August 15, 2014;

(7) The claims of eight plaintiffs who are members of a prior class action and who are bound by a release in the settlement of that action that bars them from challenging Nestlé's continued bottling, labeling, and selling of its water as "spring water" to the extent that it is sourced from four different sites (Poland Spring, Clear Spring, Evergreen Spring, and Garden Spring).

Otherwise, I will deny Nestlé's motion for summary judgment in all other respects.

## BACKGROUND

Nestlé has long sold PSW through retail channels and through direct delivery to home and office markets.[1] Each bottle of PSW features a prominent label declaring it to be "Natural Spring Water" or "100% Natural Spring Water."[2]

Plaintiffs' central claim is that this representation is false: that PSW is not spring water. These plaintiffs seek to represent a multistate class of PSW purchasers who they allege were harmed by this inaccurate claim.[3]

---

[1] Doc. #691-4 at 1 (¶ 1) (Plaintiffs Rule 56(a)(2) statement).
[2] *Id.* at 207 (¶ 2).
[3] The remaining eleven plaintiffs in this case are Julie Harding (New York), Heather Harrigan (New York/New Jersey), Stephen Shapiro (New York/New Jersey), Catherine Porter (New Jersey), Erica Russell (New Jersey), Tina Moretti (New Jersey/Rhode Island), Bridget Kopet (Connecticut), Jennifer Cole (Massachusetts), Benjamin Fletcher (Maine), Diane Bogdan (New Hampshire), and Pareshkumar Brahmbhatt (Pennsylvania). Notwithstanding the case caption, named plaintiff Mark Patane's Vermont law claims have been dismissed.

In their original complaint, plaintiffs relied on the Food and Drug Administration's standard of identity (SOI) for spring water, maintaining that PSW does not conform to that definition. *See Patane v. Nestlé Waters N. Am., Inc.*, 314 F. Supp. 3d 375, 379 (D. Conn. 2018) (*Patane I*). That complaint brought similar claims on behalf of a putative nationwide class, arguing that Nestlé's alleged mislabeling of PSW under the federal SOI gave rise to liability. *Ibid*. I dismissed these claims, concluding that efforts to directly enforce the FDA's SOI were preempted by federal law. *Id.* at 389.

Plaintiffs then filed an amended complaint, now relying on state law definitions of spring water—most of which were identical to the federal definition. Nestlé moved to dismiss again, but I allowed almost all of plaintiffs' state law claims to proceed.[4] *See Patane v. Nestlé Waters N. Am., Inc.*, 369 F. Supp. 3d 382, 386 (D. Conn. 2019) (*Patane II*).

While discovery proceeded, Nestlé filed two motions for summary judgment.[5] The first motion argued, among other things, that Nestlé could not be liable to plaintiffs because it had received permission to sell PSW as "spring water" from state regulatory officials. *See Patane v. Nestlé Waters N. Am., Inc.*, 478 F. Supp. 3d 318, 326 (D. Conn. 2020) (*Patane III*). I rejected this argument as to all claims except as to one count arising under the Rhode Island Deceptive Trade Practices Act. *Id.* at 355.

Nestlé's second summary judgment motion sought to dismiss plaintiffs' claims to the extent that they arose outside of the relevant statutes of limitation. *See Patane v. Nestlé Waters N. Am., Inc.*, 583 F. Supp. 3d 341, 343 (D. Conn. 2022) (*Patane IV*). I granted this motion as to plaintiffs' claims under the Connecticut Unfair Trade Practices Act and limited their claims

---

[4] I dismissed claims arising under Vermont state law. I concluded that Vermont state law did not affirmatively adopt the federal "spring water" standard or an equivalent requirement and that, as a result, plaintiffs' Vermont claims were impliedly preempted. *Patane II*, 369 F. Supp. 3d at 393-94.
[5] Doc. #219 (Nestlé's first summary judgment motion); Doc. #323 (Nestlé's second summary judgment motion).

under that statute to those that accrued after August 15, 2014. *Id.* at 347-48. I declined to restrict plaintiffs' claims further because I concluded that there was an issue of fact as to whether plaintiffs could rely on tolling doctrines to bring otherwise untimely claims. *Id.* at 345-47, 350.[6]

As a result of these rulings, the following claims remain pending: violations of various state fair trade practices acts, specifically the Connecticut Unfair Trade Practices Act (CUTPA), the Maine Unfair Trade Practices Act (MUTPA), the Maine Uniform Deceptive Trade Practices Act (MUDTPA), the Massachusetts Consumer Protection Act (MCPA or Chapter 93A), the New Hampshire Consumer Protection Act (NHCPA), the New Jersey Consumer Fraud Act (NJCFA), New York's General Business Law §§ 349-50 (GBL), and the Pennsylvania Unfair Trade Practices and Consumer Protection Law (PUTPCPL); common law fraud under the laws of those seven states and Rhode Island; and breach of contract under the laws of New Jersey and New York.[7] Plaintiffs continue to seek monetary damages, as well as injunctive relief that would prevent Nestlé from marketing PSW as "spring water."[8]

Nestlé now renews its motion for summary judgment, following the completion of discovery and the compilation of an extensive record. Both sides have sent experts to examine Nestlé's water sources, and both experts have submitted extensive reports on their findings.[9] Plaintiffs have also provided the results of market research that purports to demonstrate how Nestlé's "spring water" claim has inflated the price of PSW.[10] And the parties have taken the

---

[6] I did not address whether plaintiffs' claims based on Connecticut state laws other than CUTPA were barred, because Nestlé failed to identify and argue in accordance with the governing law. *Patane IV*, 583 F. Supp. 3d at 350.
[7] *See* Doc. #160 at 283-321 (¶¶ 836-1036) (plaintiffs' amended complaint listing their claims); *Patane II*, 369 F. Supp. 3d at 393-94 (dismissing the Vermont claims); *Patane III*, 478 F. Supp. 3d at 352-54 (granting summary judgment on the Rhode Island statutory claim).
[8] *See* Doc. #160 at 284, 321-24 (¶¶ 846, A-L).
[9] *See* Doc. #595 (Nestlé's expert report on water sources); Doc. #596 (plaintiffs' expert report on water sources).
[10] *See* Doc. #692-1 at 142-92 (expert report of Dr. J. Michael Dennis); Doc. #692-1 at 259-337 (expert report of Dr. Philip Johnson).

depositions of various state regulatory officials and the named plaintiffs.[11] The parties rely on all of these sources and more in their briefing.

## DISCUSSION

The principles governing review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgement is not to judge the credibility of witnesses or to resolve close, contested issues of fact, but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton,* 572 U.S. 650, 656-57 (2014) (*per curiam*); *Union Mut. Fire Ins. Co. v. Ace Caribbean Mkt.,* 64 F.4th 441, 445 (2d. Cir. 2023).[12]

Nestlé moves for summary judgment on a wide range of grounds. I first address the company's more general arguments. I then consider its state-specific claims, proceeding in alphabetical order by state.

### The *Ramsey class action*

Nestlé first maintains that *all* of plaintiffs' claims are barred by a prior judgment in *Ramsey v. Nestlé Waters N. Am.*, Case No. 03-CHK-817 (Ill. Cir. Ct., 16th Cir. Kane Cnty., Nov. 5, 2003) (*Ramsey*).[13] *Ramsey* was a class action that brought much the same claims: that Nestlé

---

[11] *See, e.g.*, Doc. #692-5 at 1-134 (depositions of various state officials).
[12] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.
[13] Doc. #608-1 at 37-44 (Nestlé's opening brief).

mislabeled PSW.[14] The *Ramsey* class was nationwide and consisted of all purchasers and consumers of PSW during the period lasting from January 1, 1996 until November 5, 2003.[15]

According to Nestlé, all of the named plaintiffs in this action were members of the *Ramsey* class. It thus argues that plaintiffs' claims are barred in full by both *res judicata* and the terms of the injunction issued by the Illinois state court as part of the *Ramsey* settlement.

I addressed this argument at an earlier stage in this litigation in *Patane I*, concluding that the record was not sufficiently developed at that time to determine if the plaintiffs were members of the *Ramsey* class. *See* 314 F. Supp. 3d at 382. I was skeptical whether, regardless of their membership in the *Ramsey* class, *res judicata* or the *Ramsey* injunction could bar all of the plaintiffs' claims. *See id.* at 382-84.

After discovery, it is now undisputed that seven of the named plaintiffs—Tina Moretti, Julie Harding, Pareshkumar Brahmbhatt, Benjamin Fletcher, Heather Harrigan, Bridget Kopet, and Catherine Porter—were *Ramsey* class members and that none of these seven opted out of the *Ramsey* settlement.[16] Nestlé has also put forward undisputed record evidence that plaintiff Erica Russell was a member of the *Ramsey* class.[17]

On the other hand, Nestlé does not point to evidence to conclusively show that named plaintiffs Diane Bogdan, Jennifer Cole, and Stephen Shapiro purchased or used PSW during the *Ramsey* class period. As to Bogdan, she was asked "[y]ou have been buying [PSW] since the '80s or early '90s. Correct?" and answered "I think so. I mean, whenever it first became

---

[14] Doc. #691-4 at 1-2 (¶¶ 2, 4).

[15] *Id.* at 2 (¶¶ 2-3).

[16] *Id.* at 4-7 (¶¶ 9, 11, 13, 15-17).

[17] *See id.* at 4-5 (¶ 10); *see also* Doc. #692-7 at 87 (deposition testimony of Erica Russell). Plaintiffs dispute whether Russell *purchased* PSW during the *Ramsey* class period but concede that she *consumed* PSW during the relevant period. Doc. #691-4 at 4-5 (¶ 10). This places her squarely within the ambit of the *Ramsey* class, which includes "all persons . . . who purchased and/or consumed" PSW during the *Ramsey* class period. Doc. #53-2 at 26-27 (¶ 2.19).

available."[18] This answer establishes only that Bogdan began purchasing PSW before the *Ramsey* class period and that she has purchased PSW "since" then. But Bogdan was not asked directly whether she purchased PSW between January 1, 1996, and November 5, 2003.

As to Cole, she testified that she first purchased PSW in "the 1990s" and "was certainly purchasing [PSW] before 2003."[19] But these statements do not conclusively establish that Cole purchased PSW during the *Ramsey* class period.

As to Shapiro, he testified that he first purchased PSW in the "1980s ish."[20] Nestlé also cites a portion of Shapiro's deposition at which, it claims, he "implied he has been buying [PSW] 'all the way back to then.'"[21] But the copy of Shapiro's deposition transcript that Nestlé submitted redacts lines 12-14 of page 60, and the quoted testimony is not found in lines 9-11. Regardless, the fact that Shapiro restated that he had purchased PSW as far back as the 80s does not conclusively establish that he purchased PSW during the *Ramsey* class period.

The company argues that I should nevertheless draw an inference that these plaintiffs were *Ramsey* class members because they admit to purchasing or consuming PSW both before and after that time period. It also criticizes plaintiffs for failing to submit evidence that they abstained from purchasing PSW during the *Ramsey* class years.

But Nestlé misstates its burden. Nestlé relies on *Ramsey* as an affirmative defense, and so it—not the plaintiffs—bears the burden of adducing evidence to support that defense.[22] *See Shepard v. Wo Hop City, Inc.*, 2021 WL 4267527, at *3 (S.D.N.Y. 2021). Likewise, it is the plaintiffs as the non-moving party at this stage who are entitled to have all reasonable inferences

---

[18] Doc. #612-1 at 227.
[19] *Id.* at 176, 184-85.
[20] *Id.* at 55.
[21] Doc. #703 at 26 n.44 (quoting Doc. #612-1 at 60 lns. 9-14).
[22] Doc. #209 at 87-88 (Nestlé's answer to plaintiff's amended complaint).

drawn in their favor. *See Bart v. Golub Corp.*, 96 F.4th 566, 567 (2d Cir. 2024). Because Nestlé has not carried its burden and shown that no factual dispute remains as to whether Bogdan, Cole, and Shapiro were members of the *Ramsey* class, it is not entitled to summary judgment as to those three plaintiffs on *Ramsey* grounds.

Having concluded that eight of the eleven named plaintiffs were members of the *Ramsey* class, I now turn to whether *Ramsey* bars these eight plaintiffs' claims in whole or in part. First, I do not agree that *res judicata* precludes their claims. In *Patane I*, I observed that "[u]nder Illinois law, the doctrine *of res judicata* bars later litigation where '(1) there was a final judgment on the merits rendered by a court of competent jurisdiction, (2) there is an identity of cause of action, and (3) there is an identity of parties or their privies.'" 314 F. Supp. 3d at 383 (quoting *Nowak v. St. Rita High Sch.*, 197 Ill. 2d 381, 390 (2001)).

I further concluded that there was no identity of cause of action, because "plaintiffs' claims are wholly based on alleged ongoing conduct that post-dates the *Ramsey* settlement," and because even under the "transactional test" for identity of cause of action, "'the doctrine of *res judicata* does not bar claims for continuing conduct complained of in the second lawsuit that occur after judgment has been entered in the first lawsuit.'" *Id.* at 383-84 (quoting *D'Last Corp. v. Ugent*, 288 Ill. App. 3d 216, 222 (1997)); *see also Karris v. KeyBank Nat'l Ass'n,* 2024 WL 3831306, at *7 (Ill. App. 2024) (same); *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 499 (2d Cir. 2014) ("courts must be mindful that a claim 'arising subsequent to a prior action . . . [is] not barred by res judicata' even if the new claim is 'premised on facts representing a continuance of the same 'course of conduct'") (applying federal law claim preclusion principles).

Nestlé does not explain why this conclusion was incorrect and cites only Illinois cases that pre-date *D'Last Corp* or cites non-Illinois cases.[23] Nor does Nestlé clarify how the development of the record since *Patane I* would change the *res judicata* analysis. As a result, I see no reason to depart from the holding of *Patane I* on this point.

I reach a different conclusion with regard to the *Ramsey* injunction, which was entered by the Illinois circuit court to enforce the *Ramsey* settlement.[24] The *Ramsey* settlement provided "[t]he Parties agree that Defendant shall be permitted to continue to bottle, label and sell Poland Spring brand bottled water as 'spring water' using all of the spring water sources it has used since January 1, 1996," and that "[n]othing in this Settlement Agreement shall require that Defendant relabel its Poland Spring brand spring water products as anything other than spring water or alter its spring water advertising in any way with respect to the spring water sources it has used since January 1, 1996."[25] The *Ramsey* injunction ordered the parties—which, as relevant here, included the eight plaintiffs in this case who were *Ramsey* class members—to consummate the settlement in accordance with its terms.[26]

I agree with Nestlé that this settlement provision, as enforced by the injunction, shields the company from further liability to *Ramsey* class members for using the "spring water sources" it drew on during the *Ramsey* class period. Though contractual releases are "strictly construed against the benefiting party" under Illinois law, *Stratman v. Brent*, 291 Ill. App. 3d 123, 137 (1997), the provision at issue here is detailed and clearly permits Nestlé to continue labeling water from the four *Ramsey* sources as "spring water." As plaintiffs' admit, the water sources at

---

[23] *See* Doc. #608-1 at 39-41 (citing among other cases *City of Chicago v. Provus*, 253 N.E.2d 182, 188 (Ill. App. Ct. 1969), *City of Chicago v. Harris Tr. & Sav. Bank*, 371 N.E.2d 1182, 1186 (Ill. App. Ct. 1977), *Monahan v. City of New York Dep't of Corrections*, 214 F.3d 275, 288-89 (2d Cir. 2000), and *Hatch v. Boulder Town Council*, 471 F.3d 1142, 1150-51 (10th Cir. 2006)).
[24] *See* Doc. #53-2 at 5-18 (the *Ramsey* injunction).
[25] *Id.* at 33-34.
[26] *Id.* at 15 (¶ 26); *see also id.* at 33-34 (¶ 6.2) (the *Ramsey* settlement agreement).

issue in *Ramsey* were: Poland Spring (Poland Spring, Maine); Clear Spring (Hollis, Maine); Evergreen Spring (Fryeburg, Maine); and Garden Spring (Poland, Maine).[27] I therefore conclude that the eight plaintiffs who were *Ramsey* class members have, by contract, released their right to assert claims against Nestlé for labeling PSW as spring water to the extent that their claims rely on water bottled from those four sources.[28]

On the other hand, I cannot agree with Nestlé's argument that this *Ramsey* settlement provision bars all of the eight *Ramsey* class plaintiffs' claims. Nestlé maintains that plaintiffs, as a whole, have submitted no proof that any of the water they purchased came from a non-*Ramsey* source. But plaintiffs have offered evidence of the labels used on PSW bottles between the mid-2000s and the mid-2010s, and those labels list two non-*Ramsey* sources—White Cedar Spring and Bradbury Spring—as supplying PSW.[29] Likewise, Nestlé has also submitted a spreadsheet indicating that it sourced meaningful amounts of water from non-*Ramsey* sources during the class period.[30] These documents are sufficient to raise an issue of fact as to whether the bottles of PSW purchased by the eight plaintiffs came exclusively from *Ramsey* sources, or whether they were mixed with other water.

---

[27] Doc. #691-4 at 4 (¶ 8).

[28] Plaintiffs contend that my ruling in *Patane I* "squarely rejected" the argument that members of the *Ramsey* class had released their ability to bring similar claims against Nestlé for future PSW labeling. Doc. #691 at 39-40. Not so. In *Patane I*, I observed that this provision "applies to only a limited number of Poland Spring water facilities that were operational from 1996 to 2003 and at most binds only plaintiffs who purchased or consumed Poland Spring water prior to November 5, 2003, not those who only bought later. This provision does not furnish grounds to conclude across the board that *all* present plaintiffs and prospective class members have released any claims concerning the full range of Poland Spring sources that have produced water since November 5, 2003." *Patane I*, 314 F. Supp. 3d at 383. This ruling and *Patane I* are consistent in holding that, while members of the *Ramsey* class may be bound by the *Ramsey* settlement's release, the *Ramsey* settlement cannot preclude those it did not bind. Although in *Patane I*, I found that there was "an insufficient factual record . . . to categorically conclude at this initial [] stage that *all* named plaintiffs and prospective class members" were members of the *Ramsey* class who might be bound by that release, the record now permits me to determine in part which plaintiffs were members of the *Ramsey* class. *See id.* at 382.

[29] Doc. #692-1 at 62-63 (¶¶ 133, 135).

[30] *See generally* Doc. #628-9.

As a result, I cannot grant summary judgment to Nestlé outright as to these eight plaintiffs. Instead, I grant summary judgment only insofar as these plaintiffs' claims are based on the four water sources subject to the *Ramsey* release. The eight plaintiffs who were members of the *Ramsey* class may still bring claims alleging that PSW is not spring water, but they must do so by reliance on PSW supplied from sources other than the four sources designated in the *Ramsey* class action settlement.

Nor am I persuaded that some other provision of the *Ramsey* injunction prevents plaintiffs from litigating their claims. Nestlé insiststhat paragraph 27 of the *Ramsey* injunction fully bars all of plaintiffs' claims.[31] That paragraph reads as follows:

> "The Class Representative and all Class Members … have released and discharged [Nestlé] and are barred and permanently enjoined from prosecuting (in any local, state or federal court, agency or other authority or forum) against [Nestlé] any and all claims, causes of action, rights, demands, liabilities, and suits, … including but not limited to, those arising under … consumer fraud laws, deceptive trade practices laws, unfair business competition or business practices laws, any common law claims whether sounding in contract or tort, law or equity … that have been alleged and asserted in the Action and/or that may arise out of or in connection with or resulting from any facts, matters, circumstances and/or transactions alleged in or made the subject of the Action, and including but not limited to, any claims that have been, could have been, or could be asserted by or on behalf of the Class or any Class Members, that existed on or before the dates of entry of Preliminary Approval, based upon, arising out of, in any way relating to, or as a result of any of the [Nestlé's] actions related to the source of its Poland Spring Water, the marketing, labeling, pricing, advertising and/or promotion of its Poland Spring Water."[32]

This dense paragraph is difficult to parse, but it seems to restrict the "released" claims to those "that existed on or before the dates of entry of Preliminary Approval" of the class settlement in *Ramsey*. This reading of paragraph 27 is consistent with the settlement agreement's definition of released claims, which only included causes of action that accrued no later than 30 days after the entry of final judgment in *Ramsey*. *See Patane I*, 314 F. Supp. 3d at 382.

---

[31] *See* Doc. #608-1 at 42 & n.39.
[32] Doc. #53-2 at 15-16 (¶ 27).

Accordingly, paragraph 27 does not bar the plaintiffs' present suit targeting conduct that occurred after that date.

For the reasons discussed above, I will deny summary judgment on Nestlé's *Ramsey* argument as to plaintiffs Bogdan, Cole, and Shapiro for lack of evidence to conclusively show that they were members of the *Ramsey* class. I will grant in part and deny in part summary judgment on the *Ramsey* argument as to the remaining eight plaintiffs who were members of the *Ramsey* class (Brahmblatt, Fletcher, Harding, Harrigan, Moretti, Porter, and Russell). For these eight plaintiffs, I will grant summary judgment on the basis of the *Ramsey* injunction to the extent that their claims stem from Nestlé's use of the Poland Spring, Clear Spring, Evergreen Spring, and Garden Spring water extraction sites, but I will deny summary judgment to the extent that their claims are based on water produced at other sites.

Though I conclude that the eight plaintiffs bound by *Ramsey* have released their right to bring suit relating to the four sources of water at issue in *Ramsey*, I will not at this point dismiss any of the claims of those eight plaintiffs on *Ramsey* grounds. I conclude that there remains a genuine issue of fact as to whether any of these plaintiffs' PSW purchases consisted exclusively of *Ramsey*-source water.

### Whether PSW qualifies as spring water

Nestlé moves for summary judgment on the ground that PSW is in fact spring water as defined by the law of the relevant States.[33] Each of those States has a spring water definition that is substantively identical to the federal SOI, which is defined in lengthy terms by federal regulation as follows:

> The name of water derived from an underground formation from which water flows naturally to the surface of the earth may be "spring water." Spring water shall be collected only at the spring or through a bore hole tapping the underground formation

---

[33] *See* Doc. #608-1 at 44-59.

feeding the spring. There shall be a natural force causing the water to flow to the surface through a natural orifice. The location of the spring shall be identified. Spring water collected with the use of an external force shall be from the same underground stratum as the spring, as shown by a measurable hydraulic connection using a hydrogeologically valid method between the bore hole and the natural spring, and shall have all the physical properties, before treatment, and be of the same composition and quality, as the water that flows naturally to the surface of the earth. If spring water is collected with the use of an external force, water must continue to flow naturally to the surface of the earth through the spring's natural orifice. Plants shall demonstrate, on request, to appropriate regulatory officials, using a hydrogeologically valid method, that an appropriate hydraulic connection exists between the natural orifice of the spring and the bore hole.

21 C.F.R. § 165.110(a)(2)(vi).

The parties vigorously dispute how this regulation should be interpreted. Nestlé maintains that terms like "natural orifice," "same underground," "same composition and quality," and "flow" should be read expansively, and that PSW qualifies as spring water under this definition. Meanwhile, plaintiffs argue that these terms should be construed more restrictively, and that PSW falls outside the bounds of the regulation.[34]

Though the parties devote large portions of their briefs to these interpretive questions, I need not construe § 165.110(a)(2)(vi) or the state SOIs at this stage in the case. That is because, even if I adopt Nestlé's legal interpretation of the standard, there is still a genuine issue as to whether PSW qualifies as spring water when the facts are interpreted in the light most favorable to plaintiffs.

The report of plaintiffs' expert, Dr. Donald Siegel, raises genuine fact questions about whether PSW is "spring water" under Nestlé's view of § 165.110(a)(2)(vi). For instance, Dr. Siegel points to evidence that some of Nestlé's alleged springs are man-made, which would violate the regulation.[35] Likewise, he offers evidence that Nestlé extracted pond water and other

---

[34] *See* Doc. #691 at 44-73 (plaintiffs' opposition brief).

[35] *See, e.g.*, Doc. #596 at 96-98, 110, 118, 121-23, 135, 137-38, 150, 166. The FDA has advised that "[i]f the water does not flow to the surface of the earth from the underground source without development of the area or the use of external force, then the water does not qualify for use of the name 'spring water.'" Beverages: Bottled Water, 60

surface water from some of its bore holes, rather than "true" spring water.[36] Finally, he provides evidence that the water extracted from Nestlé's bore holes differs substantially from the water that emerges naturally from the spring orifice.[37] These examples are just a few of many along the same lines, and raise doubts about whether any of Nestlé's water comes from sources meeting the federal or state SOIs. At a minimum, the record contains sufficient factual disputes to preclude summary judgment.[38]

Nestlé's expert, Dr. Charles Fitts, maintains that Dr. Siegel made technical errors in his report, rendering some of his conclusions unreliable.[39] But Nestlé has not sought to exclude Dr. Siegel's testimony. Nor has it adequately explained in its briefs why Dr. Siegel's evidence and conclusions are defective. Absent such a demonstration, it would not be proper for me to resolve the conflict between experts at the summary judgment stage. *See Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 233 (2d Cir. 2021) ("the question of what weight to accord expert opinion is a matter committed to the sound discretion of the factfinder").

In short, I conclude that there is a genuine issue of fact as to whether PSW qualifies as spring water under the laws of the States at issue here. Accordingly, I will deny Nestlé's motion

---

Fed. Reg. 57076 at 57097, (Nov. 13, 1995). Likewise, the SOI itself requires "water [that] flows naturally to the surface of the earth." 21 C.F.R. § 165.110(a)(2)(vi).

[36] *See, e.g.*, Doc. #596 at 60-61, 80-81, 83, 117-18, 181-82, 196-97. The FDA has stated "ground water under the influence of surface water cannot be called 'spring water.'" 60 Fed. Reg. at 57094.

[37] *See, e.g.*, Doc. #596 at 155, 176-77, 190-91. The regulation states "Spring water collected with the use of an external force shall … be of the same composition and quality, as the water that flows naturally to the surface of the earth." 21 C.F.R. § 165.110(a)(2)(vi). Even the report of Nestlé's expert, Dr. Fitts, raises a question about whether the water Nestlé extracts from bore holes is the "same" as the water that emerges naturally from the surface. *See* Doc. #595 at 76 (admitting differences in sodium and chlorine levels across water samples and arguing that these components should not be considered in comparing water chemistry composition).

[38] Nestlé asks that I resolve all interpretive disputes and decide, clause-by-clause, if its extraction process inarguably meets any portions of the definition. *See, e.g.*, Doc. #608-1 at 51. But my task at this stage is only to conclude whether Nestlé has shown that summary judgment is warranted as to any count of the complaint. Because I conclude that summary judgment should not be granted on the ground that PSW conclusively meets the spring water standard, it is unnecessary at this time to descend to the particulars of each aspect of the spring water definition to attempt to identify whether PSW meets the definition at least in part.

[39] *See, e.g.*, Doc. #595 at 19, 58, 77, 78, 103, 108.

for summary judgment on its claim that its water is "spring water" under the laws of the relevant States.

### Conflict preemption

Nestlé next argues that all of plaintiffs' claims should fail as a matter of conflict preemption.[40] "Conflict preemption is just 'one form of implied preemption' and applies [1] 'where compliance with both state and federal law is a physical impossibility, or … [2] where the state law at issue stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Patane II*, 369 F. Supp. 3d at 395 (quoting *Marentette v. Abbott Labs., Inc.*, 886 F.3d 112, 117 (2d Cir. 2018)). Nestlé relies on the second of these standards, maintaining that allowing a jury to adjudicate the company's compliance with state spring water regulations would undermine the purposes of Congress in passing the Food, Drug, and Cosmetic Act (FDCA). I rejected this argument in *Patane II*, but Nestlé argues that the expanded record now warrants a different conclusion.

I am not persuaded. In *Patane II*, I explained that "there is no indication that Congress meant to foreclose the States from creating remedies that are predicated on state law standards that are identical to the federal 'spring water' standard" and that "[t]he FDCA limits its express preemptive effect in allowance and contemplation of such state law remedies." *Ibid*. The record does not contain any information to contradict these conclusions.

Rather than introducing new evidence of congressional intent to foreclose such state remedies, Nestlé argues that the practical experience of this case demonstrates the conflict with federal law. It contends that "[p]laintiffs cannot establish noncompliance [with state spring water regulations] without negating and overturning legislatively-mandated compliance determinations

---

[40] Doc. #608-1 at 62-71.

which in fact have been made by state regulators year after year for the past two decades," and that "derogat[ing] … these … determinations will fundamentally disrupt the uniform enforcement of the FDA rule."[41]

This argument is not convincing for two reasons. First, as I discussed in *Patane III* and reaffirm below, it is not clear from the record that state regulators actually make "compliance determinations." At this stage, there remains state-by-state questions of fact as to whether officials in the eight States involved in this case do more than ensure PSW is safe to drink.

Second, as Nestlé argued elsewhere in its briefs, if state regulators were to issue a genuine "compliance determination," then state "safe harbor" laws would shield the company from at least some of the liability it faces.[42] Far from raising fears about undermining federal law, this argument suggests that private suits under state law pose no significant obstacle to establishing a uniform definition of spring water.

Nor do I share Nestlé's concern that submitting this case to a jury would undermine the federal rule. A jury would not be free to rewrite the FDA regulation or disregard regulatory compliance determinations, as Nestlé suggests. As in every case, the Court—with the aid of the parties' submissions—would carefully instruct the jury on the relevant law, including the legal meaning of the state spring water regulations and the elements of Nestlé's regulatory compliance defenses. To be sure, this case presents complex facts, but juries routinely handle technically challenging disputes. *See United States v. Zhen Zhou Wu*, 711 F.3d 1, 20 (1st Cir. 2013) ("juries are commonly called upon to decide complex cases" including "highly technical patent and tax cases as well as cases concerning terrorism and espionage").

---

[41] *Id.* at 68-69.
[42] *See, e.g.*, *id.* at 71-77.

In short, Nestlé has neither shown that compliance with both federal and state law is impossible nor that enforcement of state law is an obstacle to federal law. Accordingly, I decline to grant summary judgment on Nestlé's conflict preemption claim.

### Express preemption

Nestlé further argues that all of plaintiffs' claims are expressly preempted by the FDCA. In *Patane II*, I determined that the eight States at issue here had incorporated the federal spring water identity standard into state law, and so claims relying on those substantively identical state standards were not subject to the FDCA's express preemption provision. *Patane II*, 369 F. Supp. 3d at 389-393. Nestlé now asks me to revisit part of this conclusion, arguing that the Connecticut and New York's spring water regulations are not fully consistent with the federal SOI and are therefore expressly preempted.[43]

As I observed in *Patane II*, the words of the Connecticut and New York statutes differ slightly from the federal SOI—rather than requiring a "measurable hydraulic connection" between a bore hole and the spring orifice, they require that a bore hole be "adjacent" to the nature orifice. *Id.* at 392-93 (citing Conn. Gen. Stat. § 21a-150e(c) and N.Y. Comp. Codes R. & Regs. tit. 10, § 5-6.4(c)(5)). Nevertheless, I concluded that these state standards still appeared to be "substantively equivalent to the federal law standard" and thus not subject to express preemption. *Id.* at 393.

I see no reason to depart from this conclusion now. A state law SOI is only preempted by the FDCA if it imposes requirements that are new or different from those contained in the federal standard. *Id.* at 390. Here, there does not appear to be any substantive difference between the FDA's "hydraulic connection" requirement and Connecticut and New York's "adjacency"

---

[43] *Id.* at 60-62.

requirement. It is hard to see any purpose for an adjacency requirement other than to acknowledge a presumption of a hydraulic connection. Indeed, the FDA used an adjacency requirement in its proposed spring water SOI, and it stated regarding its final rule that the "FDA concludes that the requirement of a measurable hydraulic connection between the bore hole and the spring's natural orifice adequately encompasses the intent of the proposed adjacency requirement." 60 Fed. Reg. at 57093. The agency itself acknowledges that the "adjacency" and "hydraulic connection" language serve the same purpose.

Absent some Connecticut or New York case or regulatory guidance establishing that the state standard in fact differs from the federal SOI in its meaning, there is no reason to assume that these distinct word choices impose distinct requirements. *See Metrophones Telecommunications, Inc. v. Glob. Crossing Telecommunications, Inc.*, 423 F.3d 1056, 1077 (9th Cir. 2005) ("a hypothetical conflict is not a sufficient basis for preemption"), *aff'd*, 550 U.S. 45 (2007). And in any case, plaintiffs have disclaimed intent to rely on any putative differences between the federal and state standards.[44]

In short, Nestlé has not shown that the FDCA expressly preempts Connecticut or New York law. Accordingly, I will deny summary judgment on the basis of express preemption.

### *Regulatory approval*

Nestlé moves for summary judgment on the ground that it cannot be liable for conduct that has been approved by state regulators.[45] It first observes that plaintiffs' common law fraud claims and consumer protection statutory claims are both based on the premise that PSW's "spring water" representation is deceptive. It then argues that its spring water claim cannot be

---

[44] Doc. #691 at 75.
[45] Doc. #608-1 at 71-77.

deceptive if the claim was approved by state regulatory officials, maintaining that any other result would violate Nestlé's First Amendment's right to commercial speech.[46]

I assume without deciding that Nestlé's reasoning is correct.[47] Nevertheless, Nestlé's regulatory approval argument fails, because there remain issues of fact as to whether any of the States involved in this case have actually approved PSW for sale as spring water.

While I will later review in detail Nestlé's evidence of regulatory approval in the state-specific sections of this ruling, I note here that Nestlé's new evidence largely consists of statements in depositions of state regulatory officials and a few additional bottled water licenses omitted from the *Patane III* summary judgment briefing.[48] This newly cited evidence is not enough to show an absence of a dispute of fact whether Nestlé was granted the regulatory approval that it believes it received. Nestlé largely cites the depositions to show either (1) that state officials were statutorily obligated to determine if a bottled water product could be classified as "spring water," or (2) that state officials subjectively understood themselves to be approving Nestlé to sell PSW as spring water. But, as plaintiffs point out, this deposition testimony is usually equivocal—the regulatory officials often contradict or caveat their claims.

Even if this testimony were as categorical as Nestlé claims it to be, I would still question whether the individual views of a state regulatory agency employee could be a conclusive substitute for an on-point state statute or regulation. If no law or regulation authorizes a state agency to issue permits granting Nestlé regulatory approval to market its bottled water as "spring water," it is hard to see how a state official's subjective beliefs alone could establish that state agencies took such action.

---

[46] *Id.* at 72.
[47] I remain skeptical that regulatory approval would necessarily immunize Nestlé from plaintiffs' common law fraud claims. *See Patane III*, 478 F. Supp. 3d at 354.
[48] *See, e.g.*, Doc. #692-5 at 1-134; Docs. #628-1–#628-9 (bottled water licenses and permits from various states).

Nestlé's additional evidence of more bottled water permits is similarly unhelpful. Since *Patane III*, Nestlé has produced permits allowing it to sell PSW in States like New York and Massachusetts for every year of the class period. But beyond Nestlé's own characterization of its product as "spring water," these permits do not by their terms independently authorize the sale of "spring water," and Nestlé has not pointed to any statute or regulation that would give them that effect.[49]

Nestlé cites various state regulations that it asserts show that "[a]s a matter of law in each of the eight states at issue, before NWNA could label and sell [PSW] as 'spring water,' each state's regulatory authority with jurisdiction over the sale of bottled water had to determine that the sources of [PSW] comply with the FDA Rule and to authorize the labeling and selling of [PSW] as 'spring water.'"[50] But these regulations do not stand for the proposition Nestlé claims. Instead, at varying levels of specificity, each requires would-be sellers of food or beverages to obtain a license to do so in that State. Some speak specifically to safety requirements, and some require a separate permit for each source, but they do not speak to the permissible description of such goods in marketing. Nor do any of the cited authorities speak to a federal or state SOI, let alone the spring water SOI specifically.

For example, the Connecticut statute Nestlé cites provides: "The Commissioner of Consumer Protection is authorized to issue licenses for the business of bottling water and manufacturing and bottling beverages for the purpose of sale, upon application therefor by any person, firm or corporation, which application shall be in writing, signed by the applicant, and shall describe the

---

[49] *See generally* Docs. #628-1–#628-9. As I discuss below, the New York certificates include an "Identification of Approved Source(s)" section, which lists the water "Type" as "Spring (Borehole)." *See, e.g.*, Doc. #628-4 at 3. However, Nestlé does not point to any state statute or regulation indicating that this notation conveys approval to sell PSW as "spring water" (as opposed to Nestlé's own claim about the source type).

[50] Doc.#608-1 at 71 & n.186.

person to be licensed and the place where such manufacturing or bottling is to be carried on, and no person, firm or corporation shall engage in such business without having secured such a license." Conn. Gen. Stat. Ann. § 21a-136. It does not—as Nestlé claims—  require the State to "determine whether the sources of [PSW] comply with the FDA Rule," nor does it "authorize the labeling and selling of [PSW] as 'spring water.'"

In short, Nestlé's new evidence of regulatory approval does not conclusively establish its regulatory approval defense. Accordingly, I will deny summary judgment on the basis of this new evidence of regulatory approval.

### *Common law fraud - reliance*

Nestlé's next argument targets plaintiffs' common law fraud claims. As the company correctly observes, common law fraud requires in part that a plaintiff rely on a false statement.[51] Nestlé maintains that plaintiffs cannot demonstrate reliance.[52]

In particular, Nestlé contends that its "spring water" representation is false only to the extent that the water does not meet one or more of the technical regulatory requirements for water to constitute spring water (*e.g.*, that there was no "natural force causing the water to flow to the surface through a natural orifice" or, if there was "the use of an external force" to extract the water, the extracted water did not come "from the same underground stratum as the spring").

---

[51] Reliance is an element of common law fraud in each of the eight States at issue in this suit. *See Marion v. Bryn Mawr Tr. Co.*, 288 A.3d 76, 87 (Pa. 2023); *Conroy v. Idlibi*, 343 Conn. 201, 205 n.1 (2022); *Ridlon v. New Hampshire Bureau of Sec. Regul.*, 172 N.H. 417, 426 (2019); *Balles v. Babcock Power Inc.*, 476 Mass. 565, 573 (2017); *Carlson v. Am. Int'l Grp., Inc.*, 30 N.Y.3d 288, 310 (2017); *Fogarty v. Palumbo*, 163 A.3d 526, 542 (R.I. 2017); *Flaherty v. Muther*, 17 A.3d 640, 654 (Me. 2011); *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 172-73 (2005).

[52] Doc. #608-1 at 77-85. To the extent that Nestlé further argues lack of harm due to lack of reliance, this argument is derivative of its reliance argument.

According to Nestlé, unless plaintiffs were aware of the specific technical requirements of the spring water definition that were not met by Nestlé, then they cannot claim to have relied on Nestlé's misrepresentation.

The problem with Nestlé's argument is that it misunderstands the nature of the reliance requirement for a common law fraud claim. The element of reliance goes to "the question of whether the plaintiff has received, believed, and acted upon the defendant's misrepresentation." John C.P. Goldberg *et. al., The Place of Reliance in Fraud,* 48 ARIZ. L. REV. 1001, 1007 (2006). "One who fraudulently makes a material misrepresentation of fact, opinion, intention, or law, for the purpose of inducing another to act or refrain from acting, is subject to liability for economic loss caused by the other's justifiable reliance on the misrepresentation." RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 9 (2020). And "the recipient of a misrepresentation must rely *upon the truth of the misrepresentation itself*, and his reliance upon its truth must be a substantial factor in inducing him to act or to refrain from action." RESTATEMENT (SECOND) OF TORTS § 548 cmt. a (1977) (emphasis added).

If a defendant has engaged in a misrepresentation, the element of reliance is satisfied if the plaintiff relied on the truth of the misrepresentation itself (*e.g.*, relied on the defendant's false claim that "this water is spring water"). The reliance element does not further require that a plaintiff know—and have relied on—the technical particulars of how and why the defendant's representation was false (*e.g.*, "this water is *not* spring water" because there was no "natural force causing the water to flow to the surface through a natural orifice"). That is especially so where—as here—the seller made no labeling claim regarding such technical particulars. Rather than being concerned with precisely how and why a claim is false, the reliance requirement

assumes the falsity and focuses on whether the false statement as a whole induced a plaintiff to act to their detriment.

Indeed, if Nestlé's theory were correct, then product merchants would be at liberty to make false claims about any product that they sell provided that the characteristics of the product happen to be defined or described by regulation in a technical or complex manner. Reasonable consumers do not peruse the pages of the Federal Register to acquaint themselves with the technical characteristics of every product they buy. Yet, according to Nestlé, unless a consumer does so, they cannot be said to have relied on a seller's false claim about the nature of its product. Neither common sense nor the basic purposes of tort law's protection against fraud support Nestlé's novel theory.

Here, there is ample evidence that the plaintiffs received, believed, and acted upon Nestlé's claim that the water it sold was spring water. For example, plaintiff Julie Harding testified that she "was always drawn to the fact [that PSW] was from a natural spring" and that the "spring water" claim influenced her purchasing decision.[53] Another plaintiff, Heather Harrigan, indicated that the characteristics of spring water made PSW worth extra money to her.[54] Plaintiff Stephen Shapiro likewise stated that the "100% Spring Water" claim was a reason for his decision to purchase PSW, as did plaintiffs Catherine Porter and Tina Moretti.[55] Plaintiff Erica Russell "assumed every bottled of Poland Spring water that [she] ever purchased and consumed was pure and clean and *actual spring water*," and avoided purchasing PSW after she learned that might not be the case.[56] Plaintiff Bridget Kopet also testified that she was influenced

---

[53] Doc. #692-6 at 12, 15-16 (deposition of Julie Harding).
[54] *Id.* at 38-39 (deposition of Heather Harrigan).
[55] Doc. #692-7 at 108 (deposition of Stephen Shapiro); *id.* at 64 (deposition of Catherine Porter); *id.* at 44 (deposition of Tina Moretti).
[56] *Id.* at 88-89 (deposition of Erica Russell) (emphasis added).

by the spring water claim, and that the potential falsity of that claim led her to stop buying PSW.[57] Similarly, plaintiff Jennifer Cole stated that she mostly stopped purchasing PSW after learning that it was not spring water.[58] Plaintiff Diane Bogdan averred that she purchased PSW "[b]ecause [she] believed it was natural spring water and healthier than the other waters."[59] Plaintiff Pareshkumar Brahmbhatt testified that he was influenced to purchase PSW at least some of the time because of the spring water claim.[60] Finally, plaintiff Benjamin Fletcher indicated that he looks for spring water when he purchases water, and that he thought PSW was spring water.[61]

In short, there remains a genuine fact dispute about plaintiffs' reliance on Nestlé's "spring water" claim. Accordingly, insofar as Nestlé disputes the adequacy of evidence of reliance, I will deny summary judgment as to plaintiffs' common law fraud claims.

### State unfair trade laws - deception

For similar reasons, Nestlé moves for summary judgment on plaintiffs' statutory unfair trade practice claims. It argues that plaintiffs have not shown Nestlé's "spring water" claim to be deceptive or misleading, because plaintiffs have not demonstrated how consumers understand the term "spring water" and how PSW differs from those consumer expectations.[62]

Nestlé primarily relies on *Bustamante v. KIND, LLC*, 100 F.4th 419 (2d Cir. 2024), a recent case interpreting the "deceptive" requirement for a claim under New York General Business Law §§ 349 and 350. The Second Circuit observed that "deceptive acts are defined objectively as those that are likely to mislead a reasonable consumer acting reasonably under the

---

[57] *Id.* at 8 (deposition of Bridget Kopet).
[58] Doc. #692-5 at 195 (deposition of Jennifer Cole).
[59] *Id.* at 145 (deposition of Diane Bogdan).
[60] *Id.* at 174 (deposition of Pareshkumar Brahmbhatt).
[61] *Id.* at 221 (deposition of Benjamin Fletcher).
[62] Doc. #608-1 at 86-93.

circumstances." *Id.* at 426. In order to prove an action is deceptive, a plaintiff must "produce admissible evidence demonstrating what a reasonable consumer, acting reasonably, would expect of [a product] bearing [a particular] label." *Id.* at 434. The Second Circuit ultimately concluded that plaintiffs had failed to provide such evidence of what a consumer would take the label "All Natural" to mean on a KIND snack bar. *Ibid.*

This case is different from *Bustamante*. Because of the exclusion of the plaintiffs' expert reports in *Bustamante*, there was no admissible or objective evidence what a reasonable consumer would understand the term "all natural" to mean. *Id.* at 424, 432-34. By contrast, Dr. Dennis's expert survey evidence shows that reasonable consumers understand that the ingredient contained in bottled water labeled as "100% Natural Spring Water" or "Natural Spring Water" is spring water rather than purified, well, or some other type of water.[63]

Nestlé misplaces its reliance on *Yu v. Dreyer's Grand Ice Cream, Inc.*, 592 F. Supp. 3d 146 (S.D.N.Y. 2022), a case in which the court ruled that "*when a plaintiff argues that federal labeling regulations constitute evidence of what consumers expect a product's label to communicate about its contents*, courts have generally held that the complaint must adequately allege that reasonable consumers are aware of these complex regulations, and that they incorporate the regulations into their day-to-day marketplace expectations." *Id.* at 155-56 (emphasis added).

Here, by contrast, plaintiffs do not rely on the technical requirements of the federal spring water definition as the measure of reasonable consumer expectations. To the contrary, as plaintiffs point out, the federal SOI "provides the scientific test for whether PSW is actually

---

[63] Doc. #691-4 at 210 (¶¶ 15-23); Doc. #692-1 at 152 (¶ 31) (stating on basis of consumer surveys that "[m]y first key finding, therefore, is that the reasonable consumer understands the '100% Natural Spring Water' claim to be communicating that the at-issue Products actually contain 'Spring Water' and not 'Purified/Filtered Water' or 'Well Water.'").

'spring water,'" but this "is a separate inquiry from the Spring Water Claim's potential for deception or its materiality to consumers," and "[i]f the law were otherwise, businesses would be free to mislabel and falsely advertise their products anytime the veracity of a product's label is subject to a technical definition beyond the ken of lay consumers."[64]

For these reasons, I conclude that plaintiffs have adequately established an issue of fact about whether Nestlé's "spring water" claim is deceptive in violation of New York General Business Law §§ 349 and 350. In the absence of any meaningful showing by Nestlé about how the law of other States differs from New York law, I reach the same result for the consumer protection laws of Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, and Pennsylvania. These States (with the possible exception of New Hampshire as discussed below) also apply a "reasonable consumer" test to determining deception under their consumer protection laws.[65] Nestlé does not show that any of these States apply a more stringent standard for deception that New York does under the GBL; instead, Nestlé describes the laws of other States to be "similar" to New York law.[66]

In short, Nestlé has not shown the absence of a material fact to show deception in terms of conduct that defeated the expectations of a reasonable consumer. Accordingly, I will deny the

---

[64] Doc. #691 at 84.

[65] *See Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 100 (2d Cir. 2019) ("An act or practice is deceptive under CUTPA if the defendant makes a material representation or omission likely to mislead consumers who interpret the message reasonably under the circumstances"); *Dumont v. Reily Foods Co.*, 934 F.3d 35, 40 (1st Cir. 2019) ("an advertisement is deceptive [under Chapter 93A] when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (*i.e.*, to entice a reasonable consumer to purchase the product"); *McGahey v. Fed. Nat'l Mortg. Ass'n*, 266 F. Supp. 3d 421, 435 (D. Me. 2017) ("[a]n act or practice is deceptive if it is a material representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances"); *Slapikas v. First Am. Title Ins. Co.*, 298 F.R.D. 285, 292 (W.D. Pa. 2014) ("[t]o establish liability under the UTPCPL's catchall provision a plaintiff must present evidence showing … a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances"); *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 98 (D.N.J. 2011) (considering whether soup label would mislead an average consumer). I separately discuss the standard for liability under the New Hampshire Consumer Protection Act later in this ruling.

[66] Doc. #608-1 at 92-93.

motion for summary judgment as to the element of deception under the applicable States' consumer protection laws.

### *Lack of injury*

Nestlé argues that plaintiffs have not proved injury. Throughout this litigation, plaintiffs have advanced a price premium theory of damages. *See, e.g.*, *Patane I*, 314 F. Supp.3d at 379. They maintain that, because of Nestlé's allegedly false spring water claim, the company has been able to charge more for PSW than it otherwise could. *Ibid.* As a result, consumers pay more than they fairly should each time they buy PSW.

To measure the alleged price premium, plaintiffs' first expert (Dr. Dennis) conducted a conjoint survey.[67] Conjoint analysis "ask[s] respondents to choose from or rate hypothetical profiles that combine multiple attributes," such as (in this case) brand, price, product characteristics, and labeling choices.[68] *See, e.g.*, Jens Hainmueller et al., *Causal Inference in Conjoint Analysis: Understanding Multidimensional Choices via Stated Preference Experiments*, 22 POL. ANALYSIS 1, 2 (2014). Survey respondents typically repeat this selection task across several hypothetical choice sets with the attributes varied. *Ibid.* So for example, in one selection task, Dr. Dennis might ask a consumer to select between an Aquafina bottle labeled "drinking water" and priced at $7.99 and a Poland Spring bottle labeled "spring water" and priced at $6.99; in the next, the same consumer might be asked to select between a Crystal Geyser bottle labeled "well water" and a Poland Spring bottle labeled "purified water."[69]

Dr. Dennis ran these sort of choices by 1,278 respondents, who each completed 12 choice tasks.[70] He then calculated the relevant importance of the various attributes he measured and

---

[67] Doc. #692-1 at 151 (¶¶ 27-28).
[68] *Id.* at 176-77.
[69] *Ibid.*; *id.* at 180 (¶ 115). Respondents were also given the option of rejecting all of the choices. *Id.* at 181 (¶ 116).
[70] *Id.* at 175 (¶ 106); *id.* at 181 (¶ 119).

determined how much lower a non-spring water PSW product (*i.e.*, "drinking water" or "well water") would have to be priced in order to sell at parity with a spring water PSW product.[71] Using this methodology, Dr. Dennis concluded that Nestlé's spring water claim permitted the company to charge a little over 10% more for their product than it could have if labeled PSW "drinking water."[72]

Plaintiffs' second expert, Dr. Johnson, conducted a hedonic regression analysis to estimate the alleged price premium.[73] "In a hedonic regression, the economist attempts to consistently estimate the relationship between prices and product attributes in a differentiated product market. The regression coefficients are commonly referred to as implicit (or hedonic) prices, which can be interpreted as the effect on the market price of increasing a particular product attribute while holding the other attributes fixed." Patrick Bajari et al., *A Rational Expectations Approach to Hedonic Price Regressions with Time-Varying Unobserved Product Attributes: The Price of Pollution*, 102 AM. ECON. REV. 1898, 1898 (2012). More simply, hedonic regression is "a tool that purports to measure the value of various product attributes in order to demonstrate the existence of, and to isolate the amount of, a price premium" associated with a particular attribute. *Kurtz v. Kimberly-Clark Corp.,* 321 F.R.D. 482, 523-24 (E.D.N.Y. 2017).

Dr. Johnson's regression included water type, product size, state of sale, retailer, brand, container, and business quarter as variables.[74] Using this methodology, he calculated that "Nestlé

---

[71] *Id.* at 183-84 (¶¶ 124, 128).
[72] *See, e.g.*, *id.* at 184 (¶ 129).
[73] *Id.* at 298 (¶ 79).
[74] *Id.* at 300.

obtained a price premium of 8.5%" due to its "spring water" representation and estimated that overall class damages totaled $1.453 billion.[75]

Nestlé challenges these expert reports, arguing they measure the wrong alleged misrepresentation.[76] According to Nestlé, the relevant representation is not that PSW is "spring water," but rather the implied representation that PSW comports with the FDA SOI (as codified in state law). The company argues that, as a result, the experts "identif[y] damages that are not the result of the wrong," and so have not demonstrated a price premium derived from the alleged fraud.[77] *See Comcast Corp. v. Behrend*, 569 U.S. 27, 37 (2013).

I do not agree. Nestlé's argument assumes that there is a meaningful legal difference between the representation "this product complies with the standard of identity for spring water" and the representation "this product is spring water." That assumption is wrong. The FDA SOI— and the substantively identical state SOIs—are the only definitions of spring water that matter for product labeling purposes. The SOIs state what it means to be "spring water." As a result, to say "this product does not comply with the standard of identity for spring water" is equivalent to saying "this product is not spring water"—the statements simply reference different levels of specificity. If plaintiffs are correct that PSW does not comply with the SOI, then Nestlé's broad "spring water" claim is a possible misrepresentation for damages purposes.

Nestlé further maintains that even if its "spring water" claim is the correct misrepresentation for the plaintiffs' experts to target, those experts erred by comparing PSW marketed as "spring water" to PSW with a different type of water claim (*i.e.*, "purified water,"

---

[75] *Id.* at 267 (¶ 13).
[76] Doc. #608-1 at 93-95.
[77] *Id.* at 94.

"drinking water," or "well water").[78] Instead, Nestlé contends that those experts should have compared bottles labeled "spring water" to bottles without *any* sort of water-type claim.

The problem with this argument is that state laws often *require* bottled water labels to make a water-type claim. *See, e.g.*, 105 Mass. Code Regs. 500.090(I)(1-2) (mandating that bottled water products state their source type on their label); N.Y. Comp. Codes R. & Regs. tit. 10 § 5-6.12(a)(1) ("[e]ach label shall show [t]he type of source water"). Accordingly, it would have made little sense for plaintiffs' experts to compare a "spring water" label to a bare label, because the latter would never occur in the marketplace and because plaintiffs would have no baseline familiarity with water lacking terminology.

None of the cases Nestlé cites require a different conclusion. In *Algarin v. Maybelline, LLC*, 300 F.R.D. 444 (S.D. Cal. 2014), the court rejected a price premium theory because plaintiffs' analysis failed to account for many important variables. *Id.* at 460 (analysis failed to "control and neutralize all other product differences"). In *Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d 417 (S.D.N.Y. 2023), the court rejected plaintiffs' conjoint analysis because of insufficient evidence that a substantial number of consumers ever saw the purported misrepresentation. *Id.* at 456, 458. In *Vizcarra v. Unilever United States, Inc.*, 339 F.R.D. 530 (N.D. Cal. 2021), the expert tested the wrong misrepresentation. *Id.* at 553-55. In *Ault v. J.M. Smucker Co.*, 310 F.R.D. 59 (S.D.N.Y. 2015), the proposed method of testing a misrepresentation included the misrepresentation on both hypothetical products. *Id.* at 67. In *Izquierdo v. Mondelez Int'l, Inc.*, 2016 WL 6459832 (S.D.N.Y. 2016), plaintiffs sought to compare completely different types of candy (rather than the same product with different

---

[78] *Id.* at 95-102.

amounts of candy in the box). *Id.* at *7. And in *Housey v. Procter & Gamble Co.*, 2022 WL 874731 (S.D.N.Y. 2022), plaintiffs again compared different products. *Id.* at *8.

Thus, these cases do not establish that plaintiffs must compare a misrepresentation to a counterfactual of *no* representation (rather than a counterfactual of a plausible, *alternative* representation). And, in particular, these cases all emphasize that a comparator should represent real-world conditions as closely as possible, but Nestlé's theory requires just the opposite.

Additionally, Nestlé questions the experts' choice of alternative labels, asserting that PSW could not properly be labeled "purified water."[79] But even assuming Nestlé is correct, such a mistake would not render Dr. Dennis' study unusable, because he also compared Nestlé's "spring water" claim to "drinking water" and "well water" labels, and calculated the associated price premiums separately.[80] And there can be no real dispute that PSW could properly have been labeled "drinking water" or "well water." *See* 21 C.F.R. § 165.110(a)(1)-(2) (indicating that all safe bottled water may properly be labeled "drinking water"); *id.* § 165.110(a)(2)(viii) ("[t]he name of water from a hole bored, drilled, or otherwise constructed in the ground which taps the water of an aquifer may be 'well water.'").[81]

In short, Nestlé has not shown that there is no genuine issue of fact to show that plaintiffs were injured by Nestlé's misrepresentation by means of being induced to pay more for PSW than they otherwise would have paid. Accordingly, I will deny summary judgment as to the issue of injury.

### *Statutes of limitation*

---

[79] *Id.* at 97-98, 102.

[80] Doc. #692-1 at 183-86 (¶¶ 127-136).

[81] It appears that Dr. Johnson's regression did use "purified water" as his base category, and estimated regression coefficients accordingly. *Id.* at 300, 303. However, even if I assume that Dr. Johnson's research provides no proof of the plaintiffs' injury claims, Dr. Dennis' work is sufficient to create a fact issue as to injury.

Nestlé argues that parts of plaintiffs' claims are time-barred. Plaintiffs' claims span a class period running from November 2003 until August 15, 2017—the date when this suit was filed. Nestlé seeks to constrain the scope of some of the claims, arguing that statutes of limitations apply to the common law fraud, contract, and New York statutory claims.[82] In response, plaintiffs invoke various tolling doctrines, arguing that all their earlier claims should be dated to 2015 for statute of limitations purposes.[83]

I addressed this issue in *Patane IV*. I concluded that there was a genuine dispute as to whether Nestlé had fraudulently concealed the origin of its water, primarily because of evidence that Nestlé had tried to fake the appearance of natural springs at one of its water sites. *Patane IV*, 583 F. Supp. 3d at 345. I decided that the fraud claims might be tolled by the doctrines of fraudulent concealment (as to the common law fraud claims and New Jersey contract claims) and equitable estoppel (as to the New York contract claims). *Id.* at 345-50. I did not consider whether the New York statutory claims might be tolled, because Nestlé incorrectly argued that Connecticut law applied to those claims. *Id.* at 349-50.

Nestlé now contends that I should revisit these conclusions. First, it maintains that it could not have fraudulently concealed the origins of its water under Connecticut law, because it did not know the facts of plaintiffs' claims at the time of its alleged concealment.[84] It contends that because it had state regulatory approval for its sale of PSW as "spring water" it could not have known that its conduct was unlawful; it also asserts that because it did not know that these

---

[82] Nestlé cites the relevant statutes of limitation for the other common law claims, but only makes specific arguments about the common law fraud, contract, and New York statutory claims. *See* Doc. #608-1 at 152-57; Doc. #703 at 62-64. In addition, Nestlé does not contest plaintiffs' argument that it has not adequately argued for limitation of plaintiffs' non-New York statutory claims. *See* Doc. #691 at 141 n.224. Accordingly, I do not consider whether those other statutory claims might be constrained by a relevant statute of limitations.
[83] Doc. #691 at 141-48.
[84] Doc. #608-1 at 155.

plaintiffs had purchased PSW until the time of the suit, it could not have understood the full facts of their claims.

Second, Nestlé argues that the evidence I relied on in *Patane IV* is no longer sufficient to create a fact issue as to concealment under Connecticut law and New Jersey law (which govern the common law fraud claims and New Jersey contract claims, respectively).[85] In that ruling, I observed that Nestlé may have installed a pipe at the Fryeburg water site to make it seem as though water was bubbling up from the ground. *Id.* at 345. I concluded that this pipe—among other evidence—produced a fact issue as to concealment. *Ibid.* Nestlé now maintains that discovery has shown that this pipe was installed in 1997—well before the beginning of the class period—and so it could not have been used to stymie plaintiffs' claims.[86]

Third, Nestlé argues that under New York law, plaintiffs must show that Nestlé engaged in concealment directed specifically towards *them*, rather than towards the broader public.[87] Because the company's alleged concealment was more generally targeted, it contends that plaintiffs cannot invoke equitable estoppel.

I am unpersuaded by the first of these arguments. Nestlé is correct that for fraudulent concealment to apply under Connecticut law, the plaintiffs must prove that Nestlé "had actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiffs' cause of action."[88] *Falls Church Grp., Ltd. v. Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 105 (2007). But Nestlé is wrong that purported regulatory approval precludes this knowledge. As I

---

[85] *Id.* at 155-57.
[86] *Id.* at 155-56; Doc. #703 at 62.
[87] Doc. #608-1 at 153.
[88] The parties agree that Connecticut law applies to the tolling of plaintiffs' common law fraud claims. *See id.* at 155 n.663; Doc. #691 at 143.

have already discussed, there remains a fact issue as to whether Nestlé ever obtained permission to sell PSW as "spring water" in any state.

Nestlé is similarly mistaken that it needed to know the identity of the specific plaintiffs to have "awareness … of the facts necessary to establish the plaintiffs' cause of action." In *Martinelli v. Bridgeport Roman Cath. Diocesan Corp.*, 196 F.3d 409, 425-26 (2d Cir. 1999), the Second Circuit rejected the argument that for purposes of fraudulent concealment a defendant must know "who the potential plaintiff was," concluding instead that "the Connecticut Supreme Court would hold that … it is sufficient to show that the defendant had and concealed actual awareness of facts that created a *likely potential for harm*".

I am likewise unconvinced that the timing of the alleged "fake spring" installation at the Fryeburg water site makes any difference to fraudulent concealment under Connecticut or New Jersey law.[89] The implication of Nestlé's argument is that it is free to conceal wrongdoing to deter lawsuits so long as the initial act of concealment is complete before the harm caused by that wrongdoing occurs.

Nestlé cites *Med. Device Sols., LLC v. Aferzon*, 207 Conn. App. 707 (2021), in which the Appellate Court of Connecticut stated that fraudulent concealment predicates cannot occur "before the plaintiff's cause of action accrue[s]." *Id.* at 747. But the Appellate Court's reasoning was based on the general fraudulent concealment principle requiring that a defendant have "awareness … of the facts necessary to establish the plaintiffs' cause of action." *Ibid.* While such awareness usually cannot occur before a cause of action accrues, there are exceptions, such as

---

[89] The parties agree that New Jersey law on fraudulent concealment applies to the New Jersey contract claims. *Id.* at 145-46; Doc. #608-1 at 156-57. However, Nestlé makes no specific argument under New Jersey law other than to maintain that it has not engaged in any act of concealment. *Id.* at 157.

when a "defendant had and concealed actual awareness of facts that created a likely potential for harm." *Martinelli*, 196 F.3d at 426.

This case falls within the *Martinelli* exception—if plaintiffs' allegations prove true, then Nestlé knew that its "spring water" claim was a misrepresentation, was aware that customers were going to be defrauded, and took steps to prevent the public from discovering it. The fact that Nestlé did not know the precise identity of the victims or the precise timing of their injury would not excuse that behavior.

In any event, I doubt Nestlé's concealment could be considered "completed" on the day it installed the alleged "fake spring." Nestlé did not merely put in place the alleged fake spring infrastructure—it has maintained it in the years since.[90] That continued maintenance of the spring constitutes an ongoing act of concealment that cannot simply be "dated" to 1997.

Finally, I do not take the evidence of Nestlé's "fake springs" to be limited to the Fryeburg water site. Plaintiffs have also provided evidence of fake spring activity at the Clear Spring site and the Bradbury Spring site.[91] They have further offered evidence that Nestlé set up "demonstration springs" at the Dallas Planation site in 2019 and at the Ellis Spring site in 2016.[92] Though these latter developments postdate plaintiffs' discovery of their claims, they make more likely their claim that Nestlé was determined to hide the origin of its water.

All in all, I am satisfied that there remains a genuine issue of fact as to whether Nestlé fraudulently concealed the origins of its water under the law of Connecticut and New Jersey. Accordingly, I will deny summary judgment as to the statute of limitations for the Connecticut and New Jersey claims.

---

[90] *See* Doc. #335-2 at 17 (¶ 43) (declaration of Alexander Schmidt); Doc. #596 at 127.
[91] Doc. #596 at 106-07, 166, 168-69.
[92] *Id.* at 137-38; 193-94.

On the other hand, I reach a different conclusion when it comes to plaintiffs' New York claims. Plaintiffs rely on the doctrine of equitable estoppel to toll their GBL and Uniform Commercial Code (UCC) contract causes of action. New York law "draws a distinction between misrepresentations made to the community at large, and specific misrepresentations or deceptive conduct sufficient to constitute a basis for equitable estoppel."[93] *Rouviere v. Howmedica Osteonics Corp.*, 645 F. Supp. 3d 157, 177 (S.D.N.Y. 2022), *aff'd*, 2024 WL 1478577 (2d Cir. 2024). "The former is insufficient to make out a claim for equitable estoppel." *Ibid.* Instead, "equitable estoppel is only appropriate where the plaintiff is prevented from filing an action within the applicable statute of limitations due to defendant's misconduct toward the potential plaintiff, not a community at large." *Ibid.*

This requirement—that a defendant have directed their conduct towards the particular plaintiffs that have filed suit—differs from the fraudulent concealment law of Connecticut and New Jersey, which do not appear to require plaintiff-specific acts of concealment. *See Izzarelli v. R.J. Reynolds Tobacco Co.*, 117 F. Supp. 2d 167, 177 (D. Conn. 2000); *In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, 2008 WL 4126264, at *18 (D.N.J. 2008). That makes a crucial difference here, because plaintiffs have not pointed to pre-suit acts of concealment directed at *them*. Rather, they have pointed to more general conduct aimed at deterring public discovery of Nestlé's practices. As a result, plaintiffs have not demonstrated the requirements for equitable tolling under New York law.

Because plaintiffs are not entitled to toll their New York claims, I will grant summary judgment as to the New York contract claims that accrued before August 15, 2013, and the New York GBL claims that accrued before August 15, 2014. *See* N.Y. U.C.C. § 2-725(1) (New York

---

[93] The parties agree that New York law applies here. *See* Doc. #691 at 146-48; Doc. #608-1 at 152-54.

UCC statute of limitations); N.Y. C.P.L.R. § 214(2) (GBL statute of limitations). One plaintiff, Julie Harding, has only brought contract claims under New York law that arose prior to 2013.[94] Accordingly, her contract claims will be dismissed in their entirety. Another New York plaintiff, Stephen Shapiro, appears to have brought New York contract claims from both before and after August 15, 2013—those claims that arose before that date will be dismissed as well.[95]

### Contract claims

Nestlé next seeks summary judgment for plaintiffs' breach of contract claims. It argues that plaintiffs failed to give the company sufficient notice of their contract claims and that delivery of "spring water" was not a term in plaintiffs' contracts.[96]

Nestlé's notice argument assumes that plaintiffs' contract claims arise under the UCC (as adopted by New York and New Jersey). Section 2-607(3)(a) of the UCC provides that "[w]here a tender has been accepted the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."

I agree with Nestlé that plaintiffs' contract claims are UCC claims. Plaintiffs are asserting the existence of a contract for the sale of goods, and "the UCC applies to transactions in goods." *KSW Mech. Servs. v. Johnson Controls, Inc.*, 992 F. Supp. 2d 135, 141 (E.D.N.Y. 2014); *see also Amba v. Rupari Food Servs., Inc.*, 2016 WL 6495514, at *3 (D.N.J. 2016). But I do not agree that plaintiffs failed to provide sufficient notice of their claims. Plaintiffs point out that their attorney, Alexander Schmidt, sent a letter on behalf of one of the plaintiffs (Erica Russell) and a putative class to Nestlé. That letter notified the company that Russell believed PSW was deceptively labeled and maintained that Nestlé had violated a number of consumer protection

---

[94] Doc. #691-4 at 172 (¶ 340).
[95] *Id.* at 201 (¶ 447).
[96] Doc. 608-1 at 146-152.

laws.[97] It also included a draft complaint, which at that time included claims for fraudulent

concealment, unjust enrichment, and violations of consumer protection laws.[98]

 This letter provided Nestlé with ample notice of the core of plaintiffs' claims: that the

company was falsely marketing common ground water as spring water. New York law does not

require that plaintiffs put defendants on notice of the specific cause of action. Instead, it is

enough to alert the defendant to the suspect interaction. *See Barber v. Johnson & Johnson Co.*,

2017 WL 2903255, at *8 (C.D. Cal. 2017) (holding that, under New York law, a letter from a

putative class representative conveying notice of claims under the California Consumers Legal

Remedies Act was sufficient for Section 2-607(3)(a) purposes); *see also Maroney v. Woodstream

Corp.*, 695 F. Supp. 3d 448, 467-68 (S.D.N.Y. 2023) ("[i]ndeed, the notice required to preserve

the right to sue for damages need only alert the prospective defendant that the transaction was

troublesome"). The notice at issue in this case thus satisfies the UCC as adopted by New York

and New Jersey.

 Nestlé further argues that the plaintiffs with contract claims—at this point just Heather

Harrigan and Stephen Shapiro—have not provided evidence that they had a contract with the

company for delivery of spring water.[99] But while these plaintiffs do not appear to have copies of

the actual contracts they signed, such a copy is not necessary to prove a contract for the sale of

goods. Under the UCC, "a contract for the sale of goods may be made in any manner sufficient

to show agreement, including conduct by both parties which recognizes the existence of such a

contract." *Demand Elec., Inc. v. Innovative Tech. Holdings, LLC*, 665 F. Supp. 3d 498, 505

(S.D.N.Y. 2023); *First Valley Leasing, Inc. v. Goushy*, 795 F. Supp. 693, 696 (D.N.J. 1992).

---

[97] Doc. #692-15 at 16-18 (Chapter 93A letter of plaintiff Erica Russell).
[98] *Id.* at 19-176.
[99] Doc. #608-1 at 149-51.

Plaintiff Shapiro has provided invoices, which have been held sufficient to prove the existence of a contract in both New York and New Jersey.[100] *See Demand Elec., Inc.*, 665 F. Supp. 3d at 505; *First Valley Leasing, Inc.*, 795 F. Supp. at 696-67. Likewise, plaintiff Harrigan has provided a ledger of her purchases from Nestlé, which the company itself appears to have generated.[101] I therefore conclude that both Harrigan and Shapiro have sufficiently proved a contract with Nestlé to survive summary judgment.

Nestlé further argues that the sale of "spring water" was not a term in any of plaintiffs' contracts. But the invoices and ledger provided by the plaintiffs reflect that their contracts were for the purchase of Poland *Spring Water*. It is difficult to disclaim a "spring water" contract term when the name of the product itself promises that type of water. Even if the contract contained no other references to spring water other than the product name, a reasonable person reading such a contract could conclude that it promised the delivery of spring water.[102]

In short, Nestlé has not shown the absence of a genuine issue of fact to support plaintiffs' UCC contract claims. Accordingly, I will deny summary judgment with respect to the remaining contract claims of plaintiffs Harrigan and Shapiro.

### *Injunctive relief*

Nestlé moves for summary judgment on plaintiffs' claims for injunctive relief to stop Nestlé from marketing PSW as "spring water."[103] According to Nestlé, plaintiffs lack standing to seek such relief. I agree.

---

[100] *See* Doc. #690-27 (invoice of plaintiff Stephen Shapiro for PSW). Julie Harding also provided invoices, Doc. #690-25, but as I explained above, I will grant summary judgment on her contract claims on statute of limitations grounds.
[101] *See* Doc. #690-24 (ledger of plaintiff Heather Harrigan's purchases from Nestlé Home & Office).
[102] Nestlé also argues that it did not breach the contract because it in fact delivered spring water to the plaintiffs. For the reasons previously discussed, there is an issue of fact as to whether PSW is spring water.
[103] Doc. #160 at 284, 321-23 (¶¶ 846, C-L).

"Standing is not dispensed in gross" and so "a plaintiff must demonstrate standing … for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). When there is more than one plaintiff, at least one must have standing to seek each form of relief requested. *Ibid.* Standing for injunctive relief requires a "real and immediate" threat of injury, which past wrongs alone cannot demonstrate. *City of Los Angeles v. Lyons,* 461 U.S. 95, 101-102 (1983); *see also Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004).

Here, the named plaintiffs to this lawsuit are in no real danger of injury, because they now know the alleged "truth" about PSW. Rather than purchasing the product and paying the price premium, they can buy a different bottled beverage. *See Berni v. Barilla S.p.A. v. Sculman*, 964 F.3d 141, 147 (2d Cir. 2020) ("past purchasers of a product … are not likely to encounter future harm of the kind that makes injunctive relief appropriate"); *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 2017 WL 985640, at *10 (D. Conn. 2017) (plaintiff lacked standing to pursue injunctive relief because "[w]hatever plaintiff may have believed at the time she purchased the sunscreen products, she now understands the true ingredients of the products" and "she is no longer deceived by those claims"), *vacated on other grounds*, 897 F.3d 88 (2d Cir. 2018); *see also Davis v. Angelcare USA, LLC*, 727 F. Supp. 3d. 99, 163 (D. Conn. 2024) (no standing to pursue injunctive relief in consumer deception class action despite the fact that plaintiffs intended to purchase the deceptive product again).

Arguing to the contrary, plaintiffs maintain that they sometimes have no choice but to purchase PSW.[104] This is undoubtedly true in a limited sense: plaintiffs may sometimes enter a store thirsty, only to discover the PSW is the only bottled water on offer. But it will very rarely be the case that a plaintiff *needs* water as a matter of health or necessity. Being thirsty is not

---

[104] Doc. #691 at 149.

usually an emergency, and it would be uncommon for a vendor to only have water, and only one variety thereof, available as a beverage; and it would be more uncommon still for that vendor, or similar vendors, to be the only source of drinkable liquid in the area. In short, plaintiffs have not shown that buying PSW is an unavoidable reality.

Nor does it matter that this case is a putative class action, and that other members of the class might not be aware of the alleged deception. "When plaintiffs seek to represent a class, they must personally have standing with respect to the class relief requested, and it is not enough for there to be an injury that 'has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Langan*, 2017 WL 985640, at *10 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

In short, plaintiffs lack standing to seek injunctive relief against future sales of PSW. Accordingly, I will grant summary judgment for Nestlé against plaintiffs' injunctive relief claims.

### *Burford abstention*

Nestlé argues that I should abstain from resolving this case under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).[105] I addressed this claim in *Patane II*. There, I observed that *Burford* abstention "applies 'only in extraordinary circumstances' and where a case 'presents difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar, or if its adjudication in a federal forum would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Patane II*, 369 F. Supp. 3d at 387 (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 726-27 (1996)). Factors to consider in determining whether to abstain include "(1)

---

[105] Doc. #608-1 at 161.

the degree of specificity of the state regulatory scheme; (2) "the need to give one or another debatable construction to a state statute; and (3) whether the subject matter of the litigation is traditionally one of state concern." *Ibid.* (quoting *Liberty Mut. Ins. Co. v. Hurlbut*, 585 F.3d 639, 650 (2d Cir. 2009)).

Nestlé does not offer any new theories why *Burford* abstention is appropriate. Instead, it cites the expanded record bears to support its previous arguments. But I do not see how the summary judgment record compels a different conclusion.

First, as I have discussed above, most of the States currently at issue do not appear to have a complex scheme regulating the sale of "spring water." State regulators in Maine and elsewhere appear to take a haphazard approach to enforcing state law standards of identity. There is no "carefully established state system" for approving the sale of spring water in any of the States at issue. *Liberty Mut.*, 585 F.3d at 651. And the state SOIs defining spring water "merely incorporate the federal 'spring water' standard in order to avoid being subject to preemption." *Patane II*, 369 F. Supp. 3d at 388.

Second, there is no further need to "give one or another debatable construction to a state statute." I have already construed most of the state statutes at issue in *Patane III*, and this ruling now adds relatively little on that front.

Finally, this putative class action is about challenging an alleged fraud that affects consumers throughout the Northeast. It is not the sole concern of any specific State. Nor is defining "spring water" traditionally a matter of state—rather than federal—concern.

In short, Nestlé has not shown that this is the sort of extraordinary case that would disrupt a State's ability to regulate on an important matter of public concern. Accordingly, I decline to abstain under the *Burford* doctrine.

### Connecticut claims (Bridget Kopet)

I now turn to Nestlé's arguments addressing specific state law claims. I start with Connecticut plaintiff Bridget Kopet.

Nestlé seeks summary judgment as to Kopet's CUTPA claims on a number of grounds, including the statute of limitations.[106] In *Patane IV*, I concluded that the statute of limitations restricted Kopet's CUTPA claims to those arising after August 15, 2014. 583 F. Supp. 3d at 347-48. Nestlé now maintains that Kopet has provided no evidence that she has purchased PSW between that date and the filing of this lawsuit.

I agree with Nestlé because Kopet's deposition testimony demonstrates that she did not purchase PSW between August 15, 2014, and August 15, 2017. Asked in February 2022 what her "best estimate" was of when she last bought PSW, she replied "10 years ago."[107] Asked "how long before the lawsuit began do you think you last purchased a bottle or bottles of Poland Spring Brand spring water," she answered "I believe I did purchase Poland Springs water 20 years ago, 15 ago. I mean, once I became aware of the case, I stopped purchasing it."[108] Later in her deposition, she indicated that she learned of the case around the time her sister was getting divorced from one of the attorneys in this case, which was about 15 years prior to the deposition, and that she had not bought PSW since then.[109]

To resist this conclusion, plaintiffs point to deposition testimony that Kopet purchased PSW on "a fairly regular basis" before she became aware of the case, as well as a response to an interrogatory stating that she "first learned of some of the results of the investigation leading to

---

[106] *Id.* at 116.
[107] Doc. #692-7 at 6.
[108] *Ibid.*
[109] *Id.* at 7.

this action" from her counsel on October 20, 2016.[110] Putting these pieces of evidence together, they seek the inference that Kopet purchased PSW through October 2016.

The problem, of course, is that Kopet's testimony—that she once purchased PSW "on a fairly regular basis"—comes in the context of her discussion of purchasing PSW 15 to 20 years before. Contrary to plaintiffs' argument, Kopet does not indicate that she purchased PSW right up until she learned about the case (whether that was in October 2016 or much earlier).[111]

In short, plaintiffs point to nothing that would refute Kopet's own testimony that she did not purchase PSW within the limitations period. And plaintiffs offer no other evidence—in the form of receipts, bank statements, or otherwise—to demonstrate a purchase during that time. As I result, I will dismiss Kopet's CUTPA claim on statute of limitations grounds.

As for Kopet's Connecticut fraud claim, Nestlé's only unaddressed argument is that regulatory approval prevents Kopet from demonstrating deception.[112] I have already explained my high-level disagreement with this argument, but the specific evidence also cuts against it as a basis for summary judgment. For example, while Nestlé has provided annual licenses to sell PSW in Connecticut, those licenses "reflect permission for bottled water in general and without any further reference or approval specific to spring water."[113] *Patane III*, 478 F. Supp. 3d at 330. Moreover, Frank Greene, the Division Director for the Division of Food and Standards in the Connecticut Department of Consumer Protection, acknowledged that Nestlé's certifications do not specifically convey permission to sell spring water.[114] He further testified that the Department does not issue specific spring water bottler licenses or certificates.[115] As discussed,

---

[110] *Id.* at 33 (¶ 7) (Bridget Kopet interrogatories); *id.* at 57.
[111] Doc. #691 at 109.
[112] Doc. #608-1 at 71, 75 & n.200.
[113] *See generally* Doc. #628-1 (Nestlé's Connecticut bottled water permits).
[114] Doc. #692-4 at 89 (deposition of Frank Greene).
[115] *Ibid.*

Nestlé likewise does not point to any statutory or regulatory language requiring state officials to make a spring water determination, nor does it point to any authority that would treat its licenses as permission to sell spring water specifically (as opposed to bottled water generally). This evidence shows that there is at least an issue of fact as to whether Nestlé received regulatory approval to sell PSW as spring water in Connecticut.

In short, Nestlé has shown that plaintiff Kopet's CUTPA claim is barred by the statute of limitations, but it has not shown that regulatory approval bars Kopet's common law fraud claim. Accordingly, I will grant summary judgment as to Kopet's CUTPA claim but deny summary judgment as to her common law fraud claim.

### Maine claims (Benjamin Fletcher)

The putative Maine class representative is Benjamin Fletcher, who has brought claims under the Maine Unfair Trade Practice Act (MUTPA), the Maine Uniform Deceptive Practices Act (MUDTPA), and for common law fraud. The MUDTPA claims are for injunctive relief only, which I have already determined the plaintiffs cannot pursue.[116] I consequently focus on Fletcher's other claims for relief.

Among the arguments Nestlé musters against Fletcher's MUTPA claim is that his injury is insufficient.[117] MUTPA contains a substantial harm requirement, which "imposes a quantitative threshold in cases alleging a pecuniary harm." *Everest v. Leviton Mfg. Co.*, 2006 WL 381832, at *3 (Me. Super. Ct. 2006). Applying this requirement, the Maine Supreme Court has concluded that an overpayment of about $1.25 would not constitute a substantial injury under the statute. *See Tungate v. MacLean-Stevens Studios, Inc.*, 714 A.2d 792, 797 (Me. 1998).

---

[116] Doc. #160 at 318 (¶ 1021).
[117] Doc. #608-1 at 140-41.

45

Fletcher's claim fails to meet the substantial harm requirement. He admits to spending no more than about $50-60 on PSW during the class period, only about 10-15% of which may have been price premium.[118] As a result, Fletcher is alleging no more than about $10 in damages. Under *Tungate*, that is not enough to meet MUTPA's substantial injury requirement.

Nor am I convinced that Fletcher's status as a putative class representative should grant him an exception to this requirement. It does not appear that there is any Maine caselaw stating that a MUTPA class representative is excused from the "substantial injury" requirement, nor allowing a class representative who themselves fails the *Tungate* test to aggregate the total alleged harms of the entire class. *See Anderson v. Hannaford Bros. Co.*, 659 F.3d 151, 160 (1st Cir. 2011). I therefore conclude that Fletcher has failed to demonstrate a substantial injury, and that Nestlé is entitled to summary judgment on his MUTPA claim.

Turning to Fletcher's common law fraud claim, Nestlé argues that Maine regulatory approval defeats it.[119] But Nestlé has again "failed to show that its sale of Poland Spring water as 'spring water' is required or specifically authorized by any [Maine] agency order or rule, or by any statute." *Patane III*, 478 F. Supp. 3d at 335. Instead, it reiterates its reliance on Code Me. R. 10-144. Ch. 231, § 3(J), as was litigated in *Patane III*.[120]

And it also relies on the deposition testimony of state regulatory officials. Specifically, it points to the testimony of Andrew Tolman, who opined that the Maine Drinking Water Program (DWP) was "statutorily obligated to make" spring water determinations.[121] In addition, it refers

---

[118] Doc. #692-5 at 226; Doc. #692-1 at 184 (¶ 129).
[119] Doc. #608-1 at 71-75.
[120] *Id.* at 72 n.186.
[121] *See* Doc. #703 at 38 & n.119 (citing Doc. #691 at 10, among other documents).

to the testimony of Nancy Beardsley, who averred that the Maine Department of Agriculture issued licenses permitting Nestlé to bottle, label, and sell its water as spring water.[122]

Yet without a rule or statute to point to, it is difficult to know whether these officials are accurately stating the law. Moreover, other testimony points to a different conclusion. For example, Beardsley could not recall any regulation—aside from the Maine SOI—that might require bottled water producers to receive spring water determinations from the Drinking Water Program.[123] Another official, the "Maine State Geologist" Robert Marvinney, maintained that the role of the DWP is "to ensure that the bottling process and the water itself was safe for human consumption."[124] Meanwhile, Andrew Tolman further acknowledged that spring water determinations were "a very tiny piece of what we did [at the DWP] compared to regulating 2000 public water supplies and trying to give the people of the State of Maine safe drinking water. Doing spring water was just kind of something we did when it was necessary, and not … very often."[125] He also observed that his program only made spring water determinations when a bottler requested one, which undermines Tolman's claim that the Maine DWP was obligated to license spring sources.[126] Between the lack of written authority and the inconsistent testimony of state officials, there remains a dispute of material fact as to whether Maine authorities ever licensed Nestlé to sell PSW as "spring water" in Maine.

In short, I will grant summary judgment against Fletcher with respect to his statutory claims under MUPTA and MUDTPA. On the other hand, I will deny summary judgment as to Fletcher's common law fraud claim under the law of Maine.

---

[122] *Ibid.*; *see also* Doc. #609-1 at 365 (deposition of Nancy Beardsley).
[123] Doc. #692-3 at 26.
[124] *Id.* at 69 (deposition of Robert Marvinney).
[125] Doc. #690-4 at 8 (deposition of Andrew Tolman).
[126] *Ibid.*; *id.* at 27.

### Massachusetts claims (Jennifer Cole)

Nestlé raises four challenges to the Chapter 93A claims of Massachusetts plaintiff Jennifer Cole.[127] First, it maintains that Cole failed to send a demand letter at least 30 days prior to filing suit, as required for a claim under Chapter 93A. Second, it claims that Cole cannot demonstrate that its conduct was "extreme or egregious" as required for relief. Third, it argues that Cole has failed to demonstrate an injury sufficient for a Chapter 93A claim. Finally, it offers its regulatory approval argument against both Cole's Chapter 93A claim and her common law fraud claim.

None of these arguments are persuasive. To start, Nestlé received a Chapter 93A demand letter—it was simply sent on behalf of another named plaintiff, Erica Russell.[128] The Russell demand letter was sufficient for purposes of the statute, because it identified her claim as being on behalf of a class and notified Nestlé of the basic allegations against it. "Once the initial demand letter requirement under Chapter 93A has been satisfied, a putative class action takes on a life of its own. This is true even when the party who initially sent the letter is no longer part of the class or other plaintiffs join the class without sending an additional demand letter." *Hermida v. Archstone*, 950 F. Supp. 2d 298, 304 (D. Mass. 2013).

Similarly, the Massachusetts Supreme Court has held "[t]he demand letter required under [Chapter] 93A does not require claimants to set forth every specific statutory or regulatory violation alleged, so long as it fairly notifies the prospective respondent of the actions or practices of the respondent and the injury suffered by those actions." *Casavant v. Norwegian Cruise Line Ltd.*, 460 Mass. 500, 506 (2011). Russell's letter gave Nestlé fair notice that a class

---

[127] Doc. #608-1 at 121-30; *see also id.* at 71, 75 & n.201.
[128] Doc. #692-15 at 16-18.

action would soon be filed against it, and the gravamen of the plaintiffs' complaint. No additional notice was necessary.

Nor has Nestlé shown that there is no genuine fact issue as to whether its conduct was "extreme or egregious," as a suit under Chapter 93A appears to require. *See Anoush Cab, Inc. v. Uber Techs., Inc.*, 8 F.4th 1, 18 (1st Cir. 2021). At least some of plaintiffs' allegations—including evidence of fraudulent concealment, as well as the massive scope of the alleged fraud—would, if a jury determined them to be true, be sufficient to support a jury's further conclusion that the conduct was extreme or egregious.[129]

Cole has also sufficiently established an injury for summary judgment purposes. Contrary to Nestlé's suggestion, Chapter 93A recognizes "price premium" injuries so long as they can be measured objectively. *See Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 11-12 (1st Cir. 2017); *see also Bezdek v. Vibram USA Inc.*, 2013 WL 639145, at *6 (D. Mass. 2013) ("[i]t appears that the Supreme Judicial Court is willing to recognize 'price premium' injury by current owners of a product whose value was artificially inflated by a deceptive act or practice at the time of purchase."). Here, as discussed above, there is adequate evidence to create an issue of fact as to a price premium associated with Nestlé's spring water claim. There is also evidence that Cole purchased PSW in part because she believed it was spring water.[130] Accordingly, there is an issue of fact as to Cole's injury.

Finally, Nestlé has not demonstrated its regulatory approval defense as to Cole's claim in Massachusetts. In *Patane III*, I observed "Massachusetts law requires the submission of water quality test results to the Massachusetts Department of Public Health for licenses to sell drinking water from out-of-state sources. But the law does not require that a regulator affirmatively

---

[129] Doc. #596 at 107, 137-40, 193.

[130] *See* Doc. #692-5 at 195 (indicating that Cole stopped buying PSW after she learned it might not be spring water).

approve that the bottled water or its labels comply with the spring water standard of identity."
*Patane III*, 478 F. Supp. 3d at 338.

As I have already discussed, Nestlé points to no statute or regulation that would disturb this conclusion. Instead, it relies on a collection of permits allowing it to sell bottled water in Massachusetts and testimony from a state official. That official (Michael Moore) indicated that the issuance of a bottled water license affirmed that the product in question complied with the relevant state law standard of identity.[131] But, as I previously explained, I am reluctant to conclude that the testimony of a state official—even a high ranking one—is sufficient to demonstrate state approval in the absence of a statute or regulation.

Even if I were willing to disregard the absence of a state statute or regulation authorizing such approval, Moore's testimony is equivocal. He states that Massachusetts "[doesn't] approve sources. We approve the water—the quality of the water. We look at the contaminants that are listed in the test results to see if they exceed Massachusetts drinking water standards."[132] Accordingly, there remains a genuine dispute of fact as to whether Nestlé can rely on regulatory approval to sell PSW as "spring water" in Massachusetts, and I therefore decline to grant summary judgment on this ground.

In short, Nestlé has not shown that there is no genuine fact issue to support Cole's claims for relief under Chapter 93A and for common law fraud. Accordingly, I will deny summary judgment as to Cole's Massachusetts claims.

### New Hampshire claims (Diane Bogdan)

Nestlé argues for summary judgment against plaintiff Diane Bogdan's claims under New Hampshire law. It first relies on a provision of the NHCPA that exempts "[t]ransactions entered

---

[131] *See generally* Doc. #628-5; Doc. #692-5 at 75, 83-85 (deposition of Michael Moore).
[132] Doc.#692-5 at 91.

into more than 3 years prior to the time the plaintiff knew, or reasonably should have known, of the conduct alleged to be in violation of this chapter." N.H. Stat. § 358-A:3(IV-a). Nestlé argues that in the three years prior to discovering Nestlé's alleged deception in July 2017, Bogdan never purchased PSW. Instead, Nestlé claims, Bogdan only purchased the product after learning of the alleged fraud for the purpose of getting a receipt. Nestlé maintains that Bogdan cannot establish an injury for constitutional standing purposes or for purposes of the NHCPA because she only purchased PSW either more than three years before she knew of the alleged wrongdoing or after she knew of the wrongdoing.[133]

Yet the record includes evidence to the contrary. One of Nestlé's attorneys asked Bogdan, "Between 2003 and 2017, July or so of 2017, how frequently would you purchase Poland Springs?" to which she replied "[a]bout a year or two before would have been two to three times a month or maybe once a week."[134] This testimony indicates that at least as of July 2015, Bogdan was a regular purchaser of PSW, which testimony is enough to create an issue of fact as to an injury.

I cannot agree with Nestlé's additional argument that plaintiffs cannot establish that its "spring water" claim was deceptive under the NHCPA. The NHCPA explicitly prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" and "representing that goods … have … characteristics … that they do not have." N.H. Rev. Stat. §§ 358-A:2(V), (VII). "To prove a claim under these sections of the statute, a plaintiff must establish that the defendant made a representation, with actual knowledge of its falsity or reckless disregard for its truth, with the intent to induce consumers to enter a transaction." *Guay v. Sig Sauer, Inc.*, 626 F. Supp. 3d 536,

---

[133] Doc. #608-1 at 131-35; *see also id.* at 71, 75 & n.202.
[134] Doc. #692-5 at 159.

544 (D.N.H. 2022). Importantly, "reliance on [a defendant's] allegedly deceptive practices is not an element under the [NHCPA]." *Blackwood v. Atrium Med. Corp.*, 2019 WL 3779698, at *4 (D.N.H. 2019). Accordingly, what matters for purposes of "deceptiveness" under the NHCPA is that Nestlé knowingly or recklessly misrepresented the origin of its water for the purpose of selling more product. For all the reasons discussed throughout this ruling, there is at least an issue of fact as to this requirement.

In addition, I decline to grant summary judgment on the New Hampshire claims on the basis of Nestlé's claim of regulatory approval. As I observed in *Patane III*, it appears that the NHCPA does not recognize a safe harbor exception that might apply here. *See* 478 F. Supp. 3d at 342. But even if regulatory approval were a defense to Bogdan's NHCPA and fraud claims, there would still be an issue of fact as to whether New Hampshire officials approved Nestlé's spring water representation. The deposition testimony of Charles Metcalf—Supervisor of the Beverage and Bottled Water Program for the New Hadmpshire Department of Health and Human Services—illustrates as much.[135] Metcalf was not sure if "anybody in DHHS ha[d] made a determination that water used to produce Poland Spring brand bottled water constitutes spring water as spring water is defined by the State of New Hampshire."[136] Likewise, he appeared to confirm that the registration certificates Nestlé offers do not apply to a specific type of bottled water.[137] Accordingly, it remains an open question whether New Hampshire ever affirmatively permitted Nestlé to sell PSW as "spring water."

In short, Nestlé has not shown the absence of a genuine issue of fact to support Bogdan's claims. Accordingly, I will deny summary judgment as to plaintiffs' New Hampshire claims.

---

[135] *Id.* at 25 (deposition of Charles Metcalf).
[136] *Id.* at 39.
[137] *Id.* at 38.

### New Jersey claims

Nestlé raises five arguments in support of summary judgment as to the plaintiffs' New Jersey claims. It asserts (1) that it had regulatory approval to sell PSW as spring water, (2) that its spring water claim was not an actionable misrepresentation under the NJCFA, (3) that the New Jersey plaintiffs did not rely on the spring water claim, (4) that the plaintiffs cannot prove the price they paid for PSW, and (5) that "price-inflation" theories are not cognizable under the NJCFA.[138]

While the NJCFA does not have a specific safe harbor provision, *Patane III*, 478 F. Supp. 3d at 344-45, New Jersey recognizes a limited judicial "safe harbor," which Nestlé refers to as the "*Daaleman* doctrine," after *Daaleman v. Elizabethtown Gas Co.*, 77 N.J. 267 (1978).[139] That doctrine exempts conduct from NJCFA liability if "a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes." *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255, 270 (1997). "[T]he conflict must be patent and sharp, and must not simply constitute a mere possibility of incompatibility." *Ibid.*

As I observed in *Patane III*, New Jersey regulations do not appear to require that state officials verify drinking water source claims. *See* 478 F. Supp. 3d at 346. This largely eliminates the possibility of the sort of conflict contemplated by *Daaleman* and *Lemelledo*. Moreover, testimony from an official with the New Jersey Department of Health (Alan Talarsky) indicates that when the Department reviewed drinking water applications, it was largely concerned with potability and safety.[140] And at minimum, it did not certify compliance with the New Jersey "spring water" standard for annual bottled water permit renewals.[141] There is no "patent and

---

[138] Doc. #608-1 at 106-15; *id.* at 71, 75 & n.203.

[139] *Id.* at 107.

[140] Doc. #692-5 at 126 (deposition of Alan Talarksy).

[141] *Id.* at 126-27 (specifying that New Jersey does not perform SOI compliance checks for annual renews of water

sharp" conflict between the NJCFA and the activities of the Department of Health that would be suffice for summary judgment.

Nor can Nestlé demonstrate that its spring water claim was not an actionable misrepresentation under the NJCFA. It is true that under New Jersey law "the plaintiff must allege a reasonable expectation about the product induced by a misrepresentation, and that this expectation was not met." *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 99 (D.N.J. 2011). But the plaintiff can demonstrate a "defeated expectation" by showing that they "received a product that was worth objectively less than what one could *reasonably* expect." *Id.* at 99-100. Moreover, consumers need not understand the technical complexities of product development in order to form reasonable expectations. *See Lynch v. Tropicana Prod., Inc.*, 2013 WL 2645050, at *7 (D.N.J. 2013) (plaintiffs not expected to understand "the intricacies relating to the shelf life and processing of … orange juice").

Here, plaintiffs expected to receive spring water. That expectation was eminently reasonable in light of Nestlé's PSW labeling and its vigorous promotion of the product as "spring water," and there is now a genuine question as to whether that expectation was satisfied. Moreover, there is evidence that spring water is objectively worth more to consumers than ground water, as shown directly by Dr. Dennis' conjoint experiment, and indirectly by Nestlé's own extensive efforts to promote its product as "spring water."[142] These facts are enough to survive summary judgment on the question of misrepresentation under New Jersey law.

I am similarly unpersuaded by Nestlé's argument that plaintiffs did not rely on the spring water claim, and by its contention that plaintiffs have not proved the price they paid for PSW. As

---

certifications).
[142] Doc. #692-1 at 184 (¶ 129).

discussed previously, there is evidence from each New Jersey plaintiff's deposition that they relied on the "spring water" claim in purchasing PSW.

Nor does NJCFA impose a requirement that plaintiffs be able to identify the specific price they paid for a product, so long as they can otherwise demonstrate ascertainable loss. *Cf. In re Riddell Concussion Reduction Litig.*, 77 F. Supp. 3d 422, 438 (D.N.J. 2015) (faulting plaintiff for "fail[ing] to identify the specific price paid *or allege any other facts necessary to plead injury or ascertainable loss*") (emphasis added); *see also Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 248 (2005) ("a private plaintiff must produce evidence from which a factfinder could find or infer that the plaintiff suffered an actual loss" and "[i]n cases involving breach of contract or misrepresentation, either out-of-pocket loss *or a demonstration of loss in value* will suffice to meet the ascertainable loss hurdle") (emphasis added).

Finally, I am convinced that plaintiffs' theory of damages is cognizable under the NJCFA. It is true that the New Jersey Supreme Court and the Third Circuit have occasionally rejected price inflation theories. *See Dugan v. TGI Fridays, Inc.*, 231 N.J. 24, 55-60 (2017); *Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298, 309-13 (3d Cir. 2016). But those cases are distinguishable. In both *Dugan* and *Harnish*, the plaintiffs received the products they paid for. *See Dugan*, 231 N.J. at 54 (beverages with prices unlisted on menu); *Harnish*, 833 F.3d at 302, 308 (a law school education). They argued, however, that they paid more than they should have for those products, because defendants' deceptive practices allowed them to overcharge. *See Dugan*, 231 N.J. at 54; *Harnish*, 833 F.3d at 302.

Here, plaintiffs allege a different injury: that they purchased spring water but received ordinary ground water. They are not claiming, akin to what the plaintiffs did in *Dugan*, that they

bought Coke and received unfairly priced Coke; they are arguing in essence that they bought Coke and received generic cola.

Notwithstanding that plaintiffs call their injury a "price premium," courts applying New Jersey law would describe plaintiffs' injury as a "benefit-of-the-bargain" claim. As the New Jersey Supreme Court has recently observed, "[w]hen a consumer claims that there is a difference in value between an item as advertised and the item as delivered, but the item is not worthless, the benefit-of-the-bargain theory of damages is applicable." *Robey v. SPARC Grp. LLC*, 256 N.J. 541, 556-57 (2024); *see also Smajlaj*, 782 F. Supp. 2d at 99 (benefit-of-the-bargain theory requires that what the consumer receives "is not what was promised"). Benefit-of-the bargain injuries are cognizable under the NJCFA as "ascertainable loss," provided a consumer can quantify the difference in value between the product promised and the one received. *See Smajlaj*, 782 F. Supp. 2d at 99; *Robey*, 256 N.J. at 557-58.

Plaintiffs here have produced evidence that consumers consider spring water to be more valuable than other water and have reasonably quantified that difference in value. In a benefit-of-the-bargain case, that is enough at the summary judgment stage to create an issue of fact as to ascertainable loss.

In short, Nestlé has not shown the absence of a genuine issue of fact with respect to the plaintiffs' claims under New Jersey law. Accordingly, I will deny summary judgment on plaintiffs' NJCPA and New Jersey common law fraud claims.

### *New York claims*

Nestlé raises five more challenges to the claims of the New York plaintiffs: (1) that its spring water claim was not misleading in a material way; (2) that the New York plaintiffs were not personally misled or deceived by the misrepresentation (as supposedly required by GBL

§§ 349-50); (3) that the New York plaintiffs did not rely on the spring water claim (as required by § 350); (4) that plaintiffs have not adequately demonstrated an injury for purposes of the statutory claims; and (5) that regulatory approval defeats both plaintiffs' GBL and common law fraud claims.[143]

The first three arguments have already been addressed. There is a genuine issue of fact about whether Nestlé's spring water claim was misleading, because there is a legitimate question about whether Nestlé falsely sold consumers one product when they expected another. Likewise, there is evidence in the record that the New York plaintiffs—Julie Harding, Heather Harrigan, and Stephen Shapiro—were both misled by, and relied on, the spring water claim (to the extent that New York law imposes either requirement).[144]

Nestlé's fourth argument relies on the same claims I rejected in the NJCPA context: that price premium theories are not cognizable under the GBL and that the GBL requires plaintiffs to prove the price they paid for PSW. Neither statement accurately describes New York law. *See Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015) (collecting cases in which plaintiff's price premium injury was held sufficient when "plaintiffs paid more than they would have for the good but for the deceptive practices of the defendant-sellers"); *see also Fishon v. Peloton Interactive, Inc.*, 620 F. Supp. 3d 80, 100 (S.D.N.Y. 2022) ("a plaintiff can also plead both injury and causation under GBL §§ 349 and 350, by alleging that the defendant's misleading or deceptive advertising campaign caused a price premium, that the price premium was charged both to those who saw and relied upon the false representations and those who did not, and that, as a result of the price premium, plaintiff was charged a price she would not otherwise have been charged but for the false campaign"); *Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562,

---

[143] Doc. #608-1 at 102-06; *id.* at 71, 75 & n.204.
[144] Doc. #692-6 at 12, 15-16 (Harding); *id.* at 38-39 (Harrigan); Doc. #692-7 at 108 (Shapiro).

578 (S.D.N.Y. 2021) (plaintiff not required to allege the specific price he paid for a product in order to state a claim under §§ 349-50).

Finally, I decline to grant summary judgment on Nestlé's New York regulatory approval argument. While Nestlé has now offered bottled water licenses covering the entire class period—each of which specifically mentions the spring water sources that supply its bottling facilities—it still has not demonstrated that these certificates convey approval to market PSW as "spring water."[145] None of the regulations cited by Nestlé would give those certificates such an operative effect. *See* N.Y. Comp. Codes R. & Regs. Tit. 10 §§ 5-6.2, 5-6.3, 5-6.12, 5-6.16. Indeed, while New York Department official Stephen Marshall maintained that the list of spring water sources on each bottled water certification represents the Department's approval of that source as "spring water," he could not identify any rule or regulation that would support that statement.[146] And he elsewhere indicates that the "Certification of Approval to Operate a Bottled Water Facility" simply indicates that the water used is of a satisfactory sanitary quality.[147] There remains an issue of fact whether New York provided Nestlé with regulatory approval to market PSW as "spring water."

In short, Nestlé has not shown the absence of a genuine issue of fact with respect to plaintiffs' claims under New York law. Accordingly, I will deny summary judgment on plaintiffs' GBL and New York common law fraud claims.

### *Pennsylvania claims*

Nestlé repeats many of its now familiar arguments when seeking summary judgment on the claims of plaintiff Pareshkumar Brahmbhatt under the PUTPCPL.[148] It maintains that its

---

[145] *See generally* Doc. #628-4.
[146] Doc. #612-4 at 99, 109; Doc. #692-5 at 21 (deposition of Stephen Marshall).
[147] Doc. #691-4 at 101 (¶ 192); Doc. #692-5 at 20.
[148] Doc. #608-1 at 142-46; *id.* at 71, 75 & n.205. Nestlé also maintains that I should dismiss Brahmbhatt's claim for

"spring water" representation was not deceptive, that Brahmbhatt did not rely on the representation, and that the representation did not cause him any injury. It further contends that it received Pennsylvania regulatory approval to sell PSW as "spring water."

I have already rejected most of these arguments. As I previously stated, I could find no PUTPCPL cases suggesting that a company may falsely sell one product as another, so long as consumers lack technical knowledge about how the product fails to precisely meet certain requirements. Likewise, plaintiffs have pointed to deposition testimony creating an issue of fact as to whether Brahmbhatt relied on Nestlé's spring water claim and purchased PSW because of it.

As for regulatory approval, Nestlé fares no better here than it did elsewhere. As I observed in *Patane III*, the record includes a letter from the Pennsylvania Department of Environmental Protection, which states that the Department "does not make determinations as to whether bottled waters contain genuine 'spring water,'" and that "an applicant for a bottled water system is not required to provide information as to whether a source of bottled water is spring water."[149] This is consistent with my conclusion that nothing in the Department's regulations "requires that it verify that the water source type listed on bottled water labels is accurate prior to issuing a water supply permit." *Patane III*, 478 F. Supp. 3d at 351 (citing 25 Pa. Code §§ 109.1-109.1307). Nestlé's new evidence—the deposition testimony of state official David Mittner—does not sufficiently demonstrate regulatory approval in the face of this contrary authority.[150] A genuine issue of fact remains as to Pennsylvania regulatory approval.

---

punitive damages because the PUTPCPL does not provide for such a recovery. Doc. #608-1 at 142. But the complaint requests "treble or other punitive damages," and the PUTPCPL does provide for treble damages. *See Richards v. Ameriprise Fin., Inc.*, 152 A.3d 1027, 1035 (Pa. Super Ct. 2016); Doc. #160 at 321 (¶ 1036).

[149] Doc. #229-3 at 2 (letter from the Pennsylvania Department of Environmental Protection).

[150] *See* Doc. #691-4 at 111-16 (¶¶ 201-11) (recounting parts of Mittner's testimony).

In short, Nestlé has not shown the absence of a genuine issue of fact with respect to plaintiffs' claims under Pennsylvania law. Accordingly, I will deny summary judgment on plaintiffs' PUTPCPL and Pennsylvania common law fraud claims.

### Rhode Island claim

Nestlé moves for summary judgment on grounds of regulatory approval against the one remaining Rhode Island law claim of plaintiff Tina Moretti for common law fraud.[151] But the laws Nestlé cites in its brief (216-50-10 R.I. Code R. §§ 4.3(A)(3)(s), 4.9.0(A)) do not require that the company obtain an affirmative endorsement from the State in order to market its product as "spring water."

Instead, Nestlé's case for regulatory approval in Rhode Island is built around the declaration of Sonia Frias.[152] Frias, however, did not appear for her deposition, rendering her declaration ineligible for consideration at the summary judgment stage.[153] *See Menlo v. Friends of Tzeirei Chabad in Israel, Inc.*, 2012 WL 5927376, at *8 (S.D.N.Y. 2012), *amended*, 2013 WL 1387057 (S.D.N.Y. 2013); *see also United States v. Hansen*, 277 F. App'x 692, 693 (9th Cir. 2008); *Dedvukaj v. Equilon Enterprises, L.L.C.*, 301 F. Supp. 2d 664, 668 (E.D. Mich. 2004) ("it is unreasonable to rely on affidavit 'evidence' from an individual who has made himself unavailable for discovery"), *aff'd*, 132 F. App'x 582 (6th Cir. 2005).

In short, there remains a genuine issue of fact to sustain plaintiffs' claim under Rhode Island law. Accordingly, I will deny summary judgment on the Rhode Island common law fraud claim.

### CONCLUSION

---

[151] Doc. #608-1 at 71, 75 & n.206.
[152] Doc. #617 at 2 (¶ 4) (declaration of Sonia Frias).
[153] Doc. #692-4 at 67-68.

For the reasons set forth above, the Court GRANTS in part and DENIES in part Nestlé's motion for summary judgment. The Court GRANTS the motion as to Benjamin Fletcher's claims under the Maine Unfair Trade Practices Act, Bridget Kopet's claims under the Connecticut Unfair Trade Practices Act, Julie Harding's claims for breach of contract, Stephen Shapiro's New York claims for breach of contract from prior to August 15, 2013, plaintiffs' claims for violation of New York's General Business Law §§ 349-50 from prior to August 15, 2014, and the claims of the eight *Ramsey* class plaintiffs (Tina Moretti, Julie Harding, Pareshkumar Brahmbhatt, Benjamin Fletcher, Erica Russell, Heather Harrigan, Bridget Kopet, and Catherine Porter) to the extent that they rely on water sourced from Poland Spring, Clear Spring, Evergreen Spring, and Garden Spring. The Court further GRANTS Nestlé's motion as to all of plaintiffs' claims for injunctive relief. The Court otherwise DENIES the motion in all other respects.

It is so ordered.

Dated at New Haven this 30th day of December 2024.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge