UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------------------------------------------ x
MARK PATANE, et al.,                                               :
                                                                   :
                                        Plaintiffs,                :     ORDER DENYING
                                                                   :     CROSS-MOTIONS FOR
               -against-                                           :     RECONSIDERATION
                                                                   :
                                                                   :     3:17-CV-1381 (VDO)
                                                                   :
NESTLÉ WATERS NORTH AMERICA, INC.,                                 :
                                                                   :
                                        Defendant.                 :
------------------------------------------------------------------ x
```

**VERNON D. OLIVER**, United States District Judge:

In this putative class action, the plaintiffs allege that bottled water they purchased from the defendant was not "spring water" as defined by the standards of identity as incorporated into the law of various states. Put more simply, they allege that Nestlé's "Poland Spring Water" ("PSW") is not actually "spring water," despite branding and advertising claiming as much. Over nearly eight years, this action has seen two motions to dismiss and three motions for summary judgment.[1] The third summary judgment motion, the most recent dispositive motion, was resolved by the Court (Meyer, J.) on December 30, 2024. Judge Meyer's ruling granted in part and denied in part Nestlé's motion. *Patane V*, 761 F. Supp. 3d at 434. This opinion assumes familiarity with the background and rulings contained in *Patane V*.

---

[1] *See Patane v. Nestlé Waters N. Am., Inc.*, 314 F. Supp. 3d 375 (D. Conn. 2018) (*Patane I*); *Patane v. Nestlé Waters N. Am., Inc.*, 369 F. Supp. 3d 382 (D. Conn. 2019); *Patane v. Nestlé Waters N. Am., Inc.*, 478 F. Supp. 3d 318 (D. Conn. 2020); *Patane v. Nestlé Waters N. Am., Inc.*, 583 F. Supp. 3d 341 (D. Conn. 2022); *Patane v. Nestlé Waters N. Am., Inc.*, 761 F. Supp. 3d 424 (D. Conn. 2024) (*Patane V*).

The parties have now filed cross-motions for reconsideration of specific rulings within *Patane V*. Plaintiffs ask the Court to clarify, or alternatively, reconsider[2] *Patane V*'s holding that the four "spring water sources" contemplated in the *Ramsey* settlement were the sites of "Poland Spring (Poland Spring, Maine); Clear Spring (Hollis, Maine); Evergreen Spring (Fryeburg, Maine); and Garden Spring (Poland, Maine)." *Patane V*, 761 F. Supp. 3d at 438–39.[3] Instead, Plaintiffs argue that the *Ramsey* settlement referred only to the wells in use at the time of the settlement.[4] For its part, Nestlé seeks reconsideration of *Patane V*'s holding that the Uniform Commercial Code's pre-suit notice requirement was satisfied for breach-of-contract claims brought by two plaintiffs who purchased Defendant Nestlé's PSW directly from Nestlé for their homes or offices.[5]

The Court now addresses and, ultimately, denies each motion in turn.

I. **LEGAL STANDARD**

Reconsideration is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources," *United States v. Yudong Zhu*, 41 F. Supp. 3d 341, 342 (S.D.N.Y. 2014), and the standard for granting a motion for reconsideration is strict, *Cho v. Blackberry Ltd.*, 991 F.3d 155, 170 (2d Cir. 2021). The three primary grounds for reconsideration are "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Wachovia Mortg.,*

---

[2] Pl.'s Mot. for Reconsideration, ECF No. 717-1, at 1–2.

[3] Unless otherwise noted, this opinion omits internal quotations, citations, and footnotes from cited authorities, and adopts alterations contained therein.

[4] Pl.'s Mot. for Reconsideration at 2.

[5] Def.'s Mot. for Reconsideration, ECF No. 715-1, at 5–6.

2

*FSB v. Toczek*, 841 F. App'x 267, 272 (2d Cir. 2021) (summary order) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).

"Reconsideration is not intended for the court to reexamine a decision or the party to reframe a failed motion." *Fan v. United States*, 710 F. App'x 23, 24 (2d Cir. 2018) (summary order). Therefore, "[a] motion for reconsideration is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Weir v. Montefiore Med. Ctr.*, No. 23-CV-4468, 2024 WL 2049411, at *2 (S.D.N.Y. May 6, 2024).

## II. PLAINTIFFS' MOTION FOR CLARIFICATION OR RECONSIDERATION

Plaintiffs' motion relates to the *Ramsey* injunction, which is by now well-known to those familiar with this litigation. That injunction arose out of the settlement in *Ramsey v. Nestlé Waters N. Am.*, Case No. 03-CHK-817 (Ill. Cir. Ct., 16th Cir. Kane Cnty., Nov. 5, 2003), a nationwide "class action that brought much the same claims: that Nestlé mislabeled PSW." *Patane V*, 761 F. Supp. 3d at 436. The *Ramsey* settlement agreement included a release, which provided in part that "[t]he Parties agree that Defendant shall be permitted to continue to bottle, label and sell Poland Spring brand bottled water as 'spring water' using all of the spring water sources it has used since January 1, 1996," and that "[n]othing in this Settlement Agreement shall require that Defendant relabel its Poland Spring brand spring water products as anything other than spring water or alter its spring water advertising in any way with respect to the spring water sources it has used since January 1, 1996."[6]

---

[6] *Ramsey* Settlement, ECF No. 53-2, at 33–34 (emphasis added).

*Patane V* concluded that eight of the eleven plaintiffs in this action were indisputably members of the *Ramsey* class. 761 F. Supp. 3d at 436–37. *Patane V* then held that this provision in the *Ramsey* settlement applied to these eight plaintiffs[7] and "shield[ed] [Nestlé] from further liability to *Ramsey* class members for using the 'spring water sources' it drew on during the *Ramsey* class period" through the injunction entered as part of the consummated settlement. *Id.* at 438. Although *Patane V* recognized that "contractual releases are 'strictly construed against the benefiting party' under Illinois law," *id.* (quoting *Stratman v. Brent*, 291 Ill. App. 3d 123, 137 (1997)), it held that "the provision at issue here is detailed and clearly permits Nestlé to continue labeling water from the four *Ramsey* sources as 'spring water,'" *id.*

Without specifically discussing the meaning of the phrase "spring water sources" as used in the *Ramsey* release, *Patane V* concluded that "the water sources at issue in *Ramsey* were: Poland Spring (Poland Spring, Maine); Clear Spring (Hollis, Maine); Evergreen Spring (Fryeburg, Maine); and Garden Spring (Poland, Maine)." *Id.* at 438-39. As a result, *Patane V* held that "the eight plaintiffs who were Ramsey class members have, by contract, released their right to assert claims against Nestlé for labeling PSW as spring water" and therefore granted summary judgment to Nestlé as to these eight plaintiffs "to the extent that their claims rely on water bottled from those four <u>sources</u>." *Id.* at 439 (emphasis added). "The eight plaintiffs who were members of the *Ramsey* class may still bring claims alleging that PSW is not spring water, but they must do so by reliance on PSW supplied from sources other than the four sources designated in the *Ramsey* class action settlement." *Id.*

---

[7] The eight plaintiffs in question are: Tina Moretti, Julie Harding, Pareshkumar Brahmbhatt, Benjamin Fletcher, Heather Harrigan, Bridget Kopet, Catherine Porter, and Erica Russell. *Id.* at 436.

4

Plaintiffs now advance a new reading of the term "sources," as used by the *Ramsey* settlement in the phrase "spring water sources." They contend that "the 'spring water *sources*' covered by the *Ramsey* injunction—and thus the scope of summary judgment—is limited to those *wells* that were in use at the Poland Spring, Clear Spring, Evergreen Spring, and Garden Spring sites [] at the time of the *Ramsey* settlement."[8] Plaintiffs aver that this distinction is significant because some of the four *Patane V* sources are large properties "containing many separately drilled wells."[9] Following the entrance of the *Ramsey* settlement, Plaintiffs explain, Nestlé has "added new alleged spring water source wells" and now "routinely mixe[s] water from the new wells and preexisting wells" to produce PSW.[10] On the basis of evidence both intrinsic and extrinsic to the *Ramsey* settlement, they argue that the term "spring water sources" in the *Ramsey* release means "wells" that were used to produce PSW[11] rather than *Patane V's* implicit definition of "sources" as "properties" that were used to produce PSW[12] as of the date of the *Ramsey* settlement.

The meaning of the terms of the *Ramsey* injunction has been central to this litigation from its early days. That now presents an issue for Plaintiffs because "[a] party may waive an argument by failing to raise it in a timely manner, making consideration of that argument by

---

[8] Pl.'s Mot. for Reconsideration at 2.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Patane V*, 761 F. Supp. 3d at 438.

the district court inappropriate in certain circumstances[.]"[13] *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 176 (2d Cir. 2014); *see also Sharp v. Ally Fin., Inc.*, 328 F. Supp. 3d 81, 105 (W.D.N.Y. 2018) ("It is well-established in this Circuit that new arguments raised in successive briefing papers will not be considered where those arguments could have been raised in a previous submission.").

It is particularly well-established in this Circuit that a party who fails to raise an "argument in his opposition to [a motion for] summary judgment" forfeits that argument. *See Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004); *Triodetic Inc. v. Statue of Liberty IV, LLC*, 582 F. App'x 39, 40 (2d Cir. 2014) (summary order) ("[P]laintiff never raised these arguments in its opposition to defendants' motion for summary judgment. Accordingly, these arguments were waived."); *Aiello v. Stamford Hosp.*, 487 F. App'x 677, 678 (2d Cir. 2012) (summary order) ("The premise of our adversarial system is that federal courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them."); *cf. U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 153 (S.D.N.Y. 2015); *Sec. & Exch. Comm'n v. Ahmed*, No. 15-CV-675 (JBA), 2021 WL 4822038, at *1 (D. Conn. Oct. 15, 2021).

---

[13] The Second Circuit used the term "waiver" in *Sompo Japan*. "Waiver" is often confused with "forfeiture," which has forced the Supreme Court to discuss the distinction between the two at some length in *United States v. Olano*, 507 U.S. 725 (1993). "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *Id.* at 733. As a result, "forfeiture" instead of "waiver" is the appropriate term for the situation described in this action. Because of the consistent confusion among courts as to the differences between waiver and forfeiture, this opinion will cite cases that use the term "waiver" to discuss a party's failure to assert an argument at the correct time.

Here, the proper interpretation of the *Ramsey* settlement and its resultant injunction has been squarely presented since the very beginning of this litigation. In the first motion to dismiss, resolved in 2018, Nestlé raised the issue of *Ramsey*'s release clause to argue that "the *Ramsey* settlement agreement expressly released Nestlé from plaintiffs' claims." *Patane I*, 314 F. Supp. 3d at 382. At that stage, Judge Meyer concluded that this "provision applies to only a limited number of Poland Spring water *facilities* that were operational from 1996 to 2003 and at most binds only plaintiffs who purchased or consumed Poland Spring water prior to November 5, 2003, not those who only bought later." *Id.* at 383 (emphasis added). Judge Meyer then held that the "provision does not furnish grounds to conclude across the board that *all* present plaintiffs and prospective class members have released any claims concerning the full range of Poland Spring sources that have produced water since November 5, 2003." *Id.* Though Judge Meyer ultimately granted the motion to dismiss at issue in *Patane I* on other grounds, this early presentation of the issue foretold what was to come: Repeated disputes over the meaning and enforceability of the release clause.

*Patane I* declined to dispose of any portion of the Plaintiffs' claims on the basis of the release because relevant facts remained disputed: Namely, whether any particular plaintiff was a member of the *Ramsey* class, rather than whether each plaintiff was merely likely to have been a member of the class. But more recently, after discovery directed specifically toward this issue, Nestlé sought summary judgment as to all Plaintiffs on the grounds that each was a member of the *Ramsey* class. That argument necessarily required interpretation of the terms of the *Ramsey* release, and Nestlé put those claims front and center. In a 162-page motion for summary judgment, Nestlé's first argument was: "Bound by the *Ramsey* Judgment, Plaintiffs are barred from pursuing any claims ('*Ramsey* Claims') based on purchases of PSBW from

7

the <u>four Maine spring water sources</u> then in use: Poland Spring in Poland Spring; Clear Spring in Hollis; Evergreen Spring in Fryeburg; and Garden Spring in Poland ('*Ramsey* Water Sources')."[14] Nestlé thus carefully and noticeably defined the "sources" at issue in the *Ramsey* settlement from the very beginning of its motion for summary judgment, and it then referred to the defined term twenty times over seven pages.[15]

Nestlé did not bury this definition in a footnote or otherwise seek to obfuscate what it was doing. Instead, the term is prominently defined in the introduction paragraph of the very first argument. But that was far from the only moment when Nestlé contended that these four locations were the "sources" that *Ramsey* spoke of. For example, just two pages later, Nestlé claimed that the judgment in *Ramsey* "dismissed, with prejudice, the *Ramsey* class' [sic] claims, including that the water from the <u>four existing sources</u> was not 'spring water.'"[16] Two pages after that, the brief again refers to "four" *Ramsey* sources.[17] On the next page, Nestlé argued that *Ramsey* released claims regarding "the existing four sources."[18] And the same reference to "four" *Ramsey* sources appears three times on the following page.[19]

In their 153-page opposition brief, Plaintiffs did not once dispute Nestlé's definition of the "*Ramsey* Water Sources," nor did they dispute Nestlé's repeated assertion that the "four"

---

[14] Mem. in Support of Mot. for Summary Judgment, ECF No. 608-1, at 37 (emphasis added).

[15] *Id.* at 37–43.

[16] *Id.* at 39 (emphasis added).

[17] *Id.* at 41.

[18] *Id.* at 42.

[19] *Id.* at 43.

8

enumerated sources were those at issue in *Ramsey*.[20] Put more simply, Plaintiffs did not respond to Nestlé's description of the *Ramsey* sources. But, more importantly, they did not offer the argument they now raise: That the phrase "spring water sources" in the *Ramsey* release referred to "wells" in use at the time, and thus that summary judgment as to any plaintiff bound by the *Ramsey* release should bar their claims only to the extent that those claims were reliant on wells in use during *Ramsey*.

Though this litigation is extraordinarily complicated, it certainly cannot be said that Plaintiffs failed to raise such an argument because of briefing page limits or a lack of obvious presentation of the issue in Nestlé's motion and briefing. In response to Nestlé's argument that summary judgment should be granted on the basis of the *Ramsey* release, Plaintiffs argued only that the release did not apply to the claims brought in this litigation at all.[21] The argument that they seek to raise now—that even if the release does apply, it releases only claims as to wells, not sites—is the classic sort of conditional "even if" argument frequently found in summary judgment opposition briefs. In fact, Plaintiffs raised just this sort of argument repeatedly throughout their opposition brief.[22] Nestlé's argument regarding the existence of "four sources" was "prominently featured," Judge Meyer noted at oral argument,[23] and Plaintiffs' failure to raise the responsive argument they now offer is not excusable.

Perhaps understandably, rather than argue that this failure should be excused, Plaintiffs contend that they already raised their argument in response to Nestlé. Not so. First, Plaintiffs

---

[20] Pl.'s Mem. in Opp. to Summary Judgment, ECF No. 691.

[21] *Id.* at 42–43.

[22] *See, e.g.*, *id.* at 59, 84, 105, 124, 137, 142, 146.

[23] Oral Arg. Tr., ECF No. 712, at 91.

point to statements in their Rule 56(a)(2) statement "contest[ing] that the Poland Spring and Hollis well sites remained the same after [water from two newer wells] began mixing with the *Ramsey*-era wells' water."[24] Plaintiffs further argue that they "made the same point in their summary judgment opposition brief,"[25] and that Nestlé "acknowledged and responded to" the argument that new wells had been added to these sites.[26]

      But the argument that Plaintiffs rely on—that the four sites in use at the time of *Ramsey* have changed substantially in the years since—cannot be said to fairly raise the claim that "spring water sources" in the *Ramsey* release referred to "wells" rather than "sites." Even taken as true, this claim does not, without more, necessarily implicate the interpretation of the release's usage of "spring water sources." In some ways, the argument that the Plaintiffs now raise relies on the argument that Plaintiffs first raised, but Plaintiffs did not articulate their motion as such at summary judgment: At that stage, they made zero textual, interpretative arguments regarding the phrase "spring water sources." Now, such arguments are the basis of their entire motion. For example, Plaintiffs depend heavily on evidence of how state agencies used the term "source" to show "that each alleged spring water well is a separate 'spring water source.'"[27] This argument—which speaks to the interpretation of the language in the release itself—was not raised at summary judgment and is not fairly encompassed by the argument that the sites in question have changed since *Ramsey*.

---

[24] Pl.'s Reply in Support of Reconsideration, ECF No. 726, at 8 (citing ECF No. 691-4 at 21 (¶ 41)).

[25] *Id.*

[26] *Id.* at 9.

[27] Pl.'s Mot. for Reconsideration at 3.

Finally, Plaintiffs argue that they raised the issue of change at the four sites in use at the time of *Ramsey* during oral argument on the motion for summary judgment. Even if Plaintiffs did squarely present their argument regarding the release's interpretation at oral argument, that by itself would be insufficient to preserve this claim. *Cf. United States v. Barnes*, 107 F.3d 4 (2d Cir. 1997). Plaintiffs contend that at oral argument, "Plaintiffs' counsel argu[ed] that the *Ramsey* injunction should not be interpreted *under the governing law* to release future claims the parties did not contemplate."[28] Rather than arguing about the meaning of the terms of the *Ramsey* settlement, a contract, Plaintiffs cite (and emphasize) a section of the argument at which their counsel argued that "once the sites change, there's a change in the status quo and the injunction ought not apply after significant site change like the events I've just described."[29] That is obviously a different argument than "[t]he evidence shows that each alleged spring water well is a separate 'spring water source'" such that the *Ramsey* release "applies to 'spring water *sources*,' rather than the 'sites' or 'properties' on which those sources were located."[30]

The closest that the Plaintiffs get is in arguing that these changes "limit[], necessarily limit[] the scope of the injunction because the sites changed."[31] But even this is clearly far afield from Plaintiffs' current argument, which relies first on evidence regarding the use of the term "sources" in the bottled water industry at the time of the *Ramsey* settlement, and second on evidence regarding the *Ramsey* parties' intent to "focus on existing alleged spring

---

[28] Pl.'s Reply in Support of Reconsideration at 9 (emphasis added).

[29] *Id.* (quoting Oral Arg. Tr. at 96).

[30] Pl.'s Mot. for Reconsideration at 3.

[31] Oral Arg. Tr. at 95.

sources[.]"³² Put otherwise, Plaintiffs for the first time raise the interpretative argument that the release itself used "spring water sources" to refer to "wells" rather than "sites."³³ Instead of supporting Plaintiffs' claim to have preserved this argument, however, the transcript of the argument reveals instead that Judge Meyer and Nestlé repeatedly indicated that they understood the *Ramsey* release to refer to four sites defined in Nestlé's brief in support of summary judgment and included in Judge Meyer's opinion.³⁴ And despite ample time at argument, Plaintiffs again failed to clearly raise the limiting argument they now present.

The invocation of the doctrine of forfeiture against Plaintiffs who have had to withstand an avalanche of arguments across two motions to dismiss and three motions for summary judgment is admittedly harsh.³⁵ But Nestlé's argument was far too centrally presented to excuse the Plaintiffs' delay in raising this response until a motion for reconsideration: Any argument regarding the interpretation of the release should have been raised at summary judgment. To the extent that Plaintiffs can be read to have contested Nestlé's definition of "spring water source" at that stage, the arguments that Plaintiffs made are far too removed

---

³² Pl.'s Mot. for Reconsideration at 4. In their motion for reconsideration, Plaintiffs seek to frame their motion as raising separate arguments regarding industry use and the intent of the parties. Both arguments, however, are simply species of the same genus: Both rely on traditional tools of contractual interpretation to establish the meaning of the *Ramsey* release, and neither was sufficiently raised at summary judgment.

³³ Pl.'s Mot. for Reconsideration at 3-4.

³⁴ *See* Oral Arg. Tr. at 38, 40–41, 43.

³⁵ Viewed in another light, that Plaintiffs have had so many opportunities to raise their interpretive arguments and have submitted such extensive briefing without doing so is all the more justification to conclude that these arguments are forfeited.

from the argument that they now advance to allow them to transmogrify those arguments into their new arguments for reconsideration.

The parties to this nearly eight-year-old action cannot be granted infinite opportunities to raise new arguments that should have been raised earlier in the action: Like all good things, this too must come to an end. *See* Geoffrey Chaucer, *Troilus and Criseyde* (circa 1380). Therefore, the Court concludes that Plaintiffs have forfeited the argument they now raise and denies their motion for clarification or reconsideration.

## III. DEFENDANT'S MOTION FOR RECONSIDERATION

Nestlé has also filed a motion for reconsideration. It contends that Judge Meyer overlooked controlling legal authority in denying it summary judgment for Plaintiffs Heather Harrigan and Stephen Shapiro's claims for breach of their home and office contracts.[36] Harrigan and Shapiro claim that rather than purchasing PSW from a third-party retailer, they purchased PSW through a contract with Nestlé itself. On behalf of themselves and a putative class of other similarly situated plaintiffs, Harrigan and Shapiro claim that Nestlé breached those contracts by failing to provide them with "spring water" as these contracts required.[37]

In his most recent summary judgment ruling, Judge Meyer held that these "contract claims are [Uniform Commercial Code] claims." *Patane V*, 761 F. Supp. 3d at 455. Nestlé's motion for reconsideration invokes a provision of the UCC requiring pre-suit notice to a would-be defendant in a breach-of-contract action: "Where a tender has been accepted the buyer must within a reasonable time after he discovers or should have discovered any breach

---

[36] Def.'s Mot. for Reconsideration at 5.

[37] Amend. Compl., ECF No. 160, at ¶¶ 20, 35, 852.

13

notify the seller of breach or be barred from any remedy[.]" U.C.C. § 2-607(3)(a).[38] But Judge Meyer disagreed with Nestlé that summary judgment was warranted for failure to satisfy this requirement. Instead, he held that a letter—sent by one of Plaintiffs' attorneys "on behalf of one of the plaintiffs (Erica Russell) and a putative class to Nestlé"—had "notified the company that Russell believed PSW was deceptively labeled[.]" *Patane V*, 761 F. Supp. 3d at 455 (the "Russell Letter"). The Russell Letter "also included a draft complaint," and altogether "provided Nestlé with ample notice of the core of plaintiffs' claims," Judge Meyer concluded. *Id.*[39]

Nestlé contends that this conclusion overlooked controlling authority. More specifically, Nestlé argues that the pre-suit notice provision was not satisfied because the letter and draft complaint (1) did not specifically mention a breach-of-contract claim and thus did not allege a set of facts that would "constitute a breach" of a contract and (2) were not mailed on behalf of either Harrigan or Shapiro but were instead sent on behalf of another plaintiff (Russell) who had not purchased water directly from Nestlé and therefore could not notify Nestlé of any "buyer's claim." U.C.C. § 2-607(3)(a).

To begin, the Court notes the view of leading commentators that the pre-suit notice requirement of Section 2-607(3) was meant to be given a liberal construction: "Quite clearly,

---

[38] U.C.C. § 2-714(1) allows a buyer to recover damages for breach of contract only if the pre-suit notice requirement of Section 2–607(3)(a) is met. Harrigan and Shapiro seek to bring claims under New Jersey and New York's codifications of the UCC, but the state law provisions in question are identical in all respects relevant to this litigation to the actual UCC provisions themselves. *See* N.Y. U.C.C. Law §§ 2-607(3)(a), 2-714(1) and N.J. Stat. §§ 12A:2-607(3)(a), 12A:2-714(1). For that reason, this opinion will generally cite the UCC itself when discussing arguments applicable to both Harrigan and Shapiro.

[39] *See* ECF No. 692-15 at 16–18 (Russell Letter), 19–197 (draft complaint).

14

the drafters intended a loose test; a scribbled note on a bit of toilet paper will do[.]" 1 James J. White, Robert S. Summers & Robert A. Hillman, *Uniform Commercial Code* § 12:21 (6th ed. 2023). As the official commentary to Section 2-607 states: "The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. . . . [Buyers need not] include a clear statement of all the objections that will be relied on[.]" U.C.C. § 2-607 cmt. 4. Interpreting this comment, scholars have explained that "it is difficult to conceive of words that . . . would not satisfy the notice requirement of § 2-607. Indeed, a letter containing anything but the most exaggerated encomiums would seem to tell that the transaction 'is still troublesome and must be watched.'" White, Summers, & Hillman, *supra*, § 12:21. And courts have agreed, concluding that New York's UCC notice provision demands that buyers meet only "liberal requirements." *Paulino v. Conopco, Inc.*, No. 14-CV-5145-JG, 2015 WL 4895234, at *2 (E.D.N.Y. Aug. 17, 2015).

  The commentary surrounding Section 2-607 easily dispatches the first of Nestlé's arguments. Judge Meyer was clearly correct that the letter "provided Nestlé with ample notice of the core of plaintiffs' claims[.]" And where that notice has been provided, it is not Plaintiffs' task to perform the work of Nestlé's counsel and lay out every potentially viable theory of relief in specific. As Comment Four states, the notification need only let the seller know that the transaction is "troublesome"—it need not "include a clear statement of all objections." U.C.C. § 2-607 cmt. 4. In fact, the notice need not even include "a claim for damages" or "of any threatened litigation[.]" *Id.* It cannot be that a notice need not threaten litigation but must

15

specifically denote a claim for breach of contract.[40] A customer notifying a company that a transaction is "troublesome and must be watched" suffices without more. Or, as well reasoned by the American Law Reports:

> Requiring a buyer to use the magic word "breach" does not encourage settlement with a seller who is attempting to cure defects, and, in fact, does little more than force buyers to retain lawyers in an effort to preserve their rights and force sellers to hire lawyers as a defensive maneuver. It has been pointed out that the lenient standard promotes flexibility in commercial practice, which is one of the goals of the UCC. It is consistent with the provision that the remedies provided by the UCC are to be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed.

89 A.L.R.5th 319 at § 2[b] (2001). The Court concludes that Nestlé was well aware of the general allegation and that it was but a short jump for Nestlé to acknowledge that its contracts with consumers were implicated through this theory. The Court, therefore, rejects the argument that the Russell Letter needed to address the breach-of-contract claim more specifically, and it concludes that the letter put Nestlé on notice of the core of Plaintiffs' claims.

Even if the notice was itself sufficient, Nestlé argues that the messenger responsible for the notice was fatally defective. Chiefly, Nestlé argues that a 1925 Second Circuit case by the legendary Judge Learned Hand constitutes overlooked binding authority holding that the *buyer* must notify the seller of the theory that constitutes a breach.[41] That would present an issue for

---

[40] Nestlé argues that the phrase "[t]he notification . . . need only be such as informs the seller that the transaction is claimed to involve a breach" in Comment Four indicates that a more specific invocation of breach is required. Def.'s Mot. for Reconsideration at 9. Read in the context just provided of the full comment and the loose construction of that provision of the UCC, however, Nestlé's attempt to contort the Comment falls flat.

[41] Def.'s Mot. for Reconsideration at 10.

16

Harrigan and Shapiro, because it was Russell who submitted the letter and draft complaint to Nestlé. In the case that Nestlé chiefly relies on, *American Manufacturing Company v. U.S. Shipping Board Emergency Fleet Corporation*, 7 F.2d 565 (2d Cir. 1925), Judge Hand analyzed a notice requirement predating the UCC by decades: the UCC itself was not published until 1951. *See Fitzpatrick v. Fed. Deposit Ins. Corp.*, 765 F.2d 569, 573 (6th Cir. 1985). *American Manufacturing* is thus, literally speaking, not binding authority on this Court because it does not interpret the same provision of New York law. The provision now codified is clearly a successor to that provision at issue in *American Manufacturing* but is found in the UCC, which provides important additional commentary.

Most importantly, though, *American Manufacturing* simply did not address the issue presented here: Whether only the buyer can alert the seller of a troublesome transaction, or whether notice provided by a third party or actual knowledge of the seller can suffice. Instead, *American Manufacturing* held that "[t]he notice 'of the breach[']' required is not of the facts, which the seller presumabl[y] knows quite as well as, if not better than, the buyer, but of buyer's claim that they constitute a breach. The purpose of the notice is to advise the seller that he must meet a claim for damages[.]" 7 F.2d at 566. Today, and read alongside the UCC's loose interpretation of Section 2-607(3), Judge Hand's opinion is best understood as requiring notice of the legal theory giving rise to a claim for damages, not a recitation of every feasible cause of action.

In *American Manufacturing*, no notice whatsoever was provided by the plaintiff or any other party, and thus nothing in that case turned on whether the buyer or another party provided the notice. It is black-letter law that where there is "no necessity for ruling upon" an issue, "[a]ny such ruling necessarily could be no more than dictum[.]" *United States v. Scophony*

17

*Corp. of Am.*, 333 U.S. 795, 809 (1948). Here, *American Manufacturing* is even a further step removed: Judge Hand's opinion does not clearly state a ruling on whether third-party notification is sufficient.

Situations of this sort demonstrate one issue with the trend towards briefing arguments by ping-ponging between case quotes. It is true, as Nestlé emphasizes, that *American Manufacturing* refers to notice of the "buyer's claim." 7 F.2d at 566. But because nothing at issue in the case turned on whether the buyer or a third party had provided the notice, *American Manufacturing* cannot be cited for a holding on that question. Instead, *American Manufacturing* held that the facts of which the seller was aware did not sufficiently provide notice of the theory of relief that the plaintiff later invoked, as then-required by New York state law. The same goes for each of the somewhat more recent circuit cases citing *American Manufacturing* that Nestlé relies on: None of these cases turned on *who* delivered the notice.[42] That these cases cited *American Manufacturing* positively for propositions not at issue in this case, therefore, is of no relevance. Here, the Court has concluded that the notice itself could be deemed sufficient; the only question that remains is whether it is a terminal fault that Russell, rather than Harrigan or Shapiro, provided the pre-suit notice.

Nestlé argues that because Russell may not have been able to bring claims on behalf of a class of PSW purchasers who entered into contracts directly with Nestlé, they could not have negotiated a settlement with her.[43] This argument is critical because the commentary to Section 2-607 indicates that the notice requirement's purpose is to "open[] the way for normal

---

[42] Def.'s Mot. for Reconsideration at 11 n.30–35 (collecting cases).

[43] Def.'s Mot. for Reconsideration at 14.

18

settlement through negotiation." U.C.C. § 2-607 cmt. 4. If Nestlé's argument is true, Nestlé would have been deprived of a core benefit of the notice requirement. But Nestlé's argument is clearly wrong as a matter of common sense: Nestlé is and has been just as capable of opening settlement negotiations as its Home and Office buyers are.

There is no discernable reason that only Plaintiffs could begin settlement negotiations or otherwise try to remedy any given harm. After receiving the Russell Letter, Nestlé's choice not to address the concerns raised therein with its PSW direct purchasers was just that: Its own choice. Nestlé was well within its rights to make that choice, and if—as Nestlé vociferously contends—this litigation determines that PSW was, in fact, spring water, that choice could be judged to have been exactly right. But the Court cannot conclude as a matter of law that Nestlé could sit on its hands through nearly eight years of litigation before raising the argument that it has been denied the opportunity to pursue settlement before incurring substantial litigation costs.[44]

The Russell Letter fulfilled the core purposes of the pre-suit notice requirement, and the Court therefore concludes that the Letter met the requirements of the UCC's pre-suit notice provision as incorporated into New Jersey and New York law. On the basis of the arguments that Nestlé now raises, the Court cannot conclude that Judge Meyer's summary judgment decision overlooked controlling authority in denying summary judgment as to Plaintiffs

---

[44] For this reason, the Court deems the argument raised in Nestlé's motion to be, in the alternative, forfeited. Nestlé was not, as a matter of law, required to raise this argument as part of a motion to dismiss, but seven full years from the case's initial filing is far too long to wait to raise this issue. The provision in question is aimed at preserving judicial resources; here, however, Nestlé uses it to spring a late-in-the-game trap on Plaintiffs after they have expended substantial resources in pursuit of this litigation.

Harrigan and Shapiro's breach-of-contract claims, and Nestlé's motion for reconsideration is therefore denied.

## IV. CONCLUSION

For the reasons set forth above, the Court DENIES the parties' cross-motions for reconsideration (ECF Nos. 715, 717).

**SO ORDERED.**

Hartford, Connecticut
June 9, 2025

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge